# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT
### CASE NO. 24-1439

PORTER SMITH,

     Plaintiff/Appellant,


v.


MICHIGAN DEPARTMENT OF CORRECTIONS;
STATE OF MICHIGAN,
     Defendant/Appellee.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, CASE NO. 2:20-cv-10421

---

| | |
|---|---|
| James B. Rasor (P43476) | Kendell S. Asbenson |
| Amanda G. Washburn (P86984) | (P81747) |
| **Rasor Law Firm PLLC** | Office of the Attorney |
| Attorneys for Plaintiff | General of Michigan |
| 201 E 4th Street | Attorneys for Defendant |
| Royal Oak, MI 48067 | P.O. Box 30217 |
| (248) 543-9000/(248) 543-9050 | Lansing, MI 48909 |
| (fax) | Asbensonk1@michigan.gov |
| jbr@rasorlawfirm.com | |

---

## APPELLANT'S PRINCIPAL BRIEF ON APPEAL

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to 6th Cir. R. 25, Plaintiff-Appellant Porter Smith, makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? **No**

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? **No**

# <u>TABLE OF CONTENTS</u>

Index of Authorities…………………………………………………………...v

Statement of Support in Oral Argument……………………………………………xi

I.  Statement of Jurisdiction……………………………….……………………..1

II.  Statement of Issues……………………………………………………………...1

III.  Statement of the Case……………………………………………………….2

   A. Factual Background………………………………………………………..3
   B. Procedural History………………………………………….……....9

IV.  Summary of the Argument…………………………………………………10

V.  Argument…………………………………………………….………..10

   1.  The District Court Reversibly Erred as a Matter of Law by Instructing the Jury that they Must Find Sole Causation………………………………………..10

   2.  The District Court Erred in Excluding Plaintiff's Damages Chart …………………………………………………………………17

   3.  The District Court Reversibly Erred in Excluding Certain Me Too Evidence Because it Was Relevant to the Jury's Decisions as to Retaliation and the Rejection of Reinstatement……………………………………………20

   4.  The District Court Erred in Inserting the word "unconditional" as to offer of reemployment into the jury instructions and verdict form…………………33

   5.  The District Court Reversibly Erred in granting Defendants' Motion for Summary Judgment as to Plaintiff's Failure to Accommodate Claim………35

VI.  Conclusion…………………..………………..…………………….53

Certificate of Compliance with Rule 32(a)……………………………………...53
Addendum of Relevant District Court Documents………………………………..54

Unpublished Decisions Cited in Brief…………………………………….………….55
Proof of Service……………………………………….…………………….….…………56

# INDEX OF AUTHORITIES

## Cases

*Ability Center of Greater Toledo v. City of Sandusky*,
   385 F.3d 901, 908 (6th Cir. 2004)……………………………………….35

*A.C. v. Shelby Cnty. Bd. of Educ.*,
   711 F.3d 687, 696-97 (6th Cir. 2013)…………………………………….13

*Aero-Motive Co. v. Becker*,
   No. 1:99-CV-384, 2001 WL 1699194 (W.D. Mich. Dec. 6, 2001)………….32

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 257, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)…...........35

*Babcock v. Michigan*,
   812 F.3d 531, 540 (6th Cir. 2016)……………………………………….35

*Biddle v. Ruben*,
   1995 WL 382961 (N.D. Ill. June 23, 1995)………………………………16

*Booth Family Trust v. Jeffries*,
   640 F.3d 134 (6th Cir. 2011)……………………………………………..34

*Bratten v. SSI Services, Inc.*,
   185 F.3d 625, 633 (6th Cir. 1999)…………………………………….38, 49

*Bryant v. Farmers Ins. Exch.*,
   432 F.3d 1114, 1124 (10th Cir. 2005)……………………………………19

*Carroll v. Holder*,
   2011 WL 7091804 (D. Or. 2011);……………………..……………………16

*Dews v. A.B. Dick Co.*,
   231 F.3d 1016 (6th Cir. 2000)……………………………...………………37

*Doe v. Claiborne County*,
   103 F.2d 495, 515 (6th Cir. 1996)……………………………….………30

*Field v. Trigg County Hosp., Inc.*,

386 F.3d 729, 736 (6th Cir. 2004)……………………………………………20

*Fisher v Nissan North American, Inc*,
     951 F.3d 409 (6th Cir 2020)…………………..……..36, 38, 42, 43, 47, 49, 52

*Gantt v. Wilson Sporting Goods Co.*,
     143 F.3d 1042, 1046 (6th Cir. 1998)…………………………………..36, 42, 52

*Gardner v. QMS., Inc.*,
     448 F.2d 238, 244 (4th Cir. 1971)…………………………………………29

*Gastineau v. Fleet Mortgage Corp.*,
     137 F.3d 490, 494-95 (7th Cir. 1998))……………………………………27

*Geiger v. Pfizer, Inc.*,
     No. 2:06-CV-636,
     2009 WL 1026479 (S.D. Ohio Apr. 15, 2009)…………………………25, 32

*Gray v. City of Detroit*,
     2020 WL 772850 (E.D. Mich. 2020)……………………………………39

*Gribcheck v. Runyon*,
     245 F.3d 547, 550 (6th Cir. 2001)………………………………………..14

*Griffin v. Finkbeiner*,
     689 F.3d 584 (6th Cir. 2012)……………………………………………24

*Gulf States Utilities Co. v. Ecodyne Corp.*,
     635 F.2d 517, 519 (5th Cir. 1981)………………………………………29

*Hedrick v Western Reserve Care System*,
     355 F.3d 444, 457 (6th Cir 2004)…………………………..………...43, 45

*Hester v. Michigan Department of Corrections*,
     Wayne County Circuit Court Case No. 14-002308-CD………………...27, 28

*Hoskins v. Oakland Cty Sherriff's Dep't*,
     227 F.3d 719, 727 (6th Cir. 2000)…………………………………..………50

*Hurt v. Commerce Energy, Inc.*,

973 F.3d 509, 523 (6th Cir. 2020)………………………………………10

*In re Directech Sw., Inc.*,
    No. 08-1984, 2009 WL 10663104 (E.D. La. Nov. 19, 2009)………………19

*Jones v. Potter*,
    488 F.3d 397 (6th Cir. 2007)……………………………………..…………16

*Katz v. Geithner*,
    2013 WL 815999 (D. Haw. 2013);……………………………………16

*Kleiber v Honda of America Mfg, Inc*,
    485 F.3d 862 (6th Cir 2007)…………………………..………..……36, 38, 49

*Lange v. Michigan Department of Corrections*,
    2021 WL 9426738 (E.D.Mich.),…………………………………………...29

*Lewis v. Humboldt Acquisition Corp.*,
    681 F.3d 312……….…………………………………………………………17

*Maddox v. Univ. of Tenn.*,
    62 F.3d 843, 846 (6th Cir. 1995)……………………………………………16

*Maish v. Napolitano*,
    2013 WL 5770345, at *4 (W.D. Wash. Oct. 24, 2013)……………………..16

*Matthews v. McDonald*,
    2016 WL 29622, at *11 (S.D. Cal. Jan. 4, 2016);…………………..………16

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)…………………13, 35

*McLeod v. Parsons Corp.*,
    73 F.App'x 846, 853 (6th Cir. 2003)………………………………………27

*M.L. v. Williamson Cnty. Bd. of Educ.*,
    772 F. App'x 287, 291 (6th Cir. 2019)………………………………………13

*Pinkerton v. Spellings*,
    529 F.3d 513 (5th Cir. 2008)………………………………..….14, 15, 17

*Reid v. Nat'l Linen Service*,
   No. 97-95545, 1999 WL 407463 at *7 (6th Cir. June 2, 1999)……………...31

*Rorrer v. City of Stow*,
   743 F. 3d. 1025, 1046 (6th Cir. 2014)…………………………………………14

*Schobert v. CSX Transportation Inc*.,
   504 F. Supp. 3d 753, 785 (S.D. Ohio 2020)………………………………..14

*School Bd of Nassau County, Fla v Arline*,
   480 US 273, 287 (1987)……………………………………………………………47

*Schrand v. Federal Pac. Elec. Co*.,
   851 F.2d 152 (6th Cir. 1988)……………………………………………20, 26

*Sprint/United Management Co. v. Mendelsohn*,
   128 S.Ct. 1140, 1143, 1147 (2008)………………………..……………23, 24

*Stewart v. U.S*.,
   2000 WL 1705657 at *4, fn.10 (N.D. Cal. 2000) …………………..……16

*Texas Dept. of Community Affairs v. Burdin*e,
   450 U.S. 248, 254 (1981)…………………………………………..……….37

*Thomas v. Department of Veterans Affairs*,
   2006 WL 1636738, at *13 fn.6 (S.D.N.Y. 2006);……………..……………16

*Tuttle v. Tyco Ele's. Installations Servs., Inc.*,
   *No*. 2:06-cv-581, 2008 WL 343178, at *5-6 (S.D. Ohio Feb. 7, 2008)……..26

*United States v. Blankenship*,
   775 F.2d 735,739 (6th Cir. 1985)……………………………..……….26

*United States v. Bray*,
   139 F.3d 1104, 1109 (6th Cir. 1998)…………………………………..18

*United States v. Jamieson*,
   427 F.3d 394, 408-09 (6th Cir. 2005)……………………………..……..18

*United States v. Jennings*,
    724 F.2d 436, 443 (5th Cir. 1984)…………………………………………..19

*United States v. Joy*,
    192 F.3d 761, 767 (7th Cir. 1999)…………………………………………..32

*United States v. Modena*,
    302 F.3d 626, 633 (6th Cir. 2002)………………………………….…...18

*United States v. Vincent*,
    681 F.2d 462 (6th Cir. 1982),…………………………………………….26

*Ward v. Vilsak*,
    2011 WL 6026124 (E.D. Cal. 2011);………………………………….…16

*Wexler v White's Fine Furniture, Inc*,
    317F.3d 564, 575 (6th Cir 2003)……………………………...…..37

*Willard v. Potter*,
    264 Fed. Appx. 485, 487-88 (6th Cir. 2008)………………………39, 41, 50

*Womanchild v. Nicholson*,
    2008 WL 714091 (W.D. Wash. 2008)………………………….………………..16

## Statutes, Court Rules, and Other

29 U.S.C. § 794(a)-(b)………………………………...……………………...…1

29 U.S.C. § 794……………………………………….…………………..1, 9, 15, 16

42 U.S.C. 12111 et seq………………………………………………..……...12

42 U.S.C. 12201-12204……………………………………………………12

29 U.S.C. § 794(a)……………………………………………………1, 16

Fed. R. App. P. 3(a)(1)……………………………………………………1

Fed. R. App. P. 4(a)(1)(A)……………………………………………..1

Fed. R. App. P. 32(a)(7)(B)(i)…………………………………………………..53

Fed. R. App. P. 32(f)…………..…………………………………………………..53

Fed. R. App. 32(a)(5)...………..…………………………………………………..53

Fed. R. App. 32(a)(6)...………..…………………………………………………..53

Fed. R. Evid. 1006……………………………………………….……18, 19

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

This case merits oral argument because the district court's ruling impinges upon the civil rights of Plaintiff, a longtime employee of the Michigan Department of Corrections. At Trial, the District Court handed down rulings that were contrary to this Court's former pronouncements regarding the Rehabilitation Act. Thus, argument in this regard is an issue that will affect litigants everywhere in this circuit. This case merits oral argument because the public must understand that the civil rights of everyone must be protected by the courts. Further, Defendants Michigan Department of Corrections and the State of Michigan are public entities and the public should be afforded an opportunity to hear about this matter as a result. Moreover, as a public entity, the Defendant should be subject to just as much, if not more scrutiny, regarding civil rights violations. Plaintiff's counsel would like the opportunity to discuss all aspects of the case and clarify any questions. Given the extensive record and fact-intensive issues on appeal, oral argument will be particularly illuminating. Thus, Plaintiff believes oral argument is especially important in this case.

## I.    Statement of Jurisdiction

The jurisdiction of the United States District Court was invoked when Plaintiff-Appellant ("Plaintiff") filed his complaint requesting relief pursuant to 29 U.S.C. § 794(a)-(b) in the Eastern District of Michigan on February 19, 2020, thereby conferring jurisdiction according to 28 U.S.C. §§ 1331 and 1343(a). Summary Judgment was granted in part for Defendant on March 31, 2022. The action proceeded to a Jury Trial on April 2, 2024.  A judgment of no cause of action was entered on April 12, 2024, following a jury verdict in favor of the Defendants. Plaintiff then timely filed a Notice of Appeal within thirty days of the District Court's final order pursuant to Fed. R. App. P. 3(a)(1) and 4(a)(1)(A).

## II.    Statement of Issues

Plaintiff Porter Smith brings this appeal against Defendants Michigan Department of Corrections and the State of Michigan following a jury trial in the United States District Court for the Eastern District of Michigan before the Honorable Linda V. Parker. The District Court partially granted Defendants' motion for summary judgment as to his failure to accommodate claim.

Following that, the District Court partially granted Defendants' motion for summary judgment as to damages. The case proceeded to trial on Plaintiff's Rehabilitation Act retaliation claim.

The issues raised in this appeal are as follows:

(1) Whether the District Court erred when it ruled at trial that the causation element was "sole causation;"

(2) whether the District Court erred when it excluded the damages chart prepared by Plaintiff for trial as summary evidence;

(3) whether the District Court erred with it excluded "me-too" evidence. Plaintiff attempted to admit evidence of similar patterns of retaliation by Defendants, which was excluded.

(4) This action involved an evaluation of "reasonableness" of Plaintiff's rejections of offers of reemployment by the Defendant. The District Court further when it included the word "unconditional" in the verdict form and jury instructions.

(5) Whether the District Court erred in granting Defendants' motion for summary judgment as to his failure to accommodate claim.

### III.   Statement of the Case

Plaintiff seeks review of the District Court's decision granting Defendant's Motion Summary Judgment as to his failure to accommodate claim. Plaintiff additionally seeks review of several of the Trial-related evidentiary and other legal rulings made by the District Court, which had a palpable effect on the outcome.

Plaintiff's Complaint was asserted against the State of Michigan and Michigan Department of Corrections. Plaintiff was a long-time corrections officer at the Macomb Correctional Facility. This action arises under the Rehabilitation Act,

and this appeal presents an opportunity to clarify the causation standard to be applied to Rehabilitation Act retaliation actions.

## A.    Factual Background

Plaintiff began working for the Michigan Department of Corrections ("MDOC") in 1998 as a Corrections Officer. (Trial Tr. 4-8-24, RE 93, Page ID # 2182). At all relevant times, Plaintiff was employed at MDOC's Macomb Correctional Facility ("MCF"). For the better part of two decades, Plaintiff was an exemplary employee and, until 2017, experienced little to no issues on the job. On July 1, 2017, Plaintiff worked a shift in the Housing Unit, and while attempting to break up a fight between inmates, one of the inmates had a seizure and fell on Plaintiff. (Trial Tr. 04-8-24, RE 93, Page ID # 2191-2192). The seizing inmate pinned Plaintiff when he fell, which was when Plaintiff felt his hip pop. (*Id*.). Per Plaintiff, after the altercation was over and his adrenaline levels lowered, he experienced an "excruciating pain in [his] left hip." (*Id.* at Page ID # 2192). Plaintiff was eventually transported the emergency room due to his injury. (*Id*. at Page ID # 2193). The following day, Plaintiff began a long-term-disability leave of absence and was also told by Defendant that they would dispute any worker's compensation claims. (*Id*. at Page ID # 2193).

Plaintiff was eventually diagnosed with arthrosis in his left hip. Over the course of the next five months, Plaintiff sought varying medical treatments such as

plasma injections and physical therapy. (*Id*., at Page ID # 2194). Ultimately, conservative treatment was ineffective to fully remedy his ailments. Despite this, he could no longer extend his medical leave, so he returned to work in December 2017, wherein he was permitted to work in the Arsenal with "accommodated restrictions" in what MDOC refers to as Transitional Employment. (Trial Tr. 4.8.24, RE 93, Page ID # 2194, Emails Regarding Accommodation, RE 25-3, Page ID # # 159-165). While Plaintiff's first transitional employment position (an accommodation) encompassed working in the Arsenal, in January of 2018, he was assigned to MDOC's Training Department working with ITO Felder pursuant to his restrictions. (Trial Tr. 4-8-24, RE 93, Page ID # 2195).

Throughout the next six months, Plaintiff worked in transitional employment positions pursuant to the approved accommodations suggested by his doctor. However, in July of 2018, MDOC notified Plaintiff that it could no longer accommodate him. (Trial Tr. 4-4-24, RE 104, Page ID # 2217). Per Elaine Davis, MDOC could no longer accommodate Plaintiff because he had used more than six months of light-duty entitlement, an alleged MDOC rule. (Davis Dep. Trans., RE 25-5, Page ID # 180, p. 21:6-10). Plaintiff's accommodation, however, had been extended once beyond the alleged six-month period from June to July. (Emails Regarding Accommodation, RE 25-3, Page ID # # 159-165). According to Joanne Bridgford, MDOC's then-ADA Coordinator in Lansing, there is no set amount of

time that an employee can be on transitional employment. While MDOC will sometimes use a six-month period, since "each accommodation is looked at on a case-by-case basis," there are various factors that should be considered in extending the transitional employment assignment beyond six months. (Trial Tr. 4-3-24, RE 102, Page ID # 3365).

When MDOC informed Plaintiff he would not be accommodated beyond July, Plaintiff submitted a formal request for an accommodation on July 10, 2018. (Trial Ex. 19, admitted 4.4.24, 7-10-18 Accommodation Request, RE 25-6, Page ID # 188-189). Concurrent with his formal request for an accommodation, Plaintiff spoke with and emailed Warden Warren articulating that he felt he could be accommodated by being granted another extension for his transitional employment assignment. (Trial Tr. 4-8-24, RE 93, Page ID # # 2211, 2213, Ex. 17, 7-8-18 Email, admitted 4.4.24, RE 25-7, Page ID # 191).

On August 1, 2018, Plaintiff emailed Elaine Davis and Joanne Bridgford asking about his pending request for an accommodation, given he had been off work. (Ex. 22, 8-1-18 Email, admitted 4.4.24, RE 25-8, Page ID # 193). Specifically, Plaintiff stated, "Macomb Correctional is currently down 27 officers and there are positions such as the Front Desk, Bubble, or other areas where I could be utilized." (*Id*.). MDOC denied Plaintiff's accommodation request on August 1, 2018, claiming, "[t]he facility is unable to accommodate additional light duty restrictions

as you have exhausted your entitlements. Currently, the facility does not have any vacancies that meet your qualifications. Therefore, your request under the ADA has been denied." (Trial Ex. 23, 8-1-18 ADA Denial, RE 25-9, Page ID # 195). At the time of the summary judgment litigation, it was unclear whether the denial decision was ever run by Warden Warren before it was given to Plaintiff. However, at Trial, there was testimony confirming that the Warden was directly involved. Warden Patrick Warren testified that he had sought the extension, but then was instructed that he was no longer eligible. (Trial Tr., RE 94, Page ID # 2478). Plaintiff testified that he was told by Human Resources that he only needed ten more days of work to qualify for FMLA and expressed that to Warden Warren. Plaintiff further testified that he believes Warden Warren refused this extension as retaliation for asking for an accommodation. (Trial Tr. 4.8.24, Page ID # 2210, Trial Tr. 4.9.24, Page ID # 2379). However, at Trial, MDOC produced witness Jonathan Patterson, who testified that Plaintiff was 211 hours short, or about 5 weeks of work. (Trial Tr. 4.9.24, RE 94, Page ID # # 2524-2525).

In response to MDOC's denial, Plaintiff sent a letter to MDOC on August 3, 2018. (8-3-18 Letter, RE 25-13, Page ID # 221). Not only did Plaintiff challenge MDOC's denial, but he noted that "the facility is 27 officers short" and how his "working would alleviate some of the burden Macomb Correctional Facility is experiencing being short staffed." (*Id*.). In Plaintiff's email to Warden Warren on

July 8, 2018 requesting a continued transitional employment status, he noted another MDOC corrections officer at MCF—Sean MacLean—who had been granted numerous extensions over the years based on his disability. (Ex. 22, 8-1-18 Email, admitted 4.4.24, RE 25-8, Page ID # 193). Plaintiff raised this disparity again in his letter on August 3, 2018. (8-3-18 Letter, RE 25-13, Page ID # 221).

Indeed, Plaintiff approached Warden Warren in person, and asked him about an extension of accommodations, and in response, Plaintiff was informed that he was being investigated for sexual harassment. (Trial Tr. 4.8.24, RE 93, Page ID # # 2216-2217). The timing of the investigation and notification was particularly suspicious, because the complainant had only worked with Plaintiff until May 2018, she submitted her complaint in June, but Plaintiff was not informed until August of 2018 when he followed up about his accommodations. (Trial Tr. 4.4.24, RE 104, Page ID # 3719)

In addition to the denial letter he received on August 1st, Plaintiff also received an "Options Designation Form," which notified him that if he could not return to normal work by August 10, his choices were to retire, resign, be placed on a medical layoff, or take a waived rights leave of absence. As a result of Defendant's failure to accommodate and feeling as if he had no other option at this point, Plaintiff was forced to take a waived rights leave of absence, effectively terminating his employment, or risk permanently losing his job. (Trial Ex. 35, 8-9-18 Waived Rights

7

Letter, admitted 4.8.24, RE 25-14, Page ID # 223). (Trial Tr. 4-8-24, RE 93, Page ID # 2222).

Following being placed on waived rights of leave and essentially being terminated, the Warden of MDOC opened a frivolous and malicious investigation into Plaintiff's previous computer usage. Plaintiff was mailed a questionnaire on October 6 regarding this investigation. (Trial Tr. 4-9-24, RE 94, Page ID # 2565). Plaintiff had not once been notified about the open investigation into his computer usage prior to this. Plaintiff's response was due October 9, but because Defendant waited in bad faith to send the questionnaire, Plaintiff did not receive the form until October 10, a day after the marked due date. Plaintiff contends that he still filled out the form and mailed it back the next day, but Defendant alleges they never received Plaintiff's responses. (Trial Tr. 4-11-24, RE 95, Page ID # 2686) (Trial Tr. 4-9-24, RE 94, Page ID # 2365).

Ultimately, there was no evidence found to support the baseless claim which prompted the investigation. (Trial Tr. 4.4.24, RE 104, Page ID # 3697). Regardless, Defendant imposed an infraction of breaking work rule #38, "Reporting Requirements," because they claimed they not receive his answers to the questionnaire. (Trial Tr. 4.9.24, RE 94, Page ID # # 2503-2504).

After Plaintiff finally received surgery and was fully recovered, he attempted to return to work in August 2019 but was ultimately denied by Defendant in

September of 2019. (Trial Tr. 4-8-24, RE 93, Page ID # 2267, 2269). It was only after he attempted to return from leave that he found out about the investigation and that the alleged violation of work rule #38 disqualified him from returning to work. (*Id*. at Page ID # 2269) It is clear from the documentation that this violation was the only reason he could not return to work. Ironically, it was apparently no longer disqualifying when, two years into litigation, MDOC offered him his job back. (RE 51-2, Page ID # 1121)

### B.    Procedural History

Plaintiff's complaint in this matter was filed on February 19, 2020. (Complaint, RE 1, Page ID # 1-14). This complaint pled the following claims: Discrimination and Failure to Accommodate (Violation of 29 U.S.C. § 794, Section 504 of the Rehabilitation Act); and Retaliation (Violation of 29 U.S.C. § 794, Section 504 of the Rehabilitation Act).

After discovery, the parties filed cross motions for summary judgment on May 21, 2021. (Def's MSJ, Pltf's MSJ, RE 25).

The trial court issued an opinion and order granting Defendant's motion for summary judgment in part as to  Plaintiff's failure to accommodate claim and denying Plaintiff's motion for summary judgment on March 31, 2022. (RE 35, O&O on MSJ).

The action proceeded to a Jury Trial on April 2, 2024, on Plaintiff's Rehabilitation Act Retaliation claim. Trial concluded on April 12, 2024, when the Jury returned a verdict of no cause of action. (RE 89, Verdict Form).

On May 13, 2024, Plaintiff filed a timely notice of appeal. (RE 98, Notice of Appeal).

### IV.    Summary of the Argument

The District Court erred in granting summary judgment as to Plaintiff's failure to accommodate claim because it misapplied the "otherwise qualified" prong and erroneously accepted Defendants' hardship arguments.

At Trial, the District Court erroneously held that the causation element for Rehabilitation Act retaliation was "sole cause," which disregarded Sixth Circuit precedent to the contrary. Moreover, the District Court abused its discretion when it excluded evidence that was highly probative of Plaintiff's rejection of the Defendant's offers of reinstatement, which should be corrected on remand.

### V.    Argument

### 1. The District Court Reversibly Erred as a Matter of Law by Instructing the Jury that they Must Find Sole Causation

***Standard of Review***

This Court reviews "jury instructions as a whole in order to determine whether they adequately inform the jury of relevant considerations and provide a basis in law for aiding the jury to reach its decision." *Hurt v. Commerce Energy, Inc.*, 973 F.3d

10

509, 523 (6th Cir. 2020). "Reversal of a jury verdict based on incorrect jury instructions is warranted only when the instructions, viewed as a whole, are confusing, misleading, and prejudicial." *Id*. (cleaned up).  The "legal accuracy" of a challenged jury instruction receives de novo review; otherwise, "[e]rroneous jury instructions are generally reviewed for abuse of discretion." *Id*. The challenged jury instructions meet that standard.

### *Analysis*

During Trial, the parties disputed the causation standard the jury should have been instructed on. Defendant contends that the Rehabilitation Act requires sole causation, whereas Plaintiff argues that precedent only requires "a causal connection." The parties submitted briefs on the issue during Trial. (RE 74, 75).

The Trial Court agreed with the Defendant's proposed instruction as to causation, and instructed the Jury as follows: "The fifth element, that there was a causal connection between the protective – protected activity and the materially adverse action, which means that the Defendant took an employment action adverse to Mr. Smith solely by reason of his protected activity." (Trial Tr. 04.11.2024, RE 95, Page ID # 2811, at 230:1-5).

However, Defendant's assertion that "sole" causation is the standard flies in the face of numerous recent opinions from this Court. While the Rehabilitation Act, Section 504(a) states that no person, "solely" by reason of his or her disability, be

excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program…, this section does not prohibit retaliation. Retaliation is barred because of the following Code of Federal Regulations section:

29 CFR § 33.13 - Intimidation and retaliation prohibited.

§ 33.13 Intimidation and retaliation prohibited.

No person may discharge, intimidate, retaliate, threaten, coerce or otherwise discriminate against any person **because** such person has filed a complaint, furnished information, assisted or participated in any manner in an investigation, review, hearing or any other activity related to the administration of, or exercise of authority under, or privilege secured by section 504 and the regulations in this part.  (Emphasis Added).

Regardless, Section (d) specifically requires that the Americans with Disabilities Act standards be applied, which also contains a proximate cause standard, but not a sole proximate cause standard:

d) Standards used in determining violation of section

The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204 and 12210), as such sections related to employment.

Defendant erroneously claimed that the Rehabilitation Act requires Plaintiff to "show that the adverse action was 'solely by reason of his disability.'" (RE 75,

Def's Brief). Yet the cases MDOC relied on apply to a plaintiff's duty in discrimination claims. Instead, the prima facie elements for retaliation under the ADA and Rehab Act are identical. See *A.C. ex rel. J.C. v. Shelby County Bd. Of Educ.,* 711 F.3d 687, 697 (6th Cir. 2013) ("The Acts have a similar scope and aim; for purposes of retaliation analysis, cases construing either Act are generally applicable to both"). Indeed, the *A.C. ex rel.* Court compared 28 C.F.R. § 35.134 (ADA) and 29 C.F.R. § 33.13 (Section 504), showing that the almost identical language in each regulation expressly dictates the *prima facie* elements of a Rehab Act retaliation claim mirrors that of ADA claims. Despite Defendant's best effort to confuse this issue, the traditional *McDonnell Douglas* elements apply, including "causation."

In addition to the *A.C. ex rel*. court, several other Sixth Circuit opinions have analyzed Rehabilitation Act Retaliation claims under the same framework of the ADA. In *M.L. v. Williamson Cnty. Bd. of Educ*., 772 F. App'x 287, 291 (6th Cir. 2019), the Sixth Circuit found that only "a causal" connection was necessary, and similarly stated:

> We may address the parents' retaliation claims under § 504 of the Rehabilitation Act and Title II of the ADA together. "The Acts have a similar scope and aim; for purposes of retaliation analysis, cases construing either Act are generally applicable to both." *Id*. at 696–97. Because the parents present no direct evidence of retaliation, we analyze the claims under the *McDonnell Douglas* burden-shifting

framework. *Id.* at 697; see *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Likewise, in *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001), this Court found that the Rehab Act retaliation standard for causation was, "the protected activity and the adverse employment action are **causally connected**." (Emphasis Added).

The Southern District of Ohio used the causation standard articulated in *A.C. ex rel.* above, analyzing whether "there was **a** causal connection between the protected activity and the adverse employment action." *Schobert v. CSX Transportation Inc.*, 504 F. Supp. 3d 753, 785 (S.D. Ohio 2020). (Emphasis Added).

To be clear about the ADA standard referenced by these cases, the Sixth Circuit has articulated the following: "(1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) **there was a causal connection between the protected activity and the adverse action**." *Rorrer v. City of Stow*, 743 F. 3d. 1025, 1046 (6th Cir. 2014). Indeed, Section 504(d) **REQUIRES** application of ADA standards, as quoted above.

In *Pinkerton v. Spellings*, 529 F.3d 513 (5th Cir. 2008), the Fifth Circuit addressed whether the sole-cause standard found in Section 504 of the Rehabilitation Act should apply to a claim brought under Section 501 of the Rehabilitation Act. It held that the sole cause standard only applied to claims brought under Section 504,

but not to claims brought under Section 501. In so holding, the Fifth Circuit first reasoned that "Congress's inclusion of § 501(g),1 which explicitly incorporates the use of ADA standards 'to determine whether this section has been violated' (29 U.S.C. § 791(g)), means that, under a plain reading of the statute, the ADA causation standard incorporated by § 501(g) governs claims brought under § 501." *Pinkerton*, 529 F.3d at 516-17. Simple statutory construction leads to this logical conclusion. The word "solely" does not appear in Section 501. Because Section 501(g) adopts the ADA causation standard, it would be absurd to ignore such plain instruction and import the sole-cause standard from Section 504.  Second, the Fifth Circuit noted that because the Rehabilitation Act was amended to make it more consistent with the ADA's protections, it logically dictates that the identical causation standard that applies to ADA claimants should apply to federal employees. *Id*. at 517. Finally, the Fifth Circuit noted that "[a]pplying different causation standards to claims brought under § 501 and § 504 is consistent with how Congress distinguishes between § 501 and § 504 in the statutory scheme," particularly with different remedies and procedures available under the two sections. *Id*. Section 501 cites to the remedies provision of Title VII of the Civil Rights Act of 1964, while Section 504 cites to the remedies provision of Title VI of the Civil Rights Act. See 29 U.S.C. § 794a(1)-(2).

No other circuit court has squarely addressed this issue. Many district courts have reached the same conclusion of *Pinkerton* - that the sole causation standard

does not apply to Section 501 claims. See, e.g., *Matthews v. McDonald*, 2016 WL 29622, at *11 (S.D. Cal. Jan. 4, 2016); *Maish v. Napolitano*, 2013 WL 5770345, at *4 (W.D. Wash. Oct. 24, 2013); *Katz v. Geithner*, 2013 WL 815999 (D. Haw. 2013); *Ward v. Vilsak*, 2011 WL 6026124 (E.D. Cal. 2011); *Carroll v. Holder*, 2011 WL 7091804 (D. Or. 2011); *Womanchild v. Nicholson*, 2008 WL 714091 (W.D. Wash. 2008); *Thomas v. Department of Veterans Affairs*, 2006 WL 1636738, at *13 fn.6 (S.D.N.Y. 2006); *Stewart v. U.S.*, 2000 WL 1705657 at *4, fn.10 (N.D. Cal. 2000); *Biddle v. Ruben*, 1995 WL 382961 (N.D. Ill. June 23, 1995).

This Court has never specifically addressed the issue. At times, this Court has stated - without explanation - that the sole-cause standard applies to federal employee claims brought under the Rehabilitation Act. See, e.g., *Mitchell v. U.S. Postal Serv.*, 738 F. App'x 838, 843 (6th Cir. 2018); *Jones v. Potter*, 488 F.3d 397, 409-10 (6th Cir. 2007). This apparent contrary precedent is often the result of the plaintiff's failure to specify under which section of the Rehabilitation Act the plaintiff is proceeding, and the court's failure to consider the different statutory language in the two sections. For example, in *Jones v. Potter*, when this Court noted that the sole-cause standard applied, it cited to a Section 504 [§ 794] claim. *Jones v. Potter*, 488 F.3d 397, 409-10 (6th Cir. 2007) ("But that is not enough under the Rehabilitation Act, which, unlike Title VII, requires Jones to prove that he was fired "solely by reason of ... his disability." See *Maddox v. Univ. of Tenn.*, 62 F.3d 843,

846 (6th Cir. 1995) (quoting 29 U.S.C. § 794(a)) (emphasis added)). Thus, Sixth Circuit cases such as *Jones* or other cases brought under Section 504 are neither dispositive nor particularly informative on this issue.

Simple statutory construction, in addition to caselaw like *Pinkerton* that have addressed this issue, dictate that the appropriate causation standard for a Section 501 claim is "but-for" causation - the same standard that applies to ADA claims in the Sixth Circuit. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012). The sole-cause standard applicable to Section 504 claims should not have been imported to Plaintiff's Section 501 claim in this case.

The District Court's adoption of the Defendant's erroneous interpretation of law was erroneous and highly prejudicial. It had a palpable and prejudicial effect on the Jury's verdict of no cause of action as to liability for retaliation, as they had to find a much higher standard of causation than was legally required. As such, the District Court's ruling did not result in harmless error, but rather, it resulted in reversible error due to the high likelihood that it had a substantial effect on the outcome.

## 2. The District Court Erred in Excluding Plaintiff's Damages Chart
### *Standard of Review*

"The admission of summaries into evidence 'is a matter within the discretion of the district court, whose decisions in such matters will be upheld absent an abuse

of discretion.'" *United States v. Jamieson*, 427 F.3d 394, 408-09 (6th Cir. 2005) (quoting *United States v. Bray*, 139 F.3d 1104, 1109 (6th Cir. 1998)).

### *Analysis*

During the Jury Trial, Plaintiff moved under Fed. R. Evid. 1006 to admit an exhibit that was a chart of Plaintiff's expected earnings, with offsets for his mitigation, as a summary of his voluminous tax records. (Trial Tr. 4.11.24, RE 95, Page ID # # 2603, 2648). The District Court allowed the chart to be published to the Jury, but not admitted into evidence. (*Id.* at Page ID # # 2711-2714). Rule 1006 provides that a party may use a summary "to prove the content of voluminous [] recordings [] that cannot be conveniently examined in court." That party "must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Fed. R. Evid. 1006. This Court has interpreted this rule to impose five requirements:

> (1) the underlying documents must be so voluminous that they cannot be conveniently examined in court, (2) the proponent of the summary must have made the documents available for examination or copying at a reasonable time and place, (3) the underlying documents must be admissible in evidence, (4) the summary must be accurate and nonprejudicial, and (5) the summary must be properly introduced through the testimony of a witness who supervised its preparation.

*United States v. Modena*, 302 F.3d 626, 633 (6th Cir. 2002).

Rule 1006, by its plain text, allows the admission of calculations based on voluminous evidence so long as the underlying records are available. See Fed. R.

Evid. 1006. Defendant does not dispute that it had access to the tax records, but baselessly argued that it was not a summary, but that the chart was "based on calculations that plaintiff couldn't really even identify." (*Id*. at Page ID # 2711). The Plaintiff offered his own testimony as to the accuracy of the numbers and math in the chart based on his own knowledge and his income records. (*Id*. Page ID # 2649-2656). And an attorney declaration was sufficient to authenticate the calculations; the mere inclusion of arithmetic calculations does not convert a Rule 1006 summary into expert testimony. See *Bryant v. Farmers Ins. Exch*., 432 F.3d 1114, 1124 (10th Cir. 2005); *United States v. Jennings*, 724 F.2d 436, 443 (5th Cir. 1984); see also *In re Directech Sw., Inc*., No. 08-1984, 2009 WL 10663104, at *4 (E.D. La. Nov. 19, 2009) (ruling that attorney calculations based on voluminous time records were admissible under Fed. R. Evid. 1006).

Further, the District Court found that the underlying evidence was admissible. (*Id*., Page ID # 2712). As to accuracy and the properness of the evidence, however, the District Court discredited the Plaintiff's testimony regarding how the numbers were linked to the tax records and paystubs. (*Id*. at 2713). This finding was an abuse of discretion because Plaintiff supervised the preparation of the chart, which is the only requirement under *Modena* that the District Court did not find.

Therefore, if this action is remanded to proceed to a new trial, this Court should instruct the District Court to allow the admission of the wage loss chart pursuant to Fed. R. Evid. 1006.

**3. The District Court Reversibly Erred in Excluding Certain Evidence of Retaliation Against Other MDOC Employees Because it Was Relevant to the Jury's Decisions as to Retaliation and the Rejection of Reinstatement.**

### Standard of Review

An abuse of discretion standard is used to review a trial court's decisions on the admission of evidence. *Schrand v. Federal Pacific Elec. Co*., 851 F.2d 152, 156-57 (6th Cir. 1988). In the context of an evidentiary ruling, an abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made. Id. If such a mistake is made regarding the admission of evidence, a new trial will be granted if the admission amounted to more than harmless error. *Field v. Trigg County Hosp., Inc*., 386 F.3d 729, 736 (6th Cir. 2004).

### Introduction

The District Court allowed Defendants to file a second motion for summary judgment as to the availability of front pay damages and consequential damages at Trial. First, the District Court concluded that the entitlement to front pay damages will be made [by the Court] upon the evidence presented [at Trial] and before the case is submitted to the Jury. (O&O Granting Second MSJ In Part, RE 56, Page ID

# 1532). Then, at Trial, the District Court changed the ruling, stating that the issue of reasonableness (of the rejection of the offer of reemployment) would be presented to the Jury, and that a verdict form would be prepared that specifically asks the Jury to find that Plaintiff reasonably or unreasonably rejected the State's offer of reemployment. (Trial Tr., 4.3.24, RE 102, Page ID #3224). The District Court cited *Madden v. Chattanooga City Wide Service*, 549 F.3d 666 (6th Cir. 2008) for the proposition that the question of whether or not the rejection was reasonable is an "objective standard" considering whether a reasonable person would have refused the offer. (*Id*. at Page ID # 3220).

Later, the District Court revised its ruling as to the "objective standard," clarifying that the question is "whether a reasonable person, under the circumstances, would have refused the offer of reinstatement. And that's going to be the question I will include in the jury instruction. And that's going to be the question that guides me when I have responsibility on front pay to analyze the issue as to whether or not a reasonable person would have refused the offer of reinstatement." (*Id*. at Page ID # 3531).

Then, days later in Trial, the District Court went back to its earlier decision that it is a jury question to determine reasonableness. (Trial Tr. 4.11.24, RE 95, Page ID # 2586-87).

Regardless, the District Court determination that the Jury was to decide whether Plaintiff's rejection of the offers of reinstatement opened the door to evidence of other employee's experience with retaliation for exercising their rights in the workplace.   For example, Plaintiff sought to admit evidence that other corrections officers had sued MDOC after filing a lawsuit or participating in a lawsuit, returned to work, and faced retaliation after returning. (RE 66, Def's Motion in Limine, RE 71, Plaintiff's Response to Motion in Limine). The District Court excluded the evidence, stating "settled before any final determination of retaliation was made, are not relevant." (RE 73, O&O on Motions in Limine, PageID # 1867).

At Trial, the court excluded testimony from Joanne Bridgford, MDOC's former EEO Coordinator, whose *de benne esse* desposition indicated that after she prepared a report that showed significant disparity in MDOC's issuance of discipline based on race, that her staff and job duties were largely taken away from her in 2012. (Appendix p. 0028, Lines 6-9). The District Court, weighing factors such as temporal proximity, whether there was the same decision maker, and whether the alleged discrimination was on the same protected basis, determined that this testimony should be excluded. (Trial Tr., 4.3.24, Page ID # 3510). Plaintiff argued that because she was in leadership and had a decision-making role in parts of Plaintiff's requests for accommodation, that it was relevant to show that retaliation was occurring at the top of the organization. (*Id*. at Page ID # 3506).

Plaintiff asserts that because the Jury was tasked with determining whether Plaintiff unreasonably rejected MDOC's offer of reinstatement, that evidence of retaliation for protected activity was particularly relevant, as his personal knowledge of retaliation in similar circumstances played a role in his decision to reject the offer. Thus, Plaintiff should have been allowed to testify about his knowledge of retaliation and should have been allowed to present testimony from others because it is squarely relevant to that determination. Therefore, on remand, Plaintiff requests that the District Court is instructed to allow this evidence to be presented to the Jury so that they can have a better understanding of his decision to reject the offer of reinstatement.

### *Analysis*

The Supreme Court concluded in *Sprint/United Management Co. v. Mendelsohn*, 128 S.Ct. 1140, 1143, 1147 (2008), that evidence concerning retaliation against other employees is neither *per se* admissible, nor *per se* inadmissible. In that case, an employee brought a lawsuit against her former employer, alleging age discrimination. The district court, on a motion in limine, excluded testimonial evidence of former employees alleging discrimination by supervisors who had no role in the employment decision the employee challenged, on the grounds that the evidence was irrelevant and prejudicial. The Court of Appeals for the 10th Circuit reversed, finding that the district court had applied a per

se rule to excluding such evidence. The Supreme Court found that the Court of Appeals erred in concluding that the district court applied a per se rule and thus, inappropriately engaged in its own analysis of the relevant factors, rather than remanding the case. The Supreme Court emphasized that "[r]elevance and prejudice under Rules 401 and 403 are determined in the context of the facts and arguments in a particular case, and thus are generally not amenable to broad per se rules." *Mendelsohn*, 128 S.Ct. at 1147. The Court also noted that "[t]he question whether evidence of discrimination by other supervisors is relevant in an individual [discrimination] case is fact based and depends on many factors, **including how closely related the evidence is to the plaintiff's circumstances and theory of the case."** *Id*. (emphasis added).

The factors to consider regarding the "other acts" or "me too" evidence include not only whether the same actors were involved in each decision, but also factors "such as temporal and geographical proximity, whether the various decisionmakers knew of the other decisions, whether the employees were similarly situated in relevant respects, or the nature of each employee's allegations of [discrimination]." *Griffin v. Finkbeiner*, 689 F.3d 584 (6th Cir. 2012).

Under *Sprint/United Management Co. v. Mendelsohn*, 128 S.Ct. 1140, 1143, 1147 (2008), Plaintiff should have been permitted to present witness testimony or his own testimony about retaliation against similarly situated persons because of its

relevance to liability and damages herein. As such, because the testimony of other employees (past and present) was directly relevant to Plaintiff's proofs, the evidence should have been admitted.

At Trial, the District Court was frustrated by the fact that the Defendant had not brought a motion in limine in this regard: "Now, let me just say that I'm disappointed that I did not get a motion in limine on this. I think that the defendant's failure to file a motion in limine to preclude Mr. Smith's proffered "me too" witnesses hampers my ability to now assess their objections to this evidence…" (RE 102, Page ID # 3343-3344, at 132:23-25 – 133:1-3, Jury Trial 04.03.2024). The District Court thereafter allowed "me too" evidence if the witness's circumstances occurred within 5 years of the incidents at bar AND dealt with disability accommodation requests, as opposed to other forms of alleged discrimination. (*Id*.)

### i.  The "Me Too" Evidence Is Relevant

Plaintiff's proposed "me too" evidence was relevant and probative of his claims because the evidence was closely related to what happened to Plaintiff and it would have informed the Jury about his reason to decline the offer of reemployment. For example, in a case where plaintiffs continuously suffered due to racial discrimination and were subjected to a pervasive hostile work environment, evidence that defendant treated other African American employees in a similar fashion was found to be extremely relevant to the plaintiff's claims. See *Geiger v.*

*Pfizer, Inc.,* No. 2:06-CV-636, 2009 WL 1026479, at *8-9 (S.D. Ohio Apr. 15, 2009) (denying defendant's motion in limine to exclude "me too" evidence where plaintiff sought to testify about other employees employment experiences with defendant and/or call other employees to testify regarding the unfair treatment and defendant did not clearly establish that the evidence was inadmissible); see also *Tuttle v. Tyco Ele's. Installations Servs., Inc., No.* 2:06-cv-581, 2008 WL 343178, at *5-6 (S.D. Ohio Feb. 7, 2008) (finding "me too" evidence to be relevant and distinguishing *Schrand v. Federal Pac. Elec. Co*., 851 F.2d 152 (6th Cir. 1988)).

In *United States v. Vincent*, 681 F.2d 462 (6th Cir. 1982), this Court created a two-prong test for the admission of evidence under Fed. R. Evid. 404(b). The Court must determine that the evidence is relevant. In other words, it must relate to a matter which is "in issue," and must deal with conduct substantially similar and reasonably near in time to the offenses for which the defendant is being tried." *United States v. Blankenship*, 775 F.2d 735,739 (6th Cir. 1985). If the Court determines that the relevancy criteria has been met the evidence may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Blankenship, supra.* Here, whether Plaintiff has a well-grounded fear of retaliation if he returned to work at MDOC was clearly at issue. Further, particularly in reference to the *Lange* case, there was a reasonable closeness in time between the allegations.

Federal Rule of Evidence 404(b) provides that evidence of prior acts, including prior acts which resulted in lawsuits, "is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b); *McLeod v. Parsons Corp.,* 73 F.App'x 846, 853 (6th Cir. 2003). Such evidence could be admissible, however, if relevant to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id*. In the Sixth Circuit, evidence of prior acts is admissible only if it meets the following four-part test:

> (1) The evidence must be directed toward establishing something other than a party's propensity to commit the act charged; (2) the other act must be similar enough and close enough in time to be relevant to the matter at issue, (3) the evidence must be such that the jury could find that the act occurred and that the party in question committed it; and (4) the prejudicial effect of the evidence must not clearly outweigh its probative value.

*McLeod*, 73 F.App'x at 854 (citing *Gastineau v. Fleet Mortgage Corp.*, 137 F.3d 490, 494-95 (7th Cir. 1998)).

Here, the underlying facts of the lawsuits are relevant because they show that other officers alleged that they had faced retaliation under other circumstances, including their return to MDOC following participation in a lawsuit. Facts about the lawsuits do not convert otherwise relevant evidence into inadmissible evidence. The relevance of the evidence should be evaluated on the merits. The evidence of other lawsuits shows MDOC's opportunity to retaliate against those who file lawsuits and

27

subsequently return to work there. The evidence also can show a lack of mistake on MDOC's part when it retaliates in such a manner. Defendant discusses the "bad actors" in *Lange* and *Hester*, and argues that because the same "bad actors" are not present in this case, that Plaintiff Smith is not similarly situated. However, Plaintiff would argue that retaliation is a widespread practice of MDOC's that is not confined to any single "bad actor." Thus, a blanket order precluding their admission is improper.

The District Court erroneously restrained Plaintiff from referencing publicly filed documents that indicate MDOC's pattern of retaliation. Indeed, the undersigned has brought cases against this Defendant in the past where reinstatement led to harassment and new lawsuits. (e.g., *Hester v. Michigan Department of Corrections*, Wayne County Circuit Court Case No. 14-002308-CD). The Complaint in that action was provided to the District Court. (RE 71-4, Page ID # 1841 – 1849). In *Hester*, the plaintiff was a longtime employee of Michigan Department of Corrections. After experiencing ruthless racial discrimination, he filed a lawsuit in 2011, in which he prevailed at a jury trial. After asserting his rights and prevailing, Mr. Hester faced increased harassment, disparate treatment, and hostility at MDOC. His coworkers and superiors would ignore him entirely, and he was verbally berated. Such unlawful conduct led to the filing of the subsequent lawsuit for violations of

State civil rights laws. More to the point, the ultimate resolution of the subsequent lawsuit involved Mr. Hestor's voluntary resignation from MDOC.

In *Lange v. Michigan Department of Corrections*, 2021 WL 9426738 (E.D.Mich.), the plaintiff alleged that after he was deposed in another correction officer's discrimination and retaliation case, he faced increased scrutiny, "punishment position" assignments within the facility, and baseless disciplinary investigations. Indeed, retaliatory "punishment positions" are a tactic Defendant MDOC frequently uses against employees who oppose discrimination. This type of retaliation was the subject of many other cases that the undersigned and many other attorneys have successfully litigated.

In a comparable scenario, courts have allowed pleadings to be introduced to show notice of a defect in products liability cases to show notice. Evidence of prior lawsuits, introduced by means of a complaint, has been held relevant on the question of notice if the complaint contains allegations of a defect causing an accident substantially similar to those in the case before the court. *Gulf States Utilities Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981). See also, *Gardner v. QMS., Inc.*, 448 F.2d 238, 244 (4th Cir. 1971) ("letters of complaints [nonlitigation] should have been admitted where they described identical or similar experiences"). The circumstances herein are comparable in light of Fed. R. Evid. 404(b)'s exception that allows for such evidence to be admissible to show "motive, opportunity, intent,

preparation, plan, knowledge, identity, or absence of mistake or accident." The complaints against MDOC referenced herein would tend to show that MDOC has knowledge of such practices and that the pattern of retaliation is not a mistake.

Here, the Jury was charged with determining whether it was more likely than not that Plaintiff was retaliated against for engaging in protected activity. Evidence that other corrections officers were also retaliated against for their protected activity surely makes that more likely. Further, the Jury was charged with determining whether Plaintiff's rejection of MDOC's offer of reinstatement was reasonable. Plaintiff was unable to testify about his knowledge of other officers being retaliated against after participating in litigation against MDOC.

Finally, it likely would not have even been necessary to introduce the filed complaints, in this action. Plaintiff could have testified that he has personal knowledge of individuals being retaliated against upon their return to MDOC after filing complaints or participating in litigation as a witness.

## ii.    The "Me Too" Evidence Is Not Prejudicial

"Unfair prejudice is the 'undue tendency to suggest a decision based on improper considerations; it does not mean the damage to a defendant's case that results from legitimate probative force of the evidence.' *Tuttle*, 2008 WL 343178, at *6 (quoting *Doe v. Claiborne County*, 103 F.2d 495, 515 (6th Cir. 1996)). Where there is little potential for jury confusion and the evidence of discrimination has

probative value on the question of whether a company discriminated against an employee, it would be an abuse of discretion for a district court to determine that "jury confusion and wasted time would result from the introduction of evidence relating to alleged discrimination that was not central to the incidents tried to the jury." *Id* at *6.

Plaintiff's "me too" evidence should have been admitted. As explained above, prejudice does not result from "damage" to Defendant's case. Here, any danger of prejudice is outweighed by the probative value of the evidence Plaintiffs seek to introduce. It was important to the Jury's determination of whether retaliation was proven AND whether Plaintiff unreasonably rejected MDOC's offer of reinstatement. Defendant will claim that such evidence would prejudice or confuse the jury. To the extent any confusion had arisen, it could have been dealt with at trial with parameters to ensure there was not a "mini trial" to litigate the merits of the other cases. Even if the "me too" evidence was infinitesimally prejudicial, Defendant would have the opportunity to cross-examine the witnesses giving the evidence and dispel any potential prejudice. See *Reid v. Nat'l Linen Service*, 182 F.3d 918 at *7 (6th Cir. June 2, 1999).

### iii. The "Me Too" Evidence Is Based On Personal Knowledge and Is Not Opinion

The request to exclude testimony not based on personal knowledge or which constitutes rumor, speculation or hearsay is too general to warrant such an order by the Court. Such issues would be better dealt with at trial on a case-by-case basis. *Geiger*, 2009 WL 1026479, at *7.

Plaintiff and other witnesses should have been permitted to testify based on their personal knowledge of the events. Any arguable "opinions" that Plaintiff or other witnesses may have offered would have been "rationally based on the perception of the witness" and helpful to the "determination of fact at issue," as Rule 701 requires. See, e.g., *Aero-Motive Co. v. Becker*, No. 1:99-CV-384, 2001 WL 1699194 (W.D. Mich. Dec. 6, 2001) (finding that a witness had sufficient personal knowledge to testify where "the inference and opinions he expressed [were] rationally based on his perception, helpful to the determination of the issue, and not based on any scientific or technical knowledge"); see also *United States v. Joy*, 192 F.3d 761, 767 (7th Cir. 1999) (observing that "[b]ecause most knowledge is inferential, personal knowledge includes opinions and inferences grounded in observations or other first-hand experiences").

In sum, the so-called "me-too" evidence was highly probative as to two central issues in the case: liability (as to retaliation) and damages (as to the rejection of the offer of reinstatement). The District Court's exclusion of the majority of this evidence deprived the Jury of important information, and led to a change in the

outcome of the case. As such, the District Court's abuse of discretion should be reversed.

**4. The District Court Erred in Inserting the word "unconditional" as to offer of reemployment into the jury instructions and verdict form.**

The verdict form herein stated, "Did Defendants prove, by a preponderance of the evidence, that Plaintiff unreasonably rejected the unconditional offer of reinstatement? (RE 89, PageID # 2148). Plaintiff argued that the offers of reinstatement were not, by their terms, "unconditional," and thus, the verdict form and jury instructions should have only indicated that they were merely "offers of reemployment." (RE 102, Trial Tr. 4.3.24, Page ID # 3225-3226). The offers indicate, "this offer does not waive any of management's rights, including, but not limited to, rights granted under the Michigan Civil Service Commission Rule 6-4." *Id*. at PageID # 3225. Defendant asserted that the term was included in the offer because, despite the claim that it would allow Plaintiff to become reemployed at the facility of his choice, that MDOC could not guarantee him a spot at the facility of his choice. *Id*. at PageID # 3225-3225.

 In *Morvay v. Maghielse*, 708 F.2d 229, 232 (6th Cir. 1983), this Court said an offer is not sufficient to terminate back-pay if it is conditional. Therefore, an offer is insufficient to terminate back pay liability if it is conditional upon an employee's reapplying for his job; if it does not restore seniority or other benefits accrued by the employee; if the job which he is offered is temporary; if it is conditioned upon the

employee relinquishing his unfair labor practice claim; if the employee has insufficient time to accept the offer; or if it is conditioned upon the union steward resigning. *Morvay v. Maghielse Tool and Die Co*., 708 F.2d 229, 232 (6th Cir. 1983). This standard was modified in part by the Supreme Court in *Ford Motor Co. v. E. E. O. C.,* 458 U.S. 219, 232–33 (1982):

> An employer's unconditional offer of the job originally sought to an unemployed or underemployed claimant, moreover, need not be supplemented by an offer of retroactive seniority to be effective, lest a defendant's offer be irrationally disfavored relative to other employers' offers of substantially similar jobs.

In *Phelan v. Cook County*, 463 F.3d 773 (7th Cir. 2006), the appeal court said, "Consistent with Title VII's goal of deterring discrimination, we decline to endorse a rule that would allow employers to escape liability by merely reinstating the aggrieved employee months after termination, whenever it becomes clear that the employee intends to pursue her claims in court." *Id*. at 780.

Here, the insertion of the word "unconditional" was reversible error, as there were conditions attached to the offers. If this action is reversed and remanded, the jury instructions and verdict form should be expunged of the word "unconditional," as it creates an unsupportable illusion that there were no conditions. This has a prejudicial effect as to the Jury's deliberations as to the reasonableness of Plaintiff's rejection of the offers, which was a question for the Jury to decide.

**5. The District Court Reversibly Erred in granting Defendants' Motion for Summary Judgment as to Plaintiff's Failure to Accommodate Claim.**

    **a. The District Court erred as a matter of law by misapplying the "otherwise qualified" prong and in finding that MDOC met its burden of showing hardship.**

***Standard of Review***

A district court's order granting summary judgment is reviewed de novo. *Booth Family Trust v. Jeffries,* 640 F.3d 134 (6th Cir. 2011). As the Supreme Court recognized long ago, "the plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 257, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986).

**A. The district court erred in granting summary judgment as to Plaintiff's failure to accommodate claim where it could not meet its burden to show it was a hardship or unreasonable to accommodate him.**

Given the Rehab Act is largely the same as the ADA other than the Rehab Act requires the receipt of federal funds, the analysis for a failure to accommodate claim is identical under either law. See *Babcock v. Michigan*, 812 F.3d 531, 540 (6th Cir. 2016) ("Our analysis of Rehabilitation Act claims 'roughly parallels' ADA claims because the statutes contain similar language and are quite similar in purpose and scope") (internal citations omitted); *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 908 (6th Cir. 2004) ("[W]e have held that '[t]he analysis of

claims under the [ADA] roughly parallels those brought under the Rehabilitation Act").

While a plaintiff can proceed with a disability discrimination claim using indirect evidence and the traditional *McDonnell Douglas* framework, this Court has recognized that failure to accommodate claims proceed under a direct evidence theory. "Because failure to accommodate is listed in the Act's definition of disability discrimination, see 42 U.S.C. § 12112(b)(5)(A), 'claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination. ... [I]f the fact-finder accepts the employee's version of the facts, no inference is necessary to conclude that the employee has proven this form of discrimination.'" *Fisher v Nissan North American, Inc*, 951 F.3d 409 (6th Cir 2020) (internal citations omitted).

Under the direct evidence framework, the plaintiff "bears the burden of establishing (1) that he is disabled, and (2) that he is 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation.'" *Id.* (citing *Kleiber v Honda of America Mfg, Inc*, 485 F.3d 862 (6th Cir 2007)). The defendant then bears the burden of "proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon." *Id.* The *prima facie*

36

elements create "a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." *Texas Dept. of Community Affairs v. Burdin*e, 450 U.S. 248, 254 (1981).

The District Court's ruling appropriately accepted Plaintiff's argument that the direct evidence framework applied. (MSJ O&O, RE 35, Page ID # 883).

i.      **Plaintiff is Disabled and "Otherwise Qualified" under the ADA**

On summary judgment, the parties agreed that Plaintiff was disabled, and the District Court accepted that as true. (*Id*. at Page ID #885).

To be "otherwise qualified" for a job under the ADA, the employee bears the burden of showing he can perform the "essential functions" of the "employment position that such individual holds", with or without accommodation. 42 USC § 12111(8). To be "considered qualified for a position an employee must demonstrate that he or she was meeting the employer's legitimate expectations and was performing to the employer's satisfaction." *Dews v. A.B. Dick Co.,* 231 F.3d 1016 (6th Cir. 2000). In determining qualifications, "courts traditionally treat explanations that rely heavily on subjective considerations with caution," because "an employer's asserted strong reliance on subjective feelings about [an employee] may mask discrimination." *Wexler v White's Fine Furniture, Inc,* 317F.3d 564, 575 (6th Cir

2003). "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998) (distinguished on other grounds).

Likewise, "an employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the [c]ompany for which that employee is otherwise qualified." *Kleiber v. Honda of America Mfg., Inc.,* 485 F.3d 862, 869 (6th Cir. 2007). The ADA explicitly lists "reassignment to a vacant position" as a possible reasonable accommodation. See 42 U.S.C. § 12111(9)(B). Accordingly, reassignment to a vacant position is form of an accommodation under the Rehab Act, given "[a]fter the ADA was enacted, Congress amended the Rehabilitation Act to parallel the standard for employment discrimination under the ADA." *Bratten v. SSI Services, Inc.,* 185 F.3d 625, 633 (6th Cir. 1999).

"If an employee requests assistance in identifying vacant positions…then the employer has a duty under the ADA to ascertain whether he has some job that the employee might be able to fill." *Fisher v. Nissan North America, Inc.,* 951 F.3d 409, 419 (6th Cir. 2020) (internal citations omitted). Further, "[t]he reasonableness of a proposed accommodation is a question of fact." *Id*. The plaintiff meets this burden by identifying "a vacant, funded position for which she was qualified, with or

38

without accommodation, that existed at the time of her request for reassignment." *Willard v. Potter*, 264 Fed. Appx. 485, 487-88 (6th Cir. 2008) (Rehab Act claim).

A recently decided District Court case, *Gray v. City of Detroit*, 2020 WL 772850 (E.D. Mich. 2020), is on point here. The plaintiff in *Gray* was a City of Detroit police officer who was placed on permanent restricted duty because of a knee injury. She performed largely clerical tasks for nearly six years and was assigned to what the City deemed an accommodation position during that period. The City ultimately revoked that accommodation assignment based on a purported policy. Citing the employer's duty to transfer an employee to a new position as an accommodation, the Court held:

> Gray worked in the ID Unit for almost six years, and, according to Gray, she only retired because her supervisor changed her workstation. R&R at 27. Gray's position was not eliminated, and she had otherwise been able to perform the functions of that position for many years. Therefore, Gray has met her burden of showing that with a reasonable accommodation (returning her to the previous workstation) she was otherwise qualified for the position at the ID Unit.
>
> *Id*. at *3.

As an initial point, the analysis does not look at the overall position of Corrections Officer and those essential functions. Instead, it requires looking at the position the officer "holds." 42 U.S.C. § 12111(8). Likewise, 42 USC § 12111(9) defines "reasonable accommodation" as including "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position." As such, the fact that Plaintiff could not perform every essential function of a corrections officer is

irrelevant to this analysis. The sole question is whether Plaintiff's continued transitional employment assignment is a reasonable accommodation. Indeed, Defendant did not refuse to continue to accommodate Plaintiff because he could not perform the essential functions of his job. Quite oppositely, Plaintiff's accommodation was purportedly denied because he exhausted his leave entitlements and/or MRF did not have any vacancies available. (Davis Dep. Trans., RE 25-5, Page ID # # 180, 182). This is squarely where the District Court's analysis became erroneous, as it found that Plaintiff was "still technically employed as a corrections officer…Accordingly, the relevant inquiry is whether he could perform the essential functions of a corrections officer, not whether he could perform the functions of someone on TE." (MSJ O&O, RE 35, Page ID # 886). The District Court further found that Plaintiff had failed to create a genuine factual dispute that there was a vacant position to which he could have been reassigned or an accommodation that would have enabled him to perform the essential functions of a correctional officer. (*Id*. at Page ID # 889).

Despite MDOC's beleaguered reasoning for failing to accommodate Plaintiff's request, the reality is that Plaintiff's request was beyond reasonable. As is evident from the testimony from those at the facility, the facility needed "all hands on deck" and there were a litany of assignments Plaintiff could have been assigned to. Indeed, Plaintiff's position working with ITO Felder—i.e. his accommodation

assignment—remained vacant for a month after Plaintiff's accommodation was denied. (RE 25-11, Felder Dep. Trans., Page ID # 206). And Felder was adamant that he not only needed assistance at that time, but he would have gladly continued to have Plaintiff working with him. (*Id*.). Indeed, at Trial, Warden Patrick Warren testified unequivocally that Plaintiff could have gone back to Felder because he needed help. (RE 94, Trial Tr. 4.9.24, Page ID # 2476).

Just as this Court held in *Gray*, Plaintiff has exceedingly met his burden in showing that "with a reasonable accommodation"—continuing to work in his transitional employment assignment—he "was otherwise qualified for the position" with LTO Felder. This conclusion follows the Sixth Circuit in *Kleiber* and *Willard*, *supra*, in holding that assignment to a vacant, existing position at the time of the plaintiff's request is a reasonable accommodation. This is not a case where Plaintiff sought MDOC to create a position to accommodate him or displace an existing employee from an established position to accommodate Plaintiff. There was a funded, existing position working with ITO Felder that MDOC had a specific need for. In fact, the testimony is clear that MDOC was short staffed at the time. (Felder Dep. Trans, RE 25-11, Page ID # 206, p. 10:14-22). Elaine Davis even testified that the facility had "a need" for employees such as Plaintiff working in a light duty capacity at the time he was denied. (Davis Dep. Trans., RE 25-5, Page ID #185, p.35:3-7). As such, Plaintiff's request to continue working and help the understaffed

facility was beyond reasonable. MDOC's claim that Plaintiff had exhausted his leave entitlement will be addressed below in response to Defendant's failure to satisfy its burden of persuasion, but this argument also carries no weight. The six-month rule is not a rule; it is solely discretionary. Plaintiff had already had an extension beyond the six months. There is no argument that this purported six-month rule defeats Plaintiff being "otherwise qualified."

There is uncontroverted evidence that Plaintiff was "otherwise qualified" to continue his employment in a transitional employment assignment. Plaintiff performed the position he held at the time of MDOC's discriminatory decision admirably, even to the extent LTO Felder testified he would have liked to have Plaintiff remain working there. (Felder Dep. Trans., RE 25-11, Page ID # 208, p. 19:11-14). Just as Judge Goldsmith held in *Gray, supra*, Plaintiff's position was not eliminated, he was qualified to perform his job for months and was performing it exceptionally, and therefore, Plaintiff has met his burden in establishing that with a reasonable accommodation (continued transitional employment) he was otherwise qualified for the position. Once Plaintiff requested a reasonable accommodation in July, it was Defendant's obligation to make reasonable efforts to attempt to accommodate him. See *Gantt, Fisher, supra*. No such efforts were made, as both Davis and Warden Warren confusedly testified that no one even considered continuing Plaintiff's transitional assignment. Accordingly, because Plaintiff has

met this burden in establishing the existence of a reasonable accommodation, it is thus Defendant's burden to show that this accommodation was impossible or an undue hardship.

ii.     **Plaintiff has Direct Evidence of Discrimination and Defendant has not met its Burden of Persuasion**

Following a showing of direct evidence, Defendant bears the burden of persuasion to avoid summary judgment "to show that an accommodation would impose an undue hardship." *Hedrick v Western Reserve Care System,* 355 F.3d 444, 457 (6th Cir 2004)*.* Further, any neutral employment policy or legitimate, nondiscriminatory explanation for Plaintiffs' denial of a request for accommodation is irrelevant under the direct evidence standard. *Fisher*, 951 F.3d at 417. "In other words, an employer 'may not illegitimately deny an employee a reasonable accommodation' pursuant to 'a general policy and use that same policy as a' so-called 'neutral basis for firing him.'" *Id*. (internal citations omitted).

Here, Plaintiff presented directed evidence of disability discrimination given Defendant's decision deny his accommodation and force him to take a waived rights leave of absence solely pertained to his disability. Moreover, the denial of Plaintiff's accommodation necessarily encompasses direct evidence given the only basis was Plaintiff's disability.

Following that, Defendant utterly failed to meet its burden of persuasion. Defendant has proffered various shifting reasons for this decision. First, Elaine Davis claims that the decision rested alone with the Warden. (Davis Dep. Trans., RE 25-5, Page ID #184). Yet Warden Warren testified that Elaine Davis told him Plaintiff's transitional employment had ended and did not even discuss whether it could be extended. (Warren Dep. Trans., RE 25-10, Page ID # 200, p. 10:15-16). The fact that MDOC has not proffered a single individual to clearly articulate why it decided to terminate Plaintiff's accommodation in the face of his reasonable request and the facility's need for employees such as Plaintiff—an employee who also had twenty years on the job—deems MDOC's response invalid as a matter of law.

Following that, even if Defendant had proffered evidence articulating its decision-making, there is no evidence supporting MDOC's position that Plaintiff's leave entitlement had been exhausted. Plaintiff had already surpassed MDOC's alleged six-month transitional employment standard. Further, Joanne Bridgford testified that there is no rule setting this period at six months. (Bridgford Dep. Trans., RE 25-4, Page ID # 170, p. 12). Indeed, implicit in her testimony is that a hard and fast rule dictating six months would violate the ADA/Rehab Act because it would not encompass a "case-by-case" analysis. (*Id*.). When viewing MDOC's reliance on

this loose rule alongside the fact that CO MacLean had been given years' worth of transitional employment assignments, MDOC's reasoning lacks muster.

Akin to MDOC's inability to articulate who made what decision, there is no testimony showing who really applied this alleged six-month rule. First, Elaine Davis—the individual who signed the notice denying Plaintiff's accommodation—claims that Warden Warren made this decision. (RE 25-5, Davis Dep. Trans., Page ID # 181, pp. 24:23-25:8 ). Davis unequivocally testified Warden Warren made the decision, and when confronted with the fact that Plaintiff's accommodation had been extended once already, explained that there was no change from the first extension to Plaintiff's request for a second extension. (*Id*. at Page ID # 184, p. 36:2-37:2). Yet Warden Warren had no answers; he passed the buck to HR and Davis. (Warren Dep. Trans., RE 25-10, Page ID # 200, p. 10:15-16).

Under a proper analysis, given Plaintiff has shown he could perform his position with or without an accommodation and there were various vacant assignments, the final prong requires MDOC to show that allowing Plaintiff to remain employed in a transitional employment assignment would be unduly burdensome. Defendant's inability to meet its burden is only further evidence that this decision was wholly discriminatory and requires summary judgment for Plaintiff. See *Hedrick v Western Reserve Care System*, 355 F.3d 444, 457 (6th Cir 2004) ("An employer...has the burden of persuasion to show that an accommodation

45

would impose an undue hardship"). Defendant's conclusory, confused position that "the facility is unable to accommodate additional light duty restrictions as you have exhausted your restrictions" is utterly disproven by the record evidence. (Ex. 23, ADA Denial). Even in the face of the inconsistent application of this policy, both LTO Felder and Elaine Davis testified MRF needed employees such as Plaintiff. (Felder Dep. Trans., RE 25-11, Page ID ## 206, 208,  pp. 10:8-22, 19:20-22).

And lastly, Defendant failed to engage in any interactive process to determine if Plaintiff could remain employed. No one involved in the decision to deny Plaintiff's accommodation request evidently considered whether it was feasible to keep him employed in a transitional employment assignment. Indeed, the record establishes that keeping Plaintiff employed in a transitional assignment was not only feasible but needed as the facility was short staffed. The fact that Elaine Davis claims it was the Warden's decision, who turned around and testified it was Elaine Davis', speaks to the fact that an interactive process did not occur.

MDOC's failures here are illustrated in Elaine Davis's testimony that continuing Plaintiff's extended transitional employment assignment would "set up precedents going over that time." (Davis Dep. Trans., RE 25-5, Page ID # 184, p. 36:19-24). This patently discriminatory statement in applying an alleged policy has no bearing on whether an accommodation is reasonable under the ADA. Essentially, MDOC denied Plaintiff's reasonable accommodation out of fear it would have to

give other employees—whether reasonably or not—like accommodations. This position flies in the face of the purpose of the Rehab Act and the only explanation is MDOC based its decision not on facts or even merit, but "stereotypes" and "unfounded fear" associated with employing disabled individuals. *School Bd of Nassau County, Fla v Arline*, 480 US 273, 287 (1987). Defendant disregarded any ADA duty to engage with disabled employees such as Plaintiff and attempt to figure out if there were assignments available to continue his employment. As the evidence makes clear, there were numerous assignments available and MDOC had a need for workers such as Plaintiff.

In sum, Defendant has failed to satisfy its burden of persuasion in showing its decision arose because either the Plaintiff could not perform the position he held or that continuing to employ Plaintiff posed an undue hardship. Ironically, the evidence is clear that MDOC had a need for employees such as Plaintiff at this time, even to the extent that LTO Felder testified he did not have a replacement employee for Plaintiff's former position for a full month, despite needing assistance during that time. (Felder Dep. Trans, RE 25-11, Page ID ## 206-207, p. 13:19-14:12). The erroneous application of an ambiguous leave policy cannot support the denial of a reasonable accommodation. Just like *Fisher*, "an employer may not illegitimately deny an employee a reasonable accommodation pursuant to a general policy…" 951 F.3d at 417 (internal citations omitted). MDOC cannot stand on this purported six-

month leave policy, and further, the uncontroverted evidence that this policy is applied loosely and subject to significant discretion furthers both a statutory violation of MDOC's duty to provide reasonable accommodations and the impetus for discrimination.

MDOC claimed that it "went above and beyond" to accommodate Plaintiff, and that it denied Plaintiff an accommodation because it was "unreasonable and he simply could not perform the essential job functions of a corrections officer." (RE 26, Page ID # 243). Defendant has not, however, enumerated what "essential functions" Plaintiff's restrictions prohibited him from performing. Indeed, MDOC accommodated Plaintiff's restrictions of "no heavy lifting, no kneeling, squatting, climbing, limited standing," for seven months. (Motion for Summary Judgment, RE 25, Page ID # 98, ¶ 4-8; 100, ¶ 13).

MDOC's argument fails because it has presented conflicting reasoning from the onset of denying Plaintiff's accommodation. First, it claimed that it could not continue Plaintiff's accommodation because Plaintiff "exhausted his entitlements." (RE 25, Page ID # 100, ¶ 16). While MDOC has utterly failed to present evidence that its alleged six-month transitional employment policy has a basis in fact, any such evidence goes by the wayside when considering that Plaintiff's accommodation had already been extended past the six months once.

"[A]n employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the [c]ompany for which that employee is otherwise qualified." *Kleiber v. Honda of America Mfg., Inc.,* 485 F.3d 862, 869 (6th Cir. 2007). The ADA explicitly lists "reassignment to a vacant position" as a possible reasonable accommodation. See 42 U.S.C. § 12111(9)(B). Accordingly, reassignment to a vacant position represents a reasonable accommodation under the Rehab Act, given "[a]fter the ADA was enacted, Congress amended the Rehabilitation Act to parallel the standard for employment discrimination under the ADA." *Bratten v. SSI Services, Inc.,* 185 F.3d 625, 633 (6th Cir. 1999). "If an employee requests assistance in identifying vacant positions…then the employer has a duty under the ADA to ascertain whether he has some job that the employee might be able to fill." *Fisher v. Nissan North America, Inc.,* 951 F.3d 409, 419 (6th Cir. 2020) (internal citations omitted).

The analysis does not look at the overall position of Corrections Officer and those essential functions. Instead, it requires looking at the position the officer "holds." 42 U.S.C. § 12111(8). Likewise, 42 USC § 12111(9) defines "reasonable accommodation" as including "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position." The fact that Plaintiff could not perform every essential function of a corrections officer is irrelevant to this analysis,

49

particularly given he did not need to perform the blanket "essential functions" for seven months before his accommodation was abruptly denied. MDOC has not proffered any evidence what essential functions Plaintiff could allegedly not perform. Indeed, Defendant's citation to *Hoskins v. Oakland Cty Sherriff's Dep't*, 227 F.3d 719, 727 (6th Cir. 2000) speaks to the confusion in its argument. The plaintiff in *Hoskins* failed to present evidence there was a vacant existing position to be reassigned to. Instead, she sought her employer to create a new position, which the Court reaffirmed that "an employer's duty to reassign an otherwise qualified disabled employee does not require that the employer create a new job in order to do so." *Id*. at 730. Plaintiff Smith did not require an accommodation of a newly created position here.

The sole question is whether Plaintiff's continued transitional employment assignment is a reasonable accommodation. Defendant did not refuse to continue to accommodate Plaintiff because he could not perform the essential functions of his job. Quite oppositely, Plaintiff's accommodation was purportedly denied because he exhausted his leave entitlements and/or MRF did not have any vacancies available. (RE 25, Page ID # 99, ¶¶ 8-9). As is evident from the testimony from those at the facility, the facility needed all hands-on deck and there were a litany of assignments Plaintiff could have been assigned to. Indeed, Plaintiff's position working with ITO Felder—i.e. his accommodation assignment—remained vacant for a month after

Plaintiff's accommodation was denied. (RE 25, Page ID # 101, ¶ 22). Felder adamantly testified that he not only needed assistance at that time, but he would have gladly continued to have Plaintiff working with him. (*Id.* ¶ 21).

Again, similar to *Gray*, Plaintiff has exceedingly met his burden in showing that "with a reasonable accommodation"—continuing to work in his transitional employment assignment—he "was otherwise qualified for the position" with LTO Felder. This conclusion follows the Sixth Circuit in *Kleiber* and *Willard*, *supra*, in holding that assignment to a vacant, existing position at the time of the plaintiff's request is a reasonable accommodation. This is not a case where Plaintiff sought MDOC to create a position to accommodate him or displace an existing employee from an established position to accommodate Plaintiff. In fact, the testimony is clear that MDOC was short staffed at the time. (RE 25, Page ID # 101, ¶¶ 19-20). Elaine Davis even testified that the facility had "a need" for employees such as Plaintiff working in a light duty capacity at the time he was denied. (*Id.* Page ID # 102, ¶ 23). As such, Plaintiff's request to continue working and help the understaffed facility was beyond reasonable.

On MDOC's best day, the reasoning that it used in denying Plaintiff's accommodation—i.e. he exhausted his six-month entitlement—creates a question of fact. The six-month rule is not a rule; it is purely discretionary. Plaintiff had already been granted an extension beyond the six months. There is no argument that this

purported six-month rule defeats Plaintiff being "otherwise qualified." As Davis testified, Officer MacLean had his leave extended for years and was "qualified" as a Corrections Officer. (RE. 25, Page ID 102, ¶ 27).

Plaintiff performed the position he held at the time of MDOC's discriminatory decision admirably, even to the extent LTO Felder testified he would have liked to have Plaintiff remain working there. (RE 25, Page ID 101, ¶ 22). Just as Judge Goldsmith held in *Gray, supra*, Plaintiff's position was not eliminated, he was qualified to perform his job for months and was performing it exceptionally, and therefore, Plaintiff has met his burden in establishing that with a reasonable accommodation (continued transitional employment) he was otherwise qualified for the position. Once Plaintiff requested a reasonable accommodation in July, it was Defendant's obligation to make reasonable efforts to attempt to accommodate him. See *Gantt, Fisher, supra*. No such efforts were made, as both Davis and Warden Warren confusedly testified that no one even considered continuing Plaintiff's transitional assignment.

As such, the District Court reversibly erred in granting Defendants' motion for summary judgment as to Plaintiff's failure to accommodate claim. Therefore, Plaintiff respectfully requests that this Honorable Court reverses the District Court's order dismissing his failure to accommodate claim, and remands this matter for further proceedings.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant respectfully requests this Honorable Court to overturn the District Court's Order granting Defendant's summary judgment, set aside the judgment and remand the case back to the District Court for a new trial as to both Plaintiff's claims of failure to accommodate and retaliation.

Respectfully Submitted,

RASOR LAW FIRM, PLLC

*/s/ James B. Rasor*
James B. Rasor (P43476)
Amanda G. Washburn (P86984)
Attorneys for Plaintiff-Appellant
201 E. 4th Street
Royal Oak, MI 48067
248-543-9000
jbr@rasorlawfirm.com

Dated: August 28, 2024

## Certificate of Compliance with Rule 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because the Brief contains 12,592 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) as it is in 14-point Times New Roman font and the type-style requirements of Fed. R. App. 32(a)(6).

**ADDENDUM**

**Designation of Relevant District Court Documents**

Complaint --  RE 1-- Page ID # 1-14

Trial Transcript, 4-3-24, RE 102, Page ID # 3212-3534

Trial Transcript, 4-4-24, RE 104, Page ID # 3551-3734

Trial Transcript, 4-8-24, RE 93, Page ID # 2155-2328

Trial Transcript, 4-9-24, RE 94, Page ID # 2329-2581

Trial Transcript, 4-11-24, RE 95, Page ID # 2581-2833

Opinion and Order on Motion for Summary Judgment -- RE 35

Opinion and Order Granting Second MSJ In Part -- RE 56

Defendant's Motion for Summary Judgment -- RE 26-- Page ID # 224-247

Plaintiff's Motion for Summary Judgment – RE 25-- Page ID # 91-117

Deposition Transcript of Elaine Davis – RE 25-5 -- Page ID # 175-186

Deposition Transcript of Joanne Bridgford – RE 25-4 -- Page ID #167-173

Deposition Transcript of Felix Felder – RE 25-11 -- Page ID # 203-210

Emails Regarding Accommodation, RE 25-3 -- Page ID #  159-165

8-1-18 ADA Denial, RE 25-9 -- Page ID # 195

7-10-18 Accommodation Request, RE 25-6, Page ID # 188-189

Defendant's Motion in Limine -- RE 66 -- Page ID # 1555-1571

Plaintiff's Response to Motion in Limine --- RE 71 -- Page ID # 1635-1648

Opinion and Order on Motions in Limine – RE 73 -- Page ID # 1862-1868

Verdict Form -- RE 89

Notice of Appeal -- RE 98

## Unpublished Decisions Cited in Plaintiff's Brief:

Pursuant to 6th Cir. R. 28(b)(2), the following unpublished decisions are cited in Appellant's Brief: *Biddle v. Ruben*, 1995 WL 382961 (N.D. Ill. June 23, 1995); *Carroll v. Holder*, 2011 WL 7091804 (D. Or. 2011); *Geiger v. Pfizer, Inc.,* No. 2:06-CV-636, 2009 WL 1026479 (S.D. Ohio Apr. 15, 2009); *Installations Reid v. Nat'l Linen Service*, 182 F.3d 918 (6th Cir. June 2, 1999); *Katz v. Geithner*, 2013 WL 815999 (D. Haw. 2013); *Maish v. Napolitano*, 2013 WL 5770345 (W.D. Wash. Oct. 24, 2013); *Matthews v. McDonald*, 2016 WL 29622 (S.D. Cal. Jan. 4, 2016); *McLeod v. Parsons Corp.,* 73 F.App'x 846, 853 (6th Cir. 2003). *Mitchell v. U.S. Postal Serv*., 738 F. App'x 838 (6th Cir. 2018); *M.L. v. Williamson Cnty. Bd. of Educ*., 772 F. App'x 287, 291 (6th Cir. 2019), *Mitchell v. U.S. Postal Serv*., 738 F. App'x 838 (6th Cir. 2018); *Schobert v. CSX Transportation Inc*., 504 F. Supp. 3d 753, 785 (S.D. Ohio 2020), *Stewart v. U.S*., 2000 WL 1705657 at *4, fn.10 (N.D. Cal. 2000); *Thomas v. Department of Veterans Affairs*, 2006 WL 1636738, at *13 fn.6 (S.D.N.Y. 2006); *Tuttle v. Tyco Ele's. Servs., Inc., No*. 2:06-cv-581, 2008 WL 343178 (S.D. Ohio Feb. 7, 2008); *Ward v. Vilsak*, 2011 WL 6026124 (E.D. Cal. 2011); *Womanchild v. Nicholson*, 2008 WL 714091 (W.D. Wash. 2008).

## PROOF OF SERVICE

The undersigned certified that a copy of the foregoing instrument was delivered to each of the attorneys of record and/or unrepresented and/or interested parties on **August 28, 2024,** at their respective addresses as disclosed in the pleadings on record in this matter by:

&#x2610; Fed Ex                   &#x25A0; Other: Efiling


/s/ Amanda Washburn

1995 WL 382961, 4 A.D. Cases 1193, 11 A.D.D. 330, 6 NDLR P 372

1995 WL 382961
United States District Court, N.D. Illinois, Eastern Division.

Lawrence C. BIDDLE, Plaintiff,

v.

Robert E. RUBEN, Secretary of the
Department of Treasury and Eugene Ludwig,
Comptroller of the Currency, Defendants.

No. 95 C 1505.
|
June 23, 1995.

*MEMORANDUM OPINION AND ORDER*

CONLON, District Judge.

 **\*1** Lawrence Biddle sues Robert Rubin, Secretary of the Treasury ("Secretary") and Eugene Ludwig, the Comptroller of the Currency ("Comptroller") pursuant to Title VII, 42 U.S.C. § 2000e–16(c), the Civil Service Reform Act, 5 U.S.C. § 7703, and the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq. Counts I and III respectively allege racial and disability discrimination in connection with a termination decision. In Count II, Biddle seeks review of a Merit Systems Protection Board's ("the Merit Board") decision affirming his termination as an associate national bank examiner within the Office of the Controller of the Currency ("OCC"). The Secretary moves to dismiss Count III for failure to state a claim. Fed.R.Civ.P. 12(b)(6).[1]

*BACKGROUND*

OCC employed Biddle as an associate national bank examiner. On January 22, 1993, OCC terminated Biddle because Biddle allegedly sexually harassed a female examiner and was dishonest during an official OCC investigation. Biddle appealed the OCC's dismissal. An administrative law judge upheld the dismissal. Thereafter, Biddle appealed to the Merit Board. The Merit Board held that Biddle failed to state a *prima facie* case of disability discrimination or introduce evidence that his alleged misconduct was related to his disability. However, the Merit Board vacated the administrative law judge's decision on the issue of racial discrimination and remanded for further findings. On

November 1, 1994, the administrative law judge rejected Biddle's charge of racial discrimination. On February 2, 1995, the Merit Board issued a final order affirming the administrative law judge's decision.

Biddle filed this action seeking *de novo* review of his claims. Count I alleges that the OCC terminated Biddle, an African–American, because of his race. Count II alleges that the termination was arbitrary, capricious, not in accordance with law, and not supported by substantial evidence. Count III alleges that OCC terminated Biddle because it perceived him to have a disability. The Secretary moves to dismiss Count III.

*DISCUSSION*

A motion to dismiss receives careful scrutiny and is not often granted. *See Conley v. Gibson,* 355 U.S. 41, 45–46 (1957); *Rothner v. Chicago,* 929 F.2d 297, 302 (7th Cir.1991). Given the liberal requirements of federal notice pleading, dismissal is appropriate only where the complaint shows some bar to relief on its face. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 421 n. 6 (7th Cir.1994). A motion to dismiss is granted only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley,* 355 U.S. at 45–46; *Arst,* 25 F.3d at 421. In considering the motion, the court accepts all well-pleaded facts as true and draws all inferences in Biddle's favor as the nonmoving party. *See Bontkowski v. First Nat'l Bank,* 998 F.2d 459, 461 (7th Cir.), *cert. denied,* 114 S.Ct. 602 (1993).

 **\*2** In Count III, Biddle alleges disability discrimination in violation of section 501 of the Rehabilitation Act, 29 U.S.C. § 791 ("Act"). Biddle alleges that he "was perceived to be 'delusionary' by Defendants and thus disabled by the Agency." Compl. ¶ 18. Biddle further alleges that "the Agency took adverse employment action against Plaintiff on account of his perceived disability." Compl. ¶ 20. The Secretary contends that these allegations fail to state a claim for disability discrimination under the Act.

Biddle's threshold burden is to establish that he is an "individual with a disability" as defined by the Act. *See Jasany v. United States Postal Serv.,* 755 F.2d 1244, 1248 (6th Cir.1985). The Act defines an "individual with a disability" as any individual who (1) has a physical or mental impairment that substantially limits one or more of the person's major life activities; (2) has a record of such an impairment; or

1995 WL 382961, 4 A.D. Cases 1193, 11 A.D.D. 330, 6 NDLR P 372

(3) is regarded as having such an impairment. 29 U.S.C. § 706(8)(B). Federal regulations define "major life activities" as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1613.702(c). The regulations also provide a list of qualifying physical or mental impairments. *See* 29 C.F.R. § 1613.702(b).

Biddle alleges that he is disabled under the third definition because the Secretary perceived him as "delusionary." The Act protects those "regarded as having such an impairment" in order to disabuse employers of myths about the disabled and to prohibit discrimination against those with an impairment that does not substantially limit major life activities. *See, e.g., Flasza v. TNT Holland Motor Express, Inc.,* 159 F.R.D. 672, 678 (N.D.Ill.1994) (interpreting identical language in the American with Disabilities Act); *see also Vande Zande v. State of Wisconsin Dep't of Admin.,* 44 F.3d 538, 541 (7th Cir.1995) (same). A person is "regarded" as disabled if (1) he has a physical or mental impairment that does not substantially limit major life activities, but the condition is treated by an employer as constituting such a limitation; (2) he has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of an employer toward such impairment; or (3) he does not have a qualifying impairment but is treated by an employer as having such an impairment. 29 C.F.R. § 1613.

The Secretary contends that Biddle fails to state a claim because Biddle fails to allege that the OCC perceived him to be suffering from a physical or mental disorder. In order to establish disability discrimination based upon a perceived disability, a plaintiff must prove (in part) that the defendant regarded him as suffering from a qualifying impairment. A qualifying impairment includes a mental or psychological disorder such as mental illness. 29 C.F.R. § 1613.702(b)(2). Biddle alleges that the Secretary perceived him as "delusionary." The court finds that Biddle sufficiently alleges that the Secretary perceived him as suffering from a qualifying impairment of mental illness.

**\*3** The Secretary also contends that a plaintiff alleging disability discrimination under section 501 must show that he suffered an adverse employment action "solely" because of his handicap. *See Randle v. Bentsen,* 19 F.3d 371, 374 (7th Cir.1994). The Secretary argues that Count III must be dismissed because Biddle fails to allege that OCC discharged him "solely" because it perceived him to be delusionary. *Randle,* however, involved a disability claim that accrued

in 1990. Biddle notes that recent amendments to the Act have called into question the sole causation standard used in *Randle. See Leary v. Dalton,* 1995 U.S.App. Lexis 14624 (1st Cir. June 14, 1995) (causation issue is an "open question"). As amended in 1992, section 501 now incorporates the liability standards of Title I of the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12111–12117. *See* 29 U.S.C. § 791(g). The ADA prohibits discrimination "because of" a disability. *See* 42 U.S.C. § 12112. Thus, it appears that a federal employee alleging disability discrimination under the Act must only establish that he suffered an adverse employment action "because of" his disability.[2]

Biddle implies that his causation allegations are acceptable because the ADA's causation standard is more lenient than the sole causation requirement of section 504. *Cf. Smith v. Upson County,* 859 F.Supp. 1504, 1514 (M.D.Ga.1994) (ADA plaintiff must show some "causal connection" between disability and adverse employment action). "The precise relationship between the ADA's causation standard and the sole causation test is not well settled." *Leary,* 1995 U.S.App. Lexis at \*11. Nevertheless, the court finds that Biddle sufficiently alleges causation even under the more stringent "sole causation" test. A complaint need not narrate all relevant facts nor recite the law; all it has to do is set out a claim for relief. *See Bartholet v. Reishauer A.G. (Zurich),* 953 F.2d 1073, 1078 (7th Cir.1992). In considering a motion to dismiss under Rule 12(b)(6), a complaint must not be dismissed unless relief may not be granted "under any set of facts that could be proved *consistent* with the allegations." *Hrubec v. National R.R. Passenger Corp.,* 981 F.2d 962, 963 (7th Cir.1992) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)) (emphasis added). Biddle alleges that OCC terminated him "on account of his perceived disability." This allegation is consistent both with proof that Biddle was dismissed "because of" his disability and with proof that Biddle was dismissed "solely by reason" of his disability. Thus, even if the sole causation standard remains intact after the 1992 amendments, Biddle's allegations survive this motion to dismiss. Accordingly, the Secretary's motion must be denied.

*CONCLUSION*

Defendant Eugene Ludwig's motion to dismiss for lack of subject matter jurisdiction is granted. Ludwig is dismissed from the case with prejudice. Defendant Robert Rubin's

1995 WL 382961, 4 A.D. Cases 1193, 11 A.D.D. 330, 6 NDLR P 372

motion to dismiss Count III for failure to state a claim is denied. An answer shall be filed by July 11, 1995.

**All Citations**

Not Reported in F.Supp., 1995 WL 382961, 4 A.D. Cases 1193, 11 A.D.D. 330, 6 NDLR P 372

Footnotes

1    The Comptroller moves to dismiss Biddle's complaint against him for lack of subject matter jurisdiction. Biddle stipulates to dismissal of the Comptroller, apparently recognizing that the only proper defendant in this action is the Secretary. *See, e.g., McGuinness v. United States Postal Serv., 744 F.2d 1318, 1321–22 (7th Cir.1984); Hancock v. Egger, 848 F.2d 87, 89 (6th Cir.1988)*. Accordingly, the Comptroller is dismissed from this action with prejudice.

2    The First Circuit permits federal employees to bring disability discrimination claims under both sections 501 and 504 of the Act. *Leary,* 1995 U.S.App. Lexis at *9. Section 504 continues to prohibit discrimination "solely by reason" of a disability. 29 U.S.C. § 794. Thus, a federal employee litigating in the First Circuit might avail himself of different standards of causation depending on which section he decides to invoke. In the Seventh Circuit, however, section 501, 29 U.S.C. § 791, provides the exclusive right of action for federal employees alleging disability discrimination in the course of their direct employment. *See McGuinness,* 744 F.2d at 1321. Thus, the ADA's causation standard applies to Biddle's claim.

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 7091804

KeyCite Yellow Flag - Negative Treatment
Distinguished by Hawkins v. United States, W.D.Wash., July 31, 2017
2011 WL 7091804
Only the Westlaw citation is currently available.
United States District Court, D. Oregon,
Medford Division.

Shawna CARROLL, Plaintiff,

v.

Eric HOLDER, Jr., United States
Attorney General, Defendant.

Civ. No. 09–3093–CL.
|
Sept. 30, 2011.

## Attorneys and Law Firms

Julie R. Vacura, William L. Larkins, Jr., Larkins Vacura, LL, Portland, OR, Kevin E. Byrnes, Grad Logan & Klewans, PC, Falls Church, VA, for Plaintiff.

James E. Cox, Jr., U.S. Attorney's Office, Portland, OR, for Defendant.

## REPORT & RECOMMENDATION

CLARKE, United States Magistrate Judge.

 *1 Plaintiff Shawna Carroll ("Carroll") brings this action against defendant Eric Holder, Jr., Attorney General of the United States in his official capacity ("the Government"), alleging the Federal Bureau of Investigation ("FBI") discriminated against her on the basis of age and disability in violation of the Rehabilitation Act of 1973. This matter comes before the court on the Government's motion (# 22) to dismiss or, in the alternative, for summary judgment. For the reasons stated below, the Government's motion to dismiss should be granted in part and denied in part, and the Government's motion for summary judgment should be granted.

## PRELIMINARY PROCEDURAL MATTER

As an initial matter, the court must address the admissibility of the evidence offered by Carroll in opposition to the Government's motion. Carroll filed forty exhibits including deposition excerpts, letters, emails, what appear to be excerpts of certain policy manuals, and a number of other types of documents, as attachments to a document titled "Plaintiff's Errata sheet and Exhibit List for Plaintiff's Opposition to Defendant's Motion Judgment." (# 35). On August 23, 2011, the court ordered (# 47) the parties to submit briefing on the issue the extent to which Carroll's exhibits should be considered by the court in light of significant authentication issues perceived by the court, and allowing Carroll until September 12, 2011, to file properly authenticated exhibits. Instead of filing a responsive brief, on August 31, 2011, Carroll filed the declaration of Kevin E. Byrnes (# 48) which resolves most, but not all, of the authentication issues. (Decl. of Kevin E. Byrnes iso Pl's Exs. to Pl's Opp'n to Def's Mot. for Summ. J. ("Byrnes Decl."), ¶¶ 1, 3). On September 12, 2011, the Government filed a brief (# 49) responding to the court's order and raising objections to certain of Carroll's exhibits. The court addresses the remaining authentication and admissibility issues as well as the objections raised by the Government.

### Standard

A motion for summary judgment must be supported by evidence admissible at trial. Fed.R.Civ.P. 56(c). Authentication is a condition precedent to the admissibility of all supporting documents. Fed.R.Evid. 901(a). The Ninth Circuit has repeatedly held that "unauthenticated documents cannot be considered in a motion for summary judgment." Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir.2002). Where a party attempts to introduce an exhibit by attaching it to a declaration or affidavit, the declarant or affiant must have personal knowledge of the exhibit, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Fed.R.Civ.P. 56(c); Orr, 285 F.3d at 777.

### A. Depositions

In all, Carroll submits nine depositions and deposition excerpts. (Pl's Ex, 15, 18, 19, 24, 32, 33, 34, 35, 37). Of these, only four are properly authenticated. (Pl's Exs. 18, 19, 33, 35).

### 1. Plaintiff's Exhibits 15, 32, and 37

 *2 Three of Carroll's deposition excerpt exhibits are inadmissible. When offered at summary judgment, deposition excerpts must identify the names of the deponent and the action, and must include the reporter's certification that the deposition is a true record of the testimony of the deponent.

*Orr,* 285 F.3d at 774 (citing Fed.R.Evid. 901(b); Fed.R.Civ.P. 56(e), 30(f)(1)). The affidavit of a party's counsel providing the names of the deponent, the action, and the reporter, with a statement that the attached copy is a "true and accurate copy" is not a sufficient substitute, without more, to satisfy the authentication requirement; "such an affidavit lacks foundation even if the affiant-counsel were present at the deposition." *Id.* (citing *Beyene v. Coleman Sec. Servs. .,* 854 F.2d 1179, 1182 (9th Cir.1988)). Carroll submits as Exhibit 15 what is purported to be excerpts of the deposition of Linda Thorsen; however, she fails to provide the cover sheet identifying the name of the deponent and the action as well as the reporter's certification. (Pl's Ex. 15). Carroll submits as Exhibit 32 excerpts of the deposition of Antron Bryant, and as Exhibit 37 excerpts of the deposition of Janet Flail, but foils to provide the reporter's certification page for either of these deposition excerpts. (Pl's Ex. 32, 37). The court granted Carroll the opportunity to file properly authenticate exhibits, however, she failed to do so. Therefore, Exhibits 15, 32, and 37 are not properly authenticated and are excluded.


### 2. Plaintiff's Exhibit 24

Carroll submits as Exhibit 24 excerpts of the deposition of Robert J. Jordan. This deposition excerpt is not properly authenticated as Carroll has failed to include the reporter's certification. However, the Government has filed a properly authenticated excerpt of the Robert J. Jordan deposition. (Cox Decl., Ex. 7). Once a document is properly authenticated by one party, the requirement of authenticity is satisfied with regard to all parties and the document may not be excluded on grounds of inadequate authentication when submitted by another party. *Orr,* 285 F.3d at 775–76. Therefore, Exhibit 24 is admissible.


### 3. Plaintiff's Exhibits 18, 19, and 33

Carroll submits as Exhibit 33 a complete copy of her deposition, taken September 29, 2010. (Pl's Ex. 33). Exhibit 33 consists of 244 pages of deposition testimony. In opposing the Government's motion, Carroll cites to 42 pages of this exhibit. Carroll submits as Exhibit 18 the deposition of Michael Huff taken July 21, 2010, and as Exhibit 19 the deposition of Michael Huff taken May 28, 2008. (Pl's Exs. 18–19). These depositions are filed in their entirety. Exhibit 18 consists of 272 pages of deposition testimony and Exhibit 19 consists of 97 pages of deposition testimony. Of these 369 pages of deposition testimony, Carroll cites only twenty-four pages from Exhibit 18 and only six pages from Exhibit 19 in her memorandum opposing the Government's motion.[1]

Carroll provides the following explanation for filing the depositions of Mr. Huff in their entirety:

> **\*3** "... Mr. Huff's statements in this case are filled with contradictions and explanations that if each identified would force this motion to run dozens of more pages, we have simply copied his depositions in *their entirety* and invite the Court to read them. We know such a practice is disfavored, but it is simply maddening to try to explain or summarize Mr. Huff's shifty explanations on why he did what he did."
> (Pl's Opp'n to Def's Mot for Sumtn. J., at 16 n. 7) (emphasis in original).

As the non-moving party, Carroll "must come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks and citations omitted). In this regard, "[p]arties must designate specific facts and provide the court with their location in the record." *Orr,* 285 F.3d at 765. The Ninth Circuit strictly adheres to this specificity requirement. *See S. Cal. Gas Co. v. City of Santa Ana,* 336 F.3d 885, 889 (9th Cir.2003) (citing cases). It is within the discretion of the court to exclude evidence that the offering party fails to cite with sufficient specificity. *Orr,* 285 F.3d at 775.

The court declines to wade through the 369 pages of deposition testimony submitted by Carroll as Exhibits 18 and 19 in search of facts which support her position. No matter how "maddening" she perceives this task to be, that burden is hers to bear. The court therefore expressly limits its consideration of Exhibits 18 and 19 to the thirty pages cited in Carroll's brief, and excludes from consideration the remaining 339 pages of deposition testimony. Likewise, the court expressly limits its consideration of Carroll's Exhibit 33 to the 42 pages she specifically cites in her opposition to the Government's motions.


### B. Plaintiff's Exhibit 31 and the Government's Exhibit 8

Carroll submits as Exhibit 31 what is purported to be excerpts of the October 2008 hearing before EEOC AJ. (Pl's Ex. 31). However, although Carroll includes the portion of the testimony identifying the witness, she fails to attach the cover sheet identifying the name of the trial and the judge, and further does not attach the reporter's certification. Uncertified copies of testimony are "inadmissible in a summary judgment proceeding." Fed.R.Civ.P. 80; *Orr,* 285 F.3d at 776 (internal

2011 WL 7091804

citations omitted); *Beyene,* 854 F.2d at 1182 & n. 1 (9th Cir.1988). Nor is the declaration of Carroll's counsel Kevin E. Byrnes sufficient to authenticate the exhibit. While Mr. Byrnes states that the exhibit is a "true and correct copy," this statement "lacks foundation even if he were present when the witness testified." *Orr,* 285 F.3d at 777 (internal citations omitted). Exhibit 31 is therefore not authenticated and inadmissible.

The Government also submits excerpts of the October 2008 hearing before the EEOC as Exhibit 8 attached to the declaration of James E. Cox, Jr. (Cox Decl., Ex. 8). This exhibit includes the cover page identifying the name of the action and the judge and the portion of the testimony identifying the witness; however, the Government fails to include the reporter's certification. While this evidence may be admissible at trial as an admission by a party opponent, the authentication is a "condition precedent to admissibility." Fed.R.Evid. 901(a). Just as Mr, Byrnes' declaration is insufficient to authenticate Exhibit 31, Mr. Cox's declaration is insufficient to authenticate Exhibit 8. Therefore, the Government's Exhibit 8 attached to the Declaration of James E. Cox, Jr., is not authenticated and inadmissible.

### C. Hearsay Objections

**\*4** The Government objects to multiple exhibits in whole or in part on the basis of hearsay. The court examines the objections with respect to each exhibit.

### 1. Plaintiff's Exhibit 25: Affidavit of Dr. Heidi Bloom

Carroll submits as Exhibit 25 the Affidavit of Dr. Heidi Bloom dated April 25, 2011. (Pl's Ex. 25). The Government objects to paragraphs 22, 29, 30, 41, and 44.

Evidentiary affidavits filed in connection with motions for summary judgment must be made "on personal knowledge." Fed.R.Civ.P. 56(c). Hearsay statements in affidavits are inadmissible. *Japan Telecom, Inc. v. Japan Telecom Am. Inc.,* 287 F.3d 866, 875 n. 1 (9th Cir.2002). Hearsay is any out-of-court statement, whether oral or written, offered in evidence to prove the truth of the matter asserted. Fed.R.Evid. 801(a), (c). In the absence of a procedural rule or statute, hearsay is inadmissible unless it is defined as non-hearsay under Federal Rule of Evidence 801(d) or falls within a hearsay exception under Federal Rule of Evidence 803, 804, or 807. *See* Fed.R.Evid. 802; 30B Michael H. Graham, Federal Practice & Procedure: Evidence § 7031 at 279. When a statement is hearsay within hearsay, or double hearsay, each

statement must qualify under some exemption or exception to the hearsay rule. Fed.R.Evid. 805; *U.S. v. Arteaga,* 117 F.3d 388, 396 n. 12 (9th Cir.1997).

In Paragraph 22, Dr. Bloom makes assertions about a medical program maintained by the FBI, its relation to the use of firearms, and why the FBI maintains the program. Dr. Bloom is not an FBI employee. Her affidavit provides no foundation for her statements regarding the FBI's medical program, its parameters, or its purpose. She describes no personal experience, involvement, or experience with the program. Thus, Dr. Bloom lacks personal knowledge of the facts she asserts, which Carroll offers for the truth of the matter asserted. Paragraph 22 is therefore inadmissible hearsay. Carroll offers no exception to the hearsay rule, and the court perceives none. Therefore, Paragraph 22 is inadmissible hearsay and is excluded from evidence.

In Paragraph 29, Dr. Bloom states Carroll "seemed unaware" in 2007 that she had any option besides retirement from her position as an FBI Special Agent. Paragraph 29 lacks sufficient foundation of Dr. Bloom's personal knowledge of Carroll's state of mind. To the extent that the statement relates what Carroll told Dr. Bloom, the statement is inadmissible hearsay. Carroll offers no exception to the hearsay rule, and the court perceives none. Therefore, Paragraph 29 is inadmissible hearsay and is excluded from evidence.

In Paragraph 30, Dr. Bloom asserts Carroll was informed by the FBI that she could remain an FBI Special Agent if she was unable to qualify with a firearm. This statement relates what Carroll was told by the FBI and is therefore inadmissible unless an exception to the hearsay rule applies. Carroll offers no exception to the hearsay rule, and the court perceives none. Therefore, Paragraph 30 is inadmissible hearsay and excluded from evidence.

**\*5** In the second sentence of Paragraph 41, Dr. Bloom relates a statement made to her by Carroll regarding what Carroll had been told by the FBI. This constitutes double hearsay. Carroll offers no exception to the hearsay rule which applies to this statement, and the court perceives none. Therefore, the second sentence of Paragraph 41 is inadmissible hearsay and is excluded from evidence.

In Paragraph 44, Dr. Bloom offers her opinion regarding whether Carroll could have remained an FBI agent and employee from 2006 through the date of her affidavit. However, Dr. Bloom states in Paragraph 31 that she has never

been given a position description for Carroll and in Paragraph 32 states making a determination as to any specific work element would be outside her purview. Dr. Bloom therefore offers no foundation for the basis of her opinion regarding Carroll's ability to remain an FBI Special Agent, and further affirmatively alleges she lacks personal knowledge necessary to make such a determination. Paragraph 44 is therefore inadmissible hearsay and is excluded from evidence.

### 2. Plaintiff's Exhibit 38: Affidavit of Shawna Carroll
Carroll submits as Exhibit 38 her own sworn affidavit, dated April 28, 2011. (Pl's Ex. 38). The Government objects to Paragraph 9, in which Carroll relays Dr. Bloom did and thought based on what Carroll told her. Carroll's statement lacks sufficient foundation of her personal knowledge of Dr. Bloom's state of mind. Therefore the government's objection is sustained based on lack of personal knowledge.

### 3. Plaintiff's Exhibits 6, 7, 8, and 11
The Government objects to Exhibits 6, 7, 8, and 11 on grounds that these exhibits are inadmissible hearsay and moreover are insufficiently authenticated. These exhibits appear to be records of phone calls to and from employees of the United States Department of Labor ("DOL") Office of Worker's Compensation Programs ("OWCP"), created by the WOCP employees and recording statements and representations made during those conversation. (Pl's Exs. 6, 7, 8, 11). Carroll submits the declaration of her counsel, Mr. Byrnes, testifying that Exhibits 6, 7, 8, and 11 are "true and correct" copies of documents included in the "Report of Investigation received from the Defendant." (Byrnes Decl., ¶¶ 11–13, 16).

Even if Exhibits 6, 7, 8, and 11 are properly authenticated, Carroll offers them for the truth of the matter asserted therein: that on certain dates, certain statements were made by and to certain DOL OWCP employees. This is hearsay. Plaintiff offers no argument that an exception to the hearsay rule applies. The court has considered the business records exception created by Federal Rule of Evidence 803(6) and finds that exception inapplicable, as the exhibits are not supported by the declaration or affidavit of a custodian or other qualified person. Fed.R.Evid. 803(6); *see U.S. v. Bland,* 961 F.2d 123, 127 (9th Cir.), *cert. denied,* 506 U.S. 858, 113 S.Ct. 170, 121 L.Ed.2d 117 (1992). The court has also considered the public records exception created by Federal Rule of Evidence 803(8) and finds that exception inapplicable, as the exhibits cannot fairly be characterized as "factual findings" resulting from an investigation made

pursuant to authority granted by law. Fed.R.Evid. 803(8). The court perceives no other relevant exception. Therefore, Exhibits 6, 7, 8, and 11 are inadmissible hearsay and excluded from evidence.

### 4. Plaintiff's Exhibit 10
**\*6** Plaintiff submits as Exhibit 10 an unsigned letter dated November 22, 2006, purportedly authored by Marie Ridenour, Claims Examiner for the United States Department of Labor, and addressed to "Dear Sir/Madam." The Government objects to this exhibit on grounds that it has not been authenticated and is inadmissible. Carroll, however, has submitted the declaration of her counsel, Mr. Byrnes testifying that Exhibits 10 is a "true and correct" copy of a document included in the "Report of Investigation received from the Defendant." (Byrnes Decl., ¶ 15). When a party attempts to introduce a document by attaching it to the declaration of that party's attorney, the attorney must have personal knowledge of the document. Fed.R.Civ.P. 56(c)(4); *see also Orr,* 285 F.3d at 777. Authentication-by-production is permitted when the party identifies who produced the document, or if the party opponent admits to having produced it. *Id.* Where these threshold requirements are not met, the evidence is inadmissible. *See id.* at 777–778. Carroll has submitted the declaration of her counsel testifying that the Government produced Exhibit 10 during discovery, and the Government does not deny production. Therefore, Exhibit 10 is authenticated by production. However, Carroll offers Exhibit 10 to prove that by November 22, 2006, the Department of Labor knew she had retired, thus Exhibit 10 constitutes inadmissible hearsay. Carroll offers no hearsay exception and the court perceives none. Therefore, Exhibit 10 is excluded as inadmissible hearsay.

### 5. Plaintiff's Exhibit 26
Plaintiff submits as Exhibit 26 an assortment of documents totaling of forty-five pages, including a two-page "Notice of Occupational Disease and Claim for Compensation" dated February 25, 2004. (Pl's Ex. 26). The Government objects to portions of Exhibit 26 on grounds of authentication and hearsay. Carroll submits the declaration of her counsel, Mr. Byrnes, testifying that Exhibits 26 consists of "true and correct" copies of documents included in the "Report of Investigation received from the Defendant." (Byrnes Decl., ¶ 31). The Government does not deny producing these documents, therefore, Exhibit 26 is authenticated by production.

With respect to the government's hearsay objection, pages 3–10, 14, 29–31, and 34–36 are notes by plaintiff's medical treatment providers made contemporaneously with treatment. Pages 32–33 are submitted by the Government as Exhibit 4 attached to the Declaration of Michael Huff, the author of this two-page letter, and are therefore admissible for any purpose.

The following pages are inadmissible hearsay to the extent plaintiff offers them as proof of the factual matters asserted therein: pages 1–2 ("Notice of Occupational Disease and Claim for Compensation"); page 13 (unsigned letter addressed to Carroll and purportedly authored by a OWCP Nurse Consultant); pages 15–21 and 25–28 (correspondence and progress notes purportedly authored by Patti Hollinsworth, R.N., Medical Case Manager); pages 37–44 (Vocational Rehabilitation Status Report purportedly authored by Patricia Biscay Ayerza); and page 45 (letter dated October 19, 2006, addressed to Patricia L. Player and purportedly authored by Carroll).

**\*7**  Pages 11 and 12 are not admissible for any purpose. Page 11 is a screen shot from an unidentified source relating the content of a conversation between third parties, thus it constitutes double hearsay. Carroll offers no applicable exception and the court perceives none, thus page 11 is excluded as inadmissible hearsay. Page 12 consists of six paragraphs on an otherwise blank sheet of paper describing the effect of work-related injury on employment status under the Federal Employees' Compensation Act; neither the author nor the recipient of the message is received. This page is therefore excluded for lack of foundation and as inadmissible hearsay.

#### 6. Plaintiff's Exhibits 1, 2, 4, 12, 17, and 30

Carroll submits as Exhibit 1 a copy of her EEOC complaint; as Exhibits 2 a copy of a letter she wrote to EEO counselor Jaeger; as Exhibit 4 a copy of another letter she wrote to EEO counselor Jaeger; as Exhibit 12 a copy of a Report of Counseling; as Exhibit 17 a copy of another Report of Counseling; and as Exhibit 30 a copy of the EEOC AJ's opinion. The Government objects to these exhibits only to the extent Carroll offers them to prove the truth of the allegations asserted therein. That objection is sustained.

### *Conclusion*

Plaintiff's Exhibits 6, 7, 8, 10, 11, 15, 31, 32, and 37 are improperly authenticated or otherwise inadmissible and excluded in their entirety. Paragraphs 22, 29, 30, 41, and

44 of plaintiff's Exhibit 25 are inadmissible and excluded. Pages 11 and 12 of plaintiff's Exhibit 26 are inadmissible and excluded. Paragraph 9 of plaintiff's Exhibit 38 is inadmissible and excluded. The court expressly limits its consideration of plaintiff's Exhibits 18, 19, and 33 to the pages specifically cited in Carroll's opposition to the Government's motion. Finally, Exhibit 8 attached to the declaration of James E. Cox, Jr., submitted by the Government's is improperly authenticated and excluded in its entirety.

### BACKGROUND

The FBI is an agency of the United States Department of Justice ("DOJ") that serves both as a federal criminal investigative body and an internal intelligence agency (counterintelligence). In order to fulfill its mandate, the FBI employs a large number of highly trained law enforcement officers known as Special Agents. Special Agents are classified by the United States Office of Personnel Management ("OPM") as Series 1811 criminal investigators. The duties of Series 1811 criminal investigators are identified by the OPM as requiring "moderate to arduous physical exertion," therefore the OPM is authorized to establish medical standards for employment. 5 C.F.R. § 339.202. The medical standards established by the OPM for Series 1811 criminal investigators require "[m]anual dexterity with comparatively free motion of finger, wrist, elbow, shoulder, hip and knee joints," and further require that "[a]rms, hands, legs, and feet must be sufficiently intact and functioning in order that applicants may perform the duties satisfactorily." *See* Office of Pers. Mgmt., Standards: Criminal Investigation Series 1811, *available at* http:// www.opm.gov/qualifications/ standards/IORs/gs1800/1811a.htm. OPM standards further provide "[a]ny physical condition that would cause the applicant to be a hazard to himself/herself, or others is disqualifying." *Id.*

**\*8**  As law enforcement officers, the primary duties of FBI Special Agents are "the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States." 5 U.S.C. § 8331(20). The "Essential Tasks" of a Special Agent are promulgated in the FBI Manual of Administrative Operations and Procedures ("MAOP"). (Decl. of James E. Cox, Jr. iso Def's Mot. to Dismiss, or, in the Alternative, Mot. for Summ. J. ("Cox Decl."), Ex. 6 at 4, 8). In total, there are 247 separate Essential Tasks which an FBI agent must be able to perform. (Decl. of Michael fluff iso Defs Mot. to Dismiss, or, in the

Alternative, Mot. for Summ. J. ("Huff Decl."), ¶ 10; Cox Decl., Ex. 6 at 10–19). These tasks include basic physical criteria such as defensive maneuvers, running, jumping, lifting up to fifty pounds, climbing and crawling; the ability to do basic administrative tasks such as typing and writing various reports, notes, communications, affidavits, and forms; and maintaining proficiency with various firearms including handguns, shotguns, rifles, and MP5, which includes the requirement that Special Agents be able to fire 50 rounds from a handgun during practice and qualifying sessions, and up to 200 rounds from a handgun during quarterly training sessions. (Cox Decl., Ex. 6 at 10–19).

On March 20, 1978, the FBI hired Carroll to fill a support position. (Cox Decl., Ex. 9 at 4 & Ex 18 at 2). Carroll left the FBI and worked for the Internal Revenue Service from 1979 to 1983. (*Id.*). On April 17, 1983, the FBI rehired her in the role of Special Agent. (*Id.*). Carroll left the FBI again in 1987 but was rehired as a FBI Special Agent in July of 1989, a position which she held until her retirement in November of 2006. (*Id.*). In 1998, Carroll and her husband, also an FBI Special Agent, received "Office of Preference" transfers from the FBI's Los Angeles, California, Field Office, to the Portland, Oregon, Field Office. (Cox Decl., Ex. 1 at 5–6 & Ex. 18 at 2). Carroll and her husband were both assigned to the Resident Agency in Medford, Oregon, ("the Medford R.A.") a satellite office of the Portland Field Office. (Cox Decl., Ex. 18 at 2). There are only four Special Agents assigned to the Medford R.A. No FBI support personnel are assigned to Medford. (Cox Decl., Ex 1 at 8).

## I. Plaintiff's Injury

In July 2002, Carroll began to experience pain in her right arm. (Cox Decl., Ex 18 at 2). On July 14, 2003, Carroll's primary physician, Dr. Linden, referred her to an orthopedic surgeon, Dr. Webb. (*Id.*). In January 2004, Dr. Webb referred Carroll to Dr. Peter Grant, who diagnosed Carroll with right ulnar neuropathy at the elbow and right carpal tunnel syndrome. (*Id.*). In February of 2004, Carroll submitted a worker's compensation claim for carpal tunnel syndrome in her right arm, which was accepted by the Department of Labor ("DOL") on August 12, 2004. (Huff Decl., ¶ 3).

*\*9* When non-surgical treatments proved ineffective for treating Carroll's condition, Dr. Grant referred her to Dr. Heidi Bloom, an orthopedic surgeon. (Cox Decl., Ex. 18 at 3). Dr. Bloom recommended ulnar nerve decompression, anterior transposition, and carpal tunnel release surgery, which she performed on October 20, 2004. (*Id.*). As a result of her

medical condition, Carroll was placed on medical leave on October 20, 2004. (Cox Decl., Ex. 18 at 3–4). While on medical leave, Carroll received wage and medical benefits from the DOL Office of Worker's Compensation Programs ("OWCP"). (*Id.* at 4).

When surgery proved ineffective in alleviating Carroll's right arm pain, Dr. Bloom reevaluated Carroll's condition as possibly being radial nerve syndrome and lateral epicondyle, and referred her back to Dr. Grant. (*Id.*). In February 2005, Dr. Grant diagnosed Carroll with radial neuropathy in the radial tunnel area and referred her to Dr. Vincent Hentz for right radial neuropathy surgery. (*Id.*). In March of 2005, Dr. Bloom treated Carroll for pain in her left arm. When non-surgical treatment proved ineffective, Dr. Bloom again referred Carroll to Dr. Grant, who diagnosed Carroll's condition as left carpal tunnel syndrome, ulnar nerve neuropathy, and radial neuropathy. (*Id.*). On August 30, 2005, Dr. Hentz performed open carpal tunnel release, cubital tunnel release with ulnar nerve transposition, and radial tunnel decompression on Carroll's left arm. (*Id.*).

On or around November 17, 2005, the Government received a report from Dr. Bloom dated November 3, 2005, advising Carroll was able to work but precluded from lifting and carrying more than 20 pounds; performing defensive tactics; using firearms; direct assignments or duties expected to require the use of firearms; participating in raids, arrests, undercover surveillance activities, or reactive squad duties; and any pushing, pulling, or simple grasping with regard to her left arm. (Huff Decl., ¶ 6 & Ex. 5 at 5). Dr. Bloom attached a work release dated October 24, 2005, and a DOL duty status report dated November 2, 2005. (*Id.*, ¶ 6 & Ex. 5 at 4–7). Dr. Bloom's October 24th work release report released Carroll to work for the period of October 31 to December 31 of 2005, with the limitations that Carroll should work no more than 2–4 hours per day with no crawling or climbing, was limited to intermittent pushing or pulling, occasional reaching, and was unable to use her left hand for repetitive pushing, pulling, or simple grasping, but was able to perform keyboarding with both hands. (*Id.*, Ex. 5 at 6). Dr. Bloom's November 2nd DOL duty status report indicated Carroll had been advised to resume work on October 31 but was unable to perform certain regular work activities. (*Id.* at 4). Although Dr. Bloom imposed significant restrictions on Carroll's ability to lift or carry, stand, walk, climb, kneel, bend or stoop, twist, push or pull, simple grasping, reaching, and driving, she indicated Carroll could perform fine manipulation, including keyboarding, up to 7 hours per day. (*Id.*).

**\*10** By letter dated December 2, 2005, the Government offered Carroll a temporary, 90–day modified duty Special Agent position with the Portland Division which incorporated the restrictions set out in Dr. Bloom's November 2, 2005, DOL duty status report. (Huff Decl., ¶ 6 & Ex. 5 at 1; Pl's Ex. 16 at 3 & Ex. 22 at 3). However, on December 12, 2005, the Government received from the DOL a work release report from Dr. Bloom dated November 28, 2005, which revoked the October 24 release and restricted Carroll from performing any work for an additional 6–8 weeks.[2] (Huff Decl., ¶ 7 & Ex. 6 at 1–2). The Government therefore allowed the temporary modified duty job offer to lapse. (*Id.,* ¶ 7).

On March 21, 2006, Carroll underwent a Functional Capacity Evaluation ("FCE") conducted by Faith Kashishian, Physical Therapist ("PT"), and Gail Frank, Occupational Therapist Registered ("OTR") at Providence Medford Hospital. (Cox Decl., Ex. 18 at 4; Huff Decl., Ex. 7 at 2–23). The results of the FCE placed her in the "sedentary-light strength" classification, the second lowest of eight strength classifications. (Cox Decl., Ex. 18 at 4; Huff Decl., Ex.7 at 22). Based on the March 21, 2006, FCE, Dr. Bloom diagnosed Carroll as medically stationary with permanent duty modifications and released her to return to work on May 4, 2006. (Huff Decl., Ex. 7 at 22–26; Cox Decl., Ex 18 at 4). Dr. Bloom restricted Carroll to lifting 15 pounds occasionally and less than five pounds frequently, and stated Carroll was not to perform any crawling, climbing or "repetitive keyboarding." (Huff Decl., Ex. 7 at 1, 24–26). Dr. Bloom incorporated by reference all restrictions outlined in the FCE, concluding "I presume this makes [Can-oil] no longer eligible to work fulltime as an FBI agent as one of the requirements of her position is to be able to shoot a certain number of loads of her firearm and she clearly cannot perform this duty." (*Id.* at 24; Cox Decl., Ex. 18 at 4).

Carroll informed her immediate supervisor Joseph Conli ("Conli") of the results of her FCE and the restrictions recommended by Dr. Bloom. (Cox Decl., Ex 7 at 4–9 & Ex. 8 at 4–5). She recognized that the inability to type or use a firearm made her ineligible to continue working as a Special Agent. (Cox Decl., Ex 18 at 4). Carroll spoke to her supervisor, Conli, and requested voice activated typing software, an accommodation consistent with Dr. Bloom's restrictions precluding her from repetitive keyboarding. (Pl's Ex. 33, Deposition of Shawna M. Carroll ("Carroll Dep.") at 61). However, Conli advised Carroll he had discussed the possibility of obtaining voice activated software for her with

the Portland Field Office, but was advised by the Security Division that Congress had not approved the software and associated microphone for use by Special Agents due to security concerns, therefore this technology was unavailable. (Cox. Decl., Ex. 18 at 7; Pl's Ex. 22 at 4). Carroll then spoke to Conli and Ed Higgins in the Portland Field Office about the possibility of being reassigned to an Investigative Analyst or an administrative support position while remaining assigned to the Medford RA. (Pl's Ex. 33, Carroll Dep. at 61–62). However, no Investigative Analyst was ever assigned to the Medford RA. (*Id.* at 62). Moreover, the same considerations that precluded the use of voice activated typing software for Special Agents applied to use of the technology by Investigative Analysts. (*Id.* at 68–69).

## II. Plaintiff's Retirement Applications

**\*11** Carroll did not return to duty in the Medford R.A. after going out on medical leave in October of 2004. (Cox Decl., Ex. 18 at 3–4). On May 14, 2006, Carroll submitted a disability retirement application to the Office of Personnel Management ("OPM"). (Cox Decl., Ex. 9 & Ex. 18 at 4). In this application, Carroll describes her work history, medical condition, treatment, symptoms, and limitations. (Cox Decl., Ex. 9 at 4–7). Carroll reported increasing symptoms of pain despite various non-surgical treatments, temporarily relieved following therapy and the use of an arm brace at work, "in particular while typing," as well as at night when sleeping. (*Id.* at 5–6). However, Carroll reported that as of July 14, 2004, she was spending 95% of her work day typing, which she believed "continues to aggravate" her condition and that "repetitive shooting required during firearms qualifications" triggered her pain despite her use of anti-inflammatory medications prior to and after shooting and continued use of her arm brace. (*Id.* at 6). Carroll reported:

"[t]o this day, I spend 95% of my time typing reports. A day in the field conducting interviews can mean 2 days of typing reports. In addition to the use of the computer to prepare reports, I also use the computer to perform searches of various data bases to further my investigations."

(*Id.* at 5).

In the section of the "Applicant's Statement of Disability" requiring Carroll to describe the manner in which her condition was interfering with the performance of her duties, Carroll wrote "[m]y injuries prevent me from fully performing much of the Special Agent Essential Tasks to include: (see attached listing) Lift/Carry, Push/Pull, Climb, Quick Movements, Bend/Stoop/Squat, Stand, Walk, Sit, Run,

Jump, Crawl, Firearms, Operate Hand Controls, Drive and Write," (*Id.* at 8). In the section requiring a description of "any other restrictions of [her] activities," Carroll wrote "see Functional Evaluation Capacity Report and Dr. Bloom's [physical statement]. In conclusion no keyboarding, work at sedentary-light physical demand level." (*Id.*). Carroll reported her requests for voice activated software in lieu of typing and ergonomically adjustable furniture had both been denied because the FBI prohibited the use of voice activated software and would not provide customized furniture. *Id.*

Conli completed a "Supervisor's Statement" in connection with Carroll's application for disability retirement. (Cox Decl., Ex. 3 at 5–6, 8–10). He noted that Carroll's absence "signifies a loss of 25% of man power and constitutes a minimal staffing level for the case load." (*Id.* at 9). In the section requiring a description of the efforts made to accommodate the employee in his or her current position, Conli reported "[a]s an FBI Special Agent employee is expected/mandated to carry and demonstrate proficiency with a firearm, make arrests and perform a number of other physical tasks which [Carroll] is unable to accomplish. (See attached page)." (*Id.* at 9). In the attached document, Conli continued:

> **\*12**   "Due to the law enforcement nature of the Special Agent position, the remoteness of the Medford Resident Agency from headquarters city, and the low staffing level of the office, [Carroll] is expected to often work alone and in conjunction with other law enforcement agencies. Based on [Carroll]'s duty location, job description, critical elements and performance standards, and special agent essential task lists, an accommodation can not be made ." (*Id.* at 10).

On August 7, 2006, Carroll received a letter from a Human Resources Specialist with the FBI Employee Benefits Unit informing her that her application for disability retirement had been received. (Cox Decl., Ex 18 at 4). The letter also contained a Benefit Estimate Report for a Disability Retirement Annuity, as well as an estimate of the benefits of a Standard Title 1811 Law Enforcement Retirement. (*Id.* at 5). Side by side comparison revealed that Carroll's standard retirement annuity would be $2,000 more per month than her benefits under the disability retirement. (*Id.*). Carroll would qualify for standard retirement on her fiftieth birthday, which was November 22, 2006. (*Id.*).

On September 28, 2006, Carroll received notification that her request for disability retirement had been approved. (*Id.*

at 6). On October 9, 2006, Carroll submitted the paperwork for a standard retirement. (*Id.* at 5). On October 10, 2006, she submitted a formal request to withdraw her disability retirement application. (*Id.* at 6). On November 6, 2006, Carroll received notice that her request to withdraw her disability retirement application had been granted, effective October 30. (*Id.* at 7). Carroll went on standard law enforcement retirement on November 22, 2006. (*Id.* at 2).

### III. The FBI's Job Offer to Plaintiff

On or about July 17, 2006, the FBI's Workers' Compensation Office ("WCO") received documentation from Dr. Bloom including the FCE conducted by Providence and her May 4, 2006, opinion making Carroll medically stationary with permanent duty modifications including no lifting over 15 pounds, no repetitive keyboarding, and presumptively ineligible to continue as an FBI Special Agent due to her inability to perform her duties with regards to firearms qualification and training. (Huff Decl., ¶ 8 & Ex. 7). Finding these restrictions to be incompatible with the requirements of Special Agent, the WCO found Carroll no longer able to perform the job of Special Agent, prepared a document detailing Carroll's work and educational history, and forwarded that document to the Portland Field Office staffing unit requesting that a sedentary support position be identified for her pursuant to the requirements of the Federal Employees' Compensation Act ("FECA"). (*Id.*, ¶¶ 10–11 & Ex. 9).

On September 25, 2006, in response to an email requesting a status update on Carroll's disability retirement application, Michael Huff ("Huff"), supervisor of the WCO, informed Conli that the WCO was in contact with the DOL to determine whether Carroll had any light duty work restrictions that the FBI could accommodate on a permanent basis in a support position. (*Id.*, ¶ 14 & Ex. 10). Conli advised Huff that Carroll would be eligible for standard retirement in November. (*Id.*). Carroll alleges that the purpose of the Government's effort to locate and offer her a support position before she retired was the desire to "punish [her] for her disability and to force her out of the [FBI] without the potential for any kind of disability benefits altogether." (Pl's Opp'n to Def's Mot. for Summ. J., pp. 52). The Government denies this allegation and asserts that the effort to identify and offer Carroll a position that would accommodate her restrictions was undertaken in compliance with federal regulations requiring employers to identify and offer work that fits an employee's medical restrictions if such work is available. (Huff Decl., ¶ 9). The Government alleges it continued with this effort after being

informed that Carroll intended to retire because her decision did not affect its obligations under federal regulations, and, in fact, failure to offer Carroll "suitable work" before she retired would render the FBI liable for future wage loss benefits should Carroll later opt to reverse her election to retire and revert to receiving lost wage benefits from the DOL. (*Id.,* ¶ 14).

**\*13** On October 6, 2006, the WCO contacted Dennis Olfert[3] ("Olfert"), Administrative Officer for the Portland Field Office, and requested that available support positions be identified for Carroll. (Cox Decl., Ex. 4 at 10). When Olfert responded that no support positions were assigned to the Medford RA, he was instructed to identify available support positions at the Portland Field Office. (*Id.*). Olfert was not instructed to limit his search for a non-agent position in the Portland Field Office, therefore, he looked for all vacant positions for which candidates had not been identified to fill the position. (*Id.* at 7). Of the two available vacant positions identified, Olfert recommended the position of Operations Security Assistant ("OSA") because it was the highest grade support position then available. (Id, at 4). When Olfert advised the WCO that the position required typing, the WCO modified the position to allow for the use of voice activated software. (Huff Decl., ¶ 17 & Ex 11).

On November 10, 2006, Huff sent Carroll a letter offering her a position as an OSA in the Portland Field Office. (Huff Decl., Ex 12; Cox Decl, Ex 18 at 7). Huff's letter informed Carroll that her relocation costs would be borne by the FBI and that voice software would be available to alleviate the need for typing. (*Id.*). On November 22, 2006, Carroll declined the job offer and informed Huff that she was eligible for standard retirement on November 22, 2006 and had elected to retire. (Huff Decl., Ex 13; Cox Decl., Ex 18 at 8). Carroll retired on that dale and began receiving her retirement annuity of $5,585 per month, (Cox Decl., Ex. 26 at 2).

On December 1, 2006, the DOL sent Carroll a letter informing her it had found the OSA job offer to be suitable based upon her medical limitations and that rejection of the position would terminate her eligibility for further DOL benefits. (Cox Decl., Ex. 13). The letter also informed Carroll that the position remained available and that the DOL would pay her compensation based upon the difference between the salary of an FBI Special Agent and an OSA. (*Id.*). Carroll sent a letter back to the DOL stating she did not wish to relocate her family to Portland and that she had elected to retire and had, in fact, already done so. (*Id.,* Ex. 14).

On January 4, 2007, the DOL sent Carroll another letter informing her that the agency had not found her reasons for refusing the position to be valid. (Cox Decl., Ex. 15). The letter informed Carroll that if she did not accept the job within 15 days she would lose her entitlement to certain DOL benefits, particularly those related to wage loses and compensation for permanent injury, known as a "schedule award." (*Id.*).

On January 22, 2007, Carroll received a third letter from the DOL informing her that her entitlement to wage loss and schedule award compensation benefits under the Federal Employees' Compensation Act ("FECA") had been terminated due to her refusal to accept the FBI's offer of suitable work in Portland. (Cox Decl., Ex. 16). The letter further advised Carroll of her right to appeal the decision and directed Carroll to carefully read the enclosed document, entitled "Federal Employees' Compensation Act Appeal Rights," which informed Carroll of her right to request a hearing within 30 days of the decision, request reconsideration within one calendar year of the decision, or request review by the employees' Compensation Appeals Board ("ECAB") within 90 days of the decision. (*Id.*).

**\*14** Carroll did not timely pursue any of the three appeals methods. (Cox Decl., Ex. 1 at 69–70). Carroll requested reconsideration by letter dated September 12, 2009, nearly 18 months after the DOL issued its decision; this request was denied as untimely by the DOL on October 29, 2009. (Cox Decl., Ex. 21). On April 20, 2010, Carroll timely appealed the DOL's denial of reconsideration to the ECAB. (*Id.,* Ex. 22). On April 26, 2011, the ECAB affirmed the DOL's denial of reconsideration. *S.C. & Dept. of Justice, Fed. Bureau of Investigation,* No. 10–1364, 2011 WL 2492912 (E.G.A.B. Apr. 26, 2011).

### IV. Plaintiff's Administrative Proceedings

On February 15, 2007, Carroll contacted Equal Employment Opportunity ("EEO") Counselor Cindy Jaeger to report a complaint of discrimination. (Cox Decl., Ex. 17 at 1). In a three-page letter addressed to EEO Coordinator Cynthia Jaeger dated February 15, 2007, Carroll explained she had incurred injuries to both her arms while performing her duties as an FBI Special Agent and that, despite surgeries and rehabilitation, her injuries had left her in a "permanent and stationary condition that did not allow [her] to return to [her] former status" as a Special Agent. (*Id.* at 3–4). Carroll further explained she received a letter dated November 7, 2006 from

Michael Huff offering her the position of Operations Security Assistant ("OSA") at the Portland Field Office, which she believed constituted a demotion to a position with lower pay located 275 miles away from her current home which would detrimentally affect her retirement in that she would lose her 1811 standard law enforcement retirement eligibility and would therefore be required to work until age 65 to attain retirement age. (*Id.*).

In this letter, Carroll asserted a claim for retaliation, arguing that the job offer constituted retaliation without describing what protected activity she was engaged in or offering any other explanation for why she believed the FBI was retaliating against her. (*Id.* at 3–5). Carroll also asserted a claim of discrimination in the form of denial of reasonable accommodation based on the FBI's denial of her request for ergonomic furniture and voice activated computer software, failure to offer her a position in the Medford RA which would have accommodated her limitations despite the fact that a secretarial position available there, and because the job offer constituted a demotion and made no provision for maintaining the integrity of her household by including a transfer for her husband. (*Id.*). Carroll alleged her belief that the FBI offered her the position knowing that she would find it unreasonable and would therefore decline it, effectively forcing her to retire and rendering her ineligible for a schedule benefit award from worker's compensation for the injuries to her arms. (*Id.* at 4–5).

By letter dated February 25, 2007, Carroll again followed up with EEO Counselor Cynthia Jaeger, describing dates, persons, and documents she believed to be relevant to her complaint. (*Id.* at 8–11). In this letter, Carroll again alleged that the OSA position was a demotion, that in this clerical position she would be making less than half of her salary as Special Agent, and that she would lose her 1811 law enforcement retirement status and would instead be required to work until the age of 65 in order to reach retirement age. (*Id.* at 10). Carroll again stated her belief that the job offer, made two days before she was eligible for standard retirement, was made in a joint attempt by the FBI and the DOL to deny her eligibility for a schedule award. (*Id.*). She further stated her belief the FBI could have reasonably accommodated her limitations at the Medford RA by allowing her to remain employed there as a Special Agent in an advisory capacity to the two new agents to whom her caseload was being transferred, which would not require that she carry a firearm or do any typing, for the two weeks between the date of

her retirement and the date her retirement would become effective. (*Id.*).

**\*15** On April 4, 2007, Carroll filed a formal complaint of discrimination against the FBI with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of disability identifying the date of the most recent act of discrimination as November 7, 2006. (*Id.*). In the section of the complaint requiring a description of the corrective action sought, Carroll wrote "F.B.I. to rescind the job offer so as to allow Dept. of Labor to award me with a scheduled benefit award." (*Id.*). By letter dated June 28, 2007, the EEOC advised Carroll her claim for discrimination on the basis of physical disability had been accepted for investigation. (Cox Decl., Ex. 20). The letter noted that although the record reflected Carroll had been informed that refusal of the OSA job offer could terminate Carroll's "requested benefit," the EEOC would accept her complaint based on Carroll's allegation that she was unaware that that the "requested benefit" would be terminated until she received the January 22, 2007 letter from the Department of Labor. (*Id.* at 1).

On February 4, 2008, Carroll requested a hearing before the EEOC on her disability discrimination complaint, and her case was assigned to an EEOC Administrative Judge ("AJ"). (Pl's Opp'n to Def's Mot. for Summ. J., # 33, pp. 37). Carroll subsequently moved to amend her complaint to include an age discrimination claim, however, that request was denied by the AJ. (*Id.* at 37 n. 20). The hearing on Carroll's complaint was held on October 21 and 22 of 2008. (Cox Decl., Ex. 24 at 1). On June 11, 2009, the AJ issued a decision finding that the FBI intentionally discriminated against Carroll on the basis of her disability by offering her the OSA position in a deliberate attempt to prevent her from obtaining a schedule award. (*Id.* at 2–3). In reaching this determination, the AJ applied the burden-shifting analysis of *McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). (*Id.* at 12–116). However, the AJ rejected Carroll's request for an order granting her a DOL schedule award, holding that this request constituted a collateral attack on a determination which "lies exclusively in the jurisdiction of DOL." (*Id.* at 21–24).

The FBI challenged the AJ's decision, and the Complaint Adjudication Office of the FBI then issued a final agency determination rejecting the AJ's decision. (Cox Decl., Ex 25). Carroll appealed this final agency determination to the EEOC

on August 16, 2009; however, she subsequently abandoned that appeal and filed this action. (Complaint, ¶¶ 93–94).

**STANDARD**

**I. Motion to Dismiss**

The federal courts are courts of limited jurisdiction. *See, e.g., Exxon Mobil Corp. v. Allapattah Servs.,* 545 U.S. 546, 552, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005) (*citing Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994)). Therefore, the presumption is against jurisdiction and "the burden of establishing the contrary rests upon the party asserting jurisdiction." *Vacek v. U.S. Postal Serv.,* 447 F.3d 1248, 1250 (9th Cir.2006) (*quoting Kokkonen,* 511 U.S. at 377). "A Rule 12(b)(1) jurisdictional attack may be either facial or factual." *Safe Air v. Meyer,* 373 F.3d 1035, 1039 (9th Cir.2004) (*citing White v. Lee,* 227 F.3d 1214, 1242 (9th Cir.2000)). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* By contrast, a factual attack "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* Three different standards apply in the evaluation of a Rule 12(b)(1) motion, depending upon how the motion is made and what it addresses.

**\*16** First, in a facial attack, the factual allegations of the complaint are presumed to be true and conflicts in the pleadings are resolved in the plaintiff's favor. *Doe v. Holy See,* 557 F.3d 1066, 1073 (9th Cir.2009) (internal citations omitted); *Rio Props. ., Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1019 (9th Cir.2002). The court need merely to look at the complaint to determine whether the plaintiff has sufficiently alleged a basis of subject matter jurisdiction. To survive such a motion, the plaintiff need only make a *prima facie* showing of jurisdiction. *Rio Props., Inc.,* 284 F.3d at 1019; *see also Scarfo v. Ginsberg,* 175 F.3d 957, 960 (11th Cir.1999).

Second, in a factual attack challenging "[w]here the jurisdictional issue is separable from the merits of the case, judge may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary." *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elect. Corp.,* 594 F.2d 730, 733 (9th Cir.1979). In this situation, the court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment, and need not presume the truthfulness of the plaintiff's allegations. *Id.* (*quoting*

*Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3rd Cir.1977) 373 F.3d at 1039).

Third, in a factual attack where the relevant facts are dispositive of both the Rule 12(b)(1) motion and portions of the merits, the court applies the standard applicable to a summary judgment motion. *Autery v. U.S.,* 424 F.3d 944, 956 (9th Cir.2005) (internal citation omitted). That is, the motion to dismiss should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Trentacosta v. Frontier Pac. Aircraft Indust., Inc.,* 813 F.2d 1553, 1558 (9th Cir.1987) (*citing Augustine v. U .S.,* 704 F.2d 1074, 1077 (9th Cir.1983)).

**II. Motion for Summary Judgment**

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material of fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) (2010)[4]; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *U.S. v. Carter,* 906 F.2d 1375, 1376 (9th Cir.1990). When a properly supported motion for summary judgment is made, the burden then shifts, and the opposing party must set forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 250. Put another way, summary judgment should be granted when the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor. *Id.* at 252. When viewing the evidence at this stage, all justifiable inferences are drawn in favor of the nonmoving party. *Id.* at 255.

**DISCUSSION**

**\*17** Carroll brings this action pursuant to the Rehabilitation Act, asserting three claims for relief: discrimination on the basis of physical disability (Complaint, # 1, ¶¶ 96–113); failure to provide a reasonable accommodation for her disability (*id.,* ¶¶ 114–121); and constructive discharge on the basis of age or mixed-age and disability discrimination (*id.,* ¶¶ 122–127). The Government moves to dismiss Carroll's Complaint on grounds she has failed to comply with the EEOC's administrative presentment requirements and for lack of subject matter jurisdiction. In the alternative, the

Government moves for summary judgment on grounds that Carroll has failed to state a prima facie case for discrimination under the Rehabilitation Act.

## I. MOTION TO DISMISS

The Government moves to dismiss Carroll's Complaint in its entirety on grounds that she failed to comply with the EEOC's administrative presentment requirements. To the extent Carroll's claims survive the administrative exhaustion challenge, the Government moves to dismiss for lack of subject matter jurisdiction, arguing that Carroll seeks an order granting her a schedule award or other worker's compensation benefits on grounds of lack of subject matter jurisdiction For the reasons stated below, the Government's motion to dismiss for failure to exhaust administrative remedies should be GRANTED IN PART AND DENIED IN PART, and the Government's motion to dismiss for lack of subject matter jurisdiction should be DENIED.

### A. Failure to Exhaust Administrative Remedies

The Government argues Carroll failed to contact an EEO Counselor within 45 days of the alleged discrimination, therefore her EEOC complaint was untimely, and as a result she has failed to exhaust her administrative remedies.[5]

### Standard

The Rehabilitation Act of 1973, 87 Stat. 355, as amended, 29 U.S.C. § 701, et seq. ("the Act") makes it unlawful for an agency of the United States to discriminate against an employee or applicant on the basis of the employee's or applicant's disability. 29 U.S.C. § 791; 22 C.F.R. § 144.140. To preserve her right to maintain a suit alleging employment discrimination against an agency of the United States, a claimant must exhaust her administrative remedies by filing a claim of discrimination with the allegedly offending agency in accordance with published procedures. Brown v. Gen. Servs. Admin., 425 U.S. 820, 832, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976).

The Rehabilitation Act adopts by reference the enforcement scheme and administrative remedies established for federal employees in Title VII cases. See 29 U.S.C. § 794a; see also Boyd v. U.S. Postal Serv., 752 F.2d 410, 412 (9th Cir.1985); Leorna v. U.S. Dept. of State, 105 F.3d 548, 550 (9th Cir.1997). Federal employees who allege discrimination prohibited by Title VII are governed by section 2000e–16. See 42 U.S.C. § 2000e-1 6. This provision authorizes and instructs

the EEOC to promulgate regulations for processing federal employee discrimination complaints. Id. EEOC regulations require federal employees to first contact an EEO counselor within forty-five days of the alleged discriminatory conduct in order to try to informally resolve the matter ("pre-complaint processing"). 29 C.F.R. § 1614.105(a). If the counselor's solution is unsatisfactory to the employee, the employee must file a complaint with the agency that allegedly committed the discrimination within fifteen days of the conclusion of the pre-complaint processing. 29 C.F.R. § 1614.106. Upon receipt of notice of final action taken by the department or agency, an employee has ninety days to appeal with the EEOC or file a suit in federal district court. See 42 U.S.C. § 2000e–16(c). The agency shall dismiss a complaint that fails to comply with the applicable time limits or that raises a matter that has not been brought to the attention of a counselor. 29 C.F.R. § 1614.107(a)(2). Filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that is subject to waiver, estoppel, and equitable tolling. Leorna, 105 F.3d at 550; Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982).

### 1. Plaintiff's Disability Discrimination Claims

*18 Carroll argues that the Government did not raise this timeliness issue at any point during the administrative process and has therefore waived its right to rely on that defense in challenging this court's jurisdiction to hear her claims on the merits. Alternatively, Carroll argues her complaint should be deemed timely under the doctrines of equitable tolling and equitable estoppel. The court finds that equitable tolling is appropriate in this case and therefore need not reach the merits of Carroll's waiver and equitable estoppel arguments.

### Standard; Equitable Tolling

The doctrine of equitable tolling "has been consistently applied to excuse a claimant's failure to comply with the time limitations where she had neither actual nor constructive notice of the filing period." Id. at 551. If a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, then equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather what information he needs. Johnson v. Henderson, 314 F.3d 409, 414 (9th Cir.2002). Equitable tolling may be applied if, despite all due diligence, a plaintiff is unable to obtain vital information bearing on the existence of her claim. Santa Maria v. Pac. Bell, 202 F.3d 1170, 1178 (9th Cir.2000). Equitable tolling is not appropriate when the

2011 WL 7091804

facts that would support a charge of discrimination would have been apparent to a similarly situated person with a reasonably prudent regard for his rights. *Boyd,* 752 F.2d at 414. Equitable tolling focuses on the plaintiff's excusable ignorance of the limitations period and is "not available to avoid the consequences of one's own negligence." *Lehman v. U.S.,* 154 F.3d 1010, 1016 (9th Cir.1998).

### Discussion

Equitable tolling is appropriate in this action. Carroll alleges that although she received and thus had actual knowledge of the job offer in November of 2007, she was unaware of the consequences of her refusal of the job offer until she received the DOL's letter dated January 22, 2007 informing her that her workers compensation and schedule award benefits had been terminated. Therefore, until Carroll received this letter she perceived no harm or injury resulting from the job offer and thus had no occasion to believe she had any claim against the FBI. In its letter advising Carroll her complaint had been accepted for investigation, the EEOC expressly noted this acceptance was predicated on plaintiff's allegation that she did not realize that she had suffered discrimination until January 22, 2007.

The Government argues that the DOL's determination with regard to her eligibility for workers compensation and schedule award benefits may not serve as the basis of a claim for discrimination under the Rehabilitation Act. The merits of this claim do not go to the timeliness of Carroll's contact with the EEOC, but rather are better resolved through the Government's motion for summary judgment. With respect to the timeliness argument, the facts show that as soon as Carroll, then *pro se,* perceived an act of discrimination, she timely filed a complaint with the EEOC, The Government's motion to dismiss for failure to exhaust administrative remedies should therefore be DENIED with respect to Carroll's disability discrimination claims.

### 2. Plaintiff's Age Discrimination Claim

**\*19** Plaintiff brings this action pursuant to the Rehabilitation Act, which prohibits discrimination on the basis of disability, not discrimination on the basis of age. Despite this, Carroll asserts as her third claim for relief a claim for constructive discharge on the basis of "age discrimination and mixed-age and disability discrimination." (Compl., ¶¶ 122–127). Carroll asserts that by alleging in her administrative complaint that "the FBI effectively forced [her] to retire" she has sufficiently preserved a claim for age discrimination pursuant to the Age

Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* (Compl., ¶ 81). The court disagrees.

### Standard: Administrative Presentment

Failure to file an EEOC complaint is not a complete bar to district court jurisdiction, however, substantial compliance with the exhaustion requirement is a jurisdictional prerequisite. *Leong v. Potter,* 347 F.3d 1117, 1122 (9th Cir.2003) (*citing Sommatino v. U.S.,* 255 F.3d 704, 708 (9th Cir.2001)). The scope of the federal district court's subject matter jurisdiction is thus dependent upon the scope of the EEOC charge and investigation. *Id* . (internal citations omitted). Generally, the court's jurisdiction is limited to (1) the specific claims presented to the EEOC, (2) allegations "like or reasonably related to" the allegations of the EEOC charge, and (3) charges within the scope of an EEOC investigation that reasonably could be expected to grow out of the allegations. *Id.* (internal citations omitted).

To determine whether an allegation is like or reasonably related to allegations contained in the administrative claim, "the court inquires whether the original EEOC investigation would have encompassed the additional charges." *Green v. Los Angeles Cnty.,* 883 F.2d 1472, 1476 (9th Cir.1989), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). This evaluation "is not limited to the actual EEOC investigation, but can include the scope of an 'EEOC investigation which *can reasonably be expected* to grow out of the charge of discrimination.' " *Sosa v. Hiraoka,* 920 F.2d 1451, 1456 (9th Cir.1990) (*quoting Green,* 883 F.2d at 1476) (emphasis in original). In making this determination, the Ninth Circuit views the plaintiff's claim "with the utmost liberality." *Yamaguchi v. U.S. Dep't. of the Air Force,* 109 F.3d 1475, 1480 (9th Cir.1997). In determining whether a claim is reasonably related, the Ninth Circuit has examined the text of the plaintiff's administrative charge, *id.,* and whether a plaintiff attempts to litigate a new theory of discrimination not previously presented through the appropriate administrative process. *See Shah v. Mt. Zion Hosp. & Med. Ctr.,* 642 F.2d 268, 271–272 (9th Cir.1981) (refusing to consider additional claims for discrimination on the basis of race, color and religion where the plaintiff's EEOC complaint alleged sex and national origin discrimination; although the plaintiff relied on the same employer actions to demonstrate discrimination, the EEOC had never investigated the new theories).

### Discussion

**\*20** The argument that Carroll's EEOC complaint presented a claim for age discrimination simply by virtue of alleging that she was forced to retire lacks merit. Carroll's EEOC complaint did not present a claim for age discrimination, nor could such a claim reasonably be expected to grow out of the EEOC's investigation. The Complaint of Discrimination form Carroll submitted to the EEOC included a section requiring her to indicate the basis of the alleged discrimination using a checklist. (*See* Cox Decl., Ex. 17 at 1). The section lists the following bases: race or color, religion, sex, age, national origin, sexual harassment, handicap, and reprisal. (*Id.*). From this list, Carroll selected discrimination on the basis of physical handicap and reprisal, but left the checkbox for discrimination on the basis of age blank. (*Id.*). In the section requiring an explanation of how she had been discriminated against, Carroll referred to attached documents. (*Id.*). The attached documents consist of her February 15, 2007, and February 25, 2007, letters to EEO Counselor Jaeger. (*Id.* at 3–5, 8–11). In the February 15 letter, Carroll specifically invokes the Rehabilitation Act of 1973 in alleging claims for "discrimination and retaliatory constructive termination as a result of [her] having incurred injuries in conjunction with my employment as a Special Agent." (*Id.* at 3). By contrast, there is no mention or allegation of age discrimination in either her February 15 or her February 25 letters. Thus, nothing in these materials indicates Carroll believed she had been discriminated against on the basis of her age.

Moreover, the June 28, 2007, EEOC letter notifying Carroll her complaint had been accepted for processing clearly states that the issue accepted for investigation was the allegation that she had been discriminated against on the basis of disability. (Cox Decl., Ex. 20 at t). The letter further advised Carroll to notify the EEO if the basis or allegation in her complaint had not been properly identified. (*Id.* at 2). Despite this cautionary advisement, Carroll did not contact the EEOC to advise she also believed she had suffered discrimination on the basis of her age. In fact, there is no indication that Carroll attempted to add this allegation until after the EEOC had completed its investigation and the matter had been set for a hearing before an EEOC AJ pursuant to Carroll's February 2008 request. Thus, Carroll's request to add this claim was made more than a year after the date she alleges she became aware that she had been the victim of discrimination. At that late date, Carroll's request to amend her complaint to add a claim for age discrimination was denied by the EEOC AJ.

On these facts, the court finds that the issue of age discrimination could not reasonably be expected to grow out

of Carroll's EEOC complaint.[6] Although predicated on the same acts that form the basis of her disability discrimination claim, Carroll's age discrimination claims present a new theory of discrimination which has not been investigated and are therefore barred for failure to exhaust administrative remedies. The Government's motion to dismiss for failure to exhaust administrative remedies should therefore be GRANTED with respect to Carroll's age discrimination claims.

**B. Subject Matter Jurisdiction**

**\*21** The Government argues Carroll's Rehabilitation Act claims impermissibly seek judicial review of the DOL's determination finding her ineligible for a schedule award and other workers' compensation benefits as the result of her rejection of the OSA job offer. Because this determination is committed to the exclusive jurisdiction of the DOL, the Government argues this court lacks subject matter jurisdiction over this action.

***Federal Employee's Compensation Act***

The Federal Employees' Compensation Act ("FECA"), [5 U.S.C. § 8101 *et seq.,*](#) is the workers' compensation statute for civilian employees of the United States. *See* [20 C.F.R. § 10.0](#). FECA establishes an exclusive and comprehensive program of workers compensation for government employees injured in work-related accidents. *[Markham v. U.S.,](#)* [434 F.3d 1185, 1187 (9th Cir.2006)](#); *[Lance v. U.S.,](#)* [70 F.3d 1093, 1095 (9th Cir.1995)](#) (per curiam). Except for certain specific exceptions not relevant here, FECA requires the United States to pay compensation for the disability or death of an employee resulting from personal injury sustained while in the performance of his or her duty. [5 U.S.C. § 8102(a)](#). FECA's exclusivity provision bars recovery under other statutes for injuries compensable under FECA. *See* [5 U.S.C. § 8116(c)](#). Benefits payable under FECA include compensation for wage loss and schedule awards. [20 C.F.R. § 10.1](#).

The Department of Labor ("DOL") has the exclusive authority to administer and decide all questions arising under FECA, including the question of coverage. [5 U.S.C. §§ 8145](#), [8149](#); *see also [Markham,](#)* [434 F.3d at 1187](#). Pursuant to [§ 8145(2)](#), the DOL has delegated responsibility for administering FECA to its Office of Workers' Compensation Programs ("OWCP"). [20 C.F.R. § 10.1](#). OWCP regulations require employers to provide limited duty jobs to accommodate employees with compensable

job-related injuries. *See* 20 C.F.R. § 10.507. The OWCP is responsible for determining if the limited duty job offered to the employee is "suitable work," and makes such determinations based on an evaluation of the employee's physical limitations and all medical evidence concerning the employee's injury. *See* 20 C.F.R § 10.500 *et seq.* If the modified position is deemed to be suitable work by the OWCP and the injured employee accepts the position, she can continue to receive compensation benefits. However, if the injured employee refuses to accept a modified position deemed suitable by the OWCP, she will not be entitled to receive compensation benefits unless she can show just cause for such refusal. *See* 20 C.F.R § 10.517.

A claimant may appeal a final decision of the OWCP to the Employees' Compensation Appeals Board ("ECAB"). 5 U.S.C. § 8149; 20 C.F.R. § 501.3. The decision of the ECAB is final as to the subject matter appealed, and such decision is only subject to review by the ECAB. 20 C.F.R. § 501.6(c). FECA explicitly provides that the determinations of the Secretary or his designee regarding an award of compensation are "final and conclusive for all purposes and with respect to all questions of law and fact" and "not subject to review by another official of the United States or by a court by mandamus or otherwise." 5 U.S.C. § 8128(b). Thus, 5 U.S.C. § 8128 "explicitly provides that the courts do not have jurisdiction to review FECA claims challenging the merits of benefit determinations." *Markham,* 434 F.3d at 1187. There are two narrow exceptions to this absolute jurisdictional bar: "constitutional challenges [and] claims for violation of a clear statutory mandate or prohibition." *Id.*

### Discussion

**\*22** In support of its argument that Carroll's claims constitute a collateral attack on a DOL determination, the Government points out that Carroll (1) did not perceive the FBI's job offer as discriminatory until she realized that declining the job resulted in the DOL finding her ineligible for the schedule award; (2) her EEOC complaint sought rescission of the job offer in order to allow the DOL to grant her a schedule award; (3) she repeatedly alleges in her Complaint that the FBI's job offer was discriminatory because it was made for the purpose of denying her the ability to obtain a schedule award; and (4) her prayer for relief specifically requests "benefits [Carroll] would otherwise receive for a schedule award."

In her Complaint, Carroll alleges that at the time the Government offered her the OSA position, the Government

(1) knew she was applying for a schedule award; (2) knew she would be claiming percentage of loss of up to 100% due to her treating physician's determination that she had lost nearly total use of her arms; (3) knew that declining an offer of suitable work would deprive her of the opportunity to assessed for a schedule award, thus truncating the DOL's determination of her claim; and (4) would disqualify her from receiving a schedule award. (Compl., ¶¶ 40, 46, 68, 70, 71). Carroll further alleges that with this knowledge, the Government (1) "concocted a scheme to deprive [her] of access to a schedule award"; (2) "coordinated with the [DOL] to insure her claims would be rejected"; (3) failed to inform her that declining the OSA position could preclude her from receiving a schedule award and "left [her] with the impression that declining the offer would have no impact on her receiving an award"; and (4) the DOL denied her claim "based on the position created by [the Government]." (*Id.,* ¶¶ 51, 64, 65, 69, 76).

Despite these allegations and the inclusion of the request for a schedule award in her prayer, Carroll asserted at oral argument that her injury is not the loss of a schedule award or other workers' compensation benefits, and she denied that she seeks in these proceedings to obtain an order from the court directing the DOL to grant her a schedule award. Instead, Carroll argued the injury she suffered was disparate treatment on the basis of her disability and the denial of a reasonable accommodation that would have allowed her to continue her employment, therefore her claims fall within the "violation of a clear statutory mandate or prohibition" exception to FECA's exclusivity provision. She further argued that as a remedy for these injuries, she seeks only the relief authorized by the Rehabilitation Act including front pay, back pay, and emotional distress damages, and that she merely offers schedule award as a benchmark for establishing the proper measure of damages required to make her whole. *See* 29 C.F.R. § 1614.501. In response, the Government argues that because Carroll's Rehabilitation Act claims are premised on the same actions that form the basis for her claims under FECA, her Rehabilitation Act claims constitute a collateral attack on the DOL's determination under FECA, thus this action is precluded in its entirety.

**\*23** FECA provides "[t]he United States shall pay compensation ... for the disability or death of an employee resulting from personal injury sustained while in the performance of his duty...." 5 U.S.C. § 8102(a). Under FECA, "injury" is defined to include (1) injury by accident, (2) disease proximately caused by employment, and (3) "damage

  
to or destruction of medical braces, artificial limbs, and other prosthetic devices ... and such time lost while such device or appliance is being replaced or repaired." 5 U.S.C. § 8101(5). The threshold question of whether a plaintiff's injuries fall within the scope of FECA presents a jurisdictional question to be decided by the courts. *Moe v. U.S.,* 326 F.3d 1065, 1068 (9th Cir.), *cert. denied,* 540 U.S. 877, 124 S.Ct. 281, 157 L.Ed.2d 141 (2003). If they do, the determination of whether the plaintiff is entitled to receive compensation presents a question committed to the exclusive jurisdiction of the Secretary of Labor, and that determination is not reviewable by the courts. 5 U.S.C. § 8128; *Moe,* 326 F.3d at 1068.

The Government cites *Moe* in support of its argument that on the facts of this case, Carroll's claims present an impermissible collateral attack on the DOL's determination of her eligibility for workers' compensation benefits. In *Moe,* the issue was whether psychological injury resulting in physical injury constituted an "injury" within the scope of FECA. 326 F.3d at 1068. There, the plaintiff suffered post-traumatic stress disorder ("PTSD") as the result of a shooting incident that occurred while she was performing her duties as an administrative assistant at a medical facility at the Fairchild Air Force Base. *Id.* at 1067. The PTSD aggravated her preexisting ulcerative colitis, ultimately requiring the removal of her colon. *Id.* The plaintiff brought suit against the Government under the Federal Tort Claims Act ("FTCA") seeking damages for physical and psychological injuries, and the Government moved to dismiss for lack of subject matter jurisdiction, arguing that the plaintiff's FTCA claims were preempted by FECA's exclusivity provisions. *Id.* On the facts of the case before it, the Ninth Circuit held that because the plaintiff's physical injury resulted from the psychological injury she suffered while in the performance of her duties, she suffered an "injury" within FECA's definition of that term. *Id.* at 1068–69.

By contrast, the Ninth Circuit has held FECA's exclusivity provision does not apply to bar the plaintiff's Title VII sex discrimination claim because FECA's definition of "injury" did not encompass the harm allegedly suffered by the plaintiff. *Nichols v. Frank,* 42 F.3d 503, 515 (9th Cir.1994), *abrogation on other grounds recognized by Burrell v. Star Nursery, Inc.,* 170 F.3d 951, 955–56 (9th Cir.1999). In *Nichols,* the court examined FECA's definition of the term and found that the plaintiff's harm was the result of an intentional act, not an accidental one, and found the other provisions of the definition (disease and loss of or injury to a prosthetic device) inapplicable. *Id.* Furthermore, the Ninth Circuit found

FECA's exclusivity provisions inapplicable on the second independent ground that whereas FECA provides relief in the form of "compensation," Title VII provides equitable relief in the form of injunctions and back pay. *Id.*

**\*24** The facts of this case are analogous to *Nichols* and distinguishable from *Moe.* While Carroll did suffer an injury in the course of the performance of her duties as a Special Agent, as that term is defined by FECA, Carroll, unlike the plaintiff in *Moe,* does not seek compensation for either her disabling physical condition or for a psychological injury resulting therefrom. Rather, as in *Nichols,* Carroll alleges harm as the result of purposeful discrimination by the Government. Thus, Carroll alleges harm as the result of a deliberate act, not an accidental one. Her harm is not a "disease" proximately caused by her employment as an FBI Special Agent. And although Carroll asserts she was prescribed and wore arm braces as the result of her disabling impairment, nothing suggests she alleges injury by way of loss of or injury to her arm braces or any other prosthetic device. Moreover, the ADA incorporates Title VII's relief provisions, thus the relief sought in this action is identical to the relief sought by the plaintiff in *Nichols. See* 42 U.S.C. § 12117 (incorporating 42 U.S.C. § 2000e–5(g)(1) into the ADA). The court therefore finds that Carroll's claims are not preempted by FECA's exclusivity provision. However, FECA's exclusivity provisions apply to bar additional recovery for payments already made for work-related injuries. 5 U.S.C. § 8116(c); *Nichols,* 42 F.3d at 515. Therefore, to the extent Carroll seeks lost wages for the period she was receiving workers' compensation benefits, her recovery must be offset by the amount of workers' compensation actually received. *Id.*

### Conclusion

The court accepts Carroll's assertion that she does not seek an order directing the DOL to grant her a schedule award or any other workers' compensation benefit. The court therefore strikes Carroll's request for "benefits she would otherwise receive for a schedule award," which appears at page 16 of her Complaint in her prayer for relief. However, to the extent that Carroll seeks relief otherwise authorized by the Rehabilitation Act, the Government's motion to dismiss for lack of subject matter jurisdiction should be DENIED.

### II. MOTION FOR SUMMARY JUDGMENT

The Government moves for summary judgment on grounds that: (1) Carroll's claims under the Rehabilitation Act fail

2011 WL 7091804

because (a) no reasonable accommodation existed that
would have enabled Carroll to perform the essential duties
of a Special Agent, therefore she cannot state a claim
for failure to accommodate; (b) Carroll was not able to
perform the essential duties of an FBI Special Agent without
accommodation, therefore she cannot state a *prima facie* case
of disability discrimination; and (c) even if Carroll was able
to perform the essential duties a Special Agent either with or
without accommodation, she has failed to offer any evidence
of discriminatory intent and therefore cannot state a *prima
facie* case of discrimination; and (2) Carroll's constructive
discharge claim fails because she has failed to offer any
evidence that she was compelled to resign due to intolerable
working conditions.

### A. Constructive Discharge Claim

**\*25**  Carroll alleges that as the results of the Government's
acts and omissions she was forced to seek retirement and
resign. (Compl., ¶ 125).

### Standard

"Under the constructive discharge doctrine, an employee's
reasonable decision to resign because of unendurable working
conditions is assimilated to a formal discharge for remedial
purposes. The inquiry is objective; Did working conditions
become so intolerable that a reasonable person in the
employee's position would have felt compelled to resign?"
*Poland v. Chertoff,* 494 F.3d 1174, 1184 (9th Cir.2007)
(*quoting Penn. State Police v. Sliders,* 542 U.S. 129, 141,
124 S.Ct. 2342, 159 L.Ed.2d 204 (2004)). More specifically,
constructive discharge occurs "when the working conditions
deteriorate, as a result of discrimination, to the point that
they become sufficiently extraordinary and egregious to
overcome the normal motivation of a competent, diligent, and
reasonable employee to remain on the job to earn a livelihood
and to serve his or her employer." *Id.* (*quoting Brooks v.
City of San Mateo,* 229 F.3d 917, 930 (9th Cir.2000)). An
employee's decision to retire may constitute constructive
discharge where that decision is the result of coercion
or duress, or where a reasonable person in her position
would have felt forced to quit because of intolerable or
discriminatory working conditions. *Knappenberger v. City of
Phoenix,* 566 F.3d 936, 940 (9th Cir.2009) (internal citations
omitted).

Whether a plaintiff has been constructively discharged is
typically a factual question to be determined by the trier of
fact. *Poland,* 494 F.3d at 1184 (*citing Watson v. Nationwide

Ins. Co .,* 823 F.2d 360, 361 (9th Cir.1987)). However,
a plaintiff asserting constructive discharge as the result of
discrimination must show that "the abusive working
environment became so intolerable that her resignation
qualified as a fitting response." *Penn. State Police,* 542 U.S.
at 134. In *Poland,* the district court found that the plaintiff had
been constructively discharged where he had been transferred
from a supervisory position in Oregon to a nonsupervisory
position in Virginia. 494 F.3d at 1178–79. The Ninth Circuit
reversed, finding the evidence of the plaintiff's transfer and
demotion was insufficient as a matter of law to establish a
constructive discharge. *Id.* at 1184. In so finding, the court
noted that the plaintiff had transferred several times in the
course of his employment, had suffered no decrease in salary
or benefits, and that while he may have preferred to remain in
the position he had "constructive discharge cannot be based
upon the employee's subjective preference for one position
over another." *Id.* at 1185 (internal quotation marks and
citations omitted).

### Discussion

Here, Carroll alleges constructive discharge as the result of
the Government's "acts and omissions," which she does not
further identify except by incorporation of the allegations
in her Complaint. These allegations make clear that Carroll
alleges the Government constructively discharged her by
offering her a position which constituted a demotion from
Special Agent to an administrative support position, required
her to move 275 miles away from her home, did not include
a transfer for her husband, and did not include the relocation
of her family. Under *Poland,* this evidence is insufficient as
a matter of law to support a claim of constructive discharge.
Moreover, the evidence submitted on summary judgment
shows that by her own sworn testimony, the job offer did
not force Carroll to retire and in fact she had submitted her
retirement application before the job offer was made. (Cox
Decl., Ex. 1, Deposition of Shawna M. Carroll ("Carroll
Dep.") at 176). Carroll offers no evidence that her working
conditions had become objectively intolerable at the time she
resigned her position. Instead, at the time of her resignation
the Government was actively working to find a position for
Carroll that accommodated her restrictions as identified by
Dr. Bloom.

### Conclusion

**\*26**  On this evidence, the court finds that Carroll was
not constructively discharged. Therefore, the Government's

motion for summary judgment should be GRANTED with respect to Carroll's constructive discharge claim.

**B, Rehabilitation Act Claims**

Neither Carroll's Complaint nor her opposition to the Government's motion cites a particular section of the Rehabilitation Act. However, Ninth Circuit precedent is clear that federal employees seeking redress for disability discrimination must rely on § 501 of the Rehabilitation Act, 29 U.S.C. § 791. *Newland v. Dalton,* 81 F.3d 904, 906 n. 1 (9th Cir.1996) *Johnston v. Horne,* 875 F.2d 1415, 1420–21 (9th Cir.1989); *see also* 42 U.S .C. § 12111(5) (B)(i) (exempting federal government from the Americans with Disabilities Act). Carroll asserts two theories of discrimination: (1) disparate treatment, (Compl., ¶ 103); (2) failure to accommodate, (id., ¶ 116); and (3) that she "was forced to resign and retire" as the result of this discrimination, (id., ¶¶ 113, 121).[7]

*Standard*

To state a *prima facie* case for disparate treatment under § 501, a plaintiff must "demonstrate that (1) she is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered discrimination because of her disability." *Walton v. U.S. Marshals Serv.,* 492 F.3d 998, 1005 (9th Cir.2007). A plaintiff need only demonstrate that her disability was a "motivating factor" behind the discrimination. *See* 29 U.S.C. § 591(g) (adopting standards for Americans with Disabilities Act for claims under § 501 of the Rehabilitation Act); *Head v. Glacier Northwest, Inc.,* 413 F.3d 1053, 1065 (9th Cir.2005) (holding that "a motivating factor standard is the appropriate standard for causation in the ADA context"); *see also Pinkerton v. U.S. Dep't of Educ.,* 508 F.3d 207, 209–214 (5th Cir.2008) (reviewing authority from all circuits regarding sole causation standard in Section 501 claims).

To state a *prima facie* case for failure to accommodate under § 501, a plaintiff must show that (1) she is disabled, (2) she is a qualified individual, and (3) that a reasonable accommodation is possible. *Buckingham v. U.S.,* 998 F.2d 735, 739–740 (9th Cir.1993). Reasonable accommodation means "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o) (1)(ii).

**1. Carroll Was Disabled**

To establish the first element of her *prima facie* case, Carroll must prove she was disabled at the time of the alleged discriminatory action. Neither Carroll nor the Government addresses this element.

*Standard*

Under the Rehabilitation Act, a plaintiff has a disability if she has "a physical or mental impairment which substantially limits one or more major life activities, a record of such impairment, or is regarded as having such an impairment." 42 U.S.C. § 12102(2); *Mustafa v. Clark Cnty. School Dist.,* 157 F.3d 1169, 1174 (9th Cir.2003) (*citing* 29 C.F.R. § 1630.2(g)). "Physical impairment" includes any physiological disorder or condition affecting listed body systems, including the neurological and musculoskeletal systems. 29 C.F.R. § 1630.2(h). "Major life activity" includes functions such as caring for oneself, performing manual tasks, reaching, lifting, and working. 29 C.F.R. § 1630.2(i).

*Discussion*

**\*27** Carroll affirmatively alleges that her bilateral radial tunnel syndrome, bilateral ulnar neuropathy, and bilateral carpal tunnel syndrome impaired her range of motion, caused her extreme pain, and precluded her from "any significant lifting and repetitive motion activities such as typing or carrying or using a firearm." (Compl., pp. 3 at ¶ 13). Carroll further alleges she has suffered the loss of use of both arms due to these conditions, that these conditions are disabling, and that the impairment of the loss of use of her arms affects substantial life activities including "lifting, carrying or performing simple day-to-day tasks that require either use of the arms or range of motion activities." (*Id.* pp. 4 at ¶ 16–17). These allegations are supported by the undisputed medical evidence and not otherwise contested or disputed by the Government.

*Conclusion*

On these facts, the court finds that Carroll's bilateral radial tunnel syndrome, bilateral ulnar neuropathy, and bilateral carpal tunnel syndrome are a disability within the meaning of the Rehabilitation Act. Therefore, Carroll has established the first element of her *prima facie* case.

**2. Carroll Was Not a "Qualified" Individual**

To establish the second element of her *prima facie* case, Carroll must demonstrate that she was qualified individual.

### Standard

Under the Rehabilitation Act, a "qualified individual" is an individual with a disability "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Mustafa, 157 F.3d at 1175* (*citing* 29 C.F.R. § 1630 .2(n)(1)). To determine whether a plaintiff is a qualified individual, the court must first determine whether she can perform the essential functions of the job without reasonable accommodation, and then, if she cannot, whether she can do so with a reasonable accommodation. *Dark v. Curry Cnty., 451 F.3d 1078, 1086 (9th Cir.2006)* (*citing Kaplan v. City of N. Las Vegas, 323 F.3d 1226, 1231 (9th Cir.2003)*). An individual who is incapable of performing the functions of her employment position as the result of total disability is not a "qualified" individual. *Weyer v. Twentieth Century Fox Film Corp., 198 F.3d 1104, 1112 (9th Cir.2000)*.

### (a) Essential Functions of a Special Agent

The Government does not argue that all 247 tasks listed for FBI Special Agents are essential to the performance of that job. However, the Government argues that the tasks which Dr. Bloom opined Carroll was specifically precluded from performing—using firearms, keyboarding, lifting more than 15 pounds, crawling and climbing—are all essential to the job of Special Agent.

Essential functions are the "fundamental job duties of the employment position the individual with a disability holds or desired ... not including the marginal functions of the position ." 29 C.F.R. § 1630.2(n)(1). To determine the essential functions of the job, a court considers "the employers judgment as to what functions of the job are essential," 42 U.S.C. § 12111(8), and looks to "[t]he amount of time spent on the job performing the function," "[t]he consequences of not requiring the [employee] to perform the function," and the work experience of current and former employees. 29 C.F.R. § 1630.2(n)(3)(iii)-(vii),

### i. Firearms

 **\*28** The Government argues that the ability to carry and use a firearm is an essential function of FBI Special Agents. In support of this assertion, the Government offers the job description for an FBI Special Agent, which requires

that agents "be completely available for general or special assignment regardless of complexity or difficulty whenever and wherever needed." (Huff Decl., Ex. 8 at 1). Furthermore, Special Agents are "frequently placed in charge of raids or other assignments involving direction of groups of Special Agents and local law enforcement officers," are required to perform their duties "frequently under circumstances requiring very heavy personal responsibility in overcoming unresponsiveness, hostility, or violence," and to perform assignments which "may involve physical hardship or hazard." (*Id.* at 2, 4). Accordingly, the 247 "Essential Tasks" which an FBI Special Agent must be capable of performing include the ability to load and unload a handgun, shotgun, rifle, and MP5, and to discharge each of these firearms as needed on the job, up to 50 rounds during practice, and up to 200 rounds during quarterly firearms qualification. (Cox Decl., Ex. 6 at 10–19).

Carroll affirmatively alleges and admits that as an FBI Special Agent she was required "to carry and use a firearm." (Compl., ¶ 19). She also offers her deposition testimony in which she testified she believes it is essential for a Special Agent to be capable of firing their weapon although she has not personally had to do so, knows only three agents who have had to do so, and further knows agents who are not mandated to be able to do so. (Pl's Ex. 33 at 211).

Job functions can be essential even if they are performed infrequently. *Puletasi v. Wills, 290 Fed. Appx. 14, 18 (9th Cir. July 11, 2008)*. The danger inherent in federal law enforcement positions has led courts to conclude that physical fitness and the ability to load and fire weapons are essential functions of those jobs. *Id. at 17–18* (ICE criminal investigators must be proficient in the use of firearms and capable of handling dangerous persons and situations); *Kaplan v. City of N. Las Vegas, 323 F.3d 1226, 1230–31 (9th Cir.2003)*; *see also Butler v. Thornburgh, 900 F.2d 871, 876 (5th Cir.1990)* (Rehabilitation Act does not apply to law enforcement officers who are incapable of safely performing their duties, including the carrying of a firearm).

On these facts, the court finds that the ability to carry and use a firearm is an essential function of an FBI Special Agent.

### ii. Keyboarding

The Government argues that the ability to keyboard or type is an essential function of the position of Special Agent. In support of this assertion, the Government offers the 247 "Essential Tasks" which an FBI Special Agent must be

2011 WL 7091804

capable of, which include the ability to operate a keyboard and thirteen tasks regarding writing requirements and the ability to write electronic communications ("ECs") such as memoranda and investigative reports, prepare affidavits, conduct searches, access information, and complete other similar tasks. (Cox Decl., Ex. 6 at 10–19). At the time of her disability retirement application in May 2006, Carroll alleged the Medford RA had no secretary, that Special Agents typed their own reports, that she spent up to 95% of her time typing, that one day of investigative work could result in two days of typing, and that in addition to typing reports she used her computer to perform searches relevant to the criminal investigations she was performing. (Cox Decl., Ex. 9 at 4–5).

**\*29** On these facts, the court finds that the ability to keyboard and/or type is an essential function of an FBI Special Agent.

### iii. Lifting, carrying, climbing, and crawling

The Government argues that the ability to lift significant weight (more than 50 pounds), carry, climbing, and crawling are essential functions of a Special Agent insofar as they directly relate to the agent's ability to perform defensive tactics, conduct investigations, and apprehend suspects. In support of this assertion, the Government offers the Special Agent job description which, as described above, identifies that special agents are frequently placed in charge of raids and in other situations requiring the agent to perform his or her duties in the face of hostility and violence. (Huff Decl., Ex, 8 at 1–2, 4). Accordingly, the list of "Essential Tasks" identified for the position of Special Agents includes the ability to practice and maintain a high proficiency level of defense and tactical skills; pull or drag an uncooperative individual 20–25 feet without assistance during a search or arrest situation; separate uncooperative persons without assistance by pushing, pulling, using lock grips, or holds; place a resistive subject into a vehicle without assistance; and the ability to crawl and climb over, under, and through various obstacles. (Cox Decl., Ex. 6 at 10–19).

The Government points out that the FBI enforces these essential functions through mandatory biannual physical fitness examinations and quarterly self-defense training. Carroll does not offer any evidence to counter the Government's assertions. Rather, she affirmatively alleges and admits that as an FBI Special Agent she was required to "show significant manual dexterity and a relatively unconstricted range of motion." (Compl., ¶ 19).

As a matter of common sense, it is reasonable that a law enforcement officer charged with investigating crime and apprehending criminals would be required as a part of her job to be able to pursue, subdue, and restrain a suspect, defend herself when confronted with violence, perform searches, and other similar investigative tasks. *See, e.g., Kaplan,* 323 F.3d at 1230–31; *Puletasi,* 290 Fed. Appx. at 17–19 (plaintiff who could not meet the physical demands of a potentially hazardous criminal investigator position, including running, jumping, or handling a firearm, could not fulfill the essential functions that job). The Government offers no evidence regarding the frequency with which Carroll was required to perform these tasks, and based on Carroll's representation that she spent 95% of her time typing reports, it appears unlikely that these activities were regularly demanded of her. However, as discussed above in respect to firearms, the fact that Carroll may only have been required to perform these functions infrequently does not mean that they are not essential to her role as a Special Agent. On the basis of the Government's undisputed evidence, the court finds that the ability to lift, carry, climb and crawl are essential functions of the job of FBI Special Agent.

### Conclusion

**\*30** The ability to carry and fire a firearm, the ability to keyboard and/or type, and the ability to lift, carry, climb and crawl are all essential functions of a Special Agent. Therefore, to be a "qualified individual," Carroll must demonstrate that she was capable of performing these functions either with or without reasonable accommodation.

### (b) Carroll could not perform the essential functions of a Special Agent without accommodation

Carroll affirmatively alleges and admits that her treating physician determined she "had effectively lost nearly total use of her arms," that the loss of use of both her arms "affected the essential functions of the position of her employment," and that her bilateral radial tunnel syndrome, bilateral ulnar neuropathy, and bilateral carpal tunnel syndrome "impair[ed] her range of motion, produc[ed] extreme pain, and preclud[ed] her from any significant lifting, repetitive motion activities such as typing or carrying or using a firearm." (Compl., ¶¶ 13, 18, 46). She further admits and alleges she "may have been able to draw and use her weapon, but could only do so with great pain," and that she "may have been able to use her service handgun but probably could not have wielded a rifle, shotgun or submachine gun." (*Id.,* ¶ 27).

2011 WL 7091804

These admissions are consistent with Carroll's May 2006 disability retirement application, in which she alleged her disability precluded her from "fully performing much of the Special Agent Essential Tasks" and specifically left her unable to perform any keyboarding and limited to sedentary light physical demand level work as determined by Dr. Bloom's May 2006 report and the March 2006 FCE. (Cox Decl., Ex. 9 at 8). Furthermore, Carroll's admissions are consistent with the concurrent assessment of her supervisor, Conli, who submitted a "Supervisor's Statement" in connection with her disability retirement application indicating Carroll was "expected/mandated to carry and demonstrate proficiency with a firearm, make arrests and perform a number of other physical tasks which [she] is unable to accomplish." (*Id.,* Ex. 3 at 9).

Despite this evidence, Carroll opposes the Government's motion on grounds that the Government "presumed" she was unable to carry a firearm and therefore unable to remain a Special Agent without any "actual medical evidence" to support this determination. (Pl's Opp'n to Def's Mot. for Summ. J., pp. 43). She argues the Government was required to perform an independent fitness for duty exam and violated the Rehabilitation Act by relying on Dr. Bloom's opinion as to her limitations. (*Id.*). Carroll further argues that Dr. Bloom's opinion was merely an assessment, not a prognosis, and asserts that " '[a]t trial, Dr. Bloom is expected to testify that her limitations were imposed at the time, to help Ms. Carroll recuperate and that she has yet to make a definitive finding that Ms. Carroll could not work as an Agent." (*Id.* at 44–45). Finally, she argues that her testimony during her deposition that she was capable of performing the functions of her position as related to lifting, carrying, and firearms creates a genuine issue of material fact which precludes summary judgment. (*Id.* at 59).

**\*31** Carroll's allegations regarding Dr. Bloom's "expected testimony" is mere speculation and does not create a triable issue of fact. Likewise, Carroll's generalized, conclusory deposition testimony that she was capable of performing the essential duties of a Special Agent in 2006 does not constitute "specific facts" sufficient to defeat a summary judgment motion. *See Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir.2007) ( "[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment"); *Nelson v. Pima Cmty. Coll.,* 83 F.3d 1075, 1081–82 (9th Cir.1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment"); *Taylor v. List,*

880 F.2d 1040, 1045 (9th Cir.1989) ("[a] summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data"). In her May 2006 disability retirement application Carroll represented that her injuries prevented her from fully performing the essential functions of a Special Agent. In her September 2007 sworn statement, made in connection with her EEOC complaint, Can-oil states that the inability to type or use a firearm made her ineligible to work as a Special Agent. And in her Complaint, Carroll affirmatively alleges and admits that (1) her injuries precluded significant lifting, typing, and carrying or using a firearm; (2) her disabling condition affected the essential functions of her position as Special Agent; and (3) that her disabling condition was and is permanent. Carroll does not offer any contemporary medical evidence to support her deposition testimony. Carroll's deposition testimony is therefore uncorroborated, self-serving, and contradictory to her prior statements and the medical evidence, and therefore insufficient to create a "genuine dispute" concerning whether she was totally disabled.

Carroll also argues that the FBI should not have relied on her self-assessment or the medical evidence provided by her treating physician, but rather should have placed her in its Medical Mandates program and required her to submit to additional functional capacity evaluations. Taking this course of action would have provided the FBI with a second opinion to either confirm Dr. Bloom's assessment or provide a basis on which to challenge it. However, Carroll cites no authority for the proposition that an employer may not, as a matter of law, accept the opinion of an employee's treating physician as to that employee's functional limitations, particularly where that opinion is uncontroverted and based upon an independent functional capacity evaluation performed by a third party.

Carroll argues strenuously that the very existence of the Medical Mandates program requires this conclusion, and further argues that the Government violated its own policies and the Rehabilitation Act by failing to place her in the Medical Mandates Program. However, the evidence on which Carroll relies does not support this contention. The undisputed evidence shows that FBI Special Agents are not necessarily placed in the Medical Mandates Program when an agent's treating physician recommends restrictions due to illness or injury; rather, agents typically are not placed in the program until after they return to duty with restrictions. (Cox Decl., Ex. 6 at 7).

2011 WL 7091804

**\*32** Moreover, Medical Mandates Program policy section 24–4.1 provides "[m]edical mandates (restrictions) are assigned by the Bureau's Medical Officer (MO), a Bureau physician, *or a private physician utilized by the employee* when he/she has an illness, injury, physical/mental condition that precludes or limits their ability to perform the expected duties of their position." (Byrnes Decl., Ex. 29) (emphasis added). Thus, contrary to Carroll's assertion, the Medical Mandates Program itself explicitly allows for diagnosis and assessment by a treating physician and does not require that the agent be examined or evaluated by a program physician in order to confirm the validity of the treating physician's opinion and recommended restrictions.

Viewing these facts in the light most favorable to Carroll, the court finds that at the time of her retirement and the allegedly discriminatory job offer Carroll was unable to perform the essential functions of a Special Agent without accommodation. The issue, therefore, is whether Carroll was entitled to reasonable accommodation to help her perform the essential functions of the Special Agent position.

### (c) No reasonable accommodation was possible that would have enabled Carroll to perform the essential duties of a Special Agent

The Government argues that no reasonable accommodation was possible that would have enabled Carroll perform her duties with respect to firearms, keyboarding/typing, or the physical requirements of the position. In response, Carroll argues the Government could have accommodated her by creating an Investigative Analyst or an administrative support position for her in the Medford RA, or could have accommodated her in the Special Agent position by placing her in a modified or light duty position, providing a hand brace to accommodate her firearms restriction, and by providing ergonomic furniture and voice-activated typing software to alleviate the need for keyboarding/typing.

### Standard

Employers have an affirmative duty under the Rehabilitation Act "to make reasonable accommodations for the known physical or mental" condition of an employee. 42 U.S.C. § 12112(b)(5)(A); *Buckingham v. U.S.,* 998 F.2d 735, 739 (9th Cir.1993). The term "reasonable accommodation" includes:

"Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate

adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."

42 U.S.C. § 12111(9)(B). EEOC regulations define reasonable accommodations as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). The question of whether a proposed accommodation is reasonable requires a fact-specific, individualized inquiry that is determined on a case-by-case basis. *Wong v. Regents of the Univ. of Cal.,* 192 F.3d 807, 818 (9th Cir.1999). The plaintiff bears the initial burden of showing that a reasonable accommodation is possible and reasonable on its face, *Buckingham,* 998 F.2d at 740 (internal citations omitted).

**\*33** The party from whom accommodation is sought has an affirmative obligation to engage in an "interactive process" triggered by notice of disability and desire for accommodation. *Vinson v. Thomas,* 288 F.3d 1145, 1154 (9th Cir.2002) (discussing the mandatory interactive process in the employment discrimination context); *Barnett v. U.S. Air., Inc.,* 228 F.3d 1105, 1114 (9th Cir.2000) (same). The purpose of the process is to clarify individual needs and identify appropriate accommodation. *See Vinson,* 288 F.3d at 1154. The process involves meeting with the party who requests an accommodation, requesting information about the condition and limitations, asking about the specific request, showing some signs of considering the request, and discussing available alternatives if the request is too burdensome. *See Barnett,* 228 F.3d at 1115.

### Discussion

Carroll suggests the Government could have accommodated the restrictions resulting from her disability by providing her with voice activated typing software, placing her on firearms restrictions, or allowing her to remain stationed at the Medford RA in an Investigative Analyst or support position.

The FBI considered but was unable to accommodate Carroll's request for voice activated typing software because Congress had not approved use of the technology for Special Agents. Carroll appears to argue that because the OSA position was modified to allow for the use of voice activated typing software, the technology was or should have been available for use in other positions within the FBI. The Special

Agent job description offered by the Government states these employees handle "exceptionally difficult, confidential, and/or undercover assignments" and that the "[o]ffenses, violations, or investigative matters are of an unusually serious nature; there usually are indications of actual or potential threats or challenges to the stability and/or integrity of major segments of the national welfare or security." (Huff Decl., Ex. 8 at 1, 3). By contrast, the OSA job description for OSA shows that these employees are primarily responsible for fielding phone calls from the general public reporting complaints and requesting information, screening the calls to determine the necessary action, and relaying the information as necessary to local law enforcement of the appropriate internal contact. (*Id.,* Ex. 12 at 7–12). Carroll offers no evidences to show that the security concerns inherent to the position of Special Agent apply to the position of OSA, and she fails to offer any evidence to controvert Conli's sworn statement that the FBI's Security Division had not approved voice activated typing software for Special Agents. (Pl's Ex. 22 at 4). Because voice activated typing software was not available for use by Special Agents, it is not a reasonable accommodation.

Carroll's request that she be allowed to remain stationed at the Medford RA but be reassigned to an Investigative Analyst or support position is likewise not a reasonable accommodation because no such position existed at the Medford RA. A reasonable accommodation may include reassignment to a vacant position. 42 U.S.C. § 12111(9)(b). However, there is no duty to create a new position for disabled employees. *Wellington v. Lyon Cnty. Sch. Dist.,* 187 F.3d 1150, 1155 (9th Cir.1999). The Government accommodated Carroll's reassignment request by offering her the highest grade position available in the state which fit her restrictions. Carroll argues this offer was not reasonable because the job was located 275 miles from her home, did not include a transfer for her husband or relocation for her family, and constituted a significant demotion. However, there is no evidence that another vacant position was available that was closer to her home or closer to her pay grade. The fact that taking the job would have required her to move does not make the offer per se unreasonable. Likewise there is no obligation under the Rehabilitation Act that an employer accommodate a disabled employee by offering to transfer her spouse and relocate her family. These objections, while understandable, are simply not actionable.

**\*34** Finally, Carroll argues the Government could have reasonably accommodated her firearms and physical restrictions by placing her on modified or light duty

with firearms restrictions.[8] Reasonable accommodation may include job restructuring, part-time or modified work schedules, and adjustments or modifications of policies and other similar accommodations. 42 U.S.C. § 12111(9). However, reasonable accommodation does not require an employer to reallocate or eliminate essential functions of a job. *Mustafa,* 451 F.3d at 1089 (*citing* 29 C.F.R. Part 1630, App.). The undisputed evidence shows that in 2005, the Government did just that, by offering Carroll a modified Special Agent position. Notably, that offer was for a position stationed in Portland, not Medford, Carroll did not have any significant restrictions on her ability to keyboard or type, and Carroll had not yet been diagnosed with any permanent impairment or restrictions. By contrast, at the time of the alleged discrimination Dr. Bloom had issued a report finding Carroll to be permanently medically stationary with restrictions of no keyboarding, no repetitive firearms, and no lifting over 15 pounds. As described above, these restrictions affect essential functions of the job of Special Agent. Moreover, her condition had been diagnosed as permanent and, as described above, Carroll adopted those limitations as accurate. Therefore, to accommodate her restrictions and allow her to remain a Special Agent, the Government would have to eliminate certain essential functions of Carroll's job. This, the Rehabilitation Act does not require.

Carroll also argues she was not physically incapable of performing the functions described in the restrictions recommended by Dr. Bloom. Rather, these restrictions merely represent recommendations that she avoid certain activities which could aggravate her physical condition. Moreover, Carroll argues these restrictions were not permanent because her physical condition would have improved with additional time and treatment and did in fact do so. However, at her deposition Carroll testified that Dr. Bloom "may have" told her that the restrictions were permanent, that her basis for believing the restrictions were not permanent is her own self-assessment, and that she is unaware of any medical opinion or other medical documentation from the relevant time period which states the restrictions recommended by Dr. Bloom in May 2006 were not permanent. (Pl's Ex. 33, Carroll Dep., pp. 107–108).

The determination whether an individual is "qualified" is determined in the present tense. *See Weyer v. Twentieth Century Fox Film Corp.,* 198 F.3d 1104, 1112 (9th Cir.2000) (plaintiff who was incapable of performing the functions of her employment position as the result of total disability was not a "qualified individual"); *see also Myers v. Hose,*

50 F.3d 278, 283 (4th Cir.1995) (holding that the ADA does not require an employer to wait for the employee's condition to resolve). The relevant time period here is 2006. At that time, the undisputed medical evidence presented to the Government by Dr. Bloom after nearly two years of treatment indicated that Carroll's condition was permanent and not subject to improvement. Instead of improvement, Carroll's condition had progressively deteriorated over time. On this evidence, Carroll's subjective opinion concerning her ability to work is facially insufficient to establish that she was qualified to return to work in May 2006 with limitations.

*Conclusion*

**\*35** At the time of Carroll's retirement and the allegedly discriminatory job offer, she was not able to perform the essential functions of a Special Agent. Moreover, no reasonable accommodation was possible that would have allowed her to perfonn the essential functions of a Special Agent. Carroll therefore was not a "qualified" individual as defined by the Rehabilitation Act, and thus fails to state a *prima facie* case for either disparate treatment or failure to accommodate.

**3. "Caused Resignation" Theory**

Carroll's argument that the Government forced her to resign in violation of the Rehabilitation Act is a theory of constructive discharge. As described in Section II(A) of this opinion, Carroll has failed to offer any evidence that her working conditions deteriorated as the result of discrimination to the point where a reasonable person in her position would have felt compelled to resign. *Poland,* 494 F.3d at 1184–85. Furthermore, Carroll's own sworn testimony shows that her decision to retire was made before the Government made the job offer and thus was unaffected by the offer. Finally, as discussed in the section above, Carroll's disability rendered her physically incapable of performing the essential functions of a Special Agent, therefore she was not "qualified" to hold

that position. As a result, her decision to resign that position is not the result of coercion or duress, but her physical inability to perform the job.

*CONCLUSION*

Carroll has failed to state a *prima facie* case for disability discrimination under either a disparate treatment theory, failure to accommodate theory, or "caused resignation" theory. Therefore, the Government's motion for summary judgment should be GRANTED as to Carroll's claims under the Rehabilitation Act.

**RECOMMENDATION**

For the reasons stated above, the Government's motion to dismiss should be GRANTED IN PART AND DENIED IN PART, and the Government's motion for summary judgment should be GRANTED.

***This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.*** Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. ***Objections to this Report and Recommendation, if any, are due by October 18, 2011. If objections are filed, any response to the objections is due by November 4, 2011.*** *See* Fed.R.Civ.P. 72, 6.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 7091804

---

Footnotes

1    In her 81 page memorandum, Carroll cites to pages 36, 69, 174, and 251–272 of Exhibit 18, (Pl's Opp'n to Def's Mot. for Summ. J., at 15 n. 6, 16, 51), and pages 25–26, 51–52, 58, and 61 of Exhibit 19. (*Id.,* at 16, 48, 52, 57). She also cites to page 237 of Exhibit 19, (*id.* at 57); however, this is an invalid reference as Exhibit 19 contains only 97 pages.

2    Both Dr. Bloom's DOL duty status report and her report to the Government indicate Carroll would be seen again on November 28, 2005. (Huff Decl., Ex. 5 at 4–5).

3    Dennis Olfert's last name is misspelled as "Offert" on the cover sheet of his deposition testimony excerpt.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

4    The Government argues summary judgment is proper under Federal Rule Civil Procedure 56(c). (Mem. iso Def's Mot. to Dismiss or, in the Alternative, Mot. for Summ. J., pp. 19). However, Rule 56 was amended effective December 1, 2010. Although there is a slight language change and a change in the designation of subsections, the legal standard remains the same. *See* Fed.R.Civ.P. 56(a) (eff.Dec.1, 2010) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.") The relevant text of the prior rule stated that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2) (effective prior to December 1, 2010). The minor change in language between the old Rule 56(c)(2) and the revised Rule 56(a) has no effect on the court's ruling here.

5    At the time this motion was filed, the Government also argued plaintiff had failed to exhaust her administrative remedies because her DOL appeal was still ongoing. At oral argument, the Government withdrew this argument, noting that the DOL has ruled on plaintiff's appeal, *S.C. & Dept. of Justice. Fed. Bureau of Investigation,* No. 10–1364,2011 WL 2492912 (E.C.A.B. Apr. 26, 2011), rendering the exhaustion argument moot.

6    The court further notes that Carroll brings this action under the Rehabilitation Act only, not the ADEA, thus the Complaint itself fails to invoke the federal statute which she asserts has been violated and fails to establish the elements necessary to state a prima facie case of age discrimination. *See Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1281 (9th Cir.2000) (to establish a prima facie case of age discrimination the plaintiff must prove she was (1) at least forty years old, (2) performing her job satisfactorily, (3) discharged, and (4) either replaced by substantially younger employees with equal or inferior qualifications or discharged under circumstances otherwise "giving rise to an inference of age discrimination").

7    Carroll alleges that the Government "deployed a discriminatory and retaliatory scheme designed to punish Carroll for her disability ." (Compl., ¶ 102). However, her Complaint does not include a claim for retaliation in violation of the Rehabilitation Act, nor did Carroll raise such a claim at oral argument.

8    At oral argument Carroll also contended that the Government could have accommodated her firearms restriction by providing her a hand brace. There is no evidence that Carroll requested this accommodation at any time prior to oral argument. Moreover, Carroll conceded that although a hand brace might accommodate her firearms restriction with regards to a handgun, no such accommodation would be possible for use of a rifle, shotgun, or submachine gun, all of which are firearms which she must be able to handle and fire as a Special Agent.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1026479
United States District Court,
S.D. Ohio,
Eastern Division.

Chris GEIGER, Plaintiff,

v.

PFIZER, INC., Defendant.

No. 2:06-CV-636.
|
April 15, 2009.

West KeySummary

1   Civil Rights   🗝   Admissibility of evidence;
    statistical evidence

    Civil Rights   🗝   Retaliation claims

    Previous discrimination charge filed by
    employee was direct evidence that employee
    engaged in a protected activity, and therefore
    employer's motion in limine to exclude
    evidence of the previous charge from
    employee's retaliation claim against employer
    was denied. Employee filed a previous charge
    of discrimination alleging that employer refused
    to provide her a reasonable accommodation,
    discriminated against her because of an alleged
    disability, and retaliated against her for seeking
    an accommodation. The document was relevant
    as direct proof that employee engaged in
    a protected activity, one of the prima facie
    elements of employee's retaliation claim. The
    document was also relevant to establish a time
    line of events and to show employer had a
    motivation to retaliate against employee.

    9 Cases that cite this headnote

**Attorneys and Law Firms**

Samuel Neal Lillard, Elizabeth J. Birch, McNees Wallace &
Nurick LLC, Gary A. Reeve, Reeve & Knoll, Columbus, OH,
for Plaintiff.

Fred G Pressley, Jr., Jenny T. Swinerton, Porter Wright
Morris & Arthur, Columbus, OH, James M. Stone, Nicole
M. Monachino, Vincent J. Tersigni, Jackson Lewis LLP,
Cleveland, OH, for Defendant.

*OPINION AND ORDER*

ALGENON L. MARBLEY, District Judge.

 **\*1** This matter comes before the Court on Defendant
Pfizer, Inc.'s ("Pfizer") and Plaintiff Chris Geiger's ("Geiger")
various pretrial motions. The Court held a Final Pretrial
Conference in this matter on April 15, 2009. At the
conference, the Court issued the following rulings on the
parties' motions:

*1. The Court GRANTS Pfizer's Motion to Bifurcate (doc.
no. 105).*

Pfizer moves this Court to bifurcate the issue of punitive
damages from the issues of liability and other damages.
Under Ohio law, any tort action tried to a jury in which
the plaintiff makes a claim for compensatory and punitive
damages shall be bifurcated upon the motion of any party.
Ohio Rev.Code § 2315.21(B)(1). The initial stage shall relate
only to liability and whether plaintiff is entitled to recover
compensatory damages. *Id.* at § 2315.21(B)(1)(a). If the
jury determines in the initial stage that plaintiff is entitled
to recover compensatory damages, evidence with respect
to whether plaintiff is entitled to recover punitive damages
may be presented at the second stage of the trial. *Id.* at §
2315.21(B)(1)(b). Pfizer contends that because Geiger seeks
both compensatory and punitive damages for her Ohio law
retaliation claim under Ohio Rev.Code 4112, the trial should
be bifurcated. The motion to bifurcate is **GRANTED.**

This case involves statutory violations under state and federal
law. Geiger asserts, therefore, that this is not a tort action. It is
true that this is not a common-law tort action. Nevertheless,
an action brought under Ohio Rev.Code 4112 is a "tort action"
as it is "a civil action for damages for injury or loss to person
or property." *Ridley v. Fed. Express,* No. 82904, 2004 WL
1119591, at * 12 (Ohio Ct.App. May 20, 2004), *citing see
Ohio Rev.Code 2315.21(A)(1); see also State ex rel. Ohio
Academy of Trial Lawyers v. Sheward,* 86 Ohio St.3d 451,
537, 715 N.E.2d 1062 (Ohio 1999) (actions brought under §
4112 are discrimination tort cases); *Reilly v. Alcan Aluminum*

*Corp.,* No. 98-3566, 1999 WL 313879, at *3 (6th Cir. May 5, 1999)* (recognizing a claim brought under § 4112.14 for age discrimination is a tort claim); *McCombs v. Meijer, Inc.,* 395 F.3d 346, 355 (6th Cir.2005)* (applying the "clear and convincing" standard under § 2315.21 to a jury award under § 4112); *McIntyre v. Advance Auto Parts,* No. 1:04 CV 1857, 2007 WL 120645, at *28 (N.D.Ohio Jan.10, 2007)* (applying the standard for punitive damages under § 2315.21 to a claim under § 4112.99); *Smith v. Glaxo Wellcome,* Inc. No. C-1-96-540, 1998 WL 34024762 (S.D.Ohio June 11, 1998)* (bifurcating a trial pursuant to § 2315.21 based on a public policy tort claim for wrongful discharge based on age and sex discrimination). Because this is a tort action under Ohio law involving a request for compensatory and punitive damages, it is mandated this trial be bifurcated upon Pfizer's motion. The first phase of the trial will address the issues of liability and compensatory damages. The second phase, to follow immediately thereafter, will address the issue of punitive damages.

## 2. The Court DENIES in PART and GRANTS in PART Pfizer's Motions in Limine (doc. no. 109).

**\*2**  Pfizer moves this Court to instruct Geiger and her counsel not to refer to, interrogate any witness concerning, or comment on the following: (A) evidence regarding Geiger's medical history; (B) that Geiger is "disabled," has a "disability," or is "regarded as disabled"; (C) the parties communications with the EEOC and OCRC; (D) Geiger's 2004 charge containing allegations of disability discrimination; (E) that any action other than Geiger's 2004 and 2006 performance evaluations and merit increases for those years is an adverse employment action; (F) the reasons why Geiger was denied long-term disability benefits; (G) evidence which is not based on personal knowledge or which constitutes rumor, speculation, or hearsay; (H) subjective opinions by Geiger or Geiger's witnesses regarding alleged retaliation against Geiger or the reasons for or fairness of the performance evaluations and merit increases; (I) evidence of an alleged pattern of discrimination or "me too" evidence; (J) evidence regarding the circumstances surrounding the termination of George Loche and Richard Ferguson; (K) evidence as to back pay damages and benefits allegedly sustained during any period of time Geiger was unable to work due to an unrelated injury; (L) evidence regarding Pfizer's size, financial status, or stature in the pharmaceutical industry; and (M) evidence relating to other claims or lawsuits brought against Pfizer. Pfizer asserts if such testimony and

evidence is divulged to the jury, regardless of any objection which may be made, there is a substantial danger of undue prejudice and confusion.

"Orders in limine which exclude broad categories of evidence should rarely be employed. A better practice is to deal with questions of admissibility of evidence as they arise." *Sperberg v. Goodyear Tire & Rubber Co.,* 519 F.2d 708, 712 (6th Cir.1975)*. A court is generally better suited during trial to assess the value and utility of evidence. *Black v. Columbus Pub. Schs.,* No. 2:96-CV-326, 2007 WL 2713873, at *2 (S.D.Ohio Sept.17, 2007)*. The moving party has the burden of showing that the evidence in question is clearly inadmissible, and if the party fails to meet this burden, then evidentiary rulings should be deferred so that the issues may be resolved in the context of the trial. *Id.*

## A. Testimony and Medical Records Regarding Geiger's Medical History

Pfizer asserts that Geiger's "disability" is irrelevant to her claim of retaliation and all testimony and medical records regarding Geiger's medical history should thereby be excluded. The motion to exclude this evidence is **DENIED.**

The issue to be decided by the jury at trial is whether Pfizer unlawfully retaliated against Geiger, most notably in the ratings and merit increases provided to her in connection with her February 2005 and February 2007 performance reviews. Geiger alleges these actions were made in retaliation for (1) her requesting an accommodation in March of 2004 and December of 2005; and (2) filing charges with the OCRC and EEOC in October 2004 and March 2005. Pfizer anticipates Geiger will attempt to offer evidence at trial regarding her medical conditions and the events leading up to her requests for accommodation in an effort to elicit sympathy from the jury and reintroduce her disability discrimination claim. Pfizer asserts such evidence is irrelevant, and is unfairly prejudicial and potentially confusing to the jury.

**\*3**  Under Fed.R.Evid. 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Under Fed.R.Evid. 403, however, although relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue

2009 WL 1026479, 21 A.D. Cases 1597

delay, waste of time, or needless presentation of cumulative evidence."

To establish a prima facie case of unlawful retaliation under the ADA, the plaintiff must show: (1) that she engaged in a protected activity; (2) that she suffered an adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action. *Penny v. United Parcel Serv.,* 128 F.3d 408, 417 (6th Cir.1997). Geiger requested an accommodation for her medical conditions in March of 2004 and December of 2005 and filed charges of discrimination with the OCRC and EEOC in October of 2004 and March of 2005, based on Pfizer's subsequent actions. Evidence related to Geiger's medical conditions is relevant to show that she engaged in protected activities related to those medical conditions, her motivations for engaging in the protected activities, and to provide relevant background information and context.

Further, evidence pertaining to Geiger's medical conditions is probative to show a causal connection between engaging in protected activity related to her medical conditions and the adverse employment actions. Geiger asserts that information related to Geiger's medical conditions will be used to establish that Pfizer had a motive to retaliate against Geiger in an effort to create such an unbearable workplace environment that she would be forced to resign; with her resignation, Pfizer would not have to deal with the additional obligations it would face in having to accommodate Geiger.

The Court already determined that Pfizer is regarded Geiger as disabled. The Court's determination was based on a letter sent by Dr. Chester to Geiger on May 5, 2004. In that letter, Dr. Chester stated that Geiger's impairments were covered under the ADA, and thus she was approved for the work-related accommodation of an 8-hour work day. Geiger asserts that the letter and information pertaining to Geiger's disabilities will be used to show that Pfizer believed Geiger had addition rights under law because it regarded her as disabled, and that her former managers had a motive to retaliate against her rather than try to accommodate her needs under the law.

This Court finds that Pfizer has not shown that the probative value of this evidence is substantially outweighed by the Fed.R.Evid. 403 considerations. Nevertheless, though Pfizer has not shown that the evidence in question is clearly inadmissible, this Court recognizes that some testimony, particularly from Geiger's physicians, and evidence related to her medical conditions or the impact those conditions

have on Geiger's ability to perform her job duties may be inadmissible. This evidentiary ruling will be deferred so that the issues may be resolved in the context of trial. The sole issue in this case is whether Pfizer retaliated against Geiger for engaging in protected activity; the issue is not whether Geiger was disabled, whether Pfizer had a duty to accommodate Geiger, or whether Pfizer attempted to accommodate Geiger.

**B. Reference to Geiger as "Disabled," Having a "Disability," or "Regarded as Disabled"**

**\*4** Pfizer asserts that because the words "disabled," "disability" and "regarded as disabled" have specific legal connotations, Geiger should not be permitted to use these words to describe her medical conditions. The motion to exclude these references is **GRANTED in Part** and **DENIED in Part.**

This Court has found that Geiger has a "disability" because she was "regarded as disabled," under 42 U.S.C. § 12102(3). This Court has also found, however, that Geiger is not disabled in the sense of having "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U .S.C. § 12102(1)(A). Though Geiger's conditions meet the legal definition of "disability" under the ADA, because she was "regarded as disabled," there is a significant difference between plaintiffs who are actually disabled and plaintiffs who are only regarded as disabled. Namely, those who are only regarded as disabled, such as Geiger, have no right to a reasonable accommodation. For this reason, Geiger's disability discrimination claim has been previously dismissed by this Court.

Geiger, thereby, should be referred to as "regarded as/ believed/perceived disabled." Geiger should not, however, be referred to as "disabled," having a "disability," or having "a physical or mental impairment that substantially limits one or more major life activities of such individual." Geiger's medical conditions should not be referred to as "disabilities," but rather they should be referred to as "regarded as/believed/ perceived disabilities" or simply as "medical conditions." One of Geiger's main theories of the case is that Pfizer was motivated to retaliate against her for engaging in protected activity related to her medical conditions, because, at the time, it regarded her as disabled due to her medical conditions, and believed her medical conditions triggered additional rights under the law that Pfizer did not want to provide. It is therefore highly probative and relevant that Pfizer regarded Pfizer

2009 WL 1026479, 21 A.D. Cases 1597

as disabled. Nevertheless, the probative value of allowing Geiger to present herself as "disabled" (rather than "regarded as disabled") is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.

## C. Parties' Communications with the EEOC and OCRC

Pfizer asserts that the parties' communications with the EEOC and OCRC should be Excluded. The motion to exclude this evidence is **DENIED.**

In response to Geiger's OCRC and EEOC charges, Pfizer submitted position statements and certain documents. These position statements and documents included information regarding Geiger's alleged disability, her request for an accommodation, accommodations that were offered to Geiger by Pfizer and discussions pertaining to these topics. Geiger also submitted numerous documents to the OCRC and EEOC on these same topics. Pfizer requests the Court redact and exclude any reference in such position statements and other documents to Geiger's disability status, the need for an accommodation, and/or the interactive process. Pfizer asserts that such evidence is particularly unfairly prejudicial and should be excluded given that the Court has already ruled that Geiger is not actually disabled, but rather only "regarded as disabled," and that her disability discrimination claim was dismissed on summary judgment.

 **\*5**  Geiger argues that the charges of discrimination filed by Geiger are direct evidence that she engaged in a protected activity. Documents submitted to the OCRC and EEOC by Pfizer include admissions that she was paid substantially less and received lower pay increases than each of her colleagues in her district. Such evidence, Geiger asserts, is admissible to prove a prima facie case of retaliation and to calculate damages.

The Court finds that the charges of discrimination filed by Geiger are evidence she engaged in a protected activity, so the Court will not exclude any references to those charges. Pfizer has not shown that the information contained in the OCRC and EEOC filings is clearly inadmissible. This Court notes, however, the probative value of such evidence may be substantially outweighed by its prejudicial effect. This determination will be deferred to be resolved in the context of trial.

## D. 2004 Charge of Discrimination

Pfizer argues that Geiger's 2004 charge should not be introduced at trial as it contains allegations of disability discrimination. The motion to exclude this evidence is **DENIED.**

Pfizer objects to admission of this matter on the same grounds that Pfizer objected to testimony regarding Geiger's alleged disability and claimed disability discrimination. Pfizer asserts that these documents are irrelevant, and that even if relevant, the probative value of such testimony or evidence is substantially outweighed by the danger of unfair prejudice to Pfizer.

On October 21, 2004, Geiger filed a charge of discrimination with the OCRC and the EEOC alleging that Pfizer refused to provide her a reasonable accommodation, discriminated against her because of an alleged disability, and retaliated against her for seeking an accommodation. Pfizer asserts that since the charge alleges more than just retaliation, the only claim now pending before the jury, the charge and any accompanying documentation should be excluded. Similarly, the Complaint sets forth multiple paragraphs relating to Geiger's claim for disability discrimination.

Pfizer will stipulate at trial that Geiger filed two charges of discrimination. As such, the existence of these documents will be presented to the jury. Pfizer asserts, however, that the information contained within these documents is irrelevant to Geiger's claim of retaliation and is highly prejudicial to Pfizer.

Geiger argues that the 2004 charge of discrimination filed by Geiger is relevant as direct proof that she engaged in protected activity-one of the prima facie elements of her retaliation. The document is also relevant to establish a time line of events and to show that Pfizer had a motivation to retaliate against Geiger. Geiger asserts that even if there is some negligible prejudice due to references to disability discrimination contained in the 2004 charge of discrimination, this Court has the plenary power to issue a limiting instruction to the jury regarding such references if it deems it necessary to do so.

 **\*6**  The Court finds that the 2004 charge of discrimination filed by Geiger is direct evidence she engaged in a protected activity, so the Court will not exclude that charge. The probative value of such evidence is not substantially outweighed by its prejudicial effect.

2009 WL 1026479, 21 A.D. Cases 1597

**E. Evidence or Arguments of Action Other than Geiger's 2004 and 2006 Performance Evaluations and Merit Increases**

Pfizer asserts that evidence or arguments that any action other than Geiger's 2004 and 2006 performance evaluations and merit increases for those years is an adverse employment action must be excluded. The motion to exclude this evidence is **DENIED.**

Pfizer asserts that Geiger's claims are cognizable only as to her 2004 and 2006 performance valuations and merit increases for those years. Pfizer contends that Geiger's statements that other issues, such as isolation from management/other employees, criticism of her performance, etc. were adverse employment actions are not cognizable, and any such arguments must be excluded from trial. The ground for Pfizer's contention that other actions must be excluded is that they are not "adverse employment actions." Adverse actions are only those actions which result in a "materially adverse change in the terms and conditions of [plaintiff's] employment. " *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir.2004). As such, Pfizer asserts, any description or characterization of other events as 'adverse employment actions" is highly prejudicial and should be excluded.

The Supreme Court in *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) defines an action as "materially adverse" when it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68. Material adversity require significant, not trivial harms. *Id.* The *Burlington Northern* Court gave this example:

> A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

*Id.* at 69. This Court finds that the following actions, which occurred after Pfizer engaged in statutorily protected activity, may be significant harms that dissuade a reasonable worker from making or supporting a charge of discrimination: (1) Pfizer placed Geiger on an Immediate Action Plan; (2) Pfizer gave her two of the lowest performance review of her career; (3) Pfizer isolated her from management and

other employees; (4) representatives of Pfizer chastised her in front of colleagues; (5) Pfizer routinely criticized her in front of her colleagues where others were not so criticized; (6) she was excluded from a list announcing award winners; (7) she was called names by her boss; (8) Pfizer pressured her to quit her employment; (9) Pfizer failed to pay for work-related expenses on her American Express card; (10) Pfizer continually incorrectly copied her drug inventories. Therefore, these actions are "materially adverse" and can be introduced at trial under the *Burlington Northern* standard.

**F. Reference to the Reasons Geiger Denied Long-Term Disability Benefits**

*7 Pfizer asserts the Court should exclude any reference at trial to the reasons underlying the recent denial of Geiger's long-term disability benefits. Pfizer asserts this decision was made in the sole discretion of CIGNA, not Pfizer. As such, any testimony regarding Geiger's denial of long-term disability benefits could improperly be imputed to Pfizer and could unfairly prejudice the jury against Pfizer. Geiger submits that she does not plan to make such references unless it becomes a relevant issue at trial. This Court finds that any probative value would be substantially outweighed by the danger of unfair prejudice. The motion to exclude this evidence is **GRANTED.**

**G. Evidence not Based on Personal Knowledge which Constitutes Rumor, Speculation, or Hearsay**

Pfizer asserts the Court should exclude any testimony by Geiger or other witnesses called on her behalf which is solely based on speculation and rumor and about which the testifying witnesses have no personal knowledge, including, but not limited to, testimony by Susan Weisman and/or Kris Diehl regarding the alleged conversation they overheard between Richard Ferguson and Matthew Garvic regarding Garvic's plan to "get Geiger out of Pfizer." The motion to exclude this evidence is **DENIED.**

Fed.R.Evid. 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Accordingly, any evidence offered by Geiger or any other witness which is not based on personal knowledge should be excluded. The request, however, to exclude testimony not based on personal knowledge or which

constitutes rumor, speculation, or hearsay is too general to warrant an order. Such issues would be better dealt with at trial on a case-by-case basis.

Testimony relating to an alleged conversation between two Pfizer employees, Richard Fergus and Matthew Garvic, may be excluded from the definition of hearsay as an admission of a party opponent. If however, Garvic did not participate in personnel decisions concerning Geiger or have any authority over Geiger, then such statements may not be admissible. *Jones v. Butler Metropolitan Housing Auth.,* 40 F. App'x 131, 135 (6th Cir.2002). Pfizer has not established that the evidence is clearly inadmissible. This determination will be deferred to be resolved in the context of trial.

## H. Subjective Opinions by Geiger or Geiger's Witnesses

Pfizer moves this Court to exclude subjective opinions by Geiger or Geiger's witnesses regarding alleged retaliation against Geiger or the reasons for or fairness of the performance evaluations and merit increases. The motion to exclude this evidence is **DENIED.**

Pfizer asserts that whether Geiger was retaliated against is an objective standard determined by the court or jury based on the standards set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). As such, Pfizer contends, any subjective evidence regarding the reasonableness of Pfizer's actions, Geiger's performance evaluation ratings and amount of merit increase, and whether Geiger was subjected to retaliation, is simply irrelevant and excludable.

**\*8** Pfizer anticipates that Geiger will attempt to call witnesses who were not involved in making any decisions regarding Geiger's employment and who can only speculate as to the reason for, or reasonableness of, these decisions based on the limited information available to them. Pfizer asserts that witnesses who were not participants in Pfizer's decision as to rating Geiger's performance are in no position to give an opinion as to the reasons for it. Pfizer contends such opinions have no probative value and will result in irreparable and unfair prejudice to Pfizer.

Under Fed.R.Evid. 701, a lay witness may testify:

> in the form of opinions or inferences ... which are (a) rationally based on the perception of the witness, and (b)

helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pfizer has not established that any of the opinions by lay witnesses regarding the reasons for or reasonableness of Pfizer's decisions are clearly inadmissible. This determination will be deferred to be resolved in the context of trial.

Pfizer also anticipates that Geiger may attempt to introduce her subjective opinions through the use of third parties. Specifically, Pfizer contends, Geiger may attempt to have other witnesses testify regarding Geiger's statements and opinons relative to her allegations of retaliation. To the extent such witnesses attempt to introduce such statements for the truth of the matter asserted, as Geiger is available to testify, such opinons would be excluded as hearsay. This determination will be deferred to be resolved in the context of trial.

## I. Evidence of an Alleged Pattern of Discrimination or "Me Too" Evidence

Pfizer asserts that any evidence of an alleged pattern of discrimiantion or "me too" evidence is irrelevant and should be excluded. The motion to exclude this evidence is **DENIED.**

Pfizer anticipates that Geiger may: (i) seek to testify about other employees regarding their own (not Geiger's) employment experiences with Pfizer and/or (ii) call other employees to testify about their own (not Geiger's) claims of allegedly unfair treatment in the hope that such information might corroborate Geiger's claim of retaliation and/or create a generalized animus against Pfizer. Pfizer asserts that as this is not an adverse impact case, testimony concerning alleged discrimiantion or retaliation involving other employees is wholly unrelated to the issues in this case, i.e., whether Geiger herself suffered retaliation. Pfizer submits that evidence of this nature (concerning the experience of other employees) should be excluded because it would be unduly prejudicial to Pfizer and would cause jury confusion.

There is not a per se rule regarding the admissibility of "me too" evidence. *Sprint/United Mgmt. v. Mendelsohn,* 552 U.S. 379, ----, 128 S.Ct. 1140, 1147, 170 L.Ed.2d 1 (2008). The "question whether evidence of discrimination by other

2009 WL 1026479, 21 A.D. Cases 1597

supervisors is relevant in an individual [discrimination] case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Id.* at 1147. Evidence must be analyzed for admissibility under Federal Rules of Evidence 401 and 403. *Id.* at 1147.

 **\*9** This Court notes that "me too" evidence is relatively unwelcome in this Circuit. *Calderwood v. Omnisource Corp.,* No. 3:04 CV 7765, 2007 WL 2838969, at \*5 n. 1 (N.D.Ohio Sept.26, 2007), *citing see Schrand v. Federal Pacific Electric Co.,* 851 F.2d 152, 156-57 (6th Cir.1988). A plaintiff generally must show that the same actors, reasons, and other circumstances were involved in order for such evidence to be admissible. *See id.* There must be evidence that logically or reasonably ties the decision to give Geiger poor performance reviews to the statements of the witnesses. *See Tuttle v. Tyco Electronics Installation Servs.,* Inc. No. 2:06-cv-581, 2008 WL 343128, \*6 (S.D.Ohio Feb. 7, 2008). Pfizer has not established that the evidence is clearly inadmissable. This determination will be deferred to be resolved in the context of trial. If Geiger cannot tie the decision to give Geiger poor performance reviews to the statements or actions testified to by the witnesses, then such evidence will be excluded.

## J. Evidence Regarding the Circumstances Surrounding the Termination of George Loche and Richard Ferguson

Pfizer asserts that any evidence regarding the circumstances surrounding the termination of George Loche and Richard Ferguson should be excluded. The motion to exclude this evidence is **DENIED .**

Pfizer believes that Geiger will attempt to introduce evidence at trial surrounding the circumstances regarding Pfizer's employment termination of Loche and Ferguson, Geiger's former supervisors, which occurred at a time after the events complained of in this lawsuit and which had absolutely nothing to do with Geiger or the case at bar. Pfizer asserts that evidence that Loche and Ferguson violated Pfizer policy as to unrelated matters has no relevance whatsoever to Geiger's claim of retaliation. Rather, Pfizer asserts, the only purposes to be served by such evidence is to embarrass the witnesses and cast Pfizer in an unfairly negative light, thereby leading the jury to punish Pfizer for the alleged impropriety of its former employees in matters unrelated to the case at bar.

Geiger contends that the circumstances surrounding Loche and Ferguson's termination is admissible to impeach their credibility and veracity as witnesses. Pursuant to Fed.R.Evid. 607, "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." The improper behavior of these employees which led to their termination may impact their credibility. As such, this evidence is relevant, and Pfizer has not established that the probative value of this evidence is substantially outweighed by its prejudicial effect.

## K. Evidence as to Back Pay Damages and Benefits Allegedly Sustained

Pfizer asserts that Geiger should be precluded from testifying and introducing any evidence as to back pay damages and benefits allegedly sustained during any period of time she was unable to work due to an unrelated injury. The motion to exclude this evidence is **GRANTED.**

 **\*10** In May of 2007, Geiger was injured when she fell off her horse during a competitive horseback riding event. Since that time, Geiger has been unable to work due to this non-work related injury and has been on an approved leave of absence. Because Geiger has been unable to work since May of 2007 and has not attempted to return to work at Pfizer or seek other employment, Pfizer asserts that Geiger did not incur any lost wages or benefits due to any alleged retaliation from May of 2007 until the date of trial. Pfizer asserts, therefore, that Geiger is not entitled to back pay after May of 2007 and she should be precluded from testifying and/or introducing any evidence as to back pay damages and benefits allegedly sustained during that period. Geiger asserts that such evidence may be necessary to clearly communicate to the jury the full calculation of damages that Geiger is entitled to for Pfizer's alleged violation of the law.

A plaintiff cannot recover damages for lost wages and benefits for any period of time she is unavailable to work, such as for periods of unrelated injury or disability. *Falls Stamping & Welding v. Int'l Union,* 485 F.Supp. 1097, 1101 (N.D.Ohio 1979) (deducting six weeks from back pay award for plaintiff's disability resulting from an unrelated automobile accident); *Hatton v. Ford Motor Co.,* 508 F.Supp. 620 (E.D.Mich.1981) (awarding back pay beginning the date plaintiff was terminated until the date on which he became totally disabled because of a stroke and other illnesses and was no longer able to work); *Bender v. Salvation Army,* 830

2009 WL 1026479, 21 A.D. Cases 1597

F.Supp. 1454, 1456 (M.D.Fla.1993) (finding that "[b]ecause periods of unavailability are excluded from computations of back pay, Plaintiff cannot recoup damages for the period of time that she would have been unable to work due to her injuries"); *Sennello v. Reserve Life Ins. Co.,* 667 F.Supp. 1498, 1520 (S.D.Fla.1987) (denying back pay recovery to employee during the time that she was unemployed due to illness); *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 401 (3d Cir.1976) (periods when a plaintiff is unemployable because of illness should be deducted from back pay). As Geiger is not entitled to back pay or other benefits after May of 2007 due to her injury, she is precluded form testifying and/or introducing any evidence as to back pay or other benefits she is allegedly owed after May of 2007, as such evidence is irrelevant.

## L. Evidence Regarding Pfizer's Size, Financial Status, or Stature in the Pharmaceutical Industry

Pfizer asserts that Geiger should be precluded from presenting evidence regarding Pfizer's size, financial status, or stature in the pharmaceutical industry because such information if irrelevant and unfairly prejudicial. Pfizer asserts such evidence should be excluded during the liability/compensatory damages phase of the trial. If liability is established, such information may be admitted during the punitive damage phase of trial (if any). The motion to exclude this evidence from the liability/compensatory damages phase of trial is **GRANTED.**

 **\*11** Pfizer asserts that introducing such evidence during the liability/compensatory damages phase of the trial may tempt the jury to decide the issue of an improper basis. Pfizer contends that the presentation of evidence of Pfizer's size, financial status, and stature could well result in a finding of liability based solely on that evidence. Pfizer is concerned that there is a risk the jury could hold Pfizer liable simply because Pfizer is a "big company" that can "afford it."

The Court finds that the probative value of evidence concerning Pfizer's size, financial status, and stature in the pharmaceutical industry is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice against Pfizer at the liability/compensatory damages phase. As such, this evidence is prohibited at that phase.

## M. Evidence Relating to Other Claims or Lawsuits Brought Against Pfizer

Pfizer asserts that evidence relating to other claims or lawsuits brought against Pfizer should be precluded. Geiger submits that she does not plan to make such references unless it becomes a relevant issue at trial. The motion to exclude this evidence is **GRANTED.**

## 3. The Court GRANTS in PART and DENIES in PART Geiger's Motions in Limine (doc. no. 102).

### A. Past and Current Litigation

Geiger moves the Court to exclude all evidence related to past and current litigation she has been and is involved in, other than the case at bar. Geiger asserts that any such evidence is not relevant to the issues presented in the pending litigation and, even if such evidence was relevant, its probative value is substantially outweighed by the danger of unfair prejudice and would likely cause confusion among the jury members. Pfizer asserts it seeks to offer evidence of only one lawsuit, a lawsuit against Geiger's former employer, to show Geiger's bias or motivation, and other credibility evidence. The motion to exclude this evidence is **GRANTED.**

Geiger field a lawsuit against her former employer, Abbott Laboratories, claiming employment discrimination. As with her current lawsuit against Pfizer, Geiger claimed that she was subject to discrimination and retaliation in her duties as a medical sales representative for Abbott Laboratories. In the same manner, Geiger filed administrative charges with the OCRC against Abbott Laboratories prior to bringing her lawsuit against the company. Pfizer asserts the Abbott Laboratories lawsuit should be admitted into evidence (1) to show that Geiger has a bias against her employers in that she tends to assume that any action she disagrees with in her employment is based on a discriminatory and/or retaliatory reason; and (2) for credibility and impeachment purposes.

The Court does not find the evidence of the prior lawsuit to be relevant to the issues pending in the present litigation. And even if such evidence is marginally relevant, the Court finds that the probative value of this evidence is substantially outweighed by the danger of unfair prejudice and would likely cause confusion amongst the jury.

2009 WL 1026479, 21 A.D. Cases 1597

**B. No Probable Cause Determinations**

**\*12**  A portion of Geiger's protected activities involved the filing of two separate charges of discrimination with the OCRC and EEOC in October of 2004 and March of 2005. In each instance, the charge of discrimination was dismissed with a finding of no probable cause. Geiger seeks the exclusion of any references to the no probable cause determinations at trial. She asserts any such references would be prejudicial and would likely cause confusion amongst the jury. The motion to exclude this evidence is **DENIED.**

The admission of administrative agency determination letters regarding an employment discrimination claim lies within the sound discretion of the trial court. *Heard v. Mueller Co.,* 464 F.2d 190, 194 (6th Cir.1972); *cf. Weems v. Ball Metal and Chemical Div. ., Inc.,* 753 F.2d 527, 528 n. 1 (6th Cir.1985) (the EEOC cause determination, "in the sound discretion of the trial court, may be admitted in evidence"); *Bryant v. Martinez,* 46 F. App'x 293 (6th Cir.2000) (decisions of administrative agencies relevant to the merits of a claim are admissible despite the possibility of some prejudicial effect). The Sixth Circuit has found that a district court does not abuse its discretion by permitting the introduction of the OCRC's determination if the district court "specifically instruct[s] the jury that it was free to disregard any conclusions contained in the report because the EEOC may not have had the same evidence as the jury had." *Blakely v. City of Clarksville,* 244 F. App'x 681, 683 (6th Cir.2007); *see also Williams v. Nashville Network,* 132 F.3d 1123, 1129 (6th Cir.1997) (finding an EEOC letter of violation to be presumptively inadmissible, but a probable cause determination on the other hand, to be potentially admissible because it "is more tentative in its conclusions"). The argument is stronger for admission of an EEOC report when the EEOC is not a party to the litigation, as in this case. *See E.E.O.C. v. Sharp Mfg. Co. Of America,* No. 06-2611, 2008 WL 189847, at \*2 (W.D.Tenn. Jan.22, 2008) (when the EEOC is not a party to the litigation and has no interest therein, there is no reason to suspect any lack of trustworthiness). A court can find, however, that an EEOC determination has little probative weight and a possibility of great prejudice. *Wright v. Columbia Sussex Corp.,* No. 3:06-CV-190, 2008 WL 972699, at \*1 (E.D.Tenn. Apr.7, 2008).

Pfizer asserts that the OCRC documents Geiger seeks to exclude are highly probative as to material issues in this trial because they directly relate to Pfizer's motives and the chronology between the Geiger's protective activities and her evaluation ratings and merit increases in 2004 and 2006. Pfizer asserts it is not introducing the OCRC findings to persuade the jury to adopt the findings of the OCRC. Based on these facts, it is proper to admit the OCRC findings in question. The Court will permit introduction of the OCRC findings to establish motive and chronology, with a "limiting instruction to the Jury indicating that the probable cause determination does not indicate that there was [not] in fact discrimination" *See Kennedy v. City of Zanesville, Ohio,* No. 2:03-cv-1047, 2008 WL 2036713, at \*2 (S.D.Ohio May 9, 2008).

**4. The Court DENIES Geiger's Motion for Leave to Take and Submit the Trial Video Deposition of Rick Ferguson, Due to Unavailability (doc. no. 114).**

**\*13**  Geiger moves the Court for permission to take the video deposition of Rick Ferguson, Geiger's supervisor, and to introduce the deposition testimony at trial. According to Geiger, this is necessary because Ferguson lives in Arizona and will be unavailable to testify live at trial. Geiger explains that she was not permitted to take Ferguson's deposition during discovery "due to his employment with the company and subsequent departure from Pfizer," however, Geiger claims, defense counsel told her that she would have full access to Ferguson when he testified at trial. Now it appears that the defense will not call Ferguson at trial. Geiger asserts this is subjecting her to "unfair surprise." Geiger represents that she can arrange for the deposition to be taken before trial by video conference in Phoenix, Arizona.

Pfizer opposes Geiger's motion. In actuality, Geiger's counsel deposed Ferguson on October 17, 2007 in Columbus, Ohio. This deposition lasted approximately three and a half hours. Geiger had ample opportunity to fully question Ferguson on the retaliation claim. The entire deposition transcript was filed with the Court on February 21, 2008 (doc. no. 43). Geiger specifically referenced and quoted from Ferguson's transcript in her Memorandum Contra to Defendant's Motion for Summary Judgment (doc. no. 70). Pfizer asserts it never made any assurances to Geiger that she would have "full access" to Ferguson at trial. There is no record of such an agreement.

Pfizer claims that Geiger's assertion that she was subject to "unfair surprise" because Pfizer is no longer calling Ferguson as a witness at trial is not a credible argument. The Court

set April 6, 2009 as the date to identify trial witnesses and to designate the deposition testimony of witnesses who will not be called to testify (doc. no 87). Pursuant to this Order, Pfizer properly designated the specific portions of Ferguson's deposition transcript that it will read into the record at trial (doc. no. 106). Ferguson is a geographically distant witness who is no longer employed by Pfizer and has been fully deposed. Geiger did not file any objections to the selections identified by Pfizer.

If Ferguson is truly unavailable for trial, Geiger could have designated portions of Ferguson's transcript to read at trial. Pfizer contends it would consent if Geiger requests leave at this time to designate portions of Ferguson's transcript, despite the fact that the deadline for such filing has passed.

For the foregoing reasons, Geiger's motion to re-depose Ferguson is **DENIED.** The trial is less than two weeks away, and Geiger had ample opportunity to depose Ferguson. Because Pfizer has consented, Geiger is granted additional time to designate portions of Ferguson's transcript to read at trial. Geiger has until 4:00 p.m. on Thursday, April 23, 2009 to designate those portions. As another alternative, Geiger can arrange for Ferguson to testify live through a video stream from Phoenix Arizona. If this is arranged, Geiger must provide sufficient notice to Pfizer so that Pfizer can arrange for documents needed for examination to be provided to Ferguson.

 **\*14  IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1026479, 21 A.D. Cases 1597

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 10663104
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

IN RE: DIRECTECH SOUTHWEST, INC.,

Fair Labor Standards Act (FLSA) Litigation

MDL DOCKET NO. 08-1984
|
Signed November 18, 2009
|
Filed 11/19/2009

ORDER AND REASONS

SECTION "F"

MARTIN L. C. FELDMAN, UNITED STATES DISTRICT
JUDGE

**\*1**  Before the Court are the following motions: the
defendants' Motion for Summary Judgment; the defendants'
and Motion to Strike Plaintiffs' Evidence; and the plaintiffs'
Motion to Strike the Defendants' Reply. For the following
reasons, the Motion for Summary Judgment is DENIED; the
Motion to Strike Plaintiffs' Evidence is DENIED in part and
GRANTED in part; and the Motion to Strike the Defendants'
Reply is DENIED.

**Background**

The plaintiffs in this case represent current and former
technicians or installation and repair technicians who were
employed by DirecTech Southwest, Inc., and paid on a per
job basis after August 10, 2005. As technicians, plaintiffs
installed and repaired DirecTV satellite television hardware
into customer buildings and facilities. This dispute arises
out of DirecTech's alleged failure to pay their technicians
overtime for hours worked in excess of forty per week, in
violation of the Fair Labor Standards Act (FLSA). DirecTech,
however, classifies these technicians as exempt from the
overtime requirements of FLSA. In addition to DirecTech,
DirecTech Holding Company, Inc., and DirecTV Inc., are
defendants.

DirecTV contracts with certain companies to act as Home
Service Providers (HSPs) to be preferred service providers
in a select territory for installation, service, and repair of
satellite equipment for DirecTV customers. DirechTech is
an HSP that employs technicians who are paid different
job rates for the different type of service they are assigned
to do. The defendants characterize DirecTech's business
as providing installation services to DirecTV subscribers,
while the plaintiffs underscore that residential customers
are DirecTV customers, not DirecTech customers. The
defendants claim that DirecTech generates almost all of its
revenue from the services provided to residential customers,
but the plaintiffs point out that rather than soliciting business
from the public, DirecTech fulfills installation orders arising
out of sales by DirecTV to the public.

Although admitting that DirechTech receives DirecTV
equipment from out of state, the plaintiffs submit that this
equipment is kept in inventory at Directhech warehouses,
where it comes to rest before being removed by DirecTech
technicians to store on their trucks for installation in the
homes of DirecTV customers. The parties seem to agree that
the plaintiffs did not drive "commercial motor vehicle[s]"
within the meaning of the Safe, Accountable, Flexible,
Efficient Transportation Equity Act: A Legacy for Users
(SAFETEA-LU), which was enacted on August 10, 2005.

The defendants filed this motion for summary judgment
on October 16, 2008. The plaintiffs filed their opposition
on September 8, 2009. The defendants filed a motion to
strike certain evidence submitted by the plaintiffs with their
opposition. On October 14, 2009, the Court granted the
defendants' motion for leave to file a reply. The plaintiffs
moved to strike the defenses raised in that reply or to strike
the entire reply and accompanying exhibits.

**\*2**  As to their motion for summary judgment, the defendants
argue that the 2008 Technical Corrections Act (TCA), which
amended SAFETEA-LU, applies retroactively such that the
"motor carrier" exemption in effect prior to SAFETEA-LU
would be treated as having remained in effect. The defendants
contend that this motor-carrier exemption applies to exempt
the plaintiff technicians from overtime pay requirements. The
defendants also urge that Section 306 of the TCA creates
a one-year limitation of liability for innocent violations of
the SAFETEA-LU, but contend this section of the TCA
is inapplicable because of the retroactive effect of the
TCA. Further, the defendants argue that this section cannot
be applied retroactively because it would impose a new

Case: 24-1439    Document: 19-1    Filed: 08/28/2024    Page: 106

obligation on DirecTech for transactions that have already occurred. However, the defendants submit that if the Court determines Section 306(b) applies to DirecTech, that it would be entitled to the reprieve of liability for the one-year period following the passage of SAFETEA-LU.

Alternatively, the defendants argue that the plaintiffs are exempt from overtime pay by Section 7(i) of the FLSA as commissioned employees: The defendants contend that the plaintiffs were employed at a service establishment: DirecTech installation services are not resold and satellite television-related customer services are recognized as retail services. Next, the defendants submit that more than one half of the technicians' compensation represents commissions because they are paid based on the service performed, which the defendants contend is based on the amount of service revenue generated for DirecTech. Finally, the defendants assert that the plaintiffs pay exceeded one and one half the minimum wage rate. In support, the defendants submit calculations showing the regular rate of pay assuming certain average work hours.

The plaintiffs respond that the FLSA is remedial and should be construed liberally to protect workers. They admit that the SAFTEA-LU removed the motor carrier exemption for the plaintiff technicians, but they argue that the TCA does not apply retroactively. In support, they rely on the several courts that have considered the issue. They argue that amendments to SAFETEA-LU were rendered retroactive by the TCA, but that Section 305, which restored the prior definition of motor carrier, amended non-SAFETEA-LU provisions of the United States Code. Further, the plaintiffs argue that if Section 305 were applied retroactively, then the safe-harbor provision of Section 306 would be rendered meaningless.

The plaintiffs counter the defendants' alternative argument, insisting that the Section 7(i) commissioned employees exemption cannot apply to the plaintiffs in this case. First, the plaintiffs argue that DirecTech is not a retail or service establishment because the only part of DirecTech that could satisfy "establishment" are its warehouses, but its warehouses cannot qualify as retail establishments because they are not open to the public. Further, the plaintiffs charge that satellite television services are not recognized as retail within the industry and that DirecTech's fulfillment of DirecTV's contract is a "sale for resale," and therefore not retail. The plaintiffs add that the defendants cannot meet the statutory requirement that the plaintiffs were paid more than one and one half times the minimum wage. They argue that

defendants calculations are flawed because they are not based on realistic average hours worked. Further, they charge that the calculations wrongly use the entire employment period, because the minimum wage is measured weekly. Finally, the plaintiffs argue that the defendants cannot show the statutory requirement that the plaintiffs received wages as commissions. The plaintiffs insist that the technicians were paid based on job rates, but that job rates are not commissions because they are not based on revenues received from the customer; instead, they are based on the type of work done.

## Law and Analysis

I.

### Defendants' Motion to Strike Plaintiffs' Evidence

**\*3** In their motion to strike, the defendants object to several exhibits and declarations presented by the plaintiffs in opposition to the defendants' motion for summary judgment. They argue that the declarations of plaintiffs' counsel and his staff contain inadmissible hearsay, speculation, innuendo, and legal argument. The defendants submit that several exhibits have not been properly authenticated.

The plaintiffs invoke Federal Rule of Evidence 1006 regarding summaries of voluminous documents. They add that the calculations performed by counsel's staff comply under Rule 611(a). They point out that counsel's declaration concerns his knowledge of the discovery process. Further, the plaintiffs submit that the contested exhibits are self-authenticating and have already been produced to the defendants in discovery.

### A. Evidence Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c). The rules require that

> [a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify

2009 WL 10663104

on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. Id. R. 56(e). Thus, the Court cannot properly consider hearsay evidence or unsworn documents. See Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987). "[T]he summary judgment evidence need not be in a 'form that would be admissible at trial,' [but] the party opposing summary judgment must be able to prove the underlying facts." Love v. Nat'l Med. Enters., 230 F.3d 765, 776 (5th Cir. 2000) (quoting Geisserman v. MacDonald, 893 F.2d 787, 793 (5th Cir. 1990)).

It is well-settled that "[t]o be admissible [as summary judgment evidence], documents must be authenticated by and attached to an affidavit that meets the requirements of [Federal Rule of Civil Procedure] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." 10A Charles Alan Wright, et al., Federal Practice and Procedure § 2722, at 59-60 (2d ed. 1983) (footnotes omitted). In some cases, an exhibit may be self-authenticated by the distinctive characteristics of the evidence in conjunction with circumstances. See id. R. 901(b); see also Garcia v. Texas Dep't of Human Servs., No. 02-122, 2004 WL 1638240, at *5 (July 6, 2004). Additionally, a party may submit charts, summaries, and calculations, of "voluminous writings, recordings, or photographs which cannot conveniently be examined in court," provided that the underlying documents are "made available for examination or copying, or both." Fed. R. Evid. 1006; see Love, 230 F.3d at 776.

### B. Objections

#### i. Declarations

The defendants challenge the declaration of Dan Getman, plaintiffs' counsel, arguing that he cannot be a witness and that his declaration is filled with hearsay, argument, and speculation. Further, they submit that he cannot serve as a proper witness to authenticate the exhibits attached to plaintiffs' opposition. The Court agrees that the declaration is permissible as to statements regarding missing discovery. However, a review of this affidavit reveals several inappropriate legal arguments and unsupported factual conclusions. The Court points to paragraph 4 and the statement that "Defendants' system of coercing underreporting of overtime is common in the industry," and

the discussion of regulatory requirements in paragraph 3. The factual statements based on Mr. Getman's personal knowledge will be cautiously permitted, but the Court disregards his attempted submission of legal arguments.

**\*4** The defendants also challenge the declaration and associated calculations of Carolyn Mow and Michael Russo, plaintiffs' counsel's paralegals. They argue that the calculations are not based on personal knowledge, and submit that both lack the proper credentials to conduct mathematical and statistical analysis. The Court agrees with the plaintiffs that these summaries and calculations can be admitted under Federal Rule of Evidence 1006. The underlying documents are voluminous and were produced by the defendants in discovery and were submitted with the plaintiffs' opposition. Further, the declarations explain the methods used in making the calculations. The defendants' objections to the reliability of the underlying data and the methods of calculation used are considered in the Court's determination on the merits as to their believability and will be subject to strict scrutiny, but the exhibits and declarations will not be stricken.[1]

#### ii. Exhibits

The defendants challenge exhibits M, P, T, V, W, and AA as lacking proper authentication. The plaintiffs respond that emails in M, V, and AA are self-authenticating because they were produced by the defendants in discovery. The Court is concerned about the lack of Bates numbers on these emails; also, it is not clear to what discovery request these emails were produced in response. The Court therefore strikes these exhibits, noting that the plaintiffs do not rely on them in their opposition.

Exhibit T is a purported resignation by one of the plaintiffs, and it contains a Bates number. The plaintiffs argue that it is therefore self-authenticating as one of the defendants' corporate records. The Court finds the production of this email in discovery by the defendants is sufficient to authenticate the document, but again notes that the plaintiffs do not rely on this exhibit.

As to exhibit W, the purported pay stub, the plaintiffs claim it is self-authenticating as a business record. Simply bearing the defendants' logo is insufficient to self-authenticate a document presented by the plaintiffs without an affidavit clarifying what it is supposed to be. The Court strikes this

exhibit, once again noting that the plaintiffs did not rely on it in their opposition.

Unlike the above exhibits, the plaintiffs rely on exhibit P, the 2008 time study, for creation of the Mow and Russo calculations and in several references in their opposition. In their opposition to the present motion, the plaintiffs explain that exhibit P is the "2008 Time Study that DirecTV uses when it routes the plaintiff technicians to their different jobs for the day." The plaintiffs argue that the Time Study was supplied by the defendants in discovery (it has a Bates number) and point to deposition testimony where DirecTech's corporate designee referenced the study. However, it is not clear that the study produced here was actually identified by the designee. Nonetheless, because the document was produced by the defendants and is referenced by the designee in his deposition and additionally in the declaration submitted in defendants' reply, the Court determines it is properly authenticated.

Accordingly, the defendants motion to strike is GRANTED in part and DENIED in part.

II.

<u>Plaintiffs' Motion to Strike Defendants' Reply and Exhibits</u>

The plaintiffs argue that the reply should be stricken because it contains impermissible new materials in the form of new exhibits. Plaintiffs claim prejudice. Plaintiffs also contend that the reply should be stricken on a variety of grounds: it raises a new argument regarding the applicability of the SAFETEA-LU safe-harbor provision; it raises new arguments on subjects that the defendants precluded plaintiffs from inquiring about in discovery; the defendants have allegedly failed to comply with discovery orders that would permit plaintiffs to fully respond to defendants' motion. In the alternative, plaintiffs request permission to file a sur-reply brief.[2]

**\*5** The defendants point out that they raised the SAFETEA-LU safe harbor provision in their original motion, and the plaintiffs were on notice of this issue and had the opportunity to conduct discovery on the issue and had ample opportunity to conduct discovery on the reliability of the duration data, pointing to deposition testimony on this issue. Defendants insist that they fully complied with all discovery orders, and

that this issue was not raised prior to plaintiffs filing their opposition to defendants' motion.

Contrary to the plaintiffs' contentions, the Fifth Circuit has recognized that a district court can consider new arguments and evidence raised in a reply, as long as opportunity for a response is given. <u>Vais Arms, Inc. v. Vais, 383 F.3d 287, 292 (5th Cir. 2004)</u>; <u>see also Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996)</u> ("[O]ur [earlier] holding does not mean that defendants in this case may submit 'new' evidence in their reply without affording plaintiffs an opportunity to respond."). Thus, the Court must first determine whether plaintiffs' accusations bear up.

The defendants reply includes two new affidavits and seventeen exhibits, including new data and calculations supporting their arguments that the plaintiffs earned more than one and one-half times the minimum wage for purposes of the commissioned employees exemption. This is certainly new evidence, and in order for defendants to succeed in meeting the elements of the "commissioned" employees exemption, they would direct the Court to it. Nonetheless, even considering this evidence, as will be discussed below, there remain issues of material fact as to the minimum wage and commission elements for application of the commissioned employee exemption. Therefore, the Court finds that an opportunity to reply to the new evidence is unnecessary. Summary relief in this case, on this record, is patently improper.

The safe-harbor issue was raised by defendant in a footnote. The Court notes that the defendant's motion more directly stated "Section 306(b) is not applicable on its face to DirecTech or plaintiffs" and focused on its retroactivity argument. Because the plaintiffs did not address the issue of the applicability of the safe-harbor provision in their opposition, when it reasonably seemed a minor alternative argument, the Court ordinarily would not rule on the issue without a response by the plaintiffs, but, as noted, summary relief will not be permitted on this record.

The plaintiffs next challenge the reply because it presents arguments based on the Seibel duration data, which they allege they were denied access to in discovery. The plaintiffs seem to admit that they received some of the underlying time studies, but point out that they were denied more discovery by Magistrate Judge Shushan who determined the information was missing. They add that they were denied the opportunity to depose DirecTV, who conducted the time

2009 WL 10663104

studies, because the defendants claimed that the time studies were not necessary to resolve the summary judgment motion. The defendants' opposition to this motion points out that the plaintiffs have the underlying data and actually deposed both a DirecTech and a DirecTV witness regarding the reliability of the duration data. The Court finds that discovery has been adequate; further, the new calculations presented are insufficient to resolve the issue of regular rate of pay, thus a reply is unnecessary.

III.

Motion for Summary Judgment

*A. Standard*

Rule 56 of the Federal Rules of Civil Procedure instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986). A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

**\*6** The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. Id. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. Id. Hearsay evidence and unsworn documents do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987). Finally, in evaluating the summary judgment motion, the Court must read the facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

*B. Motor Carrier Act Exemption*

Under FLSA, employers must compensate employees who work over forty hours in a given week at a rate of at least one and one-half their regular hourly pay rate. 29 U.S.C. § 207. "The principal congressional purpose ... was to protect all covered workers from substandard wages and oppressive working hours." Barrentine v. Arkansas-Best Freight System, Inc., 450 U.S. 728, 739 (1981). The Supreme Court requires exemptions "to be narrowly construed against the employers seeking to assert them and their application [to be] limited to those establishments plainly and unmistakably within their terms and spirit." Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960). Thus, the employer bears the burden of proving that an exemption applies. See Corning Glass Works v. Brennan, 417 U.S. 188, 197 (1974).

The maximum hour requirements of the FLSA do not apply to "[a]ny employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service." 29 U.S.C. § 213 (b)(1). Under the Motor Carrier Act, the Secretary of Transportation can prescribe qualifications and maximum hours of service of "employees of ... a motor carrier." 49 U.S.C. § 31502(b). Thus, under the MCA exemption, where the definition of "motor carrier" applies, an employee is exempt from the overtime requirements of FLSA. See Barefoot v. Mid-America Dairymen, Inc., 16 F.3d 1216 (5th Cir. 1994) (per curiam). Prior to August 2005, a motor carrier was "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102 (2002) (amended 2005 and restored 2008). On August 10, 2005, Congress enacted the SAFETEA-LU, which changed the definition of motor carrier to "a person providing a commercial motor vehicle." 49 U.S.C. § 13102 (2006) (amended 2008). The associated definition of "commercial motor vehicle," required a vehicle weighing at least 10,001 pounds. Id. § 31132. The parties here all agree that the technicians did not drive vehicles weighing more than 10,000 pounds, and thus under the SAFETEA-LU, the MCA exemption would not apply. On June 6, 2008, Congress passed the Technical Corrections Act. Pub. L. No. 110-244, 122 Stat. 1573(codified as amended in scattered sections of title 49). Section 305 of the TCA amended the MCA to remove "commercial" from the definition of motor carrier, thereby restoring the pre-SAFETEA-LU exemption. In Section 306(a), the TCA requires the maximum hour protections of FLSA, 29 U.S.C.§ 207, "shall apply

Case: 24-1439    Document: 19-1    Filed: 08/28/2024    Page: 111

In re Directech Southwest, Inc., Not Reported in Fed. Supp. (2009)

2009 WL 10663104

to a covered employee notwithstanding [the Secretary of Transportation exemption] (29 U.S.C. § 213 (b)(1))." Under Section 306(c), a covered employee includes a person employed by a motor carrier "whose work, in whole or in part, is defined—(A) as that of a driver, driver's helper, loader, or mechanic; and (B) as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less." Section 306(b) created a safe harbor, limiting an employer's liability for violation of the FLSA if that violation occurred in the one-year period following August 10, 2005, and was without the employer's actual knowledge that it was subject to the FLSA overtime requirements.

**\*7** Based on the amendment of the motor carrier definition, the defendants argue that at least as of June 6, 2008, the MCA exemption applies to the plaintiff technicians and any liability of the defendants would cease. The plaintiffs do not address this point. Nonetheless, Section 306(a) of the TCA indicates that the maximum hour protections of the FLSA apply to employees otherwise covered by the MCA. See Brooks v. Halsted Commc'ns, Ltd., 620 F. Supp. 2d 193, 198 (D. Mass. 2009) ("[T]he TCA reconfirmed that the MCA exemption was inapplicable to employees of motor carriers who drove motor vehicles that weighed 10,000 pounds or less."); Glanville v. Dupar, Inc., No. 08-2537, 2009 WL 3255292, at * 4( S.D. Tex. Sept. 25, 2009) (same); Tews v. Renzenberger, Inc., 592 F. Supp. 2d 1331,1346 (D. Kan. 2009) ( "[T]he Technical Corrections Act effectively modified the MCA exemption of the FLSA by affirming that the overtime provisions of the FLSA apply to employees of a motor carrier who, in pertinent part, drive motor vehicles on public highways in interstate commerce so long as those motor vehicles weigh 10,000 pounds or less and transport eight or less passengers."). Further, the defendants seem to admit that the plaintiffs are covered employees in arguing that the safe harbor, which also applies to covered employees, acts to limit their liability if the Court finds the Section 305 amendment is not retroactive. It seems that all plaintiffs in this action terminated their employment prior to the enactment of the TCA, thus the Court need not address the issue of DirecTech's liability after June 6, 2008.

The defendants submit that Section 305 of the TCA applies retroactively because it restores the law prior to SAFETEA-LU and is curative in nature. As the plaintiffs point out, no district court that has addressed this issue has agreed. See, e.g., Benoit v. Tri-Wire Eng'r Solutions, Inc., 612 F. Supp. 2d 84, 87-90 (D. Mass. 2009); Vidinliev v. Carey Int'l, Inc., 581 F. Supp. 2d 1281, 1289-90 (N.D. Ga. 2008); Hernandez

v. Brink's, Inc., No. 08-20717, 2009 WL 113406, at *7 (S.D. Fla. Jan. 15, 2009); Loyd v. Ace Logistics, LLC, No. 08-188, 2008 Wl 5211022 (W.D. Mo. Dec. 12, 2008); Veliz v. Cintas Corp., No. 03-1180, 2008 WL 4911238, at *5 (N.D. Cal. Nov. 13, 2008). The Court agrees with the reasoning in these cases.

"The Supreme court has stated repeatedly 'that there is a presumption against retroactive legislation that is deeply rooted in our jurisprudence.' " Margolies v. Deason, 464 F.3d 547, 551 (5th Cir. 2005) (quoting Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 946 (1997)). Under the two-part test established by the Supreme Court in Landgraf v. USI Film Products, the Court must first "determine whether Congress has expressly prescribed the statute's proper reach." 511 U.S. 244, 280 (1994). "[T]he Court has indicated that an express prescription is synonymous with an 'unambiguous directive.' " Margolies, 464 F.3d at 552 (quoting Lindh v. Murphy, 521 U.S. 320, 325 (1997)).

Here, there is no unambiguous directive. First, Section 121 of the TCA states that the date of enactment is the effective date, except for amendments to SAFETEA-LU. But as the court in Vidinliev held, "a close look at the statute reveals" that Section 305 of the TCA does not amend SAFETEA-LU, it amends the ICC Termination Act and the scope of the MCA. 581 F. Supp. 2d at 1289-90. Second, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972)). As the plaintiffs point out, Sections 101-113, 120, 201, and 301-304 of the TCA all specifically state that "[SAFETEA-LU] is amended." See Vidinliev, 581 F. Supp. 2d at 1290 (recognizing that "many sections of the [TCA] expressly state that the section is an amendment to SAFETEA-LU").

Finally, "a statue should not be construed in such a way as to render certain provisions superfluous or insignificant." Woodfork v. Marine Cooks & Stewards Union, 642 F.2d 966, 970 (5th Cir. 1981)(quoting Ziegler Coal Co. v. Kleppe, 536 F.2d 398, 406 (D.C. Cir. 1976)). As the court in Vidinliev observed, "[i]f the definition of motor carrier in section 305 applies retroactively, then the one-year defense in section 306 is nothing more than surplusage." 581 F. Supp. 2d at 1291. Indeed, there is no need for a one-year limitation on liability if Section 305 applies such that there is no liability from the date

In re Directech Southwest, Inc., Not Reported in Fed. Supp. (2009)

2009 WL 10663104

of the enactment of SAFETEA-LU. Accordingly, the Court determines that Section 305 does not apply retroactively to make the restored definition of motor carrier applicable between August 2005 and June 2008.

**\*8** The Court notes that although the defendants stated in a footnote to their motion that "[t]o the extent the Court determines that 306(b) applies to DirecTech, it would be entitled to the reprieve of liability for the 1-year period following the passing of SAFTEA-LU," the plaintiffs have not had adequate opportunity to respond. Thus, as to the applicability of the one year limitation on liability to the defendants, the Court denies the motion without prejudice to raising the issue again at the proper time.

### C. Commissioned Sales Exemption

Section 7(i) of the FLSA creates an exemption from the maximum-hours regulations for an employee of "a retail or service establishment," if " (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him ... and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services." 29 U.S.C. § 207(i). As described above, the employer bears the burden of proving that an exemption applies. See Corning, 417 U.S. at 197. Thus, in order for this exemption to apply, the defendants must show that (1) DirecTech is a "retail or service establishment;" (2) the plaintiffs regular rate of pay was more than one and one-half times the minimum wage; and (3) more than half the plaintiffs' compensation represented commissions. See Gieg v. DDR, Inc., 407 F.3d 1038, 1048 (9th Cir. 2004). Furthermore, as the plaintiffs point out, the Department of Labor requires that employers claiming the exemption under Section 7(i) must note this on their payroll records and must maintain a written copy or summary of the agreement. 29 C.F.R. § 516.16.

### i. Retail or Service Establishment

For purposes of the exemption from overtime pay requirements, a retail or service establishment "means an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." 29 C.F.R. § 779.411. Courts employ a two-step process, first determining "whether the sale of a particular

type of goods or services can qualify as retail" and if this "retail concept" can apply, determining "the terms or circumstances that make a sale of those goods and services a retail sale." Brennan v. Great Am. Discount & Credit Co., 477 F.2d 292, 295 (5th Cir. 1973) (citing Idaho Sheet Metal Works v. Wirtz, 383 U.S. 190, 202-03 (1965)). Rather than a "bright line" approach, to determine whether the retail concept exists, the Court should employ a case-by-case approach. See Collins v. Horizon Training Centers, No. 3:02-1310, 2003 WL 22388448, at *5 (N.D. Tex. Sept. 30, 2003).

The plaintiffs argue that DirecTech cannot be a retail or service establishment because the only "distinct physical place of business" are DirecTech's warehouses, which are not open to the general public. However, the regulation cited by the plaintiffs for the "physical place of business" definition deals with a business that has several separate places of business, not an in-home service provider. See 29 C.F.R. § 779.23. Courts have held that businesses that provide on-site computer software training or companies providing in-home carpet cleaning can be retail or service establishments. Reich v. Delcorp., Inc., 3 F.3d 1181, 1182, 1186 (8th Cir. 1993) (in-home carpet cleaning); Schwind v. EW & Assocs., 371 F. Supp. 2d 560, 566-67 (S.D.N.Y. 2005) (on-site computer training); see also English v. Ecolab, Inc., No. 06-5672, 2008 WL 878456, at *10 (S.D.N.Y. March 31, 2008) (finding a pest-extermination company qualified as an "establishment" although service specialists received calls at their own homes before performing services on site); but see Wirtz v. Keystone Readers Serv. Inc., 418 F.2d 246, 258 (5th Cir. 1969) ( [The door to door salesman's] retailing activities occur solely in the consumer's home, and a prospective customer's home obviously cannot constitute the seller's retail establishment."). Thus, the Court does not find itself limited to DirecTech's physical warehouses in determining whether the retail concept can apply.

**\*9** A retail or service establishment is one that "meets everyday needs of the local community, stands at the end of a system of distribution and provides services for the comfort and convenience of the general public's daily routine." Collins, 2003 WL 22388448, at *6; see 29 C.F.R. § 779.318(a). It is not determinative that a third party pays for the services. See Hodgson v. Prophet Co., 68 Lab. Cas. (CCH) § 32,713, at *4 (W.D. Okla. 1971) ("The matter of being paid therefor by a third party is deemed immaterial or not of such significance as to render the sale a resale and not a direct sale."). For example, in Schwind, a district

2009 WL 10663104

court in New York held that where a company provided computer software trainers to its clients and the trainers "would train the client's employees or the client's business customers" the company's services were "at the end of the stream of distribution, demonstrating that the services were not intended for resale. 371 F. Supp. 2d at 566.

A retail or service establishment must hold itself out as available to the public. But, this does not require "in personam access." English, 2008 WL 878456, at *9. Nonetheless, there must be "either a physical or electronic confrontation or communication between buyer and seller." Wirtz, 418 F.2d at 257. In English v. Ecolab, Inc., a district court in New York held that a pest-extermination company made itself available to the public where customers had access to the specialists by telephone when in their homes or cell phones while they were out on service calls. 2008 WL 878456, at *10. The court did not find it determinative that customer calls were routed through a service center. Id. In Stevens v. Welcome Wagon International, the district court held that the home office of a local saleswoman qualified as an establishment where the saleswoman maintained a telephone listing in the name of the company. 261 F. Supp. 227, 231 (E.D. Pa. 1966).

Before the advent of satellite television, the Department of Labor listed establishments that "may be recognized as retail," including household refrigerator service and repair shops. See 29 C.F.R. § 779.320. As the regulations explain, "[a] refrigerator repair service shop ... is available and open to the general public even if it receives all its orders on the telephone and performs all of its repair services on the premises of its customers." Id. § 779.319. The regulations also describe establishments where the existence of a retail concept is not readily apparent, including air-conditioning and heating systems contractors, broadcasting companies, telegraph and cable companies, telephone companies, and plumbing contractors. Id. § 779.317. "[T]here is no retail concept in the construction industry," but, "[i]nstallation which is incidental to a retail sale (as distinguished from a construction or reconstruction contract to do a building alteration, or repair job at a contract price for materials and labor required) is considered an exempt activity." Id. § 779.321(c)-(d). Thus,

the installation for the customer of such goods sold to him at retail requires only minor carpentry, plumbing or electrical work (as may be the case where ordinary plumbing fixtures, or household items such as stoves, garbage disposals, attic fans, or window air conditioners are being installed or replaced), or where only labor of the type required for the usual installation of chain link fences around a home or small business establishment is involved, will normally be considered as incidental to the retail sale of the goods involved (unless, of course, the transaction between the parties is for a construction job at an overall price for the job, involving no retail sale of goods as such).

Id. (citation omitted). The Court notes that this regulation seems to apply to installation where the same business makes the retail sale of the equipment and performs the installation. As to telephone and broadcast companies, the regulation listing companies that lack the "retail concept" cites an Eighth Circuit case in finding a telephone company was not "a retail and service establishment." Id. § 779.317. (citing Schmidt v. Peoples Telephone Union of Maryville, Mo., 138 F.2d 13 (8th Cir. 1943)). In that case, the Eight Circuit determined that telephone switch board operators were not covered as employees of a service establishment, determining that "service establishment" should be interpreted in its narrow sense as applying to businesses like restaurants, hotels, and barber shops, not in a broad sense to include public utilities. Schmidt, 138 F.2d at 15. The circuit court also considered that FLSA elsewhere provided a specific exemption for certain switchboard operators. Id. at 16. It must be noted that the regulations cited are not binding on this Court, and like the Schmidt case, they were promulgated at least thirty-five years ago and do not take into account changes in the size of and technologies in the current retail economy. See English, 2008 WL 878456, at *8. More recently, the court in Liger v. New Orleans Hornets NBA Ltd. held that a basketball team could not qualify as a retail or service establishment on the basis of its broadcast revenue because the broadcast sales were sold by the team to a network that resold the air time to advertisers or to individual subscribers. 565 F. Supp. 2d 680, 689 (E.D. La. 2008). This decision seems to recognize that sale of a broadcast could be retail in some instances.

*10 Here, DirecTech provides installation and repair services for residential satellite dishes. The Court finds that this industry can have a retail concept. DirecTech's services do not involve the intense structural work that would categorize it as a construction contractor. Although DirecTV sells the satellite dish and the satellite television service, the installation by DirecTech can be viewed as incidental to that sale. Additionally, the Court agrees with the court in Schwind, that the fact that DirecTV solicits and accepts payment from the customers and then pays DirecTech for the installation work DirecTech technicians perform for the satellite customers does not make DirecTech's sale of services a sale for resale. Clearly, the customer for whom DirecTech

In re Directech Southwest, Inc., Not Reported in Fed. Supp. (2009)

2009 WL 10663104

Case: 24-1439    Document: 19-1    Filed: 08/28/2024    Page: 114

installs the satellite is the end user. Further, the Court finds that satellite television is a service enjoyed by, or at least available to, the community at large. Thus, not only can the retail concept apply to DirecTech's sale of services, in this case DirecTech qualifies as a retail or service establishment.[3]

ii. Rate of Pay in Excess of One and One-Half Times Minimum Wage

Application of the exemption next requires that the plaintiffs rate of pay is more than one and one-half times the minimum wage. The regular rate of pay is the "hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed." Waling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424 (1945). "It is a rate per hour, computed for the particular workweek by a mathematical computation in which hours worked are divided into straight-time earnings for such hours to obtain the statutory regular rate." 29 C.F.R. § 779.419 (citing Overnight Motor Co. v. Missel, 316 U.S. 572 (1942)). Thus the general rule seems to require that for each workweek in which the employer asserts that the exemption applies and overtime pay is not due, the employee must have earned more than one and half times the minimum wage based on the hours worked and the compensation for that week. See id. Courts have recognized, however, that a calculation dividing the income earned over a year to determine average weekly income may be appropriate, as when a salesman earns more in some weeks and less in others. Walton v United Consumers Club, Inc., 786 F.2d 303, 307 (7th Cir. 1986); see Triple "AAA" Co. v. Wirtz, 378 F.2d 884, 887 (10th Cir. 1967) (holding that a trial courts' calculation of overtime to be awarded to the plaintiffs by taking the monthly income multiplied by twelve and dividing by fifty-two to determine the regular rate of pay was appropriate).

The parties intensely dispute the calculations used to determine the rate of pay. The defendants present calculations where plaintiffs' yearly pay is divided by the number of weeks worked, and then again divided by an estimated number of hours worked per week. This type of calculation may be appropriate where, as here, the employees are paid different amounts each week. Even if the technicians averaged 60 hours per week, these calculations show that the one-and-a-half times the minimum wage requirement is easily met. The defendants submit that 60 hours per week is a generous estimate. But plaintiffs present their declarations that they consistently worked over 60 hours per week, and often

more than 70 or 80 hours per week, but were instructed to under-report their hours. Plaintiffs also present week-by-week calculations of the plaintiffs' rate of pay through the Mow declaration described above. These calculations use the amount actually paid in a week divided by the estimated hours for the jobs performed based on the 2008 time study. These calculations reveal different results for each plaintiff with some plaintiffs showing none or only a few weeks where their pay dipped under minimum wage, and others where more than half or almost all weeks were calculated as less than minimum wage. The defendants object to these calculations because they are based on a 2008 time study that estimated the average amount of time for each job. They argue that these estimates are not reliable because they were made in 2008, after the plaintiffs had terminated employment. The real dispute seems to be over how many hours the plaintiffs actually worked in any given week. If ever a record was flooded with material disputed issues of fact, it is this record.[4]

iii. The Commissions Issue

*11  Even if the plaintiffs' pay is more than one-and-a-half times the minimum wage, to qualify for the exemption, more than half of the plaintiffs' compensation for a representative period (not less than one month) must be based on commissions. The statute does not define "commission" and there is little case law in the Fifth Circuit on the issue. Nonetheless, the reasoning of other courts is instructive. A commission "provides workers with an incentive to work quickly." Klinedinst v. Swift Investments, Inc., 260 F.3d 1251, 1256 (11th Cir. 2001). Of course, the commission rate must be "bona fide" and not be an attempt to call earnings commissions simply to avoid overtime pay requirements. See Lee v. Ethan Allen Retail, Inc., No. 07-108, 2009 WL 2355900, at * 4 (N.D. Ga. July 28, 2009); see also Erichs v. Venator Group, Inc., 128 F. Supp. 2d 1255, 1260 (N.D. Cal. 2001) ("By using the term 'bona fide' commission rate, Congress apparently envisions a smell test...."). One court has helpfully written:

For purposes of the FLSA, payment to an employee is a commission if it is based on a percentage of the charge to the customer. In a "piece work" system, on the other hand, an employee is paid a certain amount per task regardless of the amount charged to the customer.

Cantu-Thacker v. Rover Oaks, Inc., No. 08-2109, 2009 WL 1883967, at * 4 (S.D. Tex. June 30, 2009) (citing Huntley

Case: 24-1439    Document: 19-1    Filed: 08/28/2024    Page: 115

In re Directech Southwest, Inc., Not Reported in Fed. Supp. (2009)

2009 WL 10663104

v. Bonner's Inc., No. 02-1004, 2003 WL 24133000, at *2-3 (W.D. Wash. Aug. 14, 2003)).

Similarly, in Klinedinst v. Swift Investments, Inc., the Eleventh Circuit held that the auto mechanics were paid a commission where customers were charged for a "flat rate" preset number of hours, while the mechanics were paid based on the flat rate hours, regardless of how long they actually took to complete a job. 260 F.3d at 1256. Similarly, in Yi v. Sterling Collision Centers, Inc., the Seventh Circuit held that auto mechanics who were paid by the job were paid commissions, observing that:

> You can spend 40 hours a week making quilts, and be paid by the quilt, and you won't be in the position of having to work overtime one week in order to make up slack time in the previous week. But if you're paid by the sale, you can't count on working steadily the same amount of time week after week, because sales depend on buyers' decisions, which are unpredictable; in the present case sales depend on the flow of wounded cars into each of [the defendant's] local repair shops.

480 F.3d 505, 510 (7th Cir. 2007). In contrast, the Western District of Washington in Huntley v. Bonner's, Inc. held that a flat rate payment system was not commission where different customers were charged different hourly rates, but this did not change the amount paid to the employee. 2003 WL 24133000, at * 3.

Thus, a flat rate payment can be a commission as long as "some amount of proportionality ... exist[s] between flat rates earned by workers and the prices paid by customers for the products sold." Parker v. Nutrisystem, No. 08-1508, 2009 WL 2358623, at *8 (E.D. Pa. July 30, 2009). For example, in Parker v. Nutrisystem, the court determined that some proportionality existed in a payment system where telephone-call-center employees were compensated based on the number of 28-day meal plans sold. However, the rate of compensation compared to customer cost did not yield a fixed ratio because while the charge to customers remained the same at different times of the day, the employees per meal compensation was higher for sales made during evening and weekend hours. Id. at *2. In holding that the employees were paid commissions, the Court found persuasive that the employees worked in sales such that the amount earned "depends in large part on the preferences of customers and on the ability of the employees to persuade those customers to buy what is being offered for sale." Id. at *9. The court contrasted piece-work payment systems, noting that under the Nutrisystem payment schedule it was "not solely the efforts

of workers to produce a product or complete an assignment without regard to the sale that determine[d] how much money they make." Id.

*12   In the present case, the defendants contend plaintiffs were paid a commission because they were paid by the job or service performed, not by the hours worked, so that by working faster and completing more jobs, the plaintiffs could earn more pay. The plaintiffs respond that they were not paid a commission because they were paid the same for jobs regardless of how much the customer pays. Paragraph 10 of the McNeel affidavit presented by the defendants in their motion indicates that "DirecTech assigns a monetary rate tied directly to the overall value of each type of service performed." Yet, in apparent contrast, plaintiffs opposition highlights deposition testimony by a DirecTech representative to the effect that the job rate is not calculated as a percentage of the payment received by DirecTech from DirecTV. To support the Mow declaration, the plaintiffs present some calculations showing the ratio of job-rate pay to the DirecTV payment rate, which shows a ratio variation of between 13% and 75%. This shows that, for example, a service coded SP earns the employee $30 and earns DirecTech $125, but a service coded R3 earns DirecTech $120 and earns the employee $60. It also shows that services that the technician might sell on site—custom services—have a consistent 75% ratio of employee pay to customer charge. The list presented by DirecTech does not include percentages but reveals a similar trend. Using the defendant's numbers, the Court calculates the ratio between employee pay and DirecTech revenue to range from 14% to 46%. Based on the evidence submitted by the parties, it is simply not clear how DirecTech determines what to pay the employees. The Court cannot conclude that employee pay is determined by the value of the service to DirecTech.

Further, unlike the employees in Nutrisystem, where the proportionality between pay and value was existent but not clear, the employees here are not primarily engaged in sales. DirecTech submits that technicians interact with customers on site and may sell them additional services for additional compensation to the technician. This scenario seems a clearer example of commission-based pay. But DirecTech does not present evidence to show what percentage of the employee's total pay is made up by this type of commission.

Here, the proportionality between the rate earned by Directech and the rate earned by the plaintiffs for each job is not clear. And while the defendants have pointed out that

In re Directech Southwest, Inc., Not Reported in Fed. Supp. (2009)

2009 WL 10663104

plaintiffs can modify services on site, there is no evidence that these modifications make up more than 50% of the plaintiffs's income. On the evidence presented, the Court cannot conclude that the technicians here were paid more than 50% in bona fide commission.[5] In sum, a submission for summary judgment is, at most, wishful thinking.

IV. Conclusion

Accordingly, the defendants Motion for Summary Judgment is DENIED; the Motion to Strike Plaintiffs' Evidence is DENIED in part and GRANTED in part to strike plaintiffs' exhibits M, V, W, and AA; and the Motion to Strike the Defendants' Reply is DENIED.

**All Citations**

Not Reported in Fed. Supp., 2009 WL 10663104

Footnotes

1    The Court notes that counsel's personal involvement and that of staff will be observed with care.

2    Both sides seem ignorant of 28 U.S.C. § 1927.

3    The plaintiffs do not challenge the percentage of DirecTech's sales that make up retail services, but challenge the entire categorization of DirecTech's sales. Having determined that the activities challenged by the plaintiffs qualify as retail services, the Court concludes that there is no disagreement that these services make up at least 75% of DirecTech's per annum sales.

4    Based on the Court's review of those plaintiffs who made declarations estimating their average weekly hours and who were also given Siebel data work hour estimates in the defendants' calculations, if the Siebel data is accurate, the plaintiffs' work estimates are completely inaccurate. In the example most favorable to the defendants, plaintiff Fuller stated that he worked consistently over 40 hours and regularly over 60 hours per week. The Seibel data work hour estimates showed 15 weeks in 42 where Fuller worked over 40 hours and zero where he worked over fifty. The example of plaintiff Gibson is more representative of the others on the list; he stated that he worked consistently over 60 hours per week and regularly 70-80 hours, but the Seibel data estimates indicate he never worked over 60 hours per week. Plaintiff Meeks stated that he worked consistently over 60 hours and regularly over 80. The Seibel data estimates one week when he worked over 60 hours.

5    The Court notes that there is no evidence that the defendants complied with the Department of Labor regulations requiring the employer seeking to claim the commissioned employee exemption to maintain a written copy or summary of the commission agreement and to note commissions on the payroll records. See 29 C.F.R. § 516.16.

End of Document                                     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 815999
Only the Westlaw citation is currently available.
United States District Court, D. Hawai'i.

Norman KATZ, Plaintiff,
v.
Timothy F. GEITHNER, Secretary
of the Treasury, Defendant.

Civil No. 09–00599 ACK–RLP.
|
March 4, 2013.

**Attorneys and Law Firms**

Norman Katz, Honolulu, HI, pro se.

Thomas A. Helper, Office of the United States Attorney,
Honolulu, HI, for Defendant.

***FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
DECISION***

ALAN C. KAY, Senior District Judge.

 **\*1** In this action, Plaintiff Norman Katz claims under
the Rehabilitation Act of 1973, 29 U.S.C. § 791, that his
former employer, the IRS,[1] failed to accommodate his visual
disability and wrongfully discriminated against him because
of that disability when it fired him in June 2007. Mr. Katz has
appeared *pro se* throughout this action.

Mr. Katz filed his complaint in this Court on December 16,
2009. The parties filed cross-motions for summary judgment
in late 2010, which the Court denied on January 21, 2011.

The Court held a four-day bench trial on February 5 through 9,
2013. At the close of Mr. Katz's case-in-chief, the IRS moved
for a judgment on partial findings under Federal Rule of Civil
Procedure 52(c). The Court reserved ruling on the motion. At
the close of all evidence, the IRS renewed its motion, and the
Court again reserved ruling on it.

This Court has original jurisdiction pursuant to 28 U.S.C.
§ 1331, and venue is proper pursuant to 28 U.S.C. §
1391(a). Having heard and weighed all the evidence and
testimony presented at trial,[2] having observed the demeanor

of the witnesses and evaluated their credibility and candor,
having heard plaintiff's and defense counsel's arguments
and considered the memoranda submitted, and pursuant to
Federal Rule of Civil Procedure 52(a)(1), this Court makes
the following findings of fact and conclusions of law. Where
appropriate, findings of fact shall operate as conclusions of
law, and conclusions of law shall operate as findings of fact.

***FINDINGS OF FACT***

***I. Mr. Katz's Background***

***A. Education & Work History***

1. Mr. Katz studied mathematics and engineering sciences
at the Illinois Institute of Technology before transferring his
grades and credits to Washington University in St. Louis,
from which he graduated in 1969 with a Bachelor of Science
Degree, with a concentration in accounting and a minor in
economics and finance. (Parties' Joint Stipulation of Fact
("Stip.Fact") ¶ 1.) He worked in various accounting- and
business-related positions before passing the examination for
Certified Public Accountant in 1973. (*Id.* ¶ 2.) He worked for
a large Chicago CPA firm for about a year and then as a sole
practitioner. (*Id.*)

2. In 1978, Mr. Katz bought a CPA practice in Hawaii. (*Id.*
¶ 3.) He was self-employed in that practice until about 1990,
when he gave the practice to his two partners and stopped
working as an accountant because of accommodative eye
spasms (*id.*), a serious condition described in more detail
below.

3. From 1990 to 1994, Mr. Katz worked as a venture capitalist
on an aero-electric energy project. (*Id.* ¶ 4.) From 1993 to
about 2006 he took and passed Series 7, 63, 24 and 27 NASD
Examinations and worked full-time as an investment banker,
general principal, or financial and operations principal for
seven or eight firms (one firm at a time) and for himself. (*Id.*)

***B. Visual Impairment***
 **\*2** 4. In 1987, Mr. Katz was diagnosed with accommodative
eye spasms, which caused temporary blindness and headaches
if he read documents, computer screens or books at close
range. (*Id.* ¶ 11.) The temporary blindness was measured
during one event to last 15 minutes and during another event
to last 40 minutes. (*Id.*) The only remedy for the spasms was
for Mr. Katz to look into the distance or close his eyes until
the spasm stopped. (Ex. 12 at 2.) Because of this condition

2013 WL 815999

from 1987 until his employment by the IRS in 2006, Mr. Katz received tax free disability benefits in excess of $6,500 per month. (Stip. Facts ¶ 3.)

5. Nothing other than reading documents, computer screens or books without aids would cause accommodative spasms. (*Id.* ¶ 11.) Mr. Katz had been advised by doctors for years to look away from close reading every fifteen minutes. If he did so, he did not suffer from spasms. Mr. Katz testified, however, that he would get engrossed in his work and forget to look away, causing the spasms. (Ex. 122 at 96:12–97:8.)

6. In addition to his accommodative spasms, Mr. Katz was very farsighted (Ex. 12 at 1) and had a severe astigmatism.

7. Starting in about 1990, Mr. Katz set up a system in his home office which included a magnified computer screen that he could use from approximately five feet away. (Stip. Facts ¶ 12.) His home office also contained a high resolution video camera mounted in the ceiling above his desk that transmitted a magnified image to a large television screen about six feet away. (*Id.*) This allowed the Mr. Katz to read documents placed on his desk without eye strain. (*Id.*) Mr. Katz testified at trial, however, that documents with very small print could not be read by the camera. For such documents, Mr. Katz had to remove the pages from their binding and scan them so that he could read them on his computer.

### II. Mr. Katz's Hiring by IRS & First Five Months of Work

#### A. Hiring

8. In July 2006, Mr. Katz was hired by the IRS as a probationary revenue agent. (Stip. Facts ¶ 5.) He was based in Austin, Texas but was supervised by the Houston, Texas office. (*Id.*) He served as the sole financial products ("FP") specialist in Austin, serving non-specialists in that office. (*Id.* ¶ 6.)

9. The IRS's FP group consists of specialist revenue agents who work on specific sections of the tax code. If an IRS case requires FP expertise, an FP specialist is brought onto the case as a consultant. On any given case, the FP specialist answers to the "team coordinator," who is a generalist revenue agent. The FP specialist writes an FP report, which forms an important part of the case file and will be heavily relied on by the IRS attorney if the case goes to litigation. The team coordinator is not the FP specialist's supervisor, however; FP specialists are supervised by FP managers. Mr. Katz's

supervisor was FP Team Manager Earnest Griffin, whose duty station was in Houston, Texas. (*Id.* ¶ 7.)

**\*3** 10. Mr. Katz was interviewed for the job by Mr. Griffin and by Jimmie Moren, a generalist revenue agent manager who worked in the Austin office. (*Id.* ¶ 13.) After the interview, Mr. Griffin recommended to the FP territorial manager, Sharon Wong, that the IRS hire Mr. Katz. Ms. Wong testified at trial that she was unenthusiastic when she read Mr. Katz's resume, but that she trusted Mr. Griffin's judgment and approved the hire. Ms. Wong was based in San Jose, California at the time, and never met Mr. Katz before or during his hiring or employment by the IRS. (*See* Ex. 7 at 26:19–23.)

11. During his interview, Mr. Katz told Mr. Griffin and Mr. Moren that he had been on disability for accommodative spasms since 1987. (Stip. Facts ¶ 13.) Because Mr. Katz had not had a significant problem with spasms for several years and was not sure he would have problems at the IRS, he did not inform Mr. Griffin or Mr. Moren of the special equipment he used to read documents, or tell them that he would need any accommodation for his vision problems. (*Id.*) He did, however, fill out an 0PM Form 256, Self Identification of Handicap, informing the IRS of his possible future need for special equipment. (*Id.; see* Ex 11.)

#### B. Classroom Period & Informal Training

12. New IRS employees enter a probationary period of approximately one year. Probationary employees spend most of their first few months in classroom training. Mr. Katz was clearly an enthusiastic trainee; his classmates voted him various awards, such as "most likely to sleep with the [tax] Code under their pillow" and "most likely to Question the Taxpayer to Death." (Ex. 10.) During this time, he did not have to do much close reading and therefore did not suffer any significant accommodative spasms. (Stip. Facts ¶ 14.)

13. After Mr. Katz's classroom period ended, Mr. Griffin arranged for him to receive informal training through Terry Eldred and Frances Mayberry in the Houston office, as well as Jimmie Moren in the Austin office. The parties dispute how much of that training Mr. Katz received.

14. For their probationary year, new employees are assigned On–the–Job Instructors ("OJI"). Mr. Katz's first OJI was Terry Eldred, a senior FP specialist based in Houston. (Stip. Facts ¶¶ 8–9.) While Mr. Eldred was Mr. Katz's OJI, Mr. Katz received a fully successful evaluation. (*Id.* ¶ 8.) Mr.

Griffin testified at trial that Mr. Katz's technical knowledge was helpful and that he performed well during this period, when he was still mostly in classroom training and did not have to juggle multiple cases.

15. Mr. Eldred retired suddenly in December 2006, and Mr. Katz was assigned a new OJI, Frances Mayberry, who like Mr. Eldred was a senior FP specialist based in Houston. (*Id.* ¶¶ 8–9.) Ms. Mayberry was Mr. Katz's OJI from January 2007 until he was fired in June 2007. (*Id.* 1 8.) During that period, Mr. Katz received only failing evaluations. (*Id.*)

***C. Accommodations for Mr. Katz's Disability***

***4** 16. Once Mr. Katz left the classroom phase of his probationary year, he had to do more close reading and began to have more significant problems with his vision. In the fall of 2006, Mr. Eldred visited Mr. Katz in Austin to train him on a software program, and saw that Mr. Katz was having considerable difficulty seeing the computer screen. (*Id.* ¶ 15.) In Mr. Katz's presence, Mr. Eldred called Mr. Griffin and informed him that Mr. Katz's vision problems interfered with his ability to work. (*Id.*)

17. Mr. Griffin called Ms. Wong, who looked into the accommodations process and gave Mr. Griffin the name of his local accommodations specialist. Mr. Griffin contacted that person, then called Mr. Katz to tell him about the IRS's reasonable accommodation process, and gave him the appropriate forms to fill out. (*Id.*)

18. On November 17, 2006, Mr. Katz submitted a Reasonable Accommodation Request to the IRS. (*Id.* ¶ 16; Ex. 101.) The request described his problem as "[p]oor vision which cannot be fully corrected [makes] it difficult for me to see and slows my performance." (Ex. 101.) The IRS form required Mr. Katz's doctor, Thomas Henderson, to explain how Mr. Katz's condition affected his major life activities. Dr. Henderson responded "headaches after close work." (*Id.*)[3]

19. Mr. Katz's Reasonable Accommodation Request sought "a large auxiliary screen; and an evaluation of what solutions might be available to me." (*Id.*) Mr. Katz initially planned to ask for a scanner as well as a large screen, and filled out a Reasonable Accommodation Request asking for both. (Ex. 1.) Mr. Griffin suggested that he request only the large screen, and Mr. Katz revised the Request to reflect that. (*See id.;* Ex. 9 at 210:11–18.)[4] An IRS internal website lists various types of equipment available for disabled employees, including a large-screen monitor. Mr. Griffin testified at trial that the cost of such a monitor would not be a hardship for the IRS.

20. In response to Mr. Katz's request, the IRS reasonable accommodation liaison sent Mr. Griffin a document titled "Denial of Reasonable Accommodation Request," (Ex. 103) which he forwarded to Mr. Katz. In support of the denial, a medical consultant retained by the IRS, Dr. Sylvie Cohen, wrote that the large screen was unnecessary and that Mr. Katz should resolve his problems ergonomically by looking away from the monitor every 15 minutes and positioning the screen 12 to 16 inches away from himself. (*See* Ex. 102.) Dr. Cohen describes herself as an "occupational medicine consultant" (*see id.*) and there is no indication in the record that she has any specialty in ophthalmology.

21. Mr. Katz learned of this opinion in December 2006 or early January 2007. (Stip. Facts ¶ 18.) Mr. Katz testified at trial that Dr. Cohen's first piece of advice was the same advice he had received from his own doctors for years, but that the second piece of advice was wrong. According to Dr. Henderson's affidavit, Dr. Cohen did not contact Dr. Henderson and erred in assuming that Mr. Katz was nearsighted. (Ex. 12.) Nonetheless, Mr. Katz never told anyone at the IRS that he believed Dr. Cohen's opinion to be unreasonable or unworkable. (Stip. Facts ¶ 21.)

***5** 22. Mr. Griffin testified at trial that he had no way of evaluating Dr. Cohen's opinion, and Mr. Katz testified that he did not tell Mr. Griffin (or anyone else at the IRS) that Dr. Cohen's opinion was wrong. Mr. Griffin knew, however, that Mr. Katz had a home office set up with equipment that was designed to work with his visual disability. Under IRS policy, probationary employees are not allowed to work from home. Mr. Griffin nonetheless secured Ms. Wong's permission and allowed Mr. Katz to work from home.

23. Unfortunately, Mr. Katz was unable to connect his IRS laptop to his home computer monitor. When he contacted an IRS computer technician, the computer technician told him that IRS policy did not allow employees to connect IRS computers to home equipment. (*See* Ex. 18 at 10.8.1.5.2.5(3)-(4).) Mr. Katz told Mr. Griffin what the computer specialist had said. In his trial testimony, Mr. Griffin recalled Mr. Katz's worry that he had gotten Mr. Griffin into trouble. Mr. Griffin told Mr. Katz that he was allowed to connect the IRS laptop to a home monitor, and that the rules only prohibited connecting home devices that could transmit data—such as a CPU—to the IRS systems. Mr. Griffin testified that he was

not aware that Mr. Katz was never able to connect the IRS laptop to his home monitor; their conversation was about the IRS's policies, not about Mr. Katz's equipment problems. Mr. Griffin also testified that he has been able to connect his own personal monitor to an IRS computer.

24. It is undisputed that Mr. Griffin never saw Mr. Katz's home office; it does not appear that Mr. Katz ever invited Mr. Griffin to see his home office, and both Mr. Griffin and Ms. Mayberry testified at trial that they believed it was office policy that managers should not visit employees who were working from home.

25. Since Mr. Katz could not connect his IRS laptop to his home monitor, he continued to use the laptop screen at home when he needed to work within the IRS system. When Mr. Katz remembered to look away from the screen every 15 minutes or so, he generally succeeded in avoiding accommodative spasms. (Stip. Facts ¶ 19.) He sometimes forgot to look away, however, because he became engrossed in his work. (*Id.*) The combination of having to take breaks every 15 minutes or so and of recovering from spasms when he forgot to look away required him to put in more than eight hours a day to complete eight hours of productive time during the day. (*Id.*)

26. The "Denial of Reasonable Accommodation Request" lays out specific steps for an employee to follow if he wants the IRS to reconsider its decision or appeal. (Ex. 103.) Mr. Katz did not follow any of these steps.

27. On February 16, 2007, Mr. Katz sent an e-mail to co-workers explaining the accommodations and his surgeries. (Ex. 105.) He noted that having to take frequent breaks required him to work longer hours. (*Id.*)

28. At some point, Mr. Griffin noticed that Mr. Katz had billed time worked on a Sunday. Mr. Griffin contacted Mr. Katz and told him that he could not bill more than eight hours of work per day without pre-clearing the time with a supervisor. It is undisputed that Mr. Katz sent Mr. Griffin e-mails outside of normal work hours. Mr. Griffin's testimony that he did not infer from these e-mails that Mr. Katz was working long hours was not credible.[5] It was, however, entirely consistent with Mr. Griffin's further testimony that new FP specialists work long hours because they are trying to learn, and that even experienced FP specialists often work twelve- to fourteen-hour days. Mr. Griffin's testimony that he did not infer that Mr. Katz was working long hours *because of his disability*

is therefore credible. Mr. Katz testified at trial that he never asked to have his workload reduced for any reason, let alone because of his visual problems.

### *D. Early Political & Religious Incidents*

 **\*6**  29. Early in his classroom training period, Mr. Katz had a conversation with Mr. Griffin about Judaism. Mr. Griffin teaches a Sunday school class, and asked Mr. Katz to send him examples of the Jewish calendar, so that he could teach his class about the Jewish roots of Christianity.

30. On September 11, 2006, FP specialist Gerald DeLuca made statements that led Mr. Katz to believe that he was being targeted for his political beliefs-in particular, for declining to condemn President Bush in connection with the Iraq war. (Stip. Facts ¶ 24 .) Mr. Katz testified during his deposition that he felt the conversation with Mr. DeLuca was a "vetting" interview on the part of Mr. DeLuca, Mr. Griffin, and Ms. Mayberry, to discover his political allegiances. (Ex. 122 at 91:25–93:11.) At trial, Mr. Katz testified that over the succeeding months after the conversation with Mr. DeLuca, Mr. Katz felt that Mr. Griffin's attitude towards him changed and became less friendly and more distant.

31. In early January 2007, Ms. Mayberry visited Mr. Katz in Austin. He picked her up from the airport wearing a baseball cap. He testified at trial that when he removed his baseball cap and Ms. Mayberry saw his yarmulke, she looked shocked and ill-at-ease.

### *III. Post–Classroom Work History*

### *A. Work Study Assignment*

32. Mr. Katz completed his "Phase II" classroom training in December 2006. The training involved a written test. Mr. Katz received a high score on the test, but missed some questions. Ms. Mayberry therefore created a "work study" program, dividing the missed questions into four sets, with four deadlines spaced over the coming months to turn in a short summary of the correct answers. (*See* Ex. 126.) Ms. Mayberry testified at trial that she sent Mr. Katz reminder e-mails before each deadline. She testified that she expected Mr. Katz to spend about 15 or 20 minutes per question, for a total of one and a half to three hours. She likewise required the other two FP trainees to explain the questions they had missed; and they responded promptly within her deadlines.

2013 WL 815999

33. On March 21, 2007, Ms. Mayberry and Mr. Griffin exchanged e-mails regarding Mr. Katz's progress in meeting training deadlines. (Ex. 128.) Mr. Katz had at that point missed all four deadlines. (*Id.*) Ms. Mayberry then set him a final deadline of May 30, 2007, to turn in the work study. (*See* Ex. 131.) Mr. Katz met that deadline. (*See id.*)

34. Mr. Katz testified at deposition that he felt that the work study assignment was "a punishment" given because Ms. Mayberry didn't like him. (Ex. 122 at 122:4–11.) He described the assignment as "inane" and "the ego mania of a crazy woman." (*Id.* at 102:23; 140:13–15.) He admitted that he "sloughed it off" in favor of other work that he believed was more important. (*Id.* at 102:20–103:8.) He testified at deposition that, while he "never missed a real [deadline]," "[t]hey may have sent me e-mails that I didn't respond to saying that they want it done by a certain time." (*Id.* at 120:15–20.) He also testified in his deposition that he did not have time to do the assignment because he was working such long hours on his cases. (*See id.* at 122:22–123:13.) He never, however, told Ms. Mayberry that his visual disability was interfering with his work.

 **\*7**  35. Mr. Griffin did not infer from Mr. Katz's missed deadlines that the accommodation for his visual disability was not working. Mr. Griffin testified that there can be any number of different reasons for an employee to fail to meet deadlines. He testified that being able to juggle an inventory of several cases with multiple issues is challenging and that he expected all new FP employees to encounter some problems with time management.

### B. Bridge Case

36. Mr. Griffin testified at trial that he assigned Mr. Katz cases that would use Mr. Katz's experience in the securities industry. He repeatedly noted Mr. Katz's passion for the technical aspects of FP work, and for complex securities cases in particular. Mr. Griffin testified that he assigned Mr. Katz fewer cases than the other two new employees training in FP at that time because Mr. Katz was new to the IRS; while the other two trainees had transferred to FP from other IRS divisions. Mr. Katz was given five or six open cases at any one time; while the other trainees were given eight to ten.

37. Mr. Katz's largest case was the "Bridge Case."[6] The Bridge Case was originally assigned to Mr. DeLuca (*see* Ex. 21), but was reassigned to Mr. Katz in late 2006 (*see* Ex. 2 at 126:2–6). The case had a short deadline, which was

originally set for December 2006, but was later extended to July 2007.[7] The case involved a complex transaction, known as a binary option, arranged by a securities broker between an American company and a related Irish company, which the IRS believed to be a tax shelter. (Its finer details, although discussed extensively at trial, are not relevant to Mr. Katz's claims.)

38. Mr. Katz had discussed his theory of the Bridge Case with Mr. Eldred as early as November 2006. (Ex. 129.) Mr. Katz believed that the transaction in the Bridge Case was effectively a "proposition bet," a kind of Las Vegas bet on a contest set up between one party and a counter party or parties where a third party holds the money and acts as judge. (Stip. Facts ¶ 25.) He analogized the transaction to a rigged roulette table. (Ex. 129.) Mr. Eldred disagreed, stating that the transaction was not a wager. (*Id.*)

39. Mr. Katz discussed his theory of the case with Ms. Mayberry after she became his OJI in January 2007. Mr. Katz wanted to use IRC Section 165(d) disallowing losses from wagers except to the extent of winnings in the current year, in addition to making a sham transaction argument under IRC Section 165(a). (Stip. Facts ¶ 25.) Ms. Mayberry disagreed. She testified at length at trial that she felt that Mr. Katz's use of betting and gambling terminology undermined the IRS's position in the case by implying that the taxpayer was taking on risk in the transaction, when in fact the transaction was a tax shelter with a fixed result and no risk. She believed that Mr. Katz should apply IRC Section 1092 to the case.

40. Mr. Katz came to believe that Ms. Mayberry was too rigid and did not have the mathematical skills and legal knowledge to understand why IRC Section 165(d) should apply to the case. (*Id.*) Ms. Mayberry at some point told Mr. Griffin about the dispute. Mr. Griffin testified at trial that at that time he considered it a healthy discussion and saw no need to interfere.

 **\*8**  41. Carlton Anderson was the team coordinator on the Bridge Case. (*Id.* ¶ 6; *see* Ex. 2 at 119:22–120:1.) Mr. Anderson testified during the EEOC hearing on Mr. Katz's claim that he had agreed with Mr. Katz on the bet option issue and felt that Mr. Katz's work on the Bridge Case was good. (Ex. 2 at 120:7–20; 121:16–24.) Mr. Anderson was not an FP specialist, however. Mr. Moren was the team manager on the case and disagreed with Mr. Katz's analysis.

2013 WL 815999

42. On February 21, 2007, Mr. Moren called Mr. Griffin and requested a conference call regarding the Bridge Case. (*See* Ex. 106.)[8] Mr. Griffin called Mr. Katz and scheduled a conference call for 9:00 a.m. (*Id.*) Mr. Katz was reluctant to join the call because of a scheduling conflict with work on another case. Mr. Griffin ordered Mr. Katz to be on the call.

43. During the conference call, in front of Mr. Moren and Mr. Anderson, Ms. Mayberry and Mr. Griffin told Mr. Katz not to claim that the taxpayer was using a gambling strategy under 165(d). (Stip. Facts ¶ 26.) Mr. Moren at one point said "We will be laughed at ." (*Id.*) Mr. Katz replied "You are the boss. If you want me to fly with one wing, I'll fly with one wing." (*Id.*) Mr. Katz believed at the time that Ms. Mayberry had set up the conference call in order to undermine him.[9]

44. Later that same day, Mr. Griffin e-mailed Mr. Katz a written summary of his job performance on the Bridge Case. (*Id.* ¶ 27; *see* Ex. 106.) Mr. Griffin told Mr. Katz in that summary that his "attitude and approach to the needs of the customer[10] in this case [was] unacceptable." (Ex. 106.) Mr. Griffin informed Mr. Katz that he was failing several critical elements of his job, including juggling priorities and case matters. (*Id.*) Ms. Wong, the FP territorial manager, testified at trial that she saw this document shortly after Mr. Griffin wrote it.

45. Two days later, Mr. Katz replied to the e-mail, copying Mr. Moren and defending his performance on the Bridge Case. (Ex. 125 at 2–3.) In the e-mail, he stated that he was "willing to defer on the issue to your practical experience and wisdom." (*Id.* at 2.) Mr. Griffin responded that he, not Mr. Moren, was Mr. Katz's supervisor, and that if Mr. Katz had issues with his performance review, he should not involve Mr. Moren. (*Id.*) Mr. Katz replied asking Mr. Griffin to reconsider his performance review. (*Id.* at 1–2.) He stated that at the time of the February 21 conference call he believed that the use of the gambling terminology was still up for discussion. (*Id.* at 2.) He also noted, however, that on February 23 he had told Mr. Moren over lunch that he "had given the matter some thought and realized that the wagering approach was novel and there might be practical reasons for not raising it." (*Id.*) Mr. Katz described Mr. Moren as "satisfied with my willingness to bow to more experienced judgment." (*Id.*) Mr. Griffin declined to reconsider his February 21 review, but stated that he would attach Katz's response to the write-up and that he would continue to monitor Mr. Katz's performance during his probationary period. (*Id.* at 1.)

**\*9** 46. At some point after the February 21 conference call, Mr. Katz and Mr. Griffin again discussed using "bet" terminology in the Bridge Case FP report. Mr. Katz pointed to a page from *The Handbook of Exotic Options* (Israel Nelken, ed.) in which "bet option" is given as a synonym for "binary option." (*See* Ex. 19.) Mr. Griffin told Mr. Katz that he could footnote this point. There was apparently a miscommunication; Mr. Katz testified at trial that he believed that Mr. Griffin had told him he could use the term "bet" as long as he footnoted it. Similarly, at some point Mr. Katz showed Mr. Griffin a schedule he had prepared for the Bridge Case (Ex. 24) and Mr. Griffin told him it was good work. The schedule uses the word "bet." (*See id.*) Mr. Katz again took this as a sanctioning of his use of the word. Mr. Griffin testified at trial, however, that he in no way meant to sanction the use of that word, except in a footnote. Regardless, Ms. Mayberry testified that Mr. Katz never told her that Mr. Griffin had approved the use of the term.

47. On March 5, 2007, Ms. Mayberry sent Mr. Katz an e-mail regarding his use in the draft FP report of Mr. Anderson's work product. (Ex. 107.) Ms. Mayberry testified at trial that this was another significant problem with Mr. Katz's work on that report. Both she and Mr. Griffin testified that FP specialists were advised not to use the work of agents who were not FP specialists, because non-specialists' analysis was likely to be incorrect. Ms. Mayberry also testified that she wanted Mr. Katz to draft his own report because he was a trainee and needed to learn how to do it.

48. On March 14, 2009, Ms. Mayberry sent Mr. Katz an e-mail regarding his use of Mr. Anderson's draft report and the bet option issue. (Ex. 109.)

49. On March 19, 2007, Mr. Griffin met with Mr. Katz to go over Mr. Griffin's write-up of the February 21 conference call. (*See* Ex. 110.) He memorialized their discussion in a memorandum. (*Id.*) Mr. Griffin told Mr. Katz that he had to consider the team manager's comfort level with terms he used in the FP report. (*Id.*) He stated that an FP specialist must be able to juggle priorities. (*Id.*) He told Mr. Katz that he had not properly documented all contacts he had on his cases, and showed him how to start doing so. (*Id.*) Mr. Griffin also told Mr. Katz that he could not make disparaging remarks about coworkers in his e-mails. (*Id.*) Mr. Katz asked whether he could have a chance to improve his performance; Mr. Griffin responded that there was time to improve his performance and that Mr. Griffin would continue to monitor it. (*Id.*) Mr. Griffin suggested that Mr. Katz take online time management and risk

management courses offered by the IRS. (*Id.*) Mr. Katz never took those courses.

50. On March 19, 2007, Ms. Mayberry and Mr. Katz talked over the phone regarding aspects of his performance. (Stip. Facts ¶ 31.) The parties stipulated that "Ms. Mayberry said something along the lines of asking if she had to throw a rock at Mr. Katz's head to get his attention." (*Id.*) The two continued the discussion by e-mail that same date. (*Id.; see* Ex. 111.) In the e-mail exchange, Mr. Katz noted that he did not feel he had sufficient training on how to write FP reports. (Ex. 111.)

**\*10** 51. On March 23, 2007, Ms. Mayberry and Mr. Katz exchanged e-mails concerning Mr. Katz's draft report. (Ex. 113.) Ms. Mayberry stated "To say I am annoyed with you is an understatement.... You have ignored all of my recommendations." (*Id.* at 2.) Mr. Katz responded "I have not ignored you and I have reviewed the code sections and regulation to which you have referred me.... So far I do not see the argument you want me to make." (*Id.* at 1.) He repeatedly noted that the report had been drafted by Mr. Anderson. (*Id.*) Ms. Mayberry reported to Mr. Griffin that their dispute was continuing; Mr. Griffin reported that fact to Ms. Wong.

52. On March 27 or 28, 2007, Ms. Mayberry and Mr. Katz had a telephone call regarding Mr. Katz's latest draft of the Bridge Case FP report. Ms. Mayberry testified at trial that Mr. Katz became very angry and was screaming at her, saying that he knew more tax law than she did and that he ought to be her OJI.[11] Mr. DeLuca, who was in the same room as Mr. Katz while he was on the call, described Mr. Katz in an affidavit as "shaking violently and spitting into the phone because he was in such a rage." (Ex. 6A at 4.) Ms. Mayberry described this call at trial as her worst interaction with Mr. Katz. She repeatedly testified at trial that Mr. Katz was very nice to her as long as they were not discussing the Bridge Case, and compared the abrupt changes in his manner to the story of Dr. Jekyll and Mr. Hyde.

53. During his deposition Mr. Katz repeatedly described Ms. Mayberry as "stupid." (Ex. 122 at 107:10–108:3; 155:8–12.) He also described her as "obstinate," "rigid," and "somewhat senile" and stated that "there was something wrong with her" and that "[s]he was not functioning right." (*Id.* at 155:14–19; 156:19–20; 167:15–22.) He also testified that he believed she was an anti-Semite. (*Id.* at 106:6–18.) During trial, Mr. Katz testified that he now regretted some of his word choices, but

that they were likely an accurate representation of his feelings in 2007.

54. Ms. Mayberry reported the March 27 phone call to Mr. Griffin, who held a conference call with both Ms. Mayberry and Mr. Katz to discuss the issue.

55. On April 27, 2007, Mr. Katz attended a meeting with an executive officer of the taxpayer company on the Bridge Case. Ms. Mayberry testified at trial that he did well at the meeting and asked professional and helpful questions.

56. The final version of the FP report that Mr. Katz submitted still contained frequent references to bets and a lengthy analogy to a roulette wheel. (*See* Ex. 27 at 25–27.) This version of the FP report contains a discussion of section 1092, the section which Ms. Mayberry wanted to apply, but the discussion consists largely of block quotations from the code section. Mr. Katz testified at trial that the discussion of section 1092 was not good work because his heart was not in it. Ms. Mayberry testified at trial that Mr. Katz's presentation and analysis of the facts was excellent, but that his law and argument section was seriously flawed. She also noted that the final version of the report continued to use Mr. Anderson's layout.

**\*11** 57. Ms. Mayberry and Mr. Griffin testified at trial that the Bridge Case closed in July 2007 without an FP report, because Ms. Mayberry was unable to rewrite the report to an appropriate standard before the deadline.

### C. Work on Other Cases & Evaluations from Other Co–Workers

58. On March 13, 2007, Mr. Livingston, who was acting FP team manager while Mr. Griffin was on detail, sent Mr. Katz a performance review. (Stip. Facts ¶ 29; Ex 108.) Mr. Katz responded by e-mail on March 15, 2007. (Ex. 108.) Mr. Livingston's evaluation was negative because Mr. Katz had failed to timely complete a spreadsheet on a case known as "SILOs." (*Id.*) Mr. Griffin testified at trial that it was later determined that Mr. Katz had been given improper instructions on the spreadsheet, which was far more complicated than anyone had realized, and that Mr. Griffin therefore did not consider Mr. Livingston's negative review when he decided to recommend firing Mr. Katz. Nonetheless, Mr. Livingston's review was one of the documents considered by Ms. Wong and listed in Mr. Katz's termination memorandum. (Ex. 119.)

59. Three of Mr. Katz's former co-workers, Robert Northcutt, Robert Davis, and Michael FitzGerald, testified during Mr. Katz's EEOC proceeding that they had never observed Mr. Katz being hostile, argumentative, loud, or angry. (*See* Ex. 3 at 101:18–24; Ex. 4 at 110:23–25; Ex. 5 at 136:25–137:4.) Mr. Davis, an IRS supervisor on whose case Mr. Katz consulted, also testified at the EEOC proceeding that Mr. Katz's work on his case and his discussion of another technical matter was helpful and on point. (Ex. 4 at 112:15–18; 114:7–15.) Mr. FitzGerald, an IRS agent in Austin who worked on three different cases with Mr. Katz, testified at the EEOC proceeding that Mr. Katz's workpapers on his cases were good. (Ex. 5 at 142:24–144:12.) The Court notes that these witnesses were not FP specialists and were not involved in reviewing or criticizing Mr. Katz's work.

### D. Spring 2007 Medical Procedures

60. At some time in late 2006 or early 2007, Mr. Katz went to see Dr. Mitchel Wong in Austin about his vision problems. (Stip. Facts ¶ 21; *see* Ex. 13.) Dr. Wong informed Mr. Katz that his accommodative spasms could be cured by cataract surgery and that his corrected vision because of cataracts was less than 20/50. (Stip. Facts ¶ 21.)

61. Mr. Katz underwent cataract surgery on one eye on February 7, 2007, and in the other eye on March 7, 2007. (Ex. 13.) He took three days off of work for each surgery. (Stip. Facts ¶ 21.) His last episode of accommodative spasm was March 8, 2007. (*Id.* ¶ 23.)

62. Nonetheless, Mr. Katz's corrected vision was not very good because the implants were not able to correct for Mr. Katz's undersized eyes and he remained farsighted making it difficult for him to work at close range until he was able to obtain corrective glasses, a process requiring time for his vision to stabilize to get a prescription for the glasses. (*Id.*) He also still had a severe astigmatism. Mr. Katz testified at trial that he had to get new lenses for his glasses up to once every two weeks during this period. Nonetheless, he was able to sharply reduce the amount of extra time he had to put in to complete his work. (*Id.*) On March 20, 2007 in an e-mail to Mr. DeLuca, Mr. Katz described his frequently-changing prescription as "not as bad as it sounds. But, it is a nuisance." (Ex. 127.)

**\*12** 63. Mr. Katz underwent "Yag" laser surgery on April 12 and 19, 2007. (Ex. 13.)[12] Finally, he underwent Lasik

surgery on both eyes on June 14, 2007 (*id.*), which improved his astigmatism problem.

### IV. Formal Evaluations and Termination

64. At some point during the spring, Ms. Wong, who had seen Mr. Griffin's February 21 write-up and Mr. Livingston's March 13 review of Mr. Katz, asked Mr. Griffin to create an improvement plan for Mr. Katz, which would set a baseline and a 60–day window for improvement. Ms. Mayberry drafted an improvement plan (Ex. 114), which Ms. Wong and Mr. Griffin reviewed.

65. On April 5, 2007, Ms. Mayberry personally delivered the improvement plan to Mr. Katz, and the two discussed it in person. (Stip. Facts ¶ 34; *see* Ex. 115.) The plan noted that Mr. Katz had "exhibited a hostile and argumentative attitude towards any and all recommendations and suggestions" and told him that he must work on adopting a calmer attitude and "refrain from loud, angry outburst." (Ex. 114.) Mr. Katz testified at trial that he rejected the terms "hostile," "loud," and "aggressive" but that he could see someone describing him as "arrogant"; he admitted that he shows his irritation. He testified that he understood at the time that if he did not follow the improvement plan he might be fired.

66. Ms. Mayberry testified at trial that Mr. Katz was visibly upset at the April 5 meeting, but was not abusive. She told Mr. Katz that his knowledge of securities products was helpful to the FP program and that almost all of his performance problems could be corrected if he developed a better attitude. She felt they made progress at the meeting. Mr. Katz testified at trial that when he drove Ms. Mayberry to the airport after this visit, she stated that the United States was fighting the war in Iraq because of Israel. (Ex. 34 at 3.)[13] Ms. Mayberry denies making this statement.

67. On April 9, 2007, Ms. Mayberry summarized her work with Mr. Katz in a memo to Mr. Griffin. (Stip. Facts ¶ 35; Ex. 115.) She noted that they still disagreed over the appropriate terminology to use in the Bridge Case, but that Mr. Katz had agreed to work with her. (Ex. 115.) Ms. Mayberry noted in this evaluation that Mr. Katz had told her he was working 60 hours a week. (*Id.*) She testified at trial that Mr. Katz had told her before that he worked extra hours, but had never put such a large number on it before. She testified that he did not say exactly what he was working on, but that her impression was that he was doing outside research on technical issues. She testified that Mr. Katz did not mention his vision problems and

did not mention any problems connecting his home monitor. Ms. Mayberry told Mr. Griffin in her write-up that she hoped to revise her evaluation in the future as Mr. Katz made progress. (*Id.*) She stated that Mr. Katz was still adjusting to IRS culture and learning his job. (*Id.*) She stated that the FP program would "reap big benefits" from Mr. Katz's technical expertise in securities. (*Id.*)

**\*13** 68. On April 11, 2007, Mr. Katz sent a fax to Mr. Griffin, in which he described the statements in the April 5 improvement plan as "untrue, abusive, outrageous, unfair, humiliating, a tirade, lacking in examples, character assassination, and not otherwise helpful." (Ex. 30.)

69. Mr. Griffin testified at trial that after the April improvement plan had been delivered, he consciously took a step back, to see whether Ms. Mayberry would be able to work with Mr. Katz to follow the improvement plan. Ms. Mayberry testified at trial that she had believed after the April 5 meeting that their dispute over the "bet" terminology in the Bridge Case FP report was settled, but that nothing changed in Mr. Katz's subsequent drafts of the report. She did testify, however, that his manner improved and that he was less hostile towards her.

70. In early June 2007, at the end of the 60–day improvement period, Mr. Griffin conducted a workload review of Mr. Katz's cases other than the Bridge Case and the SILO case. He found that Mr. Katz's workpapers were largely inadequate or missing. Mr. Griffin testified at trial that he felt that while Mr. Katz was passionate about the technical side of FP work, he was not interested in the administrative aspects of the job and considered them bureaucratic. Mr. Griffin drafted a written review of Mr. Katz's workpapers (Ex. 116), which he showed to Ms. Wong. Ms. Wong testified at trial that after she saw the review she told Mr. Griffin to contact an IRS labor relations specialist to discuss firing Mr. Katz. Mr. Griffin delivered his written workload review to Mr. Katz on June 8, 2007.[14]

71. On June 11, 2007, Ms. Mayberry wrote an evaluation of Mr. Katz's work, focused mainly on the Bridge Case. (Stip. Facts ¶ 37; Ex. 118.) She noted that Mr. Katz had missed his original work study deadlines; had stubbornly continued to use the "bet" terminology and argument in the Bridge Case report; and had turned in inadequate workpapers. (Ex. 118.) She also noted, however, that Mr. Katz's attitude had improved somewhat since their April 5, 2007 meeting, and listed recommendations for his future work. (*Id.* at 2–3.) Ms. Mayberry testified at trial that she knew at this point that Mr.

Katz might get fired, but that she also believed there was a possibility that he would continue at the IRS.

72. Mr. Katz drafted a written response to Mr. Griffin's June 8 review, received by Mr. Griffin on June 19, 2007. (Ex. 117.) Evidently, sometime before June 19, Mr. Griffin had told Mr. Katz that he was going to be fired. (*Id.* at 1.) In Mr. Katz's response, he attributed all of his problems in 2007 to Ms. Mayberry's supervision. (*Id.*) He stated that Ms. Mayberry bore "some deep seated hatred for me that I cannot fathom or understand" and that she had "manipulated and schemed to get me fired." (*Id.* at 4.) He dated this bias from when Ms. Mayberry saw his yarmulke. (*Id.* at 5.) He stated that his work on the Bridge Case had been "very professional and exemplary" and argued that the fact that it had not been included in the review was evidence of bias. (*Id.* at 6.) Mr. Katz noted that his visual impairment and eye surgeries had caused him to work extra hours and described the accommodation he was given as "limited." (*Id.* at 4.) He stated that Ms. Mayberry "failed to make even minimal allowances" for his disability. (*Id.* at 6.) He complained that he did not receive sufficient training in workpapers. (*Id.* at 5.) He also complained that he felt the work environment was oppressive and that it was not acceptable for him to disagree and express his views. (*Id.*)

**\*14** 73. Mr. Griffin testified at trial that Mr. Katz's response did not change his view that Mr. Katz should be fired. He testified that if the Bridge Case had been included in Mr. Griffin's June 8 review, the review would only have been more negative. Mr. Griffin did not ask for input from IRS employees other than Ms. Mayberry regarding Mr. Katz's performance; he testified at trial that he thought that would be inappropriate. Mr. FitzGerald testified at the EEOC proceeding, however, that, as a team coordinator on a case Mr. Katz worked on, he should have been asked for input on the evaluation of Mr. Katz. (Ex. 5 at 140:8–10.)

74. On June 21, 2007, Ms. Wong issued Mr. Katz a termination memorandum. (Stip. Facts ¶ 38; Ex. 119.) The memorandum stated that he was being fired based on his four failing evaluations dated February 21, March 5, April 5, and June 8, 2007 (*see* Ex. 119), and Ms. Wong testified at trial that those were the documents she reviewed before issuing the memorandum. In the memorandum, she stated that at each of the four evaluations he failed at least three "Critical Elements" of his work, and that at the April 5 review he failed all of them. (*Id.*)

75. On July 10, 2007, Mr. Katz signed and sent to the Office of Special Counsel a complaint form alleging violation of the Hatch Act and that his termination was, at least in part, motivated by the political beliefs of Mr. DeLuca, Ms. Mayberry, and Ms. Griffin. (Stip. Facts ¶ 39; Ex. 120.) He stated that "[t]he argument that I was fired because of poor performance is completely fabricated out of thin air." (Ex. 120 at ¶ 15.)

## CONCLUSIONS OF LAW

Having evaluated the factual aspects of the evidence, the Court will now make its conclusions of law.

1. Mr. Katz was a federal employee, and his claims therefore arise under section 501 of the Rehabilitation Act, 29 U.S.C. § 1971. *Boyd v. U.S. Postal Serv.,* 752 F.3d 410, 413 (9th Cir.1993). The IRS is covered by the Rehabilitation Act, which applies to "[e]ach department, agency, and instrumentality ... in the executive branch." 29 U.S.C. § 791(b).

2. Section 501 of the Rehabilitation Act provides for two types of claims: (1) claims based upon the government's failure to reasonably accommodate an employee's disability, as required under 29 U.S.C. § 791(b); and (2) non-affirmative action employment discrimination claims based on 29 U.S.C. § 791(g). Mr. Katz brings both types of claim.

3. In 1992, Congress amended the Rehabilitation Act to clarify that its standards for evaluating employer conduct are those applied under the Americans with Disabilities Act ("ADA"), as such sections relate to employment. 29 U.S.C. § 791(g).

### I. Failure To Accommodate

4. Regulations promulgated under the Rehabilitation Act require governmental employers to make reasonable accommodation to the known physical or mental limitations of a disabled employee, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its program. 29 C.F.R. § 1613.704(a). This regulation contains three elements: (1) plaintiff must be a qualified disabled individual; (2) the employer must make reasonable accommodation to the disability; and (3) the accommodation need not be made if it would impose an undue hardship. *Fuller v. Frank,* 916 F.2d 558, 561 (9th Cir.1990).

### A. Qualified Disabled Individual

**\*15** 5. An individual with a disability is someone who has "a physical or mental impairment which substantially limits one or more of the person's major life activities." 29 U.S.C. § 705(20)(B). For purposes of section 501, the term "physical or mental impairment" means "any physiological disorder or condition ... affecting [*inter alia* ] special sense organs...." 29 C.F.R. § 1614.203(b); *Id.* § 1630.2(h). The term "substantially limits" "clearly precludes impairments that interfere in only a minor way ... from qualifying as disabilities." *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 197 (2002). To be substantially limited, the plaintiff must be "significantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to ... the average person in the general population." *Id.* at 195.[15] The regulations list "seeing" among "major life activities." 29 C.F.R. § 1630.2(i)(1)(I); *see id.* § 1614.203(b).

6. Mr. Katz presented sufficient evidence at trial to prove that his accommodative spasms amounted to a disability under the meaning of the Rehabilitation Act up until March 8, 2007, the date of his last accommodative spasm. During this period, Mr. Katz suffered from episodes of blindness that could last for up to forty minutes. While having a spasm he was unable to work, read, or drive a car. Because of the spasms he had been forced to give up his CPA practice and had to set up a sophisticated home office that would enable him to work from home despite his vision problems. At trial, the IRS affirmed that it would not contest that Mr. Katz was disabled up until March 8, 2007.

7. To fall within the protections of the Rehabilitation Act, Mr. Katz must also demonstrate that he was "qualified," that is, that he "satisfie[d] the requisite skill, experience, education, and other job-related requirements" of his position "and, with or without reasonable accommodation, [could] perform the essential functions of such position." 29 C.F.R. § 1630.2(m).

8. In this case, there appears to be no question that Mr. Katz satisfied the requisite skill, experience, education, and other job-related requirements of the position or that he was capable of performing its essential functions, if his visual disability was properly accommodated. Both Mr. Griffin and Ms. Mayberry testified that Mr. Katz did good work on various parts of his cases, was passionate about the technical aspect of the work, and had valuable knowledge from his

extensive practice in the securities industry. Mr. Katz also passed through the classroom part of his training with high scores and was clearly an enthusiastic student during that part of his probationary year. At trial, he came across as intelligent and knowledgeable in the fields of mathematics and securities.

### B. Reasonable Accommodation

9. The term "reasonable accommodation" means "[m]odifications or adjustments to the work environment ... that enable a qualified individual with a disability to perform the essential functions of [his] position," and "may include but is not limited to ... acquisition or modifications of equipment or devices." 29 C.F.R. § 1630.2(o)(1)-(2).

**\*16** 10. Once an employer is aware that an employee may be in need of accommodation, the employer is required to engage in an interactive process with the employee aimed at determining appropriate reasonable accommodations. *Zivkovic v. S. Cal. Edison Co.,* 302 F .3d 1080, 1089 (9th Cir.2002). The interactive process requires "(1) direct communication between the employer and the employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective." *EEOC v. UPS Supply Chain Solutions,* 620 F.3d 1103, 1110 (9th Cir.2010) (citation omitted). An employer is not obligated to award a disabled employee the precise accommodation he requests: "the employer need only provide some reasonable accommodation." *Zivkovic,* 302 F.3d at 1088.

11. Both parties must actively participate in the interactive process. *See Humphrey v. Mem. Hosps. Ass'n,* 239 F.3d 1128, 1137 (9th Cir.2001) (reversing grant of summary judgment to employer where employee notified employer that initial accommodation was not working and employer refused to explore alternatives); *Allen v. Pac. Bell,* 348 F.3d 1113, 1115–16 (9th Cir.2003) (affirming grant of summary judgment to employer where employee did not submit requested medical information and did not appear for a keyboard test that employer requested to determine appropriate accommodation).

12. Mr. Katz argues that the IRS's first attempt at accommodation was not reasonable. The Court disagrees. Mr. Katz's reasonable accommodation request did not fully describe the problems that he faced in doing his work. His doctor described his symptoms merely as "headaches." It is difficult to find, as Mr. Katz argues, that the IRS's

doctor was "grossly negligent" in her analysis (*see* Pl.'s Proposed Findings at 2 ¶ 1) when Mr. Katz's doctor so lightly characterized Mr. Katz's problems. Mr. Katz makes much of the fact that Dr. Cohen never contacted Mr. Katz's own doctor. (*Id.* at 2 ¶ 1.1.) No doubt that would have been the best practice, but she was not required to do so, particularly where Mr. Katz's doctor had filled out a form that was supposed to detail his problems.

13. Mr. Katz testified at trial that Dr. Cohen's recommendation to look away from the screen every 15 minutes was the same advice that Mr. Katz's doctors had been giving him for years. He testified at deposition that the advice was effective in preventing spasms, but that the problem was he would get caught up in his work and forget to take a break. (Ex. 122 at 96:12–97:8.) Moreover, Mr. Katz testified at trial that Mr. Griffin's allowing him to work from home made it much easier for him do his work. The Court finds that the accommodation offered to Mr. Katz was made in good faith and was reasonable, given that the intention was for Mr. Katz to be able to use his home monitor.

14. The next question, then, is whether the IRS knew or should have known that Mr. Katz was not able to use his home monitor. The employer's continuing duty to accommodate its employee's disability is not exhausted by one effort. *Humphrey,* 239 F.3d at 1138. The employer's duty "continues where the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing." *Id.* In this case, however, Mr. Katz never asked for a different accommodation, and the IRS was not aware that its initial attempt at accommodation had failed. In *Humphrey,* the Ninth Circuit found that the plaintiff's repeated absences made it "abundantly clear" to her employer that the accommodation for her disability was not working. *Id.* at 1138. Here, by contrast, Mr. Katz has not presented sufficient evidence to show that the IRS should have been aware that its accommodation was not working.

**\*17** 15. Mr. Katz's repeated arguments that Mr. Griffin was not "proactive" enough in solving the problems with his accommodation are unconvincing, since Mr. Katz has not shown that Mr. Griffin was or should have been aware of any problem. The only time that Mr. Katz testified he directly told any supervisor about his equipment problems was the conversation with Mr. Griffin about the IRS's equipment policy. Mr. Griffin, testifying at trial, remembered the conversation but believed that they had discussed the IRS's policy, not Mr. Katz's technical problems connecting his

monitor. The Court finds it plausible that this conversation resulted in a miscommunication. Mr. Katz believed he had told Mr. Griffin that his monitor would not connect to the IRS laptop. Mr. Griffin, on the other hand, only understood that an IRS computer technician had told Mr. Katz that it was contrary to IRS policy to connect the monitor. Mr. Griffin told Mr. Katz that he was allowed to connect the monitor and therefore believed that the issue was now resolved.[16] It is undisputed that Mr. Katz never raised the issue again with Mr. Griffin or anyone else at the IRS.

16. Mr. Katz argues that Mr. Griffin or Ms. Mayberry ought to have known that the IRS's accommodation wasn't working because Mr. Katz was working long hours and missed his work study deadlines.[17] Mr. Griffin testified at trial, however, that missed deadlines could be caused by any number of reasons, and that new FP employees frequently had problems with time management. He also testified that both new and experienced FP specialists frequently work long hours. The Court finds Mr. Griffin's testimony credible. There was no reason for Mr. Griffin to infer that Mr. Katz was working long hours and missing deadlines *because of his disability,* rather than because he was new to the IRS and was having trouble juggling his case load.

17. Regarding the failure of the reasonable accommodation, Mr. Katz testified in his direct testimony "I sent every possible signal I could *without overtly complaining.*" (Ex. 34 at 2 (emphasis added).) This statement precisely encapsulates the problem with Mr. Katz's claim for failure to accommodate. In his Final Proposed Findings of Fact and Conclusions of Law, Mr. Katz explained that "as a practicing CPA, [he] always tried to hide his low vision condition and find creative ways to compensate for his poor vision." (Pl. Proposed Findings at 14 ¶ 1.13.) It appears that Mr. Katz continued that pattern of behavior while at the IRS.

18. Mr. Katz never requested that the IRS reconsider his accommodation request. Moreover, as Mr. Katz continued to receive and respond to failing performance reviews, he never told his supervisors that he was having problems with his monitor. Defense counsel in his closing argument noted five different occasions on which Mr. Katz defended himself against negative reviews but never mentioned his vision problems: (1) the lengthy email exchange with Mr. Griffin regarding his February 21 review (Ex. 125); (2) Mr. Katz's email response to Mr. Livingston's March 13 review (Ex. 108); (3) Mr. Katz's email exchange with Ms. Mayberry regarding the missed work study deadlines (Ex. 128); (4) the

April 9 meeting with Ms. Mayberry to discuss her April 5 improvement plan (*see* Ex. 115); and (5) Mr. Katz's fax to Mr. Griffin regarding the April 5 evaluation (Ex. 30).[18]

*\*18* 19. In sum, the evidence presented at trial, taken all together, implies that Mr. Katz did not want to be seen as "overtly complaining" and was reluctant to make evident to the IRS the extent of his visual problems. Unlike the plaintiff in *Humphrey,* Mr. Katz never asked his employer to revisit his accommodation. Instead, he worked very long hours into the evenings and on weekends. It was not, and could not have been, clear to his supervisors that his vision remained a problem. Mr. Katz's work ethic is admirable, but his reluctance to inform the IRS that its accommodation wasn't working ultimately dooms his claim for failure to accommodate. The IRS cannot be held responsible for failing to accommodate Mr. Katz's disability if Mr. Katz failed to inform the IRS that its first good-faith attempt at accommodation was unsuccessful.

### *C. Undue Burden*
20. For completeness' sake, the Court notes that there is no dispute that the cost of providing a large monitor for Mr. Katz would not have been an undue burden for the IRS.

### *II. Employment Discrimination*
21. Mr. Katz's second claim is for non-affirmative action employment discrimination, under 29 U.S.C. § 791(b). The claim has three elements: (1) at the time of the alleged discrimination, plaintiff had a disability within the meaning of the Rehabilitation Act; (2) except for such disability, he was otherwise qualified for the position; and (3) he suffered an adverse employment action "because of" his disability. *Walton v. U.S. Marshals Serv., 492 F.3d 998, 1005 (9th Cir.2007).*

22. As noted above, there is no question in this case that Mr. Katz was qualified for his position. The Court will therefore address the other two elements of his claim.

23. The familiar burden-shifting scheme set forth in *McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973),* applies to disability discrimination claims. *See Raytheon Co. v. Hernandez, 540 U.S. 44 (2003)* (applying *McDonnell Douglas* burden shifting framework to ADA disability discrimination claim); *Kim v. Potter, 474 F.Supp.2d 1175 (D.Haw.2007)* (applying *McDonnell Douglas* burden shifting to Rehabilitation Act claim). Under this burden-

shifting scheme, Mr. Katz must first set forth a prima facie disability discrimination claim under the Rehabilitation Act. Once Mr. Katz has put forth his prima facie claim, the burden then shifts to the IRS, which must present a legitimate, nondiscriminatory reason for its actions. *See Smith v. Barton, 914 F.2d 1330, 1340 (9th Cir.1990); Lucero v. Hart, 915 F.2d 1367, 1371 (9th Cir.1990)*. If the IRS does so, the burden shifts back to Mr. Katz, who must demonstrate that the IRS's proffered reason is pretextual or "encompassed unjustified consideration" of Mr. Katz's disability. *Smith, 914 F.2d at 1340.*

### A. Disability

24. The IRS contends that Mr. Katz was not disabled after his March 2007 surgeries. (Def. Proposed Findings at 25 ¶ 7.) Mr. Katz contends that he was disabled until June 22, 2007, when he received his final pair of glasses. (Pl. Proposed Findings at 1–2.)

**\*19** 25. Mr. Katz's own statements are damaging to his argument here. Mr. Katz testified in his deposition as follows:

> Q.... Then after March of 2007, after your accommodative spasms stopped, you were able to work off of a computer screen much more easily; right?
>
> A. I have no problems.... But I couldn't really see too well, because ... it takes time after the surgery for your eyes to stabilize. So ... in order to work, I had the doctor prescribe glasses for me and then when the glasses stopped working, I would go back and get another prescription.... I'd have to go back to the doctor, get a new prescription, until my eyes finally stabilized....

(Ex. 122 at 175:19–176:14.) Describing his frequently changing prescription in an e-mail to Mr. DeLuca in late March 2007, Mr. Katz said, "[e]very time it gets bad enough, I have to get the prescription changed. It's not as bad as it sounds. But, it is a nuisance." (Ex. 127.)

26. The Court credits Mr. Katz's argument that, as a person who has always had poor vision, his statements that his vision was fine or without problems after his cataract surgeries were not meant to indicate that he had perfect vision. (Pl. Proposed Findings at 4 ¶ 1.5.) But poor vision, correctable by glasses, does not rise to the level of a disability under the ADA. The term "substantially limits" "clearly precludes impairments that interfere in only a minor way ... from qualifying as disabilities." *Toyota Motor Mfg., 534 U.S. at 197.* After March 8, 2007, Mr. Katz no longer suffered from accommodative

spasms or episodes of temporary blindness. He had poor but correctable vision. He testified that he was able to sharply reduce the number of hours he worked per day. That he was forced to change his glasses lenses frequently because his eyes were still adjusting is unfortunate and was undoubtedly expensive,[19] but does not rise to the level of a disability.

27. Mr. Katz also contends that even if he was not disabled under the meaning of the Rehabilitation Act after March 8, 2007, the seeds for his dismissal were sown while he was disabled, by the IRS's failure to accommodate his disability. The Court agrees that the IRS's argument that Mr. Katz "was not disabled at the time of his termination" (Def. Proposed Findings at 22) is too narrow a framing of the issue. The Court will address this argument regarding causation below.

### B. Causation

28. "Unlike a simple failure to accommodate claim, an unlawful discharge claim requires a showing that the employer terminated the employee because of his disability." *Humphrey, 239 F.3d at 1139.* The employee bears the burden of proof on this element. *See Costa v. Desert Palace, Inc., 299 F.3d 838, 857 (9th Cir.2002).* There is no dispute that Mr. Katz was fired; the question is whether he was fired "because of" his disability. This raises the question of how to define "because of."

### 1. Legal Standard

**\*20** 29. Formerly, courts in this circuit had applied to disability discrimination claims the "motivating factor" standard which was added to Title VII by the Civil Rights Act of 1991, 42 U.S.C. § 2000e–2(m) (which itself adopted and partially abrogated the Supreme Court's decision in *Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)*). *E.g., Head v. Glacier Nw., Inc., 413 F.3d 1053 (9th Cir.2005).*[20] In 2009, however, the Supreme Court held that Title VII's "motivating factor" standard could not be applied to age discrimination claims under the Age Discrimination in Employment Act of 1967 ("ADEA"). *Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009).* The Supreme Court's rejection of the "motivating factor" standard was based on the differences between Title VII and the ADEA; Congress had added the "motivating factor" standard to Title VII only, even though it amended the ADEA at the same time. *Id. at 174.* The *Gross* decision prompted a "burgeoning circuit split" as the circuit courts attempted to parse whether *Gross's* reasoning should apply to claims under other non-Title VII statutes. *See*

*generally* Deborah A. Widiss, *Undermining Congressional Overrides: The Hydra Problem in Statutory Interpretation,* 90 Tex. L.Rev. 859 (2012) (providing national overview of *Gross's* progeny). The issue is particularly thorny when contemplating Rehabilitation Act claims: on the one hand, the ADA'S causation language, which is incorporated by section 501 of the Rehabilitation Act, is very similar to the ADEA's, *compare* 42 U.S.C. §§ 12203(ADA) to 29 U.S.C. §§ 623(a)(1) (ADEA); on the other hand, the Rehabilitation Act explicitly incorporates Title VII's standards and remedies, *see* 29 U.S.C. § 794a(a)(1).

30. The Ninth Circuit has not ruled on whether *Gross* applies to disability discrimination claims.[21] But every circuit court of appeals to examine the application of *Gross* to ADA claims has required ADA plaintiffs to prove "but-for" causation. The Sixth and Seventh Circuits squarely held that *Gross* requires "but-for" causation in ADA cases. *Serwatka v. Rockwell Automation, Inc.,* 591 F.3d 957, 961–62 (7th Cir.2010); *Lewis v. Humboldt Acquisition Corp., Inc.,* 681 F.3d 312, 318–19 (6th Cir.2012). The Third Circuit had already required "but-for" causation before *Gross* was decided. *New Directions Treatment Servs. v. City of Reading,* 490 F.3d 293, 301 n. 4 (3d Cir.2007). The Eighth Circuit noted without deciding the issue that "[w]e have our doubts" about applying the "motivating factor" standard to ADA claims after *Gross.* *Pulczinski v. Trinity Structural Towers, Inc.,* 691 F.3d 996, 1002 (8th Cir.2012).

31. The only circuit court of appeals to address whether *Gross's* reasoning applies specifically to Rehabilitation Act claims is the First Circuit, which held that a plaintiff under the Rehabilitation Act had to prove "but-for" causation. *Palmquist v. Shinseki,* 689 F.3d 66, 73–74 (1st Cir.2012). *Shinseki* discusses the interpretation of this complex statutory scheme thoroughly and clearly. This Court finds the First Circuit's reasoning convincing.

**\*21** 32. In sum, Mr. Katz need not prove that his disability was the *only* reason he was fired, but he must prove that but for his disability, he would not have been fired.

### 2. Application to Facts of this Case

33. In this case, Mr. Katz does not argue that his supervisors were directly prejudiced against disabled people. (*See, e.g.,* Ex. 122 at 91:12–21.) Rather, he argues that the IRS failed to reasonably accommodate his disability, that the accommodation failure resulted in his job performance

being inadequate, and that he was fired because of those inadequacies. (*See* Ex. 34 at 2.) As the Ninth Circuit noted in *Humphrey,* "[t]he link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability." 239 F.3d at 1140.

34. As a preliminary matter, up until trial, Mr. Katz had consistently argued that his performance was "exemplary" and that he had been fired because he is Jewish and a Republican. (Ex. 122 at 82:16–25; *see id.* at 91:12–92:4; 94:15–95:4.) In his July 2007 Hatch Act complaint he stated that "[t]he argument that I was fired because of poor performance is completely fabricated out of thin air." (Ex. 120 at ¶ 15.) At his deposition, he testified, "I was fired because of my political beliefs, period" and claimed that Mr. Griffin "wanted to get rid of me ever since Jerry DeLuca interviewed me to find out that I was really not a Democrat." (Ex. 122 at 95:1–2; 103:24–104:1.) In his deposition, the following exchange occurred:

> Q. You are aware that the IRS contends that they fired you for performance issues, right?
>
> A. That's what they contend.
>
> Q. Okay. Is it your contention, as you sit here today, that, in fact, your performance was at least adequate?
>
> A. It was exemplary.
> (*Id.* at 82:16–25.) And later:
>
> Q. But it's your contention, as I understand it, that as a result of working long hours you were able to do, as you call it, an exemplary job for the IRS, right?
>
> A. I did.
> (*Id.* at 102:16–19.)

35. It is difficult to reconcile those representations with Mr. Katz's current argument that his performance was poor in places because of his visual problems, and that he was fired because of those parts of his performance. Nonetheless, the Court will now address Mr. Katz's current theory of the case.

### a. Prima Facie Case
36. It is undisputed that Mr. Katz had an excellent work record for his first five months on the job, and only began to receive negative reviews after his classroom training period ended.

Mr. Katz argued at trial that this timing is circumstantial evidence that his poor work reviews stemmed from his vision problems, since after his classroom training ended he had to do more close work. The timing is also consistent, however, with Mr. Griffin's trial testimony that Mr. Katz's performance was good while he was mostly in class and had few cases. Mr. Griffin testified that once Mr. Katz was out of the classroom, it became apparent that he was not good at juggling multiple cases and was resistant to the administrative work that the full-time specialist position requires, refusing to follow instructions and rejecting criticism of his case work.

**\*22** 37. Mr. Katz has not presented evidence sufficient to show that he missed the work study deadlines assigned to him by Ms. Mayberry because of his vision problems. Indeed, the evidence shows that Mr. Katz ignored these deadlines because he believed they were inane and punitive and did not consider them to be "real" deadlines. Mr. Katz and Ms. Mayberry communicated repeatedly about the work study deadlines. Ms. Mayberry testified at trial—and Mr. Katz has admitted—that he never explained that he had been unable to meet the deadlines because his vision problems were interfering with his work. Even if he did miss these deadlines because of his vision problems, however, the bulk of his performance issues were related not to deadlines but to attitude and interpersonal difficulties.

38. Mr. Katz argued in his deposition that his vision problems caused his irritable behavior towards Ms. Mayberry. (Ex. 122 at 104:16–22.) That contention is not plausible. Mr. Katz himself presented substantial evidence that he was not hostile or contentious when working on other cases or with other people; and Ms. Mayberry repeatedly testified that Mr. Katz was very pleasant to her as long as they were not discussing the Bridge Case. The evidence presented at trial showed that Mr. Katz was assigned several other complex, stressful cases during this period, notably the SILOs case, but that Mr. Katz had interpersonal difficulties only with Ms. Mayberry. The evidence suggests, therefore, not that Mr. Katz was generally irritable during this period, but that he was unable to respond appropriately to having a substantive disagreement with a supervisor.

39. Finally, Mr. Katz has produced no evidence that the problems with his workpapers that Mr. Griffin identified in June 2007 were caused by his vision problems. Mr. Katz argues that he did not receive the correct training on these workpapers, but has produced no evidence that the alleged inadequacies in his training were in any way related to his vision problems.

40. The Court concludes that Mr. Katz has not presented evidence of a prima facie case of disability discrimination. Even if he had presented a prima facie case, however, the IRS has presented extensive evidence of its legitimate, nondiscriminatory reasons for firing Mr. Katz, as discussed below.

### b. IRS's Stated Reasons for Termination

41. Ms. Wong's termination letter, and her trial testimony, listed four 2007 performance reviews as reasons for firing Mr. Katz: (1) Mr. Griffin's February 21 review; (2) Mr. Livingston's March 5 review; (3) Ms. Mayberry's April 5 review and improvement plan; and (4) Mr. Griffin's June 8 workload review. In her letter, she noted that at each of these reviews Mr. Katz failed at least three "Critical Elements" of his work, and that at the April 5 review he failed all of them.

42. As a preliminary matter, on the IRS's witness' own testimony, Mr. Livingston's negative review of Mr. Katz's work on the SILOs case should not have been included in Ms. Wong's final review. Mr. Griffin testified that at some point after Mr. Livingston's review, it was determined that Mr. Katz's assignment on the SILOs case was impossible to complete in the time originally given to him. Mr. Griffin also testified that the March 5 review was not included in Mr. Katz's later performance evaluations. That testimony does not appear to be accurate, although it was not given in bad faith—Mr. Griffin deliberately excluded the SILOs case from his June review. Nonetheless, Ms. Wong apparently still considered it.

**\*23** 43. Even disregarding Mr. Livingston's March 5 review, however, the IRS has presented substantial evidence of its legitimate, nondiscriminatory reasons for firing Mr. Katz.

44. Most importantly, there is extensive evidence in the record regarding Mr. Katz's dispute with Ms. Mayberry and Mr. Moren over the correct characterization of the Bridge Case and the use of gambling terminology, and with Ms. Mayberry alone over his use of Mr. Anderson's draft report. It is clear that Mr. Katz did not meet the objectives of his April 5 improvement plan. Despite multiple warnings—and despite Mr. Katz's testimony that he understood on April 5 that if he did not conform to the improvement plan he could be fired —his final draft report for the Bridge Case contained nearly

2013 WL 815999

all of the problems identified by Ms. Mayberry in the April 5 document.

45. Mr. Katz's interpersonal difficulties with his OJI were also extreme. Mr. Katz presented past testimony from other IRS employees that Mr. Katz was enthusiastic, helpful, and not hostile. The Court does not doubt the accuracy of these characterizations. They are, however, consistent with Ms. Mayberry's repeated testimony that Mr. Katz was very nice to her as long as they were not discussing the Bridge Case. Ms. Mayberry's testimony about Mr. Katz's hostility toward her when discussing the Bridge Case is corroborated by Mr. Katz's extremely negative statements about Ms. Mayberry during his deposition. Apart from accusations of anti-Semitism, he also described her as stupid, obstinate, rigid, crazy, and somewhat senile.[22] It was clear during Mr. Katz's trial testimony that he now regrets some of the words he used in his deposition and that some of them no longer accurately reflect how he feels about Ms. Mayberry. Nonetheless, his deposition testimony is consistent with Ms. Mayberry's descriptions of his inappropriate anger regarding the Bridge Case.

46. Mr. Katz clearly believed—and still believes—that he understood the Bridge Case better than Mr. Griffin and Ms. Mayberry. The Court need not decide the merits of this dispute: "courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." *Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th Cir.2002).* The relevant point is that, while still in his first year at the IRS, and still on probation, Mr. Katz stubbornly refused to defer to the judgment of three senior specialists with, between them, several decades of experience in the field. Mr. Katz first presented his theory of the case in, at the latest, November 2006, and stubbornly stuck to it for seven months. Mr. Eldred, Mr. Griffin, and Ms. Mayberry all disagreed with Mr. Katz's assessment. The team manager, Mr. Moren, was unhappy with Mr. Katz's approach. Even if Mr. Katz were right about the Bridge Case after all, the IRS was justified in finding his attitude unworkable. Most jobs require an employee to adjust to the culture and expectations of his employer. Mr. Katz was apparently unable to adjust to the IRS's culture and expectations.

*24 47. Mr. Katz's arguments that Ms. Mayberry and Mr. Griffin were in effect asking him to lie in his report are unavailing. It was quite clear from their testimony that Ms. Mayberry and Mr. Griffin believed their interpretation of the Bridge Case to be accurate; the dispute was over how to

interpret the facts and law, and the appropriate language in which to present the arguments. Mr. Katz was simply unable—and is still unable—to accept that Ms. Mayberry or Mr. Griffin's interpretation might be more accurate than his own, or their approach better suited to the purposes of an FP report.

48. Finally, Mr. Griffin's June 2007 audit of Mr. Katz's workpapers was another factor in his termination. Mr. Katz repeatedly suggested at trial that he had not received proper training on workpapers and that Mr. Griffin had failed to check on the training he was receiving. Neither party produced evidence as to what training, exactly, Mr. Katz received. Regardless, Mr. Griffin testified that based both on the papers and on conversations he had with Mr. Katz, he felt Mr. Katz did not take seriously the administrative parts of his job. He testified that Mr. Katz told him that he did not like the bureaucracy of working for the government.

49. Mr. Griffin's decision not to include the Bridge Case in his final audit is perplexing, since by all accounts that case comprised the majority of Mr. Katz's work. The Court cannot infer any improper motive or unfair outcome from the decision, however, for two reasons. First, Mr. Griffin was well aware that Mr. Katz's work on the Bridge Case had not been acceptable; presumably if he were aiming to find fault with Mr. Katz, he would have included the Bridge Case in his review. Second, Mr. Griffin testified, and the Court believes, that including the Bridge Case in his review would not have benefitted Mr. Katz, but rather would only have made the review more negative.

### D. Conclusion as to Employment Discrimination Claim

50. In sum, the Court does not find that Mr. Katz ever acted in bad faith; indeed, it is quite clear that Mr. Katz cared passionately about his job and was trying to do it well. Unfortunately, the choices that he made while working make it entirely understandable that the IRS no longer wished to employ him. Mr. Katz was fired for a host of problems, but primarily because he was unprofessional and disrespectful to his supervisors when discussing his work on the Bridge Case, refused to defer to their judgment, and failed to keep up his workpapers properly on other cases. The IRS has provided sufficient evidence to show that if Mr. Katz had suffered no visual problems at all, he still would have been fired. Indeed, even if the Court were to apply the pre-*Gross* "motivating factor" test, Mr. Katz has not shown that his disability was a motivating factor in the IRS's decision to fire him.[23]

2013 WL 815999

## DECISION

It is clear both from the documentary evidence and from the witnesses' testimony that Mr. Katz was good at and well suited to some parts of his job. Ms. Mayberry testified that the facts section of the Bridge Case report was very good and that Mr. Katz asked intelligent and helpful questions of the taxpayer's executive officer. Mr. Griffin repeatedly testified that Mr. Katz cared about the technical part of FP work and that his experience in the securities broker-dealer industry was an asset. Mr. Griffin also agreed that Mr. Katz was very conscientious and tried hard to follow rules. Mr. Katz himself gave heartfelt testimony about his passion for tax law. There is no question that Mr. Katz cared deeply about his job and about the IRS's mission. The Court was impressed that Mr. Katz is a very principled man. The Court commends his patriotism and his dedication to his Jewish faith.

 **\*25**  Mr. Katz's conduct on the job was, however, consistently self-destructive. He did not tell anyone at the IRS that the accommodation for his visual disability wasn't working; he just worked more hours. He did not raise with Ms. Mayberry or Mr. Griffin, or anyone else at the IRS, his feelings that he was being victimized because of his religion or his political beliefs; he just bottled them up, and perhaps allowed them to influence his behavior with Ms. Mayberry. He did not push for extra training on the administrative parts of the job that he apparently was not comfortable with. He argued with his supervisor and his instructor, refused to take instruction from them, and responded angrily and obstinately to criticism.

In sum, the Court must find in favor of the IRS. As to Mr. Katz's claim for failure to accommodate, the IRS offered, in good faith, an initial reasonable accommodation of Mr. Katz's disability. Mr. Katz failed to notify the IRS that the accommodation was not working. As to Mr. Katz's claim for wrongful termination, Mr. Katz has failed to show that his disability was either the "but for" cause or a motivating factor in his termination.

In light of the foregoing findings of fact and conclusions of law, the Court finds that:

> (1) Mr. Katz has failed to prove his claims by a preponderance of the evidence, and

> (2) the IRS is entitled to judgment on all counts.

Having made those findings, the Court concludes that the IRS's motion for judgment on partial findings is moot.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 815999

Footnotes

1    Mr. Katz properly named as Defendant Timothy Geithner, then-Secretary of the Treasury, in his official capacity, as required under 42 U.S.C. § 2000e–16(c) (incorporated into the Rehabilitation Act by 29 U.S.C. § 794a(a)(1)). For clarity here, however, the Court will refer to Defendant as "the IRS," the entity that employed Mr. Katz.

2    The parties waived all evidentiary objections and stipulated to the admission of all exhibits with two exceptions: (1) Exhibit 31 was excluded; (2) Exhibit 122, the transcript of Mr. Katz's deposition testimony was admitted only where extracts had been designated in the IRS's pre-trial filings or where they had been discussed by witnesses at trial.

3    Dr. Henderson's affidavit dated December 7, 2012 lists many other serious problems caused by accommodative spasms. (Ex. 12.) The Court does not doubt that Mr. Katz suffered from these problems. The part of the Reasonable Accommodation Request that Dr. Henderson filled out, however, lists only "headaches" (Ex. 101.)

4    Mr. Griffin in his trial testimony denied advising Mr. Katz to change his request, but the IRS offered no other explanation for the two versions of the form. On the other hand, Mr. Katz offered his prior consistent sworn testimony during his EEOC hearing (see Ex. 9 at 210:11–18), albeit an after-the-fact self-serving statement.

5    In general, however, the Court found Mr. Griffin to be a very credible witness.

6    All IRS cases were referred to at trial using fictitious names, to protect taxpayers' confidential information.

[7] Mr. Griffin and Ms. Mayberry explained at trial that the IRS normally has a fixed statutory deadline to audit a tax return. The taxpayer may—and in this case did—agree to extend the statutory deadline.

[8] In their Joint Stipulation of Fact, the parties stated that Ms. Mayberry initiated this phone conference. (Stip. Facts ¶ 25.) Ms. Mayberry and Mr. Griffin testified at trial, however, that Mr. Moren initiated the phone call. Their testimony is corroborated by Mr. Griffin's contemporaneous memorandum regarding the call. (Ex. 106.) The Court finds that Mr. Moren initiated the phone call.

[9] Mr. Katz testified at trial that he no longer believes this.

[10] FP specialists often refer to the team manager as the "customer."

[11] Ms. Mayberry's memory is corroborated by Mr. Katz's deposition testimony, in which he described her as "a woman [who] worked for the IRS for 30 years or something like that, and she didn't even understand the very basics of stuff that I was taught in ... the very first course I took." (Ex. 122 at 155:1–4.) When asked whether he felt he had things to teach Ms. Mayberry, he answered "Oh, absolutely. I mean, I was an expert in my field." (*Id.* at 168:15–21.)

[12] Mr. Katz noted in his closing argument that "Yag" surgery treats clouding of the lens that sometimes occurs after cataract surgery. A laser is used to cut a hole in the clouded lens to allow light to pass through.

[13] Exhibit 34 consists of a statement in question-and-answer form which Mr. Katz read into the record as his testimony on direct.

[14] The parties' joint stipulated facts state that Ms. Mayberry conducted this review (Stip. Facts ¶ 36), but all testimony at trial indicated that Mr. Griffin conducted it. The Court finds that Mr. Griffin conducted the review.

[15] The ADA Amendments Act of 2008 was passed to reject the Supreme Court's decisions in *Sutton v. United Air Lines, Inc.,* 527 U.S. 471 (1999), and *Toyota,* 534 U.S. 184. Pub L. 110–325 §§ 2(b)(2)-(5). But this Court must apply the version of the ADA'S definitions that was in place when Mr. Katz was fired, because the 2008 amendments did not apply retroactively. *Becerril v. Pima Cnty. Assessor's Office,* 587 F.3d 1162, 1164 (9th Cir.2009).

[16] Mr. Griffin and Mr. Katz disputed at trial what exactly IRS policy allowed at the time. That dispute is not relevant here, since Mr. Katz never challenged Mr. Griffin's initial assessment. The Court credits Mr. Griffin's testimony that he believed Mr. Katz was allowed to use his monitor with the IRS laptop, particularly given Mr. Griffin's testimony that he himself had been able to connect an IRS computer to his home monitor.

[17] Mr. Katz's argument here is somewhat inconsistent with his own testimony that he "sloughed off" the work study deadlines because he felt they were "inane" and "punitive."

[18] On the other hand, Mr. Katz did raise his vision problems in his response to Mr. Griffin's June 8, 2007 final evaluation, but only after he had been told he would be fired. (*See* Ex. 117 at 4, 6.)

[19] The Court notes and credits Mr. Katz's statement that he "made every effort during the course of his employment to ... improve his vision on his own and at his own expense." (Pl. Proposed Findings at 8 ¶ 1.9.)

[20] It is important to note that although claims brought under section 504 of the Rehabilitation Act require the plaintiff to prove that action was taken against him "solely by reason of" his disability, claims, like Mr. Katz's, brought under section 501 are subject to the ADA'S causation standards, and thus merely require that the action be taken "because of" the plaintiff's disability. *See Head,* 413 F.3d 1053. It is quite clear that the ADA standards incorporated into the Rehabilitation Act under section 501(g) "do not require the adverse employment action to have been 'solely by reason of disability, in contrast to the explicit terms of § 504." *Ward v. Vilsak,* No. 2:10–CV–00376, 2011 WL 6026124, at *12 (E.D.Cal. Dec. 2, 2011) (citations omitted); *see* 42 U.S.C. § 12112(a). The legislative history of the Act shows that the omission of this language was not accidental. *See McNely v. Ocala,* 99 F.3d 1068, 1075 (11th Cir.1996) (quoting H.R.Rep. No. 485(11), 2nd Sess., at 85 (1990)).

2013 WL 815999

21    The only district court in this circuit to address the issue held that *Gross* does apply to such claims, and therefore that an ADA plaintiff must prove "but-for" causation. *Ross v. Independent Living Resource,* No. C08–00854, 2010 WL 2898773, at *6 (N.D.Cal. July 21, 2010).

22    The Court notes that during Ms. Mayberry's lengthy trial testimony, she came across as thoughtful, intelligent, and competent. The Court found no corroboration for Mr. Katz's descriptions of her. The Court also found that both Ms. Mayberry and Mr. Griffin were generally credible witnesses. The Court finds that they supervised Mr. Katz in good faith and in a professional manner.

23    As noted above, Mr. Katz has not shown that his visual disability caused any of the problems for which the IRS fired him. First, he argued that his visual problems caused him to miss Ms. Mayberry's work study deadlines; but he testified in deposition that he "sloughed off" those deadlines because he felt they were "inane" and "punitive" and were not "real" deadlines. Second, he also argued that the long hours he was working caused him to be irritable with Ms. Mayberry over the Bridge Case; but that contention is not plausible because he presented extensive evidence that he did not become irritable when dealing with any other IRS employees on any of his other cases.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5770345

United States District Court, W.D. Washington,
at Seattle.

Franz MAISH, Plaintiff,

v.

Janet NAPOLITANO, in her capacity
as Secretary of the Department of
Homeland Security, Defendant.

No. C12–581RAJ.
|
Oct. 24, 2013.

**Attorneys and Law Firms**

Dan N. Fiorito, III, Seattle, WA, for Plaintiff.

Marion J. Mittet, U.S. Attorney's Office, Seattle, WA, for
Defendant.

ORDER

RICHARD A. JONES, District Judge.

## I. INTRODUCTION

 *1  This matter comes before the court on Plaintiff's
motion for partial summary judgment and Defendant's motion
for summary judgment. Plaintiff requested oral argument,
Defendant did not. The court finds oral argument unnecessary.
For the reasons stated below, the court DENIES Plaintiff's
motion (Dkt.# 28), GRANTS in part and DENIES in part
Defendant's motion (Dkt.# 33), and sets a new deadline for
motions in limine as the parties prepare for trial on November
18.

## II. BACKGROUND

Franz Maish completed four combat tours in Iraq and
Afghanistan as a soldier in the United States Army. After his
honorable discharge in 2006, he found work as an agent of
United States Customs and Border Protection ("CBP"), an
agency within the Department of Homeland Security.[1] He
served as an agent on the Mexican border from August 2007

to July 2008, when he resigned to move to the Puget Sound
area.

He eventually sought work at CBP again, applying for both
a border patrol agent position and a customs and border
protection officer position. Speaking roughly, border patrol
agents patrol the border, whereas protection officers work
at ports of entry and inspect people and goods coming into
the United States. By May 2009, he had received tentative
employment offers for both positions along the Canadian
border. Those tentative offers, from CBP's Minneapolis
Hiring Center, informed Mr. Maish that he had to complete
aptitude tests, medical examinations, drug tests, and various
other requirements. Assuming he did so successfully, the
agency would place him in a position when one opened. The
Minneapolis Hiring Center was responsible for shepherding
Mr. Maish through the qualification process.

Mr. Maish suffers from mental illness. He was first diagnosed
with post-traumatic stress disorder ("PTSD") in May 2008
at a Department of Veterans Affairs ("VA") hospital in San
Diego, while he still worked as a border patrol agent. In May
2009, the VA rated him a 40% disabled veteran, a percentage
it attributed largely to his PTSD, but in smaller part due to
degenerative disc disease and tinnitus.

The parties dispute when Mr. Maish first informed CBP
of his mental illness. He declares that he notified CBP as
soon as he received his VA disability rating in May 2009
and again in July 2009. Gweneth Wild, a human resources
officer at the Minneapolis Hiring Center, declares that CBP
did not receive notice of his VA rating until February 2010.
There is no dispute that Mr. Maish did not disclose a mental
health condition or any mental health treatment in a medical
questionnaire that he submitted to CBP in October 2008, even
though the questionnaire asked if he had "ever been treated
for a mental condition?".

In March 2010, the Minneapolis Hiring Center sent Mr. Maish
a request for information. It acknowledged receipt of the VA
disability rating, and requested additional information about
each of the conditions the rating disclosed. As to PTSD, it
requested a current mental health evaluation, a copy of all
treatment records, and a form certifying that he met "Practical
Exercise Performance Requirements."[2]

 *2  A few weeks later, Dr. Matthew Jakupcak, a psychologist
at a Puget Sound VA clinic, provided an evaluation in
response to CBP's request. The evaluation explained that

Dr. Jakupcak had treated Mr. Maish weekly since July 2008 (when Mr. Maish moved to the Puget Sound area). Mr. Maish's initial diagnoses were PTSD, major depressive disorder, and alcohol abuse. Dr. Jakupcak explained that he had also reviewed medical records from other VA providers, including records of a three-day "voluntary stay" in the VA's "Evaluation and Brief Treatment PTSD Unit" in December 2009. Dr. Jakupcak observed that Mr. Maish's PTSD symptoms had "markedly improved relative to the severity observed at the onset of engaging in treatment," and that his symptoms were "generally stable and well managed through behavioral skills and prescribed medications." Similarly, his "depressive symptoms" had "generally improved" and were "stable and well managed ...." He explained that although Mr. Maish reported "patterns of alcohol abuse prior to seeking treatment," and had reported "brief relapses into problematic use of alcohol while in treatment," he had been able to quickly address any relapses. He reviewed a summary of skills required for both of the CBP positions for which Mr. Maish had applied, and he saw "no reason why [Mr. Maish] would not be able to successfully perform these tasks." He opined that Mr. Maish's coping skills had improved markedly since he first worked as a border patrol agent. Although he recommended continued treatment, he concluded that Mr. Maish's "treatment gains and current ability to use behavioral skills suggest that his symptoms will be manageable and will not be significantly exacerbated while completing job related duties."

When Ms. Wild received Dr. Jakupcak's evaluation, she forwarded it to a contractor whom CBP used for psychiatric evaluations. One of the psychiatrists who worked for the contractor, Dr. Paul Prunier, wrote a brief response to Ms. Wild. He indicated that he had reviewed "about 45 pages of information," although he largely did not explain what those pages were. He did not speak with Mr. Maish, nor did he request any additional information. It is plain that he reviewed Dr. Jakupcak's 6–page report, and just as plain that he found it unpersuasive. He concurred in Dr. Jakupcak's diagnoses (including a diagnosis of bereavement arising from the recent death of Mr. Maish's father), but not his evaluation of Mr. Maish's fitness for work. He claimed that Dr. Jakupcak "seem[ed] to ignore information presented in her [*sic* ] own report." The only example he cited, however, was Dr. Jakupcak's failure to provide additional information on Mr. Maish's 3–day December 2009 stay in a VA PTSD evaluation unit. He observed that Dr. Jakupcak had not clarified when Mr. Maish's relapses into alcohol abuse had occurred, and concluded that "one must therefore assume

continued relapses to the present." His critical conclusion was as follows:

> **\*3** Current, active and severe symptoms of PTSD, depression and alcohol abuse could easily impact on the safe and efficient performance of the duties of a Border Patrol Agent and of a Customs and Border Protection Officer as noted in the position descriptions and would disqualify an applicant for acceptance to these positions. The fact that this applicant' recent state is either unclear or perhaps even unstable prevents an affirmative response to this application.

He recommended that CBP not hire Mr. Maish. He did not rule out future employment. He recommended that if Mr. Maish reapplied, that he "submit himself for a 'second-opinion' evaluation preferably by a forensic psychologist or psychiatrist," and that he provide a complete medical record.

Dr. Prunier's opinion spelled doom for Mr. Maish's future at CBP. On April 2, Ms. Wild wrote Mr. Maish, parroted Dr. Prunier's conclusion, and informed him that "based on all of the information available to me, ... you do not meet the medical standards for the Border Patrol Agent and Customs and Border Protection Officer positions ...." She explained that all other medical issues (including issues related to Mr. Maish's back problems and his tinnitus) had been resolved. Her letter suggests no reason for her decision other than Dr. Prunier's opinion. In any event, Ms. Wild confirmed at her deposition that Dr. Prunier's opinion was the sole reason for her decision. Fiorito Decl. (Dkt. # 29), Ex. B (Wild dep. at 24–25). She agreed that her policy was to defer to the medical reviewer CBP hired "in all cases." *Id.* (Wild Dep. at 21). She also agreed that she would have deferred to Dr. Prunier regardless of what Dr. Jakupcak or any other medical provider offered. *Id.* There is no question that Mr. Maish lost his chance at a CBP job solely because of Dr. Prunier's two-page evaluation.

Mr. Maish requested a waiver of CBP's medical requirements. Ms. Wild promptly informed him that a waiver review board had denied his request. The parties have offered no record of the waiver board's reasoning. Mr. Maish sought review of the decision through the federal Office of Personnel Management ("OPM"). OPM affirmed the decisions in two brief letters in July and August 2010. Mr. Maish also filed a complaint of disability discrimination with the Equal Employment Opportunity Commission ("EEOC"), which resulted in a decision from an administrative law judge in February 2011 granting summary judgment to CBP. Mr. Maish appealed

2013 WL 5770345, 28 A.D. Cases 1232, 48 NDLR P 75

that decision to the EEOC; the EEOC affirmed the judge in January 2012.

Mr. Maish filed this suit in April 2012. He contends that CBP discriminated against him on the basis of a disability in violation of Title I of the Americans with Disabilities Act (42 U.S.C. § § 12111–12117, "ADA"), the Rehabilitation Act of 1973 (29 U.S.C. § 791–794f) and the Washington Law Against Discrimination (RCW Ch. 49.60, "WLAD"). Now before the court is Mr. Maish's motion for partial summary judgment, in which he asks solely for a ruling that CBP violated the Rehabilitation Act. CBP seeks summary judgment against all of Mr. Maish's claims.

## III. ANALYSIS

 *4  On motions for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.,* 198 F.3d 1130, 1134 (9th Cir.2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.,* 952 F.2d 1551, 1558 (9th Cir.1991). The court defers to neither party in resolving purely legal questions. *See Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 942 (9th Cir.1999).

### A. Mr. Maish Has No Valid ADA or WLAD Claim.

The court quickly dispenses with Mr. Maish's ADA and Washington-law claims, which CBP has asked the court to dismiss. Mr. Maish concedes that although the Rehabilitation Act incorporates ADA standards, § 501 of the Rehabilitation Act (29 U.S.C. § 791) is the sole means to remedy disability discrimination by a federal employer. *See* 42 U.S.C. § 12111(5)(B)(i) (declaring that the federal government is not an "employer" for purposes of the ADA); *Newland v. Dalton,* 81 F.3d 904, 906 (9th Cir.1996) (noting that § 501 incorporates ADA standards); *Johnston v. Horne,* 875 F.2d 1415, 1420–21 (9th Cir.1989) (concluding that § 504

of Rehabilitation Act provides no cause of action against a federal employer). He makes no attempt to defend his WLAD claims, and in particular makes no argument that the United States has waived its sovereign immunity with respect to WLAD claims. The court dismisses Mr. Smith's ADA claims because the ADA does not apply to federal employers, and dismisses his WLAD claim for lack of subject matter jurisdiction. *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941) ("The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.") (internal citations omitted).

### B. A Jury Must Decide Mr. Maish's Rehabilitation Act Claim.

#### 1. Mr. Maish's Prima Facie § 501 Case

To state a prima facie § 501 case, a plaintiff must "demonstrate that (1) she is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered discrimination because of her disability." *Walton v. United States Marshals Serv.,* 492 F.3d 998, 1005 (9th Cir.2007). Both disparate treatment of a disabled person and refusal to make a reasonable accommodation for a disabled person are actionable. *See Vinson v. Thomas,* 288 F.3d 1145, 1154 (9th Cir.2002). A plaintiff need only demonstrate that her disability was a "motivating factor" behind the discrimination. *See* 29 U.S.C. § 791(g) (adopting ADA standards for claims under § 501 of the Rehabilitation Act); *Head v. Glacier Northwest, Inc.,* 413 F.3d 1053, 1065 (9th Cir.2005) (holding that "a motivating factor standard is the appropriate standard for causation in the ADA context"). CBP erroneously cites precedent applicable to § 504 cases, which require disability to be the sole factor motivating an adverse action. Def.'s Mot. (Dkt.# 33) at 15.

#### a. CBP Regarded Mr. Maish as Disabled, and Withdrew Its Tentative Offer of Employment As a Result.

 *5  Mr. Maish has established two elements of his prima facie case as a matter of law: he has a disability within the meaning of the Rehabilitation Act; and CBP withdrew its employment offer as a result of that disability. The ADA standards incorporated into § 501 define a disability as a "physical or mental impairment that substantially limits one or more major life activities," or a "record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. §

2013 WL 5770345, 28 A.D. Cases 1232, 48 NDLR P 75

12102(1)(A)-(C); _Walton_, 492 F.3d at 1005 (applying ADA standard to Rehabilitation Act claim).

Mr. Maish easily establishes that CBP regarded him as having a disability. The court need not discuss whether he had a qualifying impairment or a record of a qualifying impairment. The ADA explains that a person is regarded as disabled if she establishes that "she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). Ms. Wild's April 2010 letter deeming Mr. Maish ineligible for the CBP positions is a bald admission that she regarded Mr. Maish as disabled:

> Regarding your history of post-traumatic stress disorder, our consulting mental health specialist [Dr. Prunier] reviewed the information you submitted and recommended you not be hired. His concerns include that current, active and severe symptoms of post-traumatic stress disorder, depression, and alcohol abuse could easily impact the safe and efficient performance of the duties of a Border Patrol Agent and of a Customs and Border Protection Officer.

Later in the letter, she stated that CBP was withdrawing its tentative offer of employment "based on the above issue(s)," although the singular "issue" she mentioned was Dr. Prunier's assessment of Mr. Maish's mental health. No reasonable jury could fail to find that Mr. Maish has proven that the CBP regarded him as disabled and disqualified him from employment as a direct result.

**b. A Jury Could Reach Different Conclusions About Whether Mr. Maish Was "Otherwise Qualified" for the CBP Jobs.**

A jury must decide whether Mr. Maish met CBP's medical standards, or, more accurately, its medical standards pertaining to mental health conditions. The court assumes, purely for purposes of this order, that CBP's mental health standards are legitimate restrictions dictated by the demands of the jobs for which Mr. Maish was applying, as opposed to proxies for disability discrimination. _See_ 42 U.S.C. § 12112(b)(6) (prohibiting use of "qualification standards ... or other selection criteria that screen out or tend to screen out an individual with a disability ... unless the standard ... or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity"); 42 U.S.C. § 12113(a) (establishing that employer can prove, as a defense to disability discrimination, that its qualification standards are "job-related and consistent

with business necessity, and such performance cannot be accomplished by reasonable accommodation"). Even under that assumption, a jury could find that Mr. Maish met CBP's standards.

**\*6** Both the border patrol agent and customs and border protection officer positions required Mr. Maish to carry a weapon. Homeland Security mental health standards applicable to any weapons-carrying position state as follows:

> Any disorder which affects normal perceptual judgment and safe and acceptable behavior, or if there is evidence of a serious mental impairment, is generally disqualifying. Cases will be reviewed on a case-by-case basis.

Mittet Decl. (Dkt.# 34), Ex. 7 at 17. The standards list major depression as a specific disorder "that may be disqualifying," but note that other "psychiatric disorders" may also be disqualifying, after a case-by-case review. _Id._ at 17–18. Standards specifically applicable to the border patrol agent position merely reproduce the mental health standards applicable to all weapons-carrying officers. _Id._, Ex. 14 at 14–15. Standards specifically applicable to the customs and border protection officer position state that "psychiatric, psychological or emotional difficulties" may be disqualifying. _Id._, Ex. 5 at 1. The standards elaborate on what makes a condition disqualifying:

> [A] condition is determined to be disqualifying if it is likely to affect safe and efficient job performance or if it is likely to endanger the health and safety of the individual, others, or national security. It is disqualifying if the individual fails to demonstrate that the condition is well stabilized, is unlikely to recur and that he/she is unlikely to experience sudden or subtle incapacitation while executing the position's duties.

_Id._

A reasonable jury could conclude that Mr. Maish met all applicable mental health standards. The standards do not mandate that every mental health condition (even a "listed" condition like major depressive disorder) is disqualifying. They instead mandate a case-by-case inquiry into whether the condition is likely to impact job performance. A jury considering those standards could credit evidence that Mr. Maish had previously worked as a border patrol agent without incident. It could credit the evidence from Dr. Jakupcak, Mr. Maish's treating physician, that his mental health conditions were stable and would not interfere with his job performance. It could discredit Dr. Prunier's two-page opinion, which was based on little more than a review of Dr. Jakupcak's report

with no effort to follow up. It could conclude that there was no basis for Dr. Prunier to transform Dr. Jacupcak's assessment of well-controlled mental health into an assessment of "[c]urrent, active, and severe symptoms of PTSD, depression, and alcohol abuse," a conclusion that Ms. Wild repeated verbatim. It could conclude that by deferring to Dr. Prunier without further inquiry, CBP abandoned its responsibility to conduct a case-by-case inquiry into the employability of applicants with mental health conditions.

A jury could also conclude that Mr. Maish did not meet those standards. It might, for example, query whether Mr. Maish's 3–day stay in a VA PTSD unit in December 2009 was a cause for concern. There is no evidence in the record that explains that stay. A jury might conclude that an unspecified number of relapses of alcohol abuse was a reason to disqualify Mr. Maish. A jury also might conclude that Dr. Jakupcak inappropriately minimized the risks that Mr. Maish's conditions presented.

### 2. Application of the McDonnell Douglas Standard

**\*7** In employment discrimination cases, including claims invoking § 501 of the Rehabilitation Act, the *McDonnell Douglas* burden-shifting analysis augments the summary judgment standard. *Sisson v. Helms*, 751 F.2d 991, 993 (9th Cir.1985) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *see also Kim v. Potter*, 474 F.Supp.2d 1175, 1186 (D.Haw.2007) (applying *McDonnell Douglas* to § 501 claim); *Wilborn v. Ashcroft*, 222 F.Supp.2d 1192, 1207 (S.D.Cal.2002) (same). The path that *McDonnell Douglas* charts requires a plaintiff hoping to avoid summary judgment to establish a prima facie case of discrimination; if she succeeds, the burden shifts to the defendant to produce evidence of a lawful motive for its action; if the defendant succeeds, the plaintiff must produce evidence that the defendant's proffered motive is pretext. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir.2003). The burden-shifting path, however, is not mandatory:

> A plaintiff does not, however, have to rely on the *McDonnell Douglas* approach to create a triable issue of fact regarding discriminatory intent in a disparate treatment case.... Instead, he may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant and that the defendant's actions adversely affected the plaintiff in some way.

*Pac. Shores Props., LLC v. City of Newport Beach*, No. 11–55460, 2013 U.S.App. LEXIS 19386, 2013 WL 5289100 (9th Cir. Sept. 20, 2013) (internal quotation omitted).

In this case, there is no need to take the *McDonnell Douglas* approach, even though it would be of no benefit to CBP. Mr. Maish relies on direct evidence of disability discrimination. There is no dispute about why CBP withdrew its employment offers. It admittedly did so solely because of Mr. Maish's mental health conditions.[3] There is no question of pretext, only a question of whether CBP properly concluded that Mr. Maish did not meet its medical standards, and perhaps a question of whether those medical standards were "job-related and consistent with business necessity," as the Rehabilitation Act requires.[4] For the reasons stated above, the court leaves those questions to the jury.

## IV. CONCLUSION

For the reasons stated above, the court DENIES Mr. Maish's motion for partial summary judgment. Dkt. # 28. The court DENIES CBP's motion for summary judgment (Dkt.# 33) except that it dismisses Mr. Maish's ADA and WLAD claims.

The court previously suspended the deadline for submission of motions in limine. The parties shall file motions in limine in accordance with Local Rules W.D. Wash. LCR 7(d)(4) no later than October 30, 2013. The court orders the parties to note those motions for November 15, and to file any opposition to the motions no later than November 12. All other deadlines shall remain as stated in the court's July 8, 2013 minute order setting the trial date and related dates. Dkt. # 24.

**\*8** In all future submissions in this case, the parties shall discontinue their practice of citing the precedent of courts other than the Ninth Circuit or Supreme Court where there is binding precedent on point. The parties may cite out-of-circuit authority, of course, but they may not do so to the exclusion of citing authority that binds this court.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5770345, 28 A.D. Cases 1232, 48 NDLR P 75

2013 WL 5770345, 28 A.D. Cases 1232, 48 NDLR P 75

Footnotes

1    Mr. Maish named only the Secretary of the Department of Homeland Security as a Defendant. For clarity, the court will refer CBP as the Defendant throughout this order.

2    The "Practical Exercise Performance Requirements" appear nowhere in the record. Two medical providers certified that Mr. Maish met the requirements, whatever they might be. CPB raised no dispute about these certifications.

3    At various times, CBP officials (and its counsel in this case) have contended that Mr. Maish acted dishonestly in failing to sooner disclose his mental health conditions. Mr. Maish contends that he did not disclose them sooner in reliance on Department of Justice guidance that veterans need not disclose their combat-related mental health conditions. The court suggests no opinion on who has the better of this argument, because it appears to be wholly irrelevant. CBP did not withdraw its employment offers because Mr. Maish was not forthcoming, it withdrew its offers because of his mental health conditions.

4    As the court previously noted, its disposition today does not require it to decide if CBP's medical restrictions satisfy a "business necessity" test. In any event, the court would have been unable to do so as a matter of law. If CBP applies its medical restrictions as they are written, which is to say that it applies them as a mandate to conduct a case-by-case inquiry to determine if a mental health condition will interfere with job performance, then they are likely valid. If CBP merely gives lip service to the letter of its restrictions, and disqualifies any applicant diagnosed with a mental health condition, then that practice (which effectively replaces the restrictions as written) is invalid. A jury must decide these issues.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

McLeod v. Parsons Corp., 73 Fed.Appx. 846 (2003)

26 NDLR P 253

KeyCite Yellow Flag - Negative Treatment

Distinguished by Cohen v. Jaffe Raitt Heuer and Weiss, P.C., 6th Cir.(Mich.), April 5, 2019

73 Fed.Appx. 846

This case was not selected for publication in West's Federal Reporter.

See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir. Rule 32.1.

United States Court of Appeals, Sixth Circuit.

Robert MCLEOD, Plaintiff–
Appellant, Cross–Appellee,

v.

PARSONS CORPORATION, et al.,

Defendants–Appellees, Cross–Appellants.

Nos. 01–6070, 01–6071

|

Sept. 5, 2003.

**Synopsis**

Former employee brought action against former employer, alleging violation of the Americans with Disabilities (ADA) and the Age Discrimination in Employment Act (ADEA). The United States District Court for the Eastern District of Tennessee, Jordan, J., denied employer's motion for summary judgment, and subsequently entered judgment, upon jury verdict, in favor of employer. Employee appealed and employer cross-appealed the denial of its motion for summary judgment. The Court of Appeals, Keith, Circuit Judge, held that: (1) testimony of co-worker was not required to be excluded as hearsay; (2) co-worker's testimony was relevant; (3) evidence concerning other discrimination lawsuits against employer was not relevant, and was more prejudicial than probative; (4) exclusion of evidence of settlement in prior action was warranted; (5) witness's testimony in prior litigation was admissible as prior inconsistent statement; and (6) evidence concerning employer's ability to develop new business was not relevant.

Affirmed.

West Headnotes (9)

**[1]**  **Evidence**  Employees in general

Testimony of co-worker, that during several meetings a human resources manager and others created a "hit list" of employees who would be laid off or discharged over time for false reasons, that former employee was on that list, and that employee's cancer was discussed during those meeting, was not required to be excluded as hearsay, in former employee's ADA and ADEA action; statements were made during company meetings held at employer's office, and concerned employment issues, and thus, statements were made by employees within the scope of their employment. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Fed.Rules Evid.Rule 801(d)(2)(D), 28 U.S.C.A.

**[2]**  **Evidence**  Discrimination

Testimony of co-worker, that during several meetings a human resources manager and others created a "hit list" of employees who would be laid off or discharged over time for false reasons, that former employee was on that list, and that employee's cancer was discussed during those meeting, was relevant, and potential prejudice did not outweigh their probative value, in former employee's ADA and ADEA action; statements were not sporadic or isolated, as they were made by employer's decision-makers at employer's offices, and concerned employment issues. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Age Discrimination in Employment Act of 1967, § 2 et seq, 29 U.S.C.A. § 621 et seq.; Fed.Rules Evid.Rules 401, 402, 28 U.S.C.A.

1 Case that cites this headnote

**[3]**  **Evidence**  Discrimination

**Evidence** 🔑 Particular crimes, wrongs, or acts

**Evidence** 🔑 Tendency to mislead or confuse; prejudicial effect

Evidence concerning other discrimination lawsuits filed against employer was not relevant, and its probative value would be substantially outweighed by danger of unfair prejudice, in former employee's ADA and ADEA action; there was no nexus between prior lawsuits and employee's action, because other lawsuits were filed by employees who worked at different locations and were discharged for a variety of reasons. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Fed.Rules Evid.Rules 401, 402, 403 28 U.S.C.A.

20 Cases that cite this headnote

[4] **Evidence** 🔑 Particular crimes, wrongs, or acts

District Court's order authorizing admission of testimony that Department of Labor audits of employer's employment records did not reveal a history of discrimination was not inconsistent with its prior order excluding evidence concerning other lawsuits filed against employer, in former employee's ADA and ADEA action, as such testimony did not concern a specific employment discrimination lawsuit. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

4 Cases that cite this headnote

[5] **Witnesses** 🔑 Rebuttal of evidence of interest or bias

Exclusion of evidence that former employee's witness settled a discrimination lawsuit with employer, offered to rehabilitate witness's credibility, after another witness testified that witness was upset about his discharge by employer, was warranted, in former employee's ADA and ADEA action; evidence fell under

District Court's ruling to exclude evidence of prior lawsuits, and potential prejudice from fact of settlement would substantially outweigh its probative value. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Fed.Rules Evid.Rules 401, 402, 403, 608(a) 28 U.S.C.A.

5 Cases that cite this headnote

[6] **Evidence** 🔑 Substantive use of prior inconsistent statements

Admission of former employee's witness's testimony in prior lawsuit against employer that he did not remember human resources manager making any age-related comments about employees was warranted, as prior inconsistent statement, in former employee's ADA and ADEA action, where witness testified in former employee's action that manager referred to employee as an old man and commented that he was a member of the senior citizens pool. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Fed.Rules Evid.Rule 801(d)(1)(A), 28 U.S.C.A.

[7] **Witnesses** 🔑 Particular statements

Testimony of former employee's witness in another lawsuit that former employee was on the employer's list of employees that would be terminated for false reasons was not admissible as prior consistent statement that could be used to rehabilitate witness's credibility after it was attacked, in former employee's ADA and ADEA action, where testimony was given after witness gave testimony in former employee's action. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Fed.Rules Evid.Rule 801(d)(1)(B), 28 U.S.C.A.

**[8]**  **Civil Rights** 🔑 Admissibility of evidence; statistical evidence

Evidence concerning employer's ability to develop new business, employer's attempts to retain two key employees who later left the company, and difficulty of cancer patients in obtaining health insurance was not relevant, in ADA and ADEA action brought by former employee with cancer; evidence did not tend to show that employer's proffered financial reasons for terminating employee were false. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.; Fed.Rules Evid.Rule 401, 28 U.S.C.A.

**[9]**  **Civil Rights** 🔑 Questions of law or fact

**Summary Judgment** 🔑 Employment Practices; Discrimination

Genuine issues of material fact as to whether 56-year-old former employee was discharged due to age discrimination, whether he was qualified for another position given to younger employee, and whether his supervisors were aware that employee had cancer and regarded it as a liability, precluded summary judgment in favor of employer, in former employee's ADA and ADEA action. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**\*848**  On Appeal from the United States District Court for the Eastern District of Tennessee.

**Attorneys and Law Firms**

Judy P. McCarthy, Dennis M. McCarthy, McCarthy & McCarthy, Knoxville, TN, for Plaintiff–Appellant/Cross–Appellee.

William S. Lockett, Jr., Rebecca B. Murray, Kennerly, Montgomery & Finley, Knoxville, TN, for Defendant–Appellee/Cross–Appellant.

Before KEITH and COLE, Circuit Judges; and WEBER, District Judge.[*]

**Opinion**

KEITH, Circuit Judge.

Plaintiff–Appellant Robert McLeod ("McLeod") appeals the jury verdict in favor of the Defendants–Appellees Cross–Appellants Parsons Corporation. Parsons Engineering Science, Inc., and Parsons Infrastructure and Technology Group, (collectively "Parsons") on his claims under the Americans with Disabilities Act ("ADA") 42 U.S.C. §§ 12102 et seq., and his claim under the Age Discrimination in Employment Act ("ADEA") 29 U.S.C. §§ 621 et seq. McLeod filed employment discrimination claims under the ADA and the ADEA alleging that Parsons, his former employer, discharged him because of his age and because he had cancer. Ultimately, the jury found that Parsons did not violate the ADA or the ADEA when it discharged McLeod.

On appeal, McLeod challenges the jury's verdict, arguing that the district court erred when it made evidentiary rulings to exclude: (1) evidence concerning other lawsuits filed against Parsons; (2) the prior consistent statements of William Bradley ("Bradley"). McLeod's key witness, and evidence that Bradley settled his employment discrimination claim against Parsons, offered in order to rehabilitate Bradley's credibility; and (3) evidence offered **\*849**  to rebut Parsons's justifications for discharging McLeod. Parsons cross appeals: (1) the district court's judgment finding that William Bradley's deposition testimony concerning the discriminatory statements of Parsons's employees was not hearsay, was relevant, and that the probative value of these statements was not substantially outweighed by the potential for prejudice; and (2) the district court's order denying in part their motion for summary judgment on McLeod's ADEA and ADA claims.

Because we find that the district court did not err when it made the evidentiary rulings challenged on appeal and cross appeal, or when it denied in part Parsons's motion for summary judgment, we AFFIRM the district court.

## I. BACKGROUND

In 1982, McLeod began working for the Atlanta office of Parsons Engineering Science, Inc. ("PESI"). In 1987, McLeod was transferred to Parsons's office in Oak Ridge,

Tennessee, where he served as the Office Manager. McLeod's expertise was in soil and ground water hydrology. The principal contract in the Oak Ridge office was a contract with the Department of Energy for hazardous waste investigation ("HAZWRAP contract"). From 1987 until 1995, McLeod worked primarily on the HAZWRAP contract. In 1995, after the HAZWRAP contract ended, most of the employees at PESI's Oak Ridge office were laid off, leaving McLeod and five to six other employees at that office. McLeod lost a substantial amount of billable work when the HAZWRAP project ended.

In 1991, McLeod was diagnosed with thyroid cancer, requiring him to undergo surgery and receive chemotherapy. McLeod returned to work after his treatment was complete. McLeod's cancer returned again in 1995, requiring him to undergo additional surgery. In January of 1996. McLeod was able to return to work. McLeod alleged that shortly after he returned to work, his supervisor told him to increase his productivity by ninety-five percent.

On June 22, 1996, McLeod and the remaining employees at the Oak Ridge PESI office were transferred to the Oak Ridge office of the Parsons Infrastructure and Technology Group, Inc. ("PI & T"). The PI & T office worked primarily on nuclear facilities clean up and operating support for nuclear facilities. After this transfer, McLeod's title was changed to Department Manager. However, his salary remained the same.

In order to find more work for McLeod and his staff, Stephen Marchetti ("Marchetti"), Senior Vice President of Parsons's government division, assigned McLeod to temporarily work at the Savannah River office, in Aiken, South Carolina. There is a factual dispute whether McLeod was willing to temporarily relocate to the Savannah River office.

Shortly after McLeod arrived at the Oak Ridge PI & T office, Marchetti appointed David Yannitell ("Yannitell") to Office Manager of that office. Yannitell was fifty-one years old when he was appointed to this position. When Yannitell resigned in 1997, Rodney Grubb was named the Office Manager. Grubb was forty years old and lacked prior management experience. During the trial, Parsons's witnesses alleged that the position Grubb held was not the same position that McLeod formerly held, and that McLeod was not qualified for this position.

In 1997, the Oak Ridge PI & T office experienced some financial difficulties. On June 20, 1997, Grubb notified McLeod that he would be laid off on July 11, 1997, as a

result of the office's financial situation. McLeod was fifty-six years old when he **\*850** was laid off. Grubb alleged that he was the sole decision maker responsible for McLeod's discharge. Grubb denied having knowledge that McLeod had cancer when he made the decision to discharge him. McLeod presented evidence suggesting that it was well known in the Oak Ridge office that he had cancer, and that the company kept records of his hospitalizations.

Upon being notified that he was being laid off. McLeod inquired whether there was work available at any of Parsons's other offices. Grubb informed him that comparable work was not available at the other offices. McLeod alleged that within one month after he was laid off, several e-mails were circulated within the company regarding openings for senior level staff positions, and that he possessed the necessary training for these positions.

Within one week after he was laid off, McLeod was hired as a consultant in Parsons's Atlanta office on an hourly basis without benefits. McLeod served as a consultant from July 1997 until February 1998. McLeod was not called back to work at the Oak Ridge office.

On November 5, 1998, McLeod filed a lawsuit against Parsons, alleging that he was discharged because of his age, in violation of the ADEA, and because he had cancer, in violation of the ADA. Parsons moved for summary judgment on McLeod's ADEA claim and ADA claims, arguing that McLeod did not present direct evidence of discrimination, and that McLeod failed to establish a prima facie case of discrimination and did not satisfy his burden of rebutting Parsons's legitimate non-discriminatory reasons underlying his discharge.

In a Memorandum Opinion dated June 7, 2000, the district court denied Parsons's motion in part, finding that McLeod presented direct evidence of discrimination and presented material issues of fact to invoke disability status under §§ 1202(2)(B) and (C) of the ADA, because there was a factual dispute whether Parsons perceived McLeod as having a disability that interfered with a major life function, and whether McLeod had a history of such impairment.[1] The district court also denied summary judgment on McLeod's ADEA claim finding that he provided direct evidence of age discrimination. However, the district court granted summary judgment on McLeod's ADA claim alleging that he suffered a substantial impairment necessary to invoke the definition of a disability under § 12102(2)(A) of the ADA. With respect

26 NDLR P 253

to this claim, the district court concluded that McLeod did not have a substantial limitation necessary to invoke disability status under § 12102(2)(A) of the ADA, because he had returned to work after each surgery and had performed the necessary tasks. Additionally, the court found that McLeod was not suffering from cancer when he was discharged.

Parsons also filed a motion to strike portions of the deposition testimony of William Bradley ("Bradley"), Parsons's former human resources recruiter, arguing that this testimony contained inadmissible hearsay. Although Bradley died in 2001, before this trial commenced, the district court permitted McLeod to read excerpts from Bradley's deposition testimony during the trial. In his deposition, Bradley testified that in 1992 and early 1993, Parsons held several company planning meetings in Pasadena, California that **\*851** were attended by: William Jack ("Jack"), Parsons's company administrator; Phil Williams ("Williams"), Parsons's human resources manager; and Carol Palmertree ("Palmertree"), Parsons's EEOC representative. Bradley testified that during these meetings, Jack, Williams, and Palmertree created a "hit list" of employees, who would be laid off or discharged over time for false reasons. Bradley testified in his deposition that, during these meetings, it was discussed that McLeod had cancer, and that he "was no longer physically capable of performing his duties as office manager. And it was discussed that perhaps they should find a younger individual that could step in and do Mr. McLeod's job." (J.A. 1098–099.) Bradley also testified that Williams referred to McLeod as "an old man" and remarked that he considered him "a member of the senior citizen pool within the company." (J.A. at 1101.) Palmertree, Jack, and Williams denied that these statements were made, or that they created a "hit list" during these meetings.

In a Memorandum Opinion of June 7, 2001, the district court denied Parsons's motion to strike these statements, finding that these statements were not hearsay because they were made by Parson's employees within the scope of their employment. Parsons later filed a motion in limine to exclude this testimony on the same grounds asserted in its motion to strike this testimony. The district court issued a Memorandum Opinion dated July 11, 2001, in which it again concluded that the statements of Parsons's employees was not hearsay because they were made during a company meeting, were made by Parsons's human resources personnel, and concerned the subject of the decision to terminate certain employees. The district court also rejected Parsons's arguments that these statements were sporadic, and as a result, were not relevant,

and that their potential for prejudice did not substantially outweigh their probative value.

Ultimately, the jury found that Parsons did not violate the ADEA or the ADA when it discharged McLeod. McLeod appeals this verdict arguing that the district court abused its discretion when it made several evidentiary rulings during the trial to exclude: (1) testimony concerning other lawsuits filed against Parsons; (2) Bradley's prior consistent testimony and evidence concerning Bradley's settlement with Parsons; and (3) evidence offered to rebut Parsons's proffered justifications for discharging McLeod. On appeal, McLeod also urges this panel to adopt the approach followed in other circuits, and permit plaintiffs to prevail in cases filed under the ADA where the plaintiff's disability was not the sole factor underlying the adverse employment action.

Parsons cross appeals the district court's judgment in which the court concluded that Bradley's testimony concerning the statements made by Parsons's employees were admissible. On cross appeal, Bradley argues that the statements of Parsons's agents were inadmissible hearsay because they were not made within the scope of employment, and that the statements were not admissible because they were not relevant and the potential for prejudice outweighed the probative value of these statements. Parsons also cross appeals the district court's judgment denying in part their motion for summary judgment against McLeod's ADEA and ADA claims, arguing that McLeod failed to provide direct evidence of discrimination, and that McLeod failed to establish a prima facie case of discrimination. Neither party appeals the grant of summary judgment on McLeod's ADA claim alleging that he suffered a physical impairment that substantially **\*852** interfered with a major life function.

## II. DISCUSSION

### A. *The district court's evidentiary rulings*

On appeal, McLeod challenges several of the district court's evidentiary rulings. Parsons cross appeals the district court's determination that Bradley's testimony concerning the statements made by Parsons's human resources employees at a company planning meeting were not hearsay and were admissible as relevant evidence. A district court's evidentiary determinations are reviewed for an abuse of discretion. *See Hancock v. Dodson, 958 F.2d 1367, 1371 (6th Cir.1992)* (citing *U.S. v. Rios, 842 F.2d 868, 872 (6th Cir.1988)*). "However, a district court's conclusions of law, such as

whether proffered evidence constitutes hearsay within the meanings of the Federal Rules of Evidence, are reviewed *de novo.*" *See id.* (citing *U.S. v. Levy,* 904 F.2d 1026, 1029 (6th Cir.1990)).

An abuse of discretion exists only when the district court " 'relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard.' " *U.S. v. Hart,* 70 F.3d 854, 859 (6th Cir.1995) (quoting *Fleischut v. Nixon Detroit Diesel, Inc.,* 859 F.2d 26, 30 (6th Cir.1988)). Under this standard, we do not reverse the district court's finding absent a " 'definite and firm conviction that the trial court committed a clear error of judgment' " and only when such abuse of discretion has caused more than harmless error. *Cincinnati Ins. Co. v. Byers,* 151 F.3d 574, 578 (6th Cir.1998) (quoting *Logan v. Dayton Hudson Corp.,* 865 F.2d 789, 790 (6th Cir.1989)); *see also Cooley v. Carmike Cinemas, Inc.,* 25 F.3d 1325, 1331 (6th Cir.1994) (citing *U.S. v. Markarian,* 967 F.2d 1098, 1103 (6th Cir.1992)).

1. *The district court's ruling on Bradley's testimony concerning statements made by Parsons's agents*

Parsons filed a motion to strike, and later a motion in limine, to exclude Bradley's testimony concerning the statements made by Parsons's agents at a company planning meeting. The specific statements at issue include Bradley's testimony that "[t]here was a list of employees that were discussed that Parsons was no longer going to keep on the payroll, and Mr. McLeod's name was one of those." (J.A. at 302.) Bradley also testified that during a company planning meeting, it was a well known fact that McLeod had cancer, and that "it was discussed that perhaps they should find a younger individual that could step in and do Mr. McLeod's job." (J.A. at 303.)

Federal Rule of Evidence 801(c) defines hearsay as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Under Federal Rule of Evidence 801(d)(2)(D), a statement is not hearsay if offered against a party, and was made by "the party's agent or servant concerning a matter within the scope of agency or employment, made during the existence of the relationship." Fed.R.Evid. 801(d)(2)(D). In order to determine whether a statement was made within the scope of employment, this Court considers whether the statement was related to the decision making process, and whether the statement was more than a vague, ambiguous, or isolated remark. *See Cooley,* 25 F.3d at 1331.

On cross appeal, Parsons argues that the district court's judgment, in which the court concluded that these statements were admissible, was reached in error because: (1) the statements were not made within the scope of the declarants' employment; **\*853** (2) the declarants did not influence the final decision to terminate McLeod's employment: and (3) the statements were made several years before Parsons was discharged. Parsons also argues that the statements were not relevant because they were sporadic, isolated comments, and that their potential for prejudice was substantially outweighed by their probative value.

[1] [2] In a thorough comprehensive opinion, the district court previously rejected these arguments finding that: (1) the statements were not hearsay because they were made by Parsons's agents within the scope of their employment; (2) the statements were not sporadic, or isolated, and, as result, were relevant; and (3) the potential for prejudice of these statements did not substantially outweigh their probative value. The district court reached this conclusion based upon the fact that these statements were made during company planning meetings, held in Parsons's Pasedena office, which was responsible for reviewing all employment decisions, and were made by Parsons's human resources managers, and concerned employment issues.

We believe that the district court's order concluding that these statements were admissible properly describe and apply the relevant law and legal standards. After reviewing the district court's legal conclusions de novo and its other determinations under the Federal Rules of Evidence for abuse of discretion, and independently analyzing the issues presented, we believe that the district court provided an exhaustive analysis, the repetition of which is unnecessary. We, therefore, affirm the district court's order, finding that this evidence was admissible, for the reasons explained by the district court. In so ruling, we rely upon the reasons set forth by the district court in its thorough analysis and order of July 11, 2001.

2. *The district court's rulings on evidence concerning other lawsuits filed against Parsons*

On appeal, McLeod argues that the district court abused its discretion when it excluded testimony concerning other lawsuits filed against Parsons. Specifically, McLeod sought to introduce testimony concerning the filing and success of other employment discrimination claims filed against Parsons by employees who were also on the "hit list," to demonstrate that Parsons had a plan to discriminate, and carried out this plan. McLeod also sought to introduce evidence that the

federal government had filed several claims against Parsons for alleged billing irregularities and that Parsons was required to pay fines for these violations, in order to attack Parsons's credibility. The district court ruled that evidence of other lawsuits was not relevant, and, therefore, was inadmissible. However, the district court permitted McLeod to read the names of the other employees who were on the "hit list," and to testify whether these employees suffered an adverse employment action.

 [3]    Under Federal Rule of Evidence 402, "evidence not relevant is inadmissible." Fed.R.Evid. 402. Federal Rule of Evidence 401 defines relevant evidence as including "evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. "Because the trial court's determinations of relevancy depend on the exercise of considerable judgment within the context of the entire trial, appellate courts will not lightly overrule the trial court's decision." *United States v. Stull,* 743 F.2d 439, 445 (6th Cir.1984). In *Wyvill v. United Companies Life Insurance Company,* 212 F.3d 296, 302 (5th Cir.2000), the Fifth Circuit cautioned that "Anecdotes **\*854** about other employees cannot establish that discrimination was a company's standard operating procedure unless those employees are similarly situated to the plaintiff." *Id.* (citing *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1221 (5th Cir.1995)).

Federal Rule of Evidence 403 provides that although relevant. "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Fed.R.Evid. 403. Federal Rule of Evidence 404(b) provides that evidence of prior acts "is not admissible to prove the character of a person in order to show action in conformity therewith. It may however be admissible for other purposes. such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." Fed.R.Evid. 404(b). In this Circuit, evidence of prior acts is only admissible if it meets a four-part test: (1) the evidence must be directed toward establishing something other than a party's propensity to commit the act charged; (2) the other act must be similar enough and close enough in time to be relevant to the matter at issue; (3) the evidence must be such that the jury could find that the act occurred and that the party in question committed it; and (4) the prejudicial effect of the evidence must not clearly outweigh its probative value. *See*

*Gastineau v. Fleet Mortgage Corp.,* 137 F.3d 490, 494–95 (7th Cir.1998).

Here, it is not apparent that evidence concerning the other employment discrimination lawsuits filed against Parsons was relevant, because there was no clear nexus between these lawsuits and this case. The employees who filed these actions worked at several different offices, and were discharged for a variety of reasons. Additionally, the potential for prejudice that would have accompanied this evidence would have substantially outweighed its probative value, and this evidence would have misled the jury. Accordingly, we find no abuse of discretion in the exclusion of this evidence.

 [4]    Next, McLeod challenges the district court's ruling, which permitted Parsons's witnesses to testify that the Department of Labor's audits of Parsons's employment records did not reveal a history of discrimination. On appeal, McLeod argues that this ruling was inconsistent with the ruling to exclude evidence concerning other lawsuits. We disagree. This testimony did not concern a specific employment discrimination lawsuit, and as a result does not appear to fall under the district court's ruling that evidence of other discrimination lawsuits was not admissible because it was not relevant. Moreover, this testimony does not contain the same degree of prejudice carried by testimony concerning specific past discrimination suits.

We also conclude that the district court properly excluded testimony that Bradley filed an employment discrimination claim against Parsons and had settled this claim for $250,000. During the trial, Palmertree testified that Bradley was discharged from Parsons in 1993, and that Bradley was upset about his termination. In order to rehabilitate Bradley's credibility, McLeod submitted testimony that Bradley had settled his employment discrimination suit against Parsons. The district court concluded that this evidence was excluded under its ruling concerning other lawsuits.

 [5]    Under Federal Rule of Evidence 608(a), "[t]he credibility of the witness may be attacked or supported by evidence in the form of opinion or reputation." Fed.R.Evid. 608(a). Although McLeod argues that testimony concerning Bradley's settlement was admissible under Rule 608(a), this evidence clearly fell under the district **\*855** court's ruling to exclude evidence of prior lawsuits. Additionally, the potential for prejudice stemming from Bradley's settlement would have substantially outweighed its probative value, and this evidence would have likely misled the jury and confused the

issues. As a result, we believe that this evidence was properly excluded. Additionally, this evidence was not in the form of opinion or reputation evidence, and, as a result, did not fall under the scope of Rule 608(a). It is not clear that this evidence would have been admissible for any other purpose.

Similarly, we reject McLeod's argument that testimony concerning the government's claims against Parsons were admissible under Rule 608(b), and were improperly excluded. McLeod sought to admit this evidence in order to attack "Parsons' reputation for honesty and truthfulness." (Appellant's Br. at 32.) Rule 608(b) provides that specific instances of conduct may "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness ..." Fed.R.Evid. 608(b).

McLeod has not presented evidence that Parsons's witnesses actually participated in the overbilling. Accordingly, this evidence was not probative on the truthfulness of Parsons's witnesses and, as a result was not admissible under Rule 608. Moreover, it does not appear that this evidence would have been relevant for any other purpose. As a result, this evidence was properly excluded.

### 3. *The district court's rulings on Bradley's testimony from other cases*

We further reject McLeod's argument that the district court inconsistently applied its ruling excluding testimony concerning other lawsuits filed against Parsons. On appeal, McLeod argues that the district court erred when it permitted Parsons to impeach Bradley's credibility by introducing Bradley's prior inconsistent testimony from the Lawson case, an employment discrimination claim filed against Parsons by Judy Lawson, Parsons's former employee. In 1997, during the Lawson trial, Bradley testified that he did not remember Williams making age-related comments about any other employees. This prior statement is inconsistent with Bradley's testimony in this case that Williams referred to McLeod as an "old man" and commented that "he was a member of the senior citizens pool within the company." The district court ruled that this testimony was not hearsay because it was a prior inconsistent statement made under oath.

Federal Rule of Evidence 801(c) defines hearsay as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Under

Federal Rule of Evidence 801(d)(1)(A), a prior inconsistent statement is not hearsay provided that it was "inconsistent with the declarant's testimony and was given under oath subject to the penalty of perjury at a trial, hearing or other proceeding, or in a deposition." Fed.R.Evid. 801(d)(1)(A). In order to be admitted under this rule, the prior statement must actually predate the witnesses' alleged motive for fabrication or improper influence. *See Tome v. U.S.*, 513 U.S. 150, 159, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995).

**[6]** We find no abuse of discretion in district court's determination that Bradley's prior inconsistent statements from the Lawson case were not hearsay. Bradley testified in the Lawson case before he was deposed for this case, satisfying the requirements of Rule 801. Because the facts of the Lawson case were not read to **\*856** the jury, admitting this evidence did not conflict with the district court's earlier ruling excluding evidence of other lawsuits.

McLeod also argues that the district court erred when it excluded Bradley's testimony from the Au case, an employment discrimination case brought by Jerry Au, Parsons's former employee. In 1999, Bradley testified during the Au case that "[o]ne of the other names added to the list is Mr. Robert McLeod. He's in Oak Ridge. Tennessee. They also terminated him, same thing, lack of performance, lack of work, et cetera." (J.A. at 1137.) This testimony is consistent with Bradley's testimony in this case that McLeod's name was included on the "hit list" and that Williams regarded McLeod's age as a liability. McLeod sought to introduce this consistent testimony, in order to rehabilitate Bradley's credibility in this case. The district court excluded this evidence as hearsay, finding that Bradley's testimony in the Au case was not a prior statement because it was given on May 3, 1999, after Bradley was deposed in conjunction with this litigation.

**[7]** Under Federal Rule of Evidence 801(d)(1)(B), prior consistent statements are not hearsay, and may be used to "rebut an express or recent charge or implied charge against the declarant of recent fabrication or improper influence or motive." Fed.R.Evid. 801(d)(1)(B). Bradley's consistent statement in the Au case does not satisfy the temporality requirement in Rule 801(d)(1)(B) because this testimony was not given before he was deposed in connection with McLeod's trial. As a result, this testimony was properly excluded. Moreover, because Bradley's testimony from the Au case was given after Bradley's testimony in this case, unlike his testimony from the Lawson case, excluding this testimony

was not inconsistent with the district court's ruling permitting Parsons to use Bradley's testimony from the Lawson case.

4. *The district court's ruling on evidence offered to rebut Parsons's justifications for discharging McLeod*

[8]    On appeal, McLeod challenges the district court's ruling excluding testimony from James Carter concerning Parsons's ability to develop new business, and testimony concerning Parsons's attempts to retain two engineers with substantial nuclear experience, who later left the company. McLeod also challenges the district court's ruling to exclude testimony from Stephen Marchetti, concerning whether it was difficult for cancer patients to obtain health insurance. Finding that this testimony was not relevant, the district court ruled that it was inadmissible. On appeal, McLeod challenges these rulings, arguing that this evidence was relevant because it suggested that Parsons's justifications for firing McLeod – financial reasons and McLeod's lack of nuclear experience – were false.

We reject McLeod's arguments, and find no error in the district court's rulings to exclude this evidence. The link between this evidence and Parsons's justifications for discharging McLeod is so attenuated, that it is not readily apparent that this evidence was relevant to demonstrate that Parsons's justifications were false. As a result, we believe that the district court correctly ruled that this evidence was not relevant, and was, therefore, inadmissible.

B. *The district court did not err when it denied Parsons's motion for summary judgment in part*

On appeal, Parsons's argues that the district court erred when it did not grant summary judgment against all of McLeod's claims. We review the district court's denial of summary judgment for an abuse of discretion. *See Valot v. Southeast Local Sch. Bd. of Educ.,* 107 F.3d 1220, 1230 (6th Cir.1997).  **\*857**  Federal Rule of Civil Procedure 56(e) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(e). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Cacevic v. City of Hazel Park,* 226 F.3d 483, 491 (6th Cir.2000) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "A genuine issue for trial exists when there is sufficient 'evidence

on which the jury could reasonably find for the plaintiff.' " *Cacevic v. City of Hazel Park,* 226 F.3d 483, 491 (6th Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In a comprehensive Memorandum Opinion dated June 7, 2000, the district court denied Parsons's motion for summary judgment on McLeod's claims, finding that the statements made by Parsons's agents provided direct evidence of both age discrimination and disability discrimination. The district court also concluded that McLeod satisfied his burden of demonstrating that he was disabled under the ADA because he created a genuine issue of material fact whether his supervisors perceived him as having a physical impairment that substantially interfered with the major life function of working, and whether he had a record of such impairment. However, the district court granted summary judgment in part on McLeod's ADA claim, finding that he did not suffer from a physical impairment that substantially interfered with his ability to perform a major life function. This later ruling is not challenged on appeal.

As did the district court, we reject Parsons's arguments that McLeod did not provide direct evidence of age or disability discrimination. Bradley's testimony indicated that McLeod's age was discussed as a liability. Additionally, McLeod was fifty-six years old when he was laid off, and he created a genuine issue of material fact concerning whether he was qualified for the position that was given to a younger employee.

Similarly, McLeod provided direct evidence that Parsons regarded his cancer as a liability, and created a genuine issue of material fact whether his supervisors were aware that he had cancer, and that the company kept a record of this impairment.

[9]    After carefully reviewing the record, the briefs of both parties, and the applicable law, we believe that the district court's order denying summary judgment in part against McLeod's ADA and ADEA claims properly describes the relevant law and legal standards. After reviewing for an abuse of discretion, and independently analyzing the issues presented, we believe that the district court provided an exhaustive analysis, and that further analysis of this issue, in this opinion, would serve no useful jurisprudential purpose. We, therefore, affirm the district court's order denying summary judgment, for the reasons stated by the district court.

C. *McLeod's request that this panel allow plaintiffs to prevail in mixedmotive cases filed under the ADA*

Next, McLeod argues that this panel should adopt the approach followed by several other circuits, with respect to the plaintiff's burden of proof under the ADA. In this circuit, in order to prevail on a claim alleging a violation of the ADA, a plaintiff must demonstrate that he or she: (1) is an individual with a disability; (2) is otherwise qualified to perform the job requirements **\*858** with or without reasonable accommodations; and (3) was discharged solely on account of the disability. *Walsh,* 201 F.3d at 725 (citing *Monette,* 90 F.3d at 1177 (6th Cir.1996)). However, several of our sister circuits have permitted plaintiffs to prevail in "mixed-motive" cases filed under the ADA. *See, e.g., McNely v. Ocala Star–Banner Corp.,* 99 F.3d 1068, 1073–77 (11th Cir.1996); *Douglas Parker v. Sony Pictures Entm't, Inc.,* 260 F.3d 100, 105 (2d Cir.2001) (holding that the plaintiff could proceed with his ADA claim because his disability played a motivating role in his discharge); *Baird v. Rose,* 192 F.3d 462, 470 (4th Cir.1999) (holding that "the ADA does not impose a 'solely by reason of' standard of causation"); *Foster v. Arthur Andersen, LLP,* 168 F.3d 1029, 1033–34 (7th Cir.1999) (noting that in order to prevail under the ADA, plaintiffs must demonstrate that impermissible discrimination was a motivating factor); *Pedigo v. P.A.M. Transp., Inc.,* 60 F.3d 1300, 1301 (8th Cir.1995) (citing 42 U.S.C. § 2000e–2(m))

("An employee is entitled to some relief if he or she proves that his or her disability was a 'motivating factor' in the decision made even though other factors also motivated the decision."); *Buchanan v. City of San Antonio,* 85 F.3d 196, 200 (5th Cir.1996).

We decline McLeod's request that this panel permit plaintiffs to recover under the ADA in mixed motive cases. Adopting the approach followed by several other circuits would require the panel to make a substantial departure from this Court's holdings in *Walsh* and *Monette.* Under *Salmi v. Secretary of Health and Human Services,* 774 F.2d 685, 689 (6th Cir.1985), one panel of this Court cannot reverse the holding of another panel unless there is a contrary Supreme Court decision or en banc decision by this Court. *Id.* Because neither of these conditions have been satisfied in this case, we must decline McLeod's request.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgments and evidentiary rulings.

### All Citations

73 Fed.Appx. 846, 26 NDLR P 253

### Footnotes

\*   The Honorable Herman J. Weber, United States District Court for the Southern District of Ohio, sitting by designation.

1   The ADA defines the term "disability" to include: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual, (B) a record of such impairment, (C) being regarded as having such impairment." 42 U.S.C. § 12102(2).

**End of Document**                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

772 Fed.Appx. 287
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

M.L.; J.L., Plaintiffs-Appellants,

v.

WILLIAMSON COUNTY BOARD OF
EDUCATION, Defendant-Appellee.

No. 18-5671
|
Filed May 24, 2019

**Synopsis**
**Background:** Parents of Tennessee public school student
brought action against school board, asserting Rehabilitation
Act, Americans with Disabilities Act (ADA), and First
Amendment retaliation claims based upon allegation that
teachers had made three reports of suspected child abuse in
retaliation for parents having advocated for special education
services for child. The United States District Court for the
Middle District of Tennessee, William L. Campbell, Jr., J.,
2018 WL 2970704, entered summary judgment for school
board. Parents appealed.

**Holdings:** The Court of Appeals, Larsen, Circuit Judge, held
that:

[1] no causal connection existed between parents' advocacy
and first report as required for retaliation under Rehabilitation
Act or ADA;

[2] school board had legitimate, non-retaliatory reason for
other reports which was not pretext for retaliation under
Rehabilitation Act or ADA; and

[3] school board was not itself liable for First Amendment
retaliation absent school board policy or custom responsible
for alleged retaliation.

Affirmed.

**West Headnotes (4)**

[1] **Civil Rights** 🗝 Discrimination by reason of
handicap, disability, or illness

No causal connection existed between advocacy
by parents of Tennessee public school student for
special education services for child and teacher's
report of suspected child abuse, and thus
report was not retaliation under Rehabilitation
Act or ADA; although report occurred shortly
after particularly contentious meeting between
parents and school staff regarding special
education services, and even if teacher worked
closely with staff who attended such meetings,
teacher herself did not attend meetings, was
not involved in deciding what services were
provided to student, and had not interacted with
parents, and so nothing showed that teacher had
known of parents' advocacy. Rehabilitation Act
of 1973 § 504, 29 U.S.C.A. § 794; Americans
with Disabilities Act of 1990 § 503, 42 U.S.C.A.
§ 12203.

[2] **Civil Rights** 🗝 Discrimination by reason of
handicap, disability, or illness

Even if parents of Tennessee public school
student established prima facie case against
school board for retaliation under Rehabilitation
Act or ADA based upon teachers' reports
of suspected child abuse following parents'
advocacy for special education services for
child, legitimate, non-retaliatory reason existed
for reports, as under Tennessee law teachers
had duty to report suspected child abuse.
Rehabilitation Act of 1973 § 504, 29 U.S.C.A. §
794; Americans with Disabilities Act of 1990 §
503, 42 U.S.C.A. § 12203; Tenn. Code Ann. §
37-1-403.

4 Cases that cite this headnote

[3] **Civil Rights** 🗝 Discrimination by reason of
handicap, disability, or illness

Even if parents of Tennessee public school student established prima facie case against school board for retaliation under Rehabilitation Act or ADA based upon teachers' reports of suspected child abuse following parents' advocacy for special education services for child, legitimate, non-retaliatory reason for reports, namely teachers' duty under Tennessee law to report suspected child abuse, was not pretext for retaliation; parents did not dispute that events prompting reports had in fact happened, there were no comparator students for which teachers had not made reports, and although some hostility existed between parents and some school staff, including staff member who one teacher had consulted with before making report, nothing suggested that reporting teachers shared those feelings. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794; Americans with Disabilities Act of 1990 § 503, 42 U.S.C.A. § 12203; Tenn. Code Ann. § 37-1-403.

4 Cases that cite this headnote

[4]    **Civil Rights**  🔑  Governmental Ordinance, Policy, Practice, or Custom

Because there is no respondeat superior liability in a § 1983 claim, a municipal defendant is liable only if the defendant itself caused the plaintiff's harm through an official policy or custom. 42 U.S.C.A. § 1983.

**\*288**  ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

**Attorneys and Law Firms**

Justin Scott Gilbert, Gilbert Russell McWherter Scott Bobbitt, Chattanooga, TN, for Plaintiffs-Appellants

Elisabeth Carson, Lee Ann Thompson, Attorney, Buerger, Moseley & Carson, Franklin, TN, for Defendant-Appellee

BEFORE: SUTTON, GRIFFIN, and LARSEN, Circuit Judges.

**Opinion**

LARSEN, Circuit Judge.

In the 2015–16 school year, teachers at an elementary school in Tennessee made three reports of suspected child abuse regarding a second-grade student with a disability. Each time, the Tennessee Department of Children's Services (DCS) either declined to investigate or found no indication of abuse. The child's parents later sued the school board, claiming that the teachers had made these reports in retaliation for the parents having advocated for special education services for their son. Following discovery, the district court granted summary judgment in the school board's favor. We AFFIRM.

I.

M.L. and J.L. are the parents of J, a child diagnosed with Attention Deficit Hyperactivity Disorder and Oppositional Defiance Disorder. Among other symptoms, J **\*289** exhibits impulsive behavior, hyperactivity, and hypersexuality. During the events in question, J was around seven years old and attended Kenrose Elementary School in Tennessee.

The relevant events, which we recount in the light most favorable to the plaintiffs, began in the spring of 2015. In April, J's mother, M.L., called an individualized education program (IEP) meeting to discuss an incident at school in which J was left alone in a "seclusion room" for over four hours without parental notification. When M.L. went to the room at the end of the school day to pick up J, she found him naked, on the floor in a fetal position, and surrounded by urine. During the meeting, the school psychologist, Diana Briley, became irritated, telling M.L. that school personnel were professionals and that they did not appreciate M.L. calling IEP meetings.

The next day, M.L. sent an email to Briley and the school's principal, Dr. Marilyn Webb, among others, complaining that Briley had acted unprofessionally. Dr. Webb responded that the Kenrose staff was happy to meet with M.L. whenever she requested a meeting. But Dr. Webb also wrote that she "would be happy to meet with [M.L.] and talk about the feelings of our staff, communicated by Ms. Briley and shared by others." In May, during another IEP meeting, M.L. overheard Dr. Webb state with annoyance that the school had needed to create a seclusion room because of J. During that same month, the school agreed to update J's Behavioral Intervention Plan

(BIP), which M.L. had been advocating for throughout the 2014–15 school year. The 2014–15 school year ended without further incident.

At the beginning of the 2015–16 school year, J displayed some troubling behavior. In September 2015, J's second-grade teacher, Allyson Whitley, observed J grab his best friend around the waist and thrust his pelvic area into the other boy's bottom. Whitley reported the incident to Carrie Glover, J's special education teacher, who claims she then called M.L. to discuss J's behavior. But M.L. denies being informed of this incident at that point. Neither Whitley nor Glover took any further action at that time.

The parents continued to advocate for J. In September, M.L. again requested that J's BIP be updated; the school had not updated the BIP despite having agreed to do so in May 2015. In early November 2015, M.L. attended an IEP meeting where the attendees discussed a written complaint J's parents had prepared regarding J's education. The parents contended that the lack of an effective BIP was contributing to J's behavioral problems; they expressed concern over the frequency and effectiveness of putting J in seclusion; and they worried the school was "hyper-focused on him and waiting for him to misbehave." In response, behavioral specialist, Lindsay Naylor, said that the school's staff members "did so much" for J and that M.L. "did not appreciate them." That same month, the school implemented the updated BIP, the delay apparently resulting from the departure of the behavioral analyst tasked with the update.

Four days after the contentious November meeting, a special education teacher's assistant, Pam Callaway, told DCS that she suspected J was being abused. Callaway reported the following: that morning, J had been "teary and emotional"; he told her that his father, J.L., had hurt J and his brother, R, by twisting their arms and pinching their noses, and J demonstrated by putting an arm around his neck in a choking position; J had some bruises on his legs at this time; Callaway asked whether J.L. had been playing with J, and J responded that he was "a little afraid." **\*290** Callaway also reported that J said that J.L. was mad at him and his brother for taking "naked pictures" of each other and of J.L. and that they made a "naked room" to hang the pictures. DCS investigated but ultimately concluded that J.L. had just been playing with the boys.

In January 2016, Glover, Whitley, and M.L. attended an IEP meeting where M.L. requested extended school year services

for J during the summer; but the teachers thought that home visits and letters would be better. M.L. responded that these recommendations were "great."

In March 2016, the same student whom J had touched in the September incident was bending over to tie his shoes when J grabbed him by the waist and slapped him on the bottom several times. J then followed the boy into an individual bathroom but exited when a staff member quickly opened the door. That same day, J told Whitley that his father, J.L., was "in trouble for spanking him, pulling his hair, and pulling his nose."

Whitley discussed both the inappropriate touching and J's new allegations of physical abuse with Glover. The next day, Glover and Whitley made a report to DCS. They described J's slapping his friend's bottom and following him into a bathroom and relayed J's recent allegations of physical abuse. They also reported that: J.L. travels often for work, and J is "clingy" with school staff when J.L. is home; J comes to school with marks and bruises on his legs; J had previously written in his journal that he was scared of J.L.; M.L. was likely aware that physical abuse was occurring; J was immature for his age; and that J and his younger sibling, N, sometimes sleep in the same bed but that M.L. removes N when she goes to bed. Glover and Whitley also described the September 2015 incident when J grabbed his friend around the waist and thrust his pelvic area into the other boy's bottom. DCS screened the case out, apparently concluding that the allegations, which included "the 'pinching of the nose,' " had been previously investigated.

J continued to demonstrate potentially troubling behavior. In May 2016, the student involved in the September and March incidents was lying on a rug preparing to watch a movie when J crawled on top of him and repeatedly pressed his face into the boy's bottom. Glover consulted Lindsay Naylor, the school's behavioral specialist, about this incident. Naylor agreed that J's behavior warranted a report, and Glover made a report to DCS the next day. In addition to relaying the previous day's event, Glover reported that: M.L. had stated that J "may be acting out with [his brother] at home" and that she is uncomfortable leaving J alone with his younger brother, N; if J and his brother were in the same bed, M.L. would remove the brother; "[t]here are strange things" between M.L. and J.L.; all the children sleep in M.L.'s bed, while J.L. sleeps in the basement; M.L. had expressed concerns about J's uncle, who may have a substance abuse problem and who "did not speak much"; and that J.L. travels frequently for work and J is

"clingy" at school when J.L. is at home. Finally, Glover again referenced both the September incident, when J had thrust his pelvic area into another boy's bottom, and the March incident, when J had grabbed the same boy by the waist and smacked his bottom.

DCS investigated. During the investigation, J disclosed some inappropriate behavior between him and his younger brother, N. A DCS investigator recommended that M.L. take steps to monitor J and N more closely, including putting a bell on J's door so J's parents could hear if he got up in the middle of the night. But DCS ultimately concluded that J "did not disclose anything" **\*291** and closed the case. Regarding the most recent incident of alleged sexual behavior at school, DCS concluded "[t]he children were watching a movie in class and [J] put his head on his best friend's butt like it was a pillow."

At the end of the 2015–16 school year, J's parents moved him to another school. They later sued the Williamson County Board of Education, alleging that the school's three reports of abuse had been made in retaliation for their advocacy for J, in violation of: (1) § 504 of the Rehabilitation Act, 29 U.S.C. § 794; (2) Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12203; and (3) the First Amendment and 42 U.S.C. § 1983. In June 2018, the district court granted summary judgment in the Board's favor on all claims. The parents now appeal.

## II.

This appeal came to us on the district court's grant of summary judgment. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, courts "consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." McKay v. Federspiel, 823 F.3d 862, 866 (6th Cir. 2016). A grant of summary judgment "should be reversed if there is a genuine need for trial, which turns on whether the evidence is such that a reasonable jury could return a verdict for [the non-moving party]." A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ., 711 F.3d 687, 696 (6th Cir. 2013) (internal quotation marks omitted). This court reviews a district court's grant of summary judgment de novo. Id.

## A. The § 504 and Title II Retaliation Claims

We may address the parents' retaliation claims under § 504 of the Rehabilitation Act and Title II of the ADA together. "The Acts have a similar scope and aim; for purposes of retaliation analysis, cases construing either Act are generally applicable to both." Id. at 696–97. Because the parents present no direct evidence of retaliation, we analyze the claims under the McDonnell Douglas burden-shifting framework. Id. at 697; see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

To state a prima facie case under either § 504 or Title II of the ADA, the parents must show: (1) they engaged in protected activity; (2) the Board knew of the protected activity; (3) the Board took an adverse action against them; and (4) there was a causal connection between the protected activity and the adverse action. A.C., 711 F.3d at 697. If the parents make out a prima facie case, the Board would carry the burden to show "that it had a legitimate, non-discriminatory" reason for its actions. Id. Once having done so, the parents would bear the burden to "prove by a preponderance of the evidence that the legitimate reasons offered by [the Board] were not its true reasons, but were a pretext for retaliation." Id. (internal quotation marks omitted).

### 1. The November 2015 Report

**[1]** The parents' claim regarding the November 2015 report fails at the prima facie stage. Advocating for accommodations under the disability laws is protected activity. Id. at 698. And we have previously held that making a false report of suspected child abuse is an adverse action under these statutes. Id. But, though the burden at the prima facie case stage is "not onerous," id. at 697, the parents cannot succeed **\*292** even under this lenient standard because they have produced no evidence of a causal connection between the November report and any protected activity; indeed, they have failed to show that the reporter, Pam Callaway, even knew of any protected activity.

The November report occurred shortly after the contentious November IEP meeting, one topic of which was the parents' written complaint. But Callaway did not attend this meeting. And the parents admit that Callaway did not attend other IEP meetings, nor was she otherwise involved in deciding what services would be provided to J. Indeed, the parents provide

no evidence that they interacted with Callaway at all. They argue only that, although Callaway did not attend the IEP meetings, she worked closely with teachers who did. This is not enough to show that Callaway was even aware of the parents' complaints, let alone that she acted in retaliation for them. Given the dearth of evidence here, no reasonable jury could return a verdict for the parents as to the November 2015 report.

2. The March and May 2016 Reports

**[2]**    **[3]**   We may assume that the parents have stated a prima facie case of retaliation as to the March and May reports; but even making that assumption, the parents' claims fail because they have not adequately shown pretext. The Board has satisfied its burden of putting forth a legitimate, nondiscriminatory reason for the March and May reports— the teachers' duty to report suspected child abuse pursuant to Tennessee law.[1] The parents, therefore, must show pretext to survive summary judgment. The same evidence can support both a finding of causation for the plaintiff's prima facie case of retaliation and a finding of pretext. *See Cantrell v. Nissan N. Am. Inc.*, 145 F. App'x 99, 107 (6th Cir. 2005).

On appeal, the parents do not marshal their evidence toward specific methods of showing pretext, though there are three. We therefore look at the entirety of their evidence to determine whether it shows that the Board's claim that it made the reports to comply with its legal duty to report suspected abuse: (1) lacks a basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to motivate the adverse action. *See Vincent v. Brewer Co.*, 514 F.3d 489, 497 (6th Cir. 2007).

*No basis in fact?* The first method of proving pretext "consists of evidence that the proffered bases for the [adverse action] never happened, *i.e.*, that they are factually false." *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004) (citation omitted). The parents do not dispute that the events leading Glover and Whitley to make the March and May reports actually happened. Two serious incidents occurred the day before the teachers made the March report. First, J again touched his friend inappropriately. Second, J told Glover that his father was "in trouble" for spanking him and pulling his hair. Although the parents claim that J "had simply playfully hit his friend's bottom and then hugged him from behind," they did not witness the event and no percipient witness disputes the teachers' description. In any event, the parents

admit that J hit his friend's bottom. And the parents never **\*293** claim that the teachers made up J's statements about his father physically hurting him. In May, J crawled on top of the same boy he had touched in September and March and repeatedly pressed his face into the boy's bottom. Although the DCS report concluded that J had "put his head on his best friend's butt like it was a pillow," the report still concludes that this touching happened. The parents have thus failed to show that the proffered reason for making the March and May reports lacked a basis in fact.

The parents lean heavily on the fact that DCS declined to investigate the March report and made no finding of abuse when it investigated the May report, instead concluding that "[t]here are no concerns at this time." This is surely a necessary component of the parents' case—if DCS had substantiated the reports of abuse, the parents could hardly claim a lack of reasonable suspicion triggering the duty to report. But it is not alone sufficient. Some legitimate suspicions of child abuse will ultimately prove unfounded, which is why DCS conducts investigations, rather than simply deeming all reports to be true. But just because a report ultimately proves false does not mean that the concerns motivating the report were fictitious. To show a "lack of basis in fact," the parents would need more than DCS's conclusion that no abuse had occurred.

*Insufficient to Motivate?* The parents next claim that the duty to report was "insufficient to motivate" the March and May reports. Proving pretext by this method typically consists of "evidence that other[s] ... were not [reported] even though they engaged in substantially identical conduct to that which the [defendant] contends motivated its [report] of the plaintiff." *Id.* (citation omitted). The parents offer no comparator evidence. Instead, they claim that J's actions were insufficient to trigger the teachers' duty to report suspected abuse in March because J was not acting in a sexual way, but rather "had simply playfully hit his friend's bottom and then hugged him from behind." But, as discussed above, the parents provide no evidence from which a reasonable jury could conclude that this is what happened. And while we are required to construe the facts in the light most favorable to the parents, the parents cannot create a genuine dispute of a material fact by making unsupported allegations. *See Cobb v. Keystone Memphis, LLC*, 526 F. App'x 623, 630 (6th Cir. 2013). Neither parent witnessed the event, and no percipient witness contradicts the teachers' characterization. The parents cite notes written by J's psychiatrist, Dr. Susanna Quasem, as putative support. But these notes reflect only how

M.L. described the event to Dr. Quasem. These same notes, moreover, state that J "made some movements that appeared sexual in nature to the teacher."

As to the May report, the parents again claim that, because DCS concluded that there had been no abuse, reasonable suspicion of abuse could not have motivated the report. We have previously explained why this analysis is faulty. It is true that J's board-certified behavior analyst, Julie Mayer, who is also a mandatory reporter of child abuse, stated that the events surrounding the May report "in no way warrant that response." But, as with Dr. Quasem's notes above, Mayer's response was based only on M.L.'s description of J's behavior, which she did not see, and which did not include, for example, the fact that J had followed his friend into the bathroom or that J again complained of physical abuse.

The parents next argue that J's actions were insufficient to motivate either report of child abuse because school staff knew that J's problems interacting appropriately **\*294** with his classmates were a result of his disabilities. As evidence, they point to a "manifestation determination" signed by school staff. In late February 2016, J had been suspended from school after he lunged at a classmate and punched her with both fists. M.L. asked a psychologist to attend the resulting IEP meeting, and the psychologist explained that J struggled with impulsivity and social immaturity. At the end of the meeting, the participants, including Glover and Whitley, collectively checked "Yes" in response to the question "Was the behavior caused by, or did it have a DIRECT and substantial relationship to the student's disability?" The parents place great weight on this document, claiming that it shows that it was "clearly determined that J's acting out toward classmates was caused by his disability." But, though we take the evidence in the light most favorable to the parents, this evidence is insufficient to demonstrate pretext. The document establishes only that Glover and Whitley agreed that that one incident—in which J punched his classmate—was a result of his disabilities, not that every future inappropriate interaction, whatever its character, would inevitably result from his disabilities. Here, the punching incident was different in kind from the behavior that immediately preceded the reports; there were no sexual overtones. And even if school staff had been aware that J's hypersexual behavior could result from his disabilities, such awareness would not negate the possibility that J was *also* being sexually abused and exposed to the behaviors he was later acting out. Finally, this argument entirely ignores

the second principal basis for making the March report—J's renewed allegations of physical abuse.

*Did not actually motivate?* The parents are left to argue that the proffered reason did not actually motivate the reports. To prove pretext by this method, "the plaintiff admits the factual basis underlying the ... proffered explanation and further admits that such conduct could motivate [a report]" but "argues that the sheer weight of the circumstantial evidence of [retaliation] makes it 'more likely than not' that the [Board's] explanation is a pretext, or a coverup." *Hedrick*, 355 F.3d at 460. In other words, under this method, the plaintiffs must admit (for arguments' sake) that the events occurred as the teachers described them and also that such conduct could trigger the teachers' mandatory duty to report. The parents must then produce sufficient evidence from which a jury could conclude that, despite these admissions, the Board is using the duty to report as a coverup for its true motivation: to retaliate. This method of proving pretext is a tough climb for the parents who, having admitted the facts arguendo, must show that teachers facing criminal and civil penalties for failure to report signs of abuse would nevertheless have kept mum, were it not for their desire to retaliate.

The parents suggest that if Glover had been serious about her duties as a mandatory reporter, she would have immediately reported the September incident (when J thrust his pelvic area into his friend's bottom), instead of waiting six months to include it in the March report. But as Glover clarified, it was the pattern of sexually inappropriate behavior that concerned her.

The parents next suggest that a reasonable jury could conclude that the school would not have complied with its duty to report, but for its desire to retaliate, because the staff had demonstrated hostility toward the parents and their desire to obtain appropriate services for their son. The facts in the light most favorable to the parents do suggest that in April 2015, roughly a year before these reports, "others" on the school staff had "shared" Briley's displeasure about M.L. calling IEP **\*295** meetings. But there is no evidence that Glover or Whitley in particular shared Briley's feelings, even at that time; nor is there any evidence of hostility between the parents and Glover or Whitley. To the contrary, the uncontradicted evidence suggests that M.L. had a good relationship with the teachers. M.L. wrote glowing emails expressing appreciation for Glover and Whitley in September 2015, December 2015, and March 2016. In her March email, for example, M.L. wrote that "[w]e are so blessed to have

such caring, patient, talented and loving people helping [J] and taking care of him at school. Thank you all for EVERYTHING you do for [J]."

The parents attempt to characterize the teachers' rejection of M.L.'s request for extended school year services as a source of tension, but no evidence supports that allegation. When the teachers proposed alternative services instead, M.L. responded that these recommendations were "great." And though M.L. later renewed her request for extended school year services, she did not do so until after Glover had made the May report to DCS.

The parents do advance some evidence suggesting displeasure by Naylor, the behavioral specialist whom Glover consulted before making the May report. In November 2015, Naylor had remarked to M.L. that school staff "did so much" for J and that M.L. "did not appreciate them." But this evidence is insufficient to create a genuine dispute of material fact. Even in the light most favorable to the parents, there is no further evidence of hostility to suggest this was anything more than a one-off comment, made six months before the report at issue. And Naylor did not even make the May report; Glover merely consulted with her before Glover made the report.

The parents argued, and the district court agreed, that the reports contained irrelevant personal allegations. While including "irrelevant personal allegations" against parents can be evidence of retaliation, *Wenk v. O'Reilly*, 783 F.3d 585, 596 (6th Cir. 2015), the information provided in the report here is not obviously irrelevant to suspected sexual abuse. We cannot say that children's sleeping arrangements, the parents' sleeping arrangement, the parents' relationship with each other, and relatives with potential substance abuse issues are categorically irrelevant considerations when trying to figure out whether a child is being sexually abused.

Finally, the parents claim that the reports' timing is suspicious. The parents argue that both reports occurred "within weeks" of IEP meetings. This statement is true, in that four weeks separated the March 3 IEP meeting and the March 31 report, and two-and-a-half weeks separated the April 26 meeting and the May 13 report. But these facts alone are insufficient to support an inference of retaliation. The school held eight IEP meetings for J throughout the school year, such that nearly any report would have followed "within weeks" of a meeting. And the parents have produced no evidence of hostility, disagreement, or other red flags during either the March 3 or April 26 meetings that could give rise to an inference of retaliatory intent.

In sum, the parents have failed to produce evidence from which a reasonable jury could conclude that a legal duty to report suspected abuse did not actually motivate the report and that retaliation did. Having failed to produce a jury-submissible case of pretext under any recognized method, the parents' claims with respect to the March and May reports cannot proceed. Because the parents have failed to show pretext, we need not address the parties' arguments regarding the honest belief rule, as that rule comes **\*296** into play only when a party has made a showing of pretext. *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 714 (6th Cir. 2007).

**B. The First Amendment Retaliation Claim**

**[4]** There remains the parents' charge of First Amendment retaliation under § 1983. The parents have sued only the Williamson County Board of Education, not any individual. Because there is no respondeat superior liability in a § 1983 claim, the Board is liable only if the Board *itself* caused the parent's harm through an official policy or custom. *See Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 403 (6th Cir. 2010).

The district court did not discuss policy or custom in granting the Board's motion for summary judgment. But the parents cannot claim that this argument took them by surprise. The Board expressly argued this point in its summary judgment motion. And we may affirm a district court's grant of summary judgment "on any grounds supported by the record, even if they are different from those relied upon by the district court." *Kennedy v. Superior Printing Co.*, 215 F.3d 650, 655 (6th Cir. 2000). The parents offer no evidence of a policy or custom that led to their injury. In their briefing, they claim only that the Board "has gone to great pains to claim that it was its policy and practice to report *all* 'known signs of abuse,' without taking into account any context." But even if this were the Board's policy, the parents have the policy's implications backwards. Requiring teachers to report any observed signs of abuse—even those a teacher would subjectively discount if permitted to consider context—denies teachers discretion, and hence their ability to retaliate.

Perhaps recognizing this flaw, the parents made an about-face following oral argument. In a Federal Rule of Appellate

Procedure 28(j) letter, the parents argued that the Board "may be found to have an undefined practice of educators reporting to DCS ... without defined parameters ... and that complete discretion is given without parameters." This belated argument lacks support in the record and cannot save the claim. Without any evidence demonstrating whether the Board had a policy, or what its contours were, the parents have failed to show that any policy or custom caused retaliation for protected speech. We thus agree with the district court that summary judgment is appropriate for this claim.

\* \* \*

We AFFIRM the district court's grant of summary judgment in favor of the Board.

**All Citations**

772 Fed.Appx. 287, 368 Ed. Law Rep. 109, 59 NDLR P 83

Footnotes

1    Tennessee law requires any person with knowledge of harm that reasonably appears to have been caused by abuse or neglect to report such harm immediately. Tenn. Code Ann. § 37-1-403. Knowingly failing to make a required report is a misdemeanor, Tenn. Code Ann. § 37-1-412(a), and may also give rise to civil liability, *see Ham v. Hosp. of Morristown, Inc.*, 917 F. Supp. 531, 535 (E.D. Tenn. 1995).

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case: 24-1439    Document: 19-1    Filed: 08/28/2024    Page: 160

Matthews v. McDonald, Not Reported in Fed. Supp. (2016)
2016 WL 29622, 2016 A.D. Cases 263

2016 WL 29622
United States District Court, S.D. California.

Carmen MATTHEWS, Plaintiff

v.

Robert MCDONALD, Secretary,
Department of Veterans Affairs, Defendant.

Case No.: 14cv1340-MMA (BLM)
|
Signed 01/04/2016

**Attorneys and Law Firms**

Carmen Matthews, San Diego, CA, pro se.

Beth Clukey, US Attorneys Office Southern District of California, San Diego, CA, for Defendant

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;**

**GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO STRIKE;**

**GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE A SUR-REPLY**

HON. MICHAEL M. ANELLO, United States District Judge

*1 Plaintiff Carmen Matthews, proceeding *pro se*, has filed an amended complaint against Defendant Robert McDonald in his capacity as the Secretary of the United States Department of Veterans Affairs, in which she alleges harassment, retaliation, and wrongful termination based on gender, race, sex, and disability discrimination. *See* Doc. No. 27. Defendant moves for summary judgment as to all of Plaintiff's claims. *See* Doc. No. 58. Plaintiff filed a response in opposition to the motion, *see* Doc. Nos. 77, 83, to which Defendant replied.[1] *See* Doc. No. 86. For the reasons set forth below, the Court **GRANTS** Defendant's motion for summary judgment.

**Factual Background**[2]

Plaintiff is an African-American female who claims to be disabled due to anxiety and panic attacks. She is a former volunteer and employee with the United States Department of Veterans Affairs San Diego Healthcare System (hereinafter referred to as "the VA").

Plaintiff started volunteering at the VA on July 5, 2010 in the Patient Advocacy section of the hospital. Sometime in the fall of 2010, Plaintiff transferred to the Member Services division as a volunteer after being interviewed by Robert Earnest, the supervisor of the section. At the end of October or beginning of November 2010, Plaintiff applied and interviewed for a paid position in a different department of the hospital. According to Plaintiff, Earnest told her that she would never have a paid position at the VA. Plaintiff interpreted Earnest's comment to mean that she would not be hired for a paid position because she refused to have sex with him. Plaintiff did not get the paid position for which she had interviewed. Plaintiff believes that Earnest influenced this hiring decision.

In November 2010, Plaintiff met with Elizabeth McDonald, Director of Health Administration and Earnest's supervisor, and Sheri Lacro, a Human Resources Specialist, to report allegations of sexual harassment against Plaintiff by Robert Earnest.

*2 In December 2010, Plaintiff was interviewed via telephone and hired by Allison Gill, Manager of the VA Call Center, for a GS-5 level paid position as a Medical Support Assistant ("MSA"). According to Plaintiff, her troubles in the Call Center began on her first day after employee orientation. During a Call Center meeting led by Allison Gill and Sheri Lacro, Plaintiff alleges that Gill and Lacro shared a "look" that Plaintiff interpreted as being directed at her and reflective of their displeasure with her complaint against Earnest. Also at that meeting, Plaintiff states that she was called out by Gill in front of the other participants for wearing blue jeans. Gill informed Plaintiff that she would have to wear "less casual slacks." Plaintiff claims that there was a difference between how men and women were permitted to dress for the job.

In January 2011, Plaintiff applied and interviewed for a GS-7 position as a Research Compliance Auditor. One week later, the VA's Human Resources department advised Plaintiff that she could not take the position because she had already accepted the MSA position in the Call Center. During this same time period, Gill solicited articles for a new newsletter. Plaintiff submitted an article. Gill did not acknowledge receipt. The newsletter never came to fruition.

Also in January 2011, Plaintiff complained about the noise level. Her supervisors, including Brenda Moore, the Call Center Team Lead and an African-American woman, advised her that nothing could be done about the noise level.

On April 21, 2011, Gill emailed Plaintiff her mid-term performance review. Gill informed Plaintiff that she was performing her job successfully, and that official evaluations would take place in September. During a team meeting that same date, Plaintiff once again complained to Gill about the noise level in the Call Center and informed Gill that the noise affected Plaintiff's breathing. Gill advised Plaintiff there was nothing she could do about the noise level.

In May 2011, Plaintiff applied and interviewed for one of two newly created Team Lead positions in the Call Center. Gill conducted the interview together with two other panel members. According to Plaintiff, Gill made sexist statements during the interview, including displaying favoritism towards Plaintiff's fellow Call Center employee, Adam Doyle, with whom Plaintiff suspected Gill of having a sexual relationship. Gill did not choose Plaintiff for the Team Leader positions. Rather, on or about May 3, 2011, Gill promoted two Call Center employees, April Adams and Aaron McDevitt. April Adams is an African-American woman. Aaron McDevitt had been employed approximately one month longer than Plaintiff.

On May 5, 2011, Plaintiff sought advice from the Patient Advocate Director regarding purported problems and discrimination she had experienced in the Call Center. The Patient Advocate Director advised Plaintiff to contact the Union. In the meantime, the next day, in regards to positive feedback Plaintiff had received from veterans dialing in to the Call Center, Adams sent Plaintiff an email stating "How much cash are you paying the vets so I can jump on the band wagon lol."

On May 10, 2011, Plaintiff met with a Union representative regarding her treatment in the Call Center.

On May 12, 2011, Plaintiff met with Marlene Carvajal, the Equal Employment Opportunity ("EEO") Manager for the VA, and filed a written Report of Contact regarding Gill's alleged fraud on the VA, poor performance as a supervisor, and discrimination and harassment against Plaintiff based on gender. Plaintiff concedes that the internal complaint did not reference any instances of alleged racial discrimination or reference the sexual harassment by Robert Earnest. The

next day, Elizabeth McDonald temporarily detailed Gill out of the Call Center pending the results of an Administrative Investigation Board ("AIB") inquiry into Plaintiff's claims regarding Gill's performance. Brenda Moore was appointed as the acting supervisor of the Call Center during Gill's absence. On June 8, 2011, Plaintiff testified in front of the AIB regarding her accusations against Gill. Moore, McDevitt, and Adams also testified. The following day, Plaintiff approached Moore regarding the noise level in the Call Center and its impact on Plaintiff's breathing. Moore did nothing.

**\*3** On June 20, 2011, Moore received a complaint from a patient advocate regarding a phone call the advocate's patient had with Plaintiff. Plaintiff interrupted the patient multiple times during the call and responded to the patient's question in an angry manner. That same day, during another call with a patient, Plaintiff interrupted the patient while the patient was speaking.

On June 22, 2011, Plaintiff approached Adams regarding the noise level in the Call Center. Adams told three employees in nearby cubicles that Plaintiff had complained about the noise level of their voices. The next day, Plaintiff asked Adams for clarity regarding a new Call Center rule and Adams responded using "Ebonics."[3] Adams once again spoke to Plaintiff using "Ebonics" on July 12, 2011. Plaintiff felt that this constituted racial discrimination and harassment.

On July 20, 2011, Plaintiff sought treatment at work for stress, heart palpitations, tingling in her upper arms, and shortness of breath. Plaintiff indicated that her symptoms were the result of the noise level in the Call Center.

Gill returned as supervisor of the Call Center on August 2, 2011. Several days later, at a team meeting, Plaintiff felt hostility between herself and Gill. The next day, McDevitt submitted a report to Gill of insubordination by Plaintiff based on Plaintiff's refusal to read McDevitt's emails. Also on August 3, 2011, Plaintiff sought treatment at work for stress, heart palpitations, tingling in her upper arms, and difficulty breathing. Plaintiff indicated that her symptoms were the result of "perceived threats" from her supervisor of potential punitive action during the August 2 team meeting.

On August 16, 2011, Plaintiff contacted an EEO Counselor and filed a Complaint of Employment Discrimination with the Office of Resolution Management.

2016 WL 29622, 2016 A.D. Cases 263

On August 20, 2011, Plaintiff told a veteran on the phone that she was not going to continue to speak to him because the phone call had already lasted for nine minutes and 26 seconds.

On August 24, 2011, McDonald recommended to Sheri Lacro that Plaintiff's employment be terminated. McDonald's recommendation was based on input from Gill and Moore. In an email to Lacro, McDonald indicated that she was recommending termination based on Plaintiff's "loafing," "willful idleness," and wasting time, as well as poor customer service. McDonald attached a call log indicating that from July 1, 2011 to August 18, 2011, Plaintiff was logged into the system to take calls for less than 6 hours per day for 76% of the days. McDonald noted that on June 30, 2011, Brenda Moore had addressed the issue of being logged out for too long with Plaintiff, and on August 5, 2011, Gill advised everyone in the Call Center during a team meeting that they need to be logged in for at least 6.5 hours per day. McDonald stated that after this meeting, Plaintiff continued to be logged in for less than 6 hours on 5 out of 9 days. McDonald also noted in the email that Plaintiff refused to read emails from the Team Leads, made personal calls and surfed the internet on facility time, and took unauthorized breaks. McDonald also detailed the allegations of Plaintiff's poor customer service.

**\*4** On September 12, 2011, Plaintiff faxed a written request for a reasonable accommodation for her anxiety and panic attacks to Carvajal, who acted as Chair of the VA's Reasonable Accommodation Committee. The next day, Plaintiff authorized the release of her medical records. Carvajal advised Plaintiff that she would need a doctor's note to support her request. Plaintiff provided two notes from her primary care physician. Carvajal received the second note on September 23, 2011.

On September 26, 2011, Linette Baker, the Acting Chief of Human Resources Management Service, issued a letter of termination to Plaintiff. The stated reasons for the termination included poor customer service, wasting time, and failure to follow instructions, including failure to read emails when instructed to do so.[4]

Plaintiff filed this lawsuit on June 2, 2014, alleging sexual and racial harassment; discrimination based on gender, race, and disability; retaliation; and failure to accommodate her disability.[5]

**Motion for Summary Judgment**

Defendant moves for summary judgment as to all of Plaintiff's claims. Defendant argues that certain claims should be dismissed based on Plaintiff's failure to comply with the pre-filing administrative exhaustion requirement. With respect to Plaintiff's exhausted claims, Defendant argues that Plaintiff fails to establish a prima facie case of discrimination and her remaining claims fail as a matter of law. In response, Plaintiff has submitted over 1400 pages of legal briefs and exhibits in support of her claims.[6]

*1. Legal Standard*

**\*5** "A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of establishing the basis of its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it could affect the outcome of the suit under applicable law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Id. at 248.

The party opposing summary judgment cannot " 'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.' " Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir.), cert. denied, 555 U.S. 827 (2008) (quoting Fed. R. Civ. P. 56(e)). However, as the Ninth Circuit recently reminded district courts, "it should not take much for plaintiff in a discrimination case to overcome a summary judgment motion." Nigro v. Sears, Roebuck & Co., 784 F.3d 495, 499 (9th Cir. 2015) (citations and internal quotation omitted); see also Schechner v. KPIX-TV, 686 F.3d 1018, 1022 (9th Cir. 2012) ("As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment.").

In cases where a party is self-represented, courts apply the general summary judgment standard, but construe the *pro se* litigant's pleadings liberally in his or her favor. *See Eldridge v. Block*, 832 F.2d 1132, 1137 (9th Cir. 1987) ("The Supreme Court has instructed federal courts to liberally construe the 'inartful pleading' of *pro se* litigants.") (citations omitted).

### 2. Defendant's Motion to Strike

As an initial matter, Defendant moves to strike certain exhibits submitted by Plaintiff in support of her response to Defendant's motion. *See* Doc. No. 87. Plaintiff opposes the motion to strike. *See* Doc. No. 96.

First, Defendant moves to strike the exhibits Plaintiff filed on October 22, 2015, Doc. No. 77, pp. 273 to end, on the grounds that Plaintiff filed a second set of exhibits on October 28, 2015, Doc. Nos. 83 and 83-1. Based on Plaintiff's *pro se* status, the Court **DENIES** Defendant's motion to strike this evidence from the record.

Second, Defendant requests that the Court disregard the handwritten comments on Plaintiff's Exhibits 11, 18, 26, 28, 31, 42, 43, 44, 62, 71, 73, 75, 108, 117, 132, 134 and 138.[7] Defendant argues that Plaintiff has not authenticated the handwritten comments, nor provided a proper foundation for their admission into evidence. In response to Defendant's motion to strike, Plaintiff has submitted documentation which she argues authenticates the handwritten comments. It appears that in certain instances the handwritten interlineation was prepared by Plaintiff for submission as supplemental and/or rebuttal argument to the EEO Investigator who handled her complaint. In any event, the notes contain commentary on the substance of the exhibits' contents. Plaintiff's handwritten notes, even if properly authenticated as her own, constitute argument and are not admissible as evidence. As such, the Court **GRANTS** Defendant's motion on this ground and has disregarded the handwritten comments on Plaintiff's exhibits.

**\*6** Finally, Defendant moves to strike Plaintiff's Exhibit 17 in its entirety and the first page of Plaintiff's Exhibit 134 based on lack of foundation. These exhibits purport to be excerpts from deposition transcripts. Defendant notes that the cover pages, witness signature pages, and transcriber's signature pages are missing from both exhibits. A party seeking to introduce a deposition transcript excerpt on summary judgment must attach the court reporter's certification that the deposition is a true and correct copy of the deponent's testimony, as the court reporter who transcribed the testimony

has the requisite personal knowledge of the transcript's accuracy. *Orr v. Bank of Amer.*, 285 F.3d 764, 774 (9th Cir. 2002) (citations omitted). Without this certificate, a deposition transcript is inadmissible for purposes of summary judgment and will not be considered. See Fed. R. Civ. P. 56(c)(4); *United States v. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970) (writings are not admissible under motion for summary judgment without proper foundation). In response to Defendant's motion to strike, Plaintiff has provided certain cover pages and transcriber's signature pages. To the extent Plaintiff's submission remedies the deficiencies identified by Defendant in his motion to strike, the Court finds the motion moot. Any deposition transcript excerpts offered by Plaintiff that are not properly authenticated are inadmissible for purposes of summary judgment and will not be considered.

### 3. Plaintiff's Title VII Claims

Plaintiff claims she was discriminated against and harassed on the basis of race, sex, and gender. Title VII prohibits consideration of "race, color, religion, sex, or national origin in employment practices," thereby establishing protected classes. 42 U.S.C. § 2000e-2(m). Plaintiff is an African-American woman, thus she belongs to two protected classes based on her race and gender. Title VII is the exclusive remedy for claims of employment discrimination by federal employees. *See Brown v. General Servs. Admin.*, 425 U.S. 820, 829-35 (1976); *Taylor v. Geithner*, 703 F.3d 328, 333 (9th Cir. 2013).

#### a) Administrative Exhaustion

Defendant argues that to the extent Plaintiff's Title VII claims arise out of events occurring prior to July 1, 2011, 45 days prior to Plaintiff's first contact with an EEO counselor on August 16, 2011, the claims are subject to dismissal for failure to comply with the pre-filing administrative exhaustion requirement.

Before bringing a Title VII claim in federal court, a federal employee must first exhaust his or her administrative remedies. *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099 (9th Cir. 2002). The employee must initiate contact with an EEO counselor within forty-five days of the date of the alleged discrimination or adverse action. *See* 29 C.F.R. § 1614.105(a)(1) ("An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."); *Sommatino v. United States*, 255 F.3d 704, 707-708 (9th Cir.

2001). For purposes of Title VII, a claim "accrues upon awareness of the actual injury, i.e., the adverse employment action, and not when the plaintiff suspects a legal wrong." *Lukovsky v. City & County of San Francisco*, 535 F.3d 1044, 1049 (9th Cir. 2008).

Defendant has submitted uncontroverted evidence that Plaintiff's first contact with an EEO counselor occurred on August 16, 2011. *See* Def. Ex. J. However, it is also undisputed that Plaintiff met with Marlene Carvajal, the EEO Manager for the VA, on May 12, 2011. *See* Def. Ex. F. The Ninth Circuit has interpreted the initiation of contact provision to include reporting to not only individuals with the specific job title of Counselor, but also "contact with agency officials with EEO counseling responsibilities or a connection to the counseling process." *Kraus v. Presidio Trust Facilities Div.*, 572 F.3d 1039, 1044 (9th Cir. 2009). Plaintiff's meeting with Carvajal and submission of a written Report of Contact as an internal complaint qualify under this standard as the type of contact required under the applicable regulation. *Id.* at 1045 (noting that "it makes good sense to interpret 'contact with a Counselor' pragmatically, to include contact with agency officials with EEO counseling responsibilities or a connection to the counseling process").

**\*7** To the extent Plaintiff's Title VII claims arise out of events occurring prior to March 28, 2011, 45 days prior to her first contact with Marlene Carvajal, the claims are unexhausted. *Lyons v. England*, 307 F.3d 1092, 1105 (9th Cir. 2002) (failure to comply with the 45 day requirement is "fatal to a federal employee's discrimination claim"). Furthermore, Plaintiff's May 12, 2011 written Report of Contact submitted to Carvajal – despite being quite detailed – does not include a complaint of racial or sexual discrimination or harassment. Thus, to the extent Plaintiff's racial and sexual discrimination and harassment claims are based on events occurring prior to July 1, 2011, 45 days prior to her first contact with Carvajal regarding such allegations, the claims are unexhausted.

In her sur-reply, Plaintiff argues that she was unaware of the requirement that she initiate contact with an EEO counselor within 45 days of an alleged discriminatory event or adverse employment action. "The exhaustion requirement is akin to a statute of limitations and is subject to waiver, equitable estoppel, and equitable tolling." *Leong v. Potter*, 347 F.3d 1117, 1122-1123 (9th Cir. 2003) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982); *Boyd v. U.S. Postal Serv.*, 752 F.2d 410, 414 (9th Cir. 1985)). The Court construes Plaintiff's argument as a request for equitable

tolling, and finds it to be without merit. Plaintiff has submitted evidence in opposition to Defendant's motion for summary judgment which demonstrates that she knew of the 45 day requirement at least as early as May 12, 2011, when she submitted her internal complaint to Carvajal. *See* Doc. No. 77 at 289. Plaintiff's signature appears at the bottom of the internal complaint form, immediately below the following admonition:

> If you feel that you have been discriminated against & wish to file an EEO complaint, you must contact an ORM Counselor within 45-calendar days of the alleged incident in order to preserve your EEO rights.

*Id.* Equitable tolling is not appropriate in this case, as Plaintiff had actual notice of the 45 day filing period. *Leorna v. United States Dep't of State*, 105 F.3d 548, 551 (9th Cir. 1997).

**b) Exhausted Harassment and Discrimination Claims**
Plaintiff alleges discrimination and harassment on the basis of race and gender. Defendant argues that Plaintiff cannot establish a prima facie case of discrimination. Defendant further asserts that the alleged discriminatory acts do not give rise to an actionable harassment claim.

To establish a prima facie case for her hostile work environment claim under Title VII, Plaintiff must raise a genuine dispute of fact as to whether (1) she was "subjected to verbal or physical conduct" because of her race or gender; (2) "the conduct was unwelcome"; and (3) "the conduct was sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive work environment." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations and internal quotation marks omitted).

Discrimination in the form of disparate treatment occurs when, predicated upon a particular trait, an employee receives treatment less favorable than other employees. *Wood v. City of San Diego*, 678 F.3d 1075, 1081 (9th Cir. 2012). In pertinent part, Title VII's disparate treatment provision provides: "[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." *42 U.S.C. § 2000e-2(m)*. A plaintiff establishes a prima facie claim for disparate

treatment by showing that: "(1) they belonged to a protected class; (2) they were qualified for their jobs; (3) they were subjected to an adverse employment action; and (4) similarly situated employees not in their protected class received more favorable treatment." *Moran v. Selig*, 447 F.3d 748, 753 (9th Cir. 2006); *see also* *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision. Although the burden of production shifts to the defendant at this point, the burden of proof remains with the plaintiff at all times. If the employer offers a nondiscriminatory reason, the burden returns to the plaintiff to show that the articulated reason is a pretext for discrimination." *Leong*, 347 F.3d at 1124 (internal citations omitted).

**\*8** Plaintiff's only exhausted allegation of racial discrimination or harassment involves April Adams, an African-American, speaking to Plaintiff using "Ebonics" on July 12, 2011.[8] This event constitutes neither discrimination nor harassment. Plaintiff did not suffer an adverse employment action as a result of this exchange, and a single incident can only support a hostile work environment claim when that incident is "extremely severe." *Brooks v. City of San Mateo*, 229 F.3d 917, 926 (9th Cir. 2000). Adams' exchange with Plaintiff simply does not suffice to establish racial harassment. *See, e.g.*, *Manatt*, 339 F.3d at 798 (holding that racial jokes, ridicule of plaintiff's accent, and act of pulling eyes back to imitate or mock the appearance of Asians were insufficient to create a hostile work environment); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 643 (9th Cir. 2003) (finding no hostile environment discrimination where the employee was told that he had "a typical Hispanic macho attitude," that he should work in the field because "Hispanics do good in the field." and where he was yelled at in front of others); *see also* *Jordan v. Clark*, 847 F.2d 1368, 1374-75 (9th Cir. 1988) (finding no hostile work environment where "off-color" jokes were told in workplace).

Plaintiff's only exhausted allegation of gender discrimination or harassment involves the purportedly sexist statements made by Allison Gill during Plaintiff's May 2011 interview for a Team Lead position in the Call Center, including Gill's "endless praise" of Adam Doyle, and Gill's subsequent failure to select Plaintiff for one of the two available positions.[9]

Title VII is not a "general civility code" and does not render actionable " 'the ordinary tribulations of the workplace,

such as the sporadic use of abusive language, gender-related jokes, and occasional teasing' ... conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (internal citations omitted). Gill's statements during Plaintiff's interview for a Team Lead position do not amount to gender harassment under the standards set forth by the Supreme Court. To the extent Gill made laudatory statements regarding Adam Doyle during Plaintiff's interview, or otherwise behaved inappropriately towards Doyle in front of Plaintiff during the time period in question, statements or conduct that create "a sexually charged environment" are insufficient to support a hostile work environment claim. *Candelore v. Clark County Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir. 1992) ("A co-worker's romantic involvement with a supervisor does not by itself create a hostile work environment.").

Nor does this incident establish gender discrimination against Plaintiff. Even assuming Plaintiff has established the first three requirements of a discrimination claim based on Gill's disparate treatment, she fails to establish the fourth. With respect to Gill's decision not to select Plaintiff for a Team Lead position, the two individuals selected were April Adams, an African-American female and therefore a member of Plaintiff's protected classes, and Aaron McDevitt, a Caucasian male who had been working at the VA for a longer period of time than Plaintiff.[10] Furthermore, Gill's statements during the interview "endlessly praising another applicant (Adam Doyle)" do not establish gender discrimination against Plaintiff, nor do they establish disparate treatment, as Doyle was not hired for either of the Team Lead positions. *Ackel v. Nat'l Communs., Inc.*, 339 F.3d 376, 382 (5th Cir. 2003) ("[w]hen an employer discriminates in favor of a paramour, such an action is not sex-based discrimination, as the favoritism, while unfair, disadvantages both sexes alike for reasons other than gender.").

**\*9** With respect to the ultimate termination of Plaintiff's employment, Plaintiff fails to produce evidence that any other VA employee, facing similar allegations of poor performance and misconduct, not in her protected class, received more favorable treatment than she. Even if Plaintiff could establish a prima facie case of gender discrimination, Defendant has offered sufficient evidence of a legitimate, nondiscriminatory reason for the decision to terminate Plaintiff's employment, and Plaintiff does not raise a genuine issue as to pretext. In cases based on circumstantial evidence of discrimination, such as this one, a plaintiff's evidence of pretext "must be specific and substantial to defeat the employer's motion

for summary judgment." *EEOC v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009). Plaintiff produces no actual evidence, circumstantial or otherwise, that she was fired based on her gender. She offers only speculation. "[A] plaintiff's belief that a defendant acted from unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive." *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1028 (9th Cir. 2001).

Accordingly, the Court **GRANTS** Defendant's motion for summary judgment as to Plaintiff's race-and gender-based discrimination and harassment claims.

### c) Retaliation Claim

Plaintiff alleges that she was fired in retaliation for engaging in protected activity, to wit, submitting an internal EEO complaint on May 12, 2011; continuing to follow up on her allegations of discrimination while still employed at the VA in the Call Center; and contacting an EEO counselor on August 16, 2011. Defendant argues that Plaintiff's retaliation claim fails because her May 12, 2011 complaint was not a protected activity and she cannot establish that her supervisors had knowledge of her August 16, 2011 contact with an EEO counselor.

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.' " *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3). In this case, Plaintiff has not proffered admissible "direct evidence" of retaliation, i.e., "evidence which, if believed, proves the fact" of retaliatory motive "without inference or presumption." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2004). Accordingly, Plaintiff's retaliation claim is governed by the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To support a prima facie claim of retaliation, Plaintiff must show "that (1) [s]he engaged in a protected activity; (2) [her] employer subjected [her] to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000).

Here, Plaintiff has sufficiently demonstrated that she engaged in a protected activity by filing an internal complaint against

Gill on May 12, 2011.[11] *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002) (citing *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 65 (2d Cir. 1992) (finding internal complaint to company management was protected under Title VII, noting that "Congress sought to protect a wide range of activity in addition to the filing of a formal complaint") (internal quotation marks omitted)); *see also Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994) ("We have held that when an employee protests the actions of a supervisor such opposition is a 'protected activity.' "). Plaintiff has produced evidence sufficient to create a question of fact as to whether her supervisors were aware that she was continuing to pursue her complaint of discrimination through September 2011. *See* Doc. No. 83-1 at 285.

**\*10** There is also no dispute that Plaintiff suffered an adverse employment action after filing her May 12, 2011 internal complaint against Gill – her employment was terminated on September 26, 2011. However, as the Ninth Circuit has held, a months-long "lapse between protected activity and an adverse employment action is simply too long, by itself, to give rise to an inference of causation." *Villiarimo*, 281 F.3d at 1065 (citing *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 398-99 (7th Cir. 1999) (four months too long); *Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998) (eight months), cert. denied, 528 U.S. 988 (1999); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) (five months); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (four months)). Here, Plaintiff's initial engagement in a protected activity occurred in May 2011. Her employment was not terminated until the end of September 2011, more than four months later. Even if this period of time was sufficient to infer causation, "timing alone," when "accompanied by evidence" of a plaintiff's poor work performance or behavior problems, and "coupled with a complete lack of evidence of retaliatory intent, is neither specific nor substantial circumstantial evidence." *Davenport v. Bd. of Trs. of the State Ctr. Cmty. College Dist.*, 654 F. Supp. 2d 1073, 1102 (E.D. Cal. 2009).

As direct evidence of retaliation, Plaintiff proffers her own testimony regarding statements made by Elizabeth McDonald in November 2011 subsequent to the termination of Plaintiff's employment. Plaintiff testified during her deposition that McDonald told her "[a]nybody that files any kind of EEO complaint, as you did, is a problem employee" "to be gotten rid of." *See, e.g.*, Doc. No. 58-3 at 32. According to Plaintiff, McDonald also told her "[i]f you promise to not sue us,

Case: 24-1439    Document: 19-1    Filed: 08/28/2024    Page: 167

Matthews v. McDonald, Not Reported in Fed. Supp. (2016)

2016 WL 29622, 2016 A.D. Cases 263

we will agree to change your termination status to your having resigned." *See* Doc. No. 77 at 60. Importantly, Plaintiff asserts that McDonald made these statements during a post-termination mediation meeting. As such, the statements are inadmissible to prove Defendant's liability for retaliation. Federal Rule of Evidence 408 prohibits any party from offering, for certain purposes, evidence of offers to settle or "conduct or statements made in compromise negotiations regarding the claim." Fed. R. Evid. 408(a). Here, Rule 408 prohibits Plaintiff from introducing McDonald's statements to defeat summary judgment. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1291 (9th Cir. 2000).

Even assuming Plaintiff has established a prima facie case of retaliation, Defendant provides substantial evidence of Plaintiff's poor customer service and conduct issues, while Plaintiff fails to demonstrate pretext. The evidence demonstrates that Plaintiff complained about Gill's misconduct and gender discrimination, and Plaintiff was *not* retaliated against. Rather, Gill was immediately removed from her supervisory position in the Call Center while AIB conducted the requisite investigation into Gill's conduct. Plaintiff continued in her position as an MSA in the Call Center under the supervision of Brenda Moore, where she remained for almost two more months after Gill's reinstatement.

Plaintiff submits satisfactory performance reviews with respect to individual telephone calls that she received during the period of time in question to establish that the VA's stated reasons for terminating her employment were pretextual. However, this evidence does not demonstrate retaliatory intent on the part of her supervisors at the VA. If anything, the satisfactory performance reviews indicate that Gill continued to review Plaintiff on the proper basis of the work she actually performed despite any knowledge of Plaintiff's engagement in protected activity.

Accordingly, the Court **GRANTS** Defendant's motion for summary judgment as to Plaintiff's retaliation claim.

### 5. Plaintiff's Rehabilitation Act Claim

 **\*11**  Plaintiff alleges that Defendant discriminated against her based on her disability, anxiety and panic attacks, and failed to reasonably accommodate her disability, in violation of Section 501 of the Rehabilitation Act, 29 U.S.C. § 791. Defendant argues that Plaintiff is not disabled within the meaning of the Rehabilitation Act.

To state a prima facie claim of disability discrimination, Plaintiff must "demonstrate that (1) she is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered discrimination because of her disability." *Walton v. United States Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007). Both disparate treatment of a disabled person and refusal to make a reasonable accommodation for a disabled person are actionable. *See Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002). A plaintiff need only demonstrate that her disability was a "motivating factor" behind the discrimination. *See* 29 U.S.C. § 791(g) (adopting ADA standards for claims under § 501 of the Rehabilitation Act); *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1065 (9th Cir. 2005) (holding that "a motivating factor standard is the appropriate standard for causation in the ADA context").

The ADA standards incorporated into section 501 define a disability as a "physical or mental impairment that substantially limits one or more major life activities," or a "record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C); *Walton*, 492 F.3d at 1005 (applying ADA standard to Rehabilitation Act claim). Plaintiff maintains that she is disabled due to anxiety and panic attacks, as substantiated by her primary healthcare provider, her request for a reasonable accommodation, her release of medical records, and her incident reports while employed in the Call Center regarding the noise level. As additional evidence of her disability, Plaintiff has submitted a declaration from Reina Remy, a VA-contracted licensed social worker, who began providing Plaintiff with counseling on September 30, 2015 after Plaintiff suffered a panic attack in August 2015. *See* Doc. No. 83-1 at 29-31. According to Remy, Plaintiff "meets criteria for a DSM 5 diagnosis of Other Trauma and Stressor Related Disorder with Adjustment-like Disorder with prolonged duration, but without prolonged stressor." *Id.* at 30. Remy also states that Plaintiff "self-reports this was brought about while she worked at the VASDHS, and has continued since her September 2011 termination from VASDHS." *Id.* Based on the fact that Remy did not start treating Plaintiff until four years after the termination of her employment at the VA, Remy's declaration does little to substantiate Plaintiff's claim of disability based on panic attacks and anxiety at the time of the events at issue in this action.

Even assuming that Plaintiff is disabled, Plaintiff's Rehabilitation Act claim fails. There is no identifiable evidence in the record to support a claim of discrimination based on Plaintiff's anxiety and panic attacks. The individual

Case: 24-1439   Document: 19-1   Filed: 08/28/2024   Page: 168

tasked with processing Plaintiff's September 12, 2011 request for a reasonable accommodation was not involved with the recommendation or decision to fire Plaintiff. To the extent Plaintiff made earlier, informal requests for a reduced noise level in the Call Center as an accommodation for her anxiety, Plaintiff herself has submitted evidence that steps were being taken to reduce the noise level in the Call Center. A July 20, 2011 VA Incident Report noted that the Call Center had requested a build-out of workstations to reduce noise levels. *See* Doc. No. 83 at 167. And in an August 30, 2011 email to Plaintiff, Gill set forth the steps she was taking to try and reduce the noise level in the Call Center, including "requisitioning an entire office re-model for new workstations 7 months ago," speaking "to each employee individually about the noise level," and addressing "the issue with everyone during our staff meeting." *See* Doc. No. 77 at 322.

**\*12** Plaintiff did not submit a formal written request for a reasonable accommodation until September 12, 2011, at which point Gill and McDonald had already recommended that Plaintiff's employment at the VA be terminated. Nonetheless, Plaintiff's request was processed by Marlene Carvajal. Carvajal requested and gathered the necessary information regarding Plaintiff's medical condition, and scheduled a meeting of the VA's reasonable accommodation committee. Plaintiff's request for a reasonable accommodation was never refused. Rather, Plaintiff's employment was officially terminated before the request could be brought before the committee for consideration. Plaintiff has failed to raise a triable dispute as to whether she was denied a reasonable accommodation.

Accordingly, the Court **GRANTS** Defendant's motion for summary judgment as to Plaintiff's Rehabilitation Act claim.

### 6. Plaintiff's ADA Claim
Plaintiff alleges a claim under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* The Rehabilitation Act is the sole means to remedy disability discrimination by a federal employer. *See* 42 U.S.C. § 12111(5)(B)(i) (declaring that the federal government is not an "employer" for purposes of the ADA); *Newland v. Dalton*, 81 F.3d 904, 906 (9th Cir. 1996) (noting that Section 501 incorporates ADA standards); *Johnston v. Horne*, 875 F.2d 1415, 1420-21 (9th Cir. 1989) (concluding that Section 504 of Rehabilitation Act provides no cause of action against a federal employer). As such, the Court **GRANTS** Defendant's motion for summary judgment

as to Plaintiff's ADA claim because the ADA does not apply to federal employers.

### 7. Plaintiff's Additional Claims
Plaintiff also alleges claims for intentional infliction of emotional distress, negligent infliction of emotional distress, violation of California's Fair Employment and Housing Act ("FEHA"), violations of the Civil Rights Act, 42 U.S.C. §§ 1981 and 1983, and violation of her Fourteenth Amendment rights. These claims are subject to dismissal on multiple grounds.

When the factual predicate of a federal employee's additional claims is the same as that behind the employee's Title VII claim, only the Title VII remedy is available. *Nolan v. Cleland*, 686 F.2d 806, 815 (9th Cir. 1982) (affirming dismissal of a federal employee's due process claim where it arose from same factual predicate as her Title VII wrongful termination claim). Plaintiff's additional claims are based upon the allegedly discriminatory and harassing employment actions by VA employees, and therefore are factually indistinguishable from her Title VII claims. *See Williams v. Gen. Servs. Admin.*, 905 F.2d 308, 311 (9th Cir. 1990) (holding that, due to its comprehensive scope, Title VII preempts other claims such as tort and constitutional claims that seek to redress wrongs predicated on discriminatory employment actions); *White v. Gen. Servs. Admin.*, 652 F.2d 913, 917 (9th Cir. 1981) (holding that Title VII is the sole remedy for a race discrimination claim by a federal employee).

With respect to Plaintiff's tort claims, the FTCA is the exclusive remedy for filing a civil action based on the tortious actions of a federal agency or officer. *See* 28 U.S.C. § 2679; *Jerves v. United States*, 966 F.2d 517, 518 (9th Cir. 1992) ("The [FTCA] vests the federal district courts with exclusive jurisdiction over suits arising from the negligence of Government employees."). The FTCA "provides that the United States is the sole party which may be sued for personal injuries arising out of the torts of its employees." *Allen v. Veterans Admin.*, 749 F.2d 1386, 1388 (9th Cir. 1984) (citing 28 U.S.C. §§ 1346(b), 2679(a)). Plaintiff's tort claims are subject to dismissal for failure to name the United States as the proper defendant as required by the FTCA. Furthermore, the plaintiff in an action seeking relief under the FTCA bears the burden of showing that he or she complied with the FTCA's administrative claim requirement. *See Bruce v. United States*, 621 F.2d 914, 918 (8th Cir. 1980). Here, there is nothing in the

Case: 24-1439   Document: 19-1   Filed: 08/28/2024   Page: 169

Matthews v. McDonald, Not Reported in Fed. Supp. (2016)

2016 WL 29622, 2016 A.D. Cases 263

record to suggest that Plaintiff exhausted her administrative remedies under the FTCA prior to filing this lawsuit.

**\*13** Plaintiff's Fourteenth Amendment claim is barred by the doctrine of sovereign immunity in so far as she seeks damages. A suit for damages against federal officers or employees in their official capacity is essentially a suit against the United States and is barred by sovereign immunity absent statutory consent. *Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985). The United States has not waived its sovereign immunity for actions seeking damages for constitutional violations. *See Holloman v. Watt*, 708 F.2d 1399, 1401-02 (9th Cir. 1983) (rejecting claimant's argument that sovereign immunity did not apply to his due process claim for damages when the federal defendants were being sued in their official capacity only).

Finally, Plaintiff's Section 1983 claim fails because "by its very terms, § 1983 precludes liability in federal government actors." *Morse v. N. Coast Opportunities, Inc.*, 118 F.3d 1338, 1343 (9th Cir. 1997) (finding the plaintiff's complaint "invalid on its face in its reliance upon § 1983 as a cause of action against alleged federal government actors"); *see also Ibrahim v. Dept. of Homeland Security*, 538 F.3d 1250, 1257 (9th Cir.

2008) (recognizing "the long-standing principle that federal officials can only be liable under section 1983 where there is a 'sufficiently close nexus between the State and the challenged action of the [federal actors] so that the action of the latter may be fairly treated as that of the State itself.' ").

Accordingly, the Court **GRANTS** Defendant's motion for summary judgment and dismisses Plaintiff's additional state law, constitutional, and civil rights claims.

## Conclusion

Based on the foregoing, the Court **GRANTS** Defendant's motion for summary judgment in its entirety. The Clerk of Court is instructed to enter judgment accordingly, terminate all pending deadlines and hearings, and close the case.

**IT IS SO ORDERED**.

## All Citations

Not Reported in Fed. Supp., 2016 WL 29622, 2016 A.D. Cases 263

Footnotes

1   Plaintiff moves for leave to file a sur-reply, which Defendant opposes. *See* Doc. Nos. 100, 101, 103. Because Plaintiff is proceeding *pro se*, the Court **GRANTS** Plaintiff's motion and considers her sur-reply and attached supporting exhibits. Plaintiff appears to allege a new cause of action in her sur-reply brought pursuant to the Whistleblower Act of 1989, 5 U.S.C. § 2302. *See* Doc. No. 100 at 8. Since a defendant must have "fair notice" of a plaintiff's claims and grounds for relief, Plaintiff cannot raise new causes of action or grounds for relief in opposition to Defendant's motion for summary judgment. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006).

2   This section provides a summary of the material facts of this case; it is not an exhaustive recitation of every factual allegation set forth by Plaintiff. The material facts are taken from Defendant's separate statement of undisputed facts and Plaintiff's response thereto, together with pertinent exhibits and relevant deposition testimony. Where a material fact is in dispute, it will be noted.

3   "Ebonics' is also known as 'African American Vernacular English.' " *Washington v. McDonald*, 2009 U.S. Dist. LEXIS 59607, at \*38, 2009 WL 2043058 (E.D. Cal. July 10, 2009) (citing Webster's II New College Dict. (2001) p. 356, col. 1.)

4   Plaintiff alleges that she did not receive the required written notice of termination pursuant to 5 C.F.R. 315.804. *See* Doc. No. 100 at 7. However, Baker's September 26, 2011 letter to Matthews constitutes the written notice required under the applicable federal regulation, and cites that regulation accordingly. *See Def. Ex. I*. The regulation requires a federal agency when terminating an individual's employment to notify him or her "in writing as to why he [or she] is being separated and the effective date of the action. The information in the notice as to why the employee is being terminated shall, as a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct." 5 C.F.R. 315.804. Baker's letter complies with this regulation.

5   In her amended complaint, Plaintiff sets forth thirty individual "counts" of discrimination, retaliation, and harassment based on her gender, race, and disability. *See* Doc. No. 27. The Court notes that while Federal Rule of Civil Procedure 10(b)

Case: 24-1439    Document: 19-1    Filed: 08/28/2024    Page: 170

Matthews v. McDonald, Not Reported in Fed. Supp. (2016)

2016 WL 29622, 2016 A.D. Cases 263

provides that "[e]ach claim founded upon a separate transaction or occurrence ... shall be stated in a separate count ...," this provision is addressed to separate factual claims rather than to separate legal grounds for relief. Here, Plaintiff's thirty separate "counts" are not each independent legal causes of action. Rather, Plaintiff's numerous factual allegations set forth grounds for a variety of causes of action under, *inter alia*, Title VII and the Rehabilitation Act.

6    The Court has reviewed and carefully considered the entirety of Plaintiff's submissions. However, regardless of Plaintiff's *pro se* status, the Court is not obligated to " 'scour the record in search of a genuine issue of triable fact.' " *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citation omitted). To the extent Plaintiff's legal briefs fail to cite to specific exhibits or other materials in the record, the Court is not required to search the entire record for evidence establishing a genuine issue of material fact. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028-29 (9th Cir. 2001); *Keenan, 91 F.3d at 1278-79* (noting that opposing papers, due to size and poor citation, "obfuscate[d] rather than promote[d] an understanding of the facts," and declining to scour papers or the rest of the record to determine if genuine issue of material fact existed). Furthermore, "[a] party may not prevail in opposing a motion for summary judgment by simply overwhelming the district court with a miscellany of unorganized documentation." *Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 883 (9th Cir. 1982).

7    The Court notes that handwritten interlineations appear on many other of Plaintiff's submitted exhibits.

8    As discussed *supra*, Plaintiff did not administratively exhaust her claims of racial discrimination and harassment as to Allison Gill. Even if those claims were properly before the Court, Plaintiff's allegations are not borne out by the evidence. For example, Plaintiff submits letters and deposition testimony from Donna Camp and Anita Mitchell, both of whom Gill supervised in the Call Center. *See* Doc. No. 83-1 at 37-41; Doc. No. 100 at 106-262. However, these individuals' statements and testimony do not establish that Gill racially discriminated against or harassed Plaintiff. Mitchell refused to testify during her deposition that Gill was racist, while Camp testified that Gill did not like her because Camp did not "suck up" to Gill. *See* Doc. No. 100 at 158, 233.

9    Plaintiff asserts that Gill referred to Plaintiff as a "man" on two occasions, *see* Doc. No. 58-3 at 43, including once in May 2011, *see* Doc. No. 77 at 244. However, Plaintiff makes no such allegation in her amended complaint, nor did she include this information in either her May 12, 2011 internal EEO complaint or her November 16, 2011 complaint of employment discrimination.

10   Plaintiff argues that McDevitt had "less experience," but provides no evidence to this effect and concedes that McDevitt had been working at the VA approximately one month longer than she.

11   Plaintiff's August 16, 2011 contact with an EEO counselor also constitutes protected activity under Title VII, however, there is no evidence in the record to suggest that McDonald or Gill was aware of Plaintiff's contact.

---

End of Document                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

738 Fed.Appx. 838
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Kedric **MITCHELL**, Plaintiff-Appellant,

v.

**UNITED STATES POSTAL**

**SERVICE**, et al., Defendants-Appellees.

No. 17-2349
|
Filed June 21, **2018**

**Synopsis**
**Background:** Former employee, acting pro se, brought
action against **United States Postal Service** (USPS), alleging
unlawful discrimination under Rehabilitation Act. The United
States District Court for the Eastern District of Michigan,
Laurie J. Michelson, J., 2017 WL 4405013, granted USPS's
motion for summary judgment. Employee appealed.

**Holdings:** The Court of Appeals, Damon J. Keith, Circuit
Judge, held that:

[1] employee failed to provide direct evidence of disability-
based discrimination;

[2] USPS offered legitimate, non-discriminatory reason for
placing employee on leave, and ultimately terminating him;
and

[3] USPS's reason for placing employee on leave, and
ultimately terminating him, was not mere pretext for
discrimination.

Affirmed.

West Headnotes (3)

[1]    **Civil Rights**   ⚖   Discrimination by reason of
       handicap, disability, or illness

       Former employee failed to provide direct
       evidence of disability-based discrimination
       in his action against **United States Postal
       Service** (USPS) under Rehabilitation Act,
       where USPS's request for response from
       employee's psychologist after receiving letter
       from employee's wife highlighting his mental
       instability and concluding that he should not be
       allowed back into USPS facility was legitimate,
       nondiscriminatory action to address workplace
       safety concern, and notes later submitted by
       employee's psychologist and rejected by USPS
       did not address issues raised in wife's letter.
       Rehabilitation Act of 1973 § 504, 29 U.S.C.A. §
       794(a).

       5 Cases that cite this headnote

[2]    **Civil Rights**   ⚖   Discrimination by reason of
       handicap, disability, or illness

       **United States Postal Service** (USPS) offered
       legitimate, non-discriminatory reason for placing
       employee on leave, and ultimately terminating
       him, thus shifting burden to employee to show
       that reason was mere pretext under *McDonnell
       Douglas*, in employee's Rehabilitation Act suit
       alleging disability-based discrimination, where
       USPS cited workplace safety concerns for its
       action, concerns that arose from letter USPS
       received from employee's wife, in which she
       stated that she was concerned employee could
       have physical or mental breakdown if he returned
       to work, that employee was mentally unstable
       at times, and that employee's doctors were not
       fully aware of his condition, and she asked that
       USPS place employee on leave until his Equal
       Employment Opportunity Commission (EEOC)
       case was resolved. Rehabilitation Act of 1973 §
       504, 29 U.S.C.A. § 794(a).

       9 Cases that cite this headnote

33 A.D. Cases 1757, 57 NDLR P 107

**[3]    Civil Rights** 🔑  Motive or intent; pretext

Reason given by **United States Postal Service** (USPS) for placing employee on leave, and ultimately terminating him, i.e., workplace safety concerns arising from letter USPS received from employee's wife, was not mere pretext for discrimination under *McDonnell Douglas* burden-shifting framework in employee's Rehabilitation Act suit alleging disability-based discrimination, where employee did not cite any record evidence to support his bare allegation that he suffered disparate treatment, and, even assuming that USPS received notes from employee's psychologist, those notes did not address issues raised in wife's letter, as USPS had reasonably requested. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a).

11 Cases that cite this headnote

**\*839**  ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

**Attorneys and Law Firms**

Herbert A. Sanders, Law Offices, Detroit, MI, for Plaintiff-Appellant

James Joseph Carty, United States Attorneys Office, Eastern District of Michigan, Detroit, MI, for Defendants-Appellees

BEFORE: KEITH, ROGERS, and BUSH, Circuit Judges.

**Opinion**

DAMON J. KEITH, Circuit Judge.

**\*840**  Appellant Kedric **Mitchell** filed a complaint claiming, pursuant to the Rehabilitation Act, that Appellees **United States Postal Service** and the Postmaster General unlawfully discriminated against him. Appellant appealed the district court's decision to grant Appellees' Motion for Summary Judgment on his discrimination claim. For the following reasons, we affirm the district court's decision.

## I. BACKGROUND

**1. Mitchell's Employment History and Roslyn Brown's Letter**

In 1997, Kedric **Mitchell** ("**Mitchell**") began working for the **United States Postal Service** ("USPS") as a full-time employee.[1] **Mitchell** had a history of taking unpaid leaves of absence from work due to his depression, including a leave for several months that began in 2007 and ended sometime in 2008. **Mitchell** subsequently took a second leave of less than a year that ended in January 2009, although **Mitchell** does not recall when it began. **Mitchell** began a third leave of absence in September 2009, and returned to work on August 3, 2010.

Upon his return to work, **Mitchell** presented a note written by his psychologist, Dr. Amy Trabitz, to his supervisor. The note read as follows: "As of [August 2, 2010], Mr. Kedric **Mitchell** is able to fully return to work with no restrictions. Please feel free to contact me should you have any further questions." Around the same time, however, USPS received a letter from **Mitchell's** wife, Roslyn Brown ("Brown"). This letter was originally sent on June 27, 2010, during **Mitchell's** leave of absence, but was returned and marked "return to sender," leading **Mitchell** himself to resend the letter around the time he resumed work. Brown's letter highlighted **Mitchell's** mental instability, and concluded that she did not think "he should be allowed back into [the USPS] facility." This letter was accompanied by a letter written by **Mitchell** himself, wherein **Mitchell** stated that he asked his wife to write her letter.

Brown's letter asserted, *inter alia*, the following allegations: (1) **Mitchell** suffered from stress and depression, and that Brown believed his mental condition rendered him mentally unstable at the time; (2) USPS should not allow a mentally unstable person to work in an "environment he[ ] deems hostile"; (3) **Mitchell** might "suffer a mental or physical breakdown if he return[ed] to work right now"; (4) USPS would assume responsibility for anything that happened to **Mitchell** should he be allowed to work; and, (5) doctors were not fully aware of recent developments in **Mitchell's** case, and how those developments were affecting his condition.

**2. Mitchell Placed on Leave Until the Concerns Raised in Brown's Letter Are Addressed**

On August 11, 2010, as a result of Brown's letter, USPS convened a threat assessment team comprised of USPS

Manager of Labor Relations Gail Lewis ("Lewis"),[2] Lee Ward—who was Lewis' manager at the time—and Dr. Nisha Parulekar, a doctor employed by USPS. The threat assessment team concluded that based on **\*841** the letter, they needed "medical documentation to substantiate that [**Mitchell**] could return to work without causing harm to [him]self or others."

Later that same day, **Mitchell** met with Lewis, Dr. Parulekar, Danyelle Riggins—who was the Manager of Distribution Operations at the USPS facility where **Mitchell** worked—and union officials to discuss the concerns presented in Brown's letter. **Mitchell** was informed that he would not be able to return to work until his doctor, Dr. Trabitz, addressed in writing the issues raised in Brown's letter. **Mitchell** was also told that in the alternative, he could sign a release that would allow Dr. Parulekar to contact Dr. Trabitz directly. **Mitchell** declined to sign the release and asked USPS officials to put their request in writing, but they refused. **Mitchell** left work on August 11, 2010, without providing the requested medical documentation.

In January 2011, USPS sent **Mitchell** a letter informing him that he had been absent from work since August 11, 2010. In this letter, USPS also requested medical documentation to substantiate his absence from work. **Mitchell** responded with his own letter shortly afterwards stating that USPS's demand for documentation was unfair. **Mitchell** also requested a written explanation for why Dr. Trabitz's August 2, 2010 note was not sufficient to allow him to return to work.

### 3. EEOC Judgment and Subsequent End of Employment with USPS

On December 23, 2010, **Mitchell** filed a formal Equal Employment Opportunity Commission ("EEOC") Complaint, asserting that USPS's rejection of his medical clearance and decision to prohibit him from returning to work until his doctor addressed the concerns raised in Brown's letter amounted to unlawful disability discrimination. He also argued that USPS's actions were retaliation for a previous EEOC Complaint that **Mitchell** had filed in February 2009.[3] The EEOC issued a judgment in favor of USPS on both claims on May 21, 2012.

USPS subsequently sent **Mitchell** a letter on May 31, 2013, because **Mitchell** had not returned to work from his August 2010 leave. The letter explained that USPS was proposing to issue a notice of separation as a result of his prolonged absence. The letter further asked **Mitchell** to participate in

an investigative interview on June 6, 2013, prior to a final decision on his separation.

On August 12, 2013, USPS sent **Mitchell** a notice of separation, informing him that he would be separated on September 13, 2013. The notice reflected that **Mitchell** had reported for the June 6, 2013 interview and was told he could return to work if he followed the instructions given to him in August 2010, namely, that he provide his doctor with a copy of Brown's letter and then provide documentation from his doctor stating there was no risk of **Mitchell** injuring himself or others. **Mitchell** failed to provide any documentation and was separated from employment, effective September 13, 2013.

### 4. Procedural Posture

On October 9, 2014, **Mitchell** filed a *pro se* complaint asserting claims against USPS for discrimination and retaliation under multiple statutes. Specifically, **Mitchell** claimed that USPS discriminated against him because of his depression, and retaliated against him after his wife filed **\*842** an EEOC grievance in 2006. USPS moved to partially dismiss the complaint, contending that **Mitchell** had failed to administratively exhaust claims related to his wife's EEOC activities. **Mitchell** then hired counsel and filed an amended complaint, along with a response to USPS's motion to dismiss.

**Mitchell's** amended complaint alleged claims of discrimination and retaliation pursuant to the Rehabilitation Act. The district court granted USPS's motion to dismiss with respect to any aspect of **Mitchell's** claim that was premised on his wife's EEOC activity. The court held that it was precluded, as a matter of law, from ruling on the claim because it was not exhausted during the administrative process.

On May 5, 2017, USPS moved for summary judgment, arguing that **Mitchell** failed to create a genuine dispute of material fact regarding whether USPS discriminated against him because of his disability. **Mitchell** filed a response opposing the motion, and the district court granted the motion in favor of USPS on October 4, 2017. The court held that **Mitchell** failed to provide direct evidence of unlawful discrimination, and also failed to identify evidence that would persuade a jury that USPS's proffered reasons for its actions were pretextual under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The district court also found for USPS on (1) **Mitchell's** retaliation claim because **Mitchell** did not address this claim in his response to USPS's

motion for summary judgment, and (2) Mitchell's purported claim for failure to provide a reasonable accommodation because the claim was not exhausted at the administrative level.

Mitchell timely filed a notice of appeal on November 2, 2017. Mitchell abandoned his retaliation claim on appeal, and did not raise a claim for wrongful termination in the district court. Accordingly, the only claim before us is whether USPS's decision to place Mitchell on leave in August 2010 amounted to unlawful discrimination under the Rehabilitation Act.

## II. DISCUSSION

### A. Standard of Review and Applicable Law

#### 1. Fed. R. Civ. P. 56(a)—Summary Judgment

We review a district court's grant of summary judgment de novo. *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016). Summary judgment is appropriate only where there is "no genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law. *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018) (quoting Fed. R. Civ. P. 56(a) ). "A genuine issue of material fact exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ). "In determining 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law,' this Court must view all of the evidence and draw all reasonable inferences in the light most favorable to the non-moving party." *Id.* (quoting *Anderson*, 477 U.S. at 251-52, 106 S.Ct. 2505).

#### 2. Discrimination Under the Rehabilitation Act

Mitchell brought his claims against USPS pursuant to the Rehabilitation Act. The Rehabilitation Act "constitutes the exclusive remedy for a federal employee alleging disability-based discrimination." **\*843** *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007) (citation omitted). "[E]mployment discrimination complaints under the Rehabilitation Act are governed by the standards of the Americans with Disabilities Act of 1990 (ADA)...." *Spence v. Donahoe*, 515 F. App'x 561, 568 (6th Cir. 2013) (citing *Lee v. City of Columbus*, 636 F.3d 245, 250 (6th Cir. 2011); 29 U.S.C. § 794(d) ). Accordingly,

"cases construing one statute are instructive in construing the other." *Andrews v. Ohio*, 104 F.3d 803, 807 (6th Cir. 1997).

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a). To prevail on a claim for discrimination under the Rehabilitation Act, a plaintiff must show that he: (1) is disabled, (2) is otherwise qualified to perform the essential functions of the position, with or without reasonable accommodation, and (3) suffered an adverse employment action solely because of his disability. *Jones*, 488 F.3d at 403.

A claimant may establish a violation of the Rehabilitation Act "by introducing direct evidence of discrimination, including evidence that the employer relied upon the plaintiff's disability in making its employment decision...." *Roetter v. Michigan Dept. of Corrs.*, 456 F. App'x 566, 569 (6th Cir. 2012) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996) *abrogated in part by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012) ).[4] Alternatively, a plaintiff who is unable to put forth direct evidence of discrimination may establish a Rehabilitation Act claim indirectly, by utilizing the burden-shifting framework of *McDonnell Douglas*. *See Jones*, 488 F.3d at 403-04. In both the indirect and direct methods, to prevail on a claim of discrimination pursuant to the Rehabilitation Act, Mitchell must demonstrate that he was fired "solely by reason of ... his disability." *Jones*, 488 F.3d at 409 (quoting 29 U.S.C. § 794(a) ). This occurs when "the employer has no reason left to rely on to justify its decision *other* than the employee's disability[.]" *Monette*, 90 F.3d at 1183 n.9 (emphasis in original).

"Distinguishing between cases that involve direct evidence of discrimination and those in which the plaintiff is not able to introduce direct evidence is vital because the framework for analyzing the two kinds of cases differs." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 892 (6th Cir. 2016) (citation omitted). "When an 'employer acknowledges that it relied upon the plaintiff's handicap in making its employment decision ... [t]he *McDonnell Douglas* burden shifting approach is unnecessary because the issue of the employer's intent, the issue for which *McDonnell Douglas* was designed, has been admitted by the defendant ... and the plaintiff has direct evidence of discrimination on the basis of

**\*844** his or her disability." *Id.* (quoting *Monette, 90 F.3d at 1182*).

## B. Analysis

### 1. Mitchell Failed to Provide Direct Evidence of Unlawful Discrimination

"Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Grizzell v. City of Columbus Div. of Police, 461 F.3d 711, 719 (6th Cir. 2006)* (internal quotation marks and citation omitted). "The direct evidence standard essentially requires an admission in some form by the employer that it relied on the disability in making an employment decision." *Coulson v. The Goodyear Tire & Rubber Co., 31 F. App'x 851, 855 (6th Cir. 2002)* (citation omitted). "If there is direct evidence that the plaintiff suffered an adverse employment action [solely] because of his or her disability, the plaintiff then 'bears the burden of establishing that he or she is "disabled" ' and ' "otherwise qualified" ' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation.' " *Ferrari, 826 F.3d at 891* (quoting *Monette, 90 F.3d at 1186*). "Once the plaintiff has established these elements, the employer 'bear[s] the burden of proving that a challenged job criterion is essential ... or that a proposed accommodation will impose an undue hardship upon the employer.' " *Id.* (quoting *Monette, 90 F.3d at 1186*).

 [1]  The district court determined that Mitchell failed to provide direct evidence of unlawful disability discrimination, but on appeal, Mitchell contests this conclusion. Mitchell first argues that USPS's requirement that either his doctor address Brown's letter in writing or Mitchell sign a release allowing USPS to contact his doctor directly, amounts to direct evidence of discrimination. This argument misses the mark, however, because USPS was merely seeking expert medical opinion concerning whether Mitchell would be a danger to himself or fellow USPS employees. Nothing in the record suggests that USPS's request was initiated *because* of his depression; instead, the request was the result of information provided by Brown's letter.

This case is similar to, but distinguishable from, *White v. Honda of Am. Mfg., Inc., 191 F.Supp.2d 933 (S.D. Ohio 2002)*. In *White*, the court held that the employer's honestly held belief that the employee, White, was not fit to work

when she attempted to return to work constituted direct evidence of disability discrimination. *Id.* at 941. White was required to work at least one day within a twelve-month period to retain her job, but the employer refused to allow White, who was undergoing treatment for cancer and related complications, to work the requisite day because an HR employee and a company nurse deemed her physically incapable of working, even though White's doctor provided documentation stating that she was fit to work. *Id.* at 938-41. The court reasoned that the employer's decision to discharge White amounted to disability discrimination because the employer unilaterally determined that White's disability prevented her from working. *Id.* at 955. The court further noted that the employer "would have been well within reason to request an independent medical evaluation, which it did not[,]" and that the employer "could have determined thereafter, from the independent exam, whether [the employee] could have returned to work during the 12 month period." *Id.* at 949.

Here, unlike the employer in *White*, USPS sought additional information in the form of an expert medical opinion by requesting **\*845** that Mitchell ask Dr. Trabitz to address the safety concerns raised in Brown's letter before making a determination regarding Mitchell's ability to return to work. USPS pursued this information in response to the letter it received from Brown questioning Mitchell's ability to safely work, not because of Mitchell's depression. And unlike the employer in *White*, USPS did not ignore input from Dr. Trabitz—it actively pursued such information.

"Employers are permitted to 'conduct voluntary medical examinations' and 'make inquiries into the ability of an employee to perform job-related functions.' " *Kroll v. White Lake Ambulance Auth., 691 F.3d 809, 815 n.7 (6th Cir. 2012)* (quoting *42 U.S.C. § 12112(d)(4)(B)* ). "[E]mployees can be instructed to undergo medical examinations by employers only 'in certain limited circumstances,' confined by the 'job-relatedness' and 'business necessity' requirements." *Id.* at 815 (quoting *E.E.O.C v. Prevo's Family Mkt., Inc., 135 F.3d 1089, 1094 (6th Cir. 1998)* ). "[F]or an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 811 (6th Cir. 1999).*[5]

At least three of our sister circuits have held that an employer's concern about workplace safety is a legitimate, nondiscriminatory reason for requesting a medical

examination consistent with a business necessity. *See Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1312 (11th Cir. 2013) (holding that "an employer can lawfully require a psychiatric/psychological fitness-for-duty evaluation ... if it has information suggesting that an employee is unstable and may pose a danger to others."); *Conroy v. New York State Dept. of Corr. Servs.*, 333 F.3d 88, 97 (2d Cir. 2003) ("[B]usiness necessities may include ensuring that the workplace is safe and secure."); *see also E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1283 (7th Cir. 1995) ("It would seem that a requirement that employees not pose a significant safety threat in the workplace would obviously be consistent with business necessity: a safe workplace is a paradigmatic necessity of operating a business."). In our view, USPS's request for a response from Dr. Trabitz, reviewing and analyzing Brown's letter, is tantamount to asking **Mitchell** to undergo a medical or mental fitness evaluation. It was a legitimate, nondiscriminatory action to address a workplace safety concern involving both **Mitchell** and other USPS employees.

To the extent that **Mitchell** argues that USPS's supposed refusal to accept certain notes written by Dr. Trabitz also represents direct evidence of discrimination, this argument also misses the mark. **Mitchell** maintains that Dr. Trabitz wrote three notes, dated August 16, 2010, August 27, 2012, and August 19, 2013. The August 16, 2010 letter stated that **Mitchell** had been treated for depression and stress since September 2009, and in Dr. Trabitz's opinion, **Mitchell** did not present a "danger to himself or to others." The August 27, 2012 and August 19, 2013 letters similarly noted the period of treatment and stated that **Mitchell** was able to work at his regular **\*846** job without restrictions. The notes did not address, or even refer to, Brown's letter.

While **Mitchell** stresses that he mailed all three letters to USPS, USPS denies receiving them. Moreover, and most saliently, Dr. Trabitz testified that **Mitchell** did not inform her of Brown's letter until April 6, 2015, years after USPS initially requested that Dr. Trabitz respond specifically to the concerns raised by Brown. Accordingly, the notes written by Dr. Trabitz that **Mitchell** highlights *could not* have addressed Brown's letter. It was therefore not discriminatory for USPS to reject the notes, even if USPS had received them, because the notes did not provide the information that USPS requested. This request was squarely within the confines of job-relatedness and business necessity concerns. *See Kroll*, 691 F.3d at 815.

**Mitchell** has not put forth any evidence of direct discrimination as it is traditionally defined. Accordingly, **Mitchell** failed to provide any direct evidence of disability-based discrimination.

**2. Indirect Evidence of Discrimination Under the Rehabilitation Act and *McDonnell Douglas***

We now turn to **Mitchell's** claim of indirect discrimination. The *McDonnell Douglas* analysis consists of three steps. *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001). First, "a plaintiff must set forth a prima facie case of discrimination." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817). Second, after a prima facie case has been made, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for its actions. *Id.* Lastly, if the employer fulfils this requirement, the burden shifts back to the plaintiff to demonstrate that the defendant's explanation is pretext for unlawful discrimination. *Jones*, 488 F.3d at 404. **Mitchell** can defeat summary judgment only if he produces evidence sufficient to "create a genuine dispute [of fact] at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).

As a preliminary matter, the district court assumed that **Mitchell** established a prima facie case "without deciding" if **Mitchell** had actually met that burden. Because "the **postal service** [does] not argue that the district court erred by assuming that **Mitchell** established a prima facie case,"[6] we will likewise assume a prima facie case.

As explained below, the district court properly granted summary judgment in favor of USPS because there is no genuine dispute of material fact as to pretext.

**a. USPS Articulated a Legitimate, Nondiscriminatory Reason for Placing Mitchell on Leave**

[2] With the prima facie case not at issue, "the burden shifts to [USPS] to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). This step is merely a "burden of production, not of persuasion, and it does not involve a credibility assessment." **\*847** *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009). Although "[t]he defendant need not persuade the court that it was actually motivated by the proffered

33 A.D. Cases 1757, 57 NDLR P 107

reasons," it must raise "a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). USPS "must clearly set forth, through the introduction of admissible evidence, the reasons for the [adverse employment action]." *Id.* at 255, 101 S.Ct. 1089. "The explanation provided must be legally sufficient to justify a judgment for the defendant." *Id.*

Here, USPS argues that workplace safety concerns were a legitimate, nondiscriminatory reason for placing **Mitchell** on leave. These concerns arose from Brown's letter, which was sent to USPS by **Mitchell** himself. Brown's letter explicitly stated, *inter alia*, that: (1) she was concerned **Mitchell** may have a physical or mental breakdown if he returned to work; (2) **Mitchell** was unstable at times; (3) **Mitchell's** doctors were not fully aware of his condition; and (4) USPS should place him on leave until his EEOC case is resolved. USPS met its burden of articulating a legitimate, nondiscriminatory reason for its actions. The burden now shifts back to **Mitchell** to establish that USPS's stated reason of workplace safety is pretextual.

**b. The Proffered Reason Offered by USPS Was Not Pretextual**

 [**3**]   Because USPS put forth a legitimate, nondiscriminatory reason for its decision to place **Mitchell** on leave, the remaining inquiry is "whether that reason was simply a pretext designed to mask discrimination." *Jones*, 488 F.3d at 406 (citing *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). "A plaintiff may show pretext by demonstrating: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the adverse employment action], or (3) that they were insufficient to motivate [the adverse employment action]." *Davis v. Cintas Corp.*, 717 F.3d 476, 491-92 (6th Cir. 2013) (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004) ). At this stage, it is **Mitchell's** burden to put forth evidence that, "taken in a light most favorable to [him], could lead a reasonable jury to reject [USPS's] proffered explanations." *Id.* at 491. **Mitchell** "need not definitively prove that [USPS's] reason[s] [are] pretextual, but rather 'must prove only enough to create a *genuine issue* as to whether the rationale is pretextual.' " *Ferrari*, 826 F.3d at 895 (quoting *Whitfield v. Tennessee*, 639 F.3d 253, 260 (6th Cir. 2011)) (emphasis in original).

**Mitchell** has not specified which theory of pretext he is pursuing, or how the district court erred in its analysis of this issue. In any event, all of **Mitchell's** purported arguments are inapposite. First, though **Mitchell** seems to suggest that he was treated differently from other USPS employees because of his disability, he has cited no evidence in the record to support this allegation. Succinctly stating that he suffered from disparate treatment, without more, does not establish pretext.

Second, to the extent that **Mitchell** argues that USPS's workplace safety concerns were not the true motivation for requesting that he provide medical documentation from his doctor, and placing him on leave, this argument fails because none of the notes that **Mitchell** purportedly provided addressed the issues raised in Brown's letter, irrespective of whether USPS actually received them. Even assuming USPS did receive the notes written by Dr. Trabitz that **Mitchell** is referring to, the notes do not support the conclusion that USPS's request for a response to Brown's letter was pretextual.  **\*848**  These notes were perfunctory and did not address the specific concerns raised by Brown's letter. In fact, Dr. Trabitz did not know Brown's letter existed until April 2015, years after USPS initially requested her input.

USPS convened a threat assessment team after receiving Brown's letter because of the concerns potentially affecting workplace safety. **Mitchell** has neither put forth any evidence showing that USPS convened the meeting to terminate **Mitchell** because of his depression, nor otherwise created a genuine issue of material fact with regard to USPS's stated motivations. USPS requested more information from **Mitchell's** doctor because **Mitchell's** wife explained that his doctors were unaware of the true state of **Mitchell's** condition. Brown's letter raised concerns for workplace safety and thus, USPS had a legitimate, non-discriminatory reason to place **Mitchell** on off-duty status until he provided medical evidence that, contrary to the assertions in Brown's letter, he was able to safely return to work.

Consequently, **Mitchell** has not created a genuine dispute of material fact with respect to whether USPS's proffered reason for placing him on leave in August 2010 was a pretext for discrimination. USPS's proffered reason has a demonstrable basis in fact.

**c. Mitchell Has Not Demonstrated That He Was Terminated Solely Because of His Disability**

Lastly, to prevail on a claim of discrimination pursuant to the Rehabilitation Act, Mitchell must also demonstrate that he was fired "solely by reason of ... his disability." *Jones*, 488 F.3d at 409 (quoting 29 U.S.C. § 794(a) ). This occurs when "the employer has no reason left to rely on to justify its decision *other* than the employee's disability[.]" *Monette*, 90 F.3d at 1183 n.9 (emphasis in original). A conclusion in **Mitchell's** favor here would not support an inference that workplace safety concerns did not play a role in USPS's request for additional medical documentation from Dr. Trabitz. Therefore, Mitchell has not met his burden

of demonstrating that he was fired solely because of his disability and consequently, Mitchell has not demonstrated that USPS's proffered reason for placing him on leave in August 2010 was pretextual.

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment.

**All Citations**

738 Fed.Appx. 838, 33 A.D. Cases 1757, 57 NDLR P 107

Footnotes

1    The **United States Postal Service** and the Postmaster General will collectively be referred to as "USPS" throughout the opinion.

2    When her deposition occurred on April 13, 2017, Ms. Lewis was the Manager of Learning, Development, and Diversity at USPS.

3    Mitchell filed his first EEOC Complaint in February 2009, alleging discriminatory treatment because of his depression. Later in 2009, Mitchell took a leave of absence due to his depression.

4    In *Lewis*, we abrogated *Monette* in part by concluding that a plaintiff seeking relief under the ADA must show that he suffered an adverse employment action "because of," rather than "*solely* by reason of" a disability. *Lewis*, 681 F.3d at 317, 321 (emphasis added). "The sole-cause standard ... is a creature of the Rehabilitation Act...." *Id.* at 317. To the extent *Monette* prescribes direct and indirect tests for demonstrating discrimination under the ADA—and consequently, the Rehabilitation Act—those tests are still good law in this circuit. *See Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891-892 (6th Cir. 2016) (applying the direct and indirect tests for establishing discrimination under the ADA as delineated in *Monette*, even after *Monette* was abrogated in part by *Lewis*).

5    Indeed, "[t]hrough the passage of the Rehabilitation Act, Congress intended to protect disabled individuals 'from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns ... as avoiding exposing others to significant health and safety risks.' " *Estate of Mauro By & Through Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 402 (6th Cir. 1998) (quoting *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 287, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) ).

6    It should be noted, however, that the district court, instead of using a three-element test from *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002), should have used the five-favor test from *Jones* to state the element of a prima facie case: "(1) that he is disabled, (2) that he is otherwise qualified for the job, with or without reasonable accommodation, (3) that he suffered an adverse employment action, (4) that his employer knew or had reason to know of his disability, and (5) that, following the adverse employment action, either he was replaced by a nondisabled person or his position remained open." *Jones*, 488 F.3d at 404 (citing *Timm v. Wright State Univ.*, 375 F.3d 418, 423 (6th Cir. 2004) ).

---

**End of Document**                                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

182 F.3d 918
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of Decisions
Without Reported Opinions" appearing in the Federal
Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206
for rules regarding the citation of unpublished opinions.)
United States Court of Appeals, Sixth Circuit.

James P. REID, Plaintiff-Appellee,

v.

NATIONAL LINEN SERVICE,
Defendant-Appellant.

No. 97-5545.
|
June 2, 1999.

On Appeal from the United States District Court for the
Western District of Kentucky.

Before GUY, SUHRHEINRICH, and GILMAN, Circuit
Judges.

**Opinion**

PER CURIAM.

 **\*1** Plaintiff-Appellee James P. Reid sued Defendant-
Appellant National Linen Service ("NLS") under Kentucky
state law for unlawfully discriminating against him because
of his alleged disability. NLS appeals from the denial of its
motion for summary judgment, the denial of its post-trial
motion for judgment as a matter of law, the jury verdict of
liability, and the damage award. We AFFIRM.

I. BACKGROUND

After previously working for NLS, a commercial laundry,
Plaintiff Reid resumed working for NLS in 1985 in
Owensboro, Kentucky, as a route sales representative.
He received four promotions, seven salary increases, and
eventually became operations manager in March 1992,
overseeing plant operations and supervising fifty-four people.

However, after Willis McKenzie became plant manager,
McKenzie noted problems in Plaintiff's management and,

in August 1992, counseled him for production deficiencies.
McKenzie gave Plaintiff sixty days to raise efficiency and
production. Although Plaintiff improved, McKenzie noted
deficiencies recurring in December 1992. McKenzie gave
Plaintiff two weeks to improve or be demoted. Again,
Plaintiff improved and in February 1993 received a "solid
performance" evaluation from McKenzie and a $25.00 per
week raise.

Nevertheless, McKenzie continued to counsel Plaintiff.
During May and June of 1993, McKenzie noted that
Plaintiff did not chart plant attendance, did not counsel low
producers, failed to post production efficiency figures, and
left work early while other employees remained working
overtime. On June 10, 1993, McKenzie limited Plaintiff's
responsibilities to the flatwork room, but allowed him to
retain his salary and title of operations manager, contingent
upon improvement. According to McKenzie, the flatwork
department area became more inefficient under Plaintiff's
supervision. McKenzie formally demoted Plaintiff from
operations manager to flatwork supervisor on July 9, 1993. To
improve the flatwork department's performance, McKenzie
required Plaintiff to spend more time in the flatwork
department and supervise. However, the flatwork department
had the most lint and was the hottest area of the plant because
of the laundry dryers and irons. McKenzie instructed Plaintiff
to stay in the flatwork department and discouraged Plaintiff
from taking breaks in the office to use "inhalers," a medicine
that helped Plaintiff breath.

While Reid was working for NLS, his physician, Robert
Pope, M.D., diagnosed Reid with allergic broncho pulmonary
aspergillosis, a pulmonary condition that impaired his
breathing. Although Dr. Pope prescribed steroid inhalers for
Reid to aid his breathing, he was concerned about their
damaging side-effects. Accordingly, Dr. Pope recommended
on June 21, 1994:
In view of his asthmatic problems, several general
recommendations are made. He should avoid dust, fumes,
smoke, or other irritating vapors. He should avoid extremes of
temperature, either hot or cold. In view of the recent problems
he's been having at work, it is probably advisable for him
to move to a different area for health reasons. Certainly the
dusty environment with lint in the air and the extremely hot
temperature could exacerbate his asthmatic problems.

 **\*2** J.A. at 659, 442-444.

After receiving Dr. Pope's recommendation, Judy Turner, Defendant's personnel director, informed Calvin Bryant, Defendant's corporate counsel. Bryant told Turner to (1) have Plaintiff authorize her to speak with his physician; (2) arrange for a consultant about accommodating Plaintiff; and (3) send Plaintiff's personnel file to him. Instead of "personnel file," however, Turner's note on the conversation reflected the words, "letter, disciplinary action." J.A. at 507. At Bryant's direction, Turner completed a "NATIONAL LINEN SERVICE ACCOMMODATION CHECKLIST," which stated that Plaintiff met the ADA definition of disability because he had difficulty breathing in Defendant's working environment and that Plaintiff could not work around extreme hot or cold, lint, fumes, dust, smoke, or irritating vapors. Bryant also directed Turner to place Plaintiff on medical leave, which McKenzie approved on July 18, 1994.

Turner also contacted two consultants about accommodating Plaintiff. Both consultants recommended moving Plaintiff out of the adverse environment. One consultant suggested a respirator and cool vest if Plaintiff could not be relocated within NLS. Defendant also retained a physician, W. Mark Abshier, M.D., who was skeptical about the respirator and the vest. Defendant attempted to accommodate Plaintiff with an air mask, which consisted of a helmet with a fan. Plaintiff claims that he stopped wearing the mask because it restricted his vision and hearing and exacerbated his breathing condition. Plaintiff also contends that McKenzie and other managers ridiculed him for wearing it.

As Plaintiff's medical condition worsened, he had to increase his intake of steroids in spite of the side-effects. In July of 1995, Dr. Pope wrote another restriction letter to Defendant stating that Plaintiff needed to avoid extremes of temperature either hot or cold. McKenzie gave Plaintiff his last warning notice when Plaintiff presented Dr. Pope's restriction. Defendant terminated Plaintiff's employment on August 28, 1995.

Plaintiff looked for another job through Skills, Inc., a local employment agency, and the unemployment office. Plaintiff began working on April 15, 1996, as a service clerk at French Implement Company for $7.00 per hour, later raised to $8.00, but with none of the retirement or life insurance benefits that he had at NLS. Plaintiff had interviewed twice at Community Towel, another commercial laundry, in Bowling Green, about 100 miles away, but had not received an offer.

Plaintiff maintains that he was willing to move, transfer, and pay his own moving expenses to continue working for Defendant; all of which he put in writing. In September and October of 1994, Plaintiff claims that several jobs were available at NLS that he could have performed, but McKenzie wanted him in the flatwork department. Turner explained that Plaintiff was not offered the washroom supervisor job because she was not aware that Plaintiff was interested in it. Turner further explained that Plaintiff was not transferred to one of two available route sales positions because Bryant told her that Plaintiff's job performance had to improve before he would be considered for those positions. Plaintiff was willing to take those jobs, even with a pay cut, to continue working for NLS.

**\*3** Martha Clark, CPA, with experience in economic evaluations, testified for Plaintiff on damages. Clark considered Plaintiff's previous and then current wage statements, tax records, pension and insurance benefits, and pay-outs from his NLS pension plan. Clark determined that Plaintiff's total economic loss was $185,491.64. Clark assumed that Plaintiff would have remained at NLS and retired at age 65 and received raises in line with the Consumer Price Index, all of which she reduced to present value. Defendant cross-examined Clark. The jury awarded Plaintiff $185,000 in economic damages and $15,000 in personal damages from embarrassment, humiliation, and mental distress.

## II. DISCUSSION

Defendant appeals from the denial of its motion for summary judgment, the denial of its post-trial motion for judgment as a matter of law, the jury verdict, and the amount of the damage award.

### A.

Defendant claims that it was entitled to summary judgment and judgment as a matter of law because Plaintiff presented no evidence that he was disabled, regarded as disabled, or was not otherwise a qualified individual when he was terminated.

A denial of a summary judgment is not properly reviewable after a trial and final judgment in favor of the non-moving party. *Jarrett v. Epperly,* 896 F.2d 1013, 1016 (6th Cir.1990). However, a denial of a judgment as a matter of law remains

reviewable. *See Orchard Group, Inc., v. Konica Medical Corp.,* 135 f3d 421, 424-25 (6th Cir.1998). Legal issues in diversity or federal question cases are reviewed de novo. *See id.* at 425. Factual issues in diversity cases are reviewed as the state forum would review them. *K & T Enters. Inc., v. Zurich Insurance Co.,* 97 F.3d 171, 176 (6th Cir.1997). Kentucky courts review factual determinations for clear error. *General Motors Corp. v. Herald,* 833 S.W.2d 804, 806 (Ky.1992). In reviewing a denial of a Rule 50 based on the sufficiency of evidence, we view the evidence in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *K & T Enters.,* at 176. We do not weigh the evidence, evaluate the credibility of witnesses or substitute our judgment for that of the jury. *Id.* at 175. The motion should be granted and the district court reversed, only if reasonable minds could not come to a conclusion other than the one favoring the moving party. *Id.* (citations omitted).

Plaintiff sued Defendant under the Kentucky Civil Rights Act, Ky.Rev.Stat. Ann. §§ 344.010 -.990 (Banks-Baldwin 1994) ("KCRA"), which requires proof that a plaintiff was both "disabled" and a "qualified individual" when terminated. *See Griffith v. Wal-Mart Stores. Inc.,* 135 F.3d 376, 380 (6th Cir.1998). Under the KCRA " 'disability' means, with respect to an individual: (a) A physical or mental impairment that substantially limits one (1) or more of the major life activities of the individual; (b) A record of such impairment; or (c) Being regarded as having such impairment." Ky.Rev.Stat. § 344.010(4).

**\*4** The district court denied Defendant's motion for summary judgment and its post-trial motion for judgment as a matter of law based on Plaintiff's testimony, the testimony of two other employees, the accommodation checklist, and Plaintiff's performance evaluation.

Even if Defendant were correct that none of Plaintiff's evidence shows that Plaintiff had a physical impairment that substantially limited a major life activity, Turner's answers on the Accommodation Checklist indicating that Plaintiff met the ADA definition of disabled creates a genuine issue of material fact whether Defendant at least regarded Plaintiff as disabled. Moreover, even though Plaintiff received several disciplinary actions, he previously had received a "solid performance" review, demonstrating that he had been qualified. Further, the recommendation of Dr. Pope that Plaintiff relocate within the plant and the evidence of the consultants relating to the air masks and cool vests creates a genuine issue of material fact whether Plaintiff would be qualified with a

reasonable accommodation. Accordingly, the district court properly denied Defendant's motion for judgment as a matter of law.

B.

Defendant also claims that he was entitled to a new trial because the district court erroneously applied a mixed motive standard permitting Plaintiff to recover if Plaintiff's disability or perceived disability was a substantial motivating factor in Defendant's decision to terminate Plaintiff.

Kentucky law only requires that a protected characteristic be a contributing, essential, or substantial motivating factor of the alleged employment discrimination. The KCRA, which covers all forms of employment discrimination in Kentucky, provides:

It is an unlawful practice for an employer:
(1) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, national origin, sex, age forty (40) and over, because the person is a qualified individual with a disability, or because the individual is a smoker or nonsmoker, as long as the person complies with any workplace policy concerning smoking

Ky.Rev.Stat. §§ 344.040. The Kentucky Supreme Court interpreted the phrase "because of" in § 344.020 to mean "substantial factor," "contributing and essential factor," or "essential ingredient,: and not "sole cause." *See Meyers v. Chapman Printing Co., Inc.,* 840 S.W.2d 814, 823-24 (Ky 1992); *see also First Property Management Group v. Zarebidaki,* 867 S.W.2d 185, 187-88 (Ky.1993).

Defendant argues that a sole cause standard should apply because Kentucky intended to interpret its disability discrimination statute in line with the Americans with Disability Act, 42 U.S.C. §§ 12101-12113 (1994) ("ADA"). *Cf. Hall v. Transit Auth. of Lexington-Fayette,* 883 S.W.2d 884, 886 (Ky.Ct.App.1994); *Harker v. Federal Land Bank,* 679 S.W.2d 226, 229 (Ky.Ct.App.1984). The ADA has been interpreted in line with the Rehabilitation Act, 29 U.S.C. §§ 701-796i, which textually requires that discrimination arise "solely by reason of" a disability. *See generally Brohm v. JH Properties, Inc.,* 149 F.3d 517, 520 (6th Cir.1998); *Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173, 1178 (6th

1999 WL 407463

Cir.1996); *Maddox v. University of Tennessee,* 62 F.3d 843, 846 n. 2 (6th Cir.1995).

**\*5** Defendant's reliance on *Brohm, Monette,* and *Maddox* is misplaced. Neither *Monette* nor *Maddox* construe the causation standard for discrimination disability claims under Kentucky law. Even *Brohm,* which was decided under Kentucky law, did not analyze the issue or reference any Kentucky case law construing the causation standard under section 344.040(1). *Brohm* simply adopted ADA precedent because "the language of the Kentucky Civil Rights Act mirrors the language of both the [ADA] and the Rehabilitation Act." *Brohm,* 149 F.3d at 520 (citations omitted). While the language of the KCRA essentially mirrors the language of the ADA, it clearly does not mirror the language of the Rehabilitation Act. The Rehabilitation Act specifies that discrimination be "solely by reason of" a disability; whereas, the KCRA simply uses "because." In view of the Kentucky Supreme Court's mixed-motive construction of the standard of causation in the state law statute, these cases are simply not persuasive.

Further, even though *Meyers* is a sex discrimination case, the discrimination statute construed in *Meyers,* Ky.Rev.Stat. § 344 . 040(1), covers all forms of employment discrimination, including disability, sex, race, color, religion, national origin, age, and smoking, without specifying different standards of causation for each type. Therefore, in the absence of countervailing Kentucky state law specifying separate standards of causation for different forms of discrimination, the mixed-motive construction of *Meyers* should control.

Although Defendant presented substantial evidence of Plaintiff's poor performance that could have possibly defeated Plaintiff's claim under a sole cause standard, we nevertheless find that Plaintiff presented sufficient evidence from which a reasonable jury could find that his disability, or Defendant's belief that Plaintiff was disabled, was a substantial motivating factor in Defendant discharging Plaintiff. Accordingly, the district court did not err in applying a mixed-motive standard to Plaintiff's claim.

**C.**

Defendant also claims that it is entitled to a new trial or remittitur because the district court refused to give the jury any limiting instructions in calculating front pay. Defendant first argues that Plaintiff waived his entitlement to front pay

by not demanding it until trial. Defendant relies on *Erebia v. Chrysler Plastic Prods. Corp.* 891 F.2d 1212, 1213 (6th Cir.1989). In *Erebia* the court found that the plaintiff waived his right to demand reinstatement when he requested front pay because front pay is an equitable remedy in place of reinstatement. *Id.* at 1214. The court further reasoned that the belated request would prejudice the defendant employer in showing that the plaintiff was not entitled to reinstatement. *Id.* Defendant's reliance on *Erebia* is misplaced because Defendant has not shown that it was prejudiced in defending against Plaintiff's claim for front pay.

**\*6** Defendant further argues that the district court improperly refused to instruct the jury on limiting the duration for which it could award front pay. We review jury instructions as a whole in order to determine whether they adequately inform the jury of relevant law to decide the case. *See Gafford v. General Elec. Co.,* 997 F.2d 150, 166 (6th Cir.1993).

Future damages or front pay is compensation for "the post-judgment effects of past discrimination." *Shore v. Federal Express Corp.,* 777 F.2d 1155, 1158 (6th Cir.1985). A court must instruct its jury on what it may consider in awarding front pay. *See Roush v. KFC Nat'l Management Co.* 10 F.3d 399 (6th Cir.1993). These factors include the availability of employment, a reasonable period for re-employment, and the employee's work and life expectancy. *See Shore,* 777 F.2d at 1160.

We have reviewed the jury instruction on damages and find that this jury instruction adequately informed the jury of the relevant law to decide this case.

**D.**

Defendant also contends that the award of future damages was speculative and unreasonable. Front pay awards for lengthy periods may be reduced as speculative because of future uncertainties. *See Schwartz v. Gregori,* 45 F.3d 1017, 1023 (6th Cir. Cir.1995); *Katch v. Speidel, Div. of Textron, Inc.,* 746 F.2d 1136. 1142-43 (6th Cir.1984). Further, remittitur is appropriate when the award exceeds the maximum damages a reasonable jury could find to be compensatory. *See Farber v. Massillon Board. of Educ.,* 917 F.2d 1391, 1395 (6th Cir.1990).

1999 WL 407463

The jury awarded Plaintiff damages for lost wages, past and future, of $185,000, which reflected calculations based on Plaintiff's continued employment at French Implement until his retirement. Defendant claims that assuming Plaintiff would remain at French Implement until he retired was speculative, in light of his relatively sporadic work history. However, Plaintiff's employment with Defendant undercuts Defendant's argument because Plaintiff remained ten years at NLS, and wanted to continue to work for NLS, even with a pay cut. We do not find the jury's determination unreasonable.

### E.

Defendant further claims that the jury simply accepted Plaintiff's alleged damages as prepared by Clark, even though Clark's assumptions were incorrect. Specifically, Clark assumed that Plaintiff was earning $13.37 per hour when discharged, whereas Plaintiff was salaried and often worked more than forty hours a week. Clark calculated Plaintiff's new wage using $7.00 per hour with 2.84% annual raises; however, Plaintiff had received a raise to $8.00, a 14% increase, even before trial. Clark further assumed that Plaintiff lost a three percent employer pension contribution from Defendant, even though Plaintiff and Turner both testified that Plaintiff was not receiving an employer contribution. Clark estimated that Plaintiff lost $7,500.00 in benefits, even though Clark admitted that she did not review Plaintiff's new benefit plan.

 **\*7** In this case, some facts had changed since Clark evaluated Plaintiff's damages. However, Defendant thoroughly cross-examined Clark and her assumptions. Moreover, Defendant did not present its own experts. The jury verdict is not clearly erroneous based on the evidence and cross-examination.

### F.

Finally, Defendant claims that it is entitled to a new trial because the jury's verdict was tainted by improper "me too" evidence. Defendant argues that the district court permitted highly prejudicial testimony that Defendant discriminated against other employees because of their disabilities and race, which Defendant described as "me too" evidence.

A trial court has broad discretion in ruling on the admissibility of evidence. *See Hines v. Joy Mfg. Co.,* 850 F.2d 1145,

1154 (6th Cir.1988). Generally, evidence is admissible if it is relevant and not unfairly prejudicial. *See United States v. Rey,* 923 F.2d 1217, 1222 (6th Cir.1991). We review a district court's evidentiary ruling for abuse of discretion. *See Morales v. American Honda Motor Co.,* 151 F.3d 500, 516 (6th Cir.1998). An abuse of discretion exists "when the reviewing court is firmly convinced that a mistake has been made." *Id.* Trial courts regularly prohibit "me too" evidence from or about other employees who claim discriminatory treatment because it is highly prejudicial, but only slightly relevant. *See Schrand v. Federal Pac. Elec. Co.,* 851 F.2d 152, 156 (6th Cir.1988). However, no error in the admission or exclusion of evidence warrants disturbing a judgment, unless the error is inconsistent with substantial justice. *See Federal Rules of Civil Procedure, Rule 61; Federal Rule of Evidence, 103(a); Morganroth & Morganroth v. DeLorean,* 123 F.3d 374, (6th Cir.1998); *TCP Indus., Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 550 (6th Cir.1981).

Here, over Defendant's objections, the district court allowed Plaintiff to testify that Defendant constructively discharged Elizabeth Jackson, whom he believed suffered from carpal tunnel syndrome. However, on cross-examination, Defendant showed that Jackson was discharged even before McKenzie arrived at the plant. The district court also allowed Plaintiff to testify that McKenzie wanted to terminate Ruth Sanders because he was racially prejudiced against her and once referred to her as the "nigger on that iron." On cross-examination, Plaintiff admitted that he did not know whether Sanders had even left NLS. Finally, Plaintiff's counsel implied that McKenzie terminated eleven other NLS employees because of their disabilities and injuries. However, on cross-examination Defendant showed that only two employees were discharged, and not for reasons related to any alleged impairment.

The "me too" evidence was potentially prejudicial and not particularly probative of whether Defendant discriminated against Plaintiff. However, Defendant was able to cross-examine the witnesses to dispel any undue prejudice. Further, McKenzie's responses to Plaintiff's questions were quite clear in denying any implication that he discriminated against the eleven employees. Moreover, sufficient other relevant evidence supports the jury's verdict. Accordingly, we conclude that the error was harmless and does not warrant a retrial.

---

1999 WL 407463

CONCLUSION

**\*8** Accordingly, we AFFIRM the jury verdict, the award of damages, and the district court's denial of Defendant's motion for judgment as a matter of law.

RALPH B. GUY, JR., concurring in result.

RALPH B. GUY, J.

I concur in the result reached, and write additionally solely to express my reservations about the jury instruction at issue in this appeal. The "but for" causation instruction given by the court is not consistent with Sixth Circuit precedent. *See Brohm v. JH Properties, Inc.,* 149 F.3d 517, 520 (6th Cir.1998). However, since this is a diversity case brought under the Kentucky Civil Rights Act, Ky.Rev.Stat. Ann. § 344.040(1) (Banks-Baldwin 1997), we look to the interpretation placed on the statute by the Kentucky courts. In *Meyers v. Chapman Printing Co.,* 840 S.W.2d 814 (Ky.1992), the Kentucky Supreme Court did reject a "solely because of" causation test, but in the context of a *gender* discrimination case. The court also indicated in *Meyers* that it would adhere to federal law interpretations in cases based on the Kentucky Civil Rights Act, *Meyers* leaves unresolved the issue of the test to be applied in a Kentucky *disability* discrimination case. Although my own view is that the Kentucky Supreme Court would follow our lead on the causation issue in a disability discrimination case, I cannot say that the conclusion reached by the district judge to the contrary constitutes an error mandating reversal.

**All Citations**

182 F.3d 918 (Table), 1999 WL 407463

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2020 Employee Benefits Cas. 465,086

504 F.Supp.3d 753
United States District Court, S.D. Ohio, Western Division.

Anthony SCHOBERT, et al., Plaintiffs,

v.

CSX TRANSPORTATION INC., Defendant.

Case No. 1:19-cv-76
|
Signed 11/30/2020

**Synopsis**
**Background:** Employee and former employee brought action against employer, on behalf of themselves and 14 putative classes of current and former employees, for violations of the Family Medical Leave Act (FMLA), the Employee Retirement Income Security Act (ERISA), and the Rehabilitation Act, alleging that employer investigated employee, former employee, and others for improperly using FMLA leave during the Christmas and New Year holidays and that employer concluded former employee misused leave and fired him. Employer moved for judgment on the pleadings on ERISA and Rehabilitation Act claims and an aspect of FMLA claim, summary judgment on other aspects of the remaining FMLA claim, and/or stay pending arbitration. Employee and former employee moved to amend the complaint and for discovery.

**Holdings:** The District Court, Douglas R. Cole, J., held that:

[1] employee's and former employee's motion to amend was futile;

[2] employee and former employee failed to plausibly allege that employer investigated them for improperly using FMLA leave with specific intent of violating ERISA, as required to state interference claim under ERISA;

[3] employee and former employee failed to plausibly allege that employer's investigation of their use of FMLA leave caused them to suffer adverse employment action solely because of their disabilities, as required to state disability-discrimination claim under Rehabilitation Act;

[4] employee and former employee plausibly alleged that, in requesting or taking FMLA leave, they engaged in protected activity, as required to state retaliation claim under Rehabilitation Act;

[5] employee and former employee plausibly alleged that employer took adverse employment actions against them, as required to state retaliation claim under Rehabilitation Act;

[6] employee and former employee plausibly alleged causal connections between their use of FMLA leave and adverse employment actions against them, as required to state retaliation claim under Rehabilitation Act; and

[7] employee's and former employee's allegations that employer actively discouraged them from pursuing or using intermittent leave plausibly alleged that employer failed to provide reasonable accommodation, as required to state claim for violation of Rehabilitation Act.

Motion to amend denied; motion for judgment on the pleadings granted in part and denied in part; motion for discovery granted; motion for summary judgment denied in part and deferred in part; motion for stay denied.

West Headnotes (100)

**[1]    Federal Civil Procedure** 🔑 **Discretion of Court**

A district court has broad discretion in deciding a motion for leave to amend a complaint.

**[2]    Federal Civil Procedure** 🔑 **Complaint**

Absent any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, undue prejudice to the opposing party, futility of the amendment, etc.—leave to amend a complaint should, as the rules require, be freely given. Fed. R. Civ. P. 15(a)(2).

**[3]    Federal Civil Procedure** 🔑 **Hearing, determination, order; matters considered**

A district court's outright refusal to grant leave to amend the complaint without any justifying

reason is not an exercise of discretion, but instead an abuse of it that is inconsistent with the spirit of the rule governing amendment. Fed. R. Civ. P. 15(a)(2).

**[4]** **Federal Civil Procedure** 🔑 Form and sufficiency of amendment;  futility

A motion to amend a complaint is futile if the amendment could not withstand a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6), 15(a)(2).

**[5]** **Federal Civil Procedure** 🔑 Form and sufficiency of amendment;  futility

Employee's and former employee's motion to amend the complaint, in their action against employer alleging violations of the Family Medical Leave Act (FMLA), ERISA, and the Rehabilitation Act, was futile, where proposed deletions regarding allegedly mishandled "disability-related information" would not change outcome on Rehabilitation Act claims, employee's additional factual claim about his alleged disability was useful, but unnecessary to analysis of Rehabilitation Act claims, and "technical phrases" employee and former employee proposed to add to their allegations did nothing to remedy defects in either their Rehabilitation Act or ERISA claims. Rehabilitation Act of 1973, § 2 et seq., 29 U.S.C.A. § 701 et seq.; Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.; Family and Medical Leave Act of 1993, § 2 et seq., 29 U.S.C.A. § 2601 et seq.; Fed. R. Civ. P. 15(a)(2).

**[6]** **Federal Civil Procedure** 🔑 Judgment on the Pleadings

Courts analyze a motion for judgment on the pleadings in the same manner as a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6), 12(c).

**[7]** **Federal Civil Procedure** 🔑 Determination of Motion

**Federal Civil Procedure** 🔑 Matters deemed admitted

A court analyzing a motion for judgment on the pleadings accepts all factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff, likewise drawing all reasonable inferences in the plaintiff's favor. Fed. R. Civ. P. 12(c).

**[8]** **Federal Civil Procedure** 🔑 Insufficiency of claim or defense

All a plaintiff must do to survive a motion for judgment on the pleadings is provide a short and plain statement of the claim showing that the pleader is entitled to relief, but that short and plain statement must offer more than mere labels and conclusions. Fed. R. Civ. P. 12(c).

**[9]** **Federal Civil Procedure** 🔑 Insufficiency of claim or defense

A formulaic recitation of the elements of a cause of action will not provide a short and plain statement of the claim showing that the pleader is entitled to relief, as required to survive a motion for judgment on the pleadings. Fed. R. Civ. P. 12(c).

**[10]** **Federal Civil Procedure** 🔑 Insufficiency of claim or defense

**Federal Civil Procedure** 🔑 Matters deemed admitted

In order for a complaint to survive a motion for judgment on the pleadings, there must be sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Fed. R. Civ. P. 12(c).

**[11]** **Federal Civil Procedure** 🔑 Insufficiency of claim or defense

2020 Employee Benefits Cas. 465,086

In order to survive a motion for judgment on the pleadings, a complaint must contain either direct or inferential allegations respecting all material elements to sustain recovery under some viable legal theory.

**[12]** **Federal Civil Procedure** 🔑 Insufficiency of claim or defense

Conclusory allegations or legal conclusion masquerading as factual allegations will not suffice to survive a motion for judgment on the pleadings. Fed. R. Civ. P. 12(c).

**[13]** **Federal Civil Procedure** 🔑 Insufficiency of claim or defense

A court will grant a motion for judgment on the pleadings if there is no law to support the claims made; the same holds where the facts alleged are insufficient to state a claim. Fed. R. Civ. P. 12(c).

**[14]** **Federal Civil Procedure** 🔑 Insufficiency of claim or defense

**Federal Civil Procedure** 🔑 Insufficiency in general

To survive a motion to dismiss for failure to state a claim or a motion for judgment on the pleadings, a plaintiff must rest his claim to relief on more than conclusory allegations that the defendant violated the law; rather, the question is whether the plaintiff has pled facts giving rise to a plausible claim, an inquiry that the court resolves in part by employing its judicial experience and common sense. Fed. R. Civ. P. 12(b)(6), 12(c).

**[15]** **Federal Civil Procedure** 🔑 Insufficiency of claim or defense

**Federal Civil Procedure** 🔑 Insufficiency in general

In analyzing a motion to dismiss for failure to state a claim or a motion for judgment on the pleadings, the distinction between plausibility, on the one hand, and facts that merely happen to be consistent with liability, on the other, can

turn, at least in part, on the availability—and plausibility—of alternative explanations for the events that occurred. Fed. R. Civ. P. 12(b)(6), 12(c).

1 Case that cites this headnote

**[16]** **Federal Civil Procedure** 🔑 Insufficiency of claim or defense

**Federal Civil Procedure** 🔑 Insufficiency in general

In analyzing the distinction between plausibility, on the one hand, and facts that merely happen to be consistent with liability, on the other, for purposes of a motion to dismiss for failure to state a claim or a motion for judgment on the pleadings, the existence of an obvious alternative explanation can help differentiate between facts merely consistent with liability and those sufficient to plausibly allege discriminatory intent; that is, an obvious alternative explanation can help illustrate the unreasonableness of the inference sought and the implausibility of the claims made. Fed. R. Civ. P. 12(b)(6), 12(c).

1 Case that cites this headnote

**[17]** **Federal Civil Procedure** 🔑 Insufficiency of claim or defense

**Federal Civil Procedure** 🔑 Insufficiency in general

The mere existence of more likely alternative explanations does not automatically entitle a defendant to dismissal for failure to state a claim or to judgment on the pleadings, as a defendant's conduct often has several plausible explanations, and ferreting out the most likely reason for the defendant's action is not appropriate at the pleading stage. Fed. R. Civ. P. 12(b)(6), 12(c).

1 Case that cites this headnote

**[18]** **Federal Civil Procedure** 🔑 Insufficiency of claim or defense

**Federal Civil Procedure** 🔑 Insufficiency in general

If a plaintiff's claim is plausible, the availability of other explanations—even more likely explanations—does not bar the door to discovery, that is, the existence of the other explanations does not automatically entitle a defendant to dismissal for failure to state a claim or to judgment on the pleadings. Fed. R. Civ. P. 12(b)(6), 12(c).

**[19]**    **Federal Civil Procedure** 🔑 Insufficiency of claim or defense

**Federal Civil Procedure** 🔑 Insufficiency in general

A court analyzing a motion to dismiss for failure to state a claim or a motion for judgment on the pleadings cannot assess the plausibility of an inference in a vacuum because the reasonableness of one explanation for an incident depends, in part, on the strength of competing explanations. Fed. R. Civ. P. 12(b)(6), 12(c).

**[20]**    **Labor and Employment** 🔑 Pensions and Benefits

ERISA provision making it unlawful to interfere with the attainment of any right to which a participant may become entitled to under an employee-benefit plan aims to prevent unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested ERISA plan rights. Employee Retirement Income Security Act of 1974 § 510, 29 U.S.C.A. § 1140.

**[21]**    **Labor and Employment** 🔑 Pensions and Benefits

Courts in the Sixth Circuit recognize two types of claims under the ERISA provision making it unlawful to interfere with the attainment of any right to which a participant may become entitled to under an employee-benefit plan: (1) an exercise or retaliation claim, where adverse action is taken because a participant availed himself of an ERISA right; and (2) an interference claim, where the adverse action is taken as interference with the attainment

of a right under ERISA. Employee Retirement Income Security Act of 1974 § 510, 29 U.S.C.A. § 1140.

**[22]**    **Labor and Employment** 🔑 Pensions and Benefits

The prima facie elements of a retaliation claim under the ERISA provision making it unlawful to interfere with the attainment of rights are: (1) that an employee engaged in activity that ERISA protects; (2) that the employee suffered an adverse employment action; and (3) that there is a causal link between the protected activity and the employer's adverse action. Employee Retirement Income Security Act of 1974 § 510, 29 U.S.C.A. § 1140.

**[23]**    **Labor and Employment** 🔑 Motive and intent;  pretext

To prevail on an interference claim under the ERISA provision making it unlawful to interfere with the attainment of rights, a plaintiff must prove that the employer administered the adverse action with the specific intent of violating ERISA. Employee Retirement Income Security Act of 1974 § 510, 29 U.S.C.A. § 1140.

**[24]**    **Labor and Employment** 🔑 Motive and intent;  pretext

To prevail on an interference claim under the ERISA provision making it unlawful to interfere with the attainment of rights, the plaintiff is not required to show that the employer's sole purpose was to interfere with ERISA benefits, but he or she must show that such interference was a motivating factor in the decision. Employee Retirement Income Security Act of 1974 § 510, 29 U.S.C.A. § 1140.

**[25]**    **Labor and Employment** 🔑 Motive and intent;  pretext

If the loss of ERISA benefits was a mere consequence of an alleged action, then an interference claim under the ERISA provision

making it unlawful to interfere with the attainment of rights fails. Employee Retirement Income Security Act of 1974 § 510, 29 U.S.C.A. § 1140.

**[26]**   **Labor and Employment** 🔑 Pleading

Given that a showing that an employer's interference with ERISA benefits was a motivating factor in the employer's decision to administer an adverse action is a required element of an interference claim under the ERISA provision making it unlawful to interfere with the attainment of rights, at the pleading stage, the plaintiff must allege sufficient factual content from which a court, informed by its judicial experience and common sense, could draw the reasonable inference that the employer acted with the intent to interfere with the attainment of the plaintiff's ERISA benefits. Employee Retirement Income Security Act of 1974 § 510, 29 U.S.C.A. § 1140.

1 Case that cites this headnote

**[27]**   **Labor and Employment** 🔑 Motive and intent;  pretext

Employee and former employee failed to plausibly allege that employer investigated them for improperly using Family Medical Leave Act (FMLA) leave during Christmas and New Year holidays with specific intent of violating ERISA, as required to state interference claim under ERISA provision making it unlawful to interfere with attainment of rights, where any loss of ERISA benefits was mere consequence of employer's FMLA-related actions, and there was obvious alternative explanation for investigation, specifically, that investigation most plausibly appeared to have been effort to curb impermissible FMLA use, particularly around holidays, not attempt to interfere with or retaliate against employee or former employee for using their ERISA benefits. Employee Retirement Income Security Act of 1974 § 510, 29 U.S.C.A. § 1140; Family and Medical Leave Act of 1993, § 2 et seq., 29 U.S.C.A. § 2601 et seq.

**[28]**   **Federal Civil Procedure** 🔑 Claim for relief in general

The rule governing notice pleading requires a short and plain statement that is sufficiently detailed to give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. Fed. R. Civ. P. 8.

**[29]**   **Federal Civil Procedure** 🔑 Claim for relief in general

The rule requiring the plaintiff to give a short and plain statement that is sufficiently detailed to give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests ensures simply that each party has adequate notice of the other's claims and an opportunity to meet them. Fed. R. Civ. P. 8.

**[30]**   **Civil Rights** 🔑 Handicap, Disability, or Illness

While the Rehabilitation Act and ADA are largely coextensive, there is a key difference: the Rehabilitation Act has a different—and more stringent—causation standard; unlike the ADA's but-for or because-of standard, the Rehabilitation Act requires solely-by-reason-of causation. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(d); Americans with Disabilities Act of 1990 § 101, 42 U.S.C.A. § 12111 et seq.

**[31]**   **Civil Rights** 🔑 Particular cases

Employee and former employee failed to plausibly allege that employer's investigation of their use of Family Medical Leave Act (FMLA) leave during Christmas and New Year holidays caused them to suffer adverse employment action solely because of their disabilities, as required to state disability-discrimination claim under Rehabilitation Act; employee and former employee alleged that employer initiated its FMLA investigation against all employees who took FMLA leave, not just employees who were, or who were thought to be, disabled,

and that disabled employees, who were more likely to take FMLA, were disparately affected by investigation, but Rehabilitation Act did not prohibit disparate-impact discrimination. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a); Family and Medical Leave Act of 1993, § 2 et seq., 29 U.S.C.A. § 2601 et seq.

**[32]** **Civil Rights** 🔑 Practices prohibited or required in general; elements

A prima facie disability discrimination claim under the Rehabilitation Act requires plaintiffs to plausibly allege that they (1) are disabled, (2) are otherwise qualified to perform the essential functions of their position, with or without a reasonable accommodation, and (3) suffered an adverse employment action solely because of their disability. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a).

2 Cases that cite this headnote

**[33]** **Civil Rights** 🔑 Discrimination in General

"Disparate-impact discrimination" occurs when an entity acts for a nondiscriminatory reason but nevertheless disproportionately harms a protected group.

**[34]** **Civil Rights** 🔑 Elements of discrimination claims in general

The Rehabilitation Act only prohibits discrimination solely by reason of disability; it does not encompass actions taken for nondiscriminatory reasons. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a).

**[35]** **Civil Rights** 🔑 Practices prohibited or required in general; elements

A Rehabilitation Act retaliation claim must plausibly allege that: (1) the employee engaged in activity protected under the Act or the ADA; (2) the employer knew of the protected activity; (3) the employer took an adverse employment action against the employee; and (4) there was a causal connection between the protected

activity and the adverse employment action. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990 § 101, 42 U.S.C.A. § 12111 et seq.

2 Cases that cite this headnote

**[36]** **Civil Rights** 🔑 Acts or Conduct Causing Deprivation

Unlike a discrimination claim, a plaintiff need not be "disabled" to assert a retaliation claim under the Rehabilitation Act. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a).

1 Case that cites this headnote

**[37]** **Civil Rights** 🔑 Acts or Conduct Causing Deprivation

In the context of the ADA's anti-retaliation provisions, which preclude companies from discriminating against any individual because the individual opposed an act or practice that violated the ADA or because the individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the ADA, "discrimination" means "retaliation." Americans with Disabilities Act of 1990 § 503, 42 U.S.C.A. § 12203(a).

1 Case that cites this headnote

**[38]** **Labor and Employment** 🔑 Denial of or interference with rights in general

**Labor and Employment** 🔑 Reinstatement; Restoration

The Family Medical Leave Act (FMLA) prohibits employers from interfering, restraining, or denying the use of FMLA leave and simultaneously ensures that an employee is restored to their pre-leave position upon return. Family and Medical Leave Act of 1993 § 102, 29 U.S.C.A. § 2612(a)(1)(D).

**[39]** **Civil Rights** 🔑 Requesting and choosing accommodations; interactive process; cooperation

Rather than protecting a right to be absent from work, the Rehabilitation Act mandates an employer to engage with an employee who asserts that he or she may be disabled in a process designed to result in a mutually agreeable reasonable accommodation for the disability, thereby permitting the employee to continue working without imposing an undue burden on the employer. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a).

[40]    **Civil Rights** 🗝 Requesting and choosing accommodations;  interactive process;  cooperation

The result of the Rehabilitation Act's interactive process may be a reasonable accommodation that allows an employee who asserts that he or she may be disabled to remain in his or her role with some modification to account for the disability. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a).

[41]    **Civil Rights** 🗝 Discrimination by Reason of Handicap, Disability, or Illness

**Labor and Employment** 🗝 Purpose and construction in general

As a general matter, the Family Medical Leave Act (FMLA) and the Rehabilitation Act protect different things—the former is directed at protecting persons facing, in either themselves or a family member, serious health issues, while the ADA and Rehabilitation Act protect those persons with disabilities. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a); Family and Medical Leave Act of 1993 § 102, 29 U.S.C.A. § 2612(a)(1)(D); Americans with Disabilities Act of 1990 § 101, 42 U.S.C.A. § 12111 et seq.

[42]    **Civil Rights** 🗝 Impairments in general;  major life activities

The Rehabilitation Act's definition of "disability" has three components: (1) whether the plaintiff has a physical or mental impairment; (2) whether that impairment impacts one or more major life activities; and (3) whether the claimed

disability imposes a substantial limitation on that identified major life activity. Rehabilitation Act of 1973 § 7, 29 U.S.C.A. § 705(20)(B).

[43]    **Civil Rights** 🗝 Impairments in general;  major life activities

The long-term existence of an impairment in itself is not sufficient to establish a disability under the ADA or the Rehabilitation Act. Rehabilitation Act of 1973 § 7, 29 U.S.C.A. § 705(20)(B); Americans with Disabilities Act of 1990 § 3, 42 U.S.C.A. § 12102(2).

1 Case that cites this headnote

[44]    **Civil Rights** 🗝 Questions of Law or Fact

In determining whether a plaintiff is disabled under the ADA or Rehabilitation act, the question of whether the plaintiff has identified a major life activity impacted by the plaintiff's impairment is a question for the court, while the issue of whether the impairment substantially limits that activity is a question for the jury. Rehabilitation Act of 1973 § 7, 29 U.S.C.A. § 705(20)(B); Americans with Disabilities Act of 1990 § 3, 42 U.S.C.A. § 12102(2).

1 Case that cites this headnote

[45]    **Civil Rights** 🗝 Activities protected

Employee and former employee plausibly alleged that, in requesting or taking Family Medical Leave Act (FMLA) leave, they engaged in protected activity, as required to state retaliation claim under Rehabilitation Act, where employee and former employee alleged that they requested FMLA leave to allow them to address ongoing ailments that plausibly met definition of disability under Rehabilitation Act, and that, if they took time off as planned, they could continue to perform essential functions of their jobs, and such FMLA leave requests were kind that could double as reasonable accommodation. Rehabilitation Act of 1973 §§ 7, 504, 29 U.S.C.A. §§ 705(20)(B), 794(a), 794(d); Family and Medical Leave Act of 1993 § 102, 29 U.S.C.A. § 2612(a)(1)(D).

2020 Employee Benefits Cas. 465,086

4 Cases that cite this headnote

**[46]** **Civil Rights** 🗝 Discharge or layoff
**Civil Rights** 🗝 Discipline

Employee and former employee plausibly alleged that employer took adverse employment actions against them, as required to state retaliation claim under Rehabilitation Act, where former employee alleged that employer fired him for taking FMLA leave, and employee alleged that employer sent company-wide notices accusing him of abusing his FMLA leave, assigned him negative disciplinary points when he had to take FMLA leave, took him out of service without pay, and required him to appear before disciplinary hearing, and construed in light most favorable to employee, allegations, especially when taken together, were enough to discourage reasonable person from engaging in protected activity, i.e., FMLA leave. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a).

**[47]** **Civil Rights** 🗝 Adverse actions in general

An "adverse employment action" in the context of a retaliation claim under the Rehabilitation Act includes both actions that affect the terms, conditions or status of employment and those that would dissuade a reasonable person from engaging in the protected activity. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a).

1 Case that cites this headnote

**[48]** **Civil Rights** 🗝 Causal connection; temporal proximity

Employee and former employee plausibly alleged causal connections between their use of Family Medical Leave Act (FMLA) leave and adverse employment actions against them, as required to state retaliation claim under Rehabilitation Act, where employer discharged former employee for misusing his FMLA leave and sent letters to employee that discussed misuse of FMLA leave, placed him on temporary leave without pay, and called him before disciplinary hearing, all specifically to address his use of FMLA leave. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a).

3 Cases that cite this headnote

**[49]** **Civil Rights** 🗝 Particular cases

Employee's and former employee's allegations that employer actively discouraged them from pursuing or using intermittent leave plausibly alleged that employer failed to provide reasonable accommodation, as required to state claim for violation of Rehabilitation Act, where employees alleged that employer actively discouraged them from using their pre-approved Family Medical Leave Act (FMLA) leave as reasonable accommodation in several ways, from subjecting them to disciplinary hearing for use of that FMLA leave, to sending them notices threatening to punish them for using their FMLA leave. Family and Medical Leave Act of 1993 § 102, 29 U.S.C.A. § 2612(a)(1)(D); Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a).

**[50]** **Civil Rights** 🗝 Accommodations in general

A claim based on a denial of a reasonable accommodation under the Rehabilitation Act differs from a disparate-impact claim. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a).

**[51]** **Civil Rights** 🗝 Accommodations in general

The ADA's definition of "discrimination," which is incorporated into the Rehabilitation Act, is broad and includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an employee unless that accommodation would impose an undue hardship on the employer. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(d); Americans with Disabilities Act of 1990 § 102, 42 U.S.C.A. § 12112(b)(5)(A).

1 Case that cites this headnote

2020 Employee Benefits Cas. 465,086

**[52]**    **Civil Rights** 🔑 In general; elements of accommodation claims

To assert a failure-to-accommodate claim under the Rehabilitation Act, plaintiffs must plausibly allege that they are (1) disabled, yet (2) otherwise qualified for the position despite their disability: (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation; (3) that their employer was aware of their disability; (4) that they requested an accommodation; and (5) that their employer failed to provide the requested reasonable accommodation. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a).

2 Cases that cite this headnote

**[53]**    **Civil Rights** 🔑 In general; elements of accommodation claims

In its traditional form, a Rehabilitation Act failure-to-accommodate claim exists when an employee asks for a reasonable accommodation and the employer explicitly denies that request. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a).

1 Case that cites this headnote

**[54]**    **Civil Rights** 🔑 Requesting and choosing accommodations; interactive process; cooperation

Generally, an employer does not have a duty under the Rehabilitation Act to provide a reasonable accommodation unless the employee has made a request for an accommodation; courts do not require employers to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a).

1 Case that cites this headnote

**[55]**    **Civil Rights** 🔑 Requesting and choosing accommodations; interactive process; cooperation

There is no liability for an employer under the Rehabilitation Act for failing to provide a reasonable accommodation if the employee withdraws their request for a reasonable accommodation on their own volition and without any pressure or discouragement on the part of their employer. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a).

1 Case that cites this headnote

**[56]**    **Civil Rights** 🔑 Employment qualifications, requirements, or tests

For a viable claim that an employer violated the Rehabilitation Act's prohibition against certain medical-information inquiries, a plaintiff must allege facts that support the plausible inference that the employer's action amounted to either a medical examination or a prohibited inquiry into the employee's medical disability within the meaning of the Americans With Disabilities Act (ADA), including inquiries into the nature and severity of such disability. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(d).

**[57]**    **Civil Rights** 🔑 Employment qualifications, requirements, or tests

For purposes of a claim that an employer's inquiry into an employee's medical records amounted to a medical examination, in violation of the Rehabilitation Act, a "medical examination" consists of a procedure or test that seeks information about an individual's physical or mental impairments or health. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(d).

**[58]**    **Civil Rights** 🔑 Employment qualifications, requirements, or tests

Employee's and former employee's allegations that employer required them to provide medical documentation in support of their Family Medical Leave Act (FMLA) leave requests failed to plausibly allege that employer inquired as to whether employee or former employee was individual with disability or as to nature or severity of disability, as required to state claim

that employer engaged in prohibited disability-related inquiry in violation of Rehabilitation Act, although employer's requests for FMLA leave verification may have led to information about disabilities, where FMLA provided for leave in number of situations, not just for employees who needed leave to address disability. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(d); Family and Medical Leave Act of 1993, § 2 et seq., 29 U.S.C.A. § 2601 et seq. (FMLA).

**[59]    Civil Rights** 🔑 Employment qualifications, requirements, or tests

To allege that an employer engaged in a prohibited disability-related inquiry, in violation of the Rehabilitation Act, a plaintiff must plausibly allege that his or her employer inquired as to whether an employee is an individual with a disability or as to the nature or severity of the disability. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(d).

**[60]    Civil Rights** 🔑 Employment qualifications, requirements, or tests

The Rehabilitation Act's solely-by-reason-of standard for a claim an employer engaged in a prohibited disability-related inquiry provides a narrow cause of action that prohibits only those inquiries that are aimed at identifying a disability. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(d).

**[61]    Civil Rights** 🔑 Employment qualifications, requirements, or tests

The viability of a claim that an employer engaged in a prohibited disability-related inquiry, in violation of the Rehabilitation Act, depends on whether a medical inquiry is intended to reveal or necessitates revealing a disability, or whether the inquiry may merely tend to reveal a disability. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(d).

**[62]    Civil Rights** 🔑 Employment qualifications, requirements, or tests

A claim that an employer engaged in a prohibited disability-related inquiry in violation of the Rehabilitation Act is different from an ADA medical inquiry violation, which requires only that an employer request medical information that may tend to reveal a disability, including a request for a general diagnosis; as a result, a medical inquiry that violates the ADA will not necessarily violate the Rehabilitation Act. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(d); Americans with Disabilities Act of 1990, § 102(d)(1), 42 U.S.C.A. § 12112(d)(1).

**[63]    Civil Rights** 🔑 Confidentiality; disclosure

Employee and former employee failed to plausibly allege that employer mishandled confidential medical information related to their alleged disabilities, as required to state claim for violation of provisions of Rehabilitation Act concerning medical-record confidentiality, where employee and former employee failed to allege that employer either conducted disability-related inquiry or required them to submit to medical exam. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(d).

**[64]    Civil Rights** 🔑 Confidentiality; disclosure

The Rehabilitation Act addresses the confidentiality of medical records only in the limited context of pre-employment examinations; however, the ADA's limitations on the disclosure of medical information are incorporated by reference into the Rehabilitation Act. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(d); Americans with Disabilities Act of 1990 § 102, 42 U.S.C.A. § 12112(d).

**[65]    Federal Civil Procedure** 🔑 Employees
**Labor and Employment** 🔑 Parties

Rule of civil procedure governing class actions, not requirements for collective actions under Fair Labor Standards Act (FLSA), applied to

employee's and former employee's putative class action against employer alleging violations of the Family Medical Leave Act (FMLA); FMLA provided employee and former employee with "right of action" against employer "for and in behalf of" other employees, but was silent as to appropriate way to proceed, and thus default procedures set forth in rule of civil procedure governed. Family and Medical Leave Act of 1993 § 107, 29 U.S.C.A. § 2617(a)(2); Fair Labor Standards Act of 1938 § 16, 29 U.S.C.A. § 216(b); Fed. R. Civ. P. 23.

**[66]    Summary Judgment**    ⌦    Continuance

The purpose behind the rule permitting a court to defer or deny a motion for summary judgment in order to allow time to take further discovery is to ensure that plaintiffs receive a full opportunity to conduct discovery to be able to successfully defeat a motion for summary judgment. Fed. R. Civ. P. 56(d).

1 Case that cites this headnote

**[67]    Summary Judgment**    ⌦    Time for Hearing

A party invoking the protections of the rule permitting a court to defer or deny a motion for summary judgment in order to allow time to take further discovery must do so in good faith by affirmatively demonstrating how postponement of a ruling on the motion will enable him to rebut the movant's showing of the absence of a genuine issue of fact. Fed. R. Civ. P. 56(d).

2 Cases that cite this headnote

**[68]    Summary Judgment**    ⌦    Time for Hearing

The party opposing a motion for summary judgment possesses no absolute right to additional time for discovery under the rule permitting a court to defer or deny a motion for summary judgment in order to allow time to take further discovery. Fed. R. Civ. P. 56(d).

1 Case that cites this headnote

**[69]    Summary Judgment**    ⌦    Time for Hearing

Denying a motion to take additional discovery before responding to a motion for summary judgment when the non-moving party has not yet received a full opportunity to conduct discovery would likely constitute an abuse of discretion. Fed. R. Civ. P. 56(d).

**[70]    Summary Judgment**    ⌦    Time for Hearing

It would likely be improper to grant summary judgment if the parties seeking time to conduct additional discovery before the court rules on the summary-judgment motion are not afforded a sufficient opportunity to conduct the additional discovery. Fed. R. Civ. P. 56(d).

1 Case that cites this headnote

**[71]    Summary Judgment**    ⌦    Time for Hearing

In deciding a motion to take additional discovery before responding to a motion for summary judgment, courts consider five factors: (1) when the movant learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery has the potential to change the ruling at issue; (3) how long the discovery period had lasted; (4) whether the movant was dilatory in its discovery efforts; and (5) whether the party moving for summary judgment was responsive to discovery requests. Fed. R. Civ. P. 56(d).

2 Cases that cite this headnote

**[72]    Summary Judgment**    ⌦    Time for Hearing

Employee and former employee were entitled to additional discovery concerning employer's Family Medical Leave Act (FMLA) policies before responding to employer's motion for summary judgment on employee's and former employee's claims that employer violated FMLA, where employer filed its summary-judgment motion just shy of a month after answering complaint and there was no allegation or evidence that employee and former employee delayed discovery or were not diligent in pursuing it given that time for discovery had only recently commenced, little to no discovery had occurred when employee and former employee

requested additional discovery, and FMLA policies had potential to change outcome of summary-judgment motion. Fed. R. Civ. P. 56(d).

1 Case that cites this headnote

[73]   **Summary Judgment** 🔑 Right to judgment as matter of law

**Summary Judgment** 🔑 Conflicting Evidence; Extent of Disagreement or Dispute as to Facts

Whether summary judgment is appropriate depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

[74]   **Labor and Employment** 🔑 Pleading

Although a court analyzes Family Medical Leave Act (FMLA) claim based on the interference theory differently from one based on the retaliation theory, notice pleading does not box plaintiffs into one theory or the other at the complaint stage of an FMLA action. Family and Medical Leave Act of 1993, § 2 et seq., 29 U.S.C.A. § 2601 et seq. (FMLA).

[75]   **Labor and Employment** 🔑 Denial of or interference with rights in general

**Labor and Employment** 🔑 Discharge or layoff

The Family Medical Leave Act's (FMLA) first interference provision prohibits employers from interfering, restraining, or denying the exercise of or attempted exercise of any FMLA right; although labeled in terms of interference, this prohibition includes retaliatory discharge for taking leave. Family and Medical Leave Act of 1993 § 105, 29 U.S.C.A. § 2615(a)(1).

[76]   **Labor and Employment** 🔑 Reinstatement; Restoration

The Family Medical Leave Act's (FMLA) second interference provision requires an employer to restore an employee to the position of employment held by the employee when the leave commenced or to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment. Family and Medical Leave Act of 1993 § 104, 29 U.S.C.A. § 2614(a)(1).

[77]   **Labor and Employment** 🔑 Denial of or interference with rights in general

The prima facie elements of an interference claim under the Family Medical Leave Act (FMLA) are that: (1) the employee was FMLA-eligible; (2) the defendant was a covered employer; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intent to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled. Family and Medical Leave Act of 1993 §§ 104, 105, 29 U.S.C.A. §§ 2614(a)(1), 2615(a) (1).

2 Cases that cite this headnote

[78]   **Labor and Employment** 🔑 Commencement, duration, and termination of leave

**Labor and Employment** 🔑 Denial of or interference with rights in general

**Labor and Employment** 🔑 Reinstatement; Restoration

The Family Medical Leave Act's (FMLA) interference provisions focus simply on whether the employer provided its employee with the entitlements set forth in the FMLA—for example, a 12-week leave or reinstatement after taking medical leave. Family and Medical Leave Act of 1993 §§ 104, 105, 29 U.S.C.A. §§ 2614(a) (1), 2615(a)(1).

[79]   **Labor and Employment** 🔑 Retaliation in general

For a prima facie retaliation claim under the Family Medical Leave Act (FMLA), a plaintiff must establish that he or she was: (1) engaged

in activity protected by the FMLA; (2) that the employer knew the employee was exercising his or her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an adverse employment action adverse to the employee; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. Family and Medical Leave Act of 1993 § 105, 29 U.S.C.A. § 2615(a)(2).

2 Cases that cite this headnote

[80]    **Labor and Employment** 🔑 Retaliation in general

A retaliation claim under the Family Medical Leave Act (FMLA) is about whether the employer took some adverse action against an employee after they availed themselves of their FMLA rights, not about whether the employee's FMLA rights were impeded in the first place. Family and Medical Leave Act of 1993 § 105, 29 U.S.C.A. § 2615(a)(2).

1 Case that cites this headnote

[81]    **Labor and Employment** 🔑 Pleading

When the essence of a claim for violation of the Family Medical Leave Act (FMLA) is retaliation, not interference, a district court can consolidate generally pled interference claims and consider them as one for retaliation. Family and Medical Leave Act of 1993 § 105, 29 U.S.C.A. § 2615(a)(2).

[82]    **Labor and Employment** 🔑 Pleading

Consolidating Family Medical Leave Act (FMLA) claims into a retaliation claim is appropriate when an employee is afforded all the rights and privileges that the FMLA contemplates but is retaliated against or terminated afterward. Family and Medical Leave Act of 1993 § 105, 29 U.S.C.A. § 2615(a)(2).

1 Case that cites this headnote

[83]    **Labor and Employment** 🔑 Pleading

Former employee's claim that employer interfered with his Family Medical Leave Act (FMLA) rights was better understood as claim for retaliation under FMLA, although claim was captioned as "Denial and Interference[,]" where former employee alleged that he was terminated, former employee appeared to be putative representative for proposed classes of employees who were allegedly terminated or disciplined for taking FMLA leave, and former employee did not allege that employer interfered with his ability to take leave or that it failed to restore him to his position when he returned, and thus retaliation, not interference, seemed to be essence of claim. Family and Medical Leave Act of 1993 §§ 104, 105, 29 U.S.C.A. §§ 2614(a)(1), 2615(a)(1), 2615(a)(2).

[84]    **Labor and Employment** 🔑 Pleading

A plaintiff may plead both retaliation and interference causes of action under the Family Medical Leave Act (FMLA). Family and Medical Leave Act of 1993 §§ 104, 105, 29 U.S.C.A. §§ 2614(a)(1), 2615(a)(1), 2615(a)(2).

[85]    **Labor and Employment** 🔑 Presumptions and burden of proof

Courts in the Sixth Circuit apply the *McDonnell Douglas* burden-shifting framework to Family Medical Leave Act (FMLA) retaliation suits when the plaintiff produces indirect evidence of a causal connection between the protected activity and the adverse action. Family and Medical Leave Act of 1993 § 105, 29 U.S.C.A. § 2615(a)(2).

1 Case that cites this headnote

[86]    **Labor and Employment** 🔑 Discharge or layoff

**Labor and Employment** 🔑 Presumptions and burden of proof

Under the *McDonnell Douglas* burden-shifting framework, as applied to Family Medical Leave Act (FMLA) retaliation claims, fraud and dishonesty constitute lawful, non-retaliatory

bases for termination and nothing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave. Family and Medical Leave Act of 1993 § 105, 29 U.S.C.A. § 2615(a)(2).

**[87]** **Labor and Employment** 🔑 Motive or intent in general

**Labor and Employment** 🔑 Presumptions and burden of proof

Under the *McDonnell Douglas* burden-shifting framework, as applied to Family Medical Leave Act (FMLA) retaliation claims, a plaintiff may establish that an employer's proffered reasons for an adverse employment action was pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action. Family and Medical Leave Act of 1993 § 105, 29 U.S.C.A. § 2615(a)(2).

**[88]** **Labor and Employment** 🔑 Motive or intent in general

**Labor and Employment** 🔑 Presumptions and burden of proof

Under the "honest-belief rule," as applied to Family Medical Leave Act (FMLA) retaliation claims, an employer's proffered reason for an adverse employment action is considered honestly held, not pretextual, where the employer can establish it reasonably relied on particularized facts that were before it at the time the decision was made; thereafter, the burden is on the plaintiff to demonstrate that the employer's belief was not honestly held. Family and Medical Leave Act of 1993 § 105, 29 U.S.C.A. § 2615(a)(2).

**[89]** **Summary Judgment** 🔑 Time off; leave

An employee's bare assertion that an employer's proffered reason for an adverse employment action has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact as to whether the proffered reason is pretext for

retaliation in violation of the Family Medical Leave Act (FMLA). Family and Medical Leave Act of 1993 § 105, 29 U.S.C.A. § 2615(a)(2).

**[90]** **Labor and Employment** 🔑 Carriers; Railway Labor Act

**Labor and Employment** 🔑 Major and minor disputes in general

The Railway Labor Act provides a comprehensive framework for the resolution of labor disputes in the railroad industry and establishes a mandatory arbitration regime for minor disputes. Railway Labor Act § 1, 45 U.S.C.A. § 151 et seq.

1 Case that cites this headnote

**[91]** **Labor and Employment** 🔑 Major and minor disputes in general

"Minor disputes" that are subject to mandatory arbitration under the Railway Labor Act involve controversies over the interpretation of an existing collective bargaining agreement and disputes invoking contract-based rights. Railway Labor Act § 1, 45 U.S.C.A. § 151 et seq.

1 Case that cites this headnote

**[92]** **Labor and Employment** 🔑 Carriers; Railway Labor Act

Although the Railway Labor Act provides a comprehensive framework for the resolution of labor disputes in the railroad industry, a federal court may resolve claims arising under federal or state statutory law if the underlying factual issues do not require a court to interpret or construe an existing collective bargaining agreement. Railway Labor Act § 1, 45 U.S.C.A. § 151 et seq.

1 Case that cites this headnote

**[93]** **Labor and Employment** 🔑 Major and minor disputes in general

To distinguish between a minor dispute that is precluded by the Railway Labor Act and one that is not, courts in the Sixth Circuit ask

two questions: (1) whether proof of the federal-law claim would require interpretation of a collective bargaining agreement; and (2) whether the right claimed by the plaintiff is created by the collective bargaining agreement or by federal law. Railway Labor Act § 1, 45 U.S.C.A. § 151 et seq.

**[94]    Federal Preemption** 🔑 Collective bargaining agreements

**Labor and Employment** 🔑 Carriers; Railway Labor Act

An employer cannot take an otherwise valid claim and cause it to become preempted by the Railway Labor Act by claiming a collective bargaining agreement as a defense. Railway Labor Act § 1, 45 U.S.C.A. § 151 et seq.

**[95]    Labor and Employment** 🔑 Discharge and layoff

Railway Labor Act did not apply to former employee's claim that employer, a rail carrier, violated Family Medical Leave Act (FMLA) by retaliating against him for taking FMLA leave, and thus claim was not required to be resolved in arbitration, where proof of former employee's claim did not require interpretation of parties' collective bargaining agreement, right asserted by former employee arose from FMLA, not agreement, arbitration could assess facts surrounding former employee's termination and whether employer's actions complied with agreement but would not resolve federal law in question, and nothing in agreement indicated that former employee expressly agreed to bring FMLA claims exclusively to arbitration. Family and Medical Leave Act of 1993 § 105, 29 U.S.C.A. § 2615(a)(2); Railway Labor Act § 1, 45 U.S.C.A. § 151 et seq.

**[96]    Action** 🔑 Stay of Proceedings

The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes in its docket with economy of time and effort for itself, for

counsel, and for litigants, and the decision to stay a proceeding ordinarily rests with the sound discretion of the court.

**[97]    Action** 🔑 Stay of Proceedings

A court must tread carefully in granting a stay of proceedings since a party has a right to a determination of its rights and liabilities without undue delay.

2 Cases that cite this headnote

**[98]    Action** 🔑 Stay of Proceedings

In addressing whether a stay of proceedings is appropriate, courts commonly consider several factors, including: (1) the need for a stay; (2) the stage of litigation; (3) whether the non-moving party will be unduly prejudiced or tactically disadvantaged; (4) whether a stay will simplify the issues; and (5) whether a stay would lessen the burden of litigation for the parties and the court.

2 Cases that cite this headnote

**[99]    Action** 🔑 Stay of Proceedings

It is the party seeking a stay who bears the burden of showing both a need for delay and that neither the other party nor the public will suffer harm from entry of the order.

1 Case that cites this headnote

**[100]    Action** 🔑 Actions in different jurisdictions in general

Employer was not entitled to stay of employee's and former employee's action alleging violations of Family Medical Leave Act (FMLA), ERISA, and Rehabilitation Act, although employer was litigating similar action in different jurisdiction and had moved to transfer instant action to other jurisdiction, where stay would not promote final resolution, any additional discovery had been greatly trimmed, limiting any benefit stay might provide in terms of avoided discovery, plaintiffs were due their day in court and to delay that for indeterminate amount of time, without strong

reason in support, was unwarranted, there was no pressing need for stay, and there was no indication that stay would lessen, or impose more of, any burden on parties or court. Rehabilitation Act of 1973, § 2 et seq., 29 U.S.C.A. § 701 et seq.; Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.; Family and Medical Leave Act of 1993, § 2 et seq., 29 U.S.C.A. § 2601 et seq.

**Attorneys and Law Firms**

**\*767** Elizabeth S. Tuck, The Tuck Firm, LLC, Tod Joseph Thompson, Tod J. Thompson, Attorney at Law, Cincinnati, OH, Joseph F. Albrechta, Fremont, OH, for Plaintiffs.

Elizabeth L. Dicus, Jones Day, Lindsay M. Cogley, JPMorgan Chase, Columbus, OH, Donald J. Munro, Pro Hac Vice, Nikki L. McArthur, Pro Hac Vice, Thomas R. Chiavetta, Pro Hac Vice, Jones Day, Washington, DC, for Defendant.

**OPINION AND ORDER**

DOUGLAS R. COLE, UNITED STATES DISTRICT JUDGE

This cause is before the Court on three pending Motions, including: (i) Defendant CSX Transportation ("CSXT"), Inc.'s combined Motion for Judgment on the Pleadings, Motion for Summary Judgment, and/or Motion to Stay (Doc. 15); (ii) Plaintiffs Anthony Schobert's and John York's First Motion to Amend/Correct Complaint Pursuant to Civil Rule 15(a)(2) (Doc. 20); and (iii) Plaintiffs' Motion for Discovery Pursuant to Rule 56(d) (Doc. 21).

For the reasons below, the Court **DENIES** Plaintiffs' Motion for Leave to Amend (Doc. 20), **GRANTS** CSXT Judgment on the Pleadings as to Part I.A of its Motion (Doc. 15, #126–29[1]), **GRANTS IN PART AND DENIES IN PART** CSXT's Motion for Judgment on the Pleadings as to Part I.B of its Motion (*id.* at #130-34), **DENIES** CSXT Judgment on the Pleadings as to Part I.C of its Motion (*id.* at #135), **GRANTS** Plaintiffs' Motion for Discovery (Doc. 21), **DEFERS** ruling on CSXT's Motion for Summary Judgment as to Parts II.A through II.C (Doc. 15 at #136–41), **DENIES** CSXT Summary Judgment as to Part II.D of its Motion (*id.* at #142–44), and

**DENIES** CSXT's request for stay, which it advanced in Part III of its Summary Judgment Motion (*id.* at #145–48).

**BACKGROUND**

Plaintiffs Anthony Schobert ("Schobert") and John York ("York") (collectively "Plaintiffs") take issue with how CSXT conducted certain FMLA-related investigations during the 2017–18 holiday season. Plaintiffs make several allegations on behalf of themselves and fourteen putative classes of current and former CSXT Train and Engineer employees, all related to those events. (*See* Compl., Doc. 1, #1–26).

While the specifics vary (not surprisingly, given fourteen separate putative classes), the Complaint generally alleges that CSXT violated: (1) the Family Medical Leave Act (Count I); (2) the Employee Retirement Income Security Act (Count II); and (3) the Rehabilitation Act (Count III), each in a variety of ways. (*See id.* at **\*768** ¶¶ 154–71, #22–24). CSXT attacks each of the three counts on the merits, either by way of judgment on the pleadings or on summary judgment, and also seeks a stay of further proceedings to the extent any claims survive. Plaintiffs responded both on the merits of CSXT's arguments and also by requesting: (1) leave to amend their Complaint; and (2) an opportunity to conduct additional discovery before responding more fully to some of CSXT's summary judgment arguments. Given the interplay among the various pending motions, the Court will begin by discussing the factual backdrop against which the motions arise (based on the allegations in the Complaint) and describe each of the motions in greater detail, before turning to its analysis of each.

**A. Schobert And York, Two Locomotive Engineers, Take FMLA Leave Around The 2017–18 Winter Holidays.**

CSXT is a rail carrier operating nationwide and employing more than 32,000 people. (Compl. at ¶ 7, #2). Schobert is, and York was, one of those employees. (*Id.* at ¶¶ 52, 94, #9, 14). Schobert first joined CSXT in 2003 and has been a locomotive engineer since 2012. (*Id.* at ¶ 52, #9). York began working with CSXT in 2001 and was a locomotive engineer from 2011 until his termination in 2018. (*Id.* at ¶ 94, #14). Locomotive engineers are part of a larger group of employees, Train & Engineer Employees ("T&E Employees"), which includes engineers, conductors, and switchmen, all of whom work pursuant to a collective bargaining agreement. (*See* Compl. at ¶ 38, #7). Instead of working a typical nine-to-five schedule, T&E Employees are "called up within two hours' notice for

multiple-day shifts that include overnight stays[.]" (*Id.* at ¶ 31, #5). They "do not work a regular workday or Monday through Friday," but are "on call" most hours of most days. (*Id.* at ¶¶ 12, 31, #3, 5).

For Schobert and York, the on-call nature of their job is complicated by their alleged disability status, which they assert entitles them to intermittent FMLA leave. (*See* Compl. at ¶¶ 55–56, 97–98, #9, 15). Roughly six years ago, Schobert suffered an injury that resulted in a "continuing disability of the spine," allegedly causing him "intermittent neck and back pain." (*Id.* at ¶¶ 55-56, #9). He further alleges that, during painful flare-ups, he is unable to work. (*Id.* at ¶ 56, #9). York suffered a knee injury approximately five years ago, which flares up from time to time and allegedly impairs his "ability to walk." (*Id.* at ¶¶ 97–98, #15). As part of addressing their respective conditions and flare-ups, Schobert and York sought, and they assert CSXT approved, pre-certified intermittent FMLA leave, which permits them time off to seek treatment. (*See id.* at ¶¶ 57–59, 99–101, #9, 15).

In late December 2017, Schobert experienced a flare-up that allegedly rendered him unable to work, but because it was Christmas time he was unable to get an appointment with his doctor until December 26, 2017. (*Id.* at ¶¶ 73–74, #12). Accordingly, he took four days of FMLA leave. (*Id.*). Separately, York's knee began to cause him problems around New Year's Eve, so he took two days of FMLA leave starting on December 30th. (*See id.* at ¶¶ 112–13, #17). While neither Plaintiff specifically alleges that he returned to work after his FMLA leave concluded, the Complaint indicates that they both did.

During the first few weeks of 2018, CSXT began investigating whether its employees who took FMLA leave during the winter holidays had done so improperly, i.e., merely to avoid being called into work on those holidays. (*See id.* at ¶ 37, #6). **\*769** CSXT undertook this broad-sweeping inquiry because, according to a CSXT notice that Plaintiffs cite in their Complaint, the company had noticed "disruptions to its operations on holidays and weekends due to crew unavailability." (*Id.* at ¶ 24, #4 (purporting to quote a CSXT employee notice)). As part of that investigation, in early-to-mid January 2018, CSXT placed both Schobert and York on administrative leave without pay pending a disciplinary hearing on whether they inappropriately used FMLA leave. (*See id.* at ¶¶ 76–79, 115–17, #12, 17).

Eventually, Schobert and York each had a hearing pursuant to the T&E Employees' collective bargaining agreement with CSXT. Schobert alleges that, at his hearing, CSXT accused him of misusing FMLA leave and lying to his employer. (*Id.* at ¶ 80, #13). He further claims that CSXT supported its accusation with only minimal evidence, consisting solely of the coincidental timing between his leave and the 2017 Christmas holiday. (*Id.* at ¶¶ 81–82, #13). Luckily for Schobert, he was "exonerated" because he "happened to bring documentation of his treatment," namely the December 26, 2017 appointment, to his disciplinary hearing. (*Id.* at ¶ 85, #13). Without expressly pleading as much, the Complaint seems to suggest that CSXT reinstated Schobert to his pre-leave position, as Schobert does not make any allegation to the contrary or assert that he was subject to additional discipline.

York was not so fortunate. Unlike Schobert, York did not provide any corroborating documents to substantiate his need for FMLA leave. So, at York's hearing, CSXT again cited the coincidental timing between FMLA leave and the holiday season to assert that its employee had wrongfully taken FMLA leave. CSXT's belief that York had misused leave led CSXT to find that York committed an act of dishonesty, a terminable offense under the T&E Employees' collective bargaining agreement. CSXT thus fired York on February 24, 2018. (*See id.* at ¶¶ 118–23, #17–18).

**B. Schobert And York Sue CSXT Over Their FMLA Policies, The FMLA Investigations, And The Adverse Employment Actions That Followed.**

Schobert's disciplinary hearing and York's termination led them to jointly sue CSXT (on behalf of fourteen putative classes of employees). Based on the Complaint, it appears that Plaintiffs' grievances with CSXT and its FMLA leave policies had been festering for some time before Plaintiffs initiated this suit. For example, Schobert and York allege that, dating back to at least 2016 and continuing through at least 2017, CSXT "issued multiple company-wide Notices accusing employees who take FMLA of routinely abusing their leave." (Compl. at ¶ 20, #4). Plaintiffs assert that these notices "threatened employees with discipline[,]" "intended to and did cause animosity" between and among employees, "chilled employees' use of FMLA intermittent leave[,]" and "caused [employees] not to use FMLA leave when they needed it." (*See id.* at ¶¶ 19–28, #4–5). Plaintiffs say this left them and other T&E Employees who need FMLA leave in an untenable position—either take leave in conjunction with other days off and risk discipline or not take leave at all. (*See id.* at ¶ 28, #5).

Schobert and York also take issue with several of CSXT's policies more broadly, which they claim violate the FMLA outright. First, they allege that CSXT improperly calculates employees' FMLA time because it measures leave "in increments of 1/100 of a week, or 1.68 hours," not in an increment less than one hour as required **\*770** by law. (*Id.* at ¶¶ 9–10, #2–3 (citing [29] C.F.R. § 825.205)).

Plaintiffs' second FMLA allegation concerns the way that CSXT allocates extra pay to T&E Employees. Schobert and York, in their roles as locomotive engineers, could work for "guarantee" pay, which they would earn for remaining "on-call" to come in and operate a train, even if they are never actually called to do so. (*See id.* at ¶ 12, #3). They allege that if T&E Employees who are "on call" take FMLA leave (thus they are "on call" but unable to work if called to do so), then CSXT "strips the engineers of their guarantee pay for an entire week, regardless of whether the employee is actually called to work while on FMLA leave." (*Id.* at ¶ 13, #3). Plaintiffs further allege that even after "stripping" this pay, CSXT "still requires the engineers to remain on call for days after the FMLA absence," apparently without pay. (*Id.* at ¶ 14, #3).

Third, Plaintiffs allege CSXT's "Crew Attendance Point System" ("CAPS") violates the FMLA. As Plaintiffs describe it, this policy "assigns negative points for non-FMLA absences," but simultaneously enables employees to reduce or eliminate accrued points if they have "perfect attendance for one month." (*Id.* at ¶ 16, #3). If an employee takes FMLA leave, then that destroys perfect attendance, and thus precludes any point reduction for that month. (*See id.* at ¶ 17, #3). That is, an employee who takes FMLA leave on June 1st, returns on June 2nd, and does not miss another day that month, would be ineligible for a point reduction. (*See id.*). The converse is also true. An employee could have perfect attendance for the first thirty days of July, take FMLA leave on July 31st, and therefore be ineligible for a reduction that month too. This means, Plaintiffs argue, that when an employee has "a prior non-FMLA absence" (i.e., negative points already on their record), they are "actively discouraged from taking FMLA" because doing so could ruin otherwise perfect attendance. (*Id.* at ¶ 17–18, #3).

## C. Plaintiffs Purport To Represent Fourteen Putative Classes Asserting Three Claims Against CSXT.

Schobert and York assert their claims as a putative class action on behalf of themselves and fourteen classes.[2] Each class is

tied to one or more causes of action against CSXT. Classes One, Two, and Three are comprised of CSXT employees allegedly harmed by CSXT's FMLA leave calculations, CAPS policy, and guarantee pay reductions, respectively. (Compl. at ¶¶ 131–33, #19). Class Four concerns employees who were threatened with adverse employment action for, or chilled from, taking FMLA leave based on CSXT's FMLA notices. (*Id.* at ¶ 134, #19). Class Five contains employees whose FMLA leave information was "published" to unauthorized persons. (*Id.* at ¶ 135, #19). Class Six covers all employees who were disciplined, forewent leave, or took more leave than necessary because of CSXT's policies. (*Id.* at ¶ 136, #20). Classes Seven, Eight, and Nine are made up of employees who were certified for, but who CSXT deterred from, or terminated or disciplined for, taking FMLA leave. (*Id.* at ¶¶ 137–39, #20).

Class Ten addresses all *disabled* employees who were deterred from, disciplined for, or terminated for, taking FMLA leave despite it being the "reasonable accommodation for their disability[.]" **\*771** (*Id.* at ¶ 140, #20–21). Classes Eleven and Twelve are employees who submitted medical information to CSXT in response to "threatening communications," or to refute charges of FMLA misuse. (*Id.* ¶¶ 141–42, #21). Class Thirteen concerns employees who had their medical information placed somewhere other than in their "confidential employee medical file," as Plaintiffs argue the law requires. (*Id.* at ¶ 143, #21). Finally, Class Fourteen is employees who were "deterred from availing themselves" of CSXT's ERISA-covered, employer-maintained healthcare plan. (*Id.* at ¶ 144, #21).

Based on Schobert and York's factual allegations and these fourteen putative classes, Plaintiffs assert three "claims," which are in actuality eight causes of action. The first two are that CSXT impermissibly denied or interfered with Plaintiffs' FMLA benefits and rights. (*Id.* at ¶¶ 154–59, #22–23). The next two allege that CSXT "harassed, disciplined, and discriminated against" Plaintiffs' regarding their rights under ERISA rights (Count II). (*Id.* at ¶¶ 160–63, #23). The final four are claims for alleged violations of the Rehabilitation Act, including: that CSXT committed disability-related discrimination and retaliation (*id.* at ¶ 170, #24); that CSXT denied Plaintiffs a reasonable accommodation (*id.* at ¶¶ 166–67, 169, #24); and that CSXT "mishandled and wrongfully disclosed" Plaintiffs' medical information (*id.* at ¶ 168, #24).

2020 Employee Benefits Cas. 465,086

## PENDING MOTIONS

### A. CSXT's Motion For Judgment On The Pleadings, Motion For Summary Judgment, And/Or Motion To Stay Pending Arbitration.

On May 1, 2019, CSXT filed a combined motion seeking: (1) judgment on the pleadings on the entirety of two claims (ERISA and Rehabilitation Act) and an aspect of the remaining claim (FMLA); (2) summary judgment on the other aspects of the remaining FMLA claim; and/or (3) a stay of this proceeding pending arbitration. (*See* Mot. for J. on the Pleadings, Mot. for Summ. J. and/or Mot. to Stay ("CSXT's Mot."), Doc. 15, #108–10; *see also* Mem. of Law in Support of Def. CSXT's Mot. ("CSXT's Mem."), Doc. 15-1, #111–49).

Regarding its Motion for Judgment on the Pleadings, CSXT argues the Complaint does not state a plausible ERISA claim because that statute imposes liability only if an employer acts with the specific intent to interfere with or violate ERISA, and Plaintiffs have failed to sufficiently plead that specific intent here. (*Id.* at #127–29 (Part I.A[3])). On the Rehabilitation Act front, CSXT argues Plaintiffs inadequately allege that they are "disabled" as defined by the Act, and that neither Plaintiff has sufficiently pled a plausible discrimination or disability-related inquiry cause of action. (*See id.* at #132–34 (Part I.B)). Last, as it relates to judgment on the pleadings, CSXT argues that it was improper for Plaintiffs to plead their putative class action under the FMLA while at the same time purporting to bring the action under Federal Rule of Civil Procedure 23. (*Id.* at #135 (Part I.C)). Instead, CSXT contends, Plaintiffs must bring their class action under the Fair Labor Standards Act's ("FLSA") collective action regime, given the textual similarities between the FLSA and the FMLA. (*See id.*).

As for summary judgment, CSXT argues that the indisputable facts show that the challenged CSXT policies, as a matter **\*772** of law, do not violate the FMLA. (*See id.* at #136–41 (Parts II.A–II.C)). First, CSXT argues the CAPS policy is a "no-fault attendance policy" and does not violate the FMLA because that law does not mandate that employees be allowed to accrue employment benefits while they are on leave. (*Id.* at #136). Second, CSXT argues that, as a matter of law, its guarantee policy does not violate the FMLA because it complies with Department of Labor guidelines, as the employees who are on the guarantee boards and take FMLA leave are treated the same as any other employees who take "equivalent" (i.e., unpaid) leave. (*Id.* at #138–40). Third, CSXT argues that Plaintiffs' allegation about how it

calculates leave is simply "wrong" because CSXT calculates leave in increments of 1/100th of an hour, not 1/100th of a week. (*Id.* at #140–41). This, CSXT says, is actually more generous than what is required by the FMLA, as "an employee is never charged with taking *more* FMLA leave than the total time for which he or she was marked off; he or she is always charged with having taken *less* time." (*Id.*).

CSXT also seeks summary judgment on its argument that York's claim must be arbitrated pursuant to the Railway Labor Act ("RLA") and Supreme Court precedent in *Hawaiian Airlines v. Norris*, 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994). (CSXT's Mem. at #142 (Part II.D)). CSXT argues that York's claim must go to arbitration because it is a "minor claim," as CSX dismissed him for "dishonesty" (based on falsely claiming FMLA leave). (*See id.* at #144). Resolving whether CSXT could permissibly dismiss York, CSXT says, would require the Court to determine "whether CSXT properly managed its contractual allegation process" under the collective bargaining agreement and whether it met its burden to prove, by substantial evidence, that York engaged in FMLA misuse. (*See id.*). If the case is not dismissed, CSXT argues that any remaining claims should be stayed pending that RLA-mandated arbitration. (*See id.* at #145–48 (Part III)).

### B. Plaintiffs' Omnibus Response.

Plaintiffs offer a three-part response to CSXT's Motion. First, they respond on the merits to CSXT's arguments. (Pls.' Mem. in Opp'n to Def. CSXT's Mots. for J. on the Pleadings, for Summ. J., and/or to Stay ("Plaintiffs' Response" or "Pls.' Resp. Mem."), Doc. 19, #210–29). Second, they move to amend the Complaint, (Pls.' First Mot. to Am. Compl. Pursuant to Civ. R. 15(a)(2) ("Plaintiffs' Motion to Amend" or "Pls.' Mot. to Am."), Doc. 20, #231–32), attaching the proposed amended pleading. (*See* Pls.' Mot. to Am. Ex. A ("Prop. Am. Compl."), Doc. 20-1, #233–57). Last, they file a Motion for Discovery pursuant to Federal Rule of Civil Procedure 56(d). (*See* Pls.' Mot. for Discovery Pursuant to Civ. R. 56(d) ("Plaintiffs' Rule 56(d) Motion" or "Pls.' R. 56(d) Mot."), Doc. 21, #258).

Plaintiffs' merits response first devotes substantial consideration to the pleading standard and what they argue is required of them at this stage in the litigation. (Pls.' Resp. Mem. at #210–12). They maintain there is no "heightened" pleading standard in discrimination cases and that a plaintiff need not plausibly allege "each evidentiary element of a claim." (*Id.* at #212). Based on this understanding of the pleading requirement, Plaintiffs argue the initial

Complaint sufficiently and plausibly alleges viable ERISA and Rehabilitation Act claims. (*Id.* at #212–18).

On the ERISA claims, Plaintiffs concede that they must plausibly allege that CSXT acted with the intent to deprive Plaintiffs of ERISA benefits, but maintain that they have met that burden, pointing to allegations in which they expressly state that **\*773** CSXT acted with that intent. (*Id.* at #212 (citing, *e.g.,* Compl. at ¶ 93, #14 ("CSX's policies, threatening letters and messages, disciplinary threats, and other behavior discouraging FMLA and other absences at the end of the calendar year had the effect of and were intended to dissuade Schobert and other employees like him from using their ERISA health insurance coverage."))). Plaintiffs further argue that, to the extent that they must plead specific intent, they are happy to add the word "specific" to the intent allegations of their ERISA claim, thereby—they assert—curing any potential defect. (*Id.*).

As for the Rehabilitation Act claims, Plaintiffs believe they plausibly allege "disabled" status within the meaning of that Act, and, because they are disabled, it is plausible that CSXT discriminated against them and made a prohibited disability-related inquiry. (*Id.* at #213–18). Plaintiffs also argue that Rule 23 is the proper vehicle for this class action and that a number of courts have rejected CSXT's argument that the FLSA applies instead. (*Id.* at #218).

In terms of the RLA's "minor claim" framework precluding York's claims from proceeding outside arbitration, Plaintiffs argue that their claims do not require this Court to consider whether the collective bargaining agreement was satisfied, but rather the issue is whether CSXT was permitted to turn to that agreement at all. (*Id.* at #222-24). That is because, in their view, FMLA violations are a completely separate issue from the T&E Employees' collective bargaining agreement. (*Id.*). Because the alleged violation at issue does not involve the collective bargaining agreement, Plaintiffs maintain that arbitration is neither required nor necessary, and a stay for such arbitration is both inappropriate and unwarranted. (*Id.* at #225–28).

As for the other summary judgment portions of CSXT's Motion (Parts II.A–II.C), Plaintiffs first argue that there are genuine issues of material fact about CSXT's FMLA leave calculation methods, the CAPS policy, and the guarantee policy. (*Id.* at #219–22). Plaintiffs' Response, however, fails to refute the affidavits and documents CSXT filed, which is why Plaintiffs also filed a Rule 56(d) motion.

In their Rule 56(d) Motion, Schobert and York argue that they were unable to adequately respond to the summary judgment portion of CSXT's Motion without some discovery on those issues. (Pls.' R. 56(d) Mot. at #258). Plaintiffs attach to that motion, as required by rule, a declaration from their attorney outlining what discovery, in particular, Plaintiffs believe they need in order to adequately respond. (*See* R. 56(d) Decl. of Tod J. Thompson ("Thompson Decl."), Doc. 21-1, #260–62).

In addition, Plaintiffs also seek leave to amend their Complaint pursuant to Federal Rule of Civil Procedure 15(a) (2) (*see* Pls.' Mot. to Am. Compl., Doc. 20, #231–32), attaching the proposed pleading (*see* Pls.' Mot. to Am. Compl. Ex. A ("Prop. Am. Compl."), Doc. 20-1, #233–59). That motion does not specify the exact changes Plaintiffs seek, but comparing it to the initial Complaint illustrates some differences, which are discussed more fully below in connection with the analysis of that Motion.

CSXT addresses Plaintiffs' Response and their related motions in its Reply. (Def.'s Reply Mem. of L. in Support CSXT's Mot. ("CSXT's Reply"), Doc. 24, #270–94). In addition to refuting Plaintiffs' merit arguments, CSXT also argues that amending the complaint is futile and that, because Plaintiffs did not submit any rebuttal affidavits, the notion that discovery will change the factual landscape is "purely speculative." (*See id.* at #276–87).

## \*774  LAW AND ANALYSIS

The Court first addresses Plaintiffs' Motion for Leave to Amend their Complaint, then turns to CSXT's combined Motion, along with Plaintiffs' responses.

### A. Plaintiffs' Motion To Amend Their Complaint Is Futile.

Schobert and York's original Complaint levies three claims against CSXT, two of which are pertinent here, as CSXT's Motion for Judgment on the Pleadings attacks two of those claims. The first is Count II, which alleges that CSXT engaged in both interference with, and retaliation for, Plaintiffs' exercise of ERISA-protected rights. (*See* Compl. at ¶¶ 160–63, #23). More specifically, they allege that CSXT "harassed, disciplined, and discriminated against Plaintiffs ... for exercising their [ERISA plan] rights ... for the purpose of interfering with the attainment" of those rights. (*See id.* at ¶ 162, #23). The other relevant claim is Count III, the

Schobert v. CSX Transportation Inc., 504 F.Supp.3d 753 (2020)
2020 Employee Benefits Cas. 465,086

caption of which indicates Plaintiffs' attempt to assert four causes of action under the Rehabilitation Act: discrimination, retaliation, denial of accommodation, and impermissible medical file disclosure. (*See id.* at ¶¶ 164–71, #23–24). On the denial of accommodation front, Plaintiffs contend that they were "pre-approved" for FMLA leave, which was a "reasonable accommodation" for their disabilities, and that CSX "refused to engage in the interactive process" with Plaintiffs. (*Id.* at ¶¶167-69, #24). As for disclosure, Plaintiffs claim that, in conducting the alleged FMLA investigation, CSXT "unlawfully obtained, mishandled, and wrongfully disclosed" Plaintiffs' "medical information ... in violation of the Rehabilitation Act." (*Id.* at ¶¶ 167–70, #24).

Plaintiffs argue that leave to amend their Complaint as to these two claims is warranted. (Pls.' Mot. to Am. Compl. at #231). This is so, they say, because there is "no serious argument" that Plaintiffs are attempting to delay the matter or that CSXT would be prejudiced by any amendment at this point. (*See id.*). Beyond their brief motion, though, Plaintiffs do not describe the particular changes the proposed amended pleading would offer. (*See id.*). In response, CSXT defends its Motion for Judgment on the Pleadings, arguing that Plaintiffs' proposed amendments do not add any "new facts to support" their legal conclusion that CSXT violated ERISA, nor have they added the necessary factual allegations to make out any viable Rehabilitation Act claim. (*See* CSXT's Reply at #280–84).

### 1. *A District Court Is Afforded Broad Discretion In Deciding A Motion For Leave To Amend.*

**[1]** **[2]** **[3]** A district court has broad discretion in deciding a motion for leave to amend a complaint. *See, e.g.*, *Cheryl & Co. v. Krueger*, No. 2:18-cv-1485, 2019 WL 7821056, at *1, (S.D. Ohio Dec. 12, 2019) (citing *Gen. Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990)). When analyzing a motion for leave filed after a defendant answers or files a Rule 12 motion, the Court applies the same standards as Federal Rule of Civil Procedure 15(a)(2), which instructs that courts should "freely" grant leave "when justice so requires." Absent " 'any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies ... undue prejudice to the opposing party ... futility of the amendment, etc.—the leave sought should, as the rules require, be freely given.' " *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 640–41 (6th Cir. 2018) (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). A district court's "outright refusal **\*775** to grant the leave without any justifying reason ...

is not an exercise of discretion," but instead an abuse of it that is "inconsistent with the spirit of the Federal Rules." *Parchman v. SLM Corp.*, 896 F.3d 728, 736 (6th Cir. 2018) (citing *Foman, 371 U.S. at 182, 83 S.Ct. 227*) (quotation omitted).

**[4]** As mentioned, one reason a court may exercise its discretion and deny a motion to amend is futility. A motion to amend a complaint is futile " 'if the amendment could not withstand a Rule 12(b)(6) motion to dismiss.' " *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017) (quoting *Foman, 371 U.S. at 182, 83 S.Ct. 227*); *see also Parchman, 896 F.3d at 737–38* (same); *Midkiff v. Adams Cnty. Reg'l Water Dist., 409 F.3d 758, 767 (6th Cir. 2005)* (denying leave to amend when the proposed amended pleading consisted of conclusory allegations without factual support).

**[5]** Reviewing the proposed amended pleading, the Court notes several changes Plaintiffs would like to make to their initial pleading. The proposed amended complaint first deletes several allegations related to the alleged mishandling of Schobert and York's "protected personal medical files" and "protected health information." (*Compare* Compl. at ¶¶ 41, 83, 86–88, 119, #7, 13, 18 *with* Prop. Am Compl., Doc. 20-1, #239, 244-45, 248-49 (showing that the indicated paragraphs from the original Complaint have been removed)). Second, Plaintiffs seek to add various legal terms to the Rehabilitation Act medical inquiry claim (adding the phrase "disability-related") and to the ERISA claims (adding the adverb "specifically" to modify "intended"). (*See* Prop. Am. Compl. at ¶¶ 66–67, 69, 84, 89, 122, 156, 163, #242–43, 245, 249, 254–255). Plaintiffs also narrow their focus regarding the medical records issue, dropping their allegations that CSXT mishandled medical information by placing it in Plaintiffs' disciplinary files, but still maintaining that placing medical information in Plaintiffs' personnel files is nevertheless impermissible. (*See* Prop. Am. Compl. at ¶ 163, #255; Pls. Resp. Mem. at #217, 217 n.4). Plaintiffs also make an additional factual claim about Schobert's alleged disability: that his condition "substantially limits his ability to sit" and that his job "requires long periods of sitting." (Prop. Am. Compl. at ¶ 56, #241).

These proposed amendments are all futile, but for differing reasons. The deletions (for lack of a better term) regarding the allegedly mishandled "disability-related information" do not change the Court's outcome on the Rehabilitation Act claims, as discussed below. Schobert's additional factual claim about his alleged disability is useful, but unnecessary to the Court's

analysis of the Rehabilitation Act claims. Last, the "technical phrases" Plaintiffs propose to add to their allegations do nothing to remedy the defects, also discussed in greater detail below, in either their Rehabilitation Act or ERISA claims. Therefore, as the proposed amended complaint is futile, the Court **DENIES** Plaintiffs' Motion (Doc. 20), and will assess the remaining motions based on the extant Complaint.

**B. The Court Grants Part I.A, Grants in Part and Denies in Part as to Part I.B, And Denies Part I.C, Of CSXT's Motion For Judgment On The Pleadings.**

With that antecedent matter resolved, the Court turns to Parts I.A, I.B, and I.C of CSXT's Motion, which seek Judgment on the Pleadings as to Plaintiffs' ERISA (Count II) and Rehabilitation Act (Count III) claims, as well as CSXT's argument that the FLSA collective action standard, **\*776** not Federal Rule of Civil Procedure 23, applies here. (Doc. 15, #126–35).

**1. The Parties' Offer Differing Viewpoints About What Is Required To Plausibly Allege ERISA and Rehabilitation Act Claims.**

CSXT argues that Plaintiffs failed to state a claim under ERISA § 510 because that statute requires an employer to act with "specific intent" to violate ERISA, but Plaintiffs merely alleged CSXT's actions had *the effect of* preventing Plaintiffs from using their ERISA benefits. (CSXT's Mem. at #127–28). CSXT also contends that Plaintiffs failed to adequately plead a Rehabilitation Act claim because they did not plausibly allege that Schobert and York are "disabled" under that statute. (*Id.* at #130–31). Moreover, even if Plaintiffs are disabled, CSXT argues, they failed to plausibly allege that they were disciplined "solely by reason of" their disability and that they similarly failed to allege CSXT made a prohibited disability-related inquiry when it investigated purported FMLA misuse. (*Id.* at #132–34). Further, CSXT asserts that it is entitled to judgment on the pleadings regarding Plaintiffs' putative class action, arguing that Plaintiffs are not permitted to plead their class action under Rule 23, but instead must adhere to the Fair Labor Standards Act's collective action requirements. (*Id.* at #135).

Plaintiffs disagree. First, they argue that their existing ERISA claim is plausible because they are not required to meet any heightened pleading standard and their Complaint meets ordinary pleading standards as it alleges a "direct linkage" between CSXT's actions and Plaintiffs' ERISA benefits "with particularity." (Pls. Resp. Mem. at #212 (citing Compl. at

¶¶ 51, 93, 127, #9, 14, 18)). As for the Rehabilitation Act claims, Plaintiffs assert that the Complaint plausibly alleges that both Schobert and York have qualifying disabilities under the Rehabilitation Act, as the Complaint states that both of their conditions limit a major life activity. Plaintiffs further contend that CSXT's reliance on *Bracken v. DASCO Home Medical Equipment, Inc.*, No. 1:12-CV-892, 2013 WL 3275479, at \*10 (S.D. Ohio June 27, 2013), and its reliance on *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), is misplaced because Congress specifically overruled *Sutton* through amendments to the ADA in 2008. (Pls. Resp. Mem. At #213–14). Finally, Plaintiffs believe they sufficiently alleged: (1) that CSXT disciplined Schobert and York due to their disabilities; (2) that CSXT's medical inquiry violated the law; and (3) that pleading Rehabilitation Act claims along with ERISA and FMLA claims is not inconsistent pleading, but is rather permissible alternative pleading. (*Id.* at #215–17).

As for the Rule 23 class action or FLSA collective action issue, Plaintiffs argue that the case CSXT relies on, *Clary v. Southwest Airlines*, No. 3:07-cv-0126, 2007 WL 4947690 (N.D. Tex. Dec. 17, 2007), has been considered and rejected by a number of courts, and should similarly be rejected here. (Pls.' Resp. Mem. at #218).

In reply, CSXT reiterates its original grounds for judgment on the pleadings, but also elaborates on its argument that Plaintiffs have conflated an FMLA claim with a Rehabilitation Act claim, noting when the two causes of action are based on the same operative facts, they cannot be pled in the alternative. (CSXT's Reply at #281–82). As for whether Schobert and York plausibly alleged they were disabled, CSXT maintains Plaintiffs have not plead with sufficient particularity that they were "substantially limited" in a major life activity, and any proposed amendments did not **\*777** cure that fatal defect. (*Id.* at #284). CSXT also rebuffs Plaintiffs' argument regarding the disability-related inquiry, reasserting its position that CSXT's inquiry was "generalized," "directed at both disabled and non-disabled employees[,]" and therefore did not violate the Rehabilitation Act. (*Id.* at #285). Last, CSXT restates its argument that the FLSA collective action framework is required here, but notes that this is a "matter of first impression" in this District. (*Id.* at #286).

**2. Judgment On The Pleadings Standard Of Review.**

[6]   [7]   Courts analyze a Rule 12(c) motion for judgment on the pleadings in the same manner as a motion to dismiss under

Rule 12(b)(6). *See Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549 (6th Cir. 2008). Accordingly, courts accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff, likewise drawing all reasonable inferences in the plaintiff's favor. *See Bullington v. Bedford Cnty.*, 905 F.3d 467, 469 (6th Cir. 2018).

 **[8]**    **[9]**    **[10]**    **[11]**    **[12]**    All a plaintiff must do to survive a motion for judgment on the pleadings is provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (quoting Fed. R. Civ. P. 8(a)(2)). But that short and plain statement must offer more than mere "labels and conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). " '[A] formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Rather, there must be "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). This means a complaint must contain "either direct or inferential allegations respecting all material elements to sustain recovery under some viable legal theory." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (quotation omitted). "Conclusory allegations or legal conclusion masquerading as factual allegations will not suffice." *Id.* (citing *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005)).

 **[13]**    In sum, courts will dismiss an action under this standard if "there is no law to support the claims made." *Stew Farm, Ltd. v. Nat. Res. Conservation Serv.*, 967 F. Supp. 2d 1164, 1169 (S.D. Ohio 2013) (citing *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978)). The same holds where "the facts alleged are insufficient to state a claim." *Id.*

### 3. *The Parties Disagree Over How The Pleading Standard Should Be Applied To Schobert And York's Claims.*

 **[14]**    As a preliminary matter, Plaintiffs are correct that ERISA and Rehabilitation Act claims are not subject to any heightened pleading standard. *Rhodes v. R&L Carriers, Inc.*, 491 F. App'x 579, 583–84 (6th Cir. 2012). But "[t]o survive a motion to dismiss, ... a plaintiff must rest his claim to relief on more than conclusory allegations that the defendant violated the law." *Vartinelli v. Aramark Corr. Servs., LLC*, 796 F. App'x 867, 870 (6th Cir. 2019). Rather, the question is whether the plaintiff has pled *facts* giving rise to a *plausible* claim, an inquiry that the Court resolves in part by employing its

"judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937.

 **[15]**    **[16]**    In operationalizing this standard, the Sixth Circuit has instructed lower courts to respect the difference between plausibility, on the one hand, and facts that **\*778** merely happen to be "consistent with liability," on the other. *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 505 (6th Cir. 2013). And the distinction between the two can turn, at least in part, on the availability—and plausibility—of alternative explanations for the events that occurred. *Id.* ("How reasonable is it to infer that it rained last night from the fact that my lawn is wet? It depends, among other things, on whether I own a sprinkler."). This is especially true as it relates to pleading intent. The existence of an "obvious alternative explanation[,]" can help differentiate between facts merely "consistent with liability" and those sufficient to plausibly allege "discriminatory intent." *Id.* That is, an obvious alternative explanation can help "illustrate[ ] the unreasonableness of the inference sought and the implausibility of the claims made." *Id.*

 **[17]**    **[18]**    **[19]**    That by no means suggests that all a defendant must do to secure dismissal is point to a potential alternative explanation. To the contrary, the Sixth Circuit has observed that "the mere existence of more likely alternative explanations does not automatically entitle a defendant to dismissal." *Id.* (citing *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011)). "Often, defendants' conduct has several plausible explanations. Ferreting out the most likely reason for the defendants' action is not appropriate at the pleading stage." *Watson Carpet*, 648 F.3d at 458. "Thus, if a plaintiff's claim is plausible, the availability of other explanations—even more likely explanations—does not bar the door to discovery." *16630 Southfield*, 727 F.3d at 505. Still, "you can't assess the plausibility of an inference in a vacuum" because the "reasonableness of one explanation for an incident depends, in part, on the strength of competing explanations." *Id.*

As this description shows, the impact of an alternative explanation in assessing plausibility appears to turn, to a large extent, on how much more likely the competing explanation is than the plaintiff's explanation. Comparing the allegations in *16630 Southfield* with those in *Keys* illustrates this point. In *16630 Southfield*, an Iraqi businessowner took out a loan immediately before the 2008 recession, which he promptly became unable to repay. 727 F.3d at 503. After refinancing, he sought another loan, but the bank denied

his application. *See id.* He sued, claiming that the bank "treated comparable non-Iraqi applicants more favorably" and had discriminated against him by refusing to renegotiate his loan. *Id.* at 503–04. Reviewing the lower court's dismissal, the Sixth Circuit determined that the businessowner's Iraqi origin does not by itself establish the requisite inference" of discrimination. *Id.* at 505. Instead, "[a] more obvious explanation, indeed the most obvious explanation" was that the bank had an "understandable concern about repayment[.]" *Id.* "Common sense suggests that [the bank] denied [the plaintiff's] request for a further extension because it thought the extension was a bad business proposition, not because it wanted to discriminate against people of Iraqi origin." *Id.* The "obvious alternative explanation" for why the bank denied the businessman a second loan was the businessman's inability to repay the existing loan, not his national origin.

Conversely in *Keys,* the Sixth Circuit reversed the district court and held that a claim should have survived a motion to dismiss because it "allege[d] facts that easily state[d] a plausible claim." *See Keys,* 684 F.3d at 610. There, the amended complaint alleged "a pattern or practice of discrimination against African American managers ... in hiring, compensation, promotion **\*779** discipline and termination[,]" "detail[ed] several specific events in each of those employment-action categories[,]" and "identifie[d] key supervisors and other relevant persons[.]" *Id.* Those factual allegations, the court said, were "at least as detailed, if not more so" than those the Supreme Court determined sufficient to survive a Rule 12(b)(6) in *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 514–15, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), and thus more than sufficient to survive there. *Id.* In other words, the Sixth Circuit found it plausible, given those factual allegations, that the employer had the requisite discriminatory intent, even if there were other potential explanations for the employer's conduct.

The question here is whether Plaintiffs have alleged facts to support a plausible ERISA violation. Plaintiffs argue that their Complaint, at least as to their ERISA and Rehabilitation Act claims, is like the one in *Keys* and thus more than sufficient to satisfy *Iqbal/Twombly.* CSXT disagrees. This Court, using its "judicial experience and common sense," *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937, must assess the plausibility of those two claims.

### 4. *Plaintiffs Failed To Allege Plausible ERISA § 510 Claims.*

**[20]** Section 510 of ERISA makes it unlawful to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled to under [an employee benefit] plan." 29 U.S.C. § 1140; *Williams v. Graphic Packaging Int'l, Inc.,* 790 F. App'x 745, 754 (6th Cir. 2019) (noting that ERISA "prohibits employers from terminating, or otherwise discriminating against, employees who choose to exercise a benefit to which they are entitled under their benefit plan"). This section aims to "prevent unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested [ERISA plan] rights." *West v. Butler,* 621 F.2d 240, 245 (6th Cir. 1980).

**[21]** Courts in this Circuit recognize two types of § 510 claims: "(1) an 'exercise' or 'retaliation' claim, ... where adverse action is taken because a participant availed [him]self of an ERISA right; and (2) an 'interference' claim where the adverse action is taken as interference with the attainment of a right under ERISA." *Hamilton v. Starcom Mediavest Grp., Inc.,* 522 F.3d 623, 627–28 (6th Cir. 2008) (quotation and citation omitted).

**[22]** The prima facie elements of an ERISA retaliation claim are: (1) that an employee engaged in activity that ERISA protects; (2) that the employee suffered an adverse employment action; and (3) that there is a causal link between the protected activity and the employer's adverse action. *See Williams,* 790 F. App'x at 755 (citing *Hamilton,* 522 F.3d at 628). The prima facie elements of an ERISA interference claim require a plaintiff to demonstrate " '(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled.' " *Bailey v. U.S. Enrichment Corp.,* 530 F. App'x 471, 477 (6th Cir. 2013) (quoting *Clark v. Walgreen Co.,* 424 F. App'x 467, 474 (6th Cir. 2011)) (quoting *Humphreys v. Bellaire Corp.,* 966 F.2d 1037, 1043 (6th Cir. 1992)).

**[23]** **[24]** **[25]** **[26]** To prevail on an interference claim, a plaintiff must prove that the employer administered the adverse action—here Schobert's disciplinary hearing and York's termination—" 'with the specific intent of violating ERISA.' " *Spangler v. E. Ky. Power Coop., Inc.,* 790 F. App'x 719, 721 (6th Cir. 2019) (quoting **\*780** *Roush v. Weastec, Inc.,* 96 F.3d 840, 845 (6th Cir. 1996)). "The plaintiff is not required to show that the employer's sole purpose" was to interfere with ERISA benefits, but he or she must show that

such interference "was a 'motivating factor' in the decision." *Id.* (quoting *Humphreys, 966 F.2d at 1043*). Conversely, if the loss of ERISA benefits was a "mere consequence" of an alleged action, then the § 510 claim fails. *See Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1113 (6th Cir. 2001).* Given that this is a required element of the claim at trial, "[a]t the pleading stage, [Plaintiffs] 'must allege sufficient factual content from which a court, informed by its judicial experience and common sense, could draw the reasonable inference' that" CSXT acted "with the intent to interfere with the attainment of" Plaintiffs' ERISA benefits. *Spangler, 790 F. App'x at 721* (quoting *Keys, 684 F.3d at 610*).

[27] Plaintiffs' ERISA claim founders because they have not plausibly alleged that CSXT conducted the alleged FMLA investigation "with the specific intent of violating ERISA," as defined above. *Spangler, 790 F. App'x at 721* (quotation omitted). To be sure, Plaintiffs *say* that CSXT "harassed, disciplined, and discriminated against Plaintiffs ... for the purpose of interfering with the attainment of the rights to which they were, may become, or may have become entitled" under the ERISA plan. But that is a mere legal conclusion that does not carry the day at the motion to dismiss stage. *Iqbal, 556 U.S. at 678, 129 S.Ct. 1937* ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). All in all, Plaintiffs must allege actual *facts* that would support a plausible inference that CSXT intended to impact Schobert and York's ERISA rights or benefits, rather than pleading that such impacts were a "mere consequence" CSXT's actions.

Plaintiffs struggle to provide any such facts. Their ERISA-related allegations include:

¶ 50. Because of CSXT's heath benefit plan's terms, it is advantageous for employees to make appointments and seek treatment at the end of the year, because the deductible and annual out of pocket maximum reset on January 1 of each year.

¶ 51. CSXT's policies, threatening letters and messages, disciplinary threats, and other behavior discouraging FMLA and other absences at the end of the year had the effect of and were intended to interfere with its employees' rights to ERISA health insurance coverage.

...

¶ 53. At all relevant times, Schobert has participated in CSXT's ERISA-covered health insurance plan.

...

¶ 90. At all relevant times, Schobert has participated in CSXT's ERISA-covered health insurance plan.

¶ 91. Schobert reached his maximum deductible in a calendar year due to his disability.

¶ 92. As a result, it was medically necessary and financially advantageous for Schobert to schedule medical appointments and procedures after he had reached his maximum out of pocket and deductible, because CSXT's insurance would cover the cost.

¶ 93. CSXT's policies, threatening letters and messages, disciplinary threats, and other behavior discouraging FMLA and other absences at the end of the calendar year had the effect of and were intended to dissuade Schobert and other employees like him from using their ERISA health insurance coverage.

**\*781** (Compl. at ¶¶ 50, 51, 53, 90–93, #8–9, 14). York makes the same individual allegations Schobert does regarding ERISA rights. (*See id.* at ¶¶ 95, 124–27, #14, 18).

Taking the Complaint as true and drawing all reasonable inferences in Plaintiffs' favor, as the Court must, their argument appears like this: (1) Schobert or York, both CSXT employees, were covered by the ERISA healthcare plan; (2) CSXT took steps to dissuade them from taking, or investigated, disciplined, or terminated them for taking, FMLA leave; (3) while on FMLA leave they could have sought medical treatment, which may have been a covered benefit under CSXT's ERISA healthcare plan; meaning, in turn, (4) that CSXT, which is self-insured (or so Plaintiffs asserted at argument), would have had to pay for that treatment with its own funds; and (5) therefore it is plausible that CSXT sought to dissuade FMLA leave with the intent of depriving its employees of those ERISA-based healthcare benefits.

For several reasons, this chain of reasoning is insufficient to plausibly allege that CSXT acted with the necessary specific intent to violate ERISA. First, any loss of ERISA benefits Schobert or York suffered was a "mere consequence" of CSXT's FMLA-related actions. *See Majewski, 274 F.3d at 1113.* Second, there is an "obvious alternative explanation ... [that] illustrates the unreasonableness of the inference sought and the implausibility of" Plaintiffs' ERISA claim. *16630 Southfield, 727 F.3d at 505.* In particular, CSXT's FMLA investigation most plausibly appears to have been an effort to

2020 Employee Benefits Cas. 465,086

curb impermissible FMLA use, particularly around holidays, not an attempt to interfere with or retaliate against Plaintiffs for using their ERISA benefits.

Further confirming this view, as a general matter FMLA leave is afforded to a broader class of employees than just disabled employees who seek ERISA-covered treatment while on FMLA leave. There is nothing in the Complaint from which the Court could reasonably conclude that any significant portion of the employees taking FMLA leave were doing so for the purpose of seeking ERISA-covered healthcare treatments. Thus, there is no factual assertion from which the Court could plausibly infer that discouraging FMLA leave would result in substantial ERISA-covered treatment cost savings, which is the asserted motivation under Plaintiffs' theory. To be sure, the investigation (and its resulting incentive effects) may have had the collateral *consequence* of discouraging some employees who happen to take FMLA leave for the purpose of obtaining ERISA-covered treatment from doing so, but absent more factual allegations about the significance of that impact, that is insufficient to create the plausible inference of intent that is needed to support a § 510 claim.

Third, the CSXT-did-it-to-save-on-ERISA-costs theory fails on another front. Schobert and York do not allege that CSXT "interfered" with FMLA leave only at the end of the year, when it was more plausible that employees may have met their deductibles and out of pocket maximums (thus rendering CSXT responsible for payments). Instead, they claim that CSXT discouraged the use of FMLA leave *all year long.* That is, Schobert and York claim CSXT sent missives to employees (or at least those with pre-approved FMLA leave) throughout the year, and they specifically recall, over the course of several years, receiving letters in May (Mother's Day and Memorial Day), late June (Fourth of July), and late August (Labor Day). (Compl. at ¶¶ 21, 24, 26, #4–5). But, earlier in the year it is increasingly unlikely that CSXT employees would have hit their deductibles, meaning CSXT would not be on the hook for the ERISA-covered treatment **\*782** costs at that time. To be sure, Plaintiffs also recount receiving letters in mid-November (Thanksgiving) and late-December (Christmas, Hanukah, Kwanza, and New Year's), and, at those times, it may have been more likely that Plaintiffs already met their deductibles and out-of-pocket maximums. But, read against the pattern of CSXT sending notices tied to other holidays throughout the year, the fact that CSXT also sent such notices in connection with holidays near the end of the year does not create a plausible basis for inferring

that CSXT sent the latter letters with the specific intent of interfering with the use of ERISA benefits.

Nor can Plaintiffs fix this problem by adding the modifier "specific" to the legal assertion in their Complaint that CSXT acted with the requisite "intent" required for these type ERISA claims. The problem is not that the Complaint omits the phrase "specific intent," but rather that it lacks any *facts* giving rise to a plausible inference that CSXT acted with that intent. Without such facts, a bare allegation that CSXT acted with "specific intent" is exactly the kind of legal conclusion that the *Iqbal*/*Twombly* line of cases prohibits the Court from considering.

Even drawing all inferences in Plaintiffs' favor, regardless of the type of claim, there is nothing to indicate CSXT acted with the specific intent of violating ERISA § 510. Accordingly, the Court **DISMISSES** Count II with prejudice and **STRIKES** putative Class 14 from the Complaint.

### 5. *Plaintiffs Allege Plausible Retaliation and Failure to Accommodate Claims Under the Rehabilitation Act but Do Not Allege a Plausible Medical Inquiry Claim or Disability Discrimination Claim.*

 [28]      [29]  Federal Rule of Civil Procedure 8's notice-pleading requirement serves another important function beyond those discussed above. That Rule also requires a "short and plain" statement that is sufficiently detailed to " 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Swierkiewicz*, 534 U.S. at 512, 122 S.Ct. 992 (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *abrogated on other grounds by Twombly*, 550 U.S. 544, 127 S.Ct. 1955). "Rule 8 ensures simply that each party has adequate notice of the other's claims and an opportunity to meet them." *Lawson v. Huerta*, 692 F. App'x 790, 794 (6th Cir. 2017) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)). This "fair notice" requirement matters here, because Plaintiffs' Rehabilitation Act claim (Count III) leaves the Court guessing to some extent about what, exactly, Schobert and York are alleging. By including the labels "discrimination, retaliation, denial of accommodation" and "employee medical file violation" in the caption for that Count, Plaintiffs appear to set out four causes of action. (*See* Compl. at Count III, #23). The substantive paragraphs that follow do little to clarify this. (*See id.* at ¶¶ 164–71, #23–24).

In fairness to Plaintiffs, the Rehabilitation Act recognizes multiple, distinct causes of action, including the claims

Plaintiffs set forth in Count III's caption. But rather than merely assert conclusory labels, complaints must allege *facts.* That being said, the Court can glean some additional insights by comparing the allegations relating to the proposed putative classes against the paragraphs relating to Count III. Based on that comparison, it appears that Schobert and York are first asserting a disability discrimination claim. In particular, Plaintiffs allege that CSXT discriminated against employees with disabilities by launching its FMLA investigation. (*See* Compl. at ¶ 170, #24). They **\*783** relatedly claim that CSXT retaliated against employees who made "requests for accommodation." (*Id.*). Third, Schobert and York allege that CSXT failed to provide reasonable accommodations for their disabilities and refused to engage in the "interactive process." (*Id.* at ¶ 169, #24). Finally, Plaintiffs' last claim appears to consist of two related claims: (1) that CSXT engaged in prohibited conduct by collecting their "medical information[;]" and (2) that CSXT mishandled that information after receiving it. (*Id.* at ¶168, #24).[4]

In assessing these claims, the Court starts from the proposition that, as a general matter, the Rehabilitation Act prohibits, among other things, entities that receive federal funding from discriminating against any "qualified individual with a disability." 29 U.S.C. §§ 794(a)–(b). The Act accomplishes this objective largely by incorporating substantial portions of the Americans with Disabilities Act. 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination" include those found in "title I of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12111 et seq.) and provisions of sections 501 through 504 and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12201 to 12204 and 12210), as such sections relate to employment.").

 [30]   But, while the Rehabilitation Act and ADA are largely coextensive, there is a key difference: the Rehabilitation Act has a different—and more stringent—causation standard. Unlike the ADA's "but for" or "because of" standard, the Rehabilitation Act requires "solely by reason of" causation. *Bent-Crumbley v. Brennan*, 799 F. App'x 342, 345 (6th Cir. 2020); *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315–16 (6th Cir. 2012) (en banc) (noting that regardless of "the common history and shared goals of the two laws, they do not share the same text" and that they employ "two distinct causation standards"). This difference in language matters. *See Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 682 (6th Cir. 2016) ("The Rehabilitation Act sets the higher

bar, requiring plaintiffs to show that the defendant's acts were done 'solely by reason of' the disability.' " (citation and emphasis omitted)). Plaintiffs do not offer sufficient factual allegations to clear that higher bar with regard to their Disability Discrimination claim or their Medical Inquiry claim, but do offer sufficient factual allegations to plausibly allege a Retaliation and Failure to Accommodate claim.

### a. Schobert And York's Disability Discrimination Claim Fails As A Matter Of Law.

 [31]    [32]   Plaintiffs first assert that CSXT discriminated against them because of their disabilities. A *prima facie* disability discrimination claim under the Rehabilitation Act requires plaintiffs to plausibly allege that they (1) are disabled, (2) are otherwise qualified to perform the essential functions of their position, with or without a reasonable accommodation, and (3) suffered an adverse employment action *solely because of* their disability. *See Mitchell v. United States Postal Serv.*, 738 F. App'x 838, 843 (6th Cir. 2018) (citing *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007)); *Lewis*, 681 F.3d at 317 ("The sole-cause standard in the end is a creature of the Rehabilitation Act, and that is where **\*784** we should leave it. The standard does not apply to claims under the ADA.").

Setting aside for now the first two factors, the third factor, the solely-because-of standard, provides the most obvious problem for Schobert and York's discrimination claim. Again, they certainly *state* the correct standard in their Complaint, alleging that CSXT's FMLA-related investigation was impermissible discrimination taken "solely by reason of" their disabilities. But *facts* plausibly supporting that claim are more difficult to come by. Plaintiffs' argument appears to be this:[5]

- The Plaintiffs allege that they are disabled, which entitles them to take FMLA leave;

- Schobert and York took said leave around the winter holidays in late-2017 and early-2018, respectively;

- In response to an uptick in FMLA-related leave over the holidays, CSXT conducted a company-wide investigation, in which it interviewed anyone who took FMLA leave within a specific time period, and required employees to provide evidence to corroborate that particular instance of leave;

2020 Employee Benefits Cas. 465,086

- Employees who failed to do so were disciplined or terminated;

- Therefore, because the investigation regarding FMLA-related leave affected disabled employees more than non-disabled employees (who may or may not also have taken FMLA leave), the company-wide investigation impacted disabled employees more than non-disabled employees and thus amounted to impermissible discrimination.

 [33]    [34]  This sounds like a disparate impact claim. That presents a problem, though, because the Sixth Circuit has held that the Rehabilitation Act "does not prohibit disparate-impact discrimination." *See Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 241 (6th Cir. 2019) ("We now resolve what *Choate* did not and conclude that § 504 does not prohibit disparate-impact discrimination." (citing *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985))). As that court explained, "[d]isparate-impact discrimination occurs when an entity acts for a nondiscriminatory reason but nevertheless disproportionately harms a protected group." *Id.* (citation omitted). Recognizing that § 504 of the Rehabilitation Act only prohibits discrimination "solely by reason of" disability, it "does not encompass actions taken for nondiscriminatory reasons." *Id.* at 242 (quoting 29 U.S.C. § 794(a)). The Sixth Circuit also explained the practical underpinnings of its rule: "Because many neutral (and well-intentioned) policies disparately affect the disabled[,]" allowing Rehabilitation Act disparate-impact claims " 'could lead to a wholly unwieldy administrative and adjudicative burden.' " *Id.* (quoting *Choate*, 469 U.S. at 298, 105 S.Ct. 712).

But such a forbidden disparate-impact claim is precisely what Schobert and York seek to pursue here. They allege that CSXT initiated its FMLA investigation against all employees who took FMLA leave, not just employees who were, or who were thought to be, disabled. (Compl. at ¶ 36, #6 ("On information and belief, in late 2017 and early 2018, CSX suspended without pay and charged with discipline *every employee who was properly certified for FMLA leave and took FMLA leave* on or around Christmas 2017 and New Year's Day 2018." (emphasis added))). This, they **\*785** argue, amounts to intentional disability discrimination under the Rehabilitation Act because disabled employees are more likely to take FMLA leave than non-disabled employees, and thus the former would be disparately affected by the

investigation. That argument does not work. The Court therefore dismisses that claim.

**b. Schobert and York Allege a Plausible Retaliation Claim Under the Rehabilitation Act.**

 [35]    [36]  Schobert and York have alleged a plausible retaliation claim. A Rehabilitation Act retaliation claim must plausibly allege that: (1) the employee engaged in activity protected under § 504 or the ADA; (2) the employer knew of the protected activity; (3) the employer took an adverse employment action against the employee; and (4) there was a causal connection between the protected activity and the adverse employment action. *See, e.g., A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013); *L.G. v. Bd. of Educ. of Fayette Cnty.*, 775 F. App'x 227, 232 (6th Cir. 2019) ("To state a retaliation claim successfully under either [§ 504 or state law] ... a plaintiff's pleading must establish a prima facie case of retaliation[.]"). Unlike a discrimination claim, a plaintiff need not be "disabled" to assert a retaliation claim. *See Barrett v. Lucent Tech.*, 36 F. App'x 835, 840 (6th Cir. 2002); *see also Wilbanks v. Ypsilanti Comm. Schs.*, 742 F. App'x 84, 87 (6th Cir. 2018) ("The anti-retaliation provisions of the ADA grant standing to non-disabled persons who are retaliated against for attempting to protect the rights of the disabled."). Rather, the key question is whether the facts in the Complaint lead to an inference that the plaintiff engaged in activity protected under § 504 or the ADA.

The first element refers to both § 504 and the ADA because the Rehabilitation Act has two separate anti-retaliation provisions. First, § 504 incorporates the anti-retaliation provision of Title VI of the Civil Rights Act. *See Wilbanks*, 742 F. App'x at 86–87 (quoting 29 U.S.C. § 794a(2)). The relevant section of Title VI states that no employer "shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by ... this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this part." *Id.* (quoting 34 C.F.R. § 100.7(e)).

 [37]  Separately, the Rehabilitation Act also incorporates the ADA's anti-retaliation provisions, which preclude companies from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Discrimination in this context means retaliation. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (en banc) ("Discrimination here means retaliation—that 'but for' an employee's statutorily protected activity the employer would not have taken the 'adverse employment action.' "). The Sixth Circuit has held that requests for accommodation are protected acts that can give rise to a retaliation claim. *See Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007); *Ellis v. Tennessee*, 603 F. App'x 355, 359 (6th Cir. 2015) ("The Rehabilitation Act prohibits recipients of federal funds from retaliating against an employee who has filed a complaint against the employer about disability discrimination or has requested a 'reasonable accommodation' for his or her disability." (citation omitted)).

At the time that CSXT investigated Plaintiffs (and terminated York), the only **\*786** thing Plaintiffs allege they did was avail themselves of pre-approved FMLA leave. The pertinent question, then, is whether Schobert and York's pre-approved FMLA leave constituted a reasonable accommodation under either the Rehabilitation Act or the ADA, such that taking that leave was a "protected activity" under those statutes.

The relationship between FMLA leave and a reasonable accommodation under the Rehabilitation Act/ADA is a difficult issue. "Although the factual scenarios that give rise to an FMLA or ADA cause of action may often coincide, the legal entitlements that flow from these facts will differ." *Chandler v. Specialty Tires of Am., Inc.*, 283 F.3d 818, 825 (6th Cir. 2002) (citing *Navarro v. Pfizer Corp.*, 261 F.3d 90, 101 (1st Cir. 2001) ("The ADA and the FMLA have divergent aims, operate in different ways, and offer disparate relief.")). That same divergence exists as to the FMLA and the Rehabilitation Act.

 [38] The FMLA provides eligible employees "as many as twelve weeks of leave" per year if that employee has, among other possible qualifiers, "a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.' " *Id.* at 825. (quoting 29 U.S.C. § 2612(a)(1)(D)). The law also prohibits employers from "interfering, restraining, or denying" the use of FMLA leave in the first place and simultaneously ensures that an employee is restored to their pre-leave position upon return. *See id.* (citations omitted). That is, the FMLA entitles a worker to be *absent from* work, either to care for themselves or a qualifying family member, in response to a serious health condition.

 [39]  [40] The Rehabilitation Act does something different. Rather than protecting a right to be absent from work, the Act mandates an employer to engage with an employee who asserts that he or she may be disabled in a process designed to result in a mutually agreeable reasonable accommodation for the disability, thereby permitting the employee to continue working without imposing an undue burden on the employer. *See Rorrer v. City of Stow*, 743 F.3d 1025, 1045 (6th Cir. 2014) (discussing the reasonable accommodation framework and the interactive process). The result of the interactive process may be a reasonable accommodation that allows an employee to remain in his or her role with some modification to account for the disability. *See, e.g.*, *Cooley v. E. Tenn. Human Res. Agency, Inc.*, 720 F. App'x 734, 741 (6th Cir. 2017) (citing *Cehrs v. Ne. Ohio Alzheimer's Rsch. Ctr.*, 155 F.3d 775, 783 (6th Cir. 1998)).

 [41] In short, as a general matter, the FMLA and the Rehab Act protect different things—the former is directed at protecting persons facing (in either themselves or a family member) "serious health issues", while the ADA and Rehabilitation Act protect those persons with "disabilities." *See Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1219 (10th Cir. 2007) ("ADA's 'disability' and the FMLA's 'serious health condition' are different concepts") (quoting *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1295 (11th Cir. 2006)). And the FMLA protects a worker's right to be absent from work for a designated period of time, while the Rehab Act is designed to allow the parties to address an employee's disability in a way that allows the employee to remain on the job.

Given this divergence, some courts have concluded, not surprisingly, that FMLA leave cannot constitute a reasonable accommodation. These courts reason that "an employee seeking FMLA leave is by nature arguing that he *cannot* perform the functions of the job, while an employee requesting a reasonable accommodation **\*787** communicates that he *can* perform the essential functions of the job." *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 791-92 (5th Cir. 2017).

That said, other courts have recognized that "medical leave of absence can constitute a reasonable accommodation under appropriate circumstances," particularly where "uninterrupted attendance is [not] an essential job requirement." *Cehrs*, 155 F.3d at 783. Perhaps most importantly to this Court, the Sixth Circuit has suggested that FMLA leave can act as a reasonable accommodation for a

disability. *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 423 (6th Cir. 2015) (recognizing a request for FMLA leave as a request for a reasonable accommodation under the ADA). *See also Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 156–57 (3d Cir. 2017); *Scruggs v. Pulaski Cnty., Ark.*, 817 F.3d 1087, 1093 (8th Cir. 2016).

In *Hurtt*, the key issue was whether an employee had engaged in "protected activity" as required to sustain a retaliation claim under the ADA. 627 F. App'x at 423. The employee in that case had, among other things, requested FMLA leave to address his acute anxiety and depression. *Id.* at 418. The court held that this request for leave was a "good faith" request for a reasonable accommodation, and thus requesting it was a protected activity under the ADA. *Id.* at 423.

Several district courts in our circuit echo this holding. For example, in *Garcia v. Third Federal Savings & Loan Association of Cleveland*, No. 1:06-CV-1990, 2007 WL 1235820, at *6 (N.D. Ohio Apr. 26, 2007), the Northern District of Ohio similarly asked whether requesting a reasonable accommodation in the form of FMLA leave was a protected activity for purposes of an ADA retaliation claim. The court answered the question in the affirmative, then went on to note that the plaintiff had engaged in such a protected activity when she "requested a reasonable accommodation in the form of FMLA leave." *Id.* The Eastern District of Michigan, although perhaps begrudgingly, also "accept[ed] that [an employee's] FMLA request [was] "protected activity" within the meaning of the ADA. *Anderson v. Detroit Transp. Corp.*, 435 F. Supp. 3d 783, 799 (E.D. Mich. 2020).

And, if the FMLA leave at issue is serving as a reasonable accommodation, it receives the same analysis under the ADA/Rehabilitation Act—including for retaliation purposes—as any other form of accommodation. *See Cehrs*, 155 F.3d at 782. ("It is not clear why unpaid leave [or leave for a lengthy duration] should be analyzed differently from any other proposed accommodation under the ADA.") (quoting *Norris v. Allied–Sysco Food Services, Inc.*, 948 F. Supp. 1418, 1439 (N.D. Cal. 1996)).

Of course, if FMLA leave can be a disability accommodation, but is not always one, the question becomes how to distinguish those cases in which it acts as an accommodation from those where it does not. The answer to that may turn in part on whether the leave is of a reasonable, finite, and definite duration. *See Cleveland v. Fed. Express Corp.*, 83 Fed. App'x 74, 78-79 (6th Cir. 2003) (explaining that leave

can only be an accommodation if it is for a reasonable time period and the employee has prospects for recovery); *Maat v. Cnty. of Ottawa, Mich.*, 657 F. App'x 404, 413 (6th Cir. 2016) (indefinite leave is not a reasonable accommodation).

Another part of the answer may turn on whether the employee requested the leave as a good-faith request for an accommodation of his or her disability. *Hurtt*, 627 F. App'x at 423 (noting that the relevant question in determining whether a request for FMLA leave is a reasonable accommodation **\*788** is if "[the employee] showed a good-faith request for reasonable accommodations" not if the request "reasonably appraise[d] [the employer] of [the employee's] alleged disability"). The question of whether the employee had reason to know of the disability may also be pertinent. *See Isley v. Aker Phila. Shipyard, Inc.*, 275 F. Supp. 620, 631 (E.D. Penn. 2017) ("As a matter of common sense then, before a request for FMLA leave could reasonably be construed as a request for ADA accommodation, the employer would need to know (or have reason to believe) that the request for FMLA leave was based on something [covered by the ADA]"). But on that front, "a prospective request for periodic FMLA leave might [ ] put [an employer] on notice that [the employee] was seeking a disability accommodation for an ongoing ailment". *Id.*

For example, in *Garcia v. Third Federal*, the Northern District of Ohio held that a request for a total of 7 weeks FMLA leave to recover from two surgeries for sleep apnea could be a reasonable accommodation. 2007 WL 1235820 at *6. The Eastern District of Pennsylvania likewise recognized FMLA leave as a reasonable accommodation in a case where the employee intended the request to address recurring problems from a chronic illness. *Dreibelbis v. Cnty. of Berks*, 438 F. Supp. 3d 304, 317-19 (E.D. Penn. 2020). There, an employer granted an employee intermittent FMLA leave for 3 days every 4 weeks so that the employee could address her anxiety and depression. *Id.* at 307. The employer fired the employee shortly after she used one of these pre-approved FMLA leave periods, and the employee sued for retaliation under the ADA. *Id.* at 307-08. In analyzing this retaliation claim, the Court explained that the employee's request for FMLA leave "also constituted a request for a reasonable accommodation" because "the requested leave would enable the employee to perform [her] essential job functions in the near future." *Id.* at 317 (internal quotations omitted).

In sum, a request for FMLA leave is also a request reasonable accommodation under the ADA/Rehabilitation Act when the

leave is designed to (1) "accommodate" (allow the employee to continue performing essential functions of the job); (2) a protected disability (not just a serious health issue under the FMLA). Accordingly, in order to plead that a FMLA leave request is a reasonable accommodation (and that punishing an employee for using such leave is retaliation under the Rehabilitation Act), a plaintiff will have to plausibly assert that: (1) the employee requested FMLA leave; (2) to address a protected "disability" not just a "serious health issue;" and (3) that FMLA leave would allow the employee to continue to perform the essential functions of his or her job.

 [42]  As noted, both Schobert and York plausibly allege that they requested pre-approved periodic FMLA leave, but for that to be an accommodation (and thus serve as the basis for a Rehabilitation Act retaliation claim), they must also plausibly allege that they sought such leave based on a "disability."[6] The Rehabilitation Act defines a disability as "a physical or mental impairment which substantially limits one or more major life activities." 29 U.S.C. § 705(20)(B) (Rehabilitation Act **789** definition); 42 U.S.C. § 12102(2) (ADA definition); Mahon v. Crowell, 295 F.3d 585, 589 (6th Cir. 2002). This statutory definition has three components: "(1) whether the plaintiff has a physical or mental impairment; (2) whether that impairment impacts "one or more major life activities"; and (3) whether the claimed disability imposes a "substantial limit[ation]" on that identified major life activity." Hentze v. CSX Transp., 477 F.Supp.3d 644, 659–60 (S.D. Ohio 2020) (citing Bragdon v. Abbott, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)).

Start with the first element. The definition of "physical impairment" is broad and includes "any physiological disorder ... affecting ... one or more ... body systems" including the "musculoskeletal" system. Thompson v. UGL Unicco Serv. Co., 750 F. Supp. 2d 907, 913 (W.D. Tenn. 2010) (quoting 29 C.F.R. § 1630.2(h)(1)). Both Schobert and York easily meet this first element. Schobert alleges that for six years he has suffered from a "disability of the spine" that causes him "intermittent neck and back pain." (Compl. at ¶¶ 55-56, #9). Similarly, York alleges that he has had a "muscular-skeletal disability of the knee" for five years "that impacts ... his ability to walk." (Id. at ¶ 97, #15). Schobert's persistent spine condition and York's enduring issues with his knee both qualify as a "physical impairment" under the Rehabilitation Act given that it affects the Plaintiffs' "musculoskeletal" systems. See Harrison v. Soave Enter. L.L.C., 826 F. App'x 517, 526 (6th Cir. 2020) (holding that a years-long knee injury qualifies as a physical impairment

because it affects the musculoskeletal system); Switala v. Schwan's Sales Enter., 231 F. Supp. 2d 672, 681 (N.D. Ohio 2002) (a plaintiff who had disorders of the spine was "physically impaired" within the meaning of the ADA).

 [43]   [44]  But the "long-term existence of an impairment in itself is not sufficient to establish a disability" under the ADA or the Rehabilitation Act. Thompson, 750 F. Supp.2d at 914. (citing Collado v. United Parcel Serv., Co., 419 F.3d 1143, 1157 (11th Cir. 2005)). Plaintiffs must also establish that their physical impairments "substantially limit a major life activity." 29 U.S.C. § 705(20)(B). The question of whether Plaintiffs identify a "major life activity" is a question for the Court, while the issue of whether the impairment "substantially limits" that activity is a question for the jury. Hentze, 477 F.Supp.3d at 659–60. At this stage, then, Plaintiffs need to plausibly allege that their impairments affect a "major life activity."

The 2008 Amendments to the ADA provide a non-exhaustive list of major life activities, which include:

> caring for oneself, performing manual tasks, seeing, hearing, eating sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."

42 U.S.C. § 12102(2)(A). Both Schobert and York allege that their impairment substantially limits one or more of these enumerated activities. For his part, York asserts that his "continuing muscular-skeletal disability of the knee ... impacts, among other activities, his ability to walk[.]" (Compl. at ¶ 97, #15). Walking is undoubtedly a major life activity, and as York alleges that problems with his knee obstruct his ability to walk, he plausibly asserts that he has a disability under the Rehabilitation Act.

Schobert's case is more complex, but he too plausibly alleges a disability under the Rehabilitation Act. The relevant part of the Complaint states that Schobert has a "continuing disability of the spine" that causes him "intermittent neck and back **790** pain that renders him temporarily unable to perform his job during the" flare-ups. (Id. at ¶¶ 55-56, #9). In short, Schobert is alleging that his impairment substantially limits his ability to work. "Working" is a major life activity that is included on the statutory list. 42 U.S.C. § 12102(2)(A). In order to allege that he is "substantially limited" in his ability to work, Schobert must plead facts plausibly alleging that his "impairment limits [his] ability to 'perform a class of jobs or broad range of jobs.' " Tinsley v. Caterpillar Fin. Servs., Corp., 766 F. App'x 337, 341-42 (6th Cir. 2019). Schobert

alleges that his impairment of the spine, coupled with his neck and back pain, prevent him from coming into work during flare-ups. (Compl. at ¶¶ 55-56, #9). If Schobert cannot come to work at CSXT during flare-ups, there is also reason to believe that he would not be able to perform a variety of jobs during that period of time. Moreover, Schobert's muscular-skeletal impairment, theoretically, would also limit his ability to perform numerous jobs that may aggravate his conditions. While that may not suffice at the summary judgment stage, *see Hentze*, the Court finds that Schobert's allegations are enough at this stage to plausibly allege that his impairment prevents him from performing a "broad range of jobs." Thus, Schobert too has alleged a disability within the meaning of the Rehabilitation Act.

 **[45]**  In sum, both Plaintiffs allege that they requested FMLA leave to allow them to address an ongoing ailment that plausibly meets the definition of a "disability," and that, if they took the time off as planned, they could continue to perform the essential functions of their job. This is the kind of request for FMLA leave that can double as a reasonable accommodation.

In fact, Plaintiffs' requests for FMLA leave look much like *Dreibelbis*, where the Eastern District of Pennsylvania found that an FMLA request was a reasonable accommodation. 438 F. Supp. 3d at 317-19. The plaintiff in *Dreibelbis* requested intermittent FMLA leave to accommodate her anxiety and depression, her employer granted that prospective request for leave, and the plaintiff used some of that pre-approved leave. Here, Schobert and York also requested intermittent FMLA leave to accommodate their conditions, CSXT granted those prospective requests for leave, and then both Plaintiffs used some of that pre-approved leave. Like in *Dreibelbis*, Schobert and York assert facts that support a finding that their FMLA leave served as a reasonable accommodation. As such, Plaintiffs plausibly allege that, in requesting or taking such leave, they engaged in a protected activity, the first element of an ADA retaliation claim.

The Court must then consider whether Plaintiffs have plausibly alleged the remaining three elements of a retaliation claim: (1) that CSXT knew of the protected activity; (2) that CSXT took an adverse employment action against the employee; and (3) that there was a causal connection between the protected activity and the adverse employment action. *See, e.g., Shelby Cnty., 711 F.3d at 697*. The first of these is straightforward—no one disputes that CSXT knew that both Schobert and York took FMLA leave. After all, CSXT

approved both Plaintiffs' requests for leave. (Compl. at ¶¶ 58, 113, #9, 17).

 **[46]**   **[47]**  The next question, then, is whether CSXT took an adverse employment action against Schobert and York. An adverse employment action in the retaliation context includes both actions that affect the terms, conditions or status of employment and those that would "dissuade a reasonable person from engaging in the protected activity." *Shelby Cnty., 711 F.3d 687, 698 (6th Cir. 2013), see also* **\*791** *Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 345 (6th Cir. 2008)* (explaining that an adverse employment action is broader in the retaliation context than the discrimination context). York easily clears this bar. He claims CSXT fired him for taking FMLA leave (Compl. at ¶123, #18), which is perhaps the paradigmatic example of an "adverse employment action." *Spees v. James Marine, Inc., 617 F.3d 380, 391 (6th Cir. 2010)*. Although Schobert's case is not as straightforward, he too plausibly alleges that he suffered an adverse employment action. In Schobert's case, the alleged adverse action occurred when CSXT penalized and discouraged him from using his FMLA leave. Schobert alleges that CSXT sent company-wide notices accusing him of abusing his FMLA leave (Compl. at ¶¶61-70, #10-11), assigned him "negative CAPS disciplinary points when he had to take FMLA leave," (Compl. at ¶ 72, #12), took him out of service without pay, (Compl. at ¶ 76, #12), and required him to appear before a disciplinary hearing. (Compl. at ¶ 77, #12). Construed in the light most favorable to him, these allegations, especially when taken together, are enough to discourage a reasonable person from taking FMLA leave, a protected activity under the ADA.

 **[48]**  Finally, both Schobert and York need to allege that their FMLA leave was the likely cause of the adverse employment action. *Shelby Cnty., 711 F.3d at 697*. To establish a causal connection, Plaintiffs can offer either direct evidence of retaliation, or they can show that CSXT knew of the protected activity and took the adverse employment action close enough in time that it creates an inference of causation. *Nguyen v. City of Cleveland, 229 F.3d 559, 566 (6th Cir. 2000)* (quoting *Parnell v. West, No. 95-2131, 1997 WL 271751, \*2 (6th Cir. 1997))*. It is undisputed that CSXT discharged York for "misusing his FMLA leave." (Compl. at ¶ 123, #18; CSXT's Answer, Doc. 9, ¶ 123, #66). CSXT also does not dispute that it sent letters to Schobert that discussed misuse of FMLA leave, placed him on temporary leave without pay, and called him before a disciplinary hearing all specifically to address his use of FMLA leave. (Compl. at ¶¶ 61-70, 76, 77, #10-12; CSXT's Answer, Doc. 9, ¶¶ 68, 77, #60,

62). Thus, both Schobert and York plausibly assert a causal connection between their use of FMLA leave and the adverse employment actions in this case. Accordingly, Plaintiffs have plausibly alleged each element of a retaliation claim under the Rehabilitation Act. The Court therefore declines to dismiss either Plaintiff's retaliation claim.

### c. Plaintiffs Have Plausibly Alleged That CSXT Denied Them A Reasonable Accommodation.

 **[49]**     **[50]**     **[51]**  Plaintiffs also contend that CSXT violated the Rehabilitation Act by denying them the reasonable accommodation of intermittent leave. (*See* Compl. at ¶¶ 59, 101, 167, #9, 15, 24). "A claim based on a denial of a reasonable accommodation differs from a disparate-impact claim." *Doe, 926 F.3d at 243* (citing *Ability Ctr. of Greater Toledo v. City of Sandusky, 385 F.3d 901, 904 n.4 (6th Cir. 2004)*). The ADA's definition of discrimination, which is incorporated into the Rehabilitation Act, is "broad" and "includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is ... an employee" unless that accommodation would impose an undue hardship on the employer. *Fisher v. Nissan N. Am., Inc., 951 F.3d 409, 415 (6th Cir. 2020)* (quoting *42 U.S.C. § 12112(b)(5)(A)*).

 **[52]**  To assert a failure to accommodate claim, Plaintiffs must plausibly allege that they are (1) disabled, yet (2) otherwise qualified for the position despite their disability: **\*792** (a) without accommodation from the employer; (b) with an enabled essential job requirement eliminated; or (c) with a proposed reasonable accommodation; (3) that their employer was aware of their disability; (4) that they requested an accommodation; and (5) that their employer failed to provide the requested reasonable accommodation. *Moore v. Hexacomb Corp., 670 F. Supp. 2d 621, 626 (W.D. Mich. 2009)*; *Tchankpa v. Ascena Retail Grp., Inc., 951 F.3d 805, 811 (6th Cir. 2020)* (quoting *Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 869 (6th Cir. 2007)*); *see also Booth v. Nissan N. Am., Inc., 927 F.3d 387 (6th Cir. 2019)* (noting the same prima facie test).

As discussed above, Schobert and York have plausibly alleged that they have a disability, that they requested FMLA leave, that CSXT knew about those requests, and that, on the facts here, such requests for leave may double as requests for a reasonable accommodation under the Rehabilitation Act. That takes care of elements 1–4, at least for purposes of the

pleading stage. The remaining inquiry, then, is whether CSXT failed to provide a reasonable accommodation.

 **[53]**  In its traditional form, a failure to accommodate claim exists when an employee asks for a reasonable accommodation and the employer explicitly denies that request. *See, e.g., Smith v. Henderson, 376 F.3d 529, 534-39 (6th Cir. 2004)* (allowing a failure to accommodate claim to survive summary judgment when the employer "flatly denied" the employee's requests for accommodations.). That kind of failure to accommodate claim does not work here because, as both Schobert and York acknowledge, every time they requested FMLA leave, CSXT granted their requests. (Compl., at ¶¶ 58, 74, 100, 113, #9, 12, 15, 17).

Instead, Plaintiffs assert as the basis for their failure to accommodate claim that CSXT "unlawfully restricted [their] ability to use their reasonable accommodation of intermittent leave[.]" (*Id.* at ¶ 169, #24). In particular, Plaintiffs point to several actions that CSXT took that "restricted" the use of their FMLA leave. First, CSXT allegedly "strips [ ] engineers of their guarantee pay for an entire week" if they use FMLA leave. (*Id.* at ¶ 13, #3). Second, CSXT refuses to remove negative disciplinary "points" on the employee's record if the employee uses FMLA leave after a non-FMLA absence. (*Id.* at ¶¶ 16-17, #3). Third, CSXT sent employees, including Schobert and York, notices threatening employees with discipline for taking FMLA leave around holidays and days-off from work. (*Id.* at ¶¶ 19-27, #4-5). Finally, CSXT subjected York, Schobert, and other CSXT employees to disciplinary hearings where they had to defend their use of FMLA leave. (*Id.* at ¶ 49, #8). Plaintiffs allege that these actions, both alone and when taken together, caused them to forgo using their pre-approved FMLA leave. (*Id.* at ¶¶ 15, 18, 28, 65, 71, 100, #3, 5, 10, 11, 16).

 **[54]**  In sum, Plaintiffs argue that CSXT *constructively* forbid them from taking their FMLA leave, and in so doing, denied them a reasonable accommodation. That raises the question: can an employer "fail to accommodate" an employee merely by discouraging that employee from seeking an accommodation? Generally, an employer does not have a duty to provide a reasonable accommodation unless the employee has made a request for an accommodation. *See, e.g., Johnson v. Cleveland City Sch. Dist., 443 F. App'x 974, 983 (6th Cir. 2011)* ("The employee also bears the burden of proposing reasonable accommodations; an employee's claim must be dismissed if the employee fails to identify and **\*793** request such reasonable accommodations.") (citing *Tubbs v.*

*Formica Corp.*, 107 F. App'x 485, 488–89 (6th Cir. 2004)). This is because the individual with a disability typically has the most knowledge about the need for reasonable accommodation and, as such, bears the burden to first inform the employer that an accommodation is needed. *EEOC Enf't Guidance on Reasonable Accommodation and Undue Hardship Under the ADA* ("*EEOC Guidance*"), EEOC Notice Number 915.002, Oct. 17, 2002 at 40. In other words, courts do not require employers to "speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046-47 (6th Cir. 1998).

This general rule, however, assumes that the employer is ready, willing, and able to grant a reasonable accommodation. But not all employers may be so eager to help. An employer may reason that if it never *hears* about the need for an accommodation, then it will never need to provide an accommodation. In this case, the employer may adopt an offensive, rather than a defensive strategy. Specifically, the employer may choose to actively discourage its employees from seeking an accommodation because, under the general rule, no request for an accommodation means no obligation on the part of the employer. But courts, and the Equal Employment Opportunity Commission ("EEOC"), are unwilling to allow such manipulation. In fact, the EEOC's Guidance specifically provides that "[a]n employer may not assert that it never received a request for reasonable accommodation, as a defense to a claim of failure to provide reasonable accommodation, if it actively discouraged an individual from making such a request." *EEOC Guidance* at 40 n. 108.

Several courts have considered the question and arrived at a similar conclusion. Take for example, the *Moore v. Computer Sciences Corporations* case from the Northern District of Alabama. No.: 5:15-cv-00683-MHH, 2017 WL 3873777 (N.D. Ala. Sept. 5, 2017). That case involved an employee who began the process of requesting FMLA leave so that she could seek treatment for her cancer. *Id.* at *8. When her employer saw the request for leave, they warned her that her department had a "challenging" time ahead and that employees should avoid taking leave during that period. *Id.* As a result, the employee withdrew her request for leave and decided to wait until the end of that period to pursue FMLA leave. *Id.* But, as soon as the period was over, the employer fired the employee. *Id.* The employee sued, alleging that her employer had failed to accommodate her disability by pressuring her to wait to take leave. *Id.*

The court acknowledged that the employee had presented an "unusual" failure to accommodate claim, because she voluntarily withdrew her request for an accommodation before her employer had an opportunity to affirmatively "fail" to accommodate that request. *Id.* at *9. Nonetheless, the Court allowed the employee to proceed on her failure to accommodate claim. The Court reasoned that a "legitimate, objective threat of a layoff if [the employee] proceeded with her request for accommodation" which caused the employee to reverse "her initial effort to obtain [leave] as an ADA accommodation" could form the basis for a failure to accommodate claim. *Id.*

The District of Colorado came to a similar conclusion in *U.S. v. City and County of Denver*, 49 F. Supp. 2d 1233 (D. Colo. 1999). In that case, several disabled Denver police officers claimed that that the City violated the ADA when it refused to reassign them to a position that could accommodate **\*794** their disabilities. *Id.* at 1236. The wrinkle, however, was that many of these officers had never actually requested reassignment, because the City had a strict "no-reassignment" policy, and the officers concluded that making such a request was futile. *Id.* The City argued that that "there was no duty to accommodate each claimant because no claimant performed the initial duty to inform the employer of his or her disability[.]" *Id.* at 1240. The court disagreed, explaining that the City's "express 'no-reassignment' policy may have actively discouraged claimants from making a knowingly futile request for reassignment" and as such, the City cannot "rais[e] the failure to make such request as a defense." *Id.* at 1241.

The Sixth Circuit's decision in *Burdett-Foster v. Blue Cross Blue Shield of Mich.*, 574 F. App'x 672 (6th Cir. 2014), also could be read to imply that a failure to accommodate claim may exist if an employer discourages an employee from seeking or using a reasonable accommodation. *Burdett-Foster v. Blue Cross Blue Shield of Mich.*, 574 F. App'x 672 (6th Cir. 2014). In *Burdett-Foster*, an employee asked her employer to let her use the bathroom frequently because of a side effect of her blood-pressure medication. *Id.* at 674. Her employer agreed to this accommodation, but when the employee used the restroom, she alleges that her supervisor followed her and stood outside the bathroom door with arms folded. *Id.* The employee sued, claiming that her employer failed to accommodate her because her employer "harassed" her based on the number of bathroom breaks she took. *Id.* at 680. The Sixth Circuit disagreed with that argument, but explained that it was doing so because the employer had not said or done

"anything to discourage or prevent [the employee's] frequent use of the bathroom." Rather, the employer "accommodated [her] and permitted her to use the bathroom as much as necessary." *Id.* That at least seems to suggest that in cases where an employer has actively discouraged or prevented an employee from using her reasonable accommodation, the employee may have a viable failure to accommodate claim.

**[55]** Taken together, these cases seem to allow the possibility that an employer may "fail to accommodate" an employee if the employer actively discourages that employee from pursuing or using a reasonable accommodation.[7] Here, Schobert and York allege that CSXT actively discouraged them from using their pre-approved FMLA leave as a reasonable accommodation in several ways, from subjecting them to a disciplinary hearing for use of that FMLA leave, to sending them notices "threatening" to punish them for using their FMLA leave. (Compl. at ¶¶ 15, 18, 28, 65, 71, 100, #3, 5, 10, 11, 16). These facts, if true, may be enough to discourage the average employee from pursuing a reasonable accommodation in the form of seeking or using FMLA leave. At least the Court is unwilling to conclusively rule that out at this early stage of the proceeding. Accordingly, Plaintiffs plausibly allege that CSXT failed to in fact actually offer them a reasonable accommodation.

In sum, Plaintiffs have plausibly alleged each element of a failure to accommodate claim: that they are disabled, that CSXT was aware of these disabilities, that Plaintiffs requested FMLA leave which would function as a reasonable accommodation **\*795** for their disabilities, and that CSXT "failed" to accommodate Plaintiffs by discouraging their use of that leave. Therefore, the Court declines to dismiss Plaintiffs' failure to accommodate claims.

### d. Plaintiffs Have Not Plausibly Alleged That CSXT Violated The Rehabilitation Act's Medical File Provisions.

Plaintiffs further allege that CSXT engaged in an "employee medical file violation." (Compl. at Count III (caption), #23). There are two flavors of "medical file" claims that Plaintiffs assert. The first alleges that CSXT unlawfully obtained medical information from them (*id.* at ¶ 168)—i.e., the prohibited-inquiry claim. The second is that, once in possession of that information, CSXT "mishandled[ ] and wrongfully disclosed" it by placing it in their personnel files (*see id.*)—the mishandling claim.[8]

**[56]** Let's take them in that order. The Rehabilitation Act precludes employers from making certain inquiries of employees. 29 U.S.C. § 794(d) (incorporating 42 U.S.C. §§ 12111, 12201–04, 12210); *see also Lee v. City of Columbus*, 636 F.3d 245, 252 (6th Cir. 2011) ("[W]e agree with the district court and other courts that the ADA's limitations on the disclosure of medical information ... are incorporated by reference into the Rehabilitation Act."). For a viable Rehabilitation Act inquiry claim, at this stage, a plaintiff must allege facts that support the plausible inference that the employer's action amounted to either a "medical examination" or a "prohibited inquiry" into the employee's "medical disability within the meaning of the ADA," including inquiries into the "nature and severity of" such disability. *Lee*, 636 F.3d at 252 (citation omitted). The Rehabilitation Act forbids such activities unless they fall within the statutory safe harbor: that the examination or inquiry is both "job-related and consistent with a business necessity." 42 U.S.C. § 12112(d)(4)(A).

**[57]** A "medical examination" consists of "a procedure or test that seeks information about an individual's physical or mental impairments or health[.]" *Bates v. Dura Auto. Sys.*, 767 F.3d 566, 574 (6th Cir. 2014). There are multiple factors used to determine whether something constitutes a "medical examination," including if it is administered by a healthcare professional or interpreted by a such a professional, among other factors. *See id.* at 574–75 (quoting EEOC, *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA) ("DRI & ME Guidance")*, at Part B.2 (last visited July 27, 2000), http://www.eeoc.gov/policy/docs/guidance-inquiries.html). "Examples of medical examinations include vision tests, blood pressure and cholesterol screening, range-of-motion tests, and diagnostic procedures such as x-rays, CAT scans, and MRIs." *Id.* Here, Schobert and York do not allege that CSXT engaged in, or forced them to undergo, a "medical examination."

**[58]** **[59]** Absent a medical examination allegation, Plaintiffs must allege that CSXT engaged in a prohibited disability-related inquiry. To set forth such a claim, a plaintiff must plausibly allege that his or her employer inquired as to whether "an employee is an individual with a disability or as to the nature or severity of the disability." *Bates*, 767 F.3d at 578 (noting **\*796** the EEOC has coined the umbrella phrase "disability-related inquiry"). Again, looking to the EEOC for guidance, the *Bates* court determined that a disability-related inquiry is "a question or series of questions

that is likely to elicit information about a disability." *Id.* (quoting DRI & ME Guidance at Part B.1). The court also acknowledged that "questions that are not likely to elicit information about a disability" are not a forbidden inquiry. *Id.* (citation and quotation omitted); *see also Lee, 636 F.3d at 254* ("Obviously, asking an employee whether he is taking prescription drugs or medication, or questions seek[ing] information about illnesses, mental conditions, or other impairments [an employee] has or had in the past[,] trigger the ADA's (and hence the Rehabilitation Act's) protections." (internal citation and quotation marks omitted)).

The EEOC guidance cited in *Bates* proves useful here, as it helps differentiate between disability-related inquiries that are prohibited under the Rehabilitation Act and inquires that may arise under other policies:

> [Question] 15. May an employer request an employee to provide a **doctor's note or other explanation** to substantiate his/her use of sick leave?
>
> Yes. An employer is entitled to know why an employee is requesting sick leave. An employer, therefore, may ask an employee to justify his/her use of sick leave by providing a doctor's note or other explanation, so long as it has a policy or practice of requiring all employees, with and without disabilities, to do so.

DRI & ME Guidance Part C.

In a footnote to that section, the EEOC Guidance further states, "[w]here an employee has been on leave under the FMLA, the employer must comply *with the requirements of that statute.*" *Id.* at Part C. n.64 (emphasis added). That is, when investigating FMLA use (or misuse), an employer must comply with that statute, too. This further emphasizes that the FMLA and the Rehabilitation Act are different statutes and overlapping facts do not mean overlapping claims.

[60] [61] And even if the Rehabilitation Act were implicated here, there is a difference between "routine or general" inquiries that may be "legitimate and innocuous ... not aimed at identifying a disability" and those that violate the law. *Lee, 636 F.3d at 254.* The Rehabilitation Act's "solely by reason of" standard provides a narrow cause of action that prohibits only those inquiries that are aimed at identifying a disability. Accordingly, the viability of a Rehabilitation Act claim depends "on whether a medical inquiry is intended to reveal or necessitates revealing a disability, [or] whether the inquiry may merely *tend to* reveal a disability." *Id.*

To illustrate, in *Lee,* an employer's policy required all employees returning from three or more days of sick leave (not FMLA leave) to "supply information justifying the use of sick leave," by providing a "note to their immediate supervisor from their doctor stating the 'nature of the illness[.]' " *Id.* at 255. The Sixth Circuit held that a "request for employees to supply information justifying the use of sick leave [was] not an improper medical inquiry under the Rehabilitation Act or the ADA." *Id.* at 256. This was because "[a]sking an employee returning to work to describe the 'nature' of his illness ... [was] not necessarily a question about whether the employee [was] disabled." *Id.* at 254–55 (emphasis added). Instead it was merely information that "may tend to lead to information about disabilities" and thus it "[fell] far short of the requisite proof that the employer was discriminating *solely* on the basis of disability." *Id.* at 255. (citing *Verkade v. U.S. Postal Serv., 378 F. App'x 567, 578 (6th Cir. 2010)*).

**\*797** [62] The Fifth Circuit illustrated this point well when that court similarly held that "an inquiry into an employee's medical condition violates the Rehabilitation Act only if it is 'intended to reveal or necessitates revealing a disability.' " *Taylor v. City of Shreveport, 798 F.3d 276, 284 (5th Cir. 2015)* (quoting *Lee, 636 F.3d at 255*). This is different from an ADA medical inquiry violation, which requires only that an employer "request medical information that *may tend to reveal* a disability, including a request for a general diagnosis[.]" *Id.* at 285. "As a result, a medical inquiry that violates Title I [of the ADA] will not necessarily violate the Rehabilitation Act." *Id.*

Accordingly, the policies at issue in *Lee* and *Taylor,* which both required employees to offer evidence of a general diagnosis to verify sick leave, did not violate the Rehabilitation Act. Plaintiffs do not assert any claims under the ADA. And although CSXT's requests for FMLA leave verification may lead to information about disabilities, that alone is insufficient to make out a Rehabilitation Act claim.[9] This is because, as noted previously, the FMLA provides for leave in a number of situations, not just for employees who need leave to address a disability. Corroborating FMLA leave is like corroborating sick leave in this regard—requesting verification may tend to lead to information that reveals a disability, but under the Rehabilitation Act, that is not enough to make out a claim.

[63] Plaintiffs' "mishandling" claim likewise falls short. Schobert and York (really just Schobert, as he is the only one

who claims to have submitted any corroborating information to CSXT) allege that CSXT mishandled confidential medical information related to their alleged disabilities because that information ultimately became part of their disciplinary hearing records. (*See* Compl. at ¶ 44–45, #8). They allege that those files, which contained "HIPPA-protected personal medical information" were made "available to any member of CSX[T] management." (*Id.* at ¶ 46). This, Plaintiffs say, also violates the Rehabilitation Act.

In turn, CSXT argues that the Rehabilitation Act protects only a "very narrow class of records" and includes only those that are "obtained as a result of job-related medical examinations or inquiries into an employee's ability to perform job-related functions." (CSXT's Mem. at #134 (citing 42 U.S.C. §§ 12112(d)(3)–(4))). CSXT asserts that any information Schobert may have provided regarding FMLA leave does not fall into these "very narrow" categories. (*Id.*). Plaintiffs disagree, arguing that 29 C.F.R. § 1630.14(c) offers "no exception" and that the scope of the Rehabilitation Act is not as narrow as CSXT says. (Pls.' Resp. at #217). In reply, CSXT argues that Plaintiffs' claim "is premised on the allegation that CSXT made an unlawful disability-related inquiry in the first place. It did not." (CSXT's Reply at #285). Thus, the question is whether, based on the Complaint, it is plausible that during the course of the FMLA investigation, CSXT had some additional obligation *under the Rehabilitation Act* to keep information submitted by its employees confidential.

 **[64]** "As a preliminary matter ... the Rehabilitation Act addresses the confidentiality of medical records only in the limited context of pre-employment examinations." *Lee*, 636 F.3d at 252. "However ... the ADA's limitations on the disclosure of medical information set forth in **\*798** 42 U.S.C. § 12112(d) are incorporated by reference into the Rehabilitation Act." *Id.* And any information gathered pursuant to § 12112(d)(4)'s safe harbor—an inquiry that is "job related and consistent with business necessity"— is "subject to the requirements of subparagraphs (B) and (C) of paragraph (3)." 42 U.S.C. § 12112(d)(4)(C). Those subsections provide that "information obtained regarding the medical condition or history" of an employee must be "maintained on separate forms and in separate medical files and is treated as a confidential medical record[.]" *Id.* at § 12112(d)(3)(B).[10] As CSXT neither conducted a disability-related inquiry, nor required Plaintiffs to submit to a medical exam, that safe harbor provision is inapplicable, as are the provisions of subsection (B) and (C).

That being said, the FMLA still might apply. The FMLA requires an employer in possession of "records and documents relating to ... medical histories of employees ... created for purposes of FMLA" to maintain those records as "confidential medical records in separate files/records from the usual personnel files." 29 C.F.R. § 825.500(g).[11] But Schobert and York do not assert an FMLA claim based on mishandling information.[12] To the contrary, their Response doubles down on asserting that theirs is solely a Rehabilitation Act claim: "Plaintiffs adequately allege that Defendant made medical inquiries unauthorized by the Rehabilitation Act and then violated the Act's confidentiality provisions by disseminating the information to anyone in management by including it in the employees' personnel files." (Pls. Resp. at #217).

In short, Plaintiffs appear to have substituted a fatally flawed Rehabilitation Act **\*799** claim for what may have been a viable FMLA claim. But they are the masters of their Complaint, and as such they have not plausibly alleged that, by engaging in the FMLA inquiry or by requiring Schobert to provide corroborating evidence of his doctor's appointment, CSXT violated the Rehabilitation Act's medical record provisions. Thus, the Court grants CSXT's Motion as to the "medical file" claims.

## C. The Court Denies Part I.C Of CSXT's Motion For Judgment On The Pleadings.

Plaintiffs allege that they were not the only employees harmed by CSXT's FMLA review, and therefore they also brought this action as a putative class action. They purport to represent fourteen separate classes, nine of which raise FMLA claims (the "FMLA Class Action"). (*See* Compl. at ¶ 129–44, #19–21).[13]

CSXT argues that Plaintiffs should not be allowed to proceed with their FMLA Class Action under Federal Rule 23, but instead must abide by the requirements for collective actions under the Fair Labor Standards Act ("FLSA"). The FMLA and the FLSA should use the same collective action framework because, CSXT explains, both statutes permit employees to bring claims on behalf of "other employees similarly situated." (CSXT's Mem. at #135 (citing 29 U.S.C. § 2617(a)(2) (the FMLA); 29 U.S.C. § 216(b) (the FLSA))).

Plaintiffs disagree, arguing the default found in Rule 23 governs their FMLA Class Action and, CSXT's cited cases notwithstanding, other district courts have and do apply Rule

23 to FMLA class actions. (Pls.' Resp. Mem. at #218). Plaintiffs do note, however, that this is a matter of first impression in this District.

In reply, CSXT argues that the "goal of statutory interpretation is divining congressional intent" and that because the FLSA and the FMLA both refer to actions for "similarly situated" employees, it was "not necessary for [Congress] to replicate the entire structure of § 216(b) in § 2617(a)(2)." (CSXT's Reply at #286).

### 1. The Text Of The FMLA Does Not Support Adopting The FLSA's Collective Action Framework.

"Which interpretation is correct? To decide, we start with the text of the statute, and as it turns out, it is not necessary to go any further." *Babb v. Wilkie*, ––– U.S. ––––, 140 S. Ct. 1168, 1172, 206 L.Ed.2d 432 (2020) (citation omitted).

 **[65]** Section 2617 of the FMLA concerns civil actions by employees brought to enforce §§ 2615(a)(1) and (a)(2), the FMLA's interference and retaliation provisions. *See* 29 U.S.C. § 2617(a)(1). Under § 2617, an employee has a statutory "right of action" against "any employer ... by any one or more employees *for and in behalf of*—the employees; or the employees and other employees similarly situated." 29 U.S.C. § 2617(a)(2) (emphasis added). The FLSA says the same thing. *See* 29 U.S.C. § 216(b) (an action can be brought by "any one or more employees *for and in behalf* of himself or themselves and all other employees similarly situated" (emphasis added)). But, unlike the FMLA, which stops at that point, the FLSA continues on. Section 216(b) adds that "No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b).

 **\*800** Asking the Court to read this missing text into the FMLA, CSXT points to its lone authority: *Clary v. Southwest Airlines*, No. 3:07-CV-0126-P, 2007 WL 4947690, at \*2–3 (N.D. Tex. Dec. 17, 2007).[14] CSXT argues this case correctly held that an FMLA claim brought as a class action under Rule 23(b)(2) should instead be considered a collective action and governed by the FLSA's "opt-in" framework. (CSXT's Mem. at #135).

*Clary* is not binding, nor is the Court inclined to follow it. Rather than focus on the differing text between the two statutes, the *Clary* court proceeded directly to the

FMLA's legislative history, which that court read to show that "Congress intended the remedial provisions of the FMLA to mirror those in the FLSA." *Clary*, 2007 WL 4947690, at \*2 (citing *Nero v. Indust. Molding Corp.*, 167 F.3d 921, 928 (5th Cir. 1999) (in turn quoting *Frizzell v. Sw. Motor Freight*, 154 F.3d 641, 644 (6th Cir. 1998))). But congressional intent not reflected in statutory language does not make for a convincing argument.

Even *Clary*'s citation to *Nero* (and the latter's reference to *Frizzell*) obfuscates the textual issue. *Nero* discussed the statutory similarities in the context of reducing liquidated damages, which both statutes expressly address. *Nero*, 167 F.3d at 928. And *Frizzell*, despite being a Sixth Circuit case, is equally unavailing. *Frizzell* involved whether the FMLA provided a right to a jury trial, absent an express provision for one in that law. *Frizzell*, 154 F.3d at 644. In answering that question, the Sixth Circuit determined that the FMLA recognizes a jury trial right—not because of congressional intent—but because the statute's *text* differentiates between "damages" (determined by a jury) and "equitable relief" (determined by a judge). *Id.* at 643. This textual distinction reflected Congress's intent "to make juries available to plaintiffs pursuing remedies" under the FMLA. *Id.*

Other district courts have similarly rejected the argument that the FLSA collective action standard applies to FMLA class actions. *See, e.g.*, *Carrel v. MedPro Grp., Inc.*, No. 1:16-CV-130-TLS, 2017 WL 1488359, at \*3 (N.D. Ind. Apr. 26, 2017) (rejecting *Clary* and holding that "Rule 23 is the correct mechanism by which to proceed with the analysis" of a motion to certify an FMLA class action); *Loy v. Motorola, Inc.*, No. 03-C-50519, 2004 WL 2967069, at \*3 (N.D. Ill. Nov. 23, 2004) ("Because the plain language of the FMLA is silent as to the appropriate vehicle for an action to proceed on the behalf of others, this court is inclined to apply Fed. R. Civ. P. 23 as it moves with this case through its discovery stages.").

The difference between § 216(b) and § 2617(a) is that the former contains additional language that simply is not present in the latter. Because the FMLA is silent as to the appropriate way to proceed "in behalf of other" employees, the Court concludes that the default procedures set forth in Federal Rule of Civil Procedure 23 must govern. That said, for the time being, **\*801** the Court sets aside further discussion of any class action issues.

### D. The Court Defers Ruling On Parts II.A Through II.C Of CSXT's Motion For Summary Judgment Because The Court Grants Plaintiffs' Motion for Discovery.

The next issue the Court must resolve is the summary judgment portion of CSXT's Motion. For its part, CSXT argues none of the three challenged FMLA-related polices—how it calculates leave, the CAPS policy, and the guarantee pay plan—violate the law. (CSXT's Mem. at #136–41). In response, Plaintiffs argue there exist genuine issues of material fact about each of those policies, as well as Sixth Circuit precedent that supports their position.[15] (Pls.' Resp. at #219–22). To the extent Plaintiffs did not refute the affidavits and documents that CSXT attached to their Motion, Schobert and York filed a motion for more discovery pursuant to Federal Rule of Civil Procedure 56(d). (*See* Doc. 21). CSXT replies by arguing Plaintiffs have not "identified a good faith dispute" about any of CSXT's arguments, and therefore, summary judgment is appropriate.

### 1. CSXT's Motion For Summary Judgment Came Early In This Litigation.

In addressing this portion of CSXT's motion and Plaintiffs' discovery motion, some procedural history is helpful. Plaintiffs filed this action on January 29, 2019, and after waiving service and answering, CSXT filed the Rule 26(f) Report on April 30, 2019, but filed the instant Motion the next day. (*See* Doc. 15). After an extension, Plaintiffs responded on June 24, 2019, filing not only their merits response, but also their motions for discovery and to amend. (*See* Docs. 19, 20, and 21). CSXT's June 24, 2019 reply addressed Plaintiffs' three-pronged response. (*See* Doc. 24).

The next month, Judge Barrett, to whom this case was originally assigned, held a status conference and requested new Rule 26(f) reports. (*See* Minute Entry, July 22, 2019). Judge Barrett set a calendar for the case, which was amended on October 16, 2019. (*See* Doc. 31). The Amended Calendar Order set a November 21, 2019 deadline to serve paper discovery and a June 8, 2020 deadline for class discovery. (*See id.*). After this case was reassigned to the undersigned judge, the deadline for class discovery was extended until August 8, 2020. (*See* Doc. 36). During the May 14, 2020 oral arguments, the parties reported discovery has progressed to some extent while all these motions have remained pending. This limited discovery occurred, however, well after Plaintiffs' response to CSXT's summary judgment motion was due.

Although Plaintiffs did offer a limited response to the summary judgment portion of CSXT's Motion, they simultaneously argued that they are entitled to relief under Federal Rule of Civil Procedure 56(d) and must have an opportunity for more thorough discovery before they can adequately respond. (*See* Pls.' Mot. for Disc. Pursuant To Civ. R. 56(d) ("Pls.' R. 56(d) Mot."), Doc. 21, #258). As discussed below, the Court concludes that Plaintiffs have met their burden under Rule 56(d) and accordingly, will allow them to pursue discovery before supplementing their response **\*802** to the summary judgment portion of CSXT's Motion.

### 2. *Rule 56(d) May Afford A Party The Opportunity For Discovery.*

When a party asserts that additional discovery is necessary before it can respond to a motion for summary judgment, Rule 56(d) controls the Court's analysis of the issue. The rule provides:

> *When Facts Are Unavailable to the Nonmovant.* If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order

Fed. R. Civ. P. 56(d)(1)–(3)

**[66]  [67]**  "The purpose behind Rule 56(d) is to ensure that plaintiffs receive 'a full opportunity to conduct discovery' to be able to successfully defeat a motion for summary judgment." *Doe v. City of Memphis*, 928 F.3d 481, 490 (6th Cir. 2019) (quoting *Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004)). " 'A party invoking [the] protections [of Rule 56(d)] must do so in good faith by affirmatively demonstrating ... how postponement of a ruling on the motion will enable him ... to rebut the movant's showing of the absence of a genuine issue of fact.' " *Id.* (alteration in original) (quoting *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 623 (6th Cir. 2014)).

**[68]  [69]  [70]**  It is true that "[t]he party opposing a motion for summary judgment ... possesses no absolute right to additional time for discovery under Rule 56[.]" *Doe*, 928 F.3d at 490 (alteration in original) (quoting *Emmons v. McLaughlin*, 874 F.2d 351, 356 (6th Cir. 1989)). At the same

time, denying a Rule 56(d) motion when the non-moving party has not yet received a full opportunity to conduct discovery would "likely constitute an abuse of discretion." *Ball*, 385 F.3d at 719. It would likely be improper to grant summary judgment if the parties seeking discovery under Rule 56(d) are not afforded a sufficient opportunity to conduct it. *See White's Landing Fisheries, Inc. v. Bucholzer*, 29 F.3d 229, 231–32 (6th Cir. 1994) ("It follows that a grant of summary judgment is improper if the non-movant is given an insufficient opportunity for discovery."). And although a district court's decision is reviewed for abuse of discretion, the Sixth Circuit "has cited approvingly other circuits' view that 'a ... motion requesting time for additional discovery should be granted almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence.' " *Doe*, 928 F.3d at 490–91 (alteration in original) (quoting *E.M.A. Nationwide*, 767 F.3d at 623 n.7).

[71] In deciding a Rule 56(d) Motion, the Sixth Circuit instructs the district courts to consider five factors: (1) when the movant learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery has the potential to change the ruling at issue; (3) how long the discovery period had lasted; (4) whether the movant was dilatory in its discovery efforts; and (5) whether the party moving for summary judgment was responsive to discovery requests.[16] *See id.* (quoting **\*803** *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008)); *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196–97 (6th Cir. 1995). Thus, the Court looks first to whether the movant complied with the procedural requirements of the Rule, then to whether the five *Plott* factors favor permitting discovery.

Plaintiffs have satisfied the technical requirements of Rule 56(d) by filing a motion and setting forth by declaration the specific information they need to adequately respond to the summary judgment portion of CSXT's Motion. (*See* Pls.' R. 56(d) Mot., #258–59; Thompson Decl. at #260–62.)

### 3. Considering The **Plott** *Factors, Plaintiffs Are Entitled To The Discovery They Seek.*

[72] For the reasons explained below and cognizant of the Sixth Circuit's preference that courts grant Rule 56(d) motions, the Court determines that Schobert and York are entitled to engage in the discovery they seek. An analysis of the *Plott* factors here leads to this same outcome.

Three of the *Plott* factors address issues related to the timing of discovery and whether the parties delayed that process. The third factor, whether Plaintiffs were dilatory in their discovery efforts, is the "main inquiry," *Doe*, 928 F.3d at 491 (citation omitted), and thus the Court discusses it first. CSXT filed its summary judgment motion just shy of a month after answering the Complaint. In the parties' Rule 26(f) Report, filed just two days before CSXT filed its Motion, the parties stated that if the Court does not grant CSXT's Motion for Judgement on the Pleadings and Summary Judgment and does not stay this action, discovery will be needed on "CSXT's FMLA policies and procedures," "CSXT's method of accounting FMLA leave," and "CSXT's attendance policy for Train & Engine employees." (*See* Joint Discovery Plan, Doc. 14, #88–89). All of these are issues that Plaintiffs likewise now say they need discovery on before they would be able to respond to CSXT's summary judgment motion. (*See* Thompson Decl. at #260–62). There is no allegation or evidence that Plaintiffs delayed discovery or were not diligent in pursuing it because the time for discovery had only recently commenced. Thus, this factor—*Plott's* "main inquiry"—favors Plaintiffs.

The other timing-related factors are neutral or favor Plaintiffs. The first factor, when Plaintiffs learned of the issue that is the subject of the requested discovery, "primarily pertains to situations when there was something that prevented a party from learning about a subject of desired discovery until after some discovery had already been sought." *Doe*, 928 F.3d at 492–93. As little to no discovery had occurred when Plaintiffs made their request, this factor is not applicable to the facts of this case and is neutral. *See id.* The fourth factor, how long the discovery period had lasted, is analyzed on a case-by-case basis. *See id.* at 494 ("[W]hat constitutes a reasonable length of time for the duration of discovery is so particular to the facts and circumstances of a given case that examining what lengths of time this court has found sufficient for discovery in the past is not particularly helpful."). Here, again, little discovery had occurred and this factor cuts in favor of Plaintiffs.

The second factor, whether the desired discovery has the potential to change the ruling, also favors Plaintiffs. They seek additional discovery related directly to specific FMLA policies that CSXT had in place at the time of the alleged events. Moreover, CSXT attached several affidavits and exhibits to its Motion, but any information that could refute the contents of those attachments would have been, at that time, in CSXT's possession. To refute CSXT's summary

judgment motion, Plaintiffs will necessarily need to discover what **804** CSXT's FMLA policies were. That is unlikely to occur without the Plaintiffs at least being afforded the opportunity to see a clearer picture of how CSXT operated in order to have a fair chance to refute the company's declarations. This factor also favors the Plaintiffs.

The fifth and final factor, whether CSXT was responsive to Plaintiffs' discovery requests, is largely neutral, as the parties had exchanged little to no discovery at the time the Plaintiffs filed the Rule 56(d) Motion. There is nothing, at least that the Court is aware of, that would indicate CSXT has not been responsive to Plaintiffs' discovery requests since discovery began.[17]

Considering these five factors, the Court grants Plaintiffs' Rule 56(d) Motion. (Doc. 21). Pursuant to Rule 56(d)(1), the Court defers ruling on parts II.A through II.C of CSXT's Motion for Summary Judgment (Doc. 15). Pursuant to Rule 56(d)(2), the Court will permit the parties time to define the scope of and engage in the discovery identified by Plaintiffs' Motion (Doc. 21) and attached affidavit. Under its discretion provided by Rule 56(d)(3), the Court permits Plaintiffs to supplement their response to CSXT's summary judgment motion, and will also afford CSXT an opportunity to supplement its reply.

To implement this part of the Order, the Court **ORDERS** the parties to confer regarding an appropriate schedule for completing any necessary discovery to comply with this Order, and also an appropriate schedule for the supplemental briefing that the Court directed above. If the parties are unable to agree, they are directed to present their competing proposals to the Court, and the Court will set a calendar.

## E. The Court Denies Part II.D of CSXT's Motion for Summary Judgment.

The last portion of CSXT's summary judgment motion argues that York's claim, because he was ultimately terminated, must go to arbitration.

CSXT contends that arbitration is mandatory under the Railway Labor Act ("RLA"), which governs disputes between labor and management in the railroad industry, and requires all "minor claims" to be arbitrated. (*See* CSXT's Mem. at #142). First, CSXT says York's claim is a "minor claim." (*Id.* at 143–44). Resolving that minor claim, it says, would require this Court to interpret the operative collective

bargaining agreement (the "CBA") to determine whether CSXT had an "honest belief" for taking the actions that it did, and further, whether that "honest belief" was supported by "substantial evidence," an implied term in the CBA. (*See id.*). This means, according to CSXT, that because the CBA is implicated, the Court cannot resolve the FMLA issue.

Plaintiffs disagree, arguing this case is instead about whether the "FMLA prohibited [CSXT] from using the disciplinary process to challenge FMLA usage in the first place." (Pls. Resp. at #222–24). They further argue that the FMLA requires employers to follow a "specific statutory procedure" before resorting to a collectively-bargained-for **805** disciplinary structure, and CSXT did not follow those procedures. (*Id.* at #223). Finally, Plaintiffs argue that because the CBA does not require arbitrating FMLA claims, despite the fact that it could, means this Court can and should adjudicate York's claim, as it is outside the RLA's preclusive reach. (*Id.* at #224).

### 1. *The Summary Judgment Standard.*

[73] Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with significant probative evidence to support its claim. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Lansing Dairy,* 39 F.3d at 1347. Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. In sum, in light of all the facts as to which CSXT shows a lack of dispute, Plaintiffs must present some remaining "sufficient disagreement" which would necessitate submission to a jury.

See *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505). In making that determination, though, this Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

### 2. *York Is Not Required To Arbitrate His Claims Because Resolving His FMLA Claim Does Not Require Interpreting The Collective Bargaining Agreement.*

There are several interrelated questions that the Court must consider before reaching a conclusion about whether York's claim must go to arbitration. The first is whether York is making a claim for FMLA interference, FMLA retaliation, or both, as the Complaint is a little vague on this point. (*Compare* Compl. at ¶¶ 154–59, #22–23, *with id.* at ¶¶ 138–39, #20). Assuming for a moment that York's claim may be treated as a retaliation claim, the second question is whether the honest-belief standard applies. If that answer is "yes," the Court must address whether CSXT's reliance on the "honest belief" standard would implicate the CBA to the extent that it would require York's claim to be arbitrated.

### a. York's Claim Is Better Understood As A Retaliation Claim.

[74]  "Although we analyze an FMLA claim based on the interference theory differently **\*806** from one based on the retaliation theory, notice pleading does not box plaintiffs into one theory or the other at the complaint stage of an FMLA action." *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 446 (6th Cir. 2007).

[75]  [76]  The FMLA has two interference provisions. The first, 29 U.S.C. § 2615(a)(1), prohibits employers from "interfering, restraining, or denying the exercise of or attempted exercise of any FMLA right." *Wysong*, 503 F.3d at 446 (quoting *Chandler*, 283 F.3d at 825 (citation omitted)). Although labeled in terms of "interference," "[t]his prohibition includes retaliatory discharge for taking leave." *Id.* at 447. The second interference prohibition, 29 U.S.C. § 2614(a)(1), requires an employer to restore an employee "to 'the position of employment held by the employee when

the leave commenced' or 'to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.' " *Grace v. USCAR*, 521 F.3d 655, 669 (6th Cir. 2008) (quoting 29 U.S.C. § 2614(a)(1)).

[77]  [78]  The prima facie elements of an interference claim are that: (1) the employee was FMLA-eligible; (2) the defendant was a covered employer; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intent to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled. *See, e.g.*, *Stein v. Atlas Indus. Inc.*, 730 F. App'x 313, 317 (6th Cir. 2018) (citing *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004)). The interference provisions focus "simply [on] whether the employer provided its employee with the entitlements set forth in the FMLA—for example, a twelve-week leave or reinstatement after taking medical leave." *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003).

[79]  [80]  Relatedly, the FMLA's anti-retaliation provision, 29 U.S.C. § 2615(a)(2), prohibits an employer from discharging "or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful" by the FMLA. *Id.* For a prima facie retaliation claim, a plaintiff must establish that he or she was: (1) engaged in activity protected by the FMLA; (2) that the employer knew the employee was exercising his or her rights under the FMLA; (3) "after learning of the employee's exercise of FMLA rights, the employer took an adverse employment action adverse to [the employee]; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action." *Jaszczyszyn v. Advantage Health Physician Network*, 504 F. App'x 440, 447 (6th Cir. 2012) (quoting *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006)). In other words, a retaliation claim is about whether the employer took some adverse action against an employee *after* they availed themselves of their FMLA rights, not about whether the employee's FMLA rights were impeded in the first place. *See Marshall v. Rawlings Co.*, 854 F.3d 368, 376 (6th Cir. 2017).

[81]  [82]  When the "essence" of a claim "is retaliation, not interference," a district court can consolidate a generally pled § 2615 claim and "consider[ ] them as one for retaliation under § 2615(a)(2)." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012) (citing *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006)); *see also LaBelle v. Cleveland Cliffs, Inc.*, 784 F. App'x 437, 443 (6th Cir. 2019)

(affirming the district court's decision to merge the two FMLA claims "under the retaliation framework"). Consolidating FMLA claims into a retaliation claim is appropriate when an employee is **\*807** afforded all the rights and privileges that FMLA contemplates but is retaliated against or terminated afterward. *See Seeger*, 681 F.3d at 282–23 (finding the Eighth Circuit's reasoning "persuasive" and treating an interference claim as one for retaliation when an employee is given the leave he requested but is later investigated and terminated for FMLA misuse); *LaBelle*, 784 F. App'x at 443 ("Given that LaBelle received all the FMLA leave he requested and was terminated afterwards for suspected fraud, the district court correctly found that the essence of LaBelle's claim is retaliation, not interference.").

[83]  [84]  Treating York's FMLA claim as a retaliation claim is appropriate here.[18] To be sure, the Complaint is somewhat ambiguous on that front, as Plaintiffs caption the FMLA cause of action "Denial and Interference" (*id.* at Count I (caption), #22). But they go on to allege that York was terminated, and he appears to be the putative representative for Classes 13 and 14, which are defined as CSXT employees who were allegedly terminated or disciplined "as a result" of taking FMLA leave. (*Id.* at ¶¶ 138–39, #20). Confirming that retaliation, not interference, seems to be the gravamen of the claim, York does not allege, beyond the letters and policies both Plaintiffs take issue with, that CSXT interfered with his ability to take leave or that it failed to restore him to his position when he returned.[19] (*See, e.g.,* Compl. at ¶¶ 100–01, 113, #15, 17). Therefore, although labeled as an interference claim, York's FMLA claim is better understood as one for retaliation.[20]

### b. The *McDonnell Douglas* Framework Applies To York's FMLA Retaliation Claim, Which In Turn Incorporates The Honest Belief Standard.

[85]  York's retaliation claim requires the court to employ a familiar framework. "There is no doubt" courts in this Circuit apply "the *McDonnell Douglas* burden-shifting framework to FMLA retaliation **\*808** suits when the plaintiff produces indirect evidence of a causal connection between the protected activity and the adverse action." *Jaszczyszyn*, 504 F. App'x at 447.

[86]  Assuming York has met his prima facie showing based on circumstantial evidence (neither party argues this

point[21]), the burden shifts to CSXT to articulate a "legitimate, nondiscriminatory reason" for taking the adverse action it did. *See Seeger*, 681 F.3d at 284. "Fraud and dishonesty constitute lawful, non-retaliatory bases for termination" and "*[n]othing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave.*" *Id.* (citation and quotation omitted). Assuming CSXT would make this argument to satisfy its burden, the burden of production returns to York to demonstrate pretext.

[87]  At the pretext stage, the question is whether York can demonstrate that CSXT's proffered reason for his termination was instead pretext for some impermissible purpose. *See id.* "A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Id.* at 285 (citing *Dews v. A.B. Dick, Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). York might argue that CSXT's decision had no basis in fact, and CSXT will likely, or at least it so appears based on CSXT's briefing, raise its "honest belief."

[88]  [89]  Under the honest-belief rule, "an employer's proffered reason is considered honestly held where the employer can establish it reasonably relied on particularized facts that were before it at the time the decision was made." *Id.* (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006)). "Thereafter, the burden is on the plaintiff to demonstrate that the employer's belief was not honestly held." *Id.* "An employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact." *Id.* (quotation omitted); *see also Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) ("Under this rule, as long as the employer had an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it was ultimately shown to be incorrect."). York must "show 'more than a dispute over the facts upon which the discharge was based.' " *Seeger*, 681 F.3d at 285 (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001)).

Perhaps recognizing that this will ultimately come down to pretext, CSXT asserts "the core merits question presented ... is whether CSXT honestly believed that York (and the employees he purports to represent) used FMLA leave dishonestly." (CSXT's Mem. at #143). But instead of arguing

York cannot defeat CSXT's "honest belief," CSXT argues instead that because its "honest belief" is relevant, the Railway Labor Act requires York's claim be resolved in arbitration. (*See id.*).

### c. The Railway Labor Act Does Not Preclude York's FMLA Claim.

 **[90]**    **[91]**    **[92]**  The Railway Labor Act provides a "comprehensive framework for the resolution of labor disputes in the railroad **\*809** industry" and establishes a mandatory arbitration regime for "minor" disputes. *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987); *45 U.S.C. § 151 et seq.* "Minor disputes" involve controversies over the interpretation of an existing collective bargaining agreement and disputes invoking contract-based rights. *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252–54, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994). A federal court, however, may resolve claims arising under federal or state statutory law if the underlying factual issues do not require a court to interpret or construe an existing collective bargaining agreement. *See Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 411, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). The question here is how to distinguish between a "minor dispute" that is precluded by the Railway Labor Act ("RLA") and one that is not.

 **[93]**    **[94]**  To aid district courts in answering this question, the Sixth Circuit instructs this Court to ask two questions: "(1) whether proof of the [federal] law claim would require interpretation of the CBA; and (2) whether the right claimed by the plaintiff is created by the collective bargaining agreement or by [federal] law." *Emswiler v. CSX Transp., Inc.*, 691 F.3d 782, 792 (6th Cir. 2012) (citing *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994)); *see also Stanley v. ExpressJet Airlines, Inc.*, 356 F. Supp. 3d 667, 684–85 (E.D. Mich. 2018), *aff'd*, 808 F. App'x 351 (6th Cir. 2020) (describing the two-part test as "(1) does proof of the plaintiff's claim require interpretation of the CBA; and (2) is the right claimed by the plaintiff created by the CBA or by state or federal law"). Relatedly, "[a]n employer cannot take an otherwise valid claim and cause it to become preempted by claiming the CBA as a defense." *Stanley*, 808 F. App'x at 355 (citation omitted).

Two district court cases in this circuit, *Stanley* and *Yelder*, both provide helpful guidance in answering *Emswiler*'s

inquiry. *See Stanley*, 356 F. Supp. 3d at 684–85; *Yelder v. Norfolk S. Ry. Co.*, No. 2:18-CV-10576, 2020 WL 1083785, at \*5 (E.D. Mich. Mar. 6, 2020).

In *Stanley*, a Muslim flight attendant sued under Title VII for religious discrimination after her employer would not provide an accommodation excusing her from serving alcohol, which the employee said Islam forbids. *Stanley*, 808 F. App'x at 352. The employer suggested Stanley take an informal approach by working it out with other flight attendants on a flight-by-flight basis, but that "arrangement was unlikely to succeed in the long-term as it violated several provisions of the CBA." *Id.* at 353. Stanley's proposed accommodation—that she would never have to assist in serving alcoholic beverages—implicated all these CBA provisions. *Id.* Particularly, the proposed accommodation ran afoul of provisions related to shift bidding, vacancies, seniority roles onboard any particular flight, and rights associated with "downgrading" from flights. *See id.* Based on this, the employer offered Stanley three options: take personal leave and find another position with the airline, serve and sell alcohol, or resign. *Id.* at 354. She rejected all three, and instead submitted a formal request for her accommodation. After her request was denied, she sued. *Id.*

Affirming the district court's decision that Stanley's Title VII claims were preempted by the RLA, the Sixth Circuit took as given that Stanley met her prima facie case and that her proposed accommodation would force her employer to "violate the CBA," which is a recognized undue hardship on an employer. *Id.* at 356. Instead of analyzing the proposed accommodation, **\*810** the court focused on "whether the CBA [could] conclusively resolve" the Title VII claim. *Id.* The court determined that the CBA "and only the CBA" could resolve the question of whether Stanley's proposed accommodation violated the seniority provisions of the CBA itself, and therefore, the RLA precluded her claims. *Id.*

Conversely in *Yelder*, the district court determined an employee's Title VII race discrimination claims were *not* subject to RLA preclusion because his claims did not depend on interpreting any CBA provision. *Yelder*, 2020 WL 1083785, at \*5. Bringing both Title VII discrimination and retaliatory discharge claims, Yelder argued they were not precluded because "he [did] not claim that the CBA provisions themselves are racially discriminatory[,]" and that it was necessary to refer to the CBA only "to determine what the assignment opportunities were and how assignments were made," (i.e., whether they were done in a way that violated

Title VII). The court agreed and drew a distinction between claims like Stanley's, which were conclusively resolved by interpreting the CBA, and claims like Yelder's, in which he did not challenge the "meaning" of a CBA provision, but instead asserted only that the CBA was "*applied* in a discriminatory manner." *Yelder*, 2020 WL 1083785, at *7 (quoting *Carmona v. Sw. Airlines, Co.*, 536 F.3d 344, 349 (5th Cir. 2008)). The court ultimately determined the RLA did not preclude his claims because " 'consideration of the CBA as applied to Title VII ...—not interpretation of the CBA itself—[was] what [was] required to resolve [Yelder's] claims." *Id.* at *8 (alteration in original) (quoting *Carmona v. Sw. Airlines Co.*, 536 F.3d 344, 349–50 (5th Cir. 2008)).

The court reasoned, "while 'certain provisions of the CBA must be examined and weighed as a relevant but non-dispositive factor' in deciding whether Yelder was subject to disparate treatment or faced racially motivated termination, the fact that such consideration of the CBA is necessary does not mean that the claims are precluded by the RLA." *Id.* (quoting *Brown v. Il. Cent. R.R. Co.*, 254 F.3d 654, 667–68 (7th Cir. 2001)). Yelder's claims, unlike Stanley's, turned on the employer's "conduct and motives in relation to the CBA's requirements," and despite claims to the contrary, the claims that Yelder was asserting were "that Defendant violated rights created by *federal statute*, ... not by the CBA." *Id.* at *8. Thus, the answer to each of the *Emswiler* questions was "no" and the claims were not precluded. *Id.*

 **[95]** These two cases aid this Court in resolving whether York's FMLA retaliation claim is precluded by the RLA. In reaching the conclusion that it is not, the Court looks no further than *Emswiler*'s two-part inquiry: (1) does proof of York's claim require interpretation of the CBA; and (2) is the right York claims created by the CBA, or instead by federal or state law? *See Emswiler*, 691 F.3d at 792.

As to the first question—whether proof of York's claim requires interpretation of the CBA—the answer is "no." York's retaliation claim is more like the one in *Yelder* than the one in *Stanley*. It may require *examining* the CBA, but that examination is a non-dispositive factor in deciding whether CSCT retaliated against York for exercising his FMLA rights. The term "honest belief" does not appear in the portion of the CBA related to termination of T&E Employees.[22] And while the "substantial **\*811** evidence" evidentiary standard may be implied in the CBA, which CSX does argue in a footnote, it has little to do with York's federal cause of action under the FMLA. Moreover, the fact that CSXT argues it had

an "honest belief" for its actions does not mean York's claim must be arbitrated merely because that is how CSXT may respond to York's claim at the pretext stage. *See Yelder*, 2020 WL 1083785, at *6 ("[A]n employer cannot ensure preclusion of a plaintiff's claim merely by asserting CBA-based defenses to what is essentially a non-CBA-based claim." (quotation omitted)).

The second question—what is the source of the claimed right, the CBA or federal law?—also cuts against RLA preclusion. The right York is asserting does not arise from the CBA, but rather from a federal statute. While an arbitrator may be called upon to assess the facts surrounding York's termination and whether CSXT's actions complied with the CBA, arbitration will not resolve the federal law in question. There is likewise nothing in the CBA, at least that CSXT identified to the Court, to indicate T&E Employees expressly agreed to bring FMLA claims exclusively to arbitration. Selecting arbitration as the only forum for federal claims was certainly a possible agreement CSXT and T&E Employees could have made when they negotiated the CBA. *See Gaffers v. Kelly Servs., Inc.*, 900 F.3d 293, 296 (6th Cir. 2018) (holding that employees can, through collective bargaining, choose arbitration as the forum to resolve federal statutory claims). The parties' failure to include any such provision in the CBA, paired with the fact that the right York asserts arises under federal law, also indicates arbitration is inappropriate here.

Accordingly, as the answers to both of *Emswiler*'s questions point the same way, this Court determines York's FMLA claims are not precluded by the RLA and arbitration of them is not required.[23]

## F. The Court Denies Part III of CSXT's Motion and Declines To Stay This Action.

The last issue to resolve is whether a stay is appropriate. CSXT asserts several reasons favoring a stay, including that York's arbitration decision may "bear on" **\*812** non-arbitrable claims, that York still has yet to decide whether he will appeal the initial arbitration decision, that there are several other cases just like this one proceeding in other districts, and that judicial economy favors a stay. (CSXT's Mem. at #145–48). CSXT also filed a motion to transfer this action to the United States District Court for the District of Maryland. (*See* Doc. 38, #350–51).

Plaintiffs respond to CSXT's request for stay by arguing it has not articulated any "pressing need" for delay and that

CSXT has similarly failed to show how a stay would not harm the Plaintiffs. (Pls.' Resp. Mem. at #225–26). CSXT counters that it will take longer to litigate Plaintiffs claims than it will to arbitrate them, and Plaintiffs can be compensated for any delay through interest payments under the FMLA, should they ultimately prevail. (*See* CSXT's Reply Mem. at #292–94).

### 1. *The District Court Has Discretion In Deciding Whether To Stay A Civil Matter.*

[96]    [97]    "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes in its docket with economy of time and effort for itself, for counsel[,] and for litigants" and the decision to stay a proceeding "ordinarily rests with the sound discretion of the District Court." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 626 (6th Cir. 2014) (quoting *Ohio Env'tl. Council v. U.S. Dist. Court, S. Dist. of Ohio, E. Div.*, 565 F.2d 393, 396 (6th Cir. 1977)); *see also Landis v. N. Am. Co.*, 299 U.S. 248, 254–55, 57 S.Ct. 163, 81 L.Ed. 153 (1936). At the same time, the court "must tread carefully in granting a stay of proceedings since a party has a right to a determination of its rights and liabilities without undue delay." *Ohio Env'tl. Council*, 565 F.2d at 396.

[98]    [99]    "There is no precise test in this Circuit for when a stay is appropriate." *Ferrell v. Wyeth-Ayerst Labs., Inc.*, No. 1:01-CV-447, 2005 WL 2709623, at *1 (S.D. Ohio Oct. 21, 2005). In addressing that issue, courts commonly consider several factors, including: (1) the need for a stay; (2) the stage of litigation; (3) whether the non-moving party will be "unduly prejudiced or tactically disadvantaged"; (4) whether a stay will simplify the issues; and (5) whether a stay would lessen the burden of litigation for the parties and the court. *See, e.g., Kirby Devs., LLC v. XPO Global Forwarding, Inc.*, No. 2:18-cv-500, 2018 WL 6075071, at *2 (S.D. Ohio Nov. 20, 2018) (citations omitted). And it is the party seeking stay who "bears the burden of showing both a need for delay and that 'neither the other party nor the public will suffer harm from entry of the order.' " *Id.* (quoting *Ohio Env'tl. Council*, 565 F.2d at 396).

[100]    Applying those factors here, the Court concludes that a stay is unnecessary at this time. As for the first factor, CSXT is litigating several actions similar to this one and the first-filed case in Maryland raises kindred questions of law based on similar underlying facts. *See Bell v. CSX Transp., Inc.*, Case No. 1:18-cv-744-JKB (D. Md. 2018). But CSXT has recently filed a motion seeking to transfer this case to that court. Although this Court has yet to decide whether

that transfer is warranted, either way, a stay here will not promote final resolution of this matter. Second, this action has yet to reach the class certification stage and discovery is still ongoing, but any additional discovery that will occur will be greatly trimmed by this Order, limiting any benefit a stay might provide in terms of avoided discovery. Third, CSXT may well be correct that there is no particular prejudice or disadvantage Plaintiffs will suffer if the Court implements a  **\*813**  stay, as they could be compensated for that delay by way of interest payments should they prevail on the merits. But again, Plaintiffs are due their day in court and to delay that for some indeterminate amount of time, without some strong reason in support, is unwarranted. Fourth, while it may be true that a stay could simplify the issues, as this Court will be able to review any arbitration decision that might occur, there is no pressing need for a stay at this point. Fifth, there is no indication that a stay would lessen (or impose more of) any burden on the parties or the Court, again especially in light of this Order. Based on these factors, the Court concludes that a stay is not appropriate.

### CONCLUSION

For the reasons above, the Court **DENIES** Plaintiffs' Motion for Leave to Amend (Doc. 20), **GRANTS** CSXT's Motion for Judgment on the Pleadings as to Part I.A of its Motion (Doc. 15, #126–29), **GRANTS IN PART AND DENIES IN PART** CSXT's Motion for Judgment on the Pleadings as to Part I.B of its Motion (*id.* at #130-34), **STRIKES** Classes 11, 12, 13, and 14 from the Complaint, and **DISMISSES WITH PREJUDICE** Count II and the portions of Count III of the Complaint that set forth Plaintiffs' Medical Inquiry and Disability Discrimination claims. (Doc. 1). The Court, however, **DENIES** CSXT's Motion for Judgment on the Pleadings as to Part I.C of its Motion (Doc. 15 at #135).

The Court further **GRANTS** Plaintiffs' Motion for Discovery (Doc. 21) and **DEFERS** ruling on CSXT's Motion for Summary Judgment as to Parts II.A through II.C (Doc. 15 at #136–41). Finally, the Court **DENIES** CSXT Summary Judgment as to Part II.D of its Motion (*id.* at #142–44) and **DENIES** CSXT a stay pursuant to Part III of its Motion (*id.* at #145–48).

### SO ORDERED.

2020 Employee Benefits Cas. 465,086

**All Citations**

504 F.Supp.3d 753, 2020 Employee Benefits Cas. 465,086

Footnotes

1     Refers to PageID Number.

2     Plaintiffs have not moved for class certification and the Court does not address that question in this Order.

3     References to "Part" correspond to the specific sections of CSXT's Memorandum. As the Court ultimately grants, denies, or defers various portions of CSXT's Motion, referring to the memorandum portions aids in organization only.

4     CSXT, perhaps also left guessing as to what, exactly, Schobert and York allege, attacked the base of several of the Rehabilitation Act claims by arguing Schobert and York are not "disabled." (*See* CSXT's Mem. at #130–31).

5     This summation, the Court acknowledges, disregards multiple differences between the FMLA and the Rehabilitation Act, which are discussed more fully later in this Opinion.

6     The Court noted above that, as a general matter, a plaintiff need not allege a "disability" in order to bring a retaliation claim. Instead, the plaintiff must merely allege that he or she engaged in activity protected by the Rehabilitation Act. Here, though, given the specific nature of the alleged conduct at issue (taking FMLA leave), in order to plausibly allege that the conduct represented protected activity under the Rehabilitation Act, as opposed merely to conduct under the FMLA, the plaintiffs must adequately allege a disability.

7     That said, there is no liability under a failure to accommodate theory if the plaintiff withdraws their request for a reasonable accommodation on their own volition and without any pressure or discouragement on the part of their employer. *See Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch., 974 F.3d 652, 670 (6th Cir. 2020).*

8     Plaintiffs note that in their Proposed Amended Complaint, they "drop[ ] their allegations that [CSXT] mishandled their medical information by placing it in the 2018 disciplinary hearing files." (Pls.' Resp. at #217 n.4). Because the Court discussed and denied Plaintiffs' Motion to Amend as futile, this claim warrants brief discussion here.

9     There is some question as to whether a private cause of action akin to the Rehabilitation Act's "disability-related inquiries" prohibition exists under the FMLA. But as the Plaintiffs did not allege it, the Court need not address it.

10     Say, for example, that CSXT did engage in a prohibited disability-related inquiry. That could certainly be a plausible violation of the Rehabilitation Act. Or say CSXT engaged in a permissible inquiry that was "job related and consistent with business necessity," obtained medical records in the course of that inquiry, and *then* mishandled them. That too would plausibly violate the Rehabilitation Act.

11     That regulation continues on to state that "[i]f the ADA, as amended, *is also applicable*, such records shall be maintained in conformance with ADA confidentiality requirements," save several exceptions not applicable here. *Id.* (emphasis added) (citing the ADA regulation, 29 C.F.R. § 1630.14(c)).

12     There appears to a question as to whether a private cause of action exists for this type of claim in the first place. *See Walker v. Gambrell, 647 F. Supp. 2d 529, 539 n.5 (D. Md. 2009)* ("It is not settled whether [29 C.F.R. § 825.500(g)] gives rise to a private right of action for disclosure[.]") (citing *Cash v. Smith, 231 F.3d 1301, 1307 (11th Cir. 2000)). Cash,* in avoiding the cause of action question, found the employee's "unlawful disclosure" claim failed because "voluntary disclosure" of medical information differs from disclosure as "the result of an examination ordered by" the employer. *See Cash, 231 F.3d at 1307–08.* Other courts have noted that when an employer does not comply with § 825.500 to keep FMLA records confidential, that gives rise to an interference claim, not a standalone cause of action. *See, e.g., Withers v. Johnson, 763 F.3d 998, 1005 (8th Cir. 2014)* ("FMLA regulations permit an employer to require a medical clearance as a condition of restoring the employee to his position, 29 C.F.R. § 825.312(a)–(b), but the regulations—like those under the ADA—require that those records be kept confidential from non-supervisory personnel. *Id.* § 825.500(g). FMLA regulations

also provide that "[a]ny violations of the Act or of these regulations constitute interfering with ... the exercise of rights provided by the Act.") (citing § 825.220(b)); *Scarbrough v. Virginia Coll., LLC*, No. 2:18-cv-00738, 2019 WL 121277, at *1 (N.D. Ala. Jan. 7, 2019)* ("Though courts have not settled whether the violation of this duty by itself gives rise to a cause of action, courts consider recordkeeping failures as evidence for claims of interference with FMLA rights." (citation omitted)). That question is not before this Court.

13  The Court does not reach any issue regarding whether class certification is appropriate, under either framework, as Plaintiffs have not yet moved for the Court to consider that question.

14  *Clary* has been cited only twice outside of the Fifth Circuit, and never by the Sixth Circuit or its District Courts. *See Andrews v. CSX Transp., Inc.*, No. 3:06-cv-704, 2009 WL 22324 (M.D. Fl. Jan. 2, 2009); *Carrel v. MedPro Grp., Inc.*, No. 1:16-CV-130-TLS, 2017 WL 1488359 (N.D. Ind. Apr. 26, 2017)*. *Andrews* addressed and disposed of *Clary* in a footnote because the "defendants ... did not advocate for such a result." *Andrews*, 2009 WL 22324, at *2 n.4*. *Carrel* discussed the Rule 23/FMLA/FLSA issue directly and expressly declined to adopt *Clary*'s reasoning. *Carrel*, 2017 WL 1488359, at *3* ("[C]ourts within the Circuit have analyzed arguments similar, if not identical, to those posed by the Defendant [that the FLSA should govern] and rejected them." (collecting cases)).

15  On August 14, 2019, CSXT notified Judge Barrett, who was assigned this case at the time, of the Sixth Circuit's decision in *Dyer v. Ventra Sandusky, LLC*, 934 F.3d 472 (6th Cir. 2019)*. (Doc. 25). Plaintiffs responded to CSXT's Notice with one of their own on October 7, 2019. (Doc. 29).

16  These five factors are often called the "*Plott*" factors. *See Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196–97 (6th Cir. 1995)*; *Doe*, 928 F.3d at 491 ("As an initial matter, it does not appear that the district court considered all five of the *Plott* factors, as it never acknowledged them.").

17  The Court does note that following oral argument (at Plaintiffs' request) and absent any ruling from this Court, the parties agreed to work together to define the proper scope of discovery that would enable Plaintiffs to respond to CSXT's summary judgment motion. (*See* Rule 56(d) Discovery Status Report re Motion for Hearing By CSXT, Doc. 40, #600–04). The parties have further discussed with the Court at a recent status conference the status of discovery, which appears to be progressing. After review of this Order, if questions remain regarding the appropriate scope of discovery, the parties are directed to contact the Court to arrange an additional status conference.

18  This is not meant to restrict Plaintiffs to asserting solely a retaliation claim at this point in their action. To be sure, a plaintiff may plead both retaliation and interference causes of action. *See, e.g.*, *Donald v. Sybra, Inc.*, 667 F.3d 757, 761-62 (6th Cir. 2012)* (analyzing both types of FMLA claims). This is also not to say that Schobert (and presumably York as well) could not *also* prevail on interference claims separate from York's termination. But for purposes here, CSXT's "honest belief" and York's termination, treating the claim as retaliation is appropriate to resolve the RLA preclusion issue.

19  Although York did not specifically state in the Complaint that he was restored to his locomotive engineer position after taking leave, that inference is certainly plausible. (*See id.* at ¶ 113 (took two days of leave on December 30, 2017); *id.* at ¶ 115 (taken out of service on January 16, 2018)). Nowhere does York indicate that he was not restored.

20  Even in the proposed amended complaint (Doc. 20-1), for example, Plaintiffs do not appear to proceed any differently as it relates to York and his representation of Classes 13 and 14. If, for example, Plaintiffs decided to only pursue an interference claim, any conversation about the RLA and CSXT's "honest belief" would likely be unnecessary. *See Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 533 (6th Cir. 2015)* (citing *Tillman v. Ohio Bell Telephone Co.*, 545 F. App'x 340, 351 (6th Cir. 2013)* (noting the honest belief rule "fits neatly into the retaliation context" but that it is "not applicable to claims where the employer's frame of mind is not at issue, FMLA interference claims for example")); *Shockley v. Corr. Healthcare Cos., Inc.*, No. 1:16-cv-599, 2018 WL 1565614, at *4 (S.D. Ohio Mar. 30, 2018)* (Barrett, J.) (noting the "Sixth Circuit has questioned whether the 'honest belief' rule should be applied to FMLA interference claims"). *Cf. Redick v. Molina Healthcare, Inc.*, No. 2:18-cv-60, 2020 WL 59796, at *7–12 (S.D. Ohio Jan. 6, 2020)* (Sargus, J.) (applying the "honest belief" rule to both FMLA interference and retaliation claims).

21  The Court refrains from ruling on whether York can establish a prima facie case, whether CSXT's reasoning was legitimate and nondiscriminatory, and whether York can demonstrate pretext. To reach the issue of RLA preclusion, however, which

2020 Employee Benefits Cas. 465,086

CSXT bases on having an "honest belief," the Court must assume, and again, no party addresses whether, York has met his prima facie burden.

22    The specific provision regarding discharge, not the process by which it is accomplished, is contained in Article 30 of the CBA. As provided to the Court by CSXT, that provision reads in full: "An employee shall not be discharged, suspended or otherwise disciplined without just cause and without a fair and impartial hearing, except that an employee may waive a hearing in accordance with B(2) below." (John Johnson Decl., Doc. 15-2, Ex. 1, at #157).

23    Other courts faced with this question in similar contexts have drawn the same distinction between claims that require interpreting a CBA and those that do not. *Compare South v. GoJet Airlines, LLC,* No. 4:12-cv-378, 2013 WL 6253582, at *3 (S.D. Iowa Sept. 30, 2013) ("The claim at issue in the present case is derived from the FMLA, not the CBA, and is thereby not subject to the CBA's arbitration provision.") *and Staunch v. Continental Airlines, Inc.,* No. 1:06-cv-1011, 2007 WL 218729, at *5 (N.D. Ohio Jan. 26, 2007) (finding an employee's FMLA claims were not a "minor dispute" subject to RLA preclusion because the claim arose under federal law, not the collective bargaining agreement) *with VanSlyck v. GoJet Airlines, LLC,* 323 F.R.D. 266, 274 (N.D. Ill. Jan. 11, 2018) (airline pilot's FMLA claim for failing to restore him to his previous position was subject to RLA arbitration because a CBA provision required a fitness for duty exam before restoration and to succeed, the pilot would have had to establish the airline "violated the return-to-work provisions" of the CBA, which required "interpretation and application" of the CBA) *and Montgomery v. Compass Airlines, LLC,* 98 F. Supp. 3d 1012, 1018 (D. Minn. 2015) (arbitration proper when "the CBA clearly and unmistakably mandates arbitration of FMLA claims"). Otherwise, CSXT could raise its "honest belief" and thereby transform every claim like this (or any other federal statutory claim subject to *McDonnell Douglas*) into one that is precluded by the RLA and results in mandatory arbitration.

---

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 1705657
United States District Court, N.D. California.

Robert L. STEWART, Plaintiff,

v.

UNITED STATES OF
AMERICA, et al., Defendants.

No. C–99–4058 JCS.
|
Oct. 10, 2000.

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SPERO, Magistrate J.

I. *INTRODUCTION*

**\*1** Defendants' Motion For Summary Judgment ("Motion")
came on for hearing on Friday, October 6, 2000, at 1:30
p.m. For the reasons stated below, Defendants' Motion is
GRANTED IN PART and DENIED IN PART.

II. *BACKGROUND*

Plaintiff is a white male Vietnam War veteran who was
employed by the Golden Gate National Cemetery, a division
of the United States Department of Veterans Affairs, until
July 1993, when he was terminated after voluntarily admitting
himself into the San Francisco veteran's hospital for treatment
of symptoms related to his Post Traumatic Stress Disorder
("PTSD"). Plaintiff alleges that he was discriminated against
on the basis of both disability and race and also asserts claims
for negligent and intentional infliction of emotional distress.

A. *Facts*[1]

Plaintiff was hired by the Golden Gate National Cemetery
(the "Cemetery") in August 1991. Stewart Deposition at
27 (Exh. A to Declaration of Neal Rubin in Support
of Motion For Summary Judgment ("Rubin Decl.")).
Plaintiff's responsibilities included trimming and maintaining
headstones and markers, edging curbs, fences and sidewalks,
and operating and maintaining tools and equipment. *Id.* at
39. Plaintiff's immediate supervisor was Chris DeLasorda.
Opposition at 2. Chris DeLasorda, in turn, reported to
William Livingston and Cynthia Nunez. *See* DeLasorda

EEOC Statement (Exh. K2 to Levin Decl.)[2] According to
William Livingston, Plaintiff was "an excellent worker" the
"first couple of years" and was recommended for and received
a performance award. Livingston EEOC Statement (Exh. B
to Declaration of Alan S. Levin And Exhibits To Plaintiff's
Opposition To Defendant's Motion For Summary Judgment
("Levin Decl.")). Although Plaintiff was hired under a six
month contract, his contract was automatically renewed at the
end of each six month period until he was terminated. *Id.* at
43. At the time of his termination, his term of employment
was set to expire on September 30, 1993. Declaration of
Cynthia Nunez in Support of Motion For Summary Judgment
("Nunez Decl.") at 3, ¶ 9. Because Plaintiff was classified as a
temporary employee, he was paid on an hourly basis and was
not eligible for health care benefits. Nunez Decl. at 2, ¶ 3.

In September 1991, Plaintiff began to undergo treatment
for stress at the Veteran's Center, in San Francisco.
Stewart Deposition at 78 (Exh. A to Rubin Decl.). Soon
thereafter, he was classified as 30% disabled by the Veterans
Administration, on the basis of his combat-related post-
traumatic stress disorder ("PTSD").[3] July 21, 1992 Letter
From Veterans Affairs to Stewart (Exh. A to Levin Decl.).
William Livingston was aware that Plaintiff was classified as
30% disabled, and at some point he told Cynthia Nunez that
Plaintiff was disabled. Livingston EEOC Statement (Exhs. B
and C to Levin Decl.). Plaintiff's immediate supervisor, Chris
DeLasorda, was also aware of Plaintiff's disability. DeLasorda
EEOC Statement (Exh. K1 to Levin Decl.). In July of 1992,
Plaintiff began to receive treatment from Dr. Erwin Lewis
at Fort Miley. *Id.* For two or three months, Plaintiff went to
daytime therapy sessions approximately three times a week,
with the prior approval of his supervisors. Stewart Deposition
at 79–81 (Exh. A to Rubin Decl.); *see also* Stewart Deposition
at 86 (Exh. W to Levin Decl.). Subsequently, he was able
to attend evening therapy sessions when a night group for
Vietnam veterans was formed. *Id.* Sometime in the spring of
1993, Plaintiff requested, at the advice of his physician, that
he be allowed to work alone and his supervisors allowed him
to do so. Nunez Decl. at 2, ¶ 5.

**\*2** In June of 1993, Plaintiff's physician, Dr. Erwin
Lewis, sent a letter to Cynthia Nunez (one of Plaintiff's
supervisors) stating that he had recommended that Plaintiff
enter the hospital because he was experiencing "increasing
stress, depression, anger, and Post–Traumatic Stress Disorder
(PTSD) symptoms." June 29, 1993 Memorandum (Exh. D2
to Levin Decl.)[4] Nunez Decl. at 3, ¶ 6. Plaintiff had, in
fact, been admitted to the hospital on June 25, 1999. Stewart

Deposition at 173 (Exh. A to Rubin Decl.). Dr. Lewis further stated in his letter that he expected that Plaintiff probably would be hospitalized "several more weeks." June 29, 1993 Memorandum (Exh. D2 to Levin Decl.). Although Cynthia Nunez states in her declaration that she believes that she first learned of Plaintiff's hospitalization when she received the letter from Dr. Lewis (that is, almost a week after Plaintiff entered the hospital, *see* Nunez Decl. at 3, ¶ 6, Plaintiff has presented evidence that he had sought and received leave from at least one of his supervisors prior to entering the hospital. *See* DeLasorda EEOC Statement (Exh. M to Levin Decl.) (stating that he was sure that Plaintiff had requested leave before entering the hospital); Stewart Deposition at 170 (Exh. DD to Levin Decl.) (stating that Chris DeLasorda spoke to Dr. Lewis about Stewart approximately one week before Stewart entered the hospital); Deposition of Cynthia Nunez at 65 (Exh. Z to Levin Decl.) (conceding that Plaintiff was "hospitalized with appropriate leave").

On July 9, 1993, Plaintiff called Cynthia Nunez from the hospital to discuss his work situation, and Ms. Nunez asked him when he would be able to return to work. Nunez Decl. at 3, ¶ 8. The facts are in dispute regarding the content of this conversation. Cynthia Nunez states in her declaration that she did not want to invade Plaintiff's privacy by asking the reason for his hospitalization and merely asked when he could return to work. Nunez Decl. at 3, ¶ 8. She further states in her declaration that Plaintiff told her he did not know when he could return to work and that it might be "sometime in August" before he could return. *Id.* Plaintiff, on the other hand, testified in his deposition that he told Cynthia Nunez that he was enrolled in a two-week treatment program, but that there was a possibility that he would need to stay for a four-week program, and that he might not be able to return to work "till August." Stewart Deposition at 189–190 (Exh. A to Rubin Declaration).[5] Plaintiff further testified in his deposition that he offered to leave the hospital and return to work immediately if he was in any danger of losing his job. Stewart Deposition at 188 (Exh. X to Levin Decl.). According to Stewart, Ms. Nunez told him not to worry about it. Stewart Deposition at 190 (Exh. A to Levin Decl.).

Around the same time Cynthia Nunez spoke to Plaintiff in the hospital, she also had a conversation with Plaintiff's treating physician, Dr. Lewis. *See* Nunez Decl. at 3, ¶ 7. According to a memorandum written by Cynthia Nunez on July 9, 1993, Dr. Lewis told her that Plaintiff would be confined for another two weeks. July 9, 1993 Memorandum from Cynthia Nunez to Chief of Human Resources Management (Exh. B to Nunez Decl.) In that memorandum, Cynthia Nunez requested that she be permitted to terminate Plaintiff's employment, effective July 24, 1993, on the basis that Plaintiff's doctor expected him to be hospitalized two more weeks and Plaintiff himself had said he might not be available "till August." *Id.* In requesting Plaintiff's termination, Ms. Nunez pointed to an "extreme need for workers who can do the job." *Id.* The Chief of Human Resources agreed to the request, and Plaintiff was terminated on July 13, 1993. Nunez Decl. at 4, ¶ 10. On July 14, 1993, Plaintiff's doctor, along with an attending nurse, informed Plaintiff (who was still hospitalized) that he had been terminated from his position at Golden Gate Cemetery. *See* Stewart Deposition at 192 (Exh. I to Levin Decl.); *see also* Livingston EEOC Statement (Exh. G to Levin Decl.) (stating that Livingston discussed Plaintiff's condition with Dr. Lewis and that Dr. Lewis told Livingston that he wanted to "break the news" to Plaintiff that he had been terminated).

**\*3** On the same day that Cynthia Nunez requested Plaintiff's termination, she completed a Personnel Action Form, signed by both Nunez and William Livingston, in which she requested that a replacement for Mr. Stewart be hired. Nunez Decl. at 4, ¶ 11. The "proposed effective date" on the Request For Personnel Action was July 26, 1993. Request For Personnel Action (Exh. R to Levin Decl.). The new position was temporary and was set to expire on September 30, 1993, the same date on which Plaintiff's position had been set to expire. *Id.* On August 20, 1993, a replacement named Donald Armanasco was hired to fill the position. Livingston EEOC Statement (Exh. U to Levin Decl.). Armanasco is a white male veteran. Nunez Decl. at 4, ¶ 12. In the meantime, Plaintiff was released from the hospital on July 23, 1993. Doctor's Orders Discharging Stewart (Exh. S to Levin Decl.).

### B. *Claims*

In his Second Amended Complaint, Plaintiff alleged seven claims. The last three of these were dismissed in this Court's order of May 8, 2000 for the reasons stated therein. Plaintiff's remaining claims are as follows:

*Claim One:* Intentional Infliction of Emotional Distress (Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1));

*Claim Two:* Negligent Infliction of Emotional Distress (Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1));

*Claim Three:* Racial Discrimination in Violation of Title VII (42 U.S.C. § 2000e–16);

*Claim Four:* Failure to Accommodate for Disability under the Rehabilitation Act (29 U.S.C. § 791).

Although Plaintiff named numerous defendants in his original complaint, the parties stipulated that in his Second Amended Complaint, Plaintiff would name the United States as a defendant and would dismiss all other defendants. *See* Stipulation To File Second Amended Complaint And Continue Case Management Conference, filed February 28, 2000. At the subsequent case management conference, on March 3, 2000, the parties stipulated that the Department of Veteran's Affairs would be added as a defendant as to all but the First and Second claims.[6] Finally, at oral argument on Defendants' Motion For Summary Judgment, the parties stipulated that the only defendant with respect to Claims Three and Four is Togo West, the head of the Department of Veteran's Affairs.

III. *ANALYSIS*

A. *Rehabilitation Act Claim (Claim Four)*
Plaintiff asserts that his employer discriminated against him on the basis of his disability and failed to provided reasonable accommodation of his disability, in violation of § 501 of the Rehabilitation Act, 29 U.S.C. § 791.[7] Second Amended Complaint at 2–3, ¶ 8. The Court notes that Defendants in their motion erroneously treat Plaintiff's Rehabilitation Act claim as a § 504 claim (29 U.S.C. § 794).[8] In fact, the Ninth Circuit has held that § 501 (29 U.S.C. § 791) is the exclusive remedy for federal employees bringing a claim of disability discrimination under the Rehabilitation Act. *Boyd v. United States Postal Service,* 752 F.2d 410, 413 (9th Cir.1985). Because there are some significant differences between the requirements of §§ 501 and 504, the standards governing § 501 claims are discussed below.

1. Analytical Framework For § 501 Claims
**\*4** Section 501 provides for two types of claims: 1) "non-affirmative action" employment discrimination claims based upon 29 U.S.C. § 791(g), *see, e.g., Newland v. Dalton,* 81 F.3d 904, 906 (9th Cir.1995), and 2) claims based upon a government employer's failure to reasonably accommodate an employee, as required under 29 U.S.C. § 791(b); *see, e.g., Buckingham v. United States,* 998 F.2d 735, 739 (9th Cir.1993). The former category of claims are governed by the standards contained in the Americans With Disabilities Act ("ADA"), which are explicitly incorporated into

501(g).[9] Affirmative action claims for failure to reasonably accommodate, on the other hand, are governed by the explicit terms of § 501(b) and its enacting regulations, which set out in some detail the affirmative action requirements imposed upon federal agencies. 29 U.S.C. § 791(b); 29 C.F.R. § 1614.203(b); *see also Mantolete v. Bolger,* 767 F.2d 1416, 1422 (holding that regulations for § 501 "provide the guidelines for determining what constitutes 'reasonable accommodation' ").

a. Non–Affirmative Action Claim
A plaintiff alleging a non-affirmative action claim under § 501 is required to make essentially the same prima facie case as is a plaintiff suing under § 504. Specifically, a plaintiff must show that: 1) he is disabled within the meaning of the statute; 2) he is "otherwise qualified" for the position; 3) he was adversely treated because of his disability; and 4) he worked for federal agency or entity. *Reynolds v. Brock,* 815 F.2d 571, 573–574 (9th Cir.1987).[10] Once a prima facie case has been made, the burden shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the action. *Id.* at 574. The burden then shifts back to the plaintiff to produce evidence showing that the reason offered by the defendant is pretextual. *See Smith v. Barton,* 914 F.2d 1330, 1339 (9th Cir.1990) (applying *McDonnell Douglas* framework for Title VII discrimination claims to discrimination claim brought under ADA).

b. Affirmative Action Claim
In addition to the non-affirmative action claim described above (which is essentially the same as a claim of discrimination under § 504), § 501 allows a plaintiff to sue for failure to provide reasonable accommodation, as required under § 501(b). As the Ninth Circuit has explained, "[t]he duty on employers ... goes beyond mere nondiscrimination; the regulations promulgated under section 501 emphasize the affirmative obligation to accommodate: An agency shall make reasonable accommodation to the known physical or mental limitations of a qualified handicapped applicant or employee unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program." *Buckingham v. United States,* 998 F.2d 735, 739 (quoting former 29 C.F.R. § 1613.704(a), now 29 C.F.R. § 1614.203(c)(1)).

In order to make a prima facie case based upon failure to reasonably accommodate, a plaintiff must show that: 1) he

2000 WL 1705657, 11 A.D. Cases 117

was an otherwise qualified handicapped individual; and 2) he received adverse treatment as a result of his handicap. _Id._ at 739–740. A "qualified handicapped individual" is one who "with or without accommodation can perform the essential functions of their job." _Id._ "If accommodation to their handicap is required to enable them to perform essential job functions, then plaintiffs must only provide evidence sufficient to make at least a facial showing that reasonable accommodation is possible." _Id. See also Meisser v. Hove,_ 872 F.Supp. 507, 519 (N.D.Ill.1994) (holding that a plaintiff may make a prima facie case based upon failure to accommodate by showing that: 1) he is handicapped and the employer was aware of the handicap; 2) he is otherwise qualified for the position; and 3) the employer failed reasonably to accommodate the handicap).

**\*5** The burden then shifts to the employer to show that the proposed accommodation is not reasonable. _Buckingham,_ 998 F.2d at 740. "An employer, to meet its burden under the Act, may not merely speculate that a suggested accommodation is not feasible. When accommodation is required to enable the employee to perform the essential functions of the job, the employer has a duty to gather sufficient information from the applicant and qualified experts as needed to determine what accommodation are necessary to enable the applicant to perform the job." _Id._ (citations omitted). However, an employer can show that a requested accommodation is unreasonable by demonstrating that it would result in undue hardship for the employer. _Id._

In determining whether an accommodation would impose an undue hardship on an employer, courts look to the implementing regulations for § 501, which instruct that the following factors should be considered: 1) the overall size of the agency's program with respect to the number of employees, number and type of facilities and size of the budget; 2) the type of agency operation, including the composition and structure of the agency's work force; and 3) the nature and cost of the accommodation. _Id.; see also_ 29 C.F.R. § 1614.203(c)(3). Included in the list of possible reasonable accommodations is "job restructuring" and "part-time or modified work schedules." 29 C.F.R. § 1614.203(c)(1).

### 2. Defendant's Arguments

Defendants assert that they are entitled to summary judgment on Plaintiff's Rehabilitation Act claim because: 1) Plaintiff has not shown that he was "otherwise qualified" for the position and 2) Plaintiff has not shown that he was terminated

"solely because of" his disability. Motion at 6–8. Although Defendants raised these arguments in the context of a § 504 claim rather than a § 501 claim, the Court assumes without deciding that they are applicable to Plaintiff's § 501 claims. Because Plaintiff has presented evidence sufficient to raise issues of material fact on the questions of whether he was "otherwise qualified" and whether he was terminated because of his disability, Defendants are not entitled to summary judgment on Plaintiff's claim under § 501 of the Rehabilitation Act.

### a. Otherwise Qualified

Under § 501, a Plaintiff must show that he was "otherwise qualified" for the position, regardless of whether he is bringing a non-affirmative action claim or an affirmative action claim based upon failure to reasonably accommodate. Plaintiff in this action has alleged violations of § 501 under both theories and therefore must make a prima facie case that he was otherwise qualified in order to avoid summary judgment as to these two theories.

An "otherwise qualified person" is one who can perform the essential functions of the job in question. _School Board of Nassau County v. Arline_ 480 U.S. 273, 287 n. 17 (1987). As the Supreme Court explained in _School Board of Nassau County v. Arline:_

> **\*6** When a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any "reasonable accommodation" by the employer would enable the handicapped person to perform those functions.... Accommodation is not reasonable if it either imposes "undue financial and administrative burdens" on a grantee, ... or requires "a fundamental alteration in the nature of [the] program."

_Id._ Ordinarily, the question of whether a particular accommodation is reasonable is a question of fact. _Fuller v. Frank,_ 916 F.2d 558, 562 n. 6 (9th Cir.1990).

Here, Plaintiff asserts that he was "otherwise qualified" because, had he been permitted to take unpaid leave for the period during which he was hospitalized during the summer of 1993, he would have been able to return to work and perform the essential functions of his job. _See_ Opposition at 6. An unpaid leave of absence may be a reasonable accommodation if it does not impose an undue hardship on the employer and it will permit the employee to eventually perform the essential functions of his job. _See Norris v. Allied–Sysco Food Service, Inc.,_ 948 F.Supp.

1418, 1439 (N.D.Cal.1996) (discussing the circumstances under which extended leave might constitute a reasonable accommodation under the ADA and noting that even unpaid leave of indefinite, or very length, duration, could under some circumstances be a reasonable accommodation).

Defendants, however, assert that this Court should find, as a matter of law, that such an accommodation would not have been reasonable. Motion at 6–8. In support of this contention, Defendants cite to a number of cases, all of which are distinguishable from this case. *See Jackson v. Veteran's Administration,* 22 F.3d 277 (11th Cir.1994) (affirming summary judgment in favor of defendant on Rehabilitation Act claim and holding that requiring employer to accommodate employee's repeated, sporadic and unscheduled absences caused by disability by "making last-minute provisions for [the employee's] work to be done by someone else" would place undue hardship on employer); *Walders v. Garrett,* 765 F.Supp. 303, 310, 313 (E.D.Va.1991) (holding on the basis of evidence presented during bench trial that requiring employer to accommodate Plaintiff's absences due to her disability would place undue hardship on employer where Plaintiff missed between sixty and ninety work days each year, where these absences were unscheduled and "essentially random," and where plaintiff worked in a small division that faced time deadlines and budget restrictions); *Wimbley v. Bolger,* 642 F.Supp. 481, 485 (W.D.Tenn.1986) (rejecting Motion For New Trial Or To Alter Or Amend Judgment where court had held, on the basis of evidence presented during bench trial, that requiring employer to accommodate Plaintiff's unscheduled absences would impose undue hardship, where Plaintiff insisted that it was impossible for him to comply with requirement that he provide documentation substantiating where he had been or to request appropriate leave); *Matzo v. Postmaster General,* 685 F.Supp. 260 (D.D.C.1987) (finding that plaintiff was not "otherwise qualified" where plaintiff had been terminated several months after she "abruptly left the office without permission," had never returned to work and had failed to respond to repeated notices warning her that she would be terminated if she did not report for fitness-for-duty exam); *Law v. United States Postal Service,* 852 F.2d 1278, 1280 (Fed.Cir.1988) (holding that Postal employee was not "otherwise qualified" where she had a history of unscheduled absences and tardiness, had been reprimanded on many occasions and where she had not sought prior approval for any of her unscheduled absences); *Amato v. St. Luke's Episcopal Hospital,* 987 F.Supp. 523 (S.D. Texas 1997) (granting defendants' motion for summary judgment on

ADA claim on basis that plaintiff was not otherwise qualified because plaintiff had long history of unscheduled absences and had been repeatedly counseled and disciplined for his poor attendance).

**\*7** In all of the cases cited by Defendants listed above, it was undisputed that the employees' absences were unscheduled and unpredictable. In finding that it would be unreasonable to require employers to accommodate such absences, the courts pointed not only to the frequency of these absences but also to the burden on employers of making last-minute provisions to cover for these absent employees. *See, e.g., Jackson,* 22 F.3d at 279 (rejecting proposed accommodation and stating that "[s]uch accommodations do not address the heart of the problem: the unpredictable nature of Jackson's absences. There is no way to accommodate this aspect of his absences"). In contrast, in this case it is undisputed that prior to his hospitalization, Plaintiff had always obtained advance approval from his supervisors for his absences due to medical appointments. Nunez Decl. at 2, ¶ 5. In addition, Plaintiff has presented evidence from which a reasonable jury could conclude that he also obtained prior approval from his supervisors to enter the hospital in June 1993. *See* DeLasorda EEOC Statement (Exh. M to Levin Decl.) (stating that he was sure that Plaintiff had requested leave before entering the hospital); Stewart Deposition at 170 (Exh. DD to Levin Decl.) (stating that Chris DeLasorda spoke to Dr. Lewis about Stewart approximately one week before Stewart entered the hospital); Deposition of Cynthia Nunez at 65 (Exh. Z to Levin Decl.) (conceding that Plaintiff was "hospitalized with appropriate leave"). In light of this distinction, the Court finds that the cases cited by Defendants do not support their assertion that Plaintiff, as a matter of law, is not "otherwise qualified."

Defendants further assert, however, that they could not have been expected to accommodate Plaintiff's absence because they did not know the exact date upon which Plaintiff would return to work. Motion at 7. In support of this contention, Defendants cite to another long list of cases, most of which address the question of whether an "indefinite, lengthy, unpaid leave of absence" is a reasonable accommodation. None of these cases support Defendants' position. *See Norris,* 948 F.Supp. at 1438–1439 (denying Defendants Motion For Judgment As A Matter Of Law on ADA claim after jury found in favor of Plaintiff and, in dicta, rejecting Defendants contention that requiring an employer to grant an employee unpaid leave of over one year is unreasonable as a matter of law); *Turco v. Hoechst Celanese Corp.,* 101

F.3d 1090, 1093 (5th Cir.1997) (affirming summary judgment in favor of employer on ADA claim where employee's diabetes prevented him from meeting the physical and mental demands of his job, rejecting the contention that he would have been able to meet these demands better if he had been switched to a day shift, and noting in addition that because the employer did not have a day shift, the proposed accommodation would have imposed an undue burden on the employer by requiring that other employees worked harder); *Hudson v. MCI Telecommunications,* 87 F.3d 1167, 1169 (10th Cir.1996) (affirming summary judgment for employer on ADA claim and rejecting Plaintiff's claim that her employer should have allowed her to take an indefinite leave of absence to recover from her condition where plaintiff "failed to present any evidence of the expected duration of her impairment as of the date of her termination" but noting that "a reasonable allowance of time for medical care and treatment may, in appropriate circumstances, constitute a reasonable accommodation"); *Myers v. Hose,* 50 F.3d 278, 283 (4th Cir.1995) (affirming summary judgment in favor of employer on ADA claim and rejecting Plaintiff's contention that employer should have allowed him to take an indefinite leave, at half-salary, to allow him to bring his severe heart condition, diabetes and hypertension under control where Plaintiff set "no temporal limit on the advocated grace period, urging only that he deserve[d] sufficient time to ameliorate his conditions"); *Morton v. GTE North, Inc.,* 922 F.Supp. 1169 (N.D. Texas 1996) (granting summary judgment in favor of employer on ADA claim where Plaintiff's depression had resulted in her inability to perform her job, where the employer had allowed her to take six month's leave, where the employer had attempted to find a less stressful position but could find no position that the employee agreed to and/or could perform, and where there was no indication that plaintiff would ever have been able to perform the essential functions of her job, even if she had been granted indefinite leave; also stating in dicta that "this court doubts that indefinite leave could ever be demanded as a reasonable accommodation"); *Guice–Mills v. Derwinski,* 772 F.Supp. 188 (S.D.N.Y.1991) (holding after a bench trial on employee's Rehabilitation Act claim that employer was not required to accommodate employee who was suffering from depression by allowing her to begin her shift at 10:00 a.m. rather than between 7 and 8 a.m. where employee was head nurse and would have been unable to handle staffing problems that often arise in the morning, attend morning meetings or review patient care issues with the night supervisor at the end of her shift and where employer had already allowed employee to take a seven month leave to treat her depression).

**\*8** In the cases cited by Defendants involving "indefinite leave," the plaintiffs requested extended leave as an accommodation but provided no evidence concerning how long that leave was likely to last. *See, e.g., Hudson v. MCI Telecommunications,* 87 F.3d 1167, 1169 (10th Cir.1996). Indeed, many of the Plaintiffs had already been granted extended leave and showed no sign of improvement. *See, e.g., Morton v. GTE North, Inc.,* 922 F.Supp. 1169 (N.D. Texas 1996). Here, in contrast, there is evidence in the record from which a reasonable jury could conclude that although the exact date of Plaintiff's return was uncertain, neither Plaintiff nor employer expected that Plaintiff's absence would extend beyond August, 1993. *See* July 9, 1993 Memorandum from Cynthia Nunez to Chief of Human Resources Management (Exh. B to Nunez Decl.) (requesting permission to terminate Plaintiff's employment, effective July 24, 1993, on the basis that Plaintiff's doctor expected him to be hospitalized two more weeks and Plaintiff himself had said he might not be available "till August"). Nor do Defendants assert or present any evidence that Plaintiff would not have been able to perform the essential functions of his job once he had been released from the hospital. As a result, there is a triable issue of fact on the question of whether or not an unpaid leave of definite duration would have been a reasonable accommodation that would have permitted Plaintiff to perform the essential functions of his job.

Finally, Defendants assert that permitting Plaintiff to take unpaid leave during the period of his hospitalization would have imposed an undue burden on Defendants because the cemetery requires the most maintenance in the summer months, when the grass grows faster, and therefore there was an urgent need to replace Plaintiff immediately. Motion at 8; Nunez Decl. at 2, ¶ 3. However, Plaintiff has presented evidence that the peak period for cemetery maintenance is the period leading up to Memorial Day rather than in the summer months. DeLasorda EEOC Statement (Exh. F to Levin Decl.) He has also presented evidence that his immediate supervisor did not feel that there was an urgent need to replace Plaintiff immediately. *Id.* Finally, Plaintiff has presented evidence that suggests that he had enough annual and sick leave to cover his hospitalization. *See* Nunez Deposition at 65 (Exh. Z to Levin Decl.) (conceding that Plaintiff was "authorized enough leave hours to be hospitalized").[11] Thus, there is a genuine factual dispute concerning a key issue of Plaintiff's case, namely, whether offering Plaintiff leave of definite duration would have imposed an undue burden on Defendants. This factual dispute may not be resolved by the Court on summary

judgment, the court therefore rejects Defendants' contention that they are entitled to summary judgment because Plaintiff is not "otherwise qualified" for his position.

  b. Termination "Solely Because of Disability"

  **\*9**  Defendants assert that Plaintiff cannot satisfy the requirement that his termination must have been solely because of his disability, arguing that Plaintiff was terminated only because he was unavailable for work and not because of his disability. Motion at 8. Defendants rely on a line of cases that hold that misconduct caused by a disability is not protected under the Rehabilitation Act. See *Newland v. Dalton,* 81 F.3d 904, 906 (9th Cir.1996) (holding that employee who was fired after being arrested for attempting to fire an assault weapon at a bar while on a "drunken rampage" had been fired because of misconduct and not because of his alcoholism); *Williams v. Widnall,* 79 F.3d 1003, 1007 (10th Cir.1996) (holding that alcoholic employee who made threats to co-workers and supervisors while under the influence of alcohol was terminated because of "egregious, misconduct" and not because of alcoholism); *Brohm v. J.H. Properties, Inc.,* 947 F.Supp. 299, 300 (W.D.Ky.1996) (holding that anaesthesiologist who repeatedly fell asleep during surgical procedures was fired for sleeping on the job in violation of hospital rules and good medical practice and not because he had sleep apnea); *Maddox v. University of Tennessee,* 62 F.3d 843, 847 (6th Cir.1995) (holding that employee who was arrested for drunk driving and who had been hostile and combative towards officer when stopped had been terminated for egregious misconduct rather than because of his alcoholism). The rational underlying all of these cases is that "[e]mployers subject to the Rehabilitation Act and ADA must be permitted to take appropriate action with respect to an employee on account of egregious or criminal conduct, regardless of whether the employee is disabled." *Maddox,* 62 F.3d at 848.

These cases have no bearing on the issue of whether Plaintiff's termination was caused by his disability because Defendants have never asserted, much less provided any evidence, that Plaintiff's termination resulted from misconduct of any kind. To the contrary, Defendant's have repeatedly stated that their sole reason for terminating Plaintiff was that he was unable to work while he was hospitalized, in June and July of 1993. *See, e.g.,* Motion at 9; Nunez Decl. at 3, ¶ 9 (stating that Nunez recommended terminating Plaintiff when she learned that Plaintiff might not be able to return "sometime in August"); Nunez Deposition at 64 (Exh. F to Levin Decl.) (conceding that Plaintiff was not fired for being a bad worker or for having

a bad attitude and that Plaintiff was a "good employee"). To extend the holdings of the cases above to situations in which no misconduct has been alleged would render meaningless the affirmative duty of federal employers to offer reasonable accommodation to employees with a disability, allowing an employer to terminate any employee who required time off from work for treatment of a disability without reaching the issue of whether the employer could have reasonably accommodate the employee. The Court therefore rejects Defendant's assertion that Plaintiff's termination was not solely because of his disability.[12]

  B. *Title VII Claim (Claim Three)*

  **\*10**  Plaintiff asserts that Defendants discriminated against him on the basis of race, in violation of Title VII, by terminating him rather than allowing him to take extended leave for the period during which he was hospitalized. Second Amended Complaint at 6–7. Under Title VII, "[a]ll personnel actions affecting employees [of the federal government] ... shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a). Claims of employment discrimination under Title VII are analyzed under framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248 (1981). In *McDonnell–Douglas,* the Supreme Court adopted a three-part analysis: "(1) [t]he complainant must establish a prima facie case of discrimination; (2) the employer must offer a legitimate reason for his actions; (3) the complainant must prove that this reason was a pretext to mask an illegal motive." 411 U.S. at 802.

On summary judgment, the requisite degree of proof to establish a prima facie case is minimal and does not even need to rise to the level of preponderance of the evidence. See *Yartzoff v. Thomas,* 809 F.2d 1371, 1375 (9th Cir.1987). A plaintiff need only offer evidence which "gives rise to an inference of unlawful discrimination." *Lowe v. City of Monrovia,* 775 F.2d 998, 1005 (9th Cir.1983); *see also Sischo–Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1111 (9th Cir.1991) (holding that "[t]he amount of evidence that must be produced in order to create a prima facie case is very little").

If the employee establishes a prima facie case, the burden shifts to the employer to "rebut the presumption of discrimination by producing evidence that [the plaintiff] was rejected, or someone else was preferred, for a legitimate, non-

discriminatory reason." *Burdine,* 450 U.S. at 254. However, it is only the burden of production that shifts. *Id.* The burden of persuasion never shifts from the plaintiff. *Id.* Therefore, the employer need not persuade the court that it was actually motivated by the proffered reason. *Id.* Rather, "it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against plaintiff." *Id.* at 254–255.

Once the employer has articulated a legitimate, non-discriminatory reason for its actions, and presented sufficient evidence to create a genuine issue of fact, an employee can survive summary judgment only if she offers "specific and significantly probative evidence that the employer's alleged purpose is a pretext for discrimination." *Schuler v. Chronicle Broadcasting Company,* 793 F.2d 1010, 1011 (9th Cir.1986). "A plaintiff 'may succeed in persuading the court that she has been the victim of intentional discrimination ... either by directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence.' " *Lowe,* 775 F.2d at 1008 (quoting *Burdine,* 450 U.S. at 256). However, " 'the decision as to an employer's true motivation plainly is one reserved to the trier of fact.' " *Id.* (quoting *Peacock v. DuVal,* 694 F.2d 644, 646 (9th Cir.1982)). Thus, where an employee has established a prima facie case of discrimination, "summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of [the dispute] is the 'elusive factual question of intentional discrimination.' " *Id.* (quoting *Burdine,* 450 U.S. at 255 n. 8).

### 1. Prima Facie Case

**\*11** In order to establish a prima facie case of race discrimination on the basis of termination, a plaintiff must show that: 1) he was within the protected class; 2) he was performing his job well enough to rule out the possibility that he was fired for inadequate job performance; and 3) his employer sought a replacement with qualifications similar to his own, thus demonstrating a continued need for the same services and skills. *Pejic v. Hughes Helicopters, Inc.,* 840 F.2d 667, 672 (9th Cir.1988). Plaintiff has presented sufficient evidence to defeat Defendant's motion for summary judgment as to his prima facie case of discrimination.

First, Plaintiff is a white male who alleges that he was treated less favorably than Filipino workers. It is well-established that Title VII protects white and non-white employees alike from racial discrimination. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 280 (1975).

Second, Plaintiff has presented evidence that his employer considered him a "good worker." *See* Nunez Deposition at 64 (Exh. FF to Levin Decl.) (conceding that Plaintiff was not fired because he was a bad worker or had a bad attitude and that Plaintiff was a good worker). Moreover, to the extent that Plaintiff's unavailability for work may have made him unqualified for the job, there is a factual dispute (discussed above) as to whether Plaintiff's employer could have reasonably accommodated Plaintiff by offering him leave of definite duration. Because this factual dispute goes directly to the question of whether Defendants' articulated reason for terminating Plaintiff was pretextual, the Court may not grant summary judgment on the basis that Plaintiff was not qualified where Plaintiff has offered evidence to the contrary. *See Sischo–Nownejad v. Merced Community College District,* 934 F.2d 1104, 1110 (9th Cir.1991) (holding that amount of evidence to create prima facie case of discrimination on summary judgment is "very little"). Finally, his employer later filled the position, demonstrating that the cemetery had a continuing need for an employee with skills similar to his own. *See* Livingston EEOC Statement (Exh. U to Levin Decl.) (stating that Plaintiff was replaced by Donald Armanasco).

### 2. Non–Discriminatory Reason

Defendants assert that they did not terminate Plaintiff due to race but merely because he was unavailable during the summer months, when they had an urgent need for someone to perform his duties. Motion at 11. As Defendants have articulated a non-discriminatory reason for their actions, the burden shifts to Plaintiff to offer evidence that the reason offered by Defendants is pretext.

### 3. Evidence of Pretext

Plaintiff asserts that the reason he was terminated was not his unavailability but his race. In particular, he points to evidence that non-white employees were permitted to take extended leave whereas when Plaintiff sought to take a comparable period of leave to obtain treatment of his PTSD, his employer terminated him. Opposition at 15–16; Dorothy Wells Sworn EEOC Statement (Exh. KK to Levin Decl.) (stating that "when I'd look through records of leave and stuff at the cemetery, I found that some of the Filipinos were granted months of leave to go to the Philippines");[13] *see also* Nunez Decl. at 4, ¶ 13 (stating that Nunez had permitted a Filipino employee to take a one-month leave to visit the Philippines). The Court finds this evidence sufficient raise a triable issue of fact as to Plaintiff's employer's motive in terminating Plaintiff.

**\*12** Defendants assert, however, that there was only a single employee who was allowed to take a one-month leave and that he was not similarly situated in comparison to Plaintiff because: 1) he took the leave in January, which is a slower period for the cemetery than the summer months; 2) he gave over one month advance notice of his intent to take the trip to the Philippines; and 3) he was a permanent rather than a temporary employee. Motion at 10. The Court does not dispute that an employee who is alleged to have been treated more favorably than a plaintiff alleging discrimination must be similarly situated in order to give rise to an inference of discrimination. *See Box v. A & P. Tea Co.,* 772 F.2d 1372, 1379 (7th Cir.1985). Here, however, the question of whether the Filipino employee in question was similarly situated turns on disputed facts. In particular, while Defendants have provided an affidavit by Cynthia Nunez stating that the need for workers is greater in the summertime than it is in January, *see* Nunez Decl. at 4, ¶ 13, Plaintiff has presented conflicting evidence suggesting that the summer months are not the peak period for the cemetery and that his immediate supervisor did not feel a pressing need to replace him right away. *See* DeLasorda EEOC Statement (Exh. F to Levin Decl.) (stating that "big push" is April and May, leading up to Memorial Day and that he did not feel that Plaintiff needed to be replaced immediately). In addition, Plaintiff has presented evidence suggesting that he had obtained advanced authorization of his hospitalization, just as the other employee had. *See* DeLasorda EEOC Statement. Moreover, to the extent that Plaintiff's unavailability for work may have made him unqualified for the job, there is a factual dispute (discussed above) as to whether Plaintiff's employer could have reasonably accommodated Plaintiff by offering him leave of definite duration. (Exh. M to Levin Decl.) (stating that he was sure that Plaintiff had requested leave before entering the hospital); Stewart Deposition at 170 (Exh. DD to Levin Decl.) (stating that Chris DeLasorda spoke to Dr. Lewis about Stewart approximately one week before Stewart entered the hospital); Deposition of Cynthia Nunez at 65 (Exh. Z to Levin Decl.) (conceding that Plaintiff was "hospitalized with appropriate leave"). Finally, Defendants fail to explain why an employee's temporary or permanent status would affect an employees entitlement to take extended leave. In the face of these factual disputes, the Court declines to hold as a matter of law that Defendants were not motivated by race when they terminated Plaintiff.

Nor does the fact that the cemetery hired a white male to replace Plaintiff entitle Defendants to summary judgment. As the Court stated in *Hannon v. Chater,* although evidence that the person hired to replace a plaintiff in a discrimination action is of the same race is "extremely helpful to the defendant's rebuttal in supporting [a] nondiscriminatory justification for its employment action ... it would be a mistake to assume that such evidence amounts to an ironclad defense." 887 F.Supp. 1303, 1313 (N.D.Cal.1995) (citation omitted). Here, Plaintiff has presented sufficient evidence to create a factual question concerning his employer's motivations. Therefore, summary judgment on his race discrimination claim is inappropriate.[14]

### C. *Intentional and Negligent Infliction of Emotional Distress Claims (Claims One and Two)*

**\*13** Plaintiff asserts claims of intentional and negligent infliction of emotional distress against Defendants under the Federal Tort Claims Act. Second Amended Complaint at 4–5; 28 U.S.C. § 1346(b)(1).[15] In the section of the complaint listing the specific claims, Plaintiff does not identify the factual basis for each claim. However, in his statement of facts, Plaintiff makes the following allegations:

> On or about July 13, 1993 defendants and their agents acted together to wrongfully discharge plaintiff from his employment as Cemetery Caretaker, WG–02. Defendants and their agents deliberately took unfair advantage of plaintiff's mental disorder to induce him to be temporarily hospitalized for treatment and stabilization of medications. While hospitalized, defendants increased plaintiff's dose of psychoactive drugs for the specific purpose of reducing his anxiety when he was presented with his job termination. This conduct caused severe and permanent physical, mental and emotional impairment.

Second Amended Complaint at 3–4, ¶ 13. These allegations are incorporated into both of Plaintiff's emotional distress claims. Second Amended Complaint at ¶¶ 14 and 20. Therefore, the Court construes each of Plaintiff's emotional distress claims as encompassing three theories: 1) Defendants wrongfully discharged Plaintiff; 2) Defendants wrongfully induced Plaintiff to be hospitalized; and 3) Defendants increased Plaintiff's medications while he was hospitalized in order to reduce his anxiety when presented with his termination. The Court finds that with respect to the first theory, Plaintiff's emotional distress claims are preempted by Title VII and the Rehabilitation Act. With respect to the remaining theories, Plaintiff has presented no evidence to support either theory. Therefore, the Court finds that there is no triable issue of fact on these claims.

### 1. Preemption

Title VII is the exclusive remedy for employment discrimination claims by federal employees. *Brown v. General Services Administration,* 425 U.S. 820, 835 (1976). Further, the holding of *Brown* also applies to employment discrimination claims based upon disability under the Rehabilitation Act. *Boyd v. United States Postal Service,* 752 F.2d 410, 413 (9th Cir.1985) (holding that § 501 of the Rehabilitation Act is "the exclusive remedy for discrimination in employment by the Postal Service on the basis of handicap"); *Vinieratos v. United States,* 939 F.2d 762, 773 (9th Cir.1991) (same holding as to employee of the Air Force). Therefore, to the extent that Plaintiff's emotional distress claims are based upon a theory of wrongful termination, they are preempted by Title VII and the Rehabilitation Act. *See, e.g., Brock v. United States,* 64 F.3d 1421, 1424 (9th Cir.1995)(affirming dismissal of plaintiff's claim of negligent supervision under FTCA on basis that it was preempted by Title VII where claim was based upon allegation that coworkers retaliated against plaintiff after she filed EEO complaint against supervisor for sexual harassment and court concluded that this stated "no more than an employment discrimination claim").

**\*14** On the other hand, to the extent that Plaintiff's emotional distress claims are based upon his allegations that he was wrongfully induced to enter the hospital and wrongfully administered drugs, these claims are based upon different facts than Plaintiff's wrongful discharge claims under Title VII and the Rehabilitation Act, and therefore are not preempted by those statutes. *See Pfau v. Reed,* 125 F.3d 927, 932 (5th Cir.1997) (holding that "when a complainant against a federal employer relies on the same facts to establish a Title VII claim and a non-Title VII claim, the non-Title VII claim is not sufficiently distinct to avoid preemption").[16]

### 2. Claims That Are Not Preempted By Title VII And Rehabilitation Act

Defendants assert that Plaintiff's emotional distress claims should be dismissed because the facts alleged do not, as a matter of law, rise to the level of outrageousness required under state law for emotional distress claims. Motion at 11–12. The Court notes that under California law the outrageous conduct standard applies only to claims of intentional infliction of emotional distress and not to claims for negligent infliction of emotional distress. *See Carney v. Rotkin Schmerin & McIntyre,* 206 Cal.App.3d 1513, (1988) (explaining that negligent infliction of emotional

distress is not an independent tort but rather a type of negligence claim involving the usual elements of duty, breach causation and harm). However, the Court need not reach the question of whether the conduct alleged by Plaintiff as to Defendants' inducing him to enter the hospital and wrongfully administering drugs satisfy either standard because Plaintiff has presented no evidence to support his claims under either theory. Specifically, aside from the allegations in the complaint quoted above, Plaintiff presents no evidence that he was pressured by anyone to enter the hospital. On the contrary, he has characterized his admission to the hospital as "voluntary." Opposition at 20. Further, although Plaintiff has presented evidence that drugs were administered to him while in the hospital, *see* Stewart Deposition at 187 (Exh. X to Levin Decl.) (listing drugs that Plaintiff was taking at the time that he called Cynthia Nunez from the hospital, on July 9), and that his doctor broke the news to him that he had been terminated, *see* Stewart Deposition at 191–192 (Exh. I to Levin Decl.) (stating that Plaintiff's doctor gave him a letter on July 14 informing him that he had been terminated), he has presented no evidence suggesting that drugs were administered prior to telling him of his termination or that any such drugs were administered with the specific intent of reducing his stress when he was told of his termination. As a result, he has failed to create a triable issue of fact on either claim.

### IV. *CONCLUSION*

For the reasons stated above, the Court holds as follows:

1) Defendants' Motion For Summary Judgment is DENIED as to Plaintiff's claim under § 501 of the Rehabilitation Act, 29 U.S.C. § 791 (Claim Four);

**\*15** 2) Defendants' Motion For Summary Judgment is DENIED as to Plaintiff's claim under Title VII, 42 U.S.C. § 2000e–16 (Claim Three);

3) Defendants' Motion For Summary Judgment is GRANTED as to Plaintiff's claim for intentional infliction of emotional distress (Claim One) and for negligent infliction of emotional distress (Claim Two) and those claims are DISMISSED.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2000 WL 1705657, 11 A.D. Cases 117

2000 WL 1705657, 11 A.D. Cases 117

Footnotes

1       In summarizing the facts, the Court has relied upon undisputed facts whenever possible. Where the facts are in dispute,
        the Court has drawn all inferences in favor of Plaintiff. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1373 (9th Cir.1987)
        (holding that on summary judgment court must view the evidence and the inferences from that evidence in the light most
        favorable to the nonmoving party).

2       The Court notes that Plaintiff has failed to appropriately authenticate, or even identify, many of the documents contained
        in the exhibits filed in support of his opposition to Defendants' Motion For Summary Judgment, as is required under
        Civil Local Rule 7–5(a) and Fed.R.Civ.P. 56(e). With the exception of Exhibits BB and II, to which Defendants have
        raised evidentiary objections, the Court has considered these documents in determining whether summary judgment is
        appropriate. The Plaintiff is cautioned, however, that these documents will not be admitted into evidence at trial unless
        Plaintiff has clearly identified and authenticated each document in a supporting declaration. With respect to Defendants'
        objections to Exhibits BB and II, the Court has not relied upon these documents and therefore does not rule on these
        objections at this time.

3       According to Plaintiff's Opposition, Plaintiff was reclassified as of October 1994 as 100% disabled, retroactive to July
        1993. Opposition at 9.

4       Plaintiff has attached as an exhibit a version of the Lewis letter that is slightly different from the version presented by
        Defendants. *See* Exh. D2 to Levin Decl.; *cf.* Exh. A to Nunez Decl. Both letters are dated June 29, 1993 and the content
        is substantially the same except that the version presented by Defendants includes the following sentence, which is
        not contained in the Plaintiff's version: "I believe the causes to be related to work related problems." Plaintiff argues
        strenuously that the version provided by Defendants is a forgery. *See* Opposition at 11–12. For the purposes of this
        motion, the Court relies upon Plaintiff's version of Dr. Lewis letter. The Court notes, however, that its ultimate conclusion
        concerning the validity of Defendants' arguments in this motion would be unaffected, regardless of which version it
        considered.

5       Defendants state in their motion that "Plaintiff explained his conversation with Ms. Nunez as follows:

        That would be impossible to give somebody an exact date when you are in a psychiatric in-patient unit, because you
        don't know which way the therapy is going to go, so it's impossible. And the doctors don't know. They know there's
        a two week or a four week program, and you can reach the end of the two-week program or four-week program
        and something could happen where you flip out and say, 'We can't leave this guy go yet' or 'We better keep him,'
        so that's all kind of vague.

        Motion at 4 (citing to Stewart Deposition at 190–191 (Exh. A to Rubin Decl.)). Plaintiff made this statement during his
        deposition when asked why he had not provided Ms. Nunez with an exact return date. However, there is no evidence
        in the record suggesting that Plaintiff made such a statement to Ms. Nunez when he spoke to her on July 9 or that he
        ever told her that he did not expect to be able to return to work in August.

6       Under both Title VII and the Rehabilitation Act, the proper defendant is the head of the relevant agency. *See* 29 U.S.C.
        § 794a and 42 U.S.C. § 2000e–16.

7       Section 501 provides, in relevant part, as follows:

        (b) Federal agencies; affirmative action program plans

        Each department, agency, and instrumentality (including the United States Postal Service and the Postal Rate
        Commission) in the executive branch and the Smithsonian Institution shall, within one hundred and eighty days after
        September 26, 1973, submit to the Commission and to the Committee an affirmative action program plan for the hiring,
        placement, and advancement of individuals with disabilities in such department, agency, instrumentality, or Institution.
        Such plan shall include a description of the extent to which and methods whereby the special needs of employees who
        are individuals with disabilities are being met. Such plan shall be updated annually, and shall be reviewed annually
        and approved by the Commission, if the Commission determines, after consultation with the Committee, that such plan

2000 WL 1705657, 11 A.D. Cases 117

provides sufficient assurances, procedures and commitments to provide adequate hiring, placement, and advancement opportunities for individuals with disabilities.

...

(g) Standards used in determining violation of section

The standards used to determine whether this section has been violated in a complaint alleging non-affirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S .C. § 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. § § 12201–12204 and 12210), as such sections relate to employment.

29 U.S.C. § 791.

8    Section 504 provides in relevant part as follows:

(a) Promulgation of rules and regulations

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service....

29 U.S.C. § 794(a).

9    The key ADA provision that is incorporated into § 501 is 42 U.S .C. § 12112, which provides in relevant part as follows:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112. The term "qualified individual with a disability" is defined under the ADA as follows:

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111 (incorporated into § 501 of Rehabilitation Act at 29 U.S.C. § 791(g)).

10    The Court notes that the ADA standards incorporated into the Rehabilitation Act under § 501(g) do not require the adverse employment action to have been "solely by reason of" disability, in contrast to the explicit terms of § 504. See 42 U.S.C. § 12112(a). The omission of this language was not accidental. The House Committee Report explained the decision to remove the word "solely" as follows:

The Committee recognizes that the phrasing of section 202 in this legislation differs from section 504 [of the Rehabilitation Act] by virtue of the fact that the phrase "solely by reason of his or her handicap" has been deleted. The deletion of this phrase is supported by the experience of the executive agencies charged with implementing section 504 [of the Rehabilitation Act]. The regulations issued by most executive agencies use the exact language set out in section 202 in lieu of the language included in the section 504 statute. A literal reliance on the phrase "solely by reason of his or her handicap" leads to absurd results. For example, assume that an employee is black and has a disability and that he needs a reasonable accommodation that, if provided, will enable him to perform the job for which he is applying. He is a qualified applicant. Nevertheless, the employer rejects the applicant because he is black and because he has a disability. In this case, the employer did not refuse to hire the individual solely on the

basis of his disability—the employer refused to hire him because of his disability and because he was black. Although the applicant might have a claim of race discrimination under title VII of the Civil Rights Act, it could be argued that he would not have a claim under section 504 [of the Rehabilitation Act] because the failure to hire was not based solely on his disability and as a result he would not be entitled to a reasonable accommodation. The Committee, by adopting the language used in regulations issued by the executive agencies, rejects the result described above.

*McNely v. Ocala*, 99 F.3d 1068, 1075 (11th Cir.1996) (quoting H.R.Rep. No. 485(II), 2nd Sess., at 85 (1990)); *see also Severino v. North Fort Myers Fire Control District*, 935 F.2d 1179, 1183 (11th Cir.1991) (holding that under § 504, the "solely by reason of" language does not preclude disability discrimination claims involving mixed motives and relying in part upon the regulations that implement § 504).

11  Plaintiff refers in his Opposition to documents produced by Defendants purporting to show that Plaintiff had used up his annual and sick leave by the time he was terminated. Opposition at 18. However, Defendants do not assert in their motion or reply brief that Plaintiff did not have enough annual and sick leave to cover his absence while he was hospitalized.

12  The Court does not dispute Defendants' position that the Ninth Circuit has rejected the holding of *Teahan v. Metro–North Commuter R.R. Co.*, 951 F.2d 511 (2d Cir.1991) to the extent that that case "suggest[s] that if the misconduct is causally related to the disability it cannot be grounds for termination." *Newland*, 81 F .3d at 906. As noted above, however, this case does not involve termination for alleged misconduct.

13  It appears from Ms. Wells' statement that she was a supervisor at the cemetery and was also an EEO counselor who was involved in an EEO investigation of Plaintiff's claims.

14  With respect to Defendants' assertion that the promotion of various Filipino employees to permanent positions is not relevant to Plaintiff's race discrimination claim, the Court agrees. Motion at 10. Plaintiff does not allege in his complaint or anywhere else in the record that his Title VII claim is based upon discriminatory failure to promote. Nor has he presented any evidence that he would have been treated differently if he had been a permanent employee rather than a temporary employee. Finally, Plaintiff fails to provide any evidence in response to the assertions in Defendants' motion that the employees who were promoted were not similarly situated to Plaintiff. By the same token, the Court finds that Defendants' evidence concerning the racial breakdown of the employees at the cemetery is not relevant to the question of whether Defendants discriminated against Plaintiff on the basis of race. *See* Motion at 9–10; Nunez Decl. at 5, ¶ 14. Nor does the fact that Plaintiff admitted he was unaware of the number of permanent employees in 1991 or of the racial breakdown of the work force there have any bearing on the question of whether Defendants discriminated against Plaintiff on the basis of race

15  This section provides as follows:

Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

16  Even if Plaintiff's emotional distress claims based upon his allegations that he was wrongfully induced to enter the hospital and administered drugs relied upon the same underlying facts as his Title VII and Rehabilitation Act claims, it is possible they would not be preempted. The Ninth Circuit recognizes an exception to the broad rule articulated in *Pfau v. Reed.* It has held that Title VII and the Rehabilitation Act do not preempt claims based upon "highly personal harm beyond discrimination," even if the claims arise from the same core of facts. *Brock*, 64 F.3d at 1423 (holding that Title VII did not bar plaintiff's claim of negligent supervision of supervisor under FTCA where supervisor had allegedly raped plaintiff, even though such behavior would constitute sexual harassment under Title VII). Thus, when the "harms suffered involve something more than discrimination, the victim can bring a separate claim." *Id.* Because Plaintiff's emotional distress

**Stewart v. U.S., Not Reported in F.Supp.2d (2000)**
2000 WL 1705657, 11 A.D. Cases 117

claims based upon his allegations that he was wrongfully induced to enter the hospital and administered drugs are based upon different facts, however, the Court does not reach the issue of whether this exception to Title VII and Rehabilitation Act preemption applies here.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1636738

2006 WL 1636738
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Charlene THOMAS, Plaintiff,

v.

DEPARTMENT OF VETERANS

AFFAIRS, et al., Defendants.

No. 05 Civ. 5348 LAK THK.
|
April 3, 2006.

REPORT AND RECOMMENDATION

KATZ, Magistrate J.

 **\*1**  Plaintiff Charlene Thomas brings this employment
discrimination action pursuant to the Age Discrimination in
Employment Act of 1967, as amended, 29 U.S.C. §§ 621-34
("ADEA"), and the Americans with Disabilities Act of 1990,
as amended, 42 U.S.C. §§ 12112-17 ("ADA"). Plaintiff
alleges that Defendants United States Department of Veterans
Affairs ("VA"), Yvonne Morris, Milagros Andino, and Delia
Reyes have discriminated against her on the basis of age and
disability by failing to rehire Plaintiff, have retaliated against
Plaintiff in response to an Equal Employment Opportunity
("EEO") complaint she filed, and have defamed Plaintiff's
character. (Compl.¶¶ 4, 7.) Read liberally, Plaintiff's *pro
se* Complaint may also be construed to state a cause of
action under section 501 of the Rehabilitation Act of 1973,
as amended, 29 U.S.C. § 791 ("Rehabilitation Act"), and
a defamation claim under the Federal Tort Claims Act, 28
U.S.C. §§ 1346(b), 2671-80 ("FTCA").[1]

Presently before the Court is Defendants' motion to dismiss
Plaintiff's Complaint for lack of subject matter jurisdiction,
pursuant to Rule 12(b)(1) of the Federal Rules of Civil
Procedure, and failure to state a claim upon which relief
may be granted, pursuant to Rule 12(b)(6) of the Federal
Rules of Civil Procedure. Defendants' motion to dismiss was
referred to this Court for a Report and Recommendation,
pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C). For the
reasons set forth below, the Court recommends that Plaintiff's
FTCA defamation claim and ADA claim be dismissed

with prejudice for lack of subject matter jurisdiction, that
Plaintiff's ADEA claim be dismissed with prejudice for
failure to exhaust administrative remedies, and that Plaintiff's
retaliation claim under the Rehabilitation Act be dismissed
with prejudice for failure to state a claim for relief. The
Court further recommends that Plaintiff's discrimination
claim under the Rehabilitation Act be dismissed without
prejudice to Plaintiff's filing an amended complaint naming
the Secretary of the VA as a defendant.

BACKGROUND

I. *The Complaint*

Plaintiff filed the instant action on May 5, 2005.[2] Plaintiff
alleges that she had been employed by the VA Medical Center
since 1987, and that her position involved caring for patients.
(*See* Compl. ¶ 8.) Plaintiff alleges that she suffered from
clinical depression and anxiety due to her youngest daughter's
murder in 1995. (*See id.* ¶¶ 7, 8.) Plaintiff also reported to
the VA that she suffered from Post-Traumatic Stress Disorder.
(*See* Notice of Final Agency Decision, Mar. 31, 2005 ("Final
Agency Decision"), attached to Complaint, ¶ 2.) At the time of
her daughter's death, she was working with "Prosthetic[s] and
Orthotics" at the VA Medical Center. (*See* Compl. ¶ 8.) During
the last three to four years of her tenure at the VA, Plaintiff
was on "Special Accommodations" or "Light Duty." (*See id.;*
Letter from Charlene Thomas to the Court, Oct. 24, 2005
("Pl.'s Letter"), ¶ 3.) In June 2000, when she was fifty-four
years old, Plaintiff retired from her position at the VA Medical
Center on account of her depression. (*See* Compl. ¶¶ 7-8;
Notification of Personnel Action, June 23, 2000 ("Personnel
Action"), attached as first exhibit to Pl.'s Letter.)

 **\*2**  At some point in 2004, Plaintiff expressed an interest
in reemployment by the VA. (*See* Compl. ¶ 8.) Plaintiff
alleges that she was "told that in order to get [her] job
back or a position caring for patients [she had] to fill out
certain forms...." (*Id.*) These forms were given to Plaintiff at
some point in March 2004. (*See id.*) Plaintiff alleges that the
staff person responsible for distributing and collecting these
forms failed to give Plaintiff a "reinstatement form." (*See id.*)
Plaintiff alleges that at some unspecified time after March
2004, Defendant Yvonne Morris, a VA employee, failed to
inform her that this reinstatement form was missing from,
and necessary for, her application. (*See id.*) Plaintiff alleges
that she had never heard of the reinstatement form and that
VA employees informed her that only a doctor's note and the

"standard form 50B" was necessary for reinstatement. (*See id.*)

Because the VA did not receive an application for reinstatement, but only received a resumé from Plaintiff, it took no action to reinstate her. (*See* Final Agency Decision ¶ 4.) Plaintiff alleges that certain individuals at the VA falsely "swore" to her that she had been informed about the need for a reinstatement form, and that Plaintiff failed to comply for nearly one year. (*See* Compl. ¶ 8.) Plaintiff alleges that when she went to see Defendant Milagros Andino, a VA employee and EEO Intake Specialist, "everyone just joined in and said that [Plaintiff] lied." (*Id.*) Plaintiff contends that "[she] feel[s Defendants' lies were due to her] illness, age, and retaliation of a prior EEO case." (*Id.*)

## II. *Administrative History*

On January 21, 2005, Plaintiff initiated EEO counseling to address her claim that she "was discriminated against on the basis of disability (PTSD) with respect to failure to reinstate when: [a]s of January 21, 2005, [Plaintiff] has not been provided with information regarding her application for reinstatement to the position of Program Support Clerk, GS-303-06, announcement number 2084-76A." (Final Agency Decision ¶ 2.) Plaintiff's EEO counseling concluded on February 18, 2005, which was the same day that Plaintiff delivered to the VA her formal EEO complaint. (*See id.* ¶ 1.)

On March 31, 2005, the VA made a final agency decision and dismissed Plaintiff's complaint. (*See id.* ¶¶ 3-5.) The VA determined that Plaintiff failed to state a claim because she did not show that she was "aggrieved," i.e. that she had actually applied for reinstatement. (*See id.* ¶¶ 4-5.) According to the VA, Plaintiff alleged, during the EEO counseling process, that she "submitted an application for reinstatement for consideration of announcement number 2084-76A...." (*Id.* ¶ 4.) In its final agency decision, the VA noted that Plaintiff was unable to provide a copy of this alleged application. (*See id.*) Furthermore, the VA determined that the only document that the VA Human Resource Service had received from Plaintiff was "a copy of [Plaintiff's] resumé with a statement." (*Id.*)

*\*3* Plaintiff alleges that she initiated the instant action less than sixty days after she filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC"). (*See* Compl. ¶ 11.) She further alleges that, on April 1, 2005, she was issued a Right to Sue Letter. (*See id.* ¶ 12.)

## DISCUSSION

### I. *Subject Matter Jurisdiction Under Rule 12(b)(1)*

Defendants contend that Plaintiff's defamation and employment discrimination claims are barred by sovereign immunity and should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. (Defs.' Mem. at 34-35.) The Court agrees with Defendants' contention in part.

In deciding a motion to dismiss under Rule 12(b)(1), a "court may inquire, by affidavits or otherwise, into the facts as they exist." *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1130 (2d Cir.1976); *accord Land v. Dollar,* 330 U.S. 731, 735, 67 S.Ct. 1009, 1011 (1947) (courts have authority to consider jurisdictional questions on basis of affidavits and pleadings); *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir.2000) (same); *Kamen v. AT & T Co.,* 791 F.2d 1006, 1011 (2d Cir.1986) (same).

On a Rule 12(b)(1) motion, "the plaintiff bears the burden of proving by a preponderance of the evidence that jurisdiction exists." *Dong v. Ridge,* No. 02 Civ. 7178(HB), 2005 WL 1994090, at *3 (S.D.N.Y. Aug. 18, 2005) (quoting *Chayoon v. Chao,* 355 F.3d 141, 143 (2d Cir.2004)). In other words, "jurisdiction must be 'affirmatively' demonstrated." *Id.* (citing *APWU et al. v. Potter,* 343 F.3d 619, 623 (2d Cir.2003)).

"The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769-70 (1941) (citations omitted); *see also Lehman v. Nakshian,* 453 U.S. 156, 160-61, 101 S.Ct. 2698, 2701-02 (1981); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953 (1976); *Dotson v. Griesa,* 398 F.3d 156, 177 (2d Cir.2005) ("a finding of sovereign immunity ... deprive[s a] court of subject matter jurisdiction"); *Adeleke v. United States,* 355 F.3d 144, 150 (2d Cir.2004). Consent to be sued, in other words, "[a] waiver of the Federal Government's sovereign immunity[,] must be unequivocally expressed in statutory text." *Lane v. Peña,* 518 U.S. 187, 192, 116 S.Ct. 2092, 2096 (1996); *see also United States v. Nordic Village, Inc.,* 503 U.S. 30, 33-34, 112 S.Ct. 1011, 1014-15 (1992); *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351 (1980); *United States v. King,* 395 U.S. 1, 4, 89

2006 WL 1636738

S.Ct. 1501, 1503 (1969). Furthermore, the "limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." *Lehman,* 453 U.S. at 161, 101 S.Ct. at 2702 (quoting *Soriano v. United States,* 352 U.S. 270, 276, 77 S.Ct. 269, 273 (1957)) (quotation marks omitted); *Lane,* 518 U.S. at 192, 116 S.Ct. at 2096 ("a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign").

**\*4** The United States need not be an expressly named defendant for an action to be considered as one against the sovereign. "The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or compel it to act ." *B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 723 (2d Cir.1983) (internal quotation marks and citations omitted) (quoting *Land v. Dollar,* 330 U.S. 731, 738, 67 S.Ct. 1009, 1012 (1947) and *Larson v. Domestic & Foreign Corp.,* 337 U.S. 682, 704, 69 S.Ct. 1457, 1468 (1949)). It follows that a lawsuit against a federal agency and its officers, acting in their official capacities, constitutes a lawsuit against the federal government. See *Fed. Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 1000 (1994) (federal agencies protected by sovereign immunity); *Dotson,* 398 F.3d at 177 (federal agencies and officers acting in official capacities protected by sovereign immunity); *Kemer v. Johnson,* 900 F.Supp. 677, 681 (S.D.N.Y.1995) (citing *B.K. Instrument,* 715 F.2d at 723) (federal officers acting in official capacities protected by sovereign immunity).

In the instant case, Defendant VA is a federal agency, and the employees named as co-Defendants in the suit are identified by their official titles and were acting in their official capacities during the incidents alleged in the Complaint. Thus, this action constitutes an action against the sovereign, and Defendants cannot be sued without an "unequivocally expressed" statutory waiver of sovereign immunity for each claim. See *Lane,* 518 U.S. at 192, 116 S.Ct. at 2096.

### A. *Plaintiff's Common Law Defamation Claim*
As noted, Plaintiff's Complaint, construed liberally, may be viewed as one that asserts a defamation claim. (*See* Compl. ¶ 4 ("Deformation [sic] of Character-Lying Against me"); *id.* ¶ 8 ("everyone [at the VA's EEO office] just joined in and said that I lied."); Pl.'s Letter ¶ 1 (Plaintiff claims "character assassination.") However, as Defendants correctly contend,

the Government has not waived its sovereign immunity for defamation claims.

The FTCA provides that an action against the United States is the exclusive remedy in any action for damages or loss of property "resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1). In the instant case, Michael J. Garcia, the United States Attorney for the Southern District of New York, certified that VA employees Yvonne Morris, Milagros Andino, and Delia Reyes were acting within the scope of their employment with regard to the incidents alleged in Plaintiff's Complaint. (*See* Certification of Michael J. Garcia, United States Attorney for the Southern District of New York, Oct. 6, 2005.)

**\*5** The FTCA expressly excludes from its waiver of sovereign immunity "[a]ny claim arising out of ... libel, slander, [or] misrepresentation." 28 U.S.C. § 2680(h); *see also Devlin v. United States,* 352 F.3d 525, 536 (2d Cir.2003); *Wilson v. United States,* 959 F.2d 12, 14 (2d Cir.1992). As Defendants correctly note, " '[c]ourts routinely dismiss claims of defamation and libel improperly brought against the United States." ' (Defs.' Mem. at 6) (quoting *Hightower v. United States,* 205 F.Supp.2d 146, 153 (S.D.N.Y.2002) and citing *Prestop v. Hamlett,* No. 99 Civ. 2747(GBD), 2001 WL 363676, at \*6 (S.D.N.Y. Apr. 12, 2001) (dismissing defamation claim against United States); *see also Saghezi v. Reno,* No. 94 Civ. 8291(HB), 1996 WL 524338, at \*6 (S.D.N.Y. Sept. 16, 1996) (same).

Therefore, any of Plaintiff's claims that are based upon defamation, slander, or libel must be dismissed for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1).[3]

### B. *Plaintiff's ADA claim*
There is also no clear, unambiguous, and "unequivocally expressed" language waiving sovereign immunity under the ADA. In fact, contrary statutory language exists. The ADA provides that

[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The term "covered entity" includes an "employer," 42 U.S.C. § 12111(2), but "the United States" is specifically excluded from the definition of "employer" under 42 U .S.C. § 12111(5)(B)(i). *See, e.g., Rivera v. Heyman,* 157 F.3d 101, 103 (2d Cir.1998) ("As a federal employee, Rivera has no remedy for employment discrimination under the ADA. His sole claim for discrimination on the basis of disability is under the Rehabilitation Act, if anywhere.") (citation omitted); *Kemer,* 900 F.Supp. at 681 (ADA not available to federal employees); *Calero-Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 12 n. 1 (1st Cir.2004) (same).

Because there has been no waiver of sovereign immunity under the ADA, Plaintiff's ADA claim should be dismissed for lack of subject matter jurisdiction.

### C. *Rehabilitation Act*

The Rehabilitation Act also prohibits employment discrimination against disabled individuals, and does apply to federal employees. *See* 29 U.S.C. § 791; *Rivera,* 157 F.3d at 104; *Guice-Mills v. Derwinski,* 967 F.2d 794, 797-98 (2d Cir.1992); *Kemer,* 900 F.Supp. at 681. Because Plaintiff is proceeding *pro se,* Plaintiff's Complaint will be liberally construed to state a cause of action under the Rehabilitation Act. *See, e.g., Kemer,* 900 F.Supp. at 681 (*pro se* complaint that stated an ADA claim against a federal agency was liberally construed to state a claim under Rehabilitation Act); *Alenski v. Potter,* No. 03 Civ. 2179(SJF)(MLO), 2005 WL 1309043, *7 n. 11 (E.D.N.Y.2005) (same).

**\*6** Nevertheless, Defendants contend that this Court lacks jurisdiction over Plaintiff's Rehabilitation Act claims because Plaintiff failed to name the proper defendant, namely, the head of the agency. (*See* Defs'. Mem. at 9 (citing *Tomka v. Seiler Corp .,* 66 F.3d 1295, 1314 (2d Cir.1995) (no agent liability under Title VII); *Torres v. U.S. Dep't Of Veteran Affairs,* No. 02 Civ. 9601(HBP), 2004 WL 691237, at *2 (S.D.N.Y. Mar. 31, 2004) (agency head is only proper defendant for claim under Rehabilitation Act); *Edinboro v. Dep't of Health and Human Servs.,* 704 F.Supp. 364, 365 (S.D.N.Y.1988)).) The Court agrees.

Section 501 of the Rehabilitation Act incorporates the procedural requirements that apply to lawsuits under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-16 ("Title VII"). *See* 29 U .S.C. § 794(a)(1). In order to commence an action under Title VII and the Rehabilitation Act, a federal employee alleging discrimination may only bring suit against "the head of the department, agency or unit." 42 U.S.C. §

2000e-16(c). Plaintiff may not bring a lawsuit against the agency itself. *See Edinboro,* 704 F.Supp. at 365; *Drayton v. Veterans Admin.,* 654 F.Supp. 558, 562 (S.D.N.Y.1987) (Title VII case). In the instant case, Plaintiff named as Defendants the VA and its employees, who are not subject to suit under the Rehabilitation Act, and failed to name the proper party, the Secretary of the VA.

Plaintiff's claim under the Rehabilitation Act should therefore be dismissed without prejudice, allowing Plaintiff to amend the Complaint to name the Secretary of the VA as a defendant. *See Platsky v. Cent. Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991) (holding that instead of dismissing complaint for failure to name proper party, "it would have been appropriate for the district judge to explain the correct form to the pro se plaintiff so that [he] could have amended his pleadings accordingly."); *Eison v. Kallstrom,* 75 F.Supp.2d 113, 116 (S.D.N.Y.1999) (granting plaintiff's motion to amend complaint to substitute federal agency in the place of individual defendants).

### D. *Plaintiff's ADEA Claim*

Plaintiff also brings a claim against Defendants under the ADEA. The ADEA contains an unambiguous waiver of sovereign immunity for age discrimination claims brought by employees of federal agencies. *See* 29 U.S.C. § 633a(a). Defendants do not challenge the existence of such a waiver. However, Defendants do contend that this Court lacks subject matter jurisdiction to decide Plaintiff's ADEA claim because Plaintiff failed to name as a defendant the only proper defendant, the agency head. (*See* Defs.' Mem. at 9 (citing *Matthews v. U.S. Postal Serv.,* No. 87 Civ. 1282, 1989 WL 14684, at *4 (N.D.N.Y. Feb. 23 1989)).)

Although the ADEA does not expressly designate who the proper defendants are in an ADEA action, *see* 29 U.S.C. § 633a, and neither the Supreme Court nor the Second Circuit have addressed the issue, the weight of authority holds that the head of the federal agency is the only proper defendant. *See Honeycutt v. Long,* 861 F.2d 1346, 1349 (5th Cir.1988); *Ellis v. U.S. Postal Serv.,* 784 F.2d 835, 838 (7th Cir.1986); *Romain v. Shear,* 799 F.2d 1416, 1418 (9th Cir.1986); *Torres v. U.S. Dep't of Veterans Affairs,* No. 02 Civ. 9601(HBP), 2004 WL 691237, *2 (S.D.N.Y. Mar. 31, 2004); *Richards v. Frank,* No. 89 Civ. 3087, 1991 WL 35502, *2 (E.D.N.Y. Mar. 6, 1991); *Healy v. U.S. Postal Serv.,* 677 F.Supp. 1284, 1289 (E.D.N.Y.1987). *But see Shostak v. U.S. Postal Serv.,* 655 F.Supp. 764, 765 (D.Me.1987) ("These words clearly indicate

Congress's contemplation that a variety of persons could be named as defendants in a suit under ADEA").

**\*7** Although Plaintiff could easily cure any such defect by amending the Complaint, the Court need not resolve whether such an amendment is required because Plaintiff's ADEA claim should be dismissed with prejudice for other reasons, which are discussed below.

II. *Failure to State a Claim Under Rule 12(b)(6)*
Defendants contend that Plaintiff's ADEA, Rehabilitation Act, and retaliation claims should be dismissed under Federal Rule of Civil Procedure 12(b)(6) because they fail to state claims for relief. (*See* Defs.' Mem. at 14-17.) In deciding a motion to dismiss under Rule 12(b)(6), the Court must "take as true all of the allegations contained in plaintiff[']s complaint and draw all inferences in favor of the plaintiff[]." *Weixel v. Bd. of Educ.,* 287 F.3d 138, 145 (2d Cir.2002); *accord Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002) (citing *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001)). Furthermore, "courts must construe pro se pleadings broadly, and interpret them 'to raise the strongest arguments that they suggest.' " *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (quoting *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)). "This is especially true when dealing with pro se complaints alleging civil rights violations." *Weixel, 287 F.3d at 146* (citing *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001)). A court may not dismiss a plaintiff's complaint under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v.. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957); *accord Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 596 (1972) (per curiam); *Weixel,* 287 F.3d at 145; *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000); *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994).

For claims involving employment discrimination, the Supreme Court has held that a plaintiff is only required to comply with the liberal rules for notice pleading set forth in Rule 8(a)(2) of the Federal Rules of Civil Procedure. *See Swierkiewicz v. Sorema N .A.,* 534 U.S. 506, 508, 122 S.Ct. 992, 995 (2002). "[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination...." *Id.* at 515, 122 S.Ct. at 999; *accord Twombly v. Bell Atlantic Corp.,* 425 F.3d 99, 107-08 (2d Cir.2005); *Phillip v. Univ. of Rochester,* 316 F.3d 291, 298 (2d Cir.2003). As the Supreme Court observed, to hold otherwise not only would "narrowly constrict the role of the pleadings," but also

would be inappropriate in certain cases, such as where a plaintiff, following discovery, may "produce direct evidence of discrimination." *Swierkiewicz,* 534 U.S. at 511, 122 S.Ct. at 997 (internal quotation marks and citation omitted).

Rule 8 requires that a plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), and that such a statement need only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz,* 534 U.S. at 512, 122 S.Ct. at 998 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103 (1957)); *see also Aguilar v. N.Y. Convention Ctr. Operating Corp.,* No. 00 Civ. 4637(CBM), 2002 WL 844397, at \*2 (S.D.N.Y. May 2, 2002). Fair notice is "that which will enable the adverse party to answer and prepare for trial...." *Wynder v. McMahon,* 360 F.3d 73, 79 (2d Cir.2004); *see also Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988).

**\*8** The Supreme Court has observed that Rule 8's "simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz,* 534 U.S. at 512, 122 S.Ct. at 998; *see also Scutti Enters., LLC. v. Park Place Entm't Corp.,* 322 F.3d 211, 215 (2d Cir.2003) ( "other devices besides pleadings" are available "to define the facts and issues and to dispose of unmeritorious claims"). Similarly, the Second Circuit has noted that Rule 8 is "fashioned in the interest of fair and reasonable notice, not technicality." *Scutti,* 322 F.3d at 215. Thus, "the district court could only correctly dismiss ... [the] complaint ... if the complaint in fact failed to meet the minimum pleading standards set forth in Rule 8(a)." *Wynder,* 360 F.3d at 79.

"On a motion to dismiss, the court may consider 'any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference." ' *Yak v. Bank Brussels Lambert,* 252 F.3d 127, 130 (2d Cir.2001) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)); *see also* Fed.R.Civ.P. 10(c) ("Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion. A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *Sira v. Morton,* 380 F.3d 57, 67 (2d Cir.2004).

"Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint

'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers,* 282 F.3d 147, 153 (quoting *Int'l Audiotext Network, Inc. v. AT & T Co.,* 62 F.3d 69, 72 (2d Cir.1995) (per curiam)); *accord Sira,* 380 F.3d at 67. In other words, a court may consider "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor,* 220 F.3d 81, 88-89 (2d Cir.2000) (citing *Cortec,* 949 F.2d at 47-48); *see also Brass v. Am. Film Tech., Inc.,* 987 F.2d 142, 150 (2d Cir.1993).

In the instant case, the Court may properly consider the VA's Notice of Final Agency Decision which is attached to Plaintiff's Complaint. The Court may also consider the letter written by Plaintiff's doctor, as it is incorporated into the Complaint by reference in ¶ 8. (Letter from Dr. Richard L. Malen, M.D. to Whom It May Concern, May 13, 2004 ("Dr.'s Letter"), attached as third exhibit to Pl.'s Letter.) Also incorporated into the Complaint by reference, in ¶ 8, is documentation of Plaintiff's disability leave. (Personnel Action, June 23, 2000, attached as first exhibit to Pl.'s Letter.)

In filing this lawsuit, Plaintiff also relied upon the following documents, which were in Plaintiff's possession at the time this action was initiated:

**\*9** - Plaintiff's letter to the VA expressing interest in employment (Letter from Charlene Thomas to the VA, attached as fifth exhibit to Pl.'s Letter);

- Plaintiff's resumé (Plaintiff's Resumé, attached as fourth exhibit to Pl.'s Letter);

- Declaration for Federal Employment (U.S. Office of Personnel Management Optional Form 306, July 7, 2004, attached as sixth exhibit to Pl.'s Letter);

- Optional Application for Federal Employment (U.S. Office of Personnel Management Optional Form 612, July 7, 2004, attached as seventh exhibit to Pl.'s Letter);

- Plaintiff's two Applications for Promotion or Reassignment (Two Automated VA Forms 5-4078, Feb. 18, 2005, attached as tenth and eleventh exhibits to Pl.'s Letter);

- Letter from EEO Specialist to Plaintiff (Letter from EEO Specialist Gregory E. Jones to Charlene Thomas, Jan. 25, 2005 ("Initial EEO Letter"), attached as eighth exhibit to Pl.'s Letter); and

- the EEO Counselor's Report (Report of EEO Counselor Gregory E. Jones, Feb. 28, 2005 ("EEO Report"), attached as ninth exhibit to Pl.'s Letter).

Since Plaintiff relied upon these documents in bringing the instant action, and since the documents are integral to her Complaint, the Court may consider their contents in deciding this motion to dismiss.

A. *Exhaustion Requirement*
Exhaustion of administrative remedies "is a precondition to civil suit under both the Rehabilitation Act and the ADEA." *Marinelli v. Chao,* 222 F.Supp.2d 402, 410 (S.D.N.Y.2002) (citing *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 82-83 (2d Cir.2001) (ADEA) and *Downey v. Runyon,* 160 F.3d 139, 145-46 (2d Cir.1998) (Rehabilitation Act and Title VII)). Defendants contend that Plaintiff failed to exhaust her administrative remedies for her claims under the Rehabilitation Act and the ADEA, and that these claims should be dismissed on this ground. (*See* Defs.' Mem. at 11-14.) The Court disagrees as to Plaintiff's claims under the Rehabilitation Act, and agrees as to Plaintiff's ADEA claims.

1. *Rehabilitation Act*
As discussed, Section 501 of the Rehabilitation Act incorporates the procedural requirements that apply to lawsuits under Title VII. *See* 29 U.S.C. § 794a(a)(1). Under these requirements, a plaintiff must "initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory...." 29 C.F .R. § 1614.105(a)(1). This 45-day time limit shall be extended when "the individual shows that he or she ... did not know and reasonably should not have ... known that the discriminatory matter or personnel action occurred...." 29 C.F.R. § 1614.105(a)(2).

A counseling period and final interview follow an aggrieved employee's initial contact with the EEO counselor. *See* 29 C.F.R. §§ 1614.105(c) and (d). After the final interview, the employee has the right to file a formal discrimination complaint with the agency. *See* 29 C.F.R. §§ 1614.105(d), 1614.106(a). An agency may dismiss a complaint if the complaint fails to state an employment discrimination claim under various statutes including the Rehabilitation Act and the ADEA. *See* 29 C.F.R. § 1614.107(a)(1). A final decision, following such a dismissal, constitutes final agency action, after which the complainant has the right to file a civil action in federal court. *See* 29 C.F.R. § 1614.110(b).

**\*10** Defendants contend that Plaintiff's claim under the Rehabilitation Act should be dismissed for failure to exhaust administrative remedies, because the EEO proceeding that culminated with a final agency decision dated March 31, 2005, "could not possibly have addressed the specific events of April 1, 2005." (Defs.' Mem. at 13.) However, Defendants take too literal an approach to reading the Complaint. Because the final agency decision was issued on March 31, 2005 (*see* Final Agency Decision), it is reasonable to construe the discriminatory event that Plaintiff alleges occurred on April 1, 2005, to be the issuance of the final agency decision on March 31, 2005, as opposed to interpreting it as an additional event that occurred one day after the final agency decision. Plaintiff is essentially alleging that, over a period of time, Defendants failed to provide her with the necessary forms for reinstatement and instruction on how to be reinstated, and then failed to reinstate her. She did raise these claims in her EEO complaint.

Alternatively, it is possible that on or after April 1, 2005, Plaintiff returned to the VA, saw EEO Intake Specialist Milagros Adinos, and again was denied the necessary forms. (*See* Compl. ¶ 8.) Assuming that to be the case, Defendants contend that it is impossible that the April 1, 2005 incident was discussed during the EEO counseling, as the final agency decision was dated March 31, 2005. (*See* Defs.' Mem. at 13; Final Agency Decision, at 1.) However, no additional EEO counseling is required if the claims not expressly brought before the agency are "reasonably related" to the claims that were presented. *See Deravin v. Kerik,* 335 F.3d 195, 200-01 (2d Cir.2003); *Fitzgerald v. Henderson,* 251 F.3d 345, 359 (2d Cir.2001); *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* 274 F.3d 683, 686 (2d Cir.2001). "Subsequent conduct is reasonably related to conduct in an EEOC charge if: (1) the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination; (2) it alleges retaliation for filing the EEOC charge; or (3) the plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Alfano v. Costello,* 294 F.3d 365, 381 (2d Cir.2002) (internal citation and quotation marks omitted); *accord Terry v. Ashcroft,* 336 F.3d 128, 151 (2d Cir.2003); *Fleming v. Verizon N.Y., Inc.,* No. 03 Civ. 5639(WHP), 2005 WL 3066040, at \*4 (Nov. 16, 2005); *Marinelli,* 222 F.Supp. at 416.

Assuming that there was a further incident of failing to give Plaintiff proper reinstatement forms or failing to reinstate her on April 1, 2005, the incident would fall under the third definition of "reasonably related," because the incidents that were the subject of EEO counseling also related to the VA's failure to provide Plaintiff with reinstatement forms and failure to reinstate Plaintiff. (*Compare* Compl. ¶ 8 *with* Final Agency Decision ¶ 2.) Thus, Plaintiff did not have to reinitiate EEO counseling in order to file a civil action arising from any continuation of the alleged discrimination on April 1, 2005.

**\*11** It follows that Plaintiff has exhausted her administrative remedies under the Rehabilitation Act, and her claims under that Act should not be dismissed on this ground.

### 2. *ADEA*

There are two available avenues for an aggrieved federal employee to bring a lawsuit for employment discrimination based upon age. The federal employee may follow the same administrative procedures, discussed above, that are required under the Rehabilitation Act. *See* 29 C.F.R. § 1614.103. Alternatively, the aggrieved employee may bypass the administrative procedures altogether, and bring a court action, so long as the employee gives the EEOC at least thirty days notice before initiating the lawsuit. *See* 29 U.S.C. §§ 633a(d), 1614.201(a). Such notice must occur within 180 days of the alleged discriminatory incident. *See id.*

Defendants argue that the Complaint alleges neither administrative exhaustion of any age-based discrimination claim, nor proper notice of the lawsuit to the EEOC at least thirty days prior to the filing of the action and within 180 days after the alleged age discrimination occurred. (*See* Defs.' Mem. at 13.) Nor are Defendants aware of any such exhaustion. Plaintiff contends that she filed a charge of age discrimination with the EEOC within sixty days of filing her Complaint. (*See* Compl. ¶ 11.) However, no such charge of age discrimination is attached to the Complaint, nor does Plaintiff allege the contents of the charge. Plaintiff also alleges that the EEOC issued a Right to Sue letter, which she received on April 1, 2005. (*See id.* ¶ 12.) She fails to provide any such document. The Court assumes that Plaintiff is referring to the final agency decision issued by the VA, not the EEOC, which is dated March 31, 2005. (*See* Final Agency Decision.)[4] However, the administrative complaint and subsequent investigation that correspond to this final agency decision only addressed Plaintiff's discrimination claim based upon disability, not age. Nowhere in the final agency decision, nor in the EEO counselor's report, is there any mention of age discrimination. (*See* Final Agency

Decision; EEO Counselor's Report, attached as eighth exhibit to Pl.'s Letter.)

Moreover, even if Plaintiff received a Right to Sue letter from the EEOC, it could not have been related to her age discrimination claim. In order to file an appeal with the EEOC as a federal employee, and obtain a Right to Sue letter from the EEOC, one must first file an administrative complaint in the appropriate federal agency, which, in the instant case, is the VA. *See* 29 C.F.R. § 1614.401. Plaintiff, however, never filed an administrative complaint based upon age discrimination. Therefore, any Right to Sue letter from the EEOC, if she received one at all, could not have been related to her age discrimination claim. Plaintiff has therefore failed to exhaust her administrative remedies with regard to her ADEA claim.

A plaintiff who fails to exhaust her administrative remedies may still file a civil action under the ADEA if she gives the EEOC at least thirty days notice before initiating the lawsuit. *See* 29 U .S.C. §§ 633a(d), 1614.201(a). Again, such notice must occur within 180 days of the alleged discriminatory incident. *See id.* In the instant case, Plaintiff failed to provide the EEOC with any notice of her age discrimination claim under the ADEA. Moreover, because more than 180 days has passed since the events upon which Plaintiff bases her discrimination claims, she can no longer exhaust those claims.

**\*12** As procedural requirements for gaining access to federal courts must be strictly adhered to, *see Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 152, 104 S.Ct. 1723, 1726 (1984), Plaintiff's ADEA claim should be dismissed with prejudice.

### B. *Discrimination Claim Under the Rehabilitation Act*
Although Plaintiff failed to name the proper party for her claim under the Rehabilitation Act, this error may be remedied easily by an amendment to the Complaint. The Court will therefore address the merits of Plaintiff's Rehabilitation Act claim.

Defendants contend that Plaintiff fails to state a cognizable disability discrimination claim under the Rehabilitation Act. (*See* Defs.' Mem. at 14-16.) The Court disagrees. Section 501 of the Rehabilitation Act requires federal agencies to institute affirmative action programs "for the hiring, placement, and advancement of individuals with disabilities...." 29 U.S.C. § 791(b). The standards of Title I of the ADA are used to determine whether this section has been violated. *See* 29 U.S.C. § 791(g). Title I of the ADA prohibits employment

discrimination "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). Defendants do not contend that Plaintiff was unqualified for the positions for which she applied. They only dispute that Plaintiff is an individual with a disability under the statute and that the alleged discrimination occurred because Plaintiff was disabled.[5]

#### 1. *"Individual With A Disability"*
Defendants argue that Plaintiff fails to allege that she is disabled. An "individual with a disability" is defined as any person who "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such impairment; or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B). The list of major life activities provided in the regulations interpreting the Rehabilitation Act includes "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii).

The Complaint merely alleges that Plaintiff left her employment in 2000, when she suffered from depression, anxiety, and Post-Traumatic Stress Disorder. (*See* Compl. ¶¶ 3, 8; Final Agency Decision ¶ 2.) It fails to allege any facts that indicate that Plaintiff had a disability that substantially limited any of her major life activities at the time of the alleged discriminatory acts in 2004-2005. Therefore, Plaintiff does not fall within the first definition of an individual with a disability.

However, "[a] person who has a record of ... an impairment [who] may at present have no actual incapacity at all," *Southeastern Cmty. Coll. v. Davis,* 442 U.S. 397, 405-06, n. 6, 99 S.Ct. 2361, 2366-67, n. 6 (1979), is nevertheless considered an individual with a disability under the statute. Having a record of such an impairment means having "a history of ... a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k).

**\*13** In the instant case, the Complaint does allege that Plaintiff suffered from clinical depression and anxiety due to her youngest daughter's murder in 1995. (*See* Compl. ¶¶ 7, 8.) The EEO Specialist also documented that Plaintiff reported that she had suffered from Post-Traumatic Stress Disorder. (*See* Initial EEO Letter, at 1.) During the last three to four years of her tenure at the VA, Plaintiff was

on "Special Accommodations" or "Light Duty" because of her impairment. (*See id.* ¶ 8; Pl.'s Letter, at 1.) Plaintiff also alleges that in 2000, she retired from her position at the VA Medical Center on account of disability. (*See* Compl. ¶ 8.) In other words, her impairment substantially limited her major life activity of working. Thus, Plaintiff has alleged that she has a record of disability, as defined by the Rehabilitation Act.

Furthermore, the Complaint may be liberally construed to allege that Plaintiff was regarded as having such an impairment. At the time of the alleged discriminatory events, Plaintiff had been on disability leave for over four years. (*See* Compl. ¶ 8.) Plaintiff interacted with several VA employees in her attempts to be reinstated and to end her disability leave. (*See id.*) Thus, the Court may infer that Defendants had knowledge of Plaintiff's earlier impairment. Furthermore, Plaintiff alleges "that in order to get my job back or a position caring for patients [I had] to fill out certain forms, including my [doctor's] info[r]mation which was extremely sensitive information." (*Id.*) Therefore, based upon Plaintiff's pleadings, it is reasonable to infer that VA employees had access to some of Plaintiff's medical information. Viewing these pleadings liberally, the Court cannot conclude that Plaintiff can prove no set of facts that would show that she was regarded as having a disability as defined under the Rehabilitation Act.

### 2. *Causation*

Defendants also contend that Plaintiff fails to allege that she was denied reinstatement because of her disability. (*See* Defs.' Mem. at 15-16.)[6] They argue that Plaintiff acknowledges that her application was incomplete, as it did not contain the necessary reinstatement form, and that, according to Defendants, is why Plaintiff was not reinstated. (*See* Defs.' Mem. at 15.) Defendants' argument addresses the merits of Plaintiff's claim rather than its sufficiency at the pleading stage. Construing the Complaint liberally, it is reasonable to infer that Plaintiff is contending that, because of her disability, she was intentionally denied the proper forms and information in order to prevent her from being reinstated. (*See* Compl. ¶¶ 4, 7, 8.) Accordingly, Plaintiff has sufficiently alleged that she was denied reinstatement because of her disability.

### C. *Retaliation Claim Under the Rehabilitation Act*

Defendants also contend that Plaintiff fails to allege sufficient facts to support a retaliation claim under the Rehabilitation Act. (*See* Defs.' Mem. at 16-17.) The Court agrees.

*\*14* The Rehabilitation Act, through regulations promulgated by the Department of Labor, prohibits retaliation against employees for their opposition to practices made unlawful by the Act. *See* 29 C .F.R. § 1614.101(b). The elements of a retaliation claim under the Rehabilitation Act are: "(1) [the plaintiff] engaged in an activity protected by the ADA [and the Rehabilitation Act]; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Treglia v. Town of Manlius,* 313 F.3d 713 (2d Cir.2002); *see also Weixel,* 287 F.3d at 148; *Sands v. Runyon,* 28 F.3d 1323, 1331 (2d Cir.1994). An adverse employment action is a "materially adverse change in the terms and conditions of employment." *Galabya v. N.Y.C. Bd. Of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (quoting *Richardson v. N.Y.S. Dep't of Corr. Serv.,* 180 F.3d 426, 446 (2d Cir.1999)). Examples of adverse employment actions include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities...." *Id.* (internal quotation marks and citations omitted).

In the Complaint, there is one mention of a "prior EEO case." (Compl.¶ 8.) Reading the Complaint liberally, the Court assumes for the purposes of this motion that the "prior EEO case" is the one described in the Notice of Final Agency Decision dated March 31, 2005. In that EEO case, Plaintiff's claim was that she was discriminated against because the VA failed to give her proper reinstatement forms. However, that is the very same claim that Plaintiff is making in the instant action. Plaintiff does not plead that any protected activity had occurred prior to the VA's alleged failure to provide the proper forms. Plaintiff also fails to allege that any adverse employment decision was taken against her as a result of this prior EEO case.

Therefore, the Complaint fails to state a claim of retaliation under the Rehabilitation Act. It also "appears beyond doubt that [Plaintiff] can prove no set of facts in support of [her] claim which would entitle [her] to relief," *Conley,* 355 U.S. at 45-46, 78 S.Ct. at 102, because the only protected activity she engaged in was taken as a result of Defendants' alleged discrimination, not prior to the discrimination. Plaintiff's retaliation claim under the Rehabilitation Act should therefore be dismissed with prejudice.

CONCLUSION

For the reasons stated above, this Court recommends that Plaintiff's FTCA defamation and ADA claims be dismissed with prejudice for lack of subject matter jurisdiction. The Court further recommends that Plaintiff's ADEA claim be dismissed with prejudice for failure to exhaust administrative remedies, and that Plaintiff's retaliation claim under the Rehabilitation Act be dismissed with prejudice for failure to state a claim for relief. Finally, the Court recommends that Plaintiff's discrimination claim under the Rehabilitation Act be dismissed without prejudice to Plaintiff's amending the Complaint to name the Secretary of the VA as a defendant.

**\*15** Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Lewis A. Kaplan, U.S.D.J., and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Kaplan. Failure to file objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn, 474 U.S. 140, 149-52, 106 S.Ct. 466, 472-73 (1985); Mario v. P & C Food Mkts., Inc., 313 F.3d 758, 766 (2d Cir.2002); Spence v. Superintendent, 219 F.3d 162, 174 (2d Cir.2000); Small v. Sec'v of Health and Human Servs., 892 F.2d 15, 16 (2d Cir.1989)* (per curiam).

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1636738

Footnotes

1    "[T]he pleadings of a pro se plaintiff must be read liberally and should be interpreted 'to raise the strongest arguments that they suggest.' " *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)); *see also Boag v. MacDougall,* 454 U.S. 364, 365, 102 S.Ct. 700, 701 (1982) (citing *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595-96 (1972) (holding *pro se* complaint "to less stringent standards than form pleadings drafted by lawyers")).

2    Although the Complaint was not docketed until June 6, 2005, it was submitted to the Court's Pro Se Office on May 5, 2005.

3    Defendants argue that even if Plaintiff's defamation claim were actionable under the FTCA, the claim should still be dismissed because Plaintiff failed to plead exhaustion of administrative remedies. The Court agrees. The FTCA provides that "[a]n action shall not be instituted upon a claim against the United States ... unless the claimant shall have first presented the claim to the appropriate Federal agency...." 28 U.S.C. § 2675(a). "Th[is] requirement that a notice of claim be filed is jurisdictional and cannot be waived." *Keene Corp. v. United States,* 700 F.2d 836, 841 (2d Cir.1983); *see also Celestine v. Mt. Vernon Neighborhood Health Ctr.,* 403 F.3d 76, 82 (2d Cir.2005); *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994). Plaintiff fails to plead any facts showing compliance with this notice requirement. Thus, even if defamation were actionable under the FTCA, Plaintiff's claim would be subject to dismissal for failure to comply with the FTCA's notice requirement.

4    If the final agency decision did not occur until March 31, 2005, there would have been no possibility of the EEOC investigating and disposing of a charge of discrimination the next day.

5    Construing the Complaint as merely alleging entitlement to the reinstatement forms and instructions on how to apply, Defendants contend that Plaintiff fails to allege that she was denied a benefit to which she was entitled. (*See* Defs.' Mem. at 15-16.) Again, Defendants take too literal an approach to reading the Complaint. Construing the Complaint liberally, the denial of the reinstatement form was merely a preliminary step to denying Plaintiff employment, allegedly for discriminatory reasons.

6    Defendants argue that in order to state a cognizable claim under the Rehabilitation Act, Plaintiff must allege that her disability was the sole reason for the VA's failure to provide her the necessary reinstatement forms and failure to reinstate her. (*See* Defs.' Mem. at 14-15.) However, the requirement that disability be the sole reason for the adverse action is an element of claims brought under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), which does not apply to federal

2006 WL 1636738

employees, *see Rivera,* 157 F.3d at 104, and Title II of the ADA, 42 U.S.C. §§ 12131-34, which addresses discrimination in public services as opposed to employment discrimination. These statutes are not applicable to the instant case.

Instead, Section 501 of the Rehabilitation Act, 29 U.S.C. § 791, is the section applicable to federal employees alleging employment discrimination. *See Rivera,* 157 F.3d at 104. As discussed, the standards of Title I of the ADA, 42 U.S.C. §§ 12111-17, are used to determine whether Section 501 has been violated. *See* 29 U.S.C. § 791(g). *Compare* 42 U.S.C. § 12112 ("No covered entity shall discriminate against a qualified individual with a disability *because of* the disability ....") (emphasis added) *with* 29 U.S.C. § 794 ("No otherwise qualified individual with a disability ... shall, *solely* by reason of her or his disability, ... be subjected to discrimination ....") (emphasis added). The Second Circuit has not directly addressed whether the language "because of the disability" means "solely by reason of" the disability. *See Wallengren v. Samuel French, Inc.,* 39 F.Supp.2d 343, 349 n. 2 (S.D.N.Y.1999) (concluding that, since Second Circuit had not ruled on the issue, plaintiff need not demonstrate that disability was sole factor in employer's decision); *Glover v. City Univ. of N.Y.,* No. 96 Civ. 7961(PKL), 1997 WL 411443, at *3 n. 8 (S.D.N.Y. July 18, 1997) (same).

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 343178
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio,
Eastern Division.

Jerry W. TUTTLE, Plaintiff,

v.

TYCO ELECTRONICS INSTALLATION
SERVICES, INC., et al., Defendants.

No. 2:06-cv-581.
|
Feb. 7, 2008.

**Attorneys and Law Firms**

John William Ferron, Jessica G. Fallon, Lisa A. Wafer, Ferron & Associates, Columbus, OH, for Plaintiff.

William S. Rutchow, Ogletree, Deakins, Nash, Smoak & Stewart, PC, Nashville, TN, Robert Frederick Seidler, Ogletree Deakins Nash Smoak & Stewart, P.C., Indianapolis, IN, for Defendants.

*OPINION AND ORDER*

GREGORY L. FROST, District Judge.

 **\*1** Plaintiff Jerry W. Tuttle ("Plaintiff") filed his Second Amended Complaint on July 20, 2007 seeking money damages from, and injunctive relief against, his former employer, Defendant Tyco Electronics Installation Services, Inc. ("Defendant" or "Tyco") and his former superiors, Defendant Robert Baurhyte ("Baurhyte") and Defendant Aaron Davis ("Davis"). (Doc. # 36.) Plaintiff's Second Amended Complaint asserts claims against Tyco, Baurhyte and Davis for unlawful age discrimination in violation of federal and Ohio law. A jury trial in this action is scheduled to commence on March 3, 2008.

This matter is before the Court on Defendants' Motion *in Limine* (Doc. # 84) and on Plaintiff's Motion *in Limine* (Doc. # 81). For the reasons that follow, the Court **DENIES** Plaintiff's Motion *in Limine* and **DENIES IN PART AND DENIES AS MOOT IN PART** Defendants' Motion *in Limine*.

## I. STANDARD FOR MOTION IN LIMINE

Although neither the Federal Rules of Evidence nor the Federal Rules of Civil Procedure explicitly authorize the Court to rule on an evidentiary motion *in limine*, the United States Supreme Court has noted that the practice of ruling on such motions "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States,* 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). The purpose of a motion *in limine* is to allow the Court to rule on issues pertaining to evidence in advance of trial in order to avoid delay and ensure an even-handed and expeditious trial. *See Ind. Ins. Co. v. Gen. Elec. Co.,* 326 F.Supp.2d 844, 846 (N.D.Ohio 2004) (citing *Jonasson v. Lutheran Child & Family Servs.,* 115 F.3d 436, 440 (7th Cir.1997)).

Courts, however, are generally reluctant to grant broad exclusions of evidence *in limine,* because "a court is almost always better situated during the actual trial to assess the value and utility of evidence." *Koch v. Koch Indus., Inc.,* 2 F.Supp.2d 1385, 1388 (D.Kan.1998); *accord Sperberg v. Goodyear Tire & Rubber Co.,* 519 F.2d 708, 712 (6th Cir.1975). A court should not make a ruling *in limine* unless the moving party meets its burden of showing that the evidence in question is clearly inadmissible. *Ind. Ins. Co.,* 326 F.Supp.2d at 846; *Koch,* 2 F.Supp.2d at 1388.

## II. ANALYSIS

### A. Plaintiff's Motion *in Limine*

During discovery in this case, Tyco produced to Plaintiff a document entitled "Memorandum for Record." Baurhyte testified that he prepared the Memorandum for Record to describe the reasons why he was planning to terminate Plaintiff's employment. (Baurhyte Deposition[1] at 37-42.) Plaintiff requests an order prohibiting admission of the Memorandum based on hearsay and on lack of any exception to the hearsay rule.

### 1. Hearsay

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Under Fed.R.Evid. 802, hearsay evidence is inadmissible. Plaintiff argues that because

Defendant proffered the Memorandum for Record to establish the truth of the information therein, *i.e.,* that Plaintiff was terminated for reasons other than his age, it is inadmissible hearsay. Defendants, however, contend that the Memorandum is evidence of Baurhyte's state of mind at the time he recommended Plaintiff's termination, and is therefore, not inadmissible hearsay. This Court agrees.

**\*2** Defendants submit this document to show that they had a legitimate basis for believing Plaintiff's performance warranted termination. The jury need not determine that Baurhyte was correct in his assessment of Plaintiff's performance; it need only determine that Defendants' asserted reason for the discharge is not a mere pretext for discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); Pesterfield v. Tennessee Valley Authority, 941 F.2d 437, 442 (6th Cir.1991). See also Jones v. Los Angeles Cmty. Coll. Dist., 702 F.2d 203, 205 (9th Cir.1983)* (unsatisfactory service notices introduced by employer in employment discrimination case were not hearsay because offered to show proper motive for termination); *Moore v. Sears, Roebuck & Co., 683 F.2d 1321, 1322 (11th Cir.1982)* (internal corporate memoranda prepared by employee's supervisors were not hearsay in age discrimination case when offered not to prove employee's poor performance, but to prove that employer thought his performance was poor).

Accordingly, Plaintiff has failed to show that the Memorandum for Record is clearly inadmissible. Therefore, the Court **DENIES** Plaintiff's request to exclude the Memorandum for Record as hearsay. The Court will, however, entertain a limiting instruction related to the Memorandum for Record if Plaintiff submits one with his proposed jury instructions.

### 2. Business Records Exception to Hearsay

Even if the Memorandum for Record were considered hearsay, it would still be admissible under an exception to the general prohibition against the use of hearsay evidence if a proper foundation is laid. *See, generally,* Fed.R.Evid. 803 ("Hearsay exceptions are provided in the evidentiary rules for certain situations when it is believed that the out-of-court statement has sufficient indicia of reliability such that the protection provided by the hearsay rule is unnecessary."). Fed.R.Evid. 803(6) provides an exception to the hearsay rule for:

A memorandum ... of acts [or] events ... made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, ... all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

The proponent of an alleged business record must lay a foundation for its admissibility through the testimony of a qualified witness. In this Circuit, this involves showing that (1) the record was made in the course of a regularly conducted business activity; (2) the record was kept in the regular course of that business; (3) the regular practice of that business was to have made the record; and (4) the record was made by a person with knowledge of the transaction or from information transmitted by a person with knowledge. *United States v. Fawaz, 881 F.2d 259, 266 (6th Cir.1989)* (citing *Redken Lab. v. Levin, 843 F.2d 226, 229 (6th Cir.1988)*).

**\*3** In the Sixth Circuit, "the standard for knowledge required of a foundation witness is very liberal ... 'all that is required is that the witness be familiar with the record keeping system.' " *United States v. Selby,* Nos. 93-1424, 93-1451, 93-1455, 1994 U.S.App. LEXIS 21293, \*26-27, 1994 WL 416262 (6th Cir. Aug.8, 1994) (quoting *United States v. Hathaway,* 798 F.2d 902, 906 (6th Cir.1986)). A witness does not need to have personal knowledge of the record in order to lay a proper foundation for its admissibility. *United States v. Skeddle,* 981 F.Supp. 1069, 1072 (N.D.Ohio 1997) (citing *United States v. Sachs,* 801 F.2d 839, 843 (6th Cir.1986)). Rather, the witness's lack of personal knowledge goes to the credibility that should be accorded that witness's testimony. *Id.* (citing *Sachs,* 801 F.2d at 843).

Accordingly, if Defendants wish this record to be admitted under the business records exception to the hearsay rule, they may ask to do so at trial once they have laid a proper foundation.

### B. Defendants' Motion *in Limine*

#### 1. Baurhyte's remarks about the age of Plaintiff and other employees

Defendants request an order prohibiting Plaintiff from introducing evidence of "stray remarks" made by Baurhyte

about Plaintiff's age and the age of other Tyco employees. This request is not well taken.

The remarks to which Defendants refer simply cannot be classified as "stray" remarks. Indeed, as this Court noted in its Opinion and Order denying summary judgment in this action, "Plaintiff has offered literally dozens of statements from the decision-makers, Baurhyte and Davis, from which one may infer that Plaintiff's termination 'was motivated at least in part by prejudice against members of the protected group.' *See* [*Johnson v.] Kroger Co.,* 319 F.3d [858,] 865 [ (6th Cir.2003).]" (Doc. # 76 at 16.)

Accordingly, Defendants have failed to show that the evidence is clearly inadmissible. Therefore, the Court **DENIES** Defendants' request to exclude Baurhyte's comments about age.

### 2. "Memorandum for Record"

Defendants request an order preventing Plaintiff from making any reference to Baurhyte's memorandum of April 11, 2006 allegedly being created after April 11, 2006. In its Opinion and Order denying summary judgment in this action, this Court opined that there was no evidence before it showing that the Memorandum's metadata had been manipulated and that Plaintiff's interpretation of that data was inaccurate. Based on this, Defendants now believe that it is inappropriate to solicit testimony related to the possible manipulation of the metadata. This Court disagrees.

Simply because there was no evidence before the Court on summary judgment that indicated the metadata was not accurate does not mean that there is no such evidence. And, if such evidence exists, it would certainly be relevant. *See* Fed.R.Evid. 401. Thus, Defendants have failed to show that this evidence is clearly inadmissible. Accordingly, the Court **DENIES** Defendants' request for an order preventing Plaintiff from making any reference to Baurhyte's Memorandum being created after April 11, 2006.

### 3. Plaintiff's alleged damages

**\*4** Defendants request an order precluding Plaintiff from making any reference to his alleged "damages due to [P]laintiff's failure to provide adequate calculations and documentation of his damages during discovery." Defendants argue that, although "Rule 26(a) requires a party-in addition to providing a calculation of damages-to make 'available for inspection and copying as under Rule 34 the documents or

other evidentiary material ... on which such computation is based,' " Plaintiff failed to provide any calculation. (Doc. # 85 at 7.) Instead, Plaintiff provided only a total amount of his lost wages, his lost 401(k) contributions, his replacement health insurance costs, and his attorney's fees and costs. Defendants contend that because Plaintiff failed to disclose the actual calculations for these damages, Rule 37(c)(1) requires exclusion of this evidence at trial, unless such failure was harmless, and in this instance, the failure was not harmless. Defendants' request is not well taken.

The Court concludes that Plaintiff's failure to set forth the actual calculations for his damages was harmless. Indeed, Defendants actually provided most of the information on which the damages are based, *i.e.,* the amount of Plaintiff's back pay and his lost benefits. This situation is easily distinguished from the cases upon which Defendants rely where the calculations were required to be made from documents with which the party had little prior experience. *See e.g.,* Design Strategy, Inc. v. Davis, 469 F.3d 284, 295 (2d Cir.2006) (financial statements about "a project of a type with which the plaintiff had little-to-no prior experience").

Accordingly, Defendants have failed to show that the evidence is clearly inadmissible. Thus, the Court **DENIES** Defendants' request for an order preventing Plaintiff from making any reference to Plaintiff's alleged damages.

### 4. Emotional distress damages

Defendants request an order preventing Plaintiff from making any reference to damages for emotional distress. Defendants argue that, during Plaintiff's deposition, he testified that he did not intend to pursue damages for emotional distress in this action.[2] Plaintiff, however, completed a timely errata sheet that indicated that Plaintiff was confused by the questions from defense counsel and has always intended to pursue emotional damages.

A sister district court has addressed this issue explaining:

Rule 30(e) [of the Federal Rules of Civil Procedure] governs changes to deposition transcripts.... Rule 30(e) is not necessarily limited only to corrections of errors made in transcribing the deponent's testimony. *Compare* Greenway v. Int'l Paper Co., 144 F.R.D. 322, 325 (W.D.La.1992) (disallowing any changes to depositions other than transcription errors) with *Innovative Mktg. & Tech., L.L. C. v. Norm Thompson Outfitters, Inc. ,* 171 F.R.D. 203, 205 (W.D.Tex.1997) (rejecting defendants'

argument that Rule 30(e) only allows "the correction of stenographer/court reporter typographical errors," calling "such a reading of the rule ... too narrow"). On the other hand, Rule 30(e) does not "allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all [*sic*] then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination." *Greenway,* 144 F.R.D. at 325.

**\*5** *Porter v. Hamilton Beach/Proctor-Silex, Inc.,* Case No. 01-2970-MaV, 2003 U.S. Dist. LEXIS 14089, at \*8-9, 2003 WL 21946595 (W.D.Tenn. July 28, 2003).

In this case, the errata sheet provided by Plaintiff alters what he said under oath about emotional damages. Indeed, defense counsel asked the question in several different ways and, Plaintiff's counsel was given the opportunity to rehabilitate Plaintiff and he still testified that he did not intend to pursue emotional damages. However, Defendants' request to exclude evidence of emotional damages is more a motion for judgment on the pleadings or for summary judgment on the issue of emotional damages than it is a motion *in limine.* The time for filing such dispositive motions has long closed and Defendants cannot evade this Court's deadlines simply by captioning its dispositive motion in a creative manner. *See Mavrinac v. Emergency Med. Ass'n of Pittsburgh,* No. 04-1880, 2007 WL 2908007, at \*1 (W.D.Pa. Oct.2, 2007)* ("Motions *in limine* are inappropriate vehicles to seek a final determination with respect to a substantive cause of action, and should not be used as a substitute for a motion for summary judgment ."); *Natural Res. Def. Council v. Rodgers,* No. CIV-S-88-1658, 2005 WL 1388671, at \*1 n. 2 (E.D.Cal. June 9, 2005)* ("Motions *in limine* address evidentiary questions and are inappropriate devices for resolving substantive issues." (also collecting authority supporting proposition)); *Pivot Point Int'l, Inc. v. Charlene Prods., Inc.,* No. 90 C 6933, 1996 WL 284940, at \*4 (N.D.Ill. May 23, 1996)* ("A motion *in limine* is not a substitute for a motion for summary judgment.").

Thus, this Court **DENIES** Defendants' request for an order preventing Plaintiff from making any reference to Plaintiff's alleged emotional damages, and instead **STRIKES** the portion of the errata sheet which pertains to emotional damages. The Sixth Circuit has instructed that, in cases of shaky evidence, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" such evidence, not exclusion. *Doe v. Claiborne County,* 103 F.3d 495, 515 (6th Cir.1996)* (citation and quotation marks omitted).

### 5. Expert testimony
Defendants request an order precluding Plaintiff from offering the testimony of any expert witness; however, Plaintiff responds that he does not intend to call any expert witness. Consequently, the Court **DENIES as MOOT** Defendants' request.

### 6. Other Tyco employees
Defendants request an order prohibiting Plaintiff from calling as witnesses at trial other Tyco employees who believe that they were subjected to age discrimination. Defendants argue that this type of "me too" evidence should be excluded under Fed.R.Evid. 401 and 403.

The Court concludes that this evidence is relevant, and therefore admissible under Rule 401. In a case that is factually similar to the one *sub judice* the Sixth Circuit explained:

> **\*6** This case is unlike our decision in *Schrand v. Federal Pacific Elec. Co.,* 851 F.2d 152 (6th Cir.1988), where this court did find as irrelevant, evidence of discriminatory comments by certain managers of the defendant-employer. In *Schrand,* an age discrimination case, this court found that the district court had erred in admitting testimony by two employees of a national corporation, that certain managers had informed them that they were being terminated because they were too old. The court found that these statements were not relevant because the manager who made the decision to terminate the plaintiff-employee in the case was not involved in the decision to terminate either of the two witnesses, since neither of the witnesses even worked in the same region as the plaintiff-employee. *Id.* at 156. In finding that there was no evidence to logically or reasonably tie the decision to terminate the plaintiff-employee to the alleged statements of the witnesses, this court noted that "the fact that two employees of a national concern, working in places far from the plaintiff's place of employment, under different supervisors, were allegedly told they were being terminated because they were too old, is simply not relevant...." *Id.* In the present case to the contrary, the racist application was circulated in the CBMC, directly where Robinson worked, and known to at least one of the managers directly involved in her termination. *Robinson v. Runyon,* 149 F.3d 507, 514 (6th Cir.1998). In this action the managers who made the comments were actually

the decision makers. Consequently, the other employees' testimony is certainly relevant.

The question then becomes whether the testimony should be excluded under 403. Fed.R.Evid. 403 permits a court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Unfair prejudice is the "undue tendency to suggest a decision based on improper considerations; it does not mean the damage to a defendant's case that results from legitimate probative force of the evidence." Doe, 103 F.3d at 515 (citation and quotations omitted).

Here, the Court is guided by Sherman v. Chrysler Corp., 47 Fed. Appx. 716 (6th Cir.2002), wherein the appellate court concluded that the district court abused its discretion by excluding the evidence of the other alleged incidents of age discrimination under Rule 403:

> We find that the district court abused its discretion when it determined that jury confusion and wasted time would result from the introduction of evidence relating to alleged discrimination that was not central to the incidents tried to the jury. There was little potential for jury confusion and the evidence of other incidents of discrimination had probative value on the question of whether Chrysler discriminated against Sherman when it denied him promotions to those positions.

*7 Accordingly, Defendants have failed to show that the evidence is clearly inadmissible. Therefore, the Court **DENIES** Defendants' request for an order preventing Plaintiff from calling "me too" witnesses.

### 7. Adequacy of Plaintiff's performance

Defendants request an order precluding Plaintiff from introducing through the testimony of any friends, customers, non-supervisor employees or former employees any opinions regarding the adequacy of Plaintiff's job performance. Defendants argue that, allowing Plaintiff's witnesses to testify regarding Plaintiff's performance would be of no assistance to the fact finder in determining whether Tyco honestly believed that its employment decision was based on performance related considerations. This Court agrees. However, whether Defendants' purported reason for terminating Plaintiff were

a pretext for discrimination is not the only issue that will be placed before the jury.

The jury will first be required to decide whether Plaintiff has set forth a *prima facie* case of discrimination by showing that he was qualified for the position from which he was terminated. (*See* Doc. # 76 at 15: "the Court concludes that Plaintiff has raised a material issue of fact as to whether he is qualified to perform Level IV Installation work.") Consequently, evidence of Plaintiff's job performance is relevant and admissible.

Accordingly, the Court **DENIES** Defendants' request to preclude testimony regarding Plaintiff's past job performance.

### 8. Discriminatory events not previously disclosed

Defendant requests an order preventing Plaintiff from introducing the testimony of any witness or through any documentary evidence incidents of allegedly discriminatory treatment that have not been previously identified by Plaintiff in his deposition:

> Plaintiff was deposed for one full day. Throughout his deposition, defendants' counsel asked plaintiff if he had testified as to everything that led him to believe that he was discriminated against because of his age. Plaintiff will likely attempt to raise new incidents of alleged discriminatory treatment that plaintiff has not previously identified....

(Doc. # 85 at 12.)

Defendants have failed to show that the evidence is clearly inadmissible and this Court **DENIES** Defendants' request to exclude any information about which Plaintiff did not testify on deposition. Much discovery was exchanged after Plaintiff's deposition and before discovery cut-off that is clearly admissible. Again, the Sixth Circuit has expressly noted that in cases of shaky evidence, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" such evidence, not exclusion. Doe, 103 F.3d at 515 (citation and quotation marks omitted).

### 9. Punitive damage evidence

Defendants request an order prohibiting Plaintiff introducing evidence related to punitive damages or to the size, net worth, or financial status of Baurhyte, Davis or Tyco until such time as Plaintiff proves a *prima facie* case for punitive damages.

Bifurcation of this trial lies within the sound discretion of the Court and turns on whether bifurcation would promote convenience and economy or avoid prejudice. *Willits v. Peabody Coal Co.*, 188 F.3d 510, 1999 WL 701916, at *10 (unpublished table decision) (discussing Fed.R.Civ.P. 42(b)).

**\*8** The purported basis for the bifurcation request here is that Plaintiff faces a "formidable burden" in proving he is entitled to punitive damages. This assertion, however, is of no moment in a bifurcation analysis. Further, this Court finds no convenience or economy to bifurcation nor does it find any particular prejudice to Defendants in denying bifurcation.

Accordingly, the Court **DENIES** Defendants' request to bifurcate this action.

### 10. Plaintiff's financial condition

Defendants request an order preventing Plaintiff from introducing any evidence related to his financial condition that is not directly related to his alleged entitlement to back pay, claiming that the information is prejudicial. This Court disagrees.

Fed.R.Evid. 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *See Doe*, 103 F.3d at 515. "Unfair prejudice" means the undue tendency to suggest a decision based on improper considerations; it "does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence." *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir.1993). This Court finds no unfair prejudice in allowing testimony related to the consequences of Plaintiff's termination.

Accordingly, Defendants have failed to show that the evidence is clearly inadmissible. Therefore, the Court

**DENIES** Defendants' request to exclude evidence related to his financial condition.

### 11. Defense counsel

Defendants request an order precluding Plaintiff from mentioning in any way that Defendants' counsel belong to a large firm, or that they are not local attorneys. Plaintiff responds that he does not intend to make any such comments. Consequently, the Court **DENIES as MOOT** Defendants' request.

### 12. Instruction to witnesses from Plaintiff and Plaintiff's counsel

Defendants request an order requiring Plaintiff and his counsel to instruct any witness they may call at trial not to testify or mention in any way the excluded evidence enumerated in paragraphs 1 through 11 above. Although the Court has no reason to believe that Plaintiff's counsel would fail to take this action without an order, the Court **ORDERS** Plaintiff and his counsel to so instruct their witnesses.

## III. CONCLUSION

The Court **DENIES** Plaintiff's Motion *in Limine* (Doc. # 81) and **DENIES IN PART AND DENIES AS MOOT IN PART** Defendants' Motion *in Limine* (Doc. # 84). Further, this Court schedules a **DEPOSITION OBJECTION HEARING** with the parties on **February 26, 2008 at 5:30 p.m.**

**IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2008 WL 343178

### Footnotes

1    The Deposition of Robert Baurhyte is filed at Docket # 63.

2    The Court notes that it has also considered Defendants' supplemental memorandum on this issue. (Doc. # 94.)

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 6026124
Only the Westlaw citation is currently available.
United States District Court,
E.D. California.

Chere D. WARD, an individual, Plaintiff,

v.

Tom VILSAK, Secretary Dept.
of Agriculture, Defendants.

No. 2:10–cv–00376 KJM KJN PS.
|
Dec. 2, 2011.

**Attorneys and Law Firms**

Chere D. Ward, Willows, CA, pro se.

Bobbie J. Montoya, United States Attorney's Office,
Sacramento, CA, for Defendants.

*FINDINGS AND RECOMMENDATIONS*

KENDALL J. NEWMAN, United States Magistrate Judge.

 **\*1** Presently before the court is defendant's Motion for
Summary Judgment (Mot. for Summ. J., Dkt. No. 22–
1) filed pursuant to Federal Rule of Civil Procedure 56,
which seeks the dismissal of plaintiff's "Civil Complaint
Disability Discrimination." (Compl.¶¶ 3–4, Dkt. No. 1.) In
this action, plaintiff Chere D. Ward ("plaintiff") alleges a
disability discrimination claim against defendant Tom Vilsak,
Secretary, Department of Agriculture ("defendant"). (*Id.*)
The claim arises from defendant's rejection of plaintiff's
application for employment with the United States Forest
Service.

The court heard this matter on its law and motion calendar
on October 6, 2011. Attorney Bobbie Montoya appeared
on behalf of defendant at the hearing. Plaintiff appeared
on her own behalf at the hearing. The undersigned has
fully considered the parties' submissions, oral arguments, and
appropriate portions of the record in this case and, for the
reasons that follow, recommends that defendant's motion be
denied.

## I. *BACKGROUND*

### A. *Plaintiff's Complaint*

The operative pleading in this case is plaintiff's complaint for
"Civil Complaint Disability Discrimination." (Compl.¶¶ 3–4,
Dkt. No. 1.) The complaint contains one claim for "disability
discrimination." (*Id.* ¶¶ 17–21.) The complaint suggests that
plaintiff brings her disability discrimination claim pursuant
to Title VII of the Civil Rights Act of 1964. (Compl.¶ 5.)
However, on closer examination and as discussed below,
plaintiff's claim actually proceeds under the Rehabilitation
Act.[1] 29 U.S.C. § 791.

Plaintiff's complaint appends an adverse decision of an
Equal Employment Opportunity Commission Administrative
Judge dated October 20, 2009. (Compl. ¶¶ 14–15 & Exh.
A.) Plaintiff alleges that she exhausted her administrative
remedies prior to bringing this lawsuit, and defendant's
motion does not dispute this fact.

Plaintiff alleges that she has been employed by defendant
since 1984. (*Id.* ¶ 6.) Plaintiff also alleges that, during
the relevant time period, she was employed as a "Forestry
Technician, purchasing agent" by the Department of
Agriculture. (*Id.* ¶ 6 .) Plaintiff alleges that she has a hearing
impairment that requires her to use a hearing aid, and that she
is an "excepted service employee hired under the handicap
program." (*Id.* ¶ 6.)

Plaintiff's claims arise from the denial of her application for a
job. Plaintiff alleges that although she was qualified for, and
applied for, the vacant position of "Forestry Technician, GS–
7" at the Beckworth Ranger District located in Blairdsen,
California, she was not hired for that position (the "Timber
Sale Prep" position). (*Id.* ¶¶ 1, 7–9, 13, 19.) She alleges that
she was subjected to disability discrimination in that she was
not hired due to having a hearing impairment. (*Id.* ¶¶ 1, 18–
20.)

### B. *Defendant's Motion For Summary Judgment*

Defendant makes three arguments in support of summary
judgment. First, defendant argues that plaintiff cannot prove
the second element of her prima facie case: that she was
"otherwise qualified" for the Timber Sale Prep job. (Mot. for
Summ. J. at 10.)

 **\*2** Second, defendant argues that plaintiff cannot prove
the third element of her prima facie case: that she was not

2011 WL 6026124

appointed to the Timber Sale Prep position "solely" because of her disability. (*Id.*)

Third, defendant argues that *even if* plaintiff could establish all of the elements of her prima facie case, defendant had legitimate, nondiscriminatory reasons for not hiring plaintiff for the Timber Sale Prep job. Those alleged reasons were plaintiff's poor performance and some "safety issues" that allegedly arose during plaintiff's work detail in the forest. (*Id.*)

Defendant filed a Reply brief ("Reply") in support of its motion. (Reply, Dkt. No. 29.) Therein, defendant reiterated several arguments, but did not raise objections to any of the documentary evidence that plaintiff filed along with her Opposition papers. (*Id.*)

### C. *Plaintiff's Opposition To The Motion*

#### 1. *Preliminary Issues*

The undersigned addresses three preliminary issues in regards to plaintiff's Opposition brief ("Opposition"). (Oppo., Dkt. No. 28.) First, plaintiff attempted to raise brand-new claims in her Opposition (i.e., for "emotional distress and negligent misrepresentation," and "intentional interference with prospective employment contracts"), but her original pleading fails to even hint at these claims. (*Compare* Dkt. No. 1 (Compl.) *with* Dkt. No. 28 (Oppo.).) As discussed during the hearing, these newly raised claims will not be considered at this procedural posture.

Second, plaintiff filed her Opposition one day late. Defendant flagged this issue in a footnote in the Reply brief, but did not argue that the delayed filing caused any prejudice. (Reply at 1.) During the hearing, the undersigned reminded plaintiff of the need to comply with the court's rules and procedural deadlines, and informed her that any failure to do so in the future would subject her to sanctions.

Third, Eastern District Local Rule 260(a) requires that "[e]ach motion for summary judgment or summary adjudication be accompanied by a 'Statement of Undisputed Facts' that shall enumerate discretely each of the specific material facts." The opposition is required to reproduce the itemized facts and admit or deny such facts with reference to evidence. E. Dist. Local Rule 260(a). The opposing party may also file a concise "Statement of Disputed Facts," and the source(s) thereof in the record, of all additional material facts as to which there is a genuine issue precluding summary judgment or adjudication. E. Dist. Local Rule 260(b). The Local Rule's

requirements seek to avoid requiring courts to stitch together from voluminous briefs precisely which are disputed versus undisputed facts and speculate thereto.

Plaintiff's Opposition neither reproduced defendant's Statement of Undisputed Facts nor included a concise Statement of Disputed Facts. However, the textual body of the Opposition both addressed some of the facts described in defendant's filing and introduced some additional facts. (Oppo. at 9–12.) As described below, plaintiff also attached pages of documentary "evidence" to her Opposition, but nowhere did she clearly link any particular fact to any particular supporting evidence.

**\*3** Plaintiff filed 113 pages of "evidence" with her Opposition brief. (Oppo. at 13–146.) None of this evidence was authenticated.[2] One central piece of that evidence is a letter from a vocational nurse confirming that plaintiff was indeed capable of performing the outdoor portion of the Timber Sale Prep job with the "reasonable accommodation" of an "alternative listening device, such as a two-way radio microphone attached to [plaintiff's] lapel." (Exh. A to Oppo. (page number "150"[3]) (Letter from Sharon O'Sullivan, Senior Vocational Rehabilitation Counselor, MS, RN, CRC, dated Oct. 14, 2008 (the "O'Sullivan Letter")).)

If authentic, the O'Sullivan Letter suggests that, at minimum, a dispute of material fact exists regarding whether plaintiff was capable of performing the essential functions of the job in question. However, defendant did not raise any evidentiary objections to the O'Sullivan Letter or to the rest of plaintiff's evidence. Defendant did not raise any evidentiary objections in its Reply briefing or during the hearing. Fed.R.Civ.P. 56(c)(1)(B) ("A party asserting that a fact cannot be ... genuinely disputed must support the assertion by: [ ... ] showing that the materials cited do not establish the ... presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.") "Defects in evidence submitted in opposition to a motion for summary judgment are waived absent a motion to strike or other objection." *Hoye v. City of Oakland*, 653 F.3d 835, 841 (9th Cir.2011) (quoting *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 485–86 (9th Cir.1991)); *Getz v. Boeing Co.*, 654 F.3d 852, 868 (9th Cir.2011) ("[B]y failing to object to or otherwise challenge the introduction of the [evidence] in the district court, [appellants] have waived any challenge on the admissibility of this evidence."). Federal Rule 56(c)(3) provides that the court "may" consider materials in the record that were not specifically cited by either party. Accordingly, and given the

2011 WL 6026124

circumstance that defendant did not object to any of plaintiff's proffered evidence, the undersigned has considered some of that evidence as described specifically herein. Pursuant to Federal Rule 56(e)[4], and solely for purposes of the pending motion, the undersigned will accept the O'Sullivan Letter (Exh. A to Oppo. (page number "150")), as evidence that plaintiff was potentially capable of performing the job with a reasonable accommodation.[5]

In sum, despite plaintiff's failures to strictly comply with the court's orders and the applicable procedural rules, the undersigned will resolve defendant's motion on the merits.[6]

### 2. *Plaintiff's Arguments In Opposition To Summary Judgment*

In terms of substantive arguments, Plaintiff argues that she was "qualified" for the Timber Sale Prep job and provides letters of recommendation and good work reviews arising from her prior positions, as well as the O'Sullivan Letter. (Compl. at 4, 6, 9, 11 (describing plaintiff's work experience and positive reviews); Exh. A to Oppo. (letter dated October 12, 1989 re: "1989 OHV Certificate of Appreciation" to Chere Ward); Exh. A to Oppo. (two letters dated February 1, 1989 re: "6140 Awards" to Chere Ward); Exh. A to Oppo. (letter dated November 2, 1988 from Forest Supervisor and District Ranger re: certificate of merit to Chere Ward); Exh. A to Oppo. (letter dated November 2, 1988 from Assistant Recreation Officer re: "Certificate of Merit/Cash Award— [ ... ] Chere Ward); Exh. A to Oppo. (Letter of Commendation dated May 30, 1980 from District Ranger to Chere Ward); Exh. A to Oppo. (Letter of recommendation re: Chere Ward dated September 3, 1997, signed by Resource Officer Karen Fortus); O'Sullivan Letter, Exh. A to Oppo., (page "150").)

**\*4** Plaintiff also argues that her former supervisor, Dave Helton ("Helton"), harbored "ill will" toward her because she was a "hearing impaired person," and that Helton lied about two "safety" incidents supposedly involving plaintiff. (Compl. at 3–6 .) Plaintiff argues that she was not hired because of these alleged misrepresentations about safety incidents in her work history. (Compl. at 10–11.)

Plaintiff does not squarely address defendant's second argument, that her application was not rejected "solely" because of her disability.

While plaintiff does not squarely address defendant's third argument, that it had "legitimate nondiscriminatory reasons" for not hiring her, plaintiff does raise various "pretext" arguments. (Oppo. at 3, 5–7, 11 (arguing Helton's false, animus-driven report to Parker was the only reason plaintiff was not hired).) Plaintiff argues that Helton did not document any alleged safety incidents in writing or otherwise approach her about safety issues. (*Id.* at 5–7.) Plaintiff also argues that one of the two safety "incidents" actually involved a completely different female employee, Karen Sheets, who confirmed her involvement in this incident via email to plaintiff. (Oppo. at 11 ("plaintiff never had any experience of accidents or near misses ... it was another detailer from TEAMS, Karen Sheets, who had the accident."); Exh. D to Oppo. (email from Karen Sheets dated October 9, 2008 at 11:20 a.m. ("Dave Helton may have gotten one of the incidents he was talking about mixed up between you and me. I know that I did get too close to the equipment one time only, but I never heard that you did.")); Exh. D to Oppo. (email from Karen Sheets dated January 7, 2009 at 1:42 p.m. (the near-miss incident "was between 8/24/05 and 9/15/05").)

### D. *Undisputed Facts*

### 1. *Plaintiff Applies For The Timber Sale Prep Job*

It is undisputed that plaintiff is an individual with a "disability" under the ADA and Rehabilitation Act. (Mot. for Summ. J. at 6 ("Defendant does not dispute the disabled status of the plaintiff under the Rehabilitation Act."); Defendant's Statement of Undisputed Facts ("SUF") ¶¶ 2–4.) It is also undisputed that, prior to applying for the Timber Sale Prep position, plaintiff had been employed in various United States Forest Service positions and had worked various "details" as part of those positions. (SUF ¶¶ 6–8.) It is undisputed that Helton was plaintiff's former supervisor, and that plaintiff listed him as a reference in her application to the Timber Sale Prep position. (SUF ¶¶ 9, 20.)

Angela Parker ("Parker"), the decision-maker with respect to hiring for the open Timber Sale Prep position, contacted Helton to inquire about plaintiff. (SUF ¶¶ 18–19.) Parker spoke telephonically with Helton on June 11, 2008, and later that same day they corresponded via email. (SUF ¶¶ 21–23; Declaration of Angela Parker ("Parker Decl.") Dkt. No. 23, ¶¶ 8–10; Exhs. A–B to Parker Decl.; pages "240" and "239" of Exh. B of plaintiff's supporting evidence; Exhs. E–F to plaintiff's deposition.)[7] These communications centered on plaintiff's safety record and prior performance of her detail under Helton. (SUF ¶¶ 21–23; Parker Decl. ¶¶ 8–10; Exhs. A–B to Parker Decl.)

**\*5** Helton told Parker that plaintiff had some close calls in terms of safety incidents while working in the woods. (SUF ¶¶ 22–24; Exhs. A–B to Parker Decl.) Helton told Parker that plaintiff's detail was terminated early due to "safety issues," that plaintiff's "lack of hearing was a big safety issue," that plaintiff had "a few instances involving personal safety," and that "the district was extremely [concerned] about her hearing ability as she was working around logging equipment where hearing is extremely important." (SUF ¶ 21–24; Parker Decl. ¶¶ 9–10; Exhs. A–B to Parker Decl.) Parker declared that Helton told her that plaintiff had "attendance issues," a "hard time" learning, that she was "not qualified" for a timber sale position, and that she had "limited woods skills." (SUF ¶ 23; Parker Decl. ¶¶ 9–10; Exhs. A–B to Parker Decl.)

### 2. *Plaintiff Is Denied The Timber Sale Job*
On June 11, 2008, the same day after Parker spoke with Helton, Parker contacted plaintiff via email and told plaintiff that she would not be hired. (SUF ¶ 25; Exh. C to Parker Decl.) Parker's email to plaintiff explained that plaintiff's previous safety issues while working in the woods meant that Parker could not support plaintiff for the Timber Sale Prep position. (SUF ¶ 25; Exh. C. to Parker Decl.) Parker explained that, "due to the nature of the ... Sales Prep position, the dangerous nature of the working conditions and the requirements of the target grade of working alone, I can not support moving you into that position." (SUF ¶ 25; Exh. C. to Parker Decl.) In her email to plaintiff, Parker framed her decision as turning entirely on a "safety issue," and reiterated that "I am responsible for the safety of my employees. I take this responsibility very seriously." (Exh. C. to Parker Decl.)

## II. *LEGAL STANDARDS*

### A. *Summary Judgment*
Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." It further provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).[8] A shifting burden of proof governs motions for summary judgment under Rule 56. *Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.),* 627 F.3d 376, 387 (9th Cir.2010). Under summary judgment practice, the moving party

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting then-numbered Fed.R.Civ.P. 56(c)). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.,* 627 F.3d at 387 (citing *Celotex Corp.,* 477 U.S. at 325); *see also* Fed.R.Civ.P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").

**\*6** If the moving party meets its initial responsibility, the opposing party must establish that a genuine dispute as to any material fact actually exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To overcome summary judgment, the opposing party must demonstrate the existence of a factual dispute that is both material, i.e., it affects the outcome of the claim under the governing law, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.,* 618 F.3d 1025, 1031 (9th Cir.2010), and genuine, i.e., " 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' " *FreecycleSunnyvale v. Freecycle Network,* 626 F.3d 509, 514 (9th Cir.2010) (quoting *Anderson,* 477 U.S. at 248). A party opposing summary judgment must support the assertion that a genuine dispute of material fact exists by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[9] Fed.R.Civ.P. 56(c)(1)(A)-(B). However, the opposing party "must show more than the mere existence of a scintilla of evidence." *In re Oracle Corp. Sec. Litig.,* 627 F.3d at 387 (citing *Anderson,* 477 U.S. at 252).

In resolving a motion for summary judgment, the evidence of the opposing party is to be believed. *See Anderson,* 477 U.S. at 255. Moreover, all reasonable inferences that may be drawn from the facts placed before the court must be viewed in a light most favorable to the opposing party. *See Matsushita,* 475 U.S. at 587; *In re Oracle Corp. Sec. Litig.,* 627 F.3d at 387. However, to demonstrate a genuine factual dispute, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (citation omitted). Conclusory, nonspecific statements in affidavits are not sufficient for summary judgment, and "missing facts" will not be "presumed." *Sullivan v. Dollar Tree Stores, Inc.,* 623 F.3d 770, 779–80 (9th Cir.2010) (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).)

**B.** *The Rehabilitation Act*

The Rehabilitation Act prohibits employment discrimination on the basis of disability. 29 U.S.C. §§ 791 *et seq.* Section 501 of the Rehabilitation Act (29 U.S.C. § 791) expressly invokes the substance of the Americans with Disabilities Act (the "ADA"). *Id.* (incorporating 42 U.S.C. §§ 12111 et seq.). The Ninth Circuit Court of Appeals looks to the standards applied under the ADA to determine whether a violation of the Rehabilitation Act occurred in the federal employment context. *Lopez v. Johnson,* 333 F.3d 959, 961 (9th Cir.2003) ("Section 501 borrows its substantive standards from the Americans with Disabilities Act (ADA) .") (citing 29 U.S.C. § 791(g)); *accord Coons v. Sec'y of the U.S. Dept. of Treasury,* 383 F.3d 879, 884 (9th Cir.2004) ("The standards used to determine whether an act of discrimination violated the Rehabilitation Act are the same standards applied under the Americans with Disabilities Act"); *accord Walton v. U.S. Marshals Serv.,* 492 F.3d 998, 1003 n. 1 (9th Cir.2007) (citing *Coons* ).[10]

**C.** *Burden Shifting*

**1.** *Plaintiff's Burden To State A Prima Facie Case Under The Rehabilitation Act*

**\*7** Making a prima facie showing of employment discrimination is not an onerous burden. *Snead v. Metro. Prop. & Cas. Ins. Co.,* 237 F.3d 1080, 1091 (9th Cir.2001) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). To state a prima facie

case under 29 U.S.C. § 791 (a.k.a., "Section 501")[11] of the Rehabilitation Act, a plaintiff must "demonstrate that (1) she is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered discrimination because of her disability." *Walton,* 492 F.3d at 1005; *Reynolds v. Brock,* 815 F.2d 571, 573–574 (9th Cir.1987). A plaintiff must demonstrate that her disability was a motivating factor behind the discrimination. 29 U.S.C. § 791(g) (adopting standards for Americans with Disabilities Act for claims under § 501 of the Rehabilitation Act, including 42 U.S.C. § 12112, which prohibits discrimination "against a qualified individual with a disability **because of** the disability ...." (emphasis added)).

**2.** *The Burden Shifts To Defendant To Offer Legitimate Nondiscriminatory Reasons Supporting The Rejection Of Plaintiff's Application*

Once a prima facie case has been made, the burden shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the action. *Reynolds,* 815 F.2d at 574; *Lucero v. Hart,* 915 F.2d 1367, 1371 (9th Cir.1990); *Wilborn v. Ashcroft,* 222 F.Supp.2d 1192, 1206–07 (S.D.Cal.2002) (applying McDonnell Douglas burden-shifting framework to disability discrimination claim under Rehabilitation Act).

**3.** *The Burden Shifts Back To Plaintiff To Show The Proffered Reasons Were Pretextual*

If defendant articulates a legitimate, non-discriminatory reason for the action, the burden then shifts back to the plaintiff to produce evidence showing that the reason offered by the defendant is pretextual. *Smith v. Barton,* 914 F.2d 1330, 1339 (9th Cir.1990) (applying McDonnell Douglas framework for Title VII discrimination claims to discrimination claim brought under ADA); *Mustafa v. Clark Cnty. Sch. Dist.,* 157 F.3d 1169, 1175 n. 6 (9th Cir.1998); *Wilborn,* 222 F.Supp.2d at 1206–07 (applying McDonnell Douglas burden-shifting framework to disability discrimination claim under Rehabilitation Act). A plaintiff "may demonstrate pretext either directly by persuading the court that a discriminatory reason likely motivated [the defendant] or indirectly by showing that [the defendant's] proffered explanation is unworthy of credence." *Diaz v. Eagle Produce Ltd. P'ship,* 521 F.3d 1201, 1212 (9th Cir.2008) (citation and quotation marks omitted) (applying McDonnell Douglas burden-shifting framework to claim under the Age Discrimination in Employment Act).

**III.** *DISCUSSION*

A. *Defendant's First Argument: Plaintiff Cannot Prove The Second Element Of Her Prima Facie Case, Namely, That She Was "Qualified" For The Job*

1. *"Qualified"*

As part of her prima facie case of disability discrimination, a plaintiff bears the burden of proving that she is "qualified" for the position in question. *Bates v. United Parcel Service, Inc.,* 511 F.3d 974, 990–91 (9th Cir.2007) (en banc). Section 501 expressly incorporates the ADA, including the ADA's definition of a "qualified individual." 29 U.S.C. § 791(g) (incorporating 42 U.S.C. §§ 12111 et seq.); 42 U.S.C. § 12111(8) (defining "qualified individual"). "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (incorporated into Section 501 of Rehabilitation Act at 29 U.S.C. § 791(g)); 29 C.F.R. § 1630.2(m).

**\*8** The statutory definition of "qualified" is in accord with the definition used in decisions addressing disability discrimination. Courts have clarified that "otherwise qualified" means that the plaintiff "can perform 'the essential functions' of the job in question," either with or without reasonable accommodations. *Sch. Bd. of Nassau Cnty., Fla. v. Arline,* 480 U.S. 273, 288 n. 17, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (citing 45 C.F.R. § 84.3(k)); *accord Chalk v. U.S. Dist. Court Cent. Dist. of Cal.,* 840 F.2d 701, 705 (9th Cir.1988) (quoting *Arline* ); *Humphrey v. Mem'l Hosp. Ass'n,* 239 F.3d 1128, 1135 (9th Cir.2001) (A qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.") (citing 42 U.S.C. § 12111(8)).) "When a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any 'reasonable accommodation' by the employer would enable the handicapped person to perform those functions." *Arline,* 480 U.S. at 288 n. 17.

The Ninth Circuit Court of Appeals has described qualification for a position as involving a two-step inquiry. *Bates,* 511 F.3d at 990. The court must first examine whether the individual satisfies the "requisite skill, experience, education and other job-related requirements" of the position. *Id.* The court then considers whether the individual "can perform the essential functions of such position" with or without a reasonable accommodation. 29 C.F.R. § 1630.2(m);

42 U.S.C. § 12111(8); *see Humphrey v. Mem'l Hosp. Ass'n,* 239 F.3d 1128, 1135 (9th Cir.2001).

The Ninth Circuit Court of Appeals has further clarified the definitions of "qualified" and "essential functions" in the summary judgment context. In *Bates,* 511 F.3d at 990–91, the court analyzed the term "qualified" under the ADA and explained:

> To prove that he is "qualified," the applicant also must show that he can perform the "essential functions" of the job. 42 U.S.C. § 12111(8). [Citations.] As noted earlier, **a job's "essential functions" are "fundamental job duties of the employment position ... not includ[ing] the marginal functions of the position."** 29 C.F.R. § 1630.2(n)(1); see also *id.* § 1630.2(n)(2)-(3) (elaborating on reasons and evidence relevant to an essential function showing). **"Essential functions" are not to be confused with "qualification standards," which an employer may establish for a certain position.** Whereas "essential functions" are basic "duties," 29 C.F.R. § 1630.2(n)(1), "qualification standards" are "personal and professional attributes" that may include "physical, medical [and] safety" requirements. *Id.* § 1630.2(q). The difference is crucial.

> [ ... ]

> **Although the plaintiff bears the ultimate burden of persuading the fact finder that he can perform the job's essential functions, we agree with the Eighth Circuit's approach that "an employer who disputes the plaintiff's claim that he can perform the essential functions must put forth evidence establishing those functions."** *EEOC v. Wal–Mart,* 477 F.3d 561, 568 (8th Cir.2007). The genesis of this rule is the recognition that "much of the information which determines those essential functions lies uniquely with the employer." *Benson v. NW. Airlines, Inc.,* 62 F.3d 1108, 1113 (8th Cir.1995). In addition, the ADA and implementing regulations direct fact finders to consider, among other things, "the employer's judgment as to what functions of a job are essential," 42 U.S.C. § 12111(8); job descriptions prepared before advertising or interviewing applicants, *id.;* "[t]he amount of time spent on the job performing the function," 29 C.F.R. § 1630.2(n)(3)(iii); "[t]he consequences of not requiring the [applicant or employee] to perform the function," *id.* § 1630.2(n)(3)(iv); and the work experience of current and former employees. *Id.* § 1630.2(n)(3)(vi), (vii). **Thus, to the extent that an employer challenges an ADA plaintiff's claim that**

he can perform the job's essential functions, we think it appropriate to place a burden of production on the employer to come forward with evidence of those essential functions. [Citations.]

*9 *Bates, 511 F.3d at 990–91* (footnote and citations omitted) (emphasis added); *Scott v. City of Yuba City, 2009 WL 4895549, at *8–9 (E.D.Cal. Dec.11, 2009)* (unpublished) (applying *Bates* at summary judgment and explaining that the court in *Bates* held that "the employer bears the "burden of production ... to come forward with evidence of [the] essential functions. Determination of essential functions is a question of fact. [Citation.] Once these functions have been identified, the plaintiff bears the burden of showing that he can perform them, either with or without accommodation." (citing 42 U.S.C. § 12111(8)).[12] "The determination of essential functions is a factual finding we review for clear error." *Bates, 511 F.3d at 991 n. 7.* "A highly fact-specific inquiry is necessary to determine what a particular job's essential functions are." *Cripe v. City of San Jose, 261 F.3d 877, 888 n. 12 (9th Cir.2001).*

2. *Whether Plaintiff Was "Otherwise Qualified" Depends On The Job's "Essential Functions"*

While the court in *Bates* described a two-step analysis for determining whether a plaintiff is "otherwise qualified" for a given position, here defendant's argument (Mot. for Summ. J. at 6–8; Reply at 2–3) focuses solely on the second step: plaintiff's inability to perform the "essential functions" of the position. *Bates, 511 F.3d at 990.* Therefore, following the approach used in *Bates,* the undersigned turns to the job's essential functions. *See id.; see also Scott, 2009 WL 4895549, at *8–9* ("[b]ecause defendant here does not otherwise argue" the issues pertaining to the first step of the two-step analysis described in *Bates,* the "court turns to essential functions"— the second step of the analysis).

To prove that she is qualified for the job in question, plaintiff must "show that [she] can perform the 'essential functions' of the job'," either with or without reasonable accommodation. *See Bates, 511 F.3d at 990.* However, as discussed above, it is the defendant's burden to come forward with evidence of what are these "essential functions," and here defendant did not do so. *See id . at 990–91.*

a. *Plaintiff Has Offered Evidence That She Was "Qualified"*

Plaintiff has supplied evidence that she was able to perform the outdoor duties of the position in question. As described

above, plaintiff has submitted a letter from a vocational nurse, the O'Sullivan Letter, confirming that plaintiff could perform the outdoor portions of the Timber Sale Prep job with the "reasonable accommodation" of an "alternative listening device, such as a two-way microphone attached to [plaintiff's] lapel." (O'Sullivan Letter, Exh. A to Oppo. (page "150").)[13] As noted above, defendant did not object to this evidence within its Reply brief or during the hearing. It is unclear what job description(s), if any, the vocational nurse reviewed prior to drawing her conclusions about plaintiff's abilities, but the letter nonetheless reflects a question of material fact regarding plaintiff's ability to perform the outdoor portions of job in question. The outdoor portions of the job are the very portions defendant argues plaintiff was not qualified to perform. (Mot. for Summ. J. at 7–8 (focusing on plaintiff's experience with work "in the forest"); Reply at 4–5 (describing plaintiff's "lack of woods savvy" as rendering her unqualified and motivating Parker's decision).) The O'Sullivan Letter directly conflicts with defendant's arguments that plaintiff's hearing abilities caused safety issues that rendered her unqualified for the Timber Sale Prep position.[14]

*10 In sum, plaintiff has produced evidence that, at least in the opinion of a vocational counselor, plaintiff was physically capable of performing the portion of the job, with a reasonable accommodation, upon which defendant's motion focuses— the job's outdoor or "woods" portion. (O'Sullivan Letter, Exh. A to Oppo., (page "150").) This evidence is not the end of the inquiry, however, as it is plaintiff's burden to show that she was capable of performing all of the job's "essential functions," not just that she could perform a major portion of the job. *See Bates, 511 F.3d at 990.*

b. *Defendant Has Not Defined The Job's "Essential Functions"*

With regard to the job's "essential functions," it is unclear whether plaintiff could perform all such functions in this particular case, because defendant did not substantiate those functions within its moving papers or supporting documents. *See Bates, 511 F.3d at 990–91* ("[T]o the extent that an employer challenges ... plaintiff's claim that he can perform the job's essential functions, we think it appropriate to place a burden of production on the employer to come forward with evidence of those essential functions.")

During the hearing, when asked about the job's "essential functions," defendant's counsel directed the court to the

general text of the job description for the Timber Sale Prep position. It is true that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S .C. § 12111(8). However, the record contains *two different* lengthy job descriptions both bearing the code "GS–462–07"—and it is unclear which of these actually governed the position when plaintiff applied. (*Compare* Exh. A to Pl.'s Depo. *with* Exh. B to Oppo. at 1–3.)[15]

Moreover, while a job description may be evidence of a job's essential functions, "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description." *Rohr v. Salt River Project Agric. Imp. & Power Dist.,* 555 F.3d 850, 864 (9th Cir.2009) (quoting *Cripe,* 261 F.3d at 887). Thus, "[w]here there is 'conflict in the evidence regarding the essential functions of [a position], we conclude that there is a factual dispute ... notwithstanding the job descriptions that [an employer] has prepared.' " *Id.* (quoting *Cripe,* 261 F.3d at 888–89).

While defendant proffers evidence that Parker rejected plaintiff's application because "the Timber Sale Preparation position ... would entail working around logging equipment, working alone, and working on steep, rocky ground" (Parker Decl. ¶ 11), defendant does not clarify whether these were the position's "essential functions" rather than tasks that would be performed infrequently. *See Bates,* 511 F.3d at 990. The undersigned will not simply assume that Parker's mention of these three job duties constitutes a list of the job's core "essential functions" given that judgment as a matter of law hangs in the balance. As plaintiff persuasively notes in her Opposition, "there is no mention in the job description that requires employee to have excellent hearing or that states that they would be working alone." (Oppo. at 12.) Although consideration is given to the employer's view as to the essential job functions, without more this order cannot conclusively decide whether the three duties stated above were necessarily "essential" job functions. *See Lazcano v. Potter,* 468 F.Supp.2d 1161, 1167–68 (N.D.Cal.2007) (holding that "[t]he government's assertion that delivering mail and casing mail were essential job functions 'does not qualify as an undisputed statement of fact in the context of a motion for summary judgment' ") (citing *Mustafa,* 157 F.3d at 1175 n. 6); *Reese v. Barton Healthcare Sys.,*

693 F.Supp.2d 1170, 1182–83 (E.D.Cal.2010) (applying *Lazcano* and *Mustafa* and finding a genuine issue of material fact existed regarding job's essential functions). Because defendant did not meet its burden of producing evidence of the job's actual essential functions, plaintiff's hands are somewhat tied: she cannot present evidence that she had the ability to perform the job's "essential functions" because defendant has not identified those functions. *See Bates,* 511 F.3d at 990–91. Further, there is evidence that plaintiff's vocational counselor believed plaintiff capable of performing *all* outdoor portions of the job if reasonable accommodations were provided. (O'Sullivan Letter, Exh. A to Oppo., (page "150").) Accordingly, a genuine issue of material fact exists with respect to whether plaintiff could perform the "essential functions" of the Timber Sales position.[16]

c. *The Undersigned Cannot Find As A Matter Of Law That Plaintiff's Work History Renders Her Unqualified*

**\*11** Finally, while defendant argues that plaintiff cannot show that she was "qualified" for the Timber Sale Prep position because she lacked sufficient experience and skill as a matter of law, this argument is not well-taken. (*E.g.,* Reply at 2–3.) To support this argument, defendant dissects plaintiff's resume and argues that "the extent of [plaintiff's] presale experience ... consisted of a total of approximately five months and two weeks over a 13–year period ... and occurred more than 17 years prior to Ms. Parker's consideration of [plaintiff] for the Timber Sale Preparation position." (Reply at 3.) Defendant also argues that, because plaintiff "had not worked in the forest" since July 2005, her forest "skills could not have improved since then." (*Id.*) Defendant notes that "all of [plaintiff's] permanent positions for the [United States Forest Service] had been in business management, purchasing/contracting, and administration." (*Id.*) Defendant also raises Helton's characterizations of plaintiff's alleged "safety issues" and argues that they rendered plaintiff unqualified for the position. (*Id.*) Defendant concludes that, given plaintiff's "five months and two weeks" of sales experience and plaintiff's alleged "safety issues," plaintiff has "failed to establish that she was qualified to perform the essential functions of the Timber Sale Preparation position." (*Id.*)

Defendant's argument essentially asks the undersigned to find, as a matter of law, that five months and two weeks' experience and some disputed[17] "safety issues" necessarily rendered plaintiff "unqualified" to perform the "essential functions" of the Timber Sale Prep position. The undersigned

cannot make this finding. As described above, defendant has not met its burden of demonstrating the "essential functions" of the position. *See Bates,* 511 F.3d at 990–91. Without a clear statement of the job's essential functions, the undersigned cannot determine whether, for instance, having "five months and two weeks" of experience renders plaintiff unqualified to perform those functions as a matter of law. (Oppo. at 11.) Without a clear statement of the job's essential functions, the undersigned cannot determine that a particular amount of experience combined with certain "safety issues" renders plaintiff unqualified as a matter of law—especially where the safety incidents are *disputed.*

### d. *Defendant's First Argument Does Not Support A Grant Of Summary Judgment*

For all of the foregoing reasons, summary judgment is inappropriate with regards to defendant's first argument. Plaintiff's O'Sullivan Letter is evidence that plaintiff was capable of performing the portion of the job, with a reasonable accommodation, upon which defendant's briefing focuses —the outdoor or "woods" portion. (Mot. for Summ. J. at 7–8 (focusing on plaintiff's experience with work "in the forest"); Reply at 4–5 (describing plaintiff's "lack of woods savvy" as rendering her unqualified and motivating Parker's decision); Parker Decl. ¶¶ 8–11, 15.) Defendant, on the other hand, has not produced evidence of the job's essential functions, and questions of fact exist with respect to what were those "essential functions."[18] Defendant has not shown that, as a matter of law, plaintiff was incapable of performing the job's essential functions with or without reasonable accommodations.[19] *See Bates,* 511 F.3d at 990–91.

### B. *Defendant's Second Argument: Plaintiff Cannot Prove That She Was Not Hired "Solely" Because Of Her Disability*

**\*12** Defendant assumes that Section 504 of the Rehabilitation Act governs plaintiff's action. (Mot. for Summ. J. at 6 (citing *Wong v. Regents of the Univ. of Cal.,* 410 F.3d 1052, 1058 (9th Cir.2005),* and framing plaintiff's prima facie case as including the burden of proving plaintiff suffered adverse action "solely" because of her disability).) As described below, however, Section 501—*not* Section 504 —governs this action. *See Boyd v. United States Postal Serv.,* 752 F.2d 410, 413 (9th Cir.1985); *Stewart v. U.S.,* No. C– 99–4058 JCS, 2000 WL 1705657, at \*3–4 (N.D.Cal. Oct.10, 2000)* (unpublished).

The plain text of Section 504 prohibits the exclusion of a qualified individual **"solely** by reason of his or her disability ." 29 U.S.C. § 794(a)* (emphasis added). In order to state a prima facie case under Section *504* of the Rehabilitation Act, a plaintiff must establish, inter alia, that they are (1) an individual with a disability, (2) otherwise qualified, and (3) subjected to discrimination solely by reason of their disability. *Mustafa,* 157 F.3d at 1174 n. 2* (applying 29 U.S.C. § 794(a),* because "it is undisputed that [defendant] receives federal financial assistance")); *Martin v. California Dept. of Veterans Affairs,* 560 F.3d 1042, 1049 (9th Cir.2009)* ( "The causal standard for [Section 504 of] the Rehabilitation Act is even stricter, demanding that [plaintiff] show that she was denied services 'solely by reason of' her disability.") (citing 29 U.S.C. § 794(a).)* Thus, applying Section 504 of the Rehabilitation Act would inject the word "solely" into the third prong of plaintiff's prima facie case. *See Stewart,* 2000 WL 1705657 at \*3–4.

Section 501* carries with it a slightly different prima facie case burden than Section 504, as the plain text of Section 501* does not contain the term "solely." 29 U.S.C. § 791. Section 501* incorporates language from the ADA that does not make the word "solely" a part of a plaintiff's prima facie case. "[T]he ADA standards incorporated into the Rehabilitation Act under § 501(g)* do not require the adverse employment action to have been 'solely by reason of' disability, in contrast to the explicit terms of § 504. *See* 42 U.S.C. § 12112(a).* The omission of this language was not accidental." *Stewart,* 2000 WL 1705657 at \*3–4 n. 10.* "The key ADA provision that is incorporated into § 501* is 42 U.S.C. § 12112, which provides in relevant part as follows: No covered entity shall discriminate against a qualified individual with a disability **because of the disability** of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id.* at 4 n. 9* (emphasis added); *e.g., Head v. Glacier Northwest Inc.,* 413 F.3d 1053, 1065 (9th Cir.2005)* ( "[W]e conclude that 'solely' is not the appropriate causal standard under any of the ADA's liability provisions....We conclude that a motivating factor standard is the appropriate standard for causation in the ADA context[.]").

**\*13** Section 501's* prima facie case thus requires plaintiff to show that she was denied the job simply "because of" her disability—such that her disability was *a* factor in the decision, albeit not necessarily the *only* factor. *See Stewart,*

2000 WL 1705657 at *3–4. Under Section 501, a plaintiff must demonstrate that her disability was a "motivating factor" behind the discrimination. 29 U.S.C. § 791(g) (adopting standards for Americans with Disabilities Act for claims under § 501 of the Rehabilitation Act, including 42 U.S.C. § 12112, which prohibits discrimination "against a qualified individual with a disability **because of** the disability …") (emphasis added).) Plaintiff makes her prima facie case showing under Section 501.

### 1. *Section 501 Applies To This Action*

Section 501 of the Rehabilitation Act governs federal agencies and directs them to institute "affirmative action plans" for the "hiring, placement, and advancement of individuals with disabilities."[20] Section 501 is broad in scope and deals with these "plans," and courts have held that Section 501 contains a private right of action for federal employees suing for disability discrimination.[21] On its face, Section 501 applies to federal employers. 29 U.S.C. § 791. "Section 501 provides for two types of claims: 1) "non-affirmative action" employment discrimination claims based upon 29 U.S.C. § 791(g), [citation], and 2) claims based upon a government employer's failure to reasonably accommodate an employee, as required under 29 U.S.C. § 791(b) [citation]. The former category of claims are governed by the standards contained in the Americans With Disabilities Act ("ADA"), which are explicitly incorporated into 501(g)." *Stewart,* 2000 WL 1705657 at *3–4 (citations omitted).

On the other hand, Section 504 of the Rehabilitation Act targets "Nondiscrimination under Federal Grants and Programs" and requires that recipients of federal funds not discriminate against disabled individuals.[22] Section 504 does not, on its face, apply to federal employers.[23] 29 U.S.C. § 794.

Moreover, the Ninth Circuit Court of Appeals has held that Section 501 of the Rehabilitation Act ("Section 501") (29 U.S.C. § 791) is the "exclusive remedy" for federal employees bringing a claim of disability discrimination under the Rehabilitation Act. *Boyd,* 752 F.2d at 413 ("[S]ection 501 is the exclusive remedy for discrimination in employment by the Postal Service on the basis of handicap."); *Johnston v. Horne,* 875 F.2d 1415, 1420–21 (9th Cir.1989) (Section 504 of the Rehabilitation Act inapplicable to federal employees) *overruled on other grounds as recognized in Williams–Scaife v. Dep't of Def. Dependent Schs.,* 925 F.2d 346, 348 n. 4 (9th Cir.1991).[24] District court decisions are in accord. *E.g.,*

*Rogers v. Potter,* No. C 08–2897 SBA, 2010 WL 1608867, at *5 (N.D.Cal. April 20, 2010) (unpublished) ( "Federal employees seeking redress for disability discrimination must rely on section 501 of the Rehabilitation Act, 29 U.S.C. § 791.") (citing *Johnston* ).

**\*14** In assuming that the word "solely" is part of plaintiff's prima facie case, defendant cited one Ninth Circuit authority: *Wong,* 410 F.3d at 1058. (Mot. for Summ. J at 5–6.) Defendant did not analyze *Wong* in any detail. (*Id.*) However, *Wong* is distinguishable. The plaintiff in *Wong* was suing the University of California, a recipient of federal funds, which necessarily made that action pursuant to Section 504. *Id.* Here, plaintiff is a federal employee suing the federal government directly as her federal employer—*not* as a recipient of federal funds—and thus plaintiff's action is pursuant to Section 501.

Accordingly, Section 501, not Section 504, governs plaintiff's action and dictates the elements of her prima facie case.[25] *See Boyd,* 752 F.2d at 413; *Johnston,* 875 F.2d at 1420–21; *Rogers,* 2010 WL 1608867 at *5 ("Federal employees seeking redress for disability discrimination must rely on section 501 of the Rehabilitation Act, 29 U.S.C. § 791.") (citing *Johnston* ); *Stewart,* 2000 WL 1705657 at *3–4.

### 2. *Section 501 Requires Plaintiff To Show That She Was Not Hired "Because Of" Her Disability, Rather Than "Solely" Because Of Her Disability*

Because Section 501 applies to this action, the word "solely" is not part of plaintiff's prima facie case. As discussed above, to state a prima facie case under 29 U.S.C. § 791 (a.k.a., "Section 501") of the Rehabilitation Act, a plaintiff must "demonstrate that (1) she is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered discrimination because of her disability." *Walton,* 492 F.3d at 1005[26]; *Reynolds,* 815 F.2d at 573–574. Under the express terms of Section 501, a plaintiff must demonstrate that her disability was a "motivating factor" behind the discrimination. 29 U.S.C. § 591(g) (adopting ADA standards for claims under § 501 of the Rehabilitation Act).")

At least one federal district court in the Ninth Circuit has expressly determined that:

> [T]he ADA standards incorporated into the Rehabilitation Act under § 501(g) do not require the adverse employment action to have been 'solely by reason of' disability, in contrast to the explicit terms of § 504. *See* 42 U.S.C.

§ 12112(a). The omission of this language was not accidental.

*Stewart*, 2000 WL 1705657 at *3–4. Accordingly, to meet her burden on summary judgment, plaintiff need not show that she was not hired "solely" because of a disability. Instead, plaintiff must show that she was not hired "because of" her disability—that her disability was a "motivating factor" behind the discrimination. *See id.;* 29 U.S.C. § 791(g) (adopting standards for Americans with Disabilities Act for claims under § 501 of the Rehabilitation Act); *Walton,* 492 F.3d at 1005; *Reynolds,* 815 F.2d at 573–574.

### 3. *Plaintiff Has Shown That She Was Not Hired, At Least In Part, "Because Of" Her Disability*

**\*15** Plaintiff has offered evidence that she was denied the Timber Sale Prep position at least partially "because of" her disability. It is undisputed that Parker told plaintiff that she would not be hired because of alleged "safety issues":

I did call a couple people that were listed as your supervisors. As I understand it, there were previous **safety issues** with you working in the woods. Due to the nature of the Beckwourth Sales Prep position, the dangerous nature of working conditions and the requirements of working alone, I can not support moving you into that position. I have spoken to Kathy Lacy Storost regarding the **safety issue** and my decision. I am sorry that this position will not work out for you. I understand that you are a good employee and a hard worker. I would support other positions such as Business Management, Special Uses or a type of position where there would be less of a dangerous exposure. I will keep you in mind for other positions. [ ... ] As a District Ranger I am responsible for the **safety** of my employees. I take this responsibility very seriously.

(Exh. C to Parker Decl. (emphasis added).)

As framed by Parker and Helton themselves, these "safety issues" arose *directly* from plaintiff's hearing abilities. For instance, Parker has declared that Helton told her that plaintiff's "lack of hearing was a big safety issue," and that "the district was extremely [concerned] about her hearing ability as she was working around logging equipment where hearing is extremely important." (Parker Decl. ¶¶ 9–10.) Email evidence in the record also confirms that, in her decision-making, Parker linked plaintiff's "safety issues" with plaintiff's hearing disability, such that reference to "safety issues" necessarily involved at least some reference to plaintiff's hearing abilities:

Hi Dave. You are listed as the person who supervised [plaintiff] in 2005 on a detail. I was wondering about her skill and ability in the woods: specifically **if her hearing was a safety issue with her work.**

(Exh. B to Parker Decl. [email exchange dated June 11, 2008 between Parker and Helton] (emphasis added).)

[Helton] told me they had to end [plaintiff's] detail in sale administration ... early due to safety. **There were several times that she was almost taken out by equipment and falling trees due to her lack of hearing. He said that lack of hearing was a big safety issue.**

(Exh. A to Parker Decl. [email from Parker to herself dated June 11, 2008, commemorating Parker's conversation with Helton] (emphasis added).)

[Plaintiff] sent me her resume and I followed up on a couple of supervisors. **They said her hearing disability was an extreme safety hazard and that they had to end her detail early because of safety issues.**

(Exh. D to Oppo. at "page 157" [Parker's email to Alice Carlton and Maria Garcia dated June 13, 2008, re: Parker's decision not to hire plaintiff] (emphasis added).)

**\*16** Similarly, according to Helton, all of plaintiff's alleged safety incidents were related, *at least in part,* to her hearing abilities.

Because of a few instances involving personal safety, her detail was terminated early. **The district was extremely concerned about her hearing ability as she was working around logging equipment where hearing is extremely important.** On two occasions she was at risk of severe injury, if not death, **either because of her hearing or** lack of knowledge regarding harvesting equipment **or a combination of both factors.** At that time, she also had limited woods skills **which combined with her hearing capability** make [sic] **a safety situation** that we had to address.

(Exh. B to Parker Decl. (emphasis added).)

Given the foregoing, in this particular case, plaintiff's alleged "safety issues" are inextricably tied to plaintiff's disability. Because Parker at least partially based her decision on plaintiff's "safety issues," and because the record indicates that plaintiff's alleged "safety issues" resulted in part from her hearing disability, plaintiff has met her burden of showing that she was denied the Timber Sale Prep position at least partially "because of" her disability. *See* 29 U.S.C. § 791(g)

(adopting standards for Americans with Disabilities Act for claims under § 501 of the Rehabilitation Act); *Walton,* 492 F.3d at 1005; *Reynolds,* 815 F.2d at 573–74; *Stewart,* 2000 WL 1705657 at *3–4. As a result, there is a genuine dispute of material fact regarding whether plaintiff's disability was a motivating factor in the decision not to hire her for the Timber Sale Prep position.

C. *Defendant's Third Argument: Defendant Had Legitimate, Nondiscriminatory Reasons For Not Hiring Plaintiff For The Timber Sale Prep Job*

Once a prima facie case has been established, the burden shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the action. *Reynolds,* 815 F.2d at 574; *Lucero,* 915 F.2d at 1371.

1. *Proffered Legitimate Nondiscriminatory Reasons: Plaintiff's "Safety Issues" And "Poor Performance"*

Defendant suggests that plaintiff's "poor performance and safety issues" were legitimate, nondiscriminatory reasons that plaintiff was not hired. (Mot. for Summ. J. at 10.)

In terms of "poor performance," Parker was apparently persuaded by Helton's statements that: plaintiff had "attendance issues," a "hard time" learning, was "not qualified" for a timber sale position, and that she had "limited woods skills." (Parker Decl. ¶¶ 9–11.) According to Parker, these reasons constituted "poor performance," and combined with plaintiff's "safety issues," made plaintiff "unqualified" for the job in question. (*Id.* ¶ 11.) Parker also declared that her decision was based on plaintiff's "lack of qualifications" and "inexperience." (*Id.* ¶ 19.)

In terms of "safety issues," as described above, it is undisputed that Parker told plaintiff that she would not be hired because of alleged "safety issues." (Exh. C to Parker Decl.) Parker was apparently persuaded by Helton's statements that: plaintiff's detail was terminated early due to "safety issues," plaintiff's "lack of hearing was a big safety issue," plaintiff had "a few instances involving personal safety," and that "the district was extremely [concerned] about her hearing ability as she was working around logging equipment where hearing is extremely important." (Parker Decl. ¶¶ 9–10.) Parker declared that, in her view, plaintiff's "safety issues" made plaintiff unsuitable for the Timber Sale Prep job. (Parker Decl. ¶¶ 11–12, 19.)

*17 Because evidence suggests that "safety issues" and "poor performance" were legitimate nondiscriminatory reasons motivating Parker's decision, the burden shifts to plaintiff to proffer sufficient evidence of pretext.[27] *Smith v. Barton,* 914 F.2d 1330, 1339 (9th Cir.1990) (applying McDonnell Douglas framework for Title VII discrimination claims to discrimination claim brought under ADA); *Mustafa,* 157 F.3d at 1175; *Wilborn,* 222 F.Supp.2d at 1206–07 (applying McDonnell Douglas burden-shifting framework to disability discrimination claim under Rehabilitation Act).

2. *"Safety Concerns" As A Pretext For "Hearing Disability"*

A plaintiff "may demonstrate pretext either directly by persuading the court that a discriminatory reason likely motivated [the defendant] or indirectly by showing that [the defendant's] proffered explanation is unworthy of credence." *Diaz,* 521 F.3d at 1212 (citation and quotation marks omitted) (applying McDonnell Douglas burden-shifting framework to claim under the Age Discrimination in Employment Act); *Snead,* 237 F.3d at 1093–94; *Hernandez v. Spacelabs Med. Inc.,* 343 F.3d 1107, 1115 (9th Cir.2003).

A plaintiff must produce specific, substantial evidence of pretext. *Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267, 270–71 (9th Cir.1996) ("[An] employee's subjective personal judgment of her competence alone does not raise a genuine issue of material fact"); *see also Aragon v. Republic Silver State Disposal, Inc.,* 292 F.3d 654, 659 (9th Cir.2002) ("[The plaintiff's] own statement that he was performing at a level equal to that of other employees is not enough to raise a genuine issue of material fact"). "While the plaintiff does not have to show direct evidence of pretext, [she] cannot merely make conclusory statements that the defendant's decisions were motivated by unlawful discrimination." *Diaz v. Federal Express Corp.,* 373 F.Supp.2d 1034, 1064 (C.D.Cal.2005) (citing cases). When examining pretext, although the inference of discrimination from the prima facie case "drops out of the picture," the evidence used in establishing the prima facie case may be considered for evaluating pretext. *Lindsey v. SLT Los Angeles, LLC,* 447 F.3d 1138, 1148 (9th Cir.2006).

Plaintiff has produced evidence demonstrating that defendant's reliance on plaintiff's alleged "safety issues" was a pretext for discrimination based on a hearing disability.[28] As discussed above, in this particular case, plaintiff's alleged

"safety issues" are inextricably tied to plaintiff's hearing abilities.

Evidence in the record reveals that Parker and Helton themselves linked the concepts of plaintiff's "safety issues" and plaintiff's hearing disability, suggesting that concerns purportedly about "safety issues" may actually have been concerns about how plaintiff's *disability* might impact her performance. For instance, Parker declared that Helton told her that plaintiff's "lack of hearing was a big safety issue" and that "the district was extremely [concerned] about her hearing ability as she was working around logging equipment where hearing is extremely important." (Parker Decl. ¶¶ 9–10.)

**\*18** Documentary evidence in the record also indicates that, in her decision-making, Parker often linked plaintiff's "safety issues" with plaintiff's hearing disability, such that references to plaintiff's "safety issues" were explicit or implicit references to plaintiff's hearing abilities. For instance, as set out in detail above, Parker specifically asked Helton "if [plaintiff's] hearing was a safety issue with her work." (Exh. A to Parker Decl.) Similarly, in making her decision, Parker understood that "[t]here were several times that [plaintiff] was almost taken out by equipment and falling trees due to her lack of hearing. [Helton] said that lack of hearing was a big safety issue." (Exh. A to Parker Decl.) Parker also understood that plaintiff's supervisors "said [plaintiff's] hearing disability was an extreme safety hazard and that they had to end her detail early because of safety issues." (Exh. D to Oppo. at page "157".)

Similarly, according to an email from Helton to Parker, all of plaintiff's alleged safety incidents were related, *at least in part,* to her hearing abilities:

> **The district was extremely concerned about her hearing ability as she was working around logging equipment where hearing is extremely important.** On two occasions she was at risk of severe injury, if not death, **either because of her hearing or** lack of knowledge regarding harvesting equipment **or a combination of both factors.** At that time, she also had limited woods skills **which combined with her hearing capability** make [sic] **a safety situation** that we had to address.

(Exh. B to Parker Decl.)

Because Parker partially based her decision on plaintiff's alleged "safety issues," and because the evidence suggests that Parker's conception of plaintiff's "safety issues" as at least partially related to plaintiff's hearing disability, a jury

could find that defendant's purported concerns about "safety issues" was a pretext for concerns about plaintiff's hearing disability and how it might negatively impact plaintiff's job performance. In other words, on these particular facts, a jury could reasonably find that defendant summarily rejected plaintiff's application because of her disability even though she may have been capable of performing the essential functions of the position with a reasonable accommodation. A jury could reasonably find that defendant's references to plaintiff's so-called "safety issues" might have been shorthand for plaintiff's "hearing ability," such that the use of the term "safety issues" was pretextual. There are genuine issues of material fact as to whether defendant's "safety issue" concerns were pretextual, and plaintiff has presented enough of a plausible case of pretext to survive summary judgment.

Plaintiff has also persuasively suggested a rather suspect timeline of events with regard to the processing of her application. Specifically, plaintiff suggests that Parker made her decision based solely on Helton's word, without waiting for certification from Vocational Rehabilitation personnel regarding plaintiff's ability to safely perform the Timber Sale Prep job. (Oppo. at 10–11 .) Parker herself declared that, after having spoken with and emailed Helton, she had "serious concern" about plaintiff and "determined that [plaintiff] was not qualified." (Parker Decl. at 11.) Indeed, the evidence in the record indicates that Parker denied plaintiff the position the very day Helton provided his views about plaintiff, without waiting to see if plaintiff's doctor would approve her to work in the job, and without ascertaining whether any accommodation might assuage Parker's concerns about plaintiff's hearing abilities and the safety issues potentially arising therefrom. *See Hernandez,* 343 F.3d at 1115 (finding "suspicious timing" to be evidence of pretext). There is no indication that Parker considered whether plaintiff's disability (and safety issues potentially arising therefrom) could be accommodated *prior to* rejecting plaintiff's application.[29] The rapid-fire timing of Parker's rejection of plaintiff's application is additional evidence suggesting pretext.

**\*19** Plaintiff has proffered evidence of at least some causal link between her disability and the rejection of her application for the Timber Sale Prep position, making summary judgment inappropriate here. A genuine issue of material fact exists as to whether the defendant's proffered nondiscriminatory reasons are merely a pretext for discrimination on the basis of plaintiff's hearing disability.[30]

2011 WL 6026124

IV. *CONCLUSION*

In light of the foregoing, IT IS HEREBY RECOMMENDED that:

1. The Motion for Summary Judgment (Dkt. No. 22) filed by defendant Tom Vilsak, Secretary of Department of Agriculture, be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. *Id.; see also* E. Dist. Local Rule 304(b). Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed with the court and served on all parties within fourteen days after service of the objections. E. Dist. Local Rule 304(d). Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan,* 158 F.3d 449, 455 (9th Cir.1998); *Martinez v. Ylst,* 951 F.2d 1153, 1156–57 (9th Cir.1991).

IT IS SO RECOMMENDED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 6026124

Footnotes

1    As discussed below, the Ninth Circuit has clarified that Section 501 of the Rehabilitation Act (29 U.S.C. § 791) is the exclusive remedy for federal employees alleging discrimination on the basis of disability. *Johnston v. Horne,* 875 F.2d 1415, 1418 (9th Cir.1989). Because plaintiff is a federal employee, her remedy for disability discrimination is through the Rehabilitation Act. *See id.; Boyd v. United States Postal Serv.,* 752 F.2d 410, 413 (9th Cir.1985) (holding that Section 501 of the Rehabilitation Act is "the exclusive remedy for discrimination in employment by the Postal Service on the basis of handicap"); *Vinieratos v. United States,* 939 F.2d 762, 773 (9th Cir.1991) (same holding as to employee of the Air Force). "The standards used to determine whether this section has been violated in a complaint alleging non-affirmative action employment discrimination under this section shall be the standards applied under Title I of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12201–12204 and 12210), as such sections relate to employment." *Stewart v. U.S.,* No. C–99–4058 JCS, 2000 WL 1705657, at *3–4 (N.D.Cal. Oct.10, 2000) (unpublished).

2    Federal Rule of Civil Procedure 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

3    The 113 pages of documents filed along with plaintiff's Opposition were separated into various groups labeled "A" through "C." While plaintiff's Opposition suggests that the documents within each group bear page numbers created by plaintiff, such page numbers do not appear on the court's copies of the documents. Instead, some of the pages bear random numbering that was apparently added at some other point in this case or perhaps as part of another proceeding. Given the absence of cohesive page numbering and exhibit labels in these documents, the undersigned identifies such documents by including their out-of-sequence page numbers in quotation marks (i.e., page number "150"), and where a given document lacks *any* such numbering, the undersigned describes the document(s) with as much detail as reasonably possible.

4    Federal Rule of Civil Procedure 56(e) provides, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order."

5    The plaintiff is cautioned, however, that notwithstanding the court's analysis of her unobjected-to evidence at this posture, plaintiff's documents will not be admitted into evidence at trial unless plaintiff has properly identified and authenticated each document, as well as ensured that the document is not barred by evidentiary rules governing hearsay.

2011 WL 6026124

**6**  Future failures to comply with the Federal Rules of Civil Procedure, the court's orders, or the court's Local Rules may be grounds for the imposition of sanctions, including involuntary dismissal of plaintiff's case pursuant to [Federal Rule of Civil Procedure 41(b)](). *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (recognizing that a court "may act *sua sponte* to dismiss a suit for failure to prosecute"); *Hells Canyon Preservation Council v. U.S. Forest Serv.*, 403 F.3d 683, 689 (9th Cir.2005) (stating that courts may dismiss an action pursuant to [Federal Rule of Civil Procedure 41(b)]() *sua sponte* for a plaintiff's failure to prosecute or comply with the rules of civil procedure or the court's orders); *Ghazali v. Moran*, 46 F.3d 52, 53 (9th Cir.1995) (per curiam) ("Failure to follow a district court's local rules is a proper ground for dismissal."); *Ferdik v. Bonzelet*, 963 F.2d 1258, 1260 (9th Cir.1992) ("Pursuant to [Federal Rule of Civil Procedure 41(b)](), the district court may dismiss an action for failure to comply with any order of the court."); *Thompson v. Housing Auth. of City of L.A.*, 782 F.2d 829, 831 (9th Cir.1986) (per curiam) (stating that district courts have inherent power to control their dockets and may impose sanctions including dismissal); *see also* E. Dist. Local Rule 110 ("Failure of counsel or of a party to comply with these Rules or with any order of the Court may be grounds for imposition by the Court of any and all sanctions authorized by statute or Rule or within the inherent power of the Court."); E. Dist. Local Rule 183(a) ("Any individual representing himself or herself without an attorney is bound by the Federal Rules of Civil or Criminal Procedure, these Rules, and all other applicable law. All obligations placed on 'counsel' by these Rules apply to individuals appearing *in propria persona.* Failure to comply therewith may be ground for dismissal ... or any other sanction appropriate under these Rules.").

**7**  While plaintiff did not file a Statement of Disputed Facts or directly respond to defendant's Statement of Undisputed Facts, many of the documents plaintiff filed with her opposition are identical to the exhibits defendant filed. Specifically, Exhibit A to Parker's Declaration, which is a June 11, 2008 email from Parker to herself commemorating her conversation with Helton, is the same as page "240" of plaintiff's supporting evidence (Exh. B to Oppo.) and is the same as Exhibit E to plaintiff's deposition; Exhibit B to Parker's Declaration, which is a June 11, 2008 email exchange between Helton to Parker, is the same as page "239" of plaintiff's supporting evidence (Exh. B to Oppo.) and is the same as Exhibit F to plaintiff's deposition; and Exhibit C to Parker's Declaration, which is Parker's June 11, 2008 email to plaintiff denying her the Timber Sales Prep position, is substantively the same (minus some underlining) as page "173" of plaintiff's supporting evidence (Exh. D to Oppo.), and is substantively the same as Exhibit G to plaintiff's deposition. For ease of reference, whenever possible, this order will refer solely to Exhibits A, B, and C to the Parker Declaration even where each of the above-listed documents could also be cited.

**8**  [Federal Rule of Civil Procedure 56]() was revised and rearranged effective December 10, 2010. However, as stated in the Advisory Committee Notes to the 2010 Amendments to [Rule 56](), "[t]he standard for granting summary judgment remains unchanged."

**9**  "The court need consider only the cited materials, but may consider other materials in the record." [Fed.R.Civ.P. 56(c)(3)](). Moreover, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." [Fed.R.Civ.P. 56(c)(2)]().

**10**  Section 501 of the Rehabilitation Act incorporates substantive portions of the ADA and, therefore, ADA cases are instructive in the Rehabilitation Act context and are cited herein. [Section 12111(8)]() of the ADA is explicitly incorporated into [Section 501]() of Rehabilitation Act at [29 U.S.C. § 791(g)](). "The standards used to determine whether an act of discrimination violated the Rehabilitation Act are the same standards applied under the Americans with Disabilities Act." *Walton,* 492 F.3d at1003 n. 1 (citing *Coons,* 383 F.3d at 884); *Lopez,* 333 F.3d at 961 ("[Section 501]() [of the Rehabilitation Act] borrows its substantive standards from the Americans with Disabilities Act (ADA).") (citing [29 U.S.C. § 791(g)]()).

**11**  Defendant's moving papers presume that Section 504 of the Rehabilitation Act—not Section 501—applies. The difference directly bears on plaintiff's burden at this procedural posture, and is discussed further below in addressing defendant's second argument. Because the federal government is the employer in this matter, Section 501 of the Rehabilitation Act is implicated here. *See* [29 U.S.C. § 791]().

**12**  *See also Brown v. Arizona,* No. CV–09–2272–PHX–GMS, 2011 WL 2911054, at *8 (D.Ariz. July 20, 2011) (unpublished) (applying *Bates* and denying summary judgment in part where defendant had not "produced any evidence as to what [the] essential functions" of the job were).

2011 WL 6026124

13    Plaintiff also provides letters of recommendation and good work reviews arising from her prior positions. (Compl. at 4, 6, 9, 11 (describing plaintiff's work experience and positive reviews); Exh. A to Oppo. (letter dated October 12, 1989 re: "1989 OHV Certificate of Appreciation" to Chere Ward); Exh. A to Oppo. (two letters dated February 1, 1989 re: "6140 Awards" to Chere Ward); Exh. A to Oppo. (letter dated November 2, 1988 from Forest Supervisor and District Ranger re: certificate of merit to Chere Ward); Exh. A to Oppo. (letter dated November 2, 1988 from Assistant Recreation Officer re: "Certificate of Merit/Cash Award—[ ... ] Chere Ward); Exh. A to Oppo. (Letter of Commendation dated May 30, 1980 from District Ranger to Chere Ward); Exh. A to Oppo. (Letter of recommendation re: Chere Ward dated September 3, 1997, signed by Resource Officer Karen Fortus).) Defendant argues that these letters and plaintiff's resume and work history do not reveal plaintiff to be sufficiently qualified as a matter of law (Reply at 2–3), however, as described below, the undersigned cannot make this determination.

14    *E.g.*, Exh. C to Parker Decl. ("As I understand it, there were previous **safety issues** with you working in the woods. Due to the nature of the Beckwourth Sales Prep position, the dangerous nature of working conditions and the requirements of working alone, I can not support moving you into that position."); Parker Decl. ¶¶ 9–10 (Parker declared that Helton told her that plaintiff's "lack of hearing was a big safety issue," and that "the district was extremely [concerned] about her hearing ability as she was working around logging equipment where hearing is extremely important."); Exh. A to Parker Decl. [June 11, 2008 email from Parker to herself commemorating her conversation with Helton] ("I was wondering about her skill and ability in the woods: specifically if her hearing was a safety issue with her."); Exh. B to Parker Decl. [email exchange dated June 11, 2008 between Parker and Helton] (" "**The district was extremely concerned about her hearing ability as she was working around logging equipment where hearing is extremely important. [ ... ]** she also had limited woods skills **which combined with her hearing capability** make [sic] **a safety situation** that we had to address.") (emphasis added).

15    One job description is labeled "Forestry Technician (Timber Sale Preparation), GS–0462–07" (Exh. A to Pl.'s Depo.), the other is labeled "Forestry Technician (Timber Sale Administration), GS–0462–07" (Exh. B to Oppo. at 1–3.) Defendant did not address plaintiff's latter-filed document. The record also contains two *additional* job descriptions bearing the codes "0462–08" and "0462–09" and described as "Forestry Technician (Timber Sale Preparation)" positions. (Exhs. B–C to Pl.'s Depo.) In any event, while the "Timber Sale Administration" description (Exh. A to Pl.'s Depo.) appears to address plaintiff's *former* position, given that two of the job descriptions bear the identical codes of "GS–0462–07," the undersigned will not assume that is the case. During the hearing, when the undersigned referenced these two lengthy job descriptions, neither party clarified which job description actually governed the position at issue in this case.

16    Moreover, *even if* "working around logging equipment, working alone, and working on steep, rocky ground" (Parker Decl. ¶ 11) constitute the precise "essential functions" plaintiff could not perform, defendant has not attempted to show that plaintiff could not perform such duties "with or without reasonable accommodation." 42 U.S.C. § 12111 (incorporated into Section 501 of the Rehabilitation Act at 29 U.S.C. § 791(g)); *see Arline*, 480 U.S. at 287 n. 17; *Bates*, 511 F.3d at 990 (whether an individual is "qualified" means "whether the individual 'can perform the essential functions of such position' with or without a reasonable accommodation"). Indeed, defendant does not discuss whether plaintiff could have performed these three functions even if she received a reasonable accommodation to help prevent any so-called "safety issues." As the court in *Mantolete v. Bolger* explained, the definition of "qualified handicapped individual" under Section 501 of the Rehabilitation Act differs from definition under Section 504 in the imposition of an explicit requirement that accommodation of the handicap be considered in determining a handicapped person's qualifications for federal employment. *Mantolete v. Bolger*, 767 F.2d 1416, 1421 (9th Cir.1985); *see also Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 410, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) (discussing the difference between the affirmative action obligation of the federal government under § 501, the encouragement to state agencies to adopt such programs, and the lack of any such requirement under § 504).

17    As discussed above, plaintiff suggests that one of the safety "incidents" actually involved a completely different female employee, Karen Sheets, who confirmed her involvement in this incident via email to plaintiff. (Oppo. at 11 ("plaintiff never had any experience of accidents or near misses ... it was another detailer from TEAMS, Karen Sheets, who had the accident."); Exh. D to Oppo. (email from Karen Sheets dated October 9, 2008 at 11:20 a.m. ("Dave Helton may have gotten one of the incidents he was talking about mixed up between you and me. I know that I did get too close to the equipment one time only, but I never heard that you did.")); Exh. D to Oppo. (email from Karen Sheets dated January 7, 2009 at 1:42 p.m. (the near-miss incident "was between 8/24/05 and 9/15/05").) Defendant did not object to these

2011 WL 6026124

emails. Plaintiff's denial of any involvement in any safety "close calls" while under Helton's supervision raises a dispute of material fact regarding whether plaintiff actually had any connection to any safety incidents. However, plaintiff's evidence that Karen Sheets, not plaintiff, had the "close call" does not sufficiently support a "pretext" argument here.

18    *See* *Brown,* 2011 WL 2911054, at * 6 ("[Defendant] does not argue that Plaintiff could not perform the essential functions of her position with or without reasonable accommodation. Because the Ninth Circuit shifts the burden of production to an employer challenging an employee's qualified status, and because the [defendant] has neither directly challenged Plaintiff's ability to perform the essential functions of her position with or without reasonable accommodation, nor has it produced any evidence as to what those essential functions are, summary judgment on this point would be inappropriate.")

19    Plaintiff's complaint alleges one claim for "disability discrimination." She does *not* allege a specific claim for failure to provide a "reasonable accommodation." However, the second prong of plaintiff's prima facie case involves determining whether plaintiff could have performed the job's essential functions "with or without" a reasonable accommodation. *See* *Walton,* 492 F.3d at 1005 (identifying whether plaintiff was "qualified" for the position as the second prong of plaintiff's prima facie case); 42 U.S.C. § 12111(8) ("The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."). Section 12111(8) of the ADA is explicitly incorporated into Section 501 of Rehabilitation Act at 29 U.S.C. § 791(g).

20    Section 501 provides, in relevant part, as follows: "(b) Federal agencies; affirmative action program plans: Each department, agency, and instrumentality (including the United States Postal Service and the Postal Regulatory Commission) in the executive branch and the Smithsonian Institution shall, within one hundred and eighty days after September 26, 1973, submit to the Commission and to the Committee an affirmative action program plan for the hiring, placement, and advancement of individuals with disabilities in such department, agency, instrumentality, or Institution. Such plan shall include a description of the extent to which and methods whereby the special needs of employees who are individuals with disabilities are being met. Such plan shall be updated annually, and shall be reviewed annually and approved by the Commission, if the Commission determines, after consultation with the Committee, that such plan provides sufficient assurances, procedures and commitments to provide adequate hiring, placement, and advancement opportunities for individuals with disabilities. [ ... ](g) Standards used in determining violation of section: The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under Title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201–12204 and 12210), as such sections relate to employment." 29 U.S.C. § 791.

21    29 U.S.C. § 794a(a)(1) (providing that Title VII remedies are available to an employee "with respect to any complaint [filed] under [Section 501] ...").

22    Section 504 provides in relevant part as follows: "(a) [ ... ] No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, **solely** by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service...." 29 U.S.C. § 794(a) (emphasis added).

23    "Section 504 does not on its face apply to federal employees; rather, it prohibits 'discrimination under any program or activity receiving federal financial assistance or under any program or activity conducted by any Executive agency.' " *Taylor v. Small,* 350 F.3d 1286, 1291 (D.C.Cir.2003) (quoting 29 U.S.C. § 794).

24    *See* *Rivera v. Heyman,* 157 F.3d 101, 103–04 (2nd Cir.1998) (noting a split in the circuits regarding whether a federal employee's disability discrimination claim can be brought pursuant to Section 501, Section 504, or both, and confirming that the Ninth Circuit has pronounced that federal employees can sue under Section 501 exclusively). The court in *Rivera* explained, "The circuits are split on whether or not a disabled federal employee can assert a claim under section 504. The Fifth, Sixth, and Eighth Circuits have concluded that section 501 and section 504 of the Rehabilitation Act overlap, and that federal employees can sue under both provisions. [Citation.] The Seventh, Ninth, and Tenth Circuits have held that section 501 is the exclusive remedy for federal employees suing under the Rehabilitation Act." *Id.* (citations omitted).

2011 WL 6026124

25    Because the prima facie cases under Section 501 and Section 504 both give plaintiff the burden of proving she was "qualified" for the position, the preceding segment of this order analyzing whether plaintiff was "qualified" did not require a determination of whether Section 501 or 504 applies. *E.g., Mustafa,* 157 F.3d at 1174, n. 2 ("otherwise qualified" as an element of the prima facie case for a Section 504 action); *Walton,* 492 F.3d at 1005 (identifying whether plaintiff was "qualified" for the position as part of plaintiff's prima facie case).

26    *Walton* proceeded under Section 501 because the defendant, the United States Marshals Service, is a federal employer. *Walton,* 492 F.3d at 1005. *Walton* provides: "To state a prima facie case under the Rehabilitation Act, a plaintiff must demonstrate that (1) she is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered discrimination because of her disability." *Id.* at 1005. *Walton'* s characterization of Section 501's prima facie case does not contain the word "solely." However, in support of *Walton'* s construction of that prima facie case, the court summarily cites to *Wong*—a Section 504 action where the term "solely" was indeed part of the prima facie case. *Id.* (citing *Wong,* 410 F.3d at 1058.) However, no explanation or analysis of *Wong* accompanies this curious citation, and without more, the undersigned declines to construe *Walton'* s citation to *Wong* as suggesting that *Wong* applies to a prima facie case in a Section 501 action.

27    The undersigned has doubts as to whether "safety issues" can be considered "nondiscriminatory reasons" in this particular case, given that plaintiff's "safety issues" were inextricably tied to plaintiff's hearing disability as described above. However, the undersigned will proceed to the "pretext" prong of the analysis rather than analyze that issue here.

28    "The court need consider only the cited materials, but may consider other materials in the record." Fed.R.Civ.P. 56(c)(3). Plaintiff does not clearly argue that defendant's reliance on plaintiff's alleged "safety issues" was pretextual because those "safety issues" were so intertwined with her hearing abilities. However, the evidence in the record suggests that "safety issues" could have been shorthand for plaintiff's hearing disability, as described below.

29    An unauthenticated email plaintiff filed with her Opposition suggests that Kathy LacyStorost an individual "who handles the Persons with Disabilities Employment Program for the USFS's Pacific Southwestern Region," (Oppo. at 10), may have been involved in the decision not to hire plaintiff. (Exh. D to Oppo. "(page 157") (email dated June 13, 2008 from Parker to Alice Carlton and Maria Garcia).) However, that email is dated two days *after* Parker had already rejected plaintiff's application on June 11, 2008. (Exh. C to Parker Decl.) Defendant has not proffered evidence that, sometime *before* rejecting plaintiff's application, Parker attempted to find out whether a reasonable accommodation would assuage concerns about the potential safety impacts of plaintiff's disability on her work.

30    Plaintiff offers several additional "pretext" arguments, such as, for instance, Helton's making false, animus-driven statements to Parker about plaintiff's abilities and work history. (Oppo. at 3–6, 10–11.) However, the undersigned need not examine whether these arguments support plaintiff's burden to show pretext, as the above-described link between plaintiff's alleged "safety issues" and her disability sufficiently shows pretext for summary judgment purposes.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 714091
United States District Court, W.D. Washington,
at Seattle.

Lesley WOMANCHILD, Plaintiff,

v.

R. James NICHOLSON, Defendant.

No. C06-1823RAJ.
|
March 13, 2008.

**Attorneys and Law Firms**

Rodney R. Moody, Law Office of Rodney R. Moody, Everett, WA, for Plaintiff.

Marion J. Mittet, Thomas M. Woods, US Attorney's Office, Seattle, WA, for Defendant.

ORDER

RICHARD A. JONES, District Judge.

# I. INTRODUCTION

 *1  This matter comes before the court on the motion of Defendant R. James Nicholson, the Secretary of the Department of Veteran's Affairs ("VA"), for summary judgment (Dkt.# 16). Neither the VA nor Plaintiff Lesley Womanchild has requested oral argument. The court has reviewed the motion together with all documents filed in support and in opposition. For the reasons set forth herein, the court GRANTS the motion, DISMISSES this action, and directs the clerk to enter judgment for Defendant.

# II. BACKGROUND

Ms. Womanchild began working for the VA in October 2004. She was enrolled concurrently in a graduate degree program at Western Washington University. The VA hired her through its Student Career Experience Program ("SCEP"). SCEP employees work for the VA until the completion of their studies, after which the VA has the option to offer them permanent employment without engaging in a competitive hiring process. See 5 CFR § 213.3202. SCEP employment

status requires concurrent status as a student. Id. Ms. Womanchild admits she was aware of these SCEP limitations. Woods Decl., Ex. A (hereinafter "Womanchild Depo.") at 37:17-38:1. Ms. Womanchild obtained her graduate degree in June 2006, and the VA chose not to offer her permanent employment.

Ms. Womanchild suffers from medical conditions associated with a prior brain injury that interfered with her employment. Womanchild Depo. at 18:16-22:5. She has a visual impairment that requires accommodation, and she is also hypersensitive to certain odors. Id. In April 2005, Ms. Womanchild requested a telephone headset as an accommodation for her visual impairment. Id. at 65:9-67:11. By July 2005, it is undisputed that she had obtained an acceptable headset at the VA's expense. Id. at 62:23-63:13; Capron Decl. (1st) ¶ 5, Exs. C-D. In April 2006, she requested an air filtration unit to counteract diesel exhaust fumes that infiltrated her office because of its proximity to a loading dock elevator. Womanchild Depo. at 62:23-63:13; Capron Decl. (1st) ¶¶ 6-8. According to uncontradicted evidence, the human resources employees had begun the process of acquiring the air filtration unit when Ms. Womanchild's supervisors decided not to hire her at the conclusion of her SCEP employment. Id.

The parties disagree sharply about what motivated the VA's decision not to make Ms. Womanchild a permanent employee. Ms. Womanchild contends that the VA made the decision because of her disability. The VA contends that Ms. Womanchild's job performance was deficient for reasons unrelated to her disability.

# III. DISCUSSION

The VA seeks summary judgment on all of Ms. Womanchild's claims. In response to the VA's motion, Ms. Womanchild concedes that judgment is appropriate on all claims except for her claim of disability discrimination in violation of the Rehabilitation Act of 1973 ("Rehabilitation Act"). The court now turns to an analysis of that claim.

 *2  On a motion for summary judgment, the court is constrained to draw all inferences from the admissible evidence in the light most favorable to the non-moving party. Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir.2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is

entitled to a judgment as a matter of law. *Fed.R.Civ.P. 56(c)*. The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)*. Once the moving party has met its burden, the opposing party must show that there is a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)*. The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir.1991)*. When confronted with purely legal questions, the court does not defer to the non-moving party.

**A. Exhaustion of Remedies**
The court first briefly addresses the parties' contentions regarding whether Ms. Womanchild properly exhausted her administrative remedies before bringing suit. There is no dispute that Ms. Womanchild made a complaint to the Equal Opportunity Employment Commission ("EEOC"), and filed suit within 90 days of receiving a right-to-sue letter. The VA contends, however, that Ms. Womanchild abandoned her right to use the EEOC process because she first filed a grievance with her union. The VA contends that applicable regulations entitled Ms. Womanchild to either file a grievance or an EEOC complaint, but not both.

There is no dispute that Ms. Womanchild attempted to file a union grievance on June 9, 2006, but there is much disagreement about whether she had a right to do so. Ms. Womanchild asserts that she abandoned the union grievance when union members told her that she was not a member of the union, and that they could not assist her. She also attempts to prove, through the union steward, that she was not a member of the union. There is evidence that even if she was not a union member, she belonged to the bargaining unit established in the collective bargaining agreement ("CBA") between the union and the VA. There is no evidence, however, that conclusively establishes that members of the bargaining unit who are not members of the union have the right to use the union grievance procedure.

Ultimately, the court finds that there is insufficient evidence to decide, for purposes of this motion, whether Ms. Womanchild inappropriately withdrew her union grievance and relied on an EEOC complaint. Although a plaintiff's failure to exhaust remedies can deprive a court of jurisdiction over a dispute, the exhaustion requirement is subject to equitable remedies such as waiver, equitable estoppel, and equitable tolling. *Leong v.*

*Potter, 347 F.3d 1117, 1122 (9th Cir.2003)*. In this case, each of these equitable remedies raises factual questions that the evidence before the court does not answer. For that reason, the court declines to resolve the parties' exhaustion-related disputes, and proceeds to the merits of Ms. Womanchild's Rehabilitation Act claim.

**B. Merits of Ms. Womanchild's Rehabilitation Act Claim**
*\*3* Federal employees seeking redress for disability discrimination must rely on § 501 of the Rehabilitation Act (*29 U.S.C. § 791*); *Johnston v. Horne, 875 F.2d 1415, 1420-21 (9th Cir.1989)*; *see also 42 U.S.C. § 12111(5)(B)(i)* (exempting federal government from the Americans with Disabilities Act). Neither Ms. Womanchild's complaint nor her opposition to this motion cites a particular section of the Rehabilitation Act. The VA asserts that her claim is under § 504 (*29 U.S.C. § 794*), which facially applies to programs receiving federal funding, certain executive programs, and the United States Postal Service. The Ninth Circuit has found that § 504 is not applicable to federal employees. *Johnston, 875 F.2d at 1421*; *see also Newland v. Dalton, 81 F.3d 904, 906 n. 1 (9th Cir.1996)* (following *Johnston* ). Instead, § 501 of the Rehabilitation Act applies to federal employees' disability discrimination claims. *Id.*; *29 U.S.C. § 791*.

To state a prima facie case under § 501, a plaintiff must "demonstrate that (1) she is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered discrimination because of her disability." *Walton v. United States Marshals Serv., 492 F.3d 998, 1005 (9th Cir.2007)*. Both disparate treatment of a disabled person and refusal to make a reasonable accommodation for a disabled person are actionable. *See Vinson v. Thomas, 288 F.3d 1145, 1154 (9th Cir.2002)*. A plaintiff need only demonstrate that her disability was a "motivating factor" behind the discrimination. *See* 29 U.S.C. § 591(g) (adopting standards for Americans with Disabilities Act for claims under § 501 of the Rehabilitation Act); *Head v. Glacier Northwest, Inc., 413 F.3d 1053, 1065 (9th Cir.2005)* (holding that "a motivating factor standard is the appropriate standard for causation in the ADA context"); *see also Pinkerton v. United States Dep't of Educ., 508 F.3d 207, 209-214 (5th Cir.2008)* (reviewing authority from all circuits regarding sole causation standard in Section 501 claims).[1]

Plaintiff has produced sufficient evidence that she is a person with a disability. Her deposition testimony, in addition to documentation from her physicians and from the Washington

2008 WL 714091, 36 NDLR P 186

Department of Social and Health Services, establishes that her prior head trauma has enduring effects that interfere with her ability to work. Womanchild Depo. at 18:16-23:17; Womanchild Decl. Exs. C-E. This evidence is sufficient to establish a genuine issue of material fact that Ms. Womanchild has a disability.

The court assumes, for purposes of this motion, that Ms. Womanchild was "otherwise qualified" to perform her duties at the VA. Much of the parties' briefing is directed to vigorously disputing this issue. Ms. Womanchild offers evidence that her performance was adequate, and that the VA did not express dissatisfaction with her until the last few months of her employment. She also offers evidence that any performance deficiencies were the result of the VA's failure to provide her with adequate training or supervision. The VA relies on evidence from Ms. Womanchild's supervisors who evaluated Ms. Womanchild and found her performance to be below acceptable levels. Even if this dispute were amenable to resolution on summary judgment, the court's disposition of this motion makes a resolution unnecessary.

**\*4** Ms. Womanchild's Rehabilitation Act claim fails because she offers no evidence from which a reasonable jury could conclude that her disability was a motivating factor behind any discrimination she suffered. To the extent that she claims a failure to accommodate her disability, her claims must fail. The record reveals two instances in which Ms. Womanchild requested accommodation. First, she requested a telephone headset in April 2005. Capron Decl. (1st), Ex. C; Womanchild Depo. at 65:17-25. By May 11, 2005, the VA had provided a headset. *Id.* Ms. Womanchild's objection to this headset was that it was too elaborate. Womanchild Depo. at 66:1-5. She ultimately purchased a "cheapo" headset in July 2005, and the VA reimbursed her. *Id.* at 62:22-67:11; Capron Decl., Ex. B. There is no evidence from which a reasonable factfinder could conclude that the VA failed to accommodate Ms. Womanchild's headset request. The same is true of Ms. Womanchild's request for an air purifier. She made the request on April 10, 2006.[2] Womanchild Depo. at 62:23-63:19. The VA provides evidence that it quickly began the process of requisitioning an air purifier. Capron Decl. ¶ 8. It abandoned the process only after the decision to not hire Ms. Womanchild had been made. *Id.* Ms. Womanchild offers no evidence to contradict the VA's evidence that it attempted to accommodate her disability.

Putting aside any allegations of failure to accommodate Ms. Womanchild's disability, her claim that she was not offered

permanent employment because of her disability is also unsupported. Even Ms. Womanchild admits that she does not know what motivated the VA's decision. When asked whether the decision was "because of your ... disability," she responded "I am not a mind reader ... I do not know," and "I do not know. Don't know, can't tell you. Ask [my supervisor]." Womanchild Depo. at 92:9-92:17. Her supervisor, however, avers that she decided not to make her a permanent employee for performance reasons. Scherich Decl. ¶¶ 3-9. Moreover, Ms. Womanchild testified that she made the VA aware of her disability throughout her nearly two-year tenure. *Id.* at 62:1-10 ("I'm very open about it, very open."). She offers no evidence of adverse employment actions during that time, or any other indicia of disability discrimination. Indeed, the only evidence bearing on the VA's approach to Ms. Womanchild's disability is that it satisfied her requests for accommodation. It is undisputed that Ms. Womanchild's employment was set to terminate in June 2006 under the terms of SCEP, solely because her graduate school enrollment would terminate at the same time. There is no evidence from which a reasonable factfinder could causally connect Ms. Womanchild's disability with the VA's decision not to make her a permanent employee.

Finally, the court notes that although Ms. Womanchild did not expressly raise a claim of retaliation, her complaint and opposition to this motion suggest that she believes that the VA declined to make her employment permanent in retaliation for her requests for accommodation. A plaintiff can use the Rehabilitation Act to assert retaliation claims. *Coons v. Sec'y of the United States Dep't of the Treasury,* 383 F.3d 879, 887 (9th Cir.2004). A retaliation claim requires the plaintiff to show that she engaged in a protected activity (like requesting a disability accommodation), an adverse employment action, and a causal link between the protected activity and the adverse action. *Id.*

**\*5** Ms. Womanchild's retaliation claim fails for the same reason as her other discrimination claims: she has no evidence from which a reasonable jury could infer causation. The sole evidence Ms. Womanchild offers is the temporal proximity between her April 2006 request for accommodation and the VA's decision to notify her in May 2006 that it would not hire her as a permanent employee. Although "in some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity," *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1065 (9th Cir.2002), this is not such a case. As previously noted, the timing of the VA's decision not to hire Ms. Womanchild was

beyond either Ms. Womanchild's or the VA's control. SCEP rules dictated that the VA had to notify Ms. Womanchild whether it would choose to hire her at the conclusion of her studies. In this case, Ms. Womanchild's request for disability accommodation (a request that the VA granted, according to unchallenged evidence) came, by coincidence, at the time her SCEP employment was set to expire. Were the court to find that timing alone was sufficient to show causation in this case, it would set the precedent that any SCEP employee need simply engage in a protected activity just before the end of his employment term in order to take a discrimination claim to a jury. Such a result is clearly at odds with Ninth Circuit precedent. *Coszalter v. City of Salem,* 320 F.3d 968, 978 (9th Cir.2003) ("There is no set time beyond which acts cannot support an inference of retaliation, and there is no set time within which acts necessarily support an inference of retaliation.").

The court concludes that there is no genuine issue of material fact regarding an essential element of Ms. Womanchild's claims under the Rehabilitation Act, and that the VA is entitled to judgment as a matter of law.

## IV. CONCLUSION

For the reasons stated above, the court GRANTS Defendant's summary judgment motion (Dkt.# 16) and DISMISSES this action. The court directs the clerk to enter judgment for Defendant.

### All Citations

Not Reported in F.Supp.2d, 2008 WL 714091, 36 NDLR P 186

---

Footnotes

1    Relying upon authority from the First Circuit, the VA erroneously asserts that Ms. Womanchild must prove that her disability was the *sole* reason for any alleged discrimination. VA Mot. at 13 (citing *Cook v. Rhode Island Dep't of Mental Health,* 10 F.3d 17, 22 (1st Cir.1993)). The First Circuit, unlike the Ninth Circuit, considers federal employee disability discrimination claims under § 504 of the Rehabilitation Act, instead of considering such claims solely under § 501. *Leary v. Dalton,* 58 F.3d 748, 752 (1st Cir.1995) (comparing inter-circuit authority). Section 504 targets discrimination "solely by reason of" a disability, whereas § 501 does not. *Compare* 29 U.S.C. § 794(a) *with* 29 U.S.C. 791. Even the First Circuit, however, has expressed doubts that the "sole" causation standard applies to government employees. *Leary,* 58 F.3d at 752 ("[T]he applicability of § 504 and its sole causation test in this federal employment suit [i]s an open question.").

2    The record reveals that Ms. Womanchild submitted a terse "prescription" from her physician to the VA on February 3, 2006. Womanchild Decl. Ex. C; Womanchild Depo. at 73:1-74:1. Because the prescription contained virtually no explanation of Ms. Womanchild's condition or the recommended accommodation, Ms. Womanchild's supervisor requested additional information, which she received in the form of a letter from Ms. Womanchild's physician on April 6, 2006. Womanchild Decl. Ex. D; Capron Decl. ¶ 7. Her supervisor began the accommodation process thereafter. Capron Decl. ¶ 8. It does not appear that Ms. Womanchild submitted the VA's request for additional information is unlawful, nor could she sustain such a claim. *Vinson v. Thomas,* 288 F.3d 1145, 1153 (9th Cir.2002) ("A public agency may require reasonable evidence of a disability before providing accommodations.").

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.