---

No. 24-1439

---

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

PORTER SMITH,

     Plaintiff-Appellant,

v.

MICHIGAN DEPARTMENT OF CORRECTIONS and
STATE OF MICHIGAN,

     Defendants-Appellees.

---

Appeal from the United States District Court
Eastern District of Michigan, Southern Division
Honorable Linda V. Parker

---

**CORRECTED BRIEF FOR DEFENDANTS-APPELLEES
MICHIGAN DEPARTMENT OF CORRECTIONS AND STATE OF
MICHIGAN**

*(Corrected as to citations only, eliminating references to appendix)*

---

Kendell S. Asbenson
Assistant Attorney General
Counsel of Record
Attorney for Defendants-
Appellees
Corrections Division
Employment Section
P.O. Box 30217
Lansing, MI 48909
(517) 335-3055

Dated:  November 12, 2024

# TABLE OF CONTENTS

Page

Table of Authorities ........................................................................ v

Statement in Opposition to Oral Argument ................................. x

Jurisdictional Statement .............................................................. xi

Statement of Issues Presented .................................................... xii

Introduction .................................................................................. 1

Statement of the Case .................................................................. 3

    A.   Procedural History .................................................... 3

    B.   Factual History – Accommodations and Investigations ........ 4

    C.   Smith quits his jobs with the Michigan Department of Health and Human Services and rejects offers to come back to work for MDOC. ......................................... 13

Summary of Argument .................................................................. 15

Argument ....................................................................................... 17

I.   The District Court did not err when applying a sole cause element to Smith's retaliation claim because the claim was brought under Section 504 of the Rehab Act. ................. 17

    A.   Standard of Review ................................................... 17

    B.   Analysis ..................................................................... 17

        1.   Theories of retaliation ..................................... 20

        2.   The plain language of the Rehab Act ............ 22

II.  There was no failure to accommodate because Smith could not perform the essential job functions, and he has not produced evidence of a funded position at MDOC for which he was qualified. ......................................................... 30

A.   Standard of Review ..............................................................30

B.   Analysis ...............................................................................30

    1.   Smith could not perform the essential job
         functions. ...................................................................32

    2.   The transitional employment position was not a
         funded position...........................................................33

    3.   Transitional employment cannot be permanent. ........35

    4.   An accommodation cannot eliminate an essential
         job function.................................................................37

    5.   Smith was properly accommodated and not
         treated differently. ......................................................39

III.  Smith's "me too" evidence was properly restricted because
      this evidence involved different claims, different
      decisionmakers, acts not at the same facility, and alleged
      acts that were not close in time to the present allegations...........40

A.   Standard of Review ..............................................................40

B.   Analysis ...............................................................................41

    1.   The District Court properly set parameters on
         Smith's proffered "me too" evidence............................41

    2.   Smith's proffered "me too" evidence was also
         improper character evidence. ......................................44

IV.  Smith's "damages" chart was properly excluded from
      admission into evidence because it was not a summary. ..............48

A.   Standard of Review ..............................................................48

B.   Analysis ...............................................................................49

    1.   Smith's "damages" chart was not a summary of
         evidence. ....................................................................51

2.    Smith's "damages" chart was inaccurate.....................54

V.    The Court's inclusion of the word "unconditional" in the jury instructions was appropriate. ........................................55

A.    Standard of Review ................................................55

B.    Analysis ...................................................................56

Conclusion and Relief Requested........................................59

Certificate of Compliance ....................................................60

Certificate of Service ...........................................................61

Designation of Relevant District Court Documents ..............62

# TABLE OF AUTHORITIES

Page

## Cases

*A.C. ex rel. J.C. v. Shelby County Board of Education,*
  711 F.3d 687 (6th Cir. 2013) ...................................................... 26, 27, 28

*Bent-Crumbley v. Brennan,*
  799 F. App'x 342 (6th Cir. 2020) ............................................................. 18

*Bultemeyer v. Fort Wayne Cmty. Schs.,*
  100 F.3d 1281 (7th Cir. 1996) ................................................................. 31

*Burns v. Coca-Cola Enters., Inc.,*
  222 F.3d 247 (6th Cir. 2000) .................................................................... 38

*Craddock v. Fedex Corp. Servs., Inc.,*
  102 F.4th 832 (6th Cir. 2024) .................................................................. 48

*Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro,*
  477 F.3d 807 (6th Cir. 2007) .................................................................... 27

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
  596 U.S. 212 (2022) .................................................................................. 3

*Dalton v. Subaru-Isuzu Auto., Inc.,*
  141 F.3d 667 (7th Cir. 1998) .................................................................... 35

*Dunning v. War Mem'l Hosp.,*
  534 F. App'x 326 (6th Cir. 2013) ........................................... 1, 19, 26, 28

*EEOC v. Ford Motor Co.,*
  782 F.3d 753 (6th Cir. 2015) .................................................................... 38

*EEOC v. Univ. of Detroit,*
  904 F.2d 331 (6th Cir. 1990) .................................................................... 30

*Gomez v. Great Lakes Steel Div., Nat. Steel Corp.,*
  803 F.2d 250 (6th Cir. 1986) ............................................... 48, 50, 51

*Gribcheck v. Runyon*,
   245 F.3d 547 (6th Cir. 2001) ............................................................... 28

*Griffin v. Finkbeiner*,
   689 F.3d 584 (6th Cir. 2012) ............................................................... 41

*Hall v. United States Postal Serv.*,
   857 F.2d 1073 (6th Cir. 1988) ............................................................. 37

*Hisrich v. Volve Cars of N. Am., Inc.*,
   226 F.3d 445 (6th Cir. 2000) ............................................................... 56

*Hoskins v. Oakland County Sheriff's Department*,
   227 F.3d 719 (6th Cir. 2000) ................................................... 32, 35, 37

*Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*,
   974 F.3d 652 (6th Cir. 2020) ......................................................... 18, 19

*Kleiber v. Honda of America Manufacturing*,
   485 F.3d 862 (6th Cir. 2007) ......................................................... 31, 38

*Lai Ming Chui v. Donahoe*,
   580 F. App'x 430 (6th Cir. 2014) ........................................................ 33

*Lewis v. Humboldt Acquisition Corp*,
   681 F.3d 312 (6th Cir. 2012) ...................................................... passim

*M.L. v. Williamson County Board of Education*,
   772 F. App'x 287 (6th Cir. 2019) ........................................................ 28

*Martin v. Funtime, Inc.*,
   963 F.2d 110 (6th Cir. 1992) ............................................................... 50

*McBride v. BIC Consumer Prods., Mfg., Co., Inc.*,
   583 F.3d 92 (2d Cir. 2009) .................................................................. 38

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) ............................................................................ 28

*McLeod v. Parsons Corp.*,
   73 F. App'x 846 (6th Cir. 2003) ..................................................... 46, 47

*Mickey v. Zeidler Tool & Die Co.,*
516 F.3d 516 (6th Cir. 2008) ................................................................ 27

*Monette v. Elec. Data Sys. Corp.,*
90 F.3d 1173, 1184 (6th Cir. 1996) ...................................................... 31

*Morvay v. Maghielse Tool & Die Co.,*
708 F.2d 229 (6th Cir. 1983) ................................................................ 58

*Nguyen v. City of Cleveland,*
229 F.3d 559 (6th Cir. 2000) ................................................................ 27

*Old Chief v. United States,*
519 U.S. 172 (1997) .............................................................................. 40

*Peat, Inc. v. Vanguard Research, Inc.,*
378 F.3d 1154 (11th Cir. 2004) ............................................................ 52

*Pinkerton v. Spellings,*
529 F.3d 513 (5th Cir. 2008) ................................................................ 29

*Ridgely Mfg. Co. v. NLRB,*
510 F.2d 185 (D.C. Cir. 1975) .............................................................. 58

*Schobert v. CSX Transportation Inc.,*
504 F. Supp. 3d 753 (S.D. Ohio 2020) ................................................. 29

*Schrack v. RNL Carriers, Inc.,*
565 F. App'x 441 (6th Cir. 2014) ......................................................... 41

*Sprint/United Mgmt. Co. v. Mendelsohn,*
562 U.S. 379 (2008) .............................................................................. 40

*Thompson v. E.I. DuPont deNemours & Co.,*
70 F. App'x 332 (6th Cir. 2003) ........................................................... 35

*Thompson v. Henderson,*
226 F. App'x 466 (6th Cir. 2007) ......................................................... 36

*United States v. Abel,*
469 U.S. 45 (1984) ................................................................................ 40

*United States v. Beaty,*
  245 F.3d 617 (6th Cir. 2001) .............................................................. 30

*United States v. Blanchard,*
  618 F.3d 562 (6th Cir. 2010) ............................................................. 17

*United States v. Bray,*
  139 F.3d 1104 (6th Cir. 1998) ........................................................... 51

*United States v. Frederick,*
  406 F.3d 754 (6th Cir. 2005) ....................................................... 17, 19

*United States v. Johnson,*
  79 F.4th 684 (6th 2023) ................................................................... 48

*United States v. Scales,*
  594 F.2d 558 (6th Cir. 1979) ............................................... 49, 50, 52

*United States v. Seelig,*
  622 F.2d 207 (6th Cir. 1980) ....................................................... 49, 50

*Virostek v. Liberty Twp. Police Dep't/Trustees,*
  14 F. App'x 493 (6th Cir. 2001) ........................................................ 56

*Wardia v. Justice & Pub. Safety Cabinet Dep't of Juv. Just.,*
  509 F. App'x 527 (6th Cir. 2013) ..................................................... 36

*Willard v. Potter,*
  264 F. App'x 485 (6th Cir. 2008) ............................................. 2, 33, 38

*Williams v. AT&T Mobility Servs. LLC,*
  847 F.3d 384 (6th Cir. 2017) ............................................................ 38

## Statutes

28 U.S.C. § 1291 ............................................................................. xi

28 U.S.C. § 1331 ............................................................................. xi

29 U.S.C § 794 ...................................................................... passim

42 U.S.C. § 12112 ...................................................................... 18, 23

42 U.S.C. § 12203.................................................................. 18, 23, 24

42 U.S.C. § 1983.......................................................................... 27

**Rules**

29 C.F.R. § 33.13........................................................................ 25

29 C.F.R. § 33.6.......................................................................... 25

Fed. R. App. P. 26........................................................................ xi

Fed. R. App. P. 4......................................................................... xi

Fed. R. Civ. P. 56........................................................................ 30

Fed. R. Evid. 1006.............................................................. passim

Fed. R. Evid. 404............................................................ 43, 44, 45, 46

## STATEMENT IN OPPOSITION TO ORAL ARGUMENT

Defendants-Appellees Michigan Department of Corrections and the State of Michigan (collectively, MDOC) do not request oral argument. This case involves straightforward legal issues that have been thoroughly developed in the briefing and no oral argument is necessary. Based on the evidence produced at trial, there is no justification for discarding the jury verdict in this case because of any issue asserted by Plaintiff-Appellant Porter Smith, and the District Court instructed the jury correctly.

## JURISDICTIONAL STATEMENT

Jurisdiction is not in dispute.  The complaint had two counts under the Rehabilitation Act (Rehab Act).  (Compl., R. 1, Page ID # 6, 10.)  The United States District Court for the Eastern District of Michigan had federal question jurisdiction pursuant to 28 U.S.C. § 1331.  This Court has jurisdiction over all appeals from final orders.  28 U.S.C. § 1291.  On April 12, 2024, a jury verdict and judgment were entered dismissing the case.  (Verdict Form, R. 89, Page ID # 2148; Judgment, R. 92, Page ID # 2154.)  Smith filed his Notice of Appeal on May 13, 2024.  (Notice of Appeal, R. 98, Page ID # 2845.)  Because May 12, 2024, was a Sunday, this appeal was timely.  Fed. R. App. P. 4(a)(1)(a); Fed. R. App. P. 26(a)(1)(c).

## STATEMENT OF ISSUES PRESENTED

1. Section 504 of the Rehab Act provides that "No otherwise qualified individual with a disability" "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . ."  Smith has raised a retaliation claim under this provision.  Does the sole causation element for a cause of action found in Section 504 apply to retaliation claims brought under that section?

2. The law does not require employers to accommodate employees in an unfunded position.  Smith has failed to produce evidence of a unique, funded position at MDOC that he was qualified for, and his transitional employment position was not a funded position.  Did the District Court properly grant MDOC's motion for summary disposition when it found that Smith failed to identify an accommodation that was objectively reasonable?

3. "Me too" evidence can be admissible when (1) it is reasonably tied to the decision, (2) the "bad actors" were the same, (3) there is close temporal proximity, (4) the decision makers within the organization knew of the decisions of others, (5) the other affected employees and Smith were similarly situated, and (6) the nature of the employees' allegations are similar.  Smith claims that he should have been able to present stale, hearsay allegations of retaliation to prop up his claims of retaliation.  Did the District Court abuse its discretion when it excluded this evidence?

4. Federal Rule of Evidence 1006 provides that a party can submit a summary of documents as evidence when the evidence is voluminous.  Smith created a damages chart, did not produce the documents it was based upon, and could not explain how he created the numbers on the chart.  Did the District Court commit a reversible error when it allowed the jury to see the chart, but did not accept it into evidence?

5.    An unconditional offer of reinstatement is one that restores an employe to the position they would have had before they left employment.  Smith was given an offer that would have restored him to the position he had before he left MDOC, and no civil service rules were waived by the offer.  Did the District Court commit reversable error when it referred to the offer provided to Smith as an unconditional offer of reinstatement?

## INTRODUCTION

The Jury was asked "Did Plaintiff prove, by a preponderance of the evidence that Defendants retaliated against him in violation of the Rehabilitation Act?" and answered "No."  (R. 89, Page ID # 2148.) Smith is asking this Court to set aside this verdict.

This Court has ruled numerous times that "[t]he prima facie case under the [Rehab] Act mirrors that under the ADA, with only one relevant exception: Under the Rehab Act, Plaintiff must show that he was excluded *solely* by reason of his disability." *Dunning v. War Mem'l Hosp.*, 534 F. App'x 326, 334 (6th Cir. 2013).  Smith only disputes the instruction that the District Court gave as to the fifth element of a prima facie case for retaliation.  That instruction stated that the jury must find "that there was a causal connection between the . . . protected activity and the materially adverse action, which means that defendants took an employment action adverse to Mr. Smith solely by reason of his protected activity."  (Jury Trial Tr. 04/11/2024, R. 95, Page ID 2811.)  Under the plain language of the Rehab Act, the District Court did not err when providing this instruction.

The second issue presented to this Court is whether the District Court properly granted MDOC's motion for summary judgment. The argument boils down to this, Smith was a Corrections Officer on transitional employment performing duties that were not Corrections Officer duties, and he believes that he should have been permitted to stay in that position longer. The transitional employment position, however, was not an actual, funded position, and the law, as quoted by Smith in his brief, requires a plaintiff to identify "a vacant, funded position for which she was qualified, with or without accommodation, that existed at the time of her request for reassignment." *Willard v. Potter*, 264 F. App'x 485, 487–88 (6th Cir. 2008). There is testimony that the transitional employment position was unfunded, and the testimony Smith cites to claim the position was a funded position does not actually say that it is a funded position.

Smith presents two evidentiary issues, but there was no reversable error. Finally, this Court need not reach Smith's claim that the District Court should not have called offers to reinstate Smith unconditional offers of reinstatement in the jury instructions, but this argument misstates the law.

## STATEMENT OF THE CASE

### A.    Procedural History

This case involved two claims brought expressly under Section 504 of the Rehab Act: (1) discrimination/failure to accommodate, and (2) retaliation.  (R. 1, Page ID # 6, 10.)

The parties both filed motions for summary judgment.  (Pl. Mot. Summ. J., R. 25; Defs. Mot. Summ. J., 26.)  The District Court granted summary judgment as to the discrimination/failure to accommodate claim but allowed the retaliation claim to go to trial.  (Order Mots. Summ. J., R. 35.)  After the United States Supreme Court issued its opinion in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022), which limited damages available under the Rehab Act, the District Court allowed MDOC to file a second motion for summary judgment as to damages.  (Order Allowing Second Mot. Summ. J., R. 49, Page ID # 1089.)  The District Court granted in part and denied in part the motion as to damages.  (Order Second Mot. Summ. J., R. 56, Page ID # 1537.)  This case then proceeded to trial.  The issue of the applicable causation element for Rehab Act cases was briefed by both parties.  (Pl. Trial Br., R. 74; Defs. Trial Br., R. 75.)  The District Court

entered its ruling on the causation on April 3, 2024, holding that the appropriate causation element for the Rehab Act is sole cause. (Jury Trial Tr. 04/03/2024, R. 105, Page ID # 3739–3742.) Trial began on April 2, 2024, and a verdict was returned on April 12, 2024. The jury entered the following verdict:

---

**VERDICT FORM**

We, the jury, answer the questions submitted as follows:

**Question 1.** Did Plaintiff prove, by a preponderance of the evidence, that Defendants retaliated against him in violation of the Rehabilitation Act?

**ANSWER**: _____ Yes  ✓_____ No

---

Smith then filed a notice of appeal. (R. 98, Page ID # 2845.)

## B.    Factual History – Accommodations and Investigations

Smith was a Corrections Officer for MDOC. (R. 1, Page ID # 3, ¶12.) The job description of a corrections officer includes:

> considerable walking, lifting, bathing, providing direct care
> to prisoners, climbing stairs and interventions with
> prisoners' misbehavior, including physical intervention.
> Hazards include working in a high security prison with
> convicted felons who are also mentally ill, some prisoners
> may demonstrate assaultive behavior, general noise of
> prison unit, abusive language, exposure to body fluids,
> occasional use of pepper gas, etc., to manage disruptive

4

prisoners, heating problems and no cooling mechanisms available. [Position Description, R. 26-2, Page ID # 255.]

Smith claims that a July 2017 injury to his hip was work-related and occurred while he was responding to a fight. (R. 1, Page ID # 3, ¶13.) The origin of the injury is not relevant to this case. When Smith testified at his deposition that he "initially went to go see" his doctor, Dr. Guettler, the doctor told Smith he "should see Dr. Karadsheh," a surgeon. (Smith Dep. Tr., R. 26-3, Page ID # 304.) Dr. Karadsheh told Smith, " '[I]t's not going to get better, . . . you have to have . . . it replaced.' " (*Id.* at Page ID # 297.) Yet Smith waited to get surgery until "October of 2018." (*Id.*) The reason – "basically I was trying to avoid [surgery]." (*Id.*) Smith testified to the same at trial. (Jury Trial Tr. 04/08/2024, R. 93, Page ID # 2316.)

Smith was on medical leave for about six months and was placed on transitional employment on December 13, 2017. (Medical File, R. 26-6, Page ID # 475.) This was a temporary accommodation and not a corrections officer position. (Bridgford Dep. Tr., R. 26-7, Page ID # 614.) This temporary accommodation is supposed to last six months while a person is recovering. (*Id.* at Page ID # 616.) Transitional employment positions are non-funded positions meaning that it was not a position

that was provided for in the budget. (*Id.* at Page ID # 623.)  At trial and his deposition, Warden Patrick Warren confirmed that transitional employment positions were not funded positions. (Warren Dep. Tr., R. 25-10, Page ID # 200; Jury Trial Tr. 04/09/2024, R. 94, Page ID # 2450.) There is no evidence in the record that the transitional employment position was a permanent, funded position. (R. 35, Page ID # 888.)

While he was on transitional employment assisting the Institutional Training Officer, Smith was reported for sexual harassment by one of the trainee nurses. (Harassment Investigation, R. 26-5, Page ID # 419 (contained in Trial Ex. E admitted on 04/09/2024, R. 94, Page ID # 2345; as modified by the Court R. 93, Page ID # 2248–2251).)  This report was dated June 9, 2018. (R. 26-5, Page ID # 435–436 (contained in Trial Ex. E).)  The nurse alleged numerous incidents that she claimed made her feel uncomfortable. These included allegations that Smith showed her pictures of his ex-girlfriend, he grabbed her hand and commented about her wedding ring, he asked her to lunch, and he wrote his name down in her notebook. (R. 26-5, Page ID # 431–433.)  The nurse also alleged "that while at the printer Officer Smith stated to her that she needed to 'cover up' and was looking her up

6

and down and even guessed her dress size." (*Id.* at Page ID # 431.)  The Court did not permit all of the details of this investigation to be shown to the jury.  (R. 93, Page ID # 2248–2251.)

After he had been on transitional employment for several months, Smith submitted medical documentation requesting an extension of his transitional employment.  (R. 26-6, Page ID # 475.)  In May, Smith's transitional employment was extended to June 13, 2018 – this was the full six months of transitional employment.  (*Id.*, see also *id.* at Page ID # 484 (Page ID # 484 contained in Trial Ex. A, admitted 04/09/2024, R. 94, Page ID # 2412–2413).)  Smith was then granted another extension to July 13, 2018.  (R. 26-6, Page ID # 471 (contained in Trial Ex. A).)

On June 28, 2018, Smith was provided notice that he was under investigation for the harassment incident that had been reported earlier in the month.  (R. 26-5, Page ID # 443 (contained in Trial Ex. E).)  On August 7, 2018, Smith was interviewed and denied the allegations.  (R. 26-5, Page ID # 457, 420 (Page ID # 420 contained in Trial Ex. E).)

At the end of his transitional employment period, Smith filed an ADA accommodation request.  (ADA Request, R. 26-8, Page ID # 635–636 (contained in Trial Ex. 19 admitted on 04/04/2024, Jury Trial Tr.

04/04/2024, R. 104, Page ID # 3584).)  Smith's doctor wrote that the

duration of the impairment was "permanent – until [Smith] has

replacement."  (R. 26-8, Page ID # 636 (contained in Trial Ex. 19).)  The

doctor indicated that Smith could not perform all job duties listed in the

job description.  (*Id.*)  The doctor wrote that Smith's restrictions were:

> No lifting over 10 lbs
> No kneeling, squatting, climbing, twisting,
> bending.
> Limit standing, walking.  Sitting job only.  [*Id.*]

The doctor's note did not include any indication that Smith would have

the surgery he needed or when he would be cleared to return to full

duty.  (*Id.* at Page ID # 630.)  Smith's request was denied because "the

facility does not have any vacancies that meet your qualifications."  (R.

26-8, Page ID # 629.)

Smith disputed this rejection claiming that another officer, Sean

MacLean,[1] was accommodated on light duty for more than six years.

(*Id.* at Page ID # 630.)  Unlike Smith, however, MacLean had a return-

to-work date and was "cleared to return to full duty."  (Email to Warren,

R. 26-10, Page ID # 645 (contained in Trial Ex. 17 admitted on

---

[1] Sean MacLean is sometimes referred to as "Sean McClean" in the
record.

04/04/2024, R. 104, Page ID # 3598–3599).)  Further, there was trial

testimony from Elaine Felder née Davis, human resources director at

Smith and MacLean's correctional facility, that MacLean was not on

light duty or transitional employment for six years; instead, MacLean

had different injuries and returned to work between the injuries.  (R.

104, Page ID # 3581, 3599.)  In 2018, Felder explained to Joanne

Bridgford, the Equal Employment Opportunity Administrator, that

"[p]reviously, [MacLean] had been on a worker's compensation [leave of

absences] and has returned to work on light duty and/or transitional

employment assignments.  He has also worked out of class in a vacancy.

Due to the multiple times he's been off work and/or in a light duty

status and working out of class, it may seem to others that he was being

accommodated over his entitlements."  (Accommodation Email, R. 26-

11, Page ID # 647.)

    This is consistent with Warden Warren's email in Trial Exhibit

17, and with Ms. Felder's deposition transcript.  (Davis Dep. Tr., R. 25-

5, Page ID # 185.)  At trial, Warden Warren testified that he was not

frustrated "whatsoever" by Smith's attempts to compare himself to

MacLean and testified that Warden Warren himself had used light duty

or transitional employment during his career, and "encourage[d]" his employees to use it.  (R. 94, Page ID # 2450.)

After this, Smith and MDOC continued to engage in an interactive process and Smith asked to be accommodated in a storekeeper position, but he was not qualified for that position.  (R. 26-11, Page ID # 647.) Having been provided no information that Smith's medical condition would be anything but permanent, Smith was sent an options letter. (Options Letter, R. 26-9, Page ID # 641–642.)  On August 9, 2018, Smith dated and signed the options letter electing to go on a waived rights leave of absence.  (*Id.* at Page ID # 643 (contained in Trial Ex. 35 admitted on 04/08/2024, R. 93, Page ID # 2222–2223).)

The investigation into Smith regarding the nurse trainee's complaints was concluded on August 14, 2018.  (R. 26-5, Page ID # 419; (contained in Trial Ex. E).)  After the file was reviewed on September 13, 2018, Smith was sent a letter informing him that the investigation was closed, and it would not appear in his record.  (R. 26-5, Page ID # 415.)

During the Harassment Investigation into Smith, it was determined that he was sending personal emails to non-MDOC staff

from his work computer.  (*Id.* at Page ID # 421.)  During trial, Smith

admitted that he signed as to the accuracy of a statement that quoted

Smith as saying: "I have a lot of pictures on my email. . . . "  (R. 94, Page

ID # 2358–2359; R. 26-5, Page ID # 457.)  Corrections officers do not

have a work-related reason to have "lots of pictures" in their email, and

this triggered a second investigation.  (Email Investigation, R. 26-12,

Page ID # 650 (contained in Trial Ex. F admitted on 04/03/2024, R. 105,

Page ID 3983).)  Smith was sent a questionnaire for the Email

Investigation, and there is no dispute that MDOC never received a copy

back.  (R. 26-12, Page ID # 655 (contained in Trial Ex. F).)  The

investigation eventually concluded without Smith ever coming forward

to tell his side of the story.  Smith claims that he mailed the

questionnaire back, but at trial, when Smith was asked if he sent the

questionnaire back with tracking, he said no.  (R. 94, Page ID # 2359.)

Smith said he did not send the questionnaire back via certified mail, he

did not take a picture of it or make a photocopy of it before sending it

back.  (*Id.* at Page ID # 2359–2360.)

 More than a year after Smith left MDOC, and after he had

surgery to replace his hip, Smith presented MDOC with a doctor's note

indicating he could return to work without restrictions along with a request to return to work and a resume. (Return to Work Request, R. 26-13, Page ID # 674 (Contained in Trial Ex. 50, admitted 04/08/2024, R. 93, Page ID # 2267).) The employee screening process was started, pursuant to MDOC policy, and it was determined that, "[a]t the time of his departure, Mr. Smith had pending discipline for violation of work rule #38 Reporting Requirements (During a review of his Outlook email account, personal emails to non-MDOC staff were found. He was sent a questionnaire, and he failed to return it)." (Return to Work Memo, R. 26-14, Page ID # 678 (contained in Trial Ex. 52 admitted on 04/08/2024, R. 93, Page ID # 2268).) This request to return to work was denied. (*Id.*, see also Return to Work Denial Letter, R. 26-15, Page ID # 680 (contained in Trial Ex. 53 admitted on 04/08/2024, R. 93, Page ID # 2269).)

Regarding this process Jonathan Patterson, former Human Resources Director for MDOC, testified that the individuals involved in the decision not to rehire had no knowledge of the accommodation requests. (R. 94, Page ID # 2518, 2533.) The documents showed that the person who did know about the accommodation requests, Warden

12

Warren, "approved the rehire." (R. 26-14, Page ID # 678 (contained in Trial Ex. 52).)

### C.    Smith quits his jobs with the Michigan Department of Health and Human Services and rejects offers to come back to work for MDOC.

After MDOC declined to rehire Smith, the Michigan Department of Health and Human Services (DHHS) hired Smith to be a Forensic Security Assistant. (R. 94, Page ID # 2368.) This job had the same responsibilities as a Corrections Officer, it just meant Smith worked at one of the state inpatient mental hospitals instead of a correctional facility. (*Id.* at Page ID # 2541.) The pay scale and benefits for the position are the same, but there were higher promotional opportunities as the Forensic Security Assistant. (*Id.*) The position is covered by the same union – the Michigan Corrections Organization. (*Id.*) After obtaining this position, Smith quit. (*Id.* at Page ID # 2368.) Smith submitted a resignation letter with no explanation.

Next, Smith went to work for DHHS in a different position as an Assistant Payment Worker. This position had a higher pay scale, and the exact same benefits. It was office work, but it was also a union job. Smith quit this position, too. (R. 95, Page ID # 2664.)

Finally, during the present litigation on December 4, 2020, MDOC learned at Smith's deposition that he claimed that he mailed back the questionnaire.  (R. 26-3, Page ID # 264, 328.)  Smith also stated at his deposition that he would be willing to come back to work for MDOC.  (*Id.* at Page ID # 393–394.)  After MDOC became aware of these facts it provided two unconditional offers of reinstatement to place Smith in the exact same Corrections officer position he held when he worked for MDOC.  (First Unconditional Offer of Reinstatement, R. 40-3, Page ID # 936 (contained in Trial Ex. J admitted on 04/03/2024, R. 105, Page ID # 3830); Second Unconditional Offer of Reinstatement, R. 51-2, Page ID # 1121 (contained in Trial Ex. K admitted on 04/03/2024, R. 105, Page ID # 3848).)  The offer first would have allowed Smith to come back to work at the Macomb Correctional Facility, the last facility that he had worked.  (R. 40-3, Page ID # 936 (contained in Trial Ex. J).)  The second offer provided that Smith could return to work at the facility of his choice.  (R. 51-2, Page ID # 1121 (contained in Trial Ex. K).)  The second offer noted that the "offer does not waive any of management's rights including, but not limited to, rights granted under Michigan Civil Service Commission Rule 6-4."  (*Id.*)  This civil service rule applies to all

14

state employees and applied to Smith when he used to work for MDOC. This notation was included in the offer to indicate that should the facility of Smith's choice close at some point in the future, then MDOC would not be obligated by the agreement to keep Smith employed at the facility he chose until he retired. Smith rejected both offers. (R. 93, Page ID # 2286.)

Instead, Smith filed suit against MDOC and the State of Michigan. At trial Smith demanded $1.2 million and told the jury they could "award more than that." (R. 95, Page ID # 2793.) The jury returned a verdict against Smith. (R. 89, Page ID # 2148.)

## SUMMARY OF ARGUMENT

This case involves five issues. First, Smith is challenging the causation instruction issued to the jury, claiming that it should have described the causation element as something less than sole cause. However, Smith brought his claim under Section 504 of the Rehab Act and the plain language of the Act requires this sole cause instruction.

Second, Smith claims that the district court should not have granted summary judgment in favor of MDOC as to his discrimination claim. But Smith was not able to fulfill the essential job functions of a

Corrections Officer and has not identified any funded position that he was qualified to fill.  These deficiencies are fatal to his claim.

Third, some of the alleged "me too" evidence Smith sought to have admitted was properly excluded because there was no connection to Smith's allegations.

Fourth, Smith's damages chart was shown to the jury, but the District Court properly excluded it from evidence and from going to the jury room because it was not a summary under Federal Rule of Evidence 1006.

Fifth, Smith claims that the District Court should not have issued a jury instruction regarding Smith's unconditional offer of reinstatement because he did not receive such an offer.  However, the District Court did not err in giving this instruction because the offer did not contain any conditions as it simply contained a clause indicating that the offer did not waive the Civil Service Rules that apply to all Corrections Officers.

16

# ARGUMENT

## I. The District Court did not err when applying a sole cause element to Smith's retaliation claim because the claim was brought under Section 504 of the Rehab Act.

### A. Standard of Review

When reviewing jury instructions, this Court looks at "the instructions as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision." *United States v. Frederick*, 406 F.3d 754, 761 (6th Cir. 2005). This Court, however, reviews "the legal accuracy of jury instructions de novo." *United States v. Blanchard*, 618 F.3d 562, 571 (6th Cir. 2010).

### B. Analysis

The Rehab Act provides that causation under Section 504 is sole cause, and this is codified at 29 U.S.C § 794. Section 504 of the Rehab Act states:

> No otherwise qualified individual with a disability . . . shall, *solely* by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . . [29 U.S.C. § 794 (emphasis added).]

17

It is true that claims under the American with Disabilities Act (ADA) and the Rehab Act are often analogous.  For example, this Court has held that to show causation under an ADA and Rehab Act retaliation claim " 'a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken' in the absence of the protected conduct." *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 664 (6th Cir. 2020) (citations omitted).  Despite the two statutes similarities, this Court has also held that the sole-cause standard is a "creature of the Rehabilitation Act . . . ." *Bent-Crumbley v. Brennan*, 799 F. App'x 342, 345 (6th Cir. 2020).  And the plain language of the Rehab Act confirms this conclusion.  *Compare* 29 U.S.C. § 794 *with* 42 U.S.C. § 12112 *and* 42 U.S.C. § 12203.  As a result, this Court has followed the plain language of the Rehab Act and applied the sole-cause standard to Rehab Act claims.  *Lewis v. Humboldt Acquisition Corp*, 681 F.3d 312, 315–16 (6th Cir. 2012) (en banc) ("No matter the common history and shared goals of the two laws, they do not share the same text.  Different words usually convey different meanings, and that is just the case here."); *see id.* at 317 ("The sole-cause standard in the end is a creature

of the Rehab[ ] Act . . . ." *Id.* at 117; *see also Dunning v. War Mem'l Hosp.*, 534 F. App'x 326, 334 (6th Cir. 2013) ("The prima facie case under the [Rehab] Act mirrors that under the ADA, with only one relevant exception: Under the Rehab[ ] Act, Plaintiff must show that he was excluded *solely* by reason of his disability.") (citations omitted).

Smith disputes the causation jury instruction.  This instruction stated that the jury must find "that there was a causal connection between the . . . protected activity and the materially adverse action, which means that defendants took an employment action adverse to Mr. Smith solely by reason of his protected activity."  (R. 95, Page ID # 2811.)  Even if there was a difference between the standard articulated in *Kirilenko-Ison* and the one articulated by the District Court, there is no way that "the instructions as a whole" "fail to adequately inform[ ] the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision." *Frederick*, 406 F.3d 754, 761.  This is especially true when the question put to the jury was: "Did Plaintiff prove, by a preponderance of the evidence that Defendants retaliated against him in violation of the Rehab[] Act?"  (R. 98, Page ID # 2845.)

19

### 1.    Theories of retaliation.

Smith explicitly brought a claim for "Retaliation (Violation of 29 U.S.C. § 794, Section 504 of the Rehabilitation Act)."  (R. 1, Page ID # 10.)  Section 504 creates the basis for Smith's cause of action and based on the plain language of this section, the causation element for a claim arising under this section is sole cause.  Smith's claim of retaliation arises under the plain language of Section 504 because regardless of the theory of what the adverse action was, Smith's claim is that he was treated differently because of his previous disability.

Smith has argued that the decision to investigate him was retaliatory based on his disability and the accommodations he needed. The testimony at trial demonstrated that MDOC was obligated to investigate Smith because he was accused of sexually harassing a female co-worker.  Smith presented no evidence at trial that his co-worker had any ulterior motive in making her report.  There was evidence presented at trial that Smith went on the Waived Rights Leave of Absence on August 9, 2018, (R. 26-9, Page ID # 643 (contained in Trial Ex. 35)), and then MDOC investigator found insufficient evidence regarding the sexual harassment allegations on August 14,

2018, because Smith's co-worker had quit MDOC and did not participate in the investigation.  (R. 26-5, Page ID # 419 (contained in Trial Ex. E).)  Finally, Warden Warran also found insufficient evidence regarding the harassment allegations on August 24, 2018.  (R. 26-5, Page ID # 417 (contained in Trial Ex. E).)  The sexual harassment allegations had to be taken seriously and be investigated under the law and policy.  There is no evidence that protected activity prompted the employee to bring accusations against Smith on June 9, 2018.  If anyone had wanted to retaliate against Smith for his seeking or using an accommodation, they ostensibly would have found sufficient evidence that he violated these work rules, but they did not.

The next part of Smith's theory of retaliatory investigations is that the Email Investigation was retaliatory.  However, Smith admitted at trial that he told the inspector in the Harassment Investigation that he "had lots of pictures on his email," and there was at least one email that Smith produced that was inappropriate and unprofessional.  (R. 94, Page ID # 2358–2359; R. 26-5, Page ID # 457.)  This is why the investigation was initiated, and Smith pointed to no evidence that it was based on his disability or leave usage.  Further, during the

21

investigation, MDOC sent Smith a questionnaire via certified mail. There is no dispute that Smith received it, but there is no evidence that MDOC received a copy of the questionnaire back. This failure to return the questionnaire is the reason Smith was not rehired.

If Smith's theory is that he was not rehired because he had been difficult to accommodate, then this is a claim under Section 504, that he was not rehired "*solely* by reason of . . . his disability." But Smith produced no evidence to contradict Patterson's testimony that the decisionmakers knew nothing about his requested accommodations.

### 2.    The plain language of the Rehab Act

Contrary to Smith's argument, the inclusion of Subsection (d) in Section 504 does not alter the causation requirement of the Rehab Act. Subsection (d) simply provides definitions and "standards" to be used in determining if there has been "employment discrimination" in violation of the Act, it does not change the causation element of a claim under the Act. 29 U.S.C. § 794. Notably subsection (d) does not incorporate claims or causes of action only "standards" and those "standards" cannot alter those set forth in Section 504 itself. If they did the

language would be nugatory, and there would have been no point to adopting the actual language of Section 504.

Subsection (d) provides:

> The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990."

29 U.S.C. § 794(d).  This subsection has not been altered since at least 1998 and was the same, in all relevant portions, when this Court decided *Dunning* and *Lewis*.  29 U.S.C. § 794 (1998).  Subsection (d) includes references to several sections of Title I and Title V of the ADA, but of particular relevance here, it includes references to both discrimination and retaliation provisions under 42 U.S.C. § 12112 and 42 U.S.C. § 12203.

The referenced discrimination section of Title I of the ADA provides: "No covered entity shall discriminate against a qualified individual *on the basis of disability* in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112 (emphasis added).  This

language from the ADA does not contain the sole cause language of Section 504. In *Lewis*, this Court found that, based on the text of 29 U.S.C § 794(a), these causes of action have different causation elements. *Lewis*, 681 F.3d at 317. In other words, even though subsection (d) applies "[t]he standards used to determine whether this section has been violated[,]" this language did not displace the sole cause language of Section 504 for Rehab Act claims.

The same analysis applies to the reference in Section 504(d) of the Rehab Act to the retaliation provision of the ADA within 42 U.S.C. § 12203. This ADA section also does not use the sole cause language of the Rehab Act, but just as the ADA's discrimination provision does not change the causation element of a discrimination claim brought under the Rehab Act, so too the retaliation section of the ADA does not change the causation element of a retaliation claim under the Rehab Act. The language of the ADA's retaliation provision states: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."

24

42 U.S.C. § 12203.  It is not clear that Smith did anything that falls under this definition of retaliation.  The closest Smith can get to this definition is his complaint to Warden Warren that Officer MacLean was treated more generously than Smith was treated.  However, this was not actually filing a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing under the Act.  Smith's allegation is more appropriately said to be a claim of retaliation specifically under Section 504(a) of being treated differently, or not rehired "by reason of  . . . his disability."  29 U.S.C. § 794.  Accordingly, there is nothing found in the language of the ADA that would change the causation element of a Rehab Act claim.

The same analysis applies to the adopted regulation regarding the Rehab Act.  The discrimination section of the Code of Federal Regulations states: "No qualified individual with handicaps shall, *on the basis of handicap*, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department."  29 C.F.R. § 33.6. This "on the basis of" language was adopted before *Lewis* and does not

modify the causation element of a Rehab Act case.  Similarly, 29 C.F.R.

§ 33.13 provides that a person must not

> discharge, intimidate, retaliate, threaten, coerce or
> otherwise discriminate against any person *because* such
> person has filed a complaint, furnished information, assisted
> or participated in any manner in an investigation, review,
> hearing or any other activity related to the administration
> of, or exercise of authority under, or privilege secured by
> section 504 and the regulations in this part.  [29 C.F.R.
> §33.13]

Just as the "on the basis of" language does not modify the sole cause

element of a discrimination claim, the "because" language does not

modify the statutory language.  To hold otherwise, would mean that

regulations could exceed the authority Congress provided to the

executive branch and actually change an element of the retaliation

cause of action.

*A.C. ex rel. J.C. v. Shelby County Board of Education* does not

change or contradict this analysis.  711 F.3d 687 (6th Cir. 2013).  It is

true that *Shelby Cnty*. found that the ADA and Rehab Acts "have a

similar scope and aim; for purposes of retaliation analysis," and that

"cases construing either Act are generally applicable to both."  *Id.* at

697.  Yet, this is nearly the same language that *Dunning* used—a

"prima facie case under the [Rehab] Act mirrors that under the ADA"—

but this Court continued that there was "one relevant exception: Under the Rehab[ ] Act, Plaintiff must show that he was excluded *solely* by reason of his disability." *Dunning*, 534 F. App'x at 334. The *Lewis* court found similarly in noting that the Rehab Act and the ADA have a "common history and shared goals . . . ." *Lewis*, 681 F.3d at 315–16.

A close reading of *Shelby Cnty.* shows that in that case there was no dispute over the applicable causation element for retaliation under the Rehab Act; instead, the Court merely indicated that, among other things, there must be a "causal connection" between the protected activity and the adverse action." 711 F.3d at 697. The Court did not actually examine the kind of causation required, sole cause, but for, or otherwise. The cases that *Shelby Cnty.* relied upon to determine if a prima facie case has been met are *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000), *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008), and *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 813 (6th Cir. 2007). None of these cases are Rehab Act cases or even ADA cases but are rather Title VII cases and a 42 U.S.C. § 1983 case. Ultimately, the question that was addressed in *Shelby Cnty.* was whether the plaintiff had met the minimal burden to

27

show evidence of causation at the summary disposition stage, and this Court found that, for the causation element, the case presented a "complicated question of fact that, on this record, must be resolved by a jury . . . ." *Shelby Cnty.*, 711 F.3d at 701. By contrast, in the present case, the question presented is the correct articulation of the causation element in a jury instruction under the Rehab Act, which *Shelby Cnty.* does not answer. Nor can *Shelby Cnty.* displace *Lewis* or *Dunning*.

Smith argues that sole cause cannot be the causation element because in *Shelby Cnty.* this Court applied the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden shifting analysis, so the appropriate causation showing would be merely "a cause." Yet *Dunning* also applied the prima facie analysis under *McDonnell Douglas* and in doing so imported a sole cause from the Rehab Act. *Dunning*, 534 F. App'x at 334.

The other cases cited by Smith similarly fail to address the issue. *M.L. v. Williamson County Board of Education* merely stands for the proposition that if you do not meet the lower causation element of the ADA, you also do not have a Rehab Act claim, and thus the causation definition did not need to be reached in that case. 772 F. App'x 287, 291

28

(6th Cir. 2019). *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001), and *Schobert v. CSX Transportation Inc.*, 504 F. Supp. 3d 753, 785 (S.D. Ohio 2020), also do not address the type of causation required for a Rehab Act claim.

Smith also cites *Pinkerton v. Spellings*, but this case does not support his position. *Pinkerton v. Spellings*, 529 F.3d 513 (5th Cir. 2008). Smith explicitly brought a claim under Section 504. (R. 1, Page ID # 10.) *Pinkerton* indicates, according to Smith, that the sole causation element did not apply to Section 501 claims, but only applied to Section 504 claims. (Pl.'s Appeal Br. 14.) Thus, *Pinkerton* supports MDOC's position, as it actually indicates that sole cause is the appropriate causation element for claims under Section 504.

Time and again, this Court has determined that the Rehab Act requires that individuals show that the employer's actions were taken "solely by reason of her or his disability." 29 U.S.C. § 794(a). "The sole-cause standard . . . is a creature of the Rehab[ ] Act . . . ." *Lewis*, 681 F.3d at 317. The District Court, therefore, provided a correct instruction to the jury.

**II.  There was no failure to accommodate because Smith could not perform the essential job functions, and he has not produced evidence of a funded position at MDOC for which he was qualified.**

### A.  Standard of Review

A district court's grant of a summary judgment motion is reviewed de novo making all reasonable inferences in favor of the non-moving party.  *United States v. Beaty*, 245 F.3d 617, 623 (6th Cir. 2001) (citing *EEOC v. Univ. of Detroit*, 904 F.2d 331, 334 (6th Cir. 1990)).  Summary judgment is appropriate when there is no genuine issue as to any material fact and the "moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

### B.  Analysis

Count I of Smith's complaint is a claim that MDOC failed to accommodate Smith.  (R. 1, Page ID # 6.)  The District Court applied the direct-evidence framework to the accommodation claim in the present case finding that MDOC did not fail to accommodate Smith.  (R. 35, Page ID # 882.)

In *Kleiber v. Honda of America Manufacturing*, this Court explained that "claims premised upon an employer's failure to offer a

reasonable accommodation *necessarily* involve direct evidence (the failure to accommodate)" because "failing to make a reasonable accommodation falls within the ADA's definition of 'discrimination.'" 485 F.3d 862, 868 (6th Cir. 2007) (emphasis added) (citing *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1283 (7th Cir. 1996)).

For the purposes of this appeal, MDOC does not dispute the application of the direct-evidence framework.  Under this framework, a plaintiff must establish that he was "disabled."  *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184, 1186 (6th Cir. 1996), *abrogated on other grounds by Lewis*, 681 F.3d at 317.[2]  For the purposes of the motion for summary disposition this element was not disputed.  (R. 25, Page ID # 106; R. 26, Page ID # 243.)

Next, a plaintiff must show that he was " 'otherwise qualified' for the position despite his . . . disability."  *Monette*, 90 F.3d at 1186.  To do this, a plaintiff must show he was able to perform the "essential functions" of the position: (a) "without accommodation"; (b) "with an

[2] *Monette* applied a sole-cause causation to an ADA claim, and this court determined, in *Lewis*, that this causation applied only in Rehabilitation cases, so while *Monette* may be abrogated as applied to ADA claims, it is appropriate to apply in Rehabilitation Act claims.

alleged 'essential' job requirement eliminated"; or (c) "with a proposed reasonable accommodation."  *Id.* at 1186.

### 1. Smith could not perform the essential job functions.

Smith was not able to perform the essential functions of a corrections officer with or without an accommodation.  In *Hoskins v. Oakland County Sheriff's Department*, this Court held that "failing to require a deputy to perform [the] function [of restraining an inmate] when the occasion arises could be a serious threat to security."  227 F.3d 719, 727 (6th Cir. 2000).  Just like a county jail, an essential function of a corrections officer is to be able to restrain a prisoner or inmate. Between July 2017 and August 2019, when Smith submitted a doctor's note saying that he could return to work, there is no evidence that Smith could perform this essential job function of a corrections officer with or without any accommodation.  Further, Smith conceded this point when he stated, "that [he] could not perform every essential function of a corrections officer."  (R. 25, Page ID # 109.)

### 2.    The transitional employment position was not a funded position.

Smith was employed as a corrections officer, so he must be evaluated based on the essential functions of the corrections officer position, not the responsibilities he had in the unfunded transitional employment position he was temporarily assigned.  *See Lai Ming Chui v. Donahoe*, 580 F. App'x 430, 434–35 (6th Cir. 2014) (where a plaintiff's position was not defined based on "the duties of her rehabilitation assignment").  As stated above, Smith could not perform the essential functions of a corrections officer.  Smith states, in his brief to this Court, that he was not properly accommodated under the Rehab Act if he can "identify[ ] 'a vacant, funded position for which [he] was qualified, with or without accommodation, that existed at the time of [his] request for reassignment.' " (Pl.'s Appeal Br. 38–39 (quoting *Willard v. Potter*, 264 F. App'x 485, 487–88 (6th Cir. 2008) (Rehab Act claim)).).  The problem for Smith is that there is no evidence on the record that the transitional employment position was a *funded* position.

Smith cites to Felder's deposition testimony to claim that the position was funded, but all Felder testified was that the transitional position was "considered for officers a light duty assignment" "for folks

that have either gotten hurt on the job or outside the job . . . ." (Felder Dep. Tr., R. 25-11, Page ID # 206.) Felder continued, "this is one of those positions, because at that time, I need assistance" they will "come and work for me up in my office." (*Id.*) This testimony is not that the transitional employment position was an actual, funded position, but rather that it was available when Felder "need[ed] assistance" meaning that it is an unfunded temporary position. (*Id.*)

Smith also claims that Elaine Felder née Davis's testimony supports his contention that the transitional employment was a funded, permanent position by quoting her to say that "the facility had 'a need' for employees such as Plaintiff working in light duty." (Pl. Appeal Br. 38–39 (quoting R. 25-5, Page ID # 185, 35:3–7).) At the deposition the question asked was: "in July, August of 2018, were there – did the facility have a need for – well, an individual like Mr. Smith to work in a light duty capacity?" (R. 25-5, Page ID # 185.) The response was "There was a need." (*Id.*) That's it. There is no evidence this was a funded position, nor an actual position established under the Michigan Civil Service Rules.

To the contrary, and as the District Court noted, Warden Warren actually testified that the transitional employment position is "not a funded position." (R. 25-10, Page ID # 200; Order, R. 35, Page ID # 888.) Joanne Bridgford also testified that this position was a temporary accommodation that is supposed to last six months while a person is recovering. (R. 26-7, Page ID # 614, 616.) MDOC's witnesses consistently testified that transitional employment positions are non-funded positions, meaning that it was not a position that was provided for in the budget. (*Id.* at Page ID # 623.)

Smith has failed to meet his burden to show the transitional employment position was funded.

### 3.    Transitional employment cannot be permanent.

The Rehab Act "does not compel an employer to convert temporary positions it has set aside into permanent positions for its disabled employees." *Hoskins*, 227 F.3d at 730 (citing *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667 (7th Cir. 1998)); *accord Thompson v. E.I. DuPont deNemours & Co.*, 70 F. App'x 332, 337 (6th Cir. 2003). Employers are "simply not required to engage [employees] in temporary light-duty assignment in perpetuity." *Thompson v. Henderson*, 226 F.

App'x 466, 474 (6th Cir. 2007). That is because requiring permanent accommodations in temporary light-duty assignments "would actually frustrate the purposes" of the Rehab Act. *Wardia v. Justice & Pub. Safety Cabinet Dep't of Juv. Just.*, 509 F. App'x 527, 532 (6th Cir. 2013). Where "employers are locked into extending temporary positions for injured workers on a permanent basis (whether initially granted consistent with company policy or as a well-intentioned special arrangement), they might well be less inclined to permit such an arrangement in the first place." *Id.*

MDOC could not permanently accommodate Smith in transitional employment, and Smith was not qualified for any other open position, so MDOC denied his request for accommodation. MDOC was more than willing to work with Smith for more than a year during his transitional employment to assist in his recovery, but his temporary assignment was never intended to be permanent, and Smith compounded these problems by delaying treatment. When Smith first met with his doctor, he was informed the only option was surgery. (R. 26-3, Page ID # 304.) Unfortunately, Smith never scheduled this surgery while he was employed by MDOC – despite MDOC's history of accommodating him.

36

Had Smith sought surgery during the nearly six months he was on medical leave and then used transitional employment to transition back into the role of a corrections officer, this dispute may have been avoided. For whatever reason, Smith chose to avoid surgery until he no longer worked for MDOC. By this time, it was too late, and MDOC was under no obligation to further extend his temporary assignment to accommodate Smith's delays in seeking treatment. MDOC's "duty to reassign an otherwise qualified disabled employee does not require that the employer create a new job in order to do so." *Hoskins*, 227 F.3d at 730. That is simply not a reasonable accommodation.

### 4. An accommodation cannot eliminate an essential job function.

This Court has held that "[a]n accommodation that eliminates an essential function of the job is not reasonable." *Hall v. United States Postal Serv.*, 857 F.2d 1073, 1078 (6th Cir. 1988). "The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment, including the existence of a vacant position for which she is qualified." *McBride v. BIC Consumer Prods.,*

*Mfg., Co., Inc.*, 583 F.3d 92, 97 (2d Cir. 2009); *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 259 (6th Cir. 2000); *Kleiber*, 485 F.3d at 870.

Nonetheless, MDOC did engage in the interactive process and evaluated Smith for the non-corrections officer position that he sought, but it found he was not qualified for those positions.  A plaintiff must "identify a vacant, funded position" that he could have filled.  *See Willard v. Potter*, 264 F. App'x 485, 487–88 (6th Cir. 2008).  Smith pointed to a warehouse storekeeper position, but MDOC found that he was not qualified for that position.  (R. 26-8, Page ID # 630; R. 26-11, Page ID # 647.)  In other words, Smith proposed no alternate position except extending the temporary, nonfunded, transitional employment position.  As the District Court noted, "an employer's failure to engage in the interactive process is actionable only if the employee can demonstrate that [there was a position for which] [ ]he was qualified." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017) (citing *EEOC v. Ford Motor Co.*, 782 F.3d 753, 766 (6th Cir. 2015) (en banc)).

38

### 5.   Smith was properly accommodated and not treated differently.

Finally, as described in the fact section of this brief, Smith was not treated differently than officer MacLean.  Officer MacLean had multiple injuries and also worked out of class.  However, this was not continuous, it was not for a single injury, and the working out of class position was neither an accommodation nor transitional employment.

MDOC did not fail to accommodate, it went above and beyond. MDOC evaluated Smith for the non-corrections officer positions that he requested, but he was not qualified.  Smith claims there were other persons who were accommodated longer than he was, but he failed to produce evidence of that allegation, and MacLean was authorized a full return to work.  Finally, Smith's claim that there were openings at the corrections officer position does not help his cause because he could not perform the essential job functions.  The accommodation Smith requested was unreasonable and he simply could not perform the essential job functions of a Corrections Officer with or without an accommodation.  Smith has failed to meet his burden of production and persuasion.

**III.  Smith's "me too" evidence was properly restricted because this evidence involved different claims, different decisionmakers, acts not at the same facility, and alleged acts that were not close in time to the present allegations.**

### A.    Standard of Review

"A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules.  Assessing the probative value of [the proffered] evidence, and weighing the factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ." *Sprint/United Mgmt. Co. v. Mendelsohn*, 562 U.S. 379, 384 (2008) (quoting *United States v. Abel*, 469 U.S. 45, 54 (1984)).  This is particularly true with respect to Rule 402 since it requires "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant." *Id.* (quoting 1 S. Childress & M. Davis, Federal Standards of Review § 4.02, p. 4–16 (3d ed. 1999)).  Under this deferential standard, courts of appeals uphold Rule 403 rulings unless the district court has abused its discretion.  *Id.* at 54.  *See Old Chief v. United States*, 519 U.S. 172, 183, n.7 (1997).

### B.    Analysis

#### 1.    The District Court properly set parameters on Smith's proffered "me too" evidence.

The District Court set proper parameters on Smith's proffered "me too" evidence.  In *Griffin v. Finkbeiner*, 689 F.3d 584, 599 (6th Cir. 2012), the Sixth Circuit identified a number of factors that go into the analysis of "me too" evidence that the District Court relied upon in making its determination in this matter.  (R. 105, Page ID # 3866.)  In particular, the Sixth Circuit held the following factors were relevant to this analysis:

> whether the evidence is logically or reasonably tied to the decision made with respect to the plaintiff; (2) whether the same "bad actors" were involved in the "other" conduct and in the challenged conduct; (3) whether the other acts and the challenged conduct were in close temporal proximity; (4) whether decision makers within the organization knew of the decisions of others; (5) whether the other affected employees and the plaintiff were similarly situated; and (6) the nature of the employees' allegations.

*Schrack v. RNL Carriers, Inc.*, 565 F. App'x 441, 445 (6th Cir. 2014) (citing *Griffin*, 689 F.3d at 599).

Here, the District Court held that Smith's proffered "me too" evidence had to fit within these parameters, noting the need to consider the same actor's involvement, temporal proximity, geographic

proximity, the decisionmakers' knowledge of other decisions, similarly situated employees, and the nature of each employee's allegations of retaliation.  (R. 105, Page ID # 3866.)

Smith was permitted to put on "me too" witnesses including Fatima Olden and Rodney Madden.  Olden testified extensively about complaints she received as a union representative but to which she had no firsthand knowledge of the facts nor the resolution of each case.  (R. 105, Page ID # 107, R. 105 Page ID # 3945–3951.)  Per Olden's own case and how these factors applied, she worked at the same facility, under the same warden (though the wardens changed from when she first made her accommodation request), she made an accommodation request within five years of Smith and worked the same position albeit on a different shift.  (R. 105, Page ID # 3871, 3900.)  While her testimony was ultimately well beyond the scope of her own case, the initial factors for her testimony fit within the district court's ruling. Olden is currently represented by Smith's counsel in a pending lawsuit against MDOC, where no factual issues have been ruled upon.  Yet, she was permitted to testify about her case and defense counsel was not permitted to cross-examine her on it based on Smith's counsel's

42

objections. (R. 105, Page ID # 3912–3914, 3917.) Thus, Smith's argument that defense counsel would have been permitted to cross-examine these additional "me too" witnesses to dispel any potential prejudice lacks credibility, as defense counsel was not permitted to do so regarding the "me too" evidence actually presented.

Additionally, Madden was permitted to testify that he felt he would be retaliated against for his testimony but then testified that he had never witnessed any retaliation. This testimony was also over MDOC's objections pursuant to Rule 404. (R. 105, Page ID # 3964–3968.) While Madden worked at the same facility and in the same position as Smith, it is unclear if any of the other factors were met as far as his testimony is concerned.

As it pertains to the witnesses that Smith was not permitted to proffer for "me too," none of them fit the factors set forth by this Court. Joann Bridgford worked for the Michigan Civil Service Commission (MCSC) as the ADA Coordinator servicing MDOC at its headquarters in Lansing. She alleged her retaliation occurred in 2012 (seven years prior to Smith's claims). Bridgford had different supervisors at MCSC and worked with different higher-level employees. Further, Bridgford did

43

not have an accommodation claim.  Given these facts, Bridgford cannot be considered similarly situated to Smith for the purposes of "me too" evidence.

The District Court appropriately applied the factors set forth by this Court and did a fact intensive case-by-case determination as to Smith's proffered witnesses.  It permitted Smith to present witnesses who the court determined were similarly situated and prohibited those that were not.  There was no abuse of discretion in prohibiting Smith's "me too" evidence, much of which was allowed over MDOC's objections.

### 2.    Smith's proffered "me too" evidence was also improper character evidence.

Smith proffered witnesses to testify about "me too" evidence and attempted to admit settlements Smith's counsel made with MDOC to show retaliation.  This is the very definition of character evidence that is inadmissible under Federal Rule of Evidence 404.  Smith attempted to make the argument that it is in MDOC's character to retaliate, i.e. it is "a widespread practice," with the direct implication being that MDOC "acted in accordance with [this] character."  (R. 71, Page ID # 1646; Pl. Appeal Br. 27); Fed. R. Evid. 404(b)(1).

Smith gives lip service to permissible uses for the alleged evidence, arguing that the evidence would show that MDOC had the "opportunity to retaliate against those who file lawsuits and subsequently return to work there," and that it could "show a lack of mistake" and "knowledge of such practices[.]"  (Pl.'s Resp to Defs.' Mot. in Limine, R. 71, Page ID # 1645, 1647; Pl. Appeal Br. 27.)  The "knowledge" Smith claims MDOC has is nothing more than knowledge of allegations, which is of no probative value.  Additionally, Smith had no witness who could lay a foundation about the facts of these cases.

 However, simply saying so does not make it true, and Smith fails to show how the alleged evidence would actually show opportunity or lack of mistake to overcome Rule 404.

Of course, every employer has an "opportunity" to retaliate against someone who files a lawsuit against it.  The lawsuit itself is that opportunity because it is a protected activity that could give rise to a retaliation claim, so there is no special "opportunity" that Smith shows by attempting to present evidence from other, unrelated, cases.  Also, it is unclear how evidence in *Hester* or *Lange* could possibly show some kind of lack of mistake.

45

Smith cites to *McLeod v. Parsons Corp.*, 73 F. App'x 846, 854 (6th Cir. 2003), for the Sixth Circuit test for admissibility under Federal Rule of Evidence 404. In *McLeod*, the Sixth Circuit affirmed a district court excluding evidence of other lawsuits filed against the employer because there "was no clear nexus between these lawsuits and this case." *Id.* at 854. The reason that there was no nexus, according to the Sixth Circuit was for two reasons, which apply here.

First, there was no nexus because "employees who filed these actions worked at several different offices[.]" *Id.* The same fact is present here, in the lawsuits Smith sought to introduce, the plaintiffs worked at different prisons, the Ryan Correctional Facility in *Hester*, the Woodland Center Correctional Facility in *Lange*, and the Macomb Correctional Facility in the present case. (Hester Compl., R. 52-3, Page ID # 1328; Lange Compl., 2:21-cv-10317, R. 1, Page ID # 2.)

Second, according to the Sixth Circuit in *McLeod*, there was no nexus because the other plaintiffs were "discharged for a variety of reasons." *McLeod*, 73 F. App'x at 854. Unlike here, neither *Hester* nor *Lange* involved a disability retaliation claim, they brought different retaliation claims. (R. 52-3, Page ID # 1330; 2:21-cv-10317, R. 1, Page

ID # 5–9.)  Just like in *McLeod*, there is no nexus between *Hester* and *Lange* and the present case.

The Sixth Circuit then concluded by saying that introducing the other employment lawsuits "would have substantially outweighed its probative value, and this evidence would have misled the jury." *McLeod*, 73 F. App'x at 854.  The same is true here.  Just like "evidence pertaining to Smith's dismissed failure to accommodate claim would very likely confuse the jury and could result in a mini-trial on that issue," so to would the dismissed complaints in *Hester* and *Lange*.  (R. 49, Page ID # 1085.)

Smith's argument that all this "evidence" somehow was going to show that it was unreasonable for him to accept the unconditional offer of reinstatement is completely undermined by the evidence that they actually presented, which was full of character assassination, prejudicial, and primarily not based on personal knowledge.  Instead of trying to prove the facts of Smith's own case, Smith's counsel simply wanted to parade his former clients through the court room and have multiple mini-trials as to the circumstances of each individual case to flood the jury with the presumption that MDOC has the character and

propensity to discriminate and retaliate.  Over MDOC's objections, the

District Court permitted Smith to put on some of these proofs but at

least limited them when the claims became too attenuated.  The

District Court did not abuse its discretion in excluding the attenuated

"me too" evidence.

## IV.  Smith's "damages" chart was properly excluded from admission into evidence because it was not a summary.

### A.    Standard of Review

Evidentiary rulings are reviewed for abuse of discretion.

*Craddock v. Fedex Corp. Servs., Inc.*, 102 F.4th 832, 841 (6th Cir. 2024).

A court will reverse for abuse of discretion only if "left with the definite

and firm conviction that the district court committed a clear error of

judgment in the conclusion it reached."  *Id.* (quoting *United States v.

Johnson*, 79 F.4th 684, 698 (6th 2023)).  The admission of summaries

under Federal Rule of Evidence 1006 is committed to the sound

discretion of the trial court.  *Gomez v. Great Lakes Steel Div., Nat. Steel

Corp.*, 803 F.2d 250, 257 (6th Cir. 1986).  Summaries under Rule 1006

are to be distinguished from such documents that "are more akin to

argument than evidence . . . .  Quite often they are used on summation."

*Id.* (quoting J. Weinsten and M Berger, *supra*, at ¶1006[07]).  Such a summary is, and should be, accompanied by a limiting instruction which informs the jury of the summary's purpose and that it does not itself constitute evidence.  *Id.*; s*ee also United States v. Seelig*, 622 F.2d 207, 214 (6th Cir. 1980), *United States v. Scales*, 594 F.2d 558, 546 (6th Cir. 1979).

### B.    Analysis

Smith proposes that his "damages" chart was simply summary evidence under Federal Rule of Evidence 1006, but it was demonstrated that it was just Smith's own calculations.  Thus, the district court appropriately kept it out of evidence while still permitting Smith to publish it to the jury and to testify about it extensively.  Rule 1006 provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court.  The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

In order to submit a summary under Rule 1006, the proponent must show that: (1) the documents are so "voluminous" that they

"cannot be conveniently examined in court" by the trier of fact, *Seelig*, 622 F.2d at 214; (2) the proponent made the documents "available for examination or copying, or both, by other parties at [a] reasonable time and place," Fed. R. Evid. 1006*; see also Scales*, 594 F.2d at 562; (3) the underlying documents are admissible, *Martin v. Funtime, Inc.*, 963 F.2d 110, 116 (6th Cir. 1992); (4) the summary is "accurate and nonprejudicial[,]" *Gomez*, 803 F.2d at 257; and (5) the summary is "properly introduced before it may be admitted into evidence." *Martin*, 963 F.2d at 115–16 (quoting *Scales*, 594 F.2d at 563).

Here, Smith failed in this showing. First, Smith never identified what documents the chart was based on aside from vague references to W-2s and tax forms—no specific list was testified to, which, in and of itself, means Smith cannot meet the first three prongs. But assuming, arguendo, that the underlying documents were voluminous, that they were provided ahead of time in discovery, and that they were admissible, Smith still cannot prove that the chart was a summary of evidence, and that the summary was accurate. First, the "damages" chart was not a summary of voluminous documents but rather Smith's own calculations based on his personal knowledge and assumptions, as

discussed below.  Second, the "damages" chart was inaccurate as it included years before any alleged protected activity occurred, used the wrong pay rate for a job he held in 2021, omitted other income entirely, and projected future earnings without any underlying documents.  As such, it was appropriate to keep Smith's "damages" chart out of evidence.

### 1.   Smith's "damages" chart was not a summary of evidence.

Smith's "damages" chart was not a summary of evidence but rather his own speculation regarding his damages.  To be a summary under Federal Rule of Evidence 1006, a summary document "must be accurate and nonprejudicial."  *Gomez*, 803 F.2d at 257.  This means that the information on the document summarizes information contained in the underlying documents accurately and in a non-misleading manner. *United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998).  *Bray* goes on to hold:

> Nothing should be lost in the translation.  It also means, with respect to summaries admitted in lieu of the underlying documents, that the information on the summary is not embellished by or annotated with the conclusions of or inferences drawn by the proponent, whether in the form of labels, captions, highlighting techniques, or otherwise.

*Id.* "[A] summary containing elements of argumentation could very well be the functional equivalent of a mini-summation by the chart's proponent every time the jurors look at it during their deliberations . . . ." *Id.* Trial courts must take care that unfair summaries are not presented to juries. *Scales*, 594 F.2d at 564; *see also Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1159–60 (11th Cir. 2004) ("And because summaries are elevated under Rule 1006 to the position of evidence, care must be taken to omit argumentative matter in their preparation lest the jury believe that such matter is itself evidence of the assertion it makes." (internal quotation and citation omitted)).

Here, Smith's "damages" chart was in violation of Rule 1006. During testimony, Smith admitted that the "damages" chart was not based on documentary evidence.

> Q.    All right.  So you're speculating as to what it would be in the future?
>
> A.    I couldn't give you exact numbers.  There's nothing to do except speculate.  [R. 94, Page ID # 2374.]

Further when Smith's counsel tried to clear up what Smith meant by "speculation," Smith still admitted he made "assumptions" or inferences when creating the chart.

52

Q.    In terms of doing financial information casting, did you make assumptions?

A.    Yes, I did.

Q.    Did you make assumptions based on the best of your ability, based on past experience?

A.    Yes.

 . . .

Q.    What assumptions did you make in calculating your wage loss?

A.    I made assumptions based upon my yearly increases. You know, we also have uniform allowances.  We also have longevity pay.  Based upon those things, yes, I made assumptions based upon my base pay and what I felt I was going to be working as far as overtime goes.  [*Id*. at Page ID # 2381–2382.]

While Smith could have submitted a chart based on documentary evidence, he did not.  It is clear from Smith's testimony and his counsel's questions that this "damages" chart was not actually a summary of documentary evidence but rather Smith's opinions. Although the District Court permitted the "damages" chart to be published to the jury on a screen and permitted Smith to testify extensively about it, the Court properly denied its admission into evidence.

### 2.    Smith's "damages" chart was inaccurate.

Smith's "damages chart" contains multiple inaccuracies that prevent it from being admitted into evidence under Federal Rule of Evidence 1006.  As noted above, the summaries must be "accurate." *Gomez*, 803 F.2d at 257.  Here, Smith's damages chart was littered with not only speculation, but also inaccuracies.

First, Smith included the year 2017 as a year that he lost wages. Smith admitted he was working for MDOC but on Union leave during the period that he claimed wage loss in 2017.  (R. 93, Page ID # 2305–2306.)  The alleged retaliation occurred in 2019, when Smith was not rehired after going off on a waived rights leave.  (R. 94, Page ID # 2359–2360.)  MDOC's alleged retaliation did not occur in 2017 and Smith going off on medical leave during that time does not entitle him to damages under the law of this case.

Next, Smith provided an inaccurate base pay amount for the position he worked in 2021 for DHHS.  Smith alleged he made approximately $17.00 per hour, but under cross-examination when presented with his actual payrate of $20.53 per hour, he said he was "not very certain" about $17.00 per hour pay rate depicted on his

"damages" chart.  (R. 93, Page ID # 2305–2306.)  Smith also omitted

income he earned as part of the chart.  (R. 95, Page ID # 2678.)

Lastly, Smith was presented as a proponent of the chart that

supervised its creation and when asked about the chart's creation,

Smith's counsel raised attorney-client privilege.  (R. 95, Page ID #

2673–2674, 2676, 2691.)  Smith could not identify what the numbers on

the chart were based on and admitted that he just guessed.  (R. 95,

Page ID # 2670.)

Smith's "damages" chart was not a summary of voluminous

documents but rather Smith's own speculative and inaccurate document

that did not meet the requirements under Federal Rule of Evidence

1006 to be admitted into evidence.  The trial court did not abuse its

discretion when it did not provide this chart to the jury as evidence.

## V.    The Court's inclusion of the word "unconditional" in the jury instructions was appropriate.

### A.    Standard of Review

"A district court's refusal to give requested jury instructions [is

reviewed] under an abuse of discretion standard."  *Virostek v. Liberty

Twp. Police Dep't/Trustees*, 14 F. App'x 493, 505 (6th Cir. 2001)

(quoting *Hisrich v. Volve Cars of N. Am., Inc.*, 226 F.3d 445, 449 (6th Cir. 2000)).  An abuse of discretion has occurred when we have " 'a definite and firm conviction that the trial court committed a clear error of judgment.' "  *Id.*  In considering a challenge to a district court's decision regarding the inclusion or exclusion of requested jury instructions, courts review " 'jury instructions as a whole in order to determine whether the instructions adequately inform the jury of relevant considerations and provide a basis in law for aiding the jury to reach its decision.' "  *Id.*  "A district court's refusal to give a jury instruction constitutes reversible error if: (1) the omitted instructions are a correct statement of the law; (2) the instruction is not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the requesting party's theory of the case."  *Id.*  This Court has held that it will only reverse a judgment " 'if the instructions, viewed as a whole, were confusing, misleading, or prejudicial.' "  *Id.*

## B.    Analysis

Smith argues that the inclusion of the word "unconditional" in the third question of the verdict form and in the jury instructions was

"reversible error." (Pl. Appeal Br. 34.)  In particular, Smith contends that MDOC's offer of reinstatement was conditional because the offer indicated that the offer did not waive Michigan Civil Service Commission Rule 6–4.  (R. 51-2, Page ID # 1121 (contained in Trial Ex. K).)  But Civil Service Rules apply to *all* corrections officers in Michigan.  Mich. Const. art. 11 § 5 (providing that the civil service commission "make[s] rules and regulations covering all personnel transactions and regulate[s] all conditions of employment in the classified service); *see also id.* (providing that the classified service consists of "all positions in the state service[,]" with limited exceptions).

Further, as explained to the District Court, the inclusion of this rule in the offer just indicates that while Smith had his choice of facilities to return to, should the prison he selected eventually close, he is subject to be transferred rather than being the sole employee at a closed correctional facility.  (R. 105, Page ID # 3748–3749.)  When presented with this information, Smith's counsel's response was simply, "It's still not unconditional, is my argument."  (R. 105, Page ID # 3749.)

Subjecting an employee to the same conditions of employment that he was previously held to, what every other employee is held to, is

not a "conditional" offer.  The purpose of an offer to reinstate is to restore " 'the employees to the position they would have occupied' " and "reasonable conditions accompanying the offer do not invalidate it." *Morvay v. Maghielse Tool & Die Co.*, 708 F.2d 229, 231–32 (6th Cir. 1983) (quoting *Ridgely Mfg. Co. v. NLRB*, 510 F.2d 185, 188 (D.C. Cir. 1975)).  The District Court's inclusion of the word "unconditional" in the jury instructions and the jury verdict form was reasonable and appropriate.

Smith has not and cannot meet the standard for reversible error.  First, the request that the word "unconditional" be removed from the jury instruction is an incorrect statement of the law, as noted above the offer was unconditional.  Second, Smith's requested instruction was an incorrect statement of law.  Third, Smith was able to argue his theory of the case and repeatedly inaccurately referred to the offer as a "so-called unconditional offer" or "completely ridiculous so-called unconditional offers" in opening, questioning of witnesses, and closing and as such Smith was not prejudiced by the instruction when arguing his case.  (R. 105, Page ID # 3780–3781, 3853; R. 93, Page ID # 2285–2287; R. 94, Page ID # 2562; R. 95, Page ID # 2741, 2743, 2794.)  The District Court

did not commit reversable error when it included the word "unconditional" in the jury instructions and the verdict form.  Even if there was an error it is harmless because the jury never reached this question.

## CONCLUSION AND RELIEF REQUESTED

For the reasons stated above, the trial court should be affirmed.

Respectfully submitted,

/s/ Kendell S. Asbenson
Kendell S. Asbenson
Assistant Attorney General
Counsel of Record
Attorney for Defendants-
Appellees
Corrections Division
Employment Section
P.O. Box 30217
Lansing, MI 48909
(517) 335-3055

Dated:  November 12, 2024

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of
Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding
the part of the document exempted by Federal Rule of Appellate
Procedure 32(f), this brief contains no more than 13,000 words.  This
document contains 12,428 words.

2.     This document complies with the typeface requirements of
Federal Rule of Appellate Procedure 32(a)(5) and the type-style
requirements of Federal Rule of Appellate Procedure 32(a)(6) because
this document has been prepared in a proportionally spaced typeface
using Word 365 in 14-point Century Schoolbook.

/s/ Kendell S. Asbenson
Kendell S. Asbenson
Assistant Attorney General
Counsel of Record
Attorney for Defendants-
Appellees
Corrections Division
Employment Section
P.O. Box 30217
Lansing, MI 48909
(517) 335-3055

60

## CERTIFICATE OF SERVICE

I certify that on November 12, 2024, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Kendell S. Asbenson
Kendell S. Asbenson
Assistant Attorney General
Counsel of Record
Attorney for Defendants-
Appellees
Corrections Division
Employment Section
P.O. Box 30217
Lansing, MI 48909
(517) 335-3055

61

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Defendants-Appellees, per Sixth Circuit Rule 28(a), 28(a)(1)-(2),

30(b), hereby designated the following portions of the record on appeal:

| Description of Entry | Date | Record Entry No. | Page ID No. Range |
|---|---|---|---|
| Complaint | 02/19/2020 | R. 1 | Page ID # 1–14 |
| Plaintiff Motion for Summary Judgment and Exhibits | 05/21/2021 | R. 25 | Page ID # 91–222 |
| Defendants' Motion for Summary Judgment and Exhibits | 05/21/2021 | R. 26 | Page ID # 224–680 |
| Order on Motions for Summary Judgment | 03/31/2022 | R. 35 | Page ID #870–897 |
| Order Allowing Second Summary Judgment Motion | 02/06/2023 | R. 49 | Page ID # 1073–1089 |
| Order Second Motion for Summary Judgment as to Damages | 08/02/2023 | R. 56 | Page ID # 1522–1537 |
| Plaintiff's Response to Defendants Motion in Limine | 03/01/24 | R. 71 | Page ID # 1635–1849 |
| Plaintiff's Trial Brief Regarding Causation | 04/02/2024 | R. 74 | Page ID # 1869–1873 |
| Defendants' Trial Brief Regarding Causation | 04/03/2024 | R. 75 | Page ID # 1874–1877 |

| Jury Verdict | 04/12/2024 | R. 89 | Page ID # 2148–2149 |
| Judgment | 04/12/2024 | R. 92 | Page ID # 2154 |
| Notice of Appeal | 05/13/2024 | R. 98 | Page ID # 2845 |
| Jury Trial Transcript Vol. 1, 04/02/2024 | 05/30/2024 | R. 101 | Page ID # 2904–3211 |
| Jury Trial Transcript Vol. 2, 04/03/2024 | 05/31/2024 | R. 105 | Page ID # 3735–4057 |
| Jury Trial Transcript Vol. 3, 04/04/2024 | 05/31/2024 | R. 104 | Page ID # 3551–3734 |
| Jury Trial Transcript Vol. 4, 04/08/2024 | 04/26/2024 | R. 93 | Page ID # 2155–2328 |
| Jury Trial Transcript Vol. 5, 04/09/2024 | 04/26/2024 | R. 94 | Page ID # 2329–2581 |
| Jury Trial Transcript Vol. 7, 04/11/2024 | 04/26/2024 | R. 95 | Page ID # 2582–2833 |
| Jury Trial Transcript Vol. 8, 04/12/2024 | 05/30/2024 | R. 103 | Page ID # 3535–3550 |
| Trial Exhibit E – Harassment Investigation | 04/09/2024 | R. 26-5 | 417–420, 434 –436, 443 |
| Trial Exhibit A – Leave & Transitional Employment Letters | 04/09/2024 | R. 26-6 | Page ID # 602, 542, 539, 535, 533, 527, 524, 521, 522, 512, 502, 493, 484, 478, 471 |
| Trial Exhibit 19 – Accommodation Request | 04/04/2024 | R. 26-6 | Page ID # 635–636 |

| Trial Exhibit 17 – 7.8.18 & 7.9.18 Warren and Plaintiff emails re. MacLean | 04/04/2024 | R. 26-10 | Page ID # 645 |
|---|---|---|---|
| Trial Exhibit 35 – 8.9.18 Waived Rights Leave Form | 04/08/2024 | R. 26-9 | Page ID # 643 |
| Trial Exhibit F – Email Investigation | 04/03/2024 | R. 26-12 | Page ID # 650–665 |
| Trial Exhibit 50 – 8.22.19 Smith Request to Return to Work | 04/08/2024 | R. 26-13 | Page ID # 674–676 |
| Trial Exhibit 52 – 9.13.19 Memo Patterson HR to Gulick re Rehire | 04/08/2024 | R. 26-14 | Page ID # 678 |
| Trial Exhibit 53 – 9.19.19 letter Denying Rehire | 04/08/2024 | R. 26-15 | Page ID # 680 55 |
| Trial Exhibit J – Unconditional offer of Reemployment | 04/03/2024 | R. 40-3 | Page ID # 936 |
| Trial Exhibit K – Second Unconditional Offer of Reemployment | 04/03/2024 | R. 51-2 | Page ID # 1121 |