# IN THE UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

### CASE NO. 24-1439

PORTER SMITH,

    Plaintiff/Appellant,


v.


MICHIGAN DEPARTMENT OF CORRECTIONS;
STATE OF MICHIGAN,

    Defendant/Appellee.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN, CASE NO. 2:20-cv-10421

---

| | |
|---|---|
| James B. Rasor (P43476) | Kendell S. Asbenson (P81747) |
| Amanda G. Washburn (P86984) | Office of the Attorney General |
| **Rasor Law Firm PLLC** | of Michigan |
| Attorneys for Plaintiff | Attorneys for Defendant |
| 201 E 4th Street | P.O. Box 30217 |
| Royal Oak, MI 48067 | Lansing, MI 48909 |
| (248) 543-9000 | Asbensonk1@michigan.gov |
| jbr@rasorlawfirm.com | |
| agw@rasorlawfirm.com | |

---

### APPELLANT'S SUPPLEMENTAL BRIEF AFFIRMING REHABILITATION ACT RETALIATION CLAIMS

## **<u>Table of Contents</u>**

Table of Authorities………………………………………………...…………3

Law and Argument………………………………………………………6

    I.    Standard of Review…………………………………………...………6

    II.    The Rehabilitation Act Creates a Cause of Action for Retaliation by Explicitly Referring to the Anti-Retaliation Provision of the Americans with Disabilities Act…………….………………………...………7

Conclusion and Relief Requested…………………………………………14

Certificate of Compliance………………………………………………...…14

## <u>Table of Authorities</u>

### <u>Cases</u>

*Abramski v. United States*,
   573 U.S. 169, 179 (2014)……………………………………………………….7

*Daywalker v. UTMB at Galveston*,
   No. 22-40813, 2024 WL 94297, at *12 (5th Cir. Jan. 19, 2024)……………..11

*Duncan v. Washington Metro. Area Transit Auth.*,
   214 F.R.D. 43, 50 (D.D.C. 2003)……………………………………………10

*Fuller v. McDonough*,
   84 F.4th 686, 691 (7th Cir. 2023)……………………………………………11

*Hale v. Johnson*,
   845 F.3d 224, 227 (6th Cir. 2016)…………………………………………….6

*Hampton v. Utah Dept. of Corrections*,
   87 F.4th 1183, 1199 (10th Cir. 2023)………………………………………..12

*Hiler v. Brown*,
   177 F.3d 542, 545 (6th Cir. 1999)…………………………………………..6, 10

*Hill v. Walker*,
   737 F.3d 1209, 1218 (8th Cir. 2013)………………………………………11, 12

*Hoyt ex rel. Siebert v. St. Mary's Rehab. Ctr.*,
   711 F.2d 864, 867 (8th Cir. 1983)…………………………………………….7

*Jackson v. Birmingham Bd. Of Educ.*,
   544 U.S. 167, 173 (2005)…………………………………………………...13

*Kendall v. Postmaster Gen. of U.S.*,
   543 Fed. Appx. 141, 144 (3d Cir. 2013)……………………………………..11

*Mohsin v. California Dept. of Water Resources*,
   No. 22-16597, 2024 WL 4144080, at *2 (9th Cir. Sept. 11, 2024)………….12

*Moody v. U.S.*,

774 F.2d 150, 156 (6th Cir. 1985)…………………………………………………9

*Owens v. Governor's Off. of Student Achievement*,
    52 F.4th 1327, 1337 (11th Cir. 2022)………………………………….12

*Palmquist v. Shinseki*,
    689 F.3d 66, 70 (1st Cir. 2012)………………………………………...10

*Quiles-Quiles v. Henderson*,
    439 F.3d 1 (1st Cir. 2006)……………………………………………...10

*Reynolds v. Little Rock Sch. Dist.*,
    854 Fed. Appx. 773 (8th Cir. 2021)………………………………....12

*Schneider v. Mahopac C. Sch. Dist./Bd. of Educ.*,
    No. 21-2201, 2022 WL 1316211, at *2 (2d Cir. May 3, 2022)……………11

*Solomon v. Vilsack*,
    763 F.3d 1, 15 (D.C. Cir. 2014)………………………………………..12

*United States v. Ron Pair Enters., Inc.*,
    489 U.S. 235, 241 (1989)………………………………………………6

*Wilson v. Safelite Group, Inc.*,
    930 F.3d 429, 433-434 (6th Cir. 2019)………………………………6

*Works v. Colvin*,
    519 Fed. Appx. 176, 186 (4th Cir. 2013)…………………………………11

**Statutes, Regulations, and Rules**

29 U.S.C. § 794…………………………………………………………………7

29 U.S.C. § 794(d)……………………………………………………………..7

42 U.S.C. 12111………………………………………………………………...8

42 U.S.C. § 12117………………………………………………………………8

42 U.S.C. § 12133………………………………………………….…………...8

42 U.S.C. § 12188…………………………………………….…………………8

42 U.S.C. § 12201…………………………………………..…………………8

42 U.S.C. § 12202………………………………………………...…………8

42 U.S.C. § 12203……………………………………………………..………8

42 U.S.C. § 12203(a)……………………………………………....…6, 9

42 U.S.C. § 12203(c)……………………………………………..……8

42 U.S.C. § 12204…………………………………………………...……8

42 U.S.C. § 12210…………………………………………………...…8

42 U.S.C. § 2000e-5…………………………………………....…8, 9

42 U.S.C. § 1981a(a)(2)………………………………………………9

29 C.F.R. § 33.13…………………………………………………...…9

## Law and Argument

On January 13, 2025, this Court issued correspondence to the parties requesting briefing addressing whether and how the Rehabilitation Act provides a cause of action for retaliation. Plaintiff/Appellant provides this brief to demonstrate that the Rehabilitation Act does provide a cause of action for retaliation. Indeed, for over twenty-five years in this Circuit, the Court has recognized that the Rehabilitation Act established a cause of action for retaliation. *Hiler v. Brown*, 177 F.3d 542, 545 (6th Cir. 1999). *Hiler* clearly states: "Rehabilitation Act of 1973 prohibits discrimination and retaliation in employment against disabled persons by federal agencies…Significantly, the anti-retaliation provision of the Rehabilitation Act, which incorporates by reference § 12203(a) of the ADA, provides in relevant part that '[n]o person shall discriminate against an individual because such individual has opposed any act or practice made unlawful by this Act." *Id.* (internal citations omitted).

### I.    Standard of Review

In *Wilson v. Safelite Group, Inc*., 930 F.3d 429, 433-434 (6th Cir. 2019), this Court stated:

> The starting point is the language of the statute. See *Hale v. Johnson*, 845 F.3d 224, 227 (6th Cir. 2016). "Where the statute's language is clear and unambiguous and the statutory framework is coherent and consistent, 'the sole function of the courts is to enforce it according to its terms.' " *Id.* (quoting *United States v. Ron Pair Enters., Inc*., 489

U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). But "we must take care not to interpret the language [of a statute] in a vacuum; instead, we must look to the 'structure, history, and purpose' of the statutory scheme." *Id*. (quoting *Abramski v. United States*, 573 U.S. 169, 179, 134 S.Ct. 2259, 189 L.Ed.2d 262 (2014)).

## II.    The Rehabilitation Act Creates a Cause of Action for Retaliation by Explicitly Referring to the Anti-Retaliation Provision of the Americans with Disabilities Act.

While the Rehabilitation Act's prohibition on discrimination does not explicitly mention retaliation, the Act states that the standards used to determine whether the Act has been violated in a complaint alleging employment discrimination are the standards applied under title I of the Americans with Disabilities Act of 1990.

Before 1992, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, did not contain an express anti-retaliation provision, but courts had construed its anti-discrimination mandate to include a prohibition on retaliation. See, e.g., *Hoyt ex rel. Siebert v. St. Mary's Rehab. Ctr*., 711 F.2d 864, 867 (8th Cir. 1983). As amended in 1992, Section 504 incorporates, for claims related to employment discrimination, the express anti-retaliation protection of the Americans with Disabilities Act. See 29 U.S.C. § 794(d) (incorporating 42 U.S.C. § 12203).

Specifically, the Rehabilitation Act, at 29 U.S.C. 794(d) states: "The standards used to determine whether this section has been violated in a complaint alleging

employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510,[1] of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201–12204 and 12210), as such sections relate to employment."

42 U.S.C. § 12203, specifically incorporated therein, is a specific prohibition against retaliation and coercion. Thus, the Rehabilitation Act now defines prohibited "discrimination" to include retaliation based on complaints of discrimination. Indeed, if Congress did not wish to incorporate violations of the Rehabilitation Act that are due to retaliation due to opposing an act made unlawful by the Rehabilitation, it would not have incorporated Section 12203.

42 U.S.C. § 12203(c), again, specifically incorporated into the Rehabilitation Act, states: "The remedies and procedures available under sections 12117, 12133, and 12188 of this title shall be available to aggrieved persons for violations of subsections (a) and (b), with respect to subchapter I, subchapter II and subchapter III, respectively."

The retaliation provision in the ADA refers the reader to 42 U.S.C. § 12117 for its remedy, which in turn adopts the remedies set forth in Title VII, specifically 42 U.S.C. §2000e-5 and 42 U.S.C. §1981a(a)(2). See id. § 12117. Thus, the remedies for violations of § 12230 of the ADA and § 12117 of the ADA are coextensive with

the remedies available in a private cause of action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5. Under the Civil Rights Act of 1991, employees who prevail on a claim under Title I of the ADA may recover compensatory and punitive damages and demand and receive a trial by jury. See 42 U.S.C. § 1981a(a)(2).

Further, 29 C.F.R. § 33.13 provides:

> No person may discharge, intimidate, retaliate, threaten, coerce or otherwise discriminate against any person because such person has filed a complaint, furnished information, assisted or participated in any manner in an investigation, review, hearing or any other activity related to the administration of, or exercise of authority under, or privilege secured by section 504 and the regulations in this part.

Regulations published in the Code of Federal Regulations have the force and effect of law, and all persons affected thereby are charged with legal notice of their provisions. *Moody v. U.S.*, 774 F.2d 150, 156 (6th Cir. 1985)(internal quotation marks and citations omitted).

For over twenty five years, this Court has explicitly recognized that the "Rehabilitation Act of 1973 prohibits discrimination and retaliation in employment against disabled persons by federal agencies…Significantly, the anti-retaliation provision of the Rehabilitation Act, which incorporates by reference § 12203(a) of the ADA, provides in relevant part that '[n]o person shall discriminate against an individual because such individual has opposed any act or practice made unlawful

by this Act." *Hiler v. Brown*, 177 F.3d 542, 545 (6th Cir. 1999)(internal citations omitted).

In *Duncan v. Washington Metro. Area Transit Auth.*, 214 F.R.D. 43, 50 (D.D.C. 2003), one of the issues on the defendant's motion to dismiss was whether the Rehabilitation Act creates a cause of action for retaliation. There, the court made the same above analysis regarding the explicit incorporation of the anti-retaliation provision of the Americans with Disabilities Act, and held that the Rehabilitation Act did create a cause of action for retaliation.

Every other United States Circuit Court of Appeals[1] has reviewed Rehabilitation Act retaliation cases without challenging whether a cause of action exists. Thus, Rehabilitation Act retaliation is a cause of action that is well-settled, nation-wide. In the First Circuit, the court reviewed whether a Rehabilitation Act retaliation claim was properly submitted to the jury, and the District Court was affirmed without questioning whether the cause of action existed. *Palmquist v. Shinseki*, 689 F.3d 66, 70 (1st Cir. 2012). See also, *Quiles-Quiles v. Henderson*, 439 F.3d 1 (1st Cir. 2006). In the Second Circuit, the court analyzed whether a plaintiff's Rehabilitation Act retaliation claim was subject to the Individuals with Disabilities Act's exhaustion procedures, and did not question the existence of the retaliation

---

[1] With the exception of the Court of Appeals for the Federal Circuit, which has held it does not have jurisdiction over Rehabilitation Act claims. See *Sageman v. United States,* 82 Fed. Cl. 367, 371 (2008).

claim. *Schneider v. Mahopac C. Sch. Dist./Bd. of Educ.*, No. 21-2201, 2022 WL 1316211, at *2 (2d Cir. May 3, 2022).

The Third Circuit explicitly recognized that Section 504 of the Rehabilitation Act incorporates by reference the standards of the Americans with Disabilities Act that prohibit retaliation, and therefore, reviewed the Rehabilitation Act retaliation claim. *Kendall v. Postmaster Gen. of U.S.*, 543 Fed. Appx. 141, 144 (3d Cir. 2013). The Fourth Circuit reversed a District Court's grant of summary judgment as to the plaintiff's Rehabilitation Act retaliation claim and ordered that the court grant the plaintiff's request for discovery, again, never challenging the issue of whether the claim existed. *Works v. Colvin*, 519 Fed. Appx. 176, 186 (4th Cir. 2013).

The Fifth Circuit recently opined that summary judgment as to the plaintiff's Rehabilitation Act retaliation claim was appropriate because of a failure to establish pretext, without challenging whether the retaliation claim existed. *Daywalker v. UTMB at Galveston*, No. 22-40813, 2024 WL 94297, at *12 (5th Cir. Jan. 19, 2024).

The Seventh Circuit rejected a plaintiff's claim of Rehabilitation Act retaliation for various reasons, including a break in the causal chain, and never questioned the viability of the retaliation claim under the Act. *Fuller v. McDonough*, 84 F.4th 686, 691 (7th Cir. 2023).

In the Eighth Circuit, the court recognized the viability of a Rehabilitation Act retaliation claim. *Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013); see also,

*Reynolds v. Little Rock Sch. Dist.*, 854 Fed. Appx. 773 (8th Cir. 2021)(recognizing that retaliation claims may be brought under the Act as pronounced in *Hill*).

In the Ninth Circuit, dismissal of an employee's Rehabilitation Act retaliation claim was recently affirmed on the basis of the employee's inability to show that he was qualified for the job and pretext, without questioning the viability of a retaliation claim. *Mohsin v. California Dept. of Water Resources*, No. 22-16597, 2024 WL 4144080, at *2 (9th Cir. Sept. 11, 2024).

Likewise, in the Tenth Circuit, dismissal of the employee's Rehabilitation Act retaliation claim was affirmed due to a failure to meet the causation element of the claim, without analysis of the existence of the claim. *Hampton v. Utah Dept. of Corrections*, 87 F.4th 1183, 1199 (10th Cir. 2023).

The Eleventh Circuit similarly found that the Rehabilitation Act prohibits retaliation, but affirmed dismissal due to a failure to meet the burden to show pretext. *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1337 (11th Cir. 2022).

Finally, in the District of Columbia Circuit, the court reversed summary judgment on the Rehabilitation Act retaliation claim, holding that the plaintiff's request for accommodation was protected activity, and further, the court acknowledged that §12203 was incorporated into the Rehabilitation Act. *Solomon v. Vilsack*, 763 F.3d 1, 15 (D.C. Cir. 2014).

The United States Supreme Court has not squarely addressed this issue. However, in *Jackson v. Birmingham Bd. Of Educ.*, 544 U.S. 167, 173 (2005), as it related to Title IX interpretation, it held that "[r]etaliation against a person because that person has complained of sex discrimination is another form of sex discrimination encompassed by Title IX's private cause of action." Analogously, retaliation on the basis of a person's disability, therefore, is a form of discrimination as contemplated by the Rehabilitation Act.

Thus, there is absolutely no dispute or split among the courts: Retaliation claims are created by the Rehabilitation Act. To hold otherwise overrule clear Sixth Circuit precedent and create an outlier in the circuits with only the Sixth Circuit holding that the Rehabilitation Act does not create a cause of action for retaliation. Appellant was unable to identify any applicable cases which would support this dramatic shift in the law which would cause the Sixth Circuit to become an outlier.

Therefore, based on the black letter language of the Rehabilitation Act and the statutes incorporated therein, as well as pursuant to legion precedent that establishes and interprets the contours of Rehabilitation Act retaliation. Plaintiff/Appellant submits that this Honorable Court should reaffirm decades of clear precedent in the Sixth Circuit and every other Circuit Court of Appeals.

## <u>CONCLUSION AND RELIEF REQUESTED</u>

WHEREFORE, for the reasons stated herein, Plaintiff/Appellant respectfully requests that this Honorable Court affirms its own long-standing precedent that the Rehabilitation Act created a cause of action for retaliation.

Respectfully Submitted,

RASOR LAW FIRM, PLLC
<u>/s/ James B. Rasor</u>
James B. Rasor (P43476)
Attorney for Plaintiff-Appellant
201 E. 4th Street
Royal Oak, MI 48067

Dated: January 24, 2025          jbr@rasorlawfirm.com

## <u>Certificate of Compliance with Rule 32(a)</u>

This brief complies with the page limitation provided by this Court's January 13, 2025 correspondence. This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) as it is in 14-point Times New Roman font and the type-style requirements of Fed. R. App. 32(a)(6).

## UNPUBLISHED CASES CITED

*Daywalker v. UTMB at Galveston*, No. 22-40813, 2024 WL 94297, at \*12 (5th Cir. Jan. 19, 2024); *Duncan v. Washington Metro. Area Transit Auth.*, 214 F.R.D. 43, 50 (D.D.C. 2003); *Kendall v. Postmaster Gen. of U.S.*, 543 Fed. Appx. 141, 144 (3d Cir. 2013); *Mohsin v. California Dept. of Water Resources*, No. 22-16597, 2024 WL 4144080, at \*2 (9th Cir. Sept. 11, 2024); *Reynolds v. Little Rock Sch. Dist.*, 854 Fed. Appx. 773 (8th Cir. 2021); *Schneider v. Mahopac C. Sch. Dist./Bd. of Educ.*, No. 21-2201, 2022 WL 1316211, at \*2 (2d Cir. May 3, 2022); *Works v. Colvin*, 519 Fed. Appx. 176, 186 (4th Cir. 2013).

2024 WL 94297
Only the Westlaw citation is currently available.
United States Court of Appeals, Fifth Circuit.

Rosandra DAYWALKER,
Plaintiff—Appellant,

v.

UTMB AT GALVESTON; MD Ben Raimer, in
his Official Capacity, Defendants—Appellees.

No. 22-40813
|
FILED January 19, 2024

Appeal from the United States District Court for the Southern
District of Texas, USDC No. 3:20-CV-99

**Attorneys and Law Firms**

Victoria L. Plante, Plante Law Firm, P.C., Houston, TX, for
Plaintiff—Appellant.

Michael Abrams, Rance Craft, Assistant Solicitor General,
Todd A. Dickerson, Esq., Office of the Attorney General,
Austin, TX, for Defendants—Appellees.

Before Richman, Chief Judge, Stewart, Circuit Judge, and
Scholer, District Judge.†

**Opinion**

Per Curiam:*

 **\*1**  Rosandra Daywalker appeals the district court's
discovery decisions, denial of her motion for sanctions,
grant of summary judgment, and dismissal of her Title
VII, Rehabilitation Act, and Family and Medical Leave
Act ("FMLA") discrimination claims against her former
employer. Because we find no error, we AFFIRM.

## I. Factual Background

In June 2015, Daywalker, a Black woman, graduated with
honors from her medical school and matched to the five-
year Otolaryngology residency program at the University
of Texas Medical Branch at Galveston ("UTMB"). In
a residency program, medical school graduates pursue

advanced certifications in specialized fields of medicine while
training under the supervision of a faculty of experienced
doctors. Otolaryngology is the medical specialty involving
the surgical and medical management of head and neck
conditions. Daywalker was the only Black resident in
UTMB's 2015–2020 Otolaryngology program class.

Otolaryngology residents at UTMB cycle through medical
rotations in different specialty departments, attend lectures,
and participate in didactic exercises. UTMB's program
is structured so that a resident is provided with greater
responsibilities and expected to exhibit core clinical
competencies as they progress through their post-graduate
years. A typical post-graduate year in the program begins
in July and runs through the following June. To aid
residents progressing through the program, UTMB's Clinical
Competency Committee discusses residents' progress and
development of core competencies. The Committee also
imposes discipline and improvement plans, if necessary.

During her first two years at UTMB, Daywalker was
supervised by Dr. Susan McCammon, a white woman. Within
her first year in the program, she received good evaluations
for her positive energy and "ability [to] communicate well
with patients and families as well as nursing staff." However,
some of her supervisors also reported that she had failed to
timely complete medical documentation and had problems
with unexcused tardiness and absences in some clinical
rotations. While Daywalker's clinical skills improved in
her second year, some of her supervisors noted that she
still needed to be more efficient in producing clinical
documentation.

In April 2017, towards the end of Daywalker's second year,
Dr. McCammon was replaced by Dr. Wasyl Szeremeta, a
white man, as director of the program. In her end of second-
year evaluations, Dr. Szeremeta noted that Daywalker needed
to improve her clinical documentation and interpersonal
communication skills. In August 2017, Dr. Szeremeta and
the assistant program director, Dr. Farrah Siddiqui, met
with Daywalker to discuss the importance of efficiency and
accuracy in completing clinical documentation. Some of her
supervisors reported that she displayed improvements after
the meeting, as her first third-year evaluations provided that
her "[r]enewed energy and positive, confident attitude have
improved [her] clinical efficiency/documentation." However,
other supervisors reported that her core competencies lagged
behind her peers based on her clinical inefficiency and slow
documentation.

**Case: 24-1439   Document: 33   Filed: 01/24/2025   Page: 17**

Daywalker v. UTMB at Galveston, Not Reported in Fed. Rptr. (2024)

**\*2** In May 2018, UTMB conducted a routine audit of the department's medical documentation. The audit revealed that Daywalker had not completed records for five patients dating back to June 2017. Dr. Szeremeta questioned her about these records, and Daywalker responded that the patients "[l]eft without being seen" and should have been removed from the schedule. Upon further review, Dr. Szeremeta learned that Daywalker did see the five patients, and he became concerned that Daywalker "subsequently created notes and 'documentation' " to cover up her omissions. He believed that Daywalker had copied and pasted prior notes from other doctors without making any significant edits. His concerns about Daywalker's clinical inefficiency led UTMB to place her on a remediation program.[1]

On May 30, 2018, Dr. Szeremeta notified Daywalker of her remediation plan and explained that her "lapses in professional behavior" have created difficulties for the faculty to trust in her competency. According to her evaluations for the first half of 2018, Daywalker scored a near eight out of ten for professionalism. On June 1, 2018, she submitted an internal complaint against Dr. Szeremeta, asserting that he created a hostile work environment and discriminated against her based on her race and sex. In her complaint, she alleged that Dr. Szeremeta made numerous disparaging comments during working hours in the UTMB emergency room, at public meetings among program residents, and at conferences that she attended. She further asserted that Dr. Szeremeta became fixated on her, consistently staring at her during working hours and consistently interrupting her work to give her negative feedback in full view of other employees and residents. Ultimately, Dr. Szeremeta was removed as her supervisor and replaced by Dr. Siddiqui.

Later that summer, she reached out to Dr. Vicente Resto, the department chair, to discuss being removed from the remediation plan. Due to personal conflicts with Dr. Siddiqui, Dr. Resto assigned her another supervisor to "help her pass the remediation and graduate from the residency program." In early August, Daywalker requested a four month "leave of absence." On August 8, 2018, UTMB sent her a letter approving her request and informing her that she would return to the program as a third-year student upon the expiration of her leave. Dr. Harold Pine, a program faculty member, delivered the letter to Daywalker and informed her of additional concerns expressed by faculty members. The following day, Daywalker engaged counsel to submit a letter to request conversion of her "leave of absence" into protected leave under the Family and Medical Leave Act ("FMLA"). UTMB granted her FMLA leave the following week.

While on FMLA leave, Daywalker obtained records from the American Board of Otolaryngology which stated that UTMB reported she was a fourth-year resident on course to complete her residency in June 2020. She also consulted an attorney and requested disability accommodations upon her return to UTMB in November 2018. On November 6, 2018, her first day back, she met with Dr. Szeremeta and other program staff to discuss her status. Dr. Szeremeta informed her that she would have to repeat her third year during the 2018–2019 program year. Daywalker resigned that same day.

A few months later, Daywalker filed suit against UTMB and its then-president, Dr. Ben Raimer, in federal court. She alleged race- and gender-based discrimination claims under Title VII, FMLA, and the Rehabilitation Act. During discovery, Daywalker served UTMB with several discovery requests seeking comparator evidence, or information about the performance and discipline of the program's other residents. UTMB objected to those requests pursuant to the Federal Education Rights Privacy Act ("FERPA"). The district court then referred the request to compel to the magistrate judge. The magistrate judge determined that FERPA applied to UTMB's other residents because medical residency was "undoubtedly an academic undertaking that allows doctors to further their education and training in the medical field." However, the magistrate judge allowed the disclosure of residents' records, subject to the individual residents' objections. The district court then issued an order directing the redaction of all identifying information and limiting the documents to counsel's eyes only.

**\*3** Under the district court's directive, the parties submitted dispute letters addressing one of Daywalker's requests for production. Daywalker asserted that her request for production governed relevant comparator evidence from two program residents outside of her protected class, anonymously numbered three ("Resident Three") and sixteen ("Resident Sixteen"). UTMB argued that the requests did not encompass Resident Three's and Resident Sixteen's performance records. The magistrate judge received the letters after the final discovery deadline passed. Her request was denied because its language did not encapsulate the records of Resident Three and Resident Sixteen as the dates listed did not precisely match their program years. Thus, Daywalker proceeded with limited comparator information about only one other resident.

Case: 24-1439   Document: 33   Filed: 01/24/2025   Page: 18

**Daywalker v. UTMB at Galveston, Not Reported in Fed. Rptr. (2024)**

Upon UTMB's and Raimer's motion for summary judgment, the district court dismissed Daywalker's Title VII claims because (1) she failed to provide comparator evidence showing that another resident outside her protected class was treated more favorably;[2] (2) she provided insufficient evidence to show that her internal complaint of discrimination caused the program staff to hold her back; and (3) binding precedent required a greater degree of harassment beyond the insensitive remarks and microaggressions she alleged to prove a hostile work environment claim. The district court then dismissed her FMLA and Rehabilitation Act claims because she had not offered evidence of the causal links between (1) her request for FMLA leave and informing UTMB of her disability status and (2) the decision to retain her as a third-year resident.

Additionally, the district court denied Daywalker's motion for sanctions based on spoliation of evidence and opposing counsel's conduct at depositions. She alleged that an internal investigator for UTMB deleted relevant notes and electronic recordings of meetings. The district court reasoned that there was no prejudice from the loss of the documents because UTMB produced the same material via another method and provided her with the minutes for the relevant meetings. The district court further concluded that "none of [her other claims] amount[ed] to sanctionable conduct." Daywalker timely appealed the magistrate judge's evidentiary decisions and the district court's order granting summary judgment in favor of UTMB and Dr. Raimer and denying her motion for sanctions.

**II. Discussion**

On appeal, Daywalker contests the magistrate judge's determination that the program's residents were covered under FERPA and his denials of Daywalker's motion to compel, and the district court's denial of her motion for sanctions and grant of summary judgment in favor of UTMB. We address each challenge in turn.

**A. FERPA Order**

We begin by discussing the magistrate judge's FERPA order determining that medical residents are students protected by the Act. "Issues of statutory interpretation are reviewed de novo." *Matter of Lopez*, 897 F.3d 663, 668 (5th Cir. 2018).

Daywalker avers that the magistrate judge "erroneously expanded FERPA to medical residents." She contends that "nothing in the limited legislative history of FERPA[ ] created rights for medical resident[s]." She points out that the U.S. Department of Education ("DOE") has held that medical residents are not students covered by FERPA in a 1995 guidance letter.[3] Alternatively, she argues that the comparator documents she sought are not " 'educational records' as defined by FERPA" because UTMB operates its residency programs independent of its medical and graduate schools as its records are not maintained like an educational institution. She further asserts that the FERPA order improperly creates new precedent citing unpublished and unpersuasive district court opinions in cases either not involving medical residents or cases where the resident did not argue that FERPA was inapplicable.

**\*4** We disagree and hold that the magistrate judge did not err in applying FERPA to UTMB's medical residents. He began his analysis by stating that "[t]he scope of the term 'student' must be considered within the context of the specific [ ] statute before the court." *Univ. of Tex. Sys. v. United States*, 759 F.3d 437, 444 (5th Cir. 2014). He then noted that FERPA defines "education records" as "records, files, documents, and other materials which (i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A). The Act defines a student as "any person with respect to whom an educational agency or institution maintains education records or personally identifiable information." *Id.* § 1232g(a)(6). FERPA defines an educational agency or institution as any entity that receives funds from any DOE program. *Id.* § 1232g(a)(3). The magistrate judge squarely addressed this issue and reasoned that UTMB's medical residents are students subject to FERPA's protections because UTMB receives DOE funding and keeps personal records of their performance as they engage in practical educational curricula in pursuit of receiving a specialized certification.[4]

The magistrate judge noted that although this court has previously recognized that medical residents are classified as employees with respect to Social Security, Medicare, and federal payroll taxes, we have consistently maintained that those determinations were based on the government regulations or statutes at issue in those cases. *See, e.g., Univ. of Tex. Sys.*, 759 F.3d at 444. The magistrate judge concluded that "medical residents are students for purposes of FERPA" because "a medical residency is undoubtedly

Case: 24-1439    Document: 33    Filed: 01/24/2025    Page: 19

Daywalker v. UTMB at Galveston, Not Reported in Fed. Rptr. (2024)

an academic undertaking that allows doctors to further their education and training in the medical field." He also pointed out that several district courts have held the same, and thus there was "no reason to chart a new course" by holding opposite. Regardless of his construction of the statute, the magistrate judge's FERPA order did not impact Daywalker's access to the comparator information she needed to establish her discrimination claims. *See* 20 U.S.C. § 1232g(b)(2) (B); 34 C.F.R. § 99.31(a)(9)(i). The magistrate judge stated that her "requests for production and interrogatories seeking comparator information [were] directly relevant to her claims of discrimination" and that "it [was] appropriate to allow the disclosure of such material." FERPA merely imposes additional protection of students' records, allowing disclosure if made to comply with a court order. 20 U.S.C. § 1232g(b)(2) (B). Thus, we find no reversible error in the magistrate judge's FERPA order.

### B. Discovery Determinations

Having addressed the FERPA issue, we now turn to the magistrate judge's denials of Daywalker's request to compel and the protective order restricting the produced records to "counsel's eyes only." We review a district court's discovery decisions for abuse of discretion. *Williams v. Boeing Co.*, 23 F.4th 507, 514 (5th Cir. 2022). We "will reverse a discovery ruling only if it is 'arbitrary or clearly unreasonable,' and the complaining party demonstrates that it was prejudiced by the ruling." *HC Gun & Knife Shows, Inc. v. City of Houston*, 201 F.3d 544, 549 (5th Cir. 2000) (quoting *Mayo v. Tri-Bell Indus., Inc.*, 787 F.2d 1007, 1012 (5th Cir. 1986)). We hold that the record does not support a determination that the magistrate judge and district court abused their discretion either by (1) construing Daywalker's contested request to not describe the records of two of UTMB's residents with reasonable particularity or (2) by ordering that only her counsel could review the produced records in a modifiable protective order.

**\*5** We begin with the magistrate judge's denial of her request for UTMB to produce comparator evidence. Daywalker asserts that the magistrate judge abused his discretion in denying her request for UTMB to produce comparator documents for two other residents in her class, Resident Three and Resident Sixteen.[5] Daywalker contends that we should not uphold the district court's decision because it failed to adhere to the liberal spirit of the Federal Rules of Civil Procedure and caused fundamental unfairness. UTMB counters that the magistrate judge reasonably construed the contested request for production and held that it could not

be read to encompass the records for Residents Three and Sixteen because their class years did not match the requested years.

We hold that the magistrate judge reasonably construed the contested discovery request. The record shows that the district court reviewed the parties' position letters[6] and determined that although the information Daywalker sought may have been relevant to her claim, no request for production at issue encompassed the contested records for Residents Three and Sixteen. She requested all records of third-year residents from 2016 to 2017 and fourth-year residents from 2017 to 2018. UTMB posited that the contested information did not fall within the relevant period because Residents Three and Sixteen were third-year residents from 2017 to 2018. The magistrate judge and district court agreed. So do we.

We hold that the magistrate judge's interpretation of Daywalker's request for production was not arbitrary or clearly unreasonable. The magistrate judge noted that it was counsel's "obligation to make document requests that define[d] specifically what [Daywalker was] looking for" and rejected any "insinuation that this [determination was] somehow an effort to cut off [Daywalker's] ability to proceed with her case" as "flat out incorrect." While courts have encouraged the liberal application of the Federal Rules of Civil Procedure in the interest of maintaining fairness to litigants,[7] the Rules also require parties to identify the documents they request with "reasonable particularity." Fed. R. Civ. P. 34(b)(1)(A). In cases where we have admonished a district court for failing to order a party to produce comparator evidence, the error occurred from a failure to compel documents governed by or subject to a valid request for production. *See Coughlin v. Lee*, 946 F.2d 1152, 1159 (5th Cir. 1991). For instance, in *Coughlin v. Lee*, the district court declined to compel an employer to produce relevant personnel records in a wrongful termination case based on the plaintiff's exercise of protected speech. *Id.* at 1158–59. The plaintiffs requested production of all personnel files for the relevant period of their discharges. *Id.* at 1158. Thus, we held that the district court's decision limiting discovery based on its determination of relevance constituted an abuse of discretion. *Id.* at 1159–60.

*Coughlin* is distinguishable, however, because the trial court's error there flowed from its refusal to compel the production of documents encompassed by the plaintiffs' requests without substantial consideration. *Id.* at 1160 ("The district court appears to have limited discovery because it considered these

**Daywalker v. UTMB at Galveston, Not Reported in Fed. Rptr. (2024)**

Case: 24-1439   Document: 33   Filed: 01/24/2025   Page: 20

files irrelevant to the plaintiffs' freedom of speech case."). Here, there was no request encompassing the information and the district court provided a reasonable justification for its interpretation of the contested request. At the hearing, Daywalker argued that a denial of her request would allow UTMB to evade liability "because of some technical reading of" her request for production. To the contrary, the record shows that the shortcoming in Daywalker's case results from the imprecision with which the contested request was drafted, not the result of a mere technicality.

**\*6** As written, Daywalker's requests could not be construed to incorporate the records of Residents Three and Sixteen because they were not third-year residents during the program year spanning from 2016 to 2017. And because they were not third-year residents from 2016 to 2017, it follows that they were not fourth-year residents from 2017 to 2018. For Daywalker to receive those documents, the magistrate judge would have had to re-write her document requests. On appeal, Daywalker cites no binding Fifth Circuit precedent for the proposition that a district court is obligated to reform a party's discovery requests to encapsulate desired, relevant information. Thus, we hold that the magistrate judge and district court did not commit reversible error by denying her request for production, and subsequently denying her motion for reconsideration.

With respect to the district court's standing order, Daywalker's arguments also fail to demonstrate an abuse of discretion. She argues that the district court unfairly prevented her from reviewing the produced records of the other residents by limiting access to her counsel's eyes only. UTMB counters that Daywalker's substantial rights were not affected by the imposition of a standard protective order limiting access to confidential and sensitive information. It further argues that nothing in the disclosed performance records necessitated a medical degree or insider institutional knowledge to interpret them and that Daywalker "does not explain why it would take a medical doctor to ascertain whether the documents contained useful comparator information, and none is apparent from the record."

We again agree and find no reversible error. As aggrieved as Daywalker may feel from the dismissal of her claims against her employer, the record does not demonstrate that the district court abused its discretion by requiring her to abide by a protective order. She did not move to modify the order to assist her counsel, nor does she demonstrate that she could not sufficiently explain UTMB's performance standards

and scoring data to her counsel to supplement her search for comparator evidence. Thus, we hold that the magistrate judge's and district court's discovery determinations did not constitute abuses of discretion. See *Williams*, 23 F.4th at 514.

**C. Motion for Sanctions**

"We review a court's granting or denial of a motion for sanctions under an abuse of discretion standard." *Haase v. Countrywide Home Loans, Inc.*, 748 F.3d 624, 630 (5th Cir. 2014). We have consistently held that this standard of review is "necessarily very deferential." *Jenkins v. Methodist Hosps. of Dall.*, 478 F.3d 255, 264 (5th Cir. 2007). Daywalker contends that the district court abused its discretion when it denied her motion for sanctions against UTMB and its counsel for the alleged spoliation of evidence and its counsel's alleged misconduct during depositions. Beyond referencing the allegations she made to the district court, Daywalker improperly attempts to incorporate the law and facts raised in her motion for sanctions by reference "[d]ue to word limitation[s] and the number of issues briefed in this case."

As a preliminary matter, we hold that the district court did not abuse its discretion in denying Daywalker's motion for sanctions. The district court concluded that any deleted records relevant to her claims were cured through the production of other evidence, such as the Committee's meeting minutes where the committee members discussed Daywalker. Furthermore, Daywalker did not brief the issue before the court in spite of our consistent holdings that a party must brief issues before us and cannot simply incorporate by reference their positions taken in district court.[8] See, e.g., *Peel & Co., Inc. v. The Rug Market*, 238 F.3d 391, 398–99 (5th Cir. 2001). Nevertheless, even if we ignored her abandonment of the issue, there is no basis for reversal of the district court's determination. In line with our established principle to defer to a district court's denial to impose sanctions, we decline to reverse the district court's decision in this case. See *Jenkins*, 478 F.3d at 264.

**D. UTMB's Motion for Summary Judgment**

**\*7** We now turn to Daywalker's challenge to the district court's summary judgment to her Title VII, FMLA, and Rehabilitation Act claims. A district court's summary judgment is subject to de novo review. *Williams*, 23 F.4th at 512. We begin with Daywalker's claims that UTMB unlawfully retaliated against her for taking protected actions under Title VII, the FMLA, and the Rehabilitation Act, as they are reviewed under the same burden-shifting framework.

Case: 24-1439    Document: 33    Filed: 01/24/2025    Page: 21

Daywalker v. UTMB at Galveston, Not Reported in Fed. Rptr. (2024)

**i. Title VII Race Discrimination in Advancement Claim**

Title VII prohibits an employer from "fail[ing] to or refus[ing] to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Our en banc court has recently made clear that a plaintiff is not required to suffer a permanent adverse employment decision to maintain a Title VII claim. *Hamilton v. Dallas County, 79 F.4th 494, 502 (5th Cir. 2023)* (en banc).[9] However, to establish a prima facie case of racial discrimination under Title VII, a plaintiff must demonstrate that she was "treated less favorably because of [her] membership in [a] protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances." *Lee v. Kan. City S. Ry. Co., 574 F.3d 253, 259 (5th Cir. 2009)*.

Where a plaintiff establishes less favorable treatment, an inference of racial discrimination is raised, and the burden then shifts to the employer to offer a legitimate nondiscriminatory explanation. *Id.* (citing *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)*). If the employer provides such an explanation, "the burden shifts back to the [plaintiff] to demonstrate that the employer's explanation is merely a pretext for racial bias." *Id.*

Daywalker's Title VII claims fail to surpass the first hurdle, establishing a prima facie case of discrimination. To survive summary judgment, she must show that she was treated less favorably than similarly situated employees who were not members of her protected class, under nearly identical circumstances. *Paske v. Fitzgerald, 785 F.3d 977, 985 (5th Cir. 2015)*. We have clarified that an appropriate comparator is an employee treated more favorably under the same circumstances or with "essentially comparable violation histories." *Lee, 574 F.3d at 260*. This court has consistently rejected arguments that proffered comparators need not be nearly identical, that is, need not share similar attributes or responsibilities to sustain a claim. *See Herster v. Bd. of Supervisors of La. State Univ., 887 F.3d 177, 185 (5th Cir. 2018)*.

For instance, in *Saketkoo v. Administrators of Tulane Educational Fund*, we held that the plaintiff, a female

physician, failed to establish a prima facie case for gender discrimination where she did not "present evidence that any male physicians shared her research responsibilities, section assignments, historical performances, or other attributes that would render them similarly situated." 31 F.4th 990, 998 (5th Cir. 2022). The *Saketkoo* panel determined that the standard to show discrimination is not met where a plaintiff offers no explanation as to why the individuals are appropriate comparators. *Id.* at 999. The panel concluded that while she did identify that other male physicians, like herself, were not generating revenue from their practice, that alone was insufficient to render their experiences "nearly identical" in the field of academic medicine. *Id.* at 998–99.

**\*8** Just like in *Saketkoo*, Daywalker cannot establish a prima facie case of discrimination by merely pointing to other residents that UTMB's faculty expressed concerns about. She has failed to show how their experiences in the field of practical medicine in Otolaryngology were "nearly identical." *See id.* Furthermore, her arguments on appeal offer little to no explanation as to how Resident Three is an appropriate comparator. *See id.* at 999. Daywalker asserts that Resident Three is similarly situated because UTMB "would have provided Resident [Three]'s records if this were not the case." She further asserts that "[i]t cannot be disputed in good faith that Daywalker has not met all elements of her race discrimination on her demotion and discharge claims." UTMB counters that the record shows that Resident Three's disciplinary history governed a vastly different faculty concern that she "[m]ay be having depth or eye/hand issues with endoscopic cases." In other words, Resident Three has a disciplinary history with no similarity to Daywalker's.

We hold that summary judgment was appropriate as to Daywalker's Title VII claims because she has not proven her prima facie case to raise the inference of racial discrimination. The district court noted that Resident Three did not have issues with the accuracy and punctuality of recording medical notes and "was in a different stage of the disciplinary process." Beyond making the bare assertion that Resident Three is an appropriate comparator, Daywalker offers no explanation of how Resident Three is similarly situated to her. *See Saketkoo, 31 F.4th at 999; see also Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 343 (5th Cir. 2007)* ("[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.' "). Setting aside any possible issues of abandonment due to the limited discussion of this issue in her briefs,[10] we hold that Daywalker failed to adduce evidence of

**Daywalker v. UTMB at Galveston, Not Reported in Fed. Rptr. (2024)**

Case: 24-1439    Document: 33    Filed: 01/24/2025    Page: 22

a comparator with comparable violation histories to raise an inference of racial discrimination. *See Saketkoo*, 31 F.4th at 999–1000. Ordinarily, the Title VII inquiry ends here because a plaintiff's "Title VII claims fail[ ] as a matter of law" where they are unable to prove a prima facie case of discrimination. *See Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017).

In the interest of completeness, however, we evaluate Daywalker's assertion that she has proven that UTMB's non-discriminatory justification was a pretext for racial discrimination. Assuming *arguendo* that her Title VII claims present a prima facie case of racial discrimination, her claims fail because she cannot demonstrate that UTMB's alleged non-discriminatory ground for termination—her untimely clinical notetaking—is merely pretextual. After presenting a prima facie case of discrimination, a defendant must offer a legitimate, non-discriminatory justification for the alleged discriminatory conditions. *See Septimus v. Univ. of Hous.*, 399 F.3d 601, 609 (5th Cir. 2005). In that case, summary judgment is appropriate unless the plaintiff demonstrates that a genuine issue of material fact exists as to whether the proffered legitimate reasons are a pretext for discrimination. *Id.* Even if an employer's stated non-discriminatory justification lacks support, it does not violate Title VII if it acted on a reasonably held belief. *Dickerson v. Metropolitan Dade County*, 659 F.2d 574, 581 (5th Cir. Unit B 1981) ("Even if [the employer] w[as] wrong in its evaluation of the [employee's performance], it did not violate Title VII if it acted on a reasonable belief about [the conduct].").

 **\*9**  On appeal, Daywalker asserts that she demonstrated pretext because (1) Dr. Resto admitted to her in a meeting in the summer of 2018 that "there was no validity to the remediation"; (2) she invalidated the reasons offered in Dr. Szeremeta's remediation memo with her own recounting of the events; and (3) Dr. Resto and Dr. Siddiqui said she was "passing" her remediation plan in July 2018. UTMB argues that any comment about the "validity" of the remediation plan does not establish a fact issue as to pretext because "the remediation and UTMB's decision to retain her as a [third-year resident] were separate acts, even if based on some of the same underlying conduct." UTMB further contends that no "fundamentally different" rationales exist to establish pretext through inconsistency and that Dr. Resto's comments "do not disprove that the faculty was concerned that 'her notes were untimely and inaccurate.' "

We conclude on these facts that the district court appropriately determined that Daywalker did not create a fact issue as to pretext. UTMB supervisors' comments on Daywalker's progress on her clinical charting skills during her first three years of residency are a mixed bag. Numerous comments for years two and three show that she did extremely well in certain rotations. However, the record also shows that numerous supervisors throughout the entirety of her time at UTMB commented on her need to improve her clinical notetaking skills and timeliness in recording patient notes. Daywalker admitted in her opposition to summary judgment that she did not complete some of the patient notes in a timely manner. In a July 2018 meeting with Dr. Siddiqui and Dr. Resto, Dr. Siddiqui informed Daywalker that she "continued to have lapses in documentation, [ ] was late on a call note," and that her clinical efficiency skills lagged behind what was expected for a resident of her experience. Notably, UTMB's program requires senior residents to exhibit higher levels of clinical competency such that select positive reviews from years one and two cannot be said to be an accurate determinator that Daywalker would consistently meet expectations as she gained more responsibility. Numerous documents in the record support UTMB's stated justification that Daywalker had difficulties with the timely charting of patient notes.

Daywalker does not attack UTMB's reliance on its justification as unreasonable, which only further supports this conclusion. *See Baker v. Exxon Chem. Americas*, 68 F.3d 467 (5th Cir. 1995) (per curiam) (noting plaintiff's failure to show pretext or disprove reasonable reliance on stated justification for failure-to-promote claim did not merit reversal). Thus, summary judgment was appropriate as to her Title VII claims because she did not provide evidence creating a fact dispute as to pretext.

### ii. Title VII Hostile Work Environment Claim

Title VII also makes it unlawful to subject employees "to work in a discriminatorily hostile or abusive environment." *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 325 (5th Cir. 2019). To bring a hostile work environment claim, a plaintiff must show that they were harassed based on their status within a protected class in such a pervasive and severe manner to affect a term, condition, or privilege of employment. *See, e.g., West v. City of Houston*, 960 F.3d 736, 741 (5th Cir. 2020). A court must look at the totality of the circumstances to determine whether

**Daywalker v. UTMB at Galveston, Not Reported in Fed. Rptr. (2024)**

Case: 24-1439   Document: 33   Filed: 01/24/2025   Page: 23

the alleged discriminatory conduct unreasonably interferes with an employee's performance, including the severity and frequency of the conduct and whether it is comprised of physical threats or humiliation, or are merely offensive utterances. *See Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993). The alleged hostile environment must be both objectively and subjectively offensive. *Id.* at 21–22.

Here, the objectively offensive requirement is determinative of Daywalker's claim. We have held that "[d]iscriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions" of employment and "create an abusive working environment that violates Title VII." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1049 n.9 (5th Cir. 1996) (citation omitted). One instance where the racially discriminatory remarks and intimidation crossed the line occurred in *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000), *abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67 (2006). The district court in *Walker* granted summary judgment as to a Black employee's hostile work environment claims because it concluded that none of the comments were physically threatening or humiliating. *Id.* at 625–26. This court reversed because the district court ignored substantial evidence creating a fact dispute as to the severity and pervasiveness of the consistent use of racial epithets and derisive remarks against Black employees in the workplace over a period of three years.[11] *Id.* at 626.

**\*10** Based on the evidence adduced at the district court, this is not such a case where the district court ignored years of derisive comments and intimidating behavior to grant summary judgment in UTMB's favor. The evidence presented in cases like *Walker* goes far beyond the conduct alleged here. At most, Daywalker has shown that Dr. Szeremeta made a handful of statements offensive to employees of color over the span of a few years. The insensitive statements are separated by months, and most involve instances where Dr. Szeremeta gave feedback or criticism about Daywalker's performance. However, the course of alleged racially insensitive treatment is less prolonged and pervasive than other cases where we determined that the plaintiff failed to show that they suffered from extraordinarily pervasive discriminatory conduct. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 347–48 (5th Cir. 2007) (determining that no reasonable jury could find that the employer's consistent comments on "ghetto children" and Black employees' spending habits and family structure were sufficiently pervasive to create a hostile work environment). Therefore, we hold that summary judgment

was appropriate as to Daywalker's Title VII hostile work environment claim.

### iii. Title VII Constructive Discharge Claim

A resignation is actionable under Title VII where it constitutes a constructive discharge. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001). To prove constructive discharge, the plaintiff must demonstrate that their "working conditions were so intolerable that a reasonable employee would feel compelled to resign." *Faruki v. Parson, S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997). We have accepted certain events—demotions, reductions in salary or responsibilities, assignment to degrading work, badgering or harassment by an employer to encourage resignation, and offers to place them on early retirement—are evidence of circumstances where a reasonable employee would feel compelled to resign. *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000). "Constructive discharge requires a greater degree of harassment than that required by a hostile environment claim." *Kinney Shoe*, 237 F.3d at 566. Based on our constructive discharge jurisprudence and the reasons given above, we hold that Daywalker's constructive discharge claim also fails. *See id.*

Even absent our jurisprudence's ascription of a higher degree of harassment to maintain a constructive discharge claim, Daywalker's claim would nonetheless fail to survive summary judgment. For instance, in *Lauderdale v. Texas Department of Criminal Justice*, a female correctional officer alleged that her supervisor sexually harassed her over a period of four months while she worked in a state facility. 512 F.3d 157, 161 (5th Cir. 2007). The district court denied her constructive discharge claim because she did not present evidence that the sexual harassment was calculated to encourage her resignation or evidence of intentional animus to "create or perpetuate the intolerable conditions compelling resignation." *Id.* at 167 (quoting *Haley v. Alliance Compressor*, 391 F.3d 644, 650 (5th Cir. 2004)). The panel determined that the plaintiff "merely reiterated the facts that constituted harassment" and that her "failure to [adequately] brief and to correctly distinguish constructive discharge from her harassment claim [meant that] she ha[d] failed to create a genuine issue of material fact that a reasonable employee would have felt compelled to resign under the same circumstances." *Id.*

Daywalker's case is strikingly similar in terms of its deficiencies to the plaintiff's in *Lauderdale*. However,

Case: 24-1439    Document: 33    Filed: 01/24/2025    Page: 24

Daywalker v. UTMB at Galveston, Not Reported in Fed. Rptr. (2024)

she asserts in her brief that hostile work environment claims and constructive discharge claims are functionally coextensive without noting the distinctions established by our jurisprudence. Her analysis, however, misses the mark. For these reasons, we hold that summary judgment in favor of UTMB as to Daywalker's constructive discharge claim was appropriate. *Id.* at 167.

### iv. Title VII Retaliation Claim

Daywalker's Title VII, FMLA, and **Rehabilitation Act retaliation** claims also fail here. We evaluate each of these claims under functionally similar structures based on the same *McDonnell Douglas* burden-shifting framework. *See, e.g., Lindsley v. TRT Holdings, Inc.,* 984 F.3d 460, 469 (5th Cir. 2021); *Jenkins v. Cleco Power, LLC,* 487 F.3d 309, 316 n.3 (5th Cir. 2007).* To survive summary judgment, a plaintiff must demonstrate that "a causal link exists between the protected activity" and the complained of discriminatory "terms, conditions, or privileges of employment" or adverse employment action. *See Gorman v. Verizon Wireless Tex., L.L.C.,* 753 F.3d 165, 170 (5th Cir. 2014); *Hamilton,* 79 F.4th at 499–506 (eliminating the adverse employment action requirement from a prima facie case). Plaintiffs must prove their claims "according to traditional principles of but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 360 (2013).

**\*11**  On appeal, Daywalker argues that the close proximity of time between her internal discrimination complaint and the August 8, 2018 letter is evidence of a causal link between her protected activity and UTMB's discriminatory terms, conditions, and privileges of employment. She further asserts that Dr. Pine spoke to her as a representative of the Committee and faculty when he told Daywalker that she would never be an Otolaryngologist if she did not sign the remediation plan and that "a sizeable group in the faculty" thought she would not finish the program. She contends that because Dr. Pine made these comments about the pending investigations against Dr. Szeremeta and Dr. Siddiqui, "they are evidence a [sic] retaliatory animus of the faculty."

Daywalker brings a "cat's paw" argument, a theory of proving causation in discrimination cases by asserting that an individual with racially discriminatory animus infected the decision-making process. *EEOC v. Emcare, Inc.,* 857 F.3d 678, 684 & n.3 (5th Cir. 2017).* Here, she argues that Dr. Pine and Dr. Szeremeta asserted influence over the rest

of the faculty to hold her back as a third-year resident. However, merely asserting a theory is not enough. We have held that a plaintiff pursuing this theory of causation must demonstrate that individuals with discriminatory animus "had influence or leverage over the official decisionmaker." *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 226 (5th Cir. 2000).* Beyond making these unsubstantiated allegations, Daywalker points to no specific evidence showing how Dr. Szeremeta and Dr. Pine tainted the deliberative process or had "influence or leverage" over the entire faculty. *See id.*

In fact, she does not include more than conclusory allegations that the evidence and allegations presented at the district court even satisfy the relevant standards. Therefore, we hold that summary judgment was appropriate to Daywalker's Title VII retaliation claim. *Nassar,* 570 U.S. at 360.

### v. FMLA Retaliation Claim

Daywalker also brings a retaliation claim under the FMLA. The FMLA prohibits retaliation against employees that exercise their FMLA rights. *Campos v. Steves & Sons, Inc.,* 10 F.4th 515, 527 (5th Cir. 2021).* In her prima facie case, a plaintiff is required to demonstrate that she was treated less favorably than an employee who had not requested leave under the FMLA *or* that she suffered from discriminatory conditions of employment because she sought protection under the FMLA. *See id.* A plaintiff must provide evidence of a causal link, and her claim is subject to the *McDonnell Douglas* burden-shifting framework. *See Caldwell v. KHOU-TV,* 850 F.3d 237, 245–46 (5th Cir. 2017) ("[E]ven if the plaintiff makes out a prima facie case, he may not overcome a motion for summary judgment if the employer articulates a legitimate non-discriminatory reason for the employment action at issue."). A plaintiff may use retaliatory comments to establish causation. *See Saketkoo,* 31 F.4th at 1001.

The reasons articulated in our analysis of her other claims demonstrate that Daywalker's FMLA claim also fails under the burden-shifting framework. *Caldwell,* 850 F.3d at 245. But in the interest of completeness and because the district court addressed these claims, we endeavor to address her arguments as to her FMLA retaliation claim.[12] Because she has not pointed to comparator evidence on her FMLA claim, we look to her other offered circumstantial evidence of causation. *See Saketkoo,* 31 F.4th at 1001. One of her primary arguments is that a short temporal link of a few months existed between her putting Dr. Resto on notice of her

Case: 24-1439    Document: 33    Filed: 01/24/2025    Page: 25

Daywalker v. UTMB at Galveston, Not Reported in Fed. Rptr. (2024)

disabilities and the cause for her FMLA leave in a meeting in June 2018 and again in October 2018. She maintains that UTMB "did not notify [her that] she had been demoted until she returned from FMLA leave on November 6, 2018." She alternatively contends that Dr. Pine's statements made on August 8, 2018 that she would likely not finish the program if she did not agree to repeat select third-year rotations demonstrates retaliatory animus. Thus, she concludes that her proffered evidence in addition to the underlying "falsity of the remediation" plan is sufficient to establish a prima facie case.

**\*12** We disagree. The record contains numerous sources that provide that UTMB's faculty decided to have Daywalker repeat certain third-year rotations before her request to convert her personal leave to FMLA leave was received. For instance, the Committee's August 6, 2018 meeting minutes show that the committee discussed holding Daywalker back as a third-year resident after she returned from leave. The August 8, 2018 letter was delivered on that date and stated that her leave was not considered FMLA. It follows that the letter explicitly stated so because the program staff did not know she sought FMLA leave.

UTMB points out that an employee is required to "provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." Daywalker's statement that she "thought [she] might qualify for FMLA" leave made to UTMB's administration in early August thus cannot be interpreted as sufficient verbal notice to trigger FMLA protection pre-dating the August 8, 2018 letter. Furthermore, Daywalker's exact words in her August 1, 2018 email requesting leave stated that "I would like to inform the [Graduate Medical Education] Office of my official request to take a leave of absence." Looking to her complaint, Daywalker averred that she engaged counsel to "draft[ ] a letter requesting FMLA [leave], among other things" *after* she received the August 8, 2018 letter. Thus, we hold that the record demonstrates that summary judgment in favor of UTMB was appropriate as to Daywalker's FMLA retaliation claim because she did not create a fact issue as to the causal link between her protected activity and the alleged discriminatory terms, conditions, or privileges of employment. *See Saketkoo*, 31 F.4th at 1001.

### vi. **Rehabilitation Act Retaliation** Claim

The Rehabilitation Act prohibits discrimination based solely on account of a person's disability. 29 U.S.C. § 794(a). Under the Rehabilitation Act, unlike Title VII, liability arises "only if the discrimination occurred 'solely by reason of [plaintiff's] disability,' not when it is simply a 'motivating factor.' " *See Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 585 (5th Cir. 2021) (quoting *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 505 (5th Cir. 2002)). Rehabilitation Act claims are also evaluated under the *McDonnell Douglas* burden-shifting framework. *See id.* Because we have held that Daywalker has failed to show that UTMB's proffered non-discriminatory reasons for its decision were pretextual, her Rehabilitation Act claim also fails. *See id.* at 586 (denying Rehabilitation Act claim for the same reasons the plaintiff's FMLA claims were rejected because she incorporated her arguments together and admitted they were "intimately connected"). Notably, Daywalker's arguments that UTMB had notice of her disability as early as June 2018 do not square with the record or our caselaw. *See, e.g., Hileman v. City of Dallas*, 115 F.3d 352, 353 (5th Cir. 1997); *Soledad*, 304 F.3d at 505. Throughout her brief, Daywalker offers only conclusory assertions that UTMB's conduct, whether it be through Dr. Pine, Dr. Szeremeta, the Committee, or the faculty at large demonstrates that her disability was the *sole* reason for her alleged discrimination. Thus, we hold that summary judgment was appropriate as to her Rehabilitation Act claim because she has not provided sufficient evidence of a causal link between the alleged discrimination and her disability status.

### III. Conclusion

In sum, we hold that (1) UTMB's medical residents are students covered by FERPA; (2) the district court did not abuse its discretion in making any discovery decisions in this case and in denying Daywalker's motion for sanctions; and (3) summary judgment was appropriate because Daywalker could not provide sufficient evidence to create a material fact dispute as to her Title VII, FMLA, and Rehabilitation Act claims. Thus, we AFFIRM.

### All Citations

Not Reported in Fed. Rptr., 2024 WL 94297

**Daywalker v. UTMB at Galveston, Not Reported in Fed. Rptr. (2024)**

Case: 24-1439    Document: 33    Filed: 01/24/2025    Page: 26

## Footnotes

† United States District Judge for the Northern District of Texas, sitting by designation.

\* This opinion is not designated for publication. See 5th Cir. R. 47.5.

1 UTMB describes remediation programs as a performance improvement plan "provid[ing] tailored assistance, training, and/ or supervision to residents who need additional support to meet expectations" and not "formal discipline" or "report[ed] ... to future employers."

2 The district court held that the other resident she pointed to was not similarly situated because he had different disciplinary issues and was in a different stage of the program's disciplinary process.

3 The DOE guidance letter provides that "[a] medical resident who works at a hospital is not a 'student' as that term is defined in FERPA" because they have achieved a terminal degree in their field and merely seek advanced certification.

4 UTMB stores and reports such information pertaining to its residents to the American Board of Otolaryngology. Shortly after completing the program, residents desiring to continue in the field must take and pass both written and oral exams. *See https://www.abohns.org/about-our-certifications/our-assessment-programs.*

5 She avers that the abuse of discretion is facially apparent because the magistrate judge's FERPA order states that the records of other residents were "directly relevant to her claims of discrimination" such that it was appropriate to allow her to access other residents' records.

6 The parties submitted position letters describing the production dispute pursuant to the district court's directive.

7 *See Hickman v. Taylor, 329 U.S. 495, 506 (1947).*

8 In her reply, Daywalker argues that incorporation by reference is permissible because "[t]here is no case law forbidding a party from citeimg [sic] or incorporating arguments already briefed and referenced in ROA [sic]." This ignores the Federal Rules of Appellate Procedure, Fifth Circuit rules, and our consistent and longstanding precedent that parties must brief their issues on appeal to obtain relief from this court. *See Yohey v. Collins*, 985 F.3d 222, 224–25 (5th Cir. 1993). Notably, Daywalker's counsel had other options. In accordance with the Federal Rules of Appellate Procedure and Fifth Circuit rules, counsel could have moved to file a brief in excess of the page or word-volume limitations to ensure adequate space to explain her arguments that sanctions are appropriate. *See* Fed. R. App. P. 32; 5th Cir. R. 32.4.

9 While the district court also held that Daywalker could not sustain her claim because no adverse employment action occurred, we note that she has preserved her claim of error in the district court and on appeal. Thus, Daywalker is entitled to the benefit of the substantive change of our Title VII jurisprudence that is congruent with her claim of error. *See Harrison v. Brookhaven Sch. Dist.*, 82 F.4th 427, 428 (5th Cir. 2023).

10 Federal Rule of Appellate Procedure 28(a)(4) requires that an "appellant's argument contain the reasons [she] deserves the requested relief with citation to the authorities, statutes and parts of the record relied on." *Weaver v. Puckett*, 896 F.2d 126, 128 (5th Cir. 1990) (internal quotations omitted). We have deemed arguments containing mere conclusory assertions without sufficient support from caselaw or the record abandoned. *See Yohey v. Collins*, 985 F.3d 222, 224–25 (5th Cir. 1993).

11 The panel summarized some of the evidence of the pervasive discriminatory animus as follows:

The offensive remarks began in 1994, shortly after [plaintiff] was hired and had not ceased the week prior to the appellants' resignations in May of 1997. While working for [her employer], the [Black employees] at various times were subjected to: comparisons to slaves and monkeys, derisive remarks regarding their African heritage, patently offensive remarks regarding the hair of African–Americans, and conversations in which a co-worker and supervisor used the word "n\*gger." The office manager also informed them that the vice-president did not want the African–American women to talk to each other.

**WESTLAW**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

*Id.*

12    In her brief, Daywalker admits that the analyses for all of her retaliation claims are closely related and essentially advances the same arguments as to the causal link required to prove her prima facie case.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

214 F.R.D. 43

United States District Court,

District of Columbia.

Jimmy L. DUNCAN, Plaintiff,

v.

WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY, Defendant.

Civ.A. No. 01–2360(GK).

|

April 1, 2003.

**Synopsis**

Former employee of Washington Metropolitan Transit Authority (WMATA) brought action contending that his termination and authority's failure to rehire him constituted disability discrimination in violation of the Rehabilitation Act. On defendant's motion to dismiss, the District Court, Kessler, J., held that: (1) by accepting federal Rehabilitation Act funds, WMATA waived its Eleventh Amendment immunity to suit in federal court; (2) Rehabilitation Act provides a cause of action for retaliation; and (3) complaint stated a claim for retaliation under the Rehabilitation Act.

Motion denied.

West Headnotes (5)

[1]    **Federal Courts**  🗝  Participation in federal
programs

By accepting federal Rehabilitation Act funds, Washington Metropolitan Transit Authority (WMATA) waived its Eleventh Amendment immunity to suit in federal court under section of the Act. U.S.C.A. Const.Amend. 11; Rehabilitation Act Amendments of 1986, § 1003, 42 U.S.C.A. § 2000d–7.

3 Cases that cite this headnote

[2]    **Civil Rights**  🗝  Retaliation for Exercise of
Rights

The Rehabilitation Act provides a cause of action for retaliation pursuant to its incorporation of the retaliation provision of the ADA. Rehabilitation Act of 1973, § 504(a), 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990, § 503(a), 42 U.S.C.A. § 12203(a).

8 Cases that cite this headnote

[3]    **Civil Rights**  🗝  Practices prohibited or
required in general;  elements

To establish a prima facie case of retaliation under the Rehabilitation Act, a plaintiff must show that: (1) he engaged in statutorily protected activity, (2) the employer was aware of the activity; (3) the plaintiff suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. Rehabilitation Act of 1973, § 504(a), 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990, § 503(a), 42 U.S.C.A. § 12203(a).

20 Cases that cite this headnote

[4]    **Civil Rights**  🗝  Activities protected

**District of Columbia**  🗝  Officers, agents, and
employees

**Public Employment**  🗝  Protected activities

Former employee of Washington Metropolitan Transit Authority (WMATA) sufficiently alleged that he engaged in a protected activity for purpose of retaliation claim under the Rehabilitation Act, where he alleged that he opposed disability discrimination made unlawful by both the Rehabilitation Act and the ADA when he filed suit for disability discrimination against WMATA, and subsequently defended against WMATA's appeal. Rehabilitation Act of 1973, § 504(a), 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990, § 503(a), 42 U.S.C.A. § 12203(a).

7 Cases that cite this headnote

[5]    **Civil Rights**  🗝  Causal connection;  temporal
proximity

**District of Columbia** 🔑 Officers, agents, and employees

**Public Employment** 🔑 Causal connection; temporal proximity

Former employee of Washington Metropolitan Transit Authority (WMATA) sufficiently alleged a causal connection between his protected activity and his termination from his position for purpose of prima facie case of **retaliation** under the **Rehabilitation Act**, where he alleged that he successfully sued WMATA for disability discrimination, was reinstated to his position, performed his job without incident or need for any accommodation for two-and-one-half years, defended verdict of disability discrimination on appeal, and was subsequently terminated from his job one month after jury verdict was reversed by the appellate court. **Rehabilitation Act** of 1973, § 504(a), 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990, § 503(a), 42 U.S.C.A. § 12203(a).

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*44** Julie Glass Martin, Zipin Melehy & Driscoll, Silverspring, MD, Suzanne L. Lawrence, North Bethesda, MD, for plaintiff.

Mark Francis Sullivan, Jeanette J. Clark, Washington Metropolitan Area Transit Auth., Washington, DC, Bruce Heppen, Washington, DC, for defendant.

**MEMORANDUM OPINION**

KESSLER, District Judge.

Plaintiff, Jimmy Duncan, brings this action against the Washington Metropolitan Area Transportation Authority ("WMATA") for employment discrimination in violation of Section 504 of the **Rehabilitation Act** of 1973 ("**Rehabilitation Act**" or "Act"), 29 U.S.C. § 794. The matter is now before the Court on Defendant's Motion to Dismiss. Upon consideration of the Motion, Opposition, Reply, Surreply, and the entire record herein, for the reasons stated below, Defendant's Motion to Dismiss is **denied**.

**I. BACKGROUND**

Plaintiff was employed by Defendant WMATA from 1986 through 1993 and again from 1997 through 2001. He was employed initially as a custodian and subsequently as an Automatic Fare Collector ("AFC") from November 1991 through December 1992.

In February 1992, Plaintiff was in an automobile accident, unrelated to his employment, which caused injury to his back. He subsequently returned to work and resumed his regular duties. *See Duncan v. WMATA,* No. 95–02360, slip op. at 2 (D.D.C. May 19, 1997) ("*Duncan I*").

In December 1992, Defendant reassigned Plaintiff to the position of Parts Runner in its Elevator/Escalator Branch ("ELES"). On December 19, 1992, Duncan reinjured his back. As a result, Plaintiff contended that he was unable to continue performing his heavy-lifting ELES assignments. Plaintiff's supervisor informed him that no light-lifting jobs were available, and Duncan was placed on sick leave and then on leave without pay.

Plaintiff contended that he twice applied for vacant AFC positions in March and July 1993, but was not selected for these positions. In October 1993, Plaintiff was discharged from his ELES position.

On December 22, 1994, Plaintiff filed his first suit in the District Court for the District of Columbia, alleging that WMATA violated the Americans with Disabilities Act ("ADA") by discharging him on account of his disability and by failing to reasonably accommodate his disability. *See id.*

After a five-day trial, the jury entered a verdict on May 27, 1997, finding that WMATA had violated the ADA as alleged. Duncan was awarded compensatory damages of $125,000 on his wrongful termination claim and $125,000 on his reasonable accommodation claim. *Id.,* May 27, 1997 Judgment on the Verdict.

Subsequent to the jury verdict, WMATA reinstated Plaintiff to his previously held AFC parts runner position. He contends that he held that position for two-and-one-half years without incident and without need of any accommodation.

On March 2, 2001, the D.C. Circuit reversed the district court's order denying judgment as a matter of law and vacated the jury verdict. In so doing, it concluded that Duncan had

failed to prove that he was disabled within the meaning of the ADA. *See Duncan v. WMATA,* 240 F.3d 1110, 1117 (D.C.Cir.2001) (en banc).

Subsequent to the D.C. Circuit ruling, on April 11, 2001, Duncan was again terminated from his position with WMATA. WMATA's Acting Superintendent of the Automatic Fare Collection Department, Office of Systems Maintenance, Charles Buettner, indicated that Duncan's reinstatement had been conditioned on the outcome of the appeal, and because he had lost the appeal, he was terminated effective immediately.

Since his termination, Plaintiff contends that he has unsuccessfully applied for the vacant AFC parts runner position he previously held.

**\*45** On November 13, 2001, Plaintiff brought this action ("*Duncan II*"), alleging that his April 11, 2001 termination was in violation of Section 504 of the Rehabilitation Act. He further contends that, by failing to hire him for the vacant AFC parts runner position he previously held, Defendant violated the Rehabilitation Act.

In its Motion to Dismiss, Defendant contends, first, that WMATA is immune from suit under the Eleventh Amendment, and the Court therefore lacks subject matter jurisdiction. Second, Defendant argues that the Rehabilitation Act does not provide a cause of action for retaliation. Third, WMATA contends that, even if the Rehabilitation Act does create a cause of action for retaliation claims, Plaintiff cannot establish that he engaged in a protected activity under the Rehabilitation Act. Fourth, WMATA argues that Plaintiff cannot establish any causal nexus between his alleged protected activity and his April 11, 2001 termination.

## II. STANDARD OF REVIEW

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) requires the plaintiff to bear the burden of establishing, by a preponderance of the evidence, that the Court has jurisdiction to entertain his claims. Fed.R.Civ.P. 12(b)(1); *Grand Lodge of the Fraternal Order of Police v. Ashcroft,* 185 F.Supp.2d 9, 13 (D.D.C.2001) (holding that the court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority"); *Pitney Bowes, Inc. v. United States Postal Serv.,*

27 F.Supp.2d 15, 18 (D.D.C.1998); *Darden v. United States,* 18 Cl.Ct. 855, 859 (1989).

While the Court must accept as true all the factual allegations contained in the Complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), " 'plaintiff's factual allegations in the complaint ... will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim," because the plaintiff has the burden of proof to establish jurisdiction. *Grand Lodge of the Fraternal Order of Police,* 185 F.Supp.2d at 13–14 (citation omitted).

Finally, in deciding a 12(b)(1) motion, it is well-established in this Circuit that the Court is not limited to the allegations in the Complaint but may consider material outside of the Complaint in an effort to determine whether the Court has jurisdiction in the case. *See EEOC v. St. Francis Xavier Parochial Sch.,* 117 F.3d 621, 624–25 n. 3 (D.C.Cir.1997); *Herbert v. Nat'l Acad. of Sciences,* 974 F.2d 192, 197 (D.C.Cir.1992); *Haase v. Sessions,* 835 F.2d 902, 906 (D.C.Cir.1987).

### B. Motion to Dismiss for Failure to State a Claim

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), the Complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The factual allegations of the Complaint must be presumed true and liberally construed in favor of the plaintiff. *Shear v. National Rifle Ass'n of Am.,* 606 F.2d 1251, 1253 (D.C.Cir.1979).

## III. ANALYSIS

### A. By Accepting Federal Rehabilitation Act Funds, WMATA Waived its Sovereign Immunity

#### 1. Waiver of Sovereign Immunity Generally

**[1]**     As noted above, Defendant contends that it possesses sovereign immunity under the Eleventh Amendment of the Constitution, and that the Court therefore lacks subject matter jurisdiction over Plaintiff's claims.

The Eleventh Amendment provides in pertinent part that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced **\*46** or prosecuted against one of the United States by Citizens of another State." U.S. Const. amend. XI. It is well-established that this amendment, despite its express terms, also precludes citizens from bringing suit in federal court against their own states. *See Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana,* 134 U.S. 1, 13–15, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

The Supreme Court has, however, recognized exceptions to the immunity guaranteed by the Eleventh Amendment. For instance, Congress may abrogate the immunity without state consent if it acts pursuant to a valid exercise of congressional power and unequivocally expresses its intent to do so. *See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). In addition, a state may waive its Eleventh Amendment immunity by consenting to be sued in federal court. *See College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, et al.,* 527 U.S. 666, 675, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *Seminole Tribe,* 517 U.S. at 63, 116 S.Ct. 1114 (acknowledging the "unremarkable ... proposition that the States may waive their sovereign immunity") (citations omitted); *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985).

Here, the parties do not dispute that WMATA possesses sovereign immunity. Indeed, Courts in this Circuit have consistently affirmed this principle. *See Jones v. WMATA,* 205 F.3d 428, 432 (D.C.Cir.2000); *Morris v. WMATA,* 781 F.2d 218, 219–20 (D.C.Cir.1986); *Taylor v. WMATA,* 109 F.Supp.2d 11, 13 n.3 (D.D.C.2000).[1]

Instead, the parties dispute whether WMATA has waived this immunity. Specifically, Plaintiff contends that, by accepting federal **Rehabilitation Act** funds, WMATA voluntarily waived its immunity from suit under Section 504 of the **Rehabilitation Act**.

## 2. The Rehabilitation Act Amendments of 1986 Constitute a Valid and Unambiguous Waiver of States' Sovereign Immunity

It is well-established that states may waive their Eleventh Amendment immunity by accepting federal funds. Under the Spending Clause power of Article I, Congress is empowered to "lay and collect Taxes, Duties, Imposts, and Excises to pay the Debts and provide for the common Defense and general Welfare of the United States." Art. I, § 8, cl. 1.

As the Supreme Court repeatedly has recognized, "Congress has no obligation to use its Spending Clause power to disburse funds to the States; such funds are gifts." *See College Savings Bank,* 527 U.S. at 686–86, 119 S.Ct. 2219. Therefore, "Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails an agreement to the actions." *Id.* at 686, 119 S.Ct. 2219. Specifically, the federal government may condition a waiver of state sovereign immunity upon receipt of federal funds. *See Atascadero,* 473 U.S. at 238 n. 1, 105 S.Ct. 3142 (noting that "a State may effectuate a waiver of its constitutional immunity ... by otherwise waiving its immunity to suit in the context of a particular federal program").

The Supreme Court has clarified, however, that the mere receipt of federal funds does not establish that a state has consented to suit in federal court. Instead, the statute must evince a "clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity." *Id.* at 247, 105 S.Ct. 3142. Here, the plain language of the **Rehabilitation Act** Amendments of 1986 provides the clear and unambiguous waiver of states' sovereign **\*47** immunity required by *Atascadero.*[2]

In *Atascadero,* the Supreme Court held that the initial version of the **Rehabilitation Act** fell "far short of manifesting a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity." *Id.* As a result, the next year Congress adopted the **Rehabilitation Act** Amendments of 1986 ("**Rehabilitation Act** Amendments" or "Section 2000d–7"), which expressly provide that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the **Rehabilitation Act** of 1973." 42 U.S.C. § 2000d–7 (1986).[3]

The Supreme Court has recognized Section 2000d–7 as a valid and unambiguous waiver of states' Eleventh Amendment immunity. In *Lane v. Pena,* 518 U.S. 187, 200, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996), the Supreme Court

described Section 2000d–7 as an "unambiguous waiver of the States' Eleventh Amendment immunity." In so doing, it emphasized that the **Rehabilitation** **Act** Amendments were enacted in response to its decision in *Atascadero*. By enacting the Amendments, the Supreme Court reasoned, "Congress sought to provide the sort of unequivocal waiver that our precedents demand." *Id.* (evaluating parallel Title IX provision).[4]

Moreover, every court of appeals to address this issue, except the Second Circuit, has concluded that, by accepting federal funds, the state entities waived their Eleventh Amendment immunity. In so doing, they reasoned that Section 2000d–7 constitutes a clear and unambiguous waiver of states' sovereign immunity. *See Douglas v. California Dep't of Youth Authority,* 271 F.3d 812, 818–21 (9th Cir.2001) ("the clear waiver language of the **Rehabilitation** **Act** conditions the receipt of federal funds under the **Rehabilitation** **Act** upon a state's agreement to forgo the Eleventh Amendment defense"); *Nihiser,* 269 F.3d at 628 ("Section 2000d–7 is 'the most express language' of waiver of Eleventh Amendment immunity"); *Stanley v. Litscher,* 213 F.3d 340, 344 (7th Cir.2000) ("[w]e therefore agree with the fourth, ninth, and eleventh circuits that the **Rehabilitation** **Act** is enforceable in federal court against recipients of federal largess"); *Pederson et al. v. Louisiana State University et al.,* 213 F.3d 858 (5th Cir.2000) ("we find that in 42 U.S.C. § 2000d–7(a) (a) [sic] Congress has successfully codified a statute which clearly, unambiguously, and unequivocally conditions receipt of federal funds under Title IX on the State's waiver of Eleventh Amendment Immunity"); *Jim C.,* 235 F.3d at 1081 (concluding that state "waived sovereign immunity, with respect to suits under Section 504 ... when it chose to participate in the federal spending program **created** by that Section"); *Litman v. George Mason University,* 186 F.3d at 554 (evaluating parallel Title IX provision and concluding that "Congress succeeded in its effort to codify a clear, unambiguous, and unequivocal condition of waiver of Eleventh Amendment immunity in 42 U.S.C. § 2000d–7(a)(1)"); *Sandoval v. L.N. Hagan,* 197 F.3d 484, 493 (11th Cir.1999) (concluding that the plain language of 42 U.S.C. § 2000d–7 "manifests an **\*48** unmistakable intent to condition federal funds on a state's waiver of sovereign immunity"), *reversed on other grounds by Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).[5]

Defendant argues that the reasoning of the Second Circuit— the only court of appeals to conclude that, by accepting federal **Rehabilitation** **Act** funds, the state did not waive its Eleventh

Amendment immunity—compels a finding that WMATA did not waive its immunity here. *See Garcia v. S.U.N.Y.,* 280 F.3d 98 (2d Cir.2001). Significantly, in reaching this conclusion, the Second Circuit did determine—as did every other court of appeals to address this issue—that Section 2000d–7 "constitutes a clear expression of Congress' intent to condition acceptance of federal funds on a state's waiver of its Eleventh Amendment immunity." *Id.* at 113–14.

Nonetheless, the Second Circuit concluded that the state entity had not knowingly waived its immunity by accepting federal **Rehabilitation** **Act** funds because, at the time it received the funds, Title II of the ADA was understood to abrogate the state's sovereign immunity. The *Garcia* court reasoned that, since "the proscriptions of Title II and § 504 are virtually identical," the state would have believed that its sovereign immunity under the **Rehabilitation** **Act** was already abrogated as well, and the state therefore could not knowingly waive a right it believed it had already lost. *Id.* at 114.

This Court is not persuaded by the reasoning of the Second Circuit because Title II of the ADA and Section 504 of the **Rehabilitation** **Act** are simply not analogous statutes. Instead, the Court concludes—as did the Supreme Court and every court of appeals, including the Second Circuit, to address this issue—that Section 2000d–7 constitutes an "unambiguous waiver of the States' Eleventh Amendment immunity." *Lane,* 518 U.S. at 200, 116 S.Ct. 2092. Accordingly, by accepting federal **Rehabilitation** **Act** funds, despite this clear Congressional requirement, WMATA waived its Eleventh Amendment immunity.

Defendants further rely on *College Savings Bank,* 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605, in which the Supreme Court rejected the concept of a constructive or implied waiver of state sovereign immunity articulated in *Parden v. Terminal Ry. of Ala. Docks Dep't,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). However, that case is inapplicable here. The *College Savings Bank* Court distinguished "conditions attached to a State's receipt of federal funds"—such as Section 2000d–7—from unconstitutional "*Parden* style conditions,"[6] concluding that the two "are simply not analogous." *Id.* at 678 n. 2, 685, 119 S.Ct. 2219 (concluding that Congress' "exercise of its spending power, condition[ing] its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of the funds entails an agreement to the actions," are "fundamentally different" from the unconstitutional *Parden* conditions).

**\*49**  In sum, the Court concludes that Section 2000d–7 constitutes a valid and unambiguous waiver of states' Eleventh Amendment immunity. By accepting federal **Rehabilitation Act** funds, WMATA therefore waived its sovereign immunity from suit under Section 504 of the **Rehabilitation Act**.[7]

**B. The Rehabilitation Act Provides a Cause of Action for Retaliation**

**[2]**  As noted above, Defendant also contends that the **Rehabilitation Act** does not provide a **cause** of **action** for **retaliation**. Specifically, WMATA contends that, "in contrast to the ADA and Title VII, the **Rehabilitation Act** lacks a statutory provision prohibiting **retaliation** for engaging in 'statutorily protected activity.' " Def. Mot. to Dismiss at 16. However, the text of the **Rehabilitation Act** is clear that Congress did **create** a **cause** of **action** for **retaliation**. Specifically, the **Rehabilitation Act** incorporates the standards of the ADA, one of which—Section 503— specifically prohibits **retaliation**.

Section 504 of the **Rehabilitation Act** provides, in relevant part, that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a). Section 504 further clarifies that

> [t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12201–12204 and 12210), as such sections relate to employment.

*Id.* 794(d). Thus, Congress made it clear that, in determining whether an individual has been subjected to discrimination in violation of Section 504, one of the standards to be applied is Section 503 of the ADA.

Section 503 of the ADA, in turn, specifically prohibits **retaliation**. It provides that

> (a) **Retaliation**. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such

individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act.

42 U.S.C. § 12203(a).

Accordingly, by incorporating Section 503 of the ADA into the **Rehabilitation Act**, Congress included **retaliation** as a form of employment discrimination prohibited by the **Rehabilitation Act**.[8] *See Hiler v. Brown,* 177 F.3d 542, 545 (6th Cir.1999) ("the anti-**retaliation** provision of the **Rehabilitation Act**, **\*50** which incorporates by reference § 12203(a) of the ADA, provides in relevant part that 'no person shall discriminate against an individual because such individual has opposed any act or practice made unlawful by this Act' ") (quoting 42 U.S.C. § 12203(a)). The **Rehabilitation Act** therefore does include a **cause** of **action** for **retaliation**.

**C. Plaintiff's Complaint Sufficiently States a Claim for Retaliation Under the Rehabilitation Act**

**[3]**  To establish a prima facie case of **retaliation** under the **Rehabilitation Act**, a plaintiff must show that (1) he engaged in statutorily protected activity, (2) the employer was aware of the activity; (3) the plaintiff suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *McGill v. Munoz,* 203 F.3d 843, 845 (D.C.Cir.2000).

WMATA contends that Duncan has failed to establish that he engaged in statutorily protected activity. Alternatively, Defendant contends that Plaintiff has failed to establish a causal connection between any protected activity and his termination.

**1. Plaintiff Has Alleged That He Engaged in Protected Activity**

**[4]**  As addressed above, under the anti-**retaliation** provision of the **Rehabilitation Act**, statutorily protected activity includes "oppos[ing] any act or practice made unlawful by this Act or ... ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under this Act." 42 U.S.C. § 12203(a). The act or practice made unlawful by the **Rehabilitation Act** is

discrimination "solely by reason of ... his disability." 29 U.S.C. § 794(a).

Here, Plaintiff has sufficiently alleged that he engaged in this statutorily protected activity. Specifically, he alleges that he opposed disability discrimination made unlawful by both the **Rehabilitation Act** and the ADA when he filed suit, on December 22, 1994, for disability discrimination against WMATA, and subsequently defended against WMATA's appeal in the D.C. Circuit. *See Duncan I; Duncan v. WMATA,* 240 F.3d 1110.

It is irrelevant, for purposes of this Motion to Dismiss, that Plaintiff's previous suit alleged claims under the ADA, and did not allege a violation of the **Rehabilitation Act**. The "act or practice" Plaintiff opposed in his first ADA case is the same "act or practice" made unlawful by the **Rehabilitation Act**—namely, disability discrimination.

Accordingly, treating Plaintiff's allegations as true, as the Court must in considering a Motion to Dismiss, Plaintiff has sufficiently alleged that, by filing and prosecuting the 1994 ADA suit against WMATA, as well as defending against WMATA's appeal, he engaged in a statutorily protected activity under the **Rehabilitation Act**.

**2. Plaintiff Has Alleged a Causal Nexus Between His Protected Activity and Termination**

 **[5]**   Plaintiff has also sufficiently alleged a causal connection between this protected activity and his April 2001 termination from the AFC parts runner position.

As addressed above, in considering a Motion to Dismiss, the Court must accept as true all of the allegations set forth in the Complaint and draw all reasonable inferences in favor of Plaintiff.

Here, Plaintiff's Amended Complaint alleges that he successfully sued WMATA for disability discrimination, was reinstated to his AFC parts runner position, performed his job without incident or need for any accommodation for two-and-one-half years, defended the verdict of disability discrimination on appeal, and was subsequently terminated from that job one month after the jury verdict was reversed by the Court of Appeals. Accepting all of these allegations as true, Plaintiff has sufficiently alleged a causal nexus between his protected activity and termination.

Defendant contends that Plaintiff was terminated because he lost the appeal, and the basis for his reinstatement—the district court order and verdict—was no longer in effect. Defendant further contends that **\*51** Plaintiff himself has alleged that the D.C. Circuit ruling was the reason for his termination.

It is true that Plaintiff indicated, in his Amended Complaint, that WMATA advised him that he was terminated as a result of the D.C. Circuit ruling. However, in so doing, Plaintiff did not concede that Defendant's proffered reason for terminating him was the real reason for its actions. Moreover, Plaintiff need not prove, at this stage, that Defendant's proffered reason was pretextual. Instead, it is sufficient that Plaintiff alleged that his termination was **retaliatory** and that he was terminated despite performing his job without incident for two-and-one-half years.

In short, drawing all reasonable inferences in favor of Plaintiff and accepting his allegations as true, Plaintiff has sufficiently alleged a causal nexus between his protected activity and his April 2001 termination.

**IV. CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss is **denied**.

**All Citations**

214 F.R.D. 43

Footnotes

1    WMATA was **created** by a compact enacted by Congress and to which the Commonwealth of Virginia, the State of Maryland, and the District of Columbia are signatories ("WMATA Compact"). The D.C. Circuit has consistently recognized that "in signing the WMATA Compact, Virginia and Maryland each conferred its immunity upon WMATA, which therefore enjoys, to the same extent as each state, immunity from suit in federal court based on its performance of governmental functions." *Jones,* 205 F.3d at 432.

2    It is undisputed that WMATA receives federal **Rehabilitation Act** funds.

3    The **Rehabilitation Act** Amendments also specifically provide that states shall not be immune from suit for violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.,* the Age Discrimination Act of 1975, 42 U.S.C. § 6101, *et seq.,* Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.,* "or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." 42 U.S.C. § 2000d–7.

4    Defendants contend that "no weight should be given" to this discussion in *Lane* because the Supreme Court referred interchangeably to abrogation and waiver of sovereign immunity. Def. Reply to Opp'n to Mot. to Dismiss at 4–5. However, the *Lane* Court's conclusion that the **Rehabilitation Act** Amendments **created** an "unambiguous waiver of the States' Eleventh Amendment immunity" was a critical element of the Court's holding that the Amendments do not waive the federal government's sovereign immunity. *Lane,* 518 U.S. at 200, 116 S.Ct. 2092. Indeed, numerous courts have relied on the *Lane* Court's conclusion that the Amendments constitute an unambiguous waiver of states' Eleventh Amendment immunity. *See Nihiser v. Ohio Environmental Protection Agency,* 269 F.3d 626, 628 (6th Cir.2001); *Jim C. v. United States,* 235 F.3d 1079, 1082 (8th Cir.2000); *Litman v. George Mason University,* 186 F.3d 544, 554 (4th Cir.1999).

5    Defendants rely on the fact that the Eleventh and Eighth Circuits remanded this waiver question to the district courts. *See Garrett v. Univ. of Alabama,* 276 F.3d 1227, 1229 (11th Cir.2001); *Randolph v. Rodgers,* 253 F.3d 342, 348 (8th Cir.2001). In so doing, both courts of appeals concluded that the lower courts should consider whether the defendants had voluntarily waived their Eleventh Amendment immunity under Section 504 of the **Rehabilitation Act** by their receipt of federal funds conditioned upon such a waiver. These rulings do not advance WMATA's argument that it did not waive its sovereign immunity by accepting federal **Rehabilitation Act** funds. Instead, they merely indicate that the Eleventh and Eight Circuits properly deferred to the trial courts by remanding for consideration, in the first instance, an issue that had not been properly considered by the lower courts.

6    In *Parden,* the Supreme Court held that the state of Alabama had waived its sovereign immunity under the Federal Employers' Liability Act. In so doing, the *Parden* Court did not conclude that the state had expressed unequivocally that it waived its immunity or that Congress had unequivocally expressed its intention that if the state took certain action it would be deemed to have waived its immunity. Instead, the *Parden* Court concluded that Alabama's waiver of its Eleventh Amendment immunity was constructive or implied because of its "mere presence in a field subject to congressional regulation"—operation of a railroad in interstate commerce. *College Savings Bank,* 527 U.S. at 680, 119 S.Ct. 2219.

7    Defendants further contend that Section 2000d–7 does not **create** an enforceable waiver because (1) the purported waiver is ambiguous, and (2) there is an insufficient relationship between the purpose of the expenditures under which WMATA receives federal funding and the conditions imposed by the **Rehabilitation Act**. *See South Dakota v. Dole,* 483 U.S. 203, 207, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987).

First, for the reasons addressed above, the Court concludes that the waiver is unambiguous. Second, Congress' enactment of Section 2000d–7 is reasonably related to the federal interest in remedying employment discrimination against disabled persons. In *Conrail v. Darrone,* 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984), the Supreme Court held that a suit for employment discrimination under Section 504 "may be maintained even if petitioner receives no federal aid the primary purpose of which is to promote employment." *Id.* at 637, 104 S.Ct. 1248. In so doing, the Supreme Court recognized Congress' interest in prohibiting employment discrimination based on disability and the relationship between that interest and its grant of federal funding. *Id.* at 633 n. 13, 104 S.Ct. 1248 ("Congress chose to ban employment discrimination against the handicapped, not by all employers, but only by the Federal Government and recipients of federal contracts and grants. As to the latter, Congress apparently determined that it would require contractors and grantees to bear the costs of providing employment for the handicapped as a *quid pro quo* for the receipt of federal funds").

8    Defendant contends that discrimination is distinct from **retaliation**, and that **retaliation** is therefore not prohibited by the **Rehabilitation Act**. However, it is clear from the plain language of Section 504 of the **Rehabilitation Act** and Section 503 of the ADA that **retaliation** is a form of employment discrimination under the **Rehabilitation Act**.

**Duncan v. Washington Metropolitan Area Transit Authority, 214 F.R.D. 43 (2003)**

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

543 Fed.Appx. 141
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct.
of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals,
Third Circuit.

Beth E. KENDALL, Appellant,

v.

POSTMASTER GENERAL
OF the UNITED STATES.

No. 13–1229.
|
Submitted Pursuant to Third Circuit
LAR 34.1(a) Oct. 18, 2013.
|
Opinion filed: Oct. 18, 2013.

**Synopsis**

**Background:** United States Postal Service (USPS) employee brought action against Postmaster General, claiming that her discharge was in unlawful retaliation for her engaging in prior protected activity, in violation of the Rehabilitation Act. The United States District Court for the Western District of Pennsylvania, 913 F.Supp.2d 186, Mark R. Hornak, J., granted defendant summary judgment. Plaintiff appealed.

**Holdings:** The Court of Appeals held that:

[1] filing of a workers' compensation claim was not protected activity for purposes of retaliation claim under Rehabilitation Act, and

[2] fact that employee obtained default judgment on charge did not convert the charge to a protected activity.

Affirmed.

West Headnotes (2)

**[1]**   **Civil Rights** 🔑 Activities protected
**Postal Service** 🔑 Officers, clerks, and employees
**Public Employment** 🔑 Protected activities

United States Postal Service (USPS) employee's filing of an Equal Employment Opportunity Commission (EEOC) charge alleging only that she was retaliated against for filing a workers' compensation claim after she was injured while shoveling snow outside post office, was not "protected activity" under the Rehabilitation Act, and thus could not form the basis of a claim of retaliatory discharge; EEOC charge was facially invalid, as it did not allege discriminatory retaliation in violation of Rehabilitation Act. 5 U.S.C.A. § 8116(c); Rehabilitation Act of 1973, § 2, 29 U.S.C.A. § 701.

15 Cases that cite this headnote

**[2]**   **Civil Rights** 🔑 Activities protected
**Postal Service** 🔑 Officers, clerks, and employees
**Public Employment** 🔑 Protected activities

The fact that United States Postal Service (USPS) employee managed to prevail, on default grounds, on her Equal Employment Opportunity Commission (EEOC) charge alleging only that postal employee was retaliated against for filing a workers' compensation claim because United States Postal Service (USPS) failed to respond to the charge did not convert her conduct as to her workers' compensation claim into the protected activity required to bring a retaliation claim under the Rehabilitation Act, even though she was awarded default judgment on the claim; employee had received money damages solely because USPS neglected to comply with discovery. Rehabilitation Act of 1973, § 2, 29 U.S.C.A. § 701; 5 U.S.C.A. § 8116(c).

14 Cases that cite this headnote

**\*142**  On Appeal from the United States District Court for the Western District of Pennsylvania, (D.C.Civ. No. 10–cv–01209), District Judge: Honorable Mark R. Hornak.

**Attorneys and Law Firms**

Beth E. Kendall, New Wilmington, PA, pro se.

Alice L.A. Covington, Esq., United States Postal Service, Washington, DC, Paul D. Kovac, Esq., Office of United States Attorney, Pittsburgh, PA, for Postmaster General of the United States.

Before: FUENTES, VANASKIE and VAN ANTWERPEN, Circuit Judges.

OPINION

PER CURIAM.

Appellant Beth Kendall appeals from an order of the District Court granting summary judgment to her former employer, the Postmaster General of the U.S. Postal Service. For the reasons that follow, we will affirm.

Kendall was hired by the Postal Service in 2003 as a part-time flexible sales and service distribution associate at the Pulaski, Pennsylvania post office. On February 14, 2007, Kendall allegedly suffered a back injury while shoveling snow outside the front door of the post office. She filed a federal workers' compensation claim on February 16, 2007 for that injury, *see* 5 U.S.C. § 8116(c). Thereafter, Kendall experienced difficulties receiving pay for her absences, and in getting her Sick Leave, Annual Leave, and Family Medical Leave Act hours approved and/or reinstated. On December 31, 2007, Kendall filed a Charge of Discrimination with the Equal Employment Opportunity Commission, alleging that the Postal Service had engaged in "retaliation/discrimination/harassment" after she filed her "OWCP claim for my on the job injury while shoveling snow at the Pulaski office on 2–14–07." Importantly for our purposes here, Kendall did not check any of the boxes for "Type of Discrimination You Are Alleging (Race, Color, Religion, National Origin, Sex, Age, Retaliation, and Disability)" on the EEO Charge form. In addition, prior to submitting the Charge of Discrimination, Kendall also filled out two "Information for Pre—Complaint Counseling" forms, in which she explained that she was being retaliated against and harassed for filing a workers'

compensation claim. These submissions  **\*143**  also made no mention of discrimination or harassment on the basis of race, color, gender, national origin, age, or disability.

The EEOC allowed Kendall's claim to proceed upon the mistaken impression that her Charge of Discrimination alleged retaliation for prior EEO activity; in fact, Kendall's 2007 Charge relating to her workers' compensation claim was her first contact ever with the EEOC. As the case proceeded, the EEOC ordered the Postal Service to answer Kendall's discovery requests, and, when the Postal Service failed to comply, an Administrative Law Judge sanctioned the Postal Service by awarding Kendall a default judgment on her Charge of Discrimination. The Postal Service did not contest the sanction or seek to reopen the default judgment and apparently paid over $30,000 in damages to Kendall.

In the meantime, on October 2, 2009, Kendall submitted another pre-complaint grievance with the EEOC, alleging that the Postal Service had mistreated her in retaliation for her 2007 Charge of Discrimination. On December 11, 2009, Kendall was fired by the Postal Service for allegedly improperly opening mail addressed to the "Postmaster." After her termination, Kendall filed a second EEO Charge of Discrimination (on February 28, 2010), alleging that she was terminated in retaliation for her 2007 EEO case. Under "Type of Discrimination You Are Alleging," Kendall checked the "Retaliation" box.

After receiving a right to sue letter for the second Charge, Kendall filed suit in the United States District Court for the Western District of Pennsylvania, alleging that the Postal Service terminated her in unlawful retaliation for her prior protected activity, in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*, and the Rehabilitation Act, 29 U.S.C. 701, *et seq.* Kendall asserted that the protected activities which provided the basis for her claim of retaliation were her 2007 EEO Charge and her October, 2009 pre-complaint activity. Discovery ensued and depositions were taken. At the close of discovery, the Postmaster General moved for summary judgment, *see* Fed. R. Civ. Pro. 56(a). In a supplemental brief in support of the motion, the Postmaster General argued that Kendall had not engaged in statutorily protected activity. Kendall, in response to the motion for summary judgment, conceded that she did not have a valid Title VII retaliation claim because her claims did not originate with alleged discrimination on the basis of race, color, gender, national origin, age, or religion, but she argued that her **Rehabilitation Act retaliation** claim presented a triable issue in that it arose

out of her physical and mental disability. Kendall pointed to the extensive testimony during discovery regarding her various leaves of absence and whether she supplied the proper documentation regarding those requested leaves. The District Court heard oral argument on the motion for summary judgment and then granted it; judgment was entered on January 9, 2013. The court held that Kendall had not engaged in protected activity under the Rehabilitation Act because her 2007 EEO Charge was facially invalid. *See Kendall v. Donahoe,* 913 F.Supp.2d 186 (W.D.Pa.2012).

Kendall appeals. We have jurisdiction under 28 U.S.C. § 1291. We review a District Court's grant of summary judgment de novo. *See Alcoa, Inc. v. United States,* 509 F.3d 173, 175 (3d Cir.2007). Summary judgment is proper where the summary judgment record "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. Pro.* 56(a). The moving party has the initial burden of identifying evidence that shows an absence of a genuine issue of **\*144** material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In addition, we are required to view the facts in the light most favorable to the non-moving party, and make all reasonable inferences in her favor. *See Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994). But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

We will affirm. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(d), incorporates by reference the substantive standards of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12201–04, 12210. *See Shiring v. Runyon,* 90 F.3d 827, 830 (3d Cir.1996). Section 503(a) of the ADA prohibits retaliation, providing that: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Precedent interpreting the ADA is relevant to interpreting the Rehabilitation Act. *See Fogleman v. Mercy Hospital, Inc.,* 283 F.3d 561, 567 (3d Cir.2002) (addressing retaliation claim under ADA).

To make out a prima facie case of retaliation under the Rehabilitation Act, Kendall was required to show that (1) she

engaged in protected activity; (2) she suffered a materially adverse action; and (3) there is a causal connection between the adverse action and the protected activity. *See id.* The parties agree that this appeal turns on whether Kendall engaged in protected activity. Kendall argues in her Amended Informal Brief that her protected activity included: her 2007 EEO case; her 2007 EEO claims brought forth for counseling; and her 2009 EEO claims brought forth for counseling. *See* Amended Informal Brief, at 5. The District Court concluded that, when Kendall filed the 2007 Charge of Discrimination with the EEOC, alleging only that she had been retaliated against for filing a workers' compensation claim, she did not engage in protected activity. The 2007 EEO Charge was facially invalid, and therefore insufficient to constitute protected activity, because at no time did Kendall complain of discrimination or retaliation on the basis of disability or any other status protected by the federal antidiscrimination statutes. We agree. Although the filing of an EEO Charge is normally protected activity under the participation clause, 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual ... because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter"), under the circumstances presented here, it is not. Kendall's paperwork surrounding her 2007 EEO Charge uniformly shows that she believed she was retaliated against for filing a federal workers' compensation claim.

In *Slagle v. County of Clarion,* 435 F.3d 262 (3d Cir.2006), we addressed a Title VII retaliation claim involving two EEO charges. We held that the filing of an EEO Charge of Discrimination by itself was not protected activity under Title VII's anti-retaliation provision where that Charge did not facially allege a violation of Title VII's anti-discrimination provisions. The plaintiff had filed an EEO Charge against his employer alleging discrimination on the basis of his "whistleblowing, in violation of his civil rights;" it did not allege that he was subjected to discrimination on any basis protected by Title VII. The plaintiff then asserted in a second and subsequent **\*145** EEO Charge that he was eventually discharged from his position in retaliation for his filing of the first Charge. *Id.* at 263–64. In holding that the plaintiff had not engaged in protected activity, we explained that a plaintiff must allege in the first charge that the employer violated Title VII by discriminating against him on the basis of either race, color, religion, sex, or national origin, but a charge alleging "unspecified civil rights violations," was facially invalid and could not give rise to a subsequent Title VII claim of retaliation. *See id.* at 267–68.

[1]  *Slagle's* reasoning applies with equal force to this case. Under *Slagle,* Kendall's 2007 EEO case is considered protected activity only if it involves a facially valid complaint of discrimination or retaliation in violation of the ADA or Rehabilitation Act. These statutes prohibit discrimination and retaliation against qualified persons with disabilities, but they do not protect against retaliation on the basis of an individual's having filed a claim seeking benefits for an on-the-job injury. Just as an initial charge alleging unspecified civil rights violations cannot form the basis of a later Title VII retaliation claim, Kendall's initial charge based on filing a workers' compensation claim cannot form the basis of a later **Rehabilitation Act retaliation** claim. Kendall's 2007 EEO Charge could only have constituted protected activity under the Rehabilitation Act if she had made a facially valid complaint of discrimination on the basis of a disability or a physical or mental impairment, but she alleged only that she was discriminated against for filing a federal workers' compensation claim. *See Reynolds v. American National Red Cross,* 701 F.3d 143, 154 (4th Cir.2012) ("Filing a workers' compensation claim is not something that is covered by the ADA, but rather by retaliation provisions under state law."); *Leavitt v. SW & B Construction Co.,* 766 F.Supp.2d 263, 286 (D.Me.2011) (employee's filing of workers' compensation claim not protected activity under ADA). Here, there was no genuine dispute that the basis of Kendall's 2007 EEO Charge was not disability discrimination, because she did not identify any disability, and the allegations she made did not suggest that she was seeking accommodation for any disability.

[2]  In arguing that her 2007 EEO Charge was facially valid, Kendall notes that she received "a monetary award in regards to [her] 2007 EEO/EEOC Complaint." *See* Amended Informal Brief, at 20. The fact that Kendall was awarded a default judgment in her 2007 EEO case does not affect the protected activity analysis, because her 2007 Charge was not actually litigated or addressed on the merits. Kendall received money damages solely because the Postal Service neglected to comply with discovery. Kendall also argues that, in addition to the 2007 EEO Charge, she engaged in protected activity when she sought EEO counseling in the fall of 2009 prior to filing her second EEO Charge. This argument also does not save her claim because, as noted by the District Court, it suggests that "what starts out as wholly unprotected activity can somehow become protected activity via persistence in piling on layers of claimed retaliation, each nonetheless having its genesis in a facially invalid disability charge." *Kendall,* 913 F.Supp.2d at 196.

Last, we reject as meritless Kendall's assertions that the summary judgment record was incomplete, and that her membership in a class defined by the "McConnell" class action proves that her 2007 EEO Charge was facially valid, *see* Informal Brief, at 7–8, and we decline to consider any items that were not made a part of the district court record.

**\*146** For the foregoing reasons, we will affirm the order of the District Court granting summary judgment to the Postmaster General. Appellant's motion for permission to include documents not admitted in the district court record and motion for leave to file a supplemental appendix are denied. Appellant's second motion for an extension of time to file a reply brief and request to exceed the page limit for a reply brief are denied. Appellant's motion for additional time to supplement the appendix and motion to include documents not in the record are also denied.

### All Citations

543 Fed.Appx. 141, 28 A.D. Cases 1199

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 24-1439   Document: 33   Filed: 01/24/2025   Page: 41

Mohsin v. California Department of Water Resources, Not Reported in Fed. Rptr. (2024)

2024 WL 4144080
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

Syed MOHSIN, Plaintiff-Appellant,

v.

CALIFORNIA DEPARTMENT OF WATER RESOURCES; David Gutierrez, in his personal and official capacity as Chief of Division of Safety of Dams; Michael Waggoner, Defendants-Appellees.

No. 22-16597
|
Submitted September 9, 2024* San Francisco, California
|
FILED SEPTEMBER 11, 2024

Appeal from the United States District Court for the Eastern District of California, Troy L. Nunley, District Judge, Presiding, D.C. No. 2:13-cv-01236-TLN-JDP

**Attorneys and Law Firms**

George S. Wynns, San Francisco, CA, for Plaintiff-Appellant.

Lauren Elisabeth Powe Esquire, California Department of Justice, Office of the Attorney General, Oakland, CA, for Defendants-Appellees.

Before: GOULD and BUMATAY, Circuit Judges, and SEABRIGHT,** District Judge.

MEMORANDUM***

**\*1** Syed Mohsin, a former employee of the California Department of Water Resources (DWR), appeals a grant of summary judgment for DWR and David Gutierrez, who was Mohsin's supervisor at DWR (collectively, "Appellees"). Mohsin alleges (1) disability discrimination under Title I of the Americans with Disabilities Act (ADA), § 504 of the Rehabilitation Act, and § 12940(a) of California's Fair Employment and Housing Act (FEHA); (2) failure to reasonably accommodate a disability and engage in the interactive process under §§ 12940(m)–(n) of FEHA; (3) retaliation under Title I of the ADA and § 504 of the

Rehabilitation Act; (4) disability harassment under § 12940(j) of FEHA; and (5) violations of the Equal Protection Clause and the Due Process Clause under 42 U.S.C. § 1983. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

We review the district court's grant of summary judgment *de novo. DeFries v. Union Pac. R.R. Co.*, 104 F.4th 1091, 1104 (9th Cir. 2024). We view the evidence in the light most favorable to Mohsin, the non-moving party, *id.*, but "[i]t is not our task, or that of the district court, to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citation omitted). If Appellees, the moving parties, carry their burden of production by negating essential elements of Mohsin's claims, Mohsin must produce evidence to demonstrate that there is a genuine issue of material fact for each of his claims to survive summary judgment. *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

We conclude that Appellees have carried their burden of production as to each of Mohsin's claims but that Mohsin has not carried his burden of production to show any genuine issues of material fact. Counsel for Mohsin does not acknowledge his deficient briefing before the district court, and instead insists that the district court and DWR did not adequately examine the extensive record or anticipate Mohsin's counterarguments. But Mohsin misunderstands the nature of the adversarial process. "We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan*, 91 F.3d at 1279 (citation omitted); *see also Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). Mohsin's briefs do not set forth the elements of his claims, nor do Mohsin's briefs provide adequate record citations. Appellees are entitled to summary judgment on all of Mohsin's claims.[1]

1. Appellees are entitled to summary judgment on Mohsin's discrimination claims under the ADA, Rehabilitation Act, and FEHA because Mohsin has not established a genuine issue of material fact as to whether he was a "qualified individual with a disability," which is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1133 & n.6 (9th Cir. 2001) (quoting 42 U.S.C. § 12111(8)); *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004) ("The standards used to determine whether an act of discrimination violated the Rehabilitation Act are the same standards applied under the [ADA]."). Appellees

Mohsin v. California Department of Water Resources, Not Reported in Fed. Rptr. (2024)

Case: 24-1439    Document: 33    Filed: 01/24/2025    Page: 42

provided evidence that the only report concerning Mohsin's fitness for duty is Dr. Elliot Henderson's report, which states that Mohsin could **not** perform the essential functions of an Assistant Engineering Specialist. Mohsin offers no specific response other than taking issue with DWR's reliance on his defaulted admissions, which we may rely on in reviewing a grant of summary judgment. *Conlon v. United States*, 474 F.3d 616, 621 (9th Cir. 2007); *see also* Fed. R. Civ. P. 36(a)(3).

**\*2** 2. Similarly, DWR is entitled to summary judgment on Mohsin's FEHA claims that DWR did not provide him with reasonable accommodations or engage in the interactive process because Mohsin has not established a genuine issue of material fact as to whether he was a "qualified individual with a disability." *See Humphrey*, 239 F.3d at 1133; *Dep't of Fair Emp. & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 743 (9th Cir. 2011). Even if Mohsin were a qualified individual with a disability, he does not create a genuine issue of material fact as to whether DWR provided him with reasonable accommodations or engaged in the interactive process. First, Mohsin contends in his response to DWR's statement of undisputed facts that DWR required him to perform field inspections contrary to his accommodations, but the cited portion of Mohsin's affidavit does not support these facts. Mohsin's default admissions also include an admission that he was never required to act contrary to these four accommodations. Second, Mohsin disputes that DWR had privacy concerns warranting DWR's removal of information about some of his accommodations from his duty statement and placing this information in a separate file. But Mohsin has not created a genuine issue of material fact as to whether subjecting some of his accommodations to privacy requirements would mean that he was not provided those accommodations. Finally, Mohsin contends that he was not given accommodations for his Professional Engineer licensure exam, but does not contest DWR's statement that DWR had no obligation to provide such accommodations because DWR does not administer that exam.

3. Appellees are entitled to summary judgment on Mohsin's retaliation claims under the ADA and the Rehabilitation Act. Under both the ADA and the Rehabilitation Act, a retaliation claim is assessed under the well-established burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973) for Title VII claims. *T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 472–73 (9th Cir. 2015); *see also Coons*, 383 F.3d at 887. Appellees explained that Mohsin was terminated because he could not perform all of the essential functions of his position even with accommodations. Even assuming that the cited pages of Mohsin's affidavit could establish a prima facie case of retaliation, these pages do not create a genuine issue of material fact as to whether Appellees' valid reason for his termination was pretextual.

4. Appellees are entitled to summary judgment on Mohsin's FEHA disability harassment claim. Mohsin did not respond to Appellees' argument that his harassment claim should be dismissed because it is only based on managerial actions. *See Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1244 (9th Cir. 2013).

5. Gutierrez is entitled to summary judgment on Mohsin's equal protection and due process claims brought under Section 1983. Gutierrez contends that Mohsin received all of the process he was due, and that it was rational for Mohsin to be terminated because he could not perform the essential functions of his position. In response, Mohsin only cites conclusory statements that he was denied equal protection and due process. He thus fails to raise a genuine factual issue precluding summary judgment on those constitutional claims.

6. Also, the district court did not abuse its discretion under Fed. R. Civ. P. 56(e) in denying Mohsin an additional opportunity to demonstrate a genuine issue of material fact for each of his claims. Our precedent establishes that "[t]he efficient management of judicial business mandates that parties submit evidence responsibly," and that a district court has the discretion to exclude evidence when a party, as here, relies on evidence at the summary judgment stage "without citing to page and line numbers." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 775 & n.14 (9th Cir. 2002).

**AFFIRMED.**

**All Citations**

Not Reported in Fed. Rptr., 2024 WL 4144080

Footnotes

\*        The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

Case: 24-1439    Document: 33    Filed: 01/24/2025    Page: 43

**Mohsin v. California Department of Water Resources, Not Reported in Fed. Rptr. (2024)**

**   The Honorable J. Michael Seabright, United States District Judge for the District of Hawaii, sitting by designation.

***   This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

1   Because we dismiss Mohsin's claims on the merits, we do not address the parties' arguments regarding whether claims can be brought against Gutierrez under *Ex parte Young*, 209 U.S. 123 (1908) or Section 1983.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2021 A.D. Cases 289,510, 63 NDLR P 139

KeyCite Yellow Flag - Negative Treatment

Distinguished by Lewis v. MHM Health Professionals, LLC, E.D.Mo.,
September 30, 2023

854 Fed.Appx. 773 (Mem)
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1, generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S.Ct. of App. 8th Cir. Rule 32.1A.
United States Court of Appeals, Eighth Circuit.

Rodney Michael REYNOLDS

Plaintiff - Appellant

v.

LITTLE ROCK SCHOOL DISTRICT;

Michael Poore, In his official capacity
as Superintendent of the Little Rock
School District Defendants - Appellees

No. 20-1898
|
Submitted: April 15, 2021
|
Filed: August 2, 2021

Appeal from United States District Court for the Eastern
District of Arkansas - Central

**Attorneys and Law Firms**

Amelia Theresa Lafont, Law Office of A. Lafont, Little Rock,
AR, William B. Putman, Putman Law Office, Fayetteville,
AR, for Plaintiff-Appellant.

Christopher Heller, Friday & Eldredge, Little Rock, AR, for
Defendants-Appellees.

Before LOKEN, WOLLMAN, and STRAS, Circuit Judges.

[Unpublished]

PER CURIAM.

After choosing to retire rather than face termination, Rodney
Reynolds sued his former employer for **retaliation** under
the **Rehabilitation Act**. The question here is whether he
exhausted his administrative remedies. Like the district

court,[1] we conclude that he did not, so we affirm the dismissal
of his complaint.

I.

Reynolds, who served for many years as a special-education
teacher in the Little Rock School District, frequently
complained about the inequality in instruction and resources
for disabled students. Over time, the school district became
less receptive to his complaints.

With tensions growing, the school district decided to transfer
him to a new position. About a year before, Reynolds had
suffered a family tragedy that caused him to develop anxiety.
He protested the new assignment, which he feared would
worsen his anxiety, but to no avail.

As he feared, his anxiety became worse, to the point where
he had to take medical leave. After four months away, an
employee-relations specialist called him to ask whether he
would be returning to work. When he said "not at [this]
time," she allegedly gave him two choices: retire or be fired.
Reynolds chose retirement.

When Reynolds later sued under the **Rehabilitation Act**, his
theory was that the school district **retaliated** against him due
to his complaints about the treatment of disabled students.
See 29 U.S.C. § 794(a); Hill v. Walker, 737 F.3d 1209, 1218
(8th Cir. 2013) (recognizing that **retaliation** claims may be
brought under the **Rehabilitation Act**). The district court
dismissed the case because, among other reasons, he had
failed to exhaust his administrative remedies.

II.

Referenced in and attached to Reynolds's complaint is a
charge he filed with the Equal Employment Opportunity
Commission. In it, he did not mention **retaliation** or
the **Rehabilitation Act**. Nor did he **\*774** check the
"**retaliation**" box on the form, marking only the one for
"disability" discrimination instead. His sole claim was that
the school district's decision to assign him to a new position
reflected a failure to accommodate his disability. In short, the
theory he now raises is not the same one that was described
in his charge.

Assuming that Reynolds had to exhaust his administrative remedies in these circumstances,[2] his position is that he got close enough by mentioning the reassignment. Even liberally construing the charge, however, we cannot invent "a claim [that] simply was not made." *Sellers v. Deere & Co.*, 791 F.3d 938, 943 (8th Cir. 2015) (quotation marks omitted). Nor can we say that the claim he described—one for disability discrimination—is "like or reasonably related to" the one he now makes for **retaliation**. *Weatherly v. Ford Motor Co.*, 994 F.3d 940, 944–45 (8th Cir. 2021) (quotation marks omitted) ("We have long treated discrimination and **retaliation** claims as distinct for exhaustion purposes...."). The latter claim, in other words, remains unexhausted.

Still, Reynolds argues it was too early for the district court to dismiss the case based on an affirmative defense. Ordinarily, he would be right, but not when "the complaint itself establishes the defense." *Id.* at 943 (quotation marks omitted);

*see also Brooks v. Midwest Heart Grp.*, 655 F.3d 796, 801 (8th Cir. 2011) (affirming the Rule 12(b)(6) dismissal of age-discrimination and **retaliation** claims for failure to exhaust when there was no mention of them in the charge). Here, Reynolds's complaint discusses the charge, quotes it at length, and even attaches it as an exhibit. Under these circumstances, he has "pleaded himself out of court." *Weatherly*, 994 F.3d at 944.

III.

We accordingly affirm the judgment of the district court.

**All Citations**

854 Fed.Appx. 773 (Mem), 2021 A.D. Cases 289,510, 63 NDLR P 139

---

**Footnotes**

1    The Honorable Billy Roy Wilson, United States District Judge for the Eastern District of Arkansas.

2    The briefing does not address this threshold question. *See Gardner v. Morris*, 752 F.2d 1271, 1278 (8th Cir. 1985) (requiring exhaustion under the **Rehabilitation Act**). *But see Morgan v. U.S. Postal Serv.*, 798 F.2d 1162, 1164–65 (8th Cir. 1986) (per curiam) (explaining that exhaustion is not required for actions brought under section 504 "against employers receiving federal assistance"). Indeed, the school district mentioned during oral argument that there was "no debate" on this point, perhaps because Reynolds's position was that he *had* exhausted, not that it was *unnecessary* for him to do so. *See United States v. Adkins*, 636 F.3d 432, 434 n.3 (8th Cir. 2011) (explaining that arguments not raised by the appellant are waived). Given that the parties have litigated this case as if Reynolds needed to exhaust, we will proceed under that assumption too.

---

**End of Document**                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case: 24-1439    Document: 33    Filed: 01/24/2025    Page: 46

Schneider v. Mahopac Central School District/Board of..., Not Reported in Fed....

2022 WL 1316211

2022 WL 1316211
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Jonathan M. SCHNEIDER, Plaintiff-Appellant,

v.

MAHOPAC CENTRAL SCHOOL
DISTRICT/BOARD OF EDUCATION;
Anthony DiCarlo, Dr. Gregory Stowell, Jeffrey
Finton, Dr. Bennett Pallant, Leslie Mancuso,
Michael Mongon, David Furfaro, Lawrence
Keene, Ray McDonough, Lucy Massafra, Marc
O'Connor, Adam Savino and Michael Simone,
all in their official and individual capacity as
Board Members, contracted professionals,
and employees of the Mahopac Central
School District, Defendants-Appellees.[*][−]

21-2201
|
May 3, 2022

Appeal from a judgment of the United States District Court
for the Southern District of New York (Seibel, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Jonathan M. Schneider, pro
se, Mahopac, NY.

FOR DEFENDANTS-APPELLEES: Deanna L. Collins,
Silverman & Associates, White Plains, NY.

PRESENT: ROSEMARY S. POOLER, RICHARD C.
WESLEY, SUSAN L. CARNEY, Circuit Judges.

**SUMMARY ORDER**

**\*1** *Pro se* Plaintiff-Appellant Jonathan Schneider sued
Defendants-Appellees Mahopac Central School District and
numerous District employees (together, "MCSD"), alleging

that MCSD retaliated against him by ending certain services
it had been providing to his disabled son, J.S., after Schneider
voiced concerns about MCSD's provision of those services.
The second amended complaint, operative here, asserts
retaliation claims under the First Amendment and Section 504
of the Rehabilitation Act of 1973 (pursuant to 42 U.S.C. §
1983), a conspiracy claim under 18 U.S.C. § 241, and a claim
under the Individuals with Disabilities Act ("IDEA"), *see*
20 U.S.C. § 1400 *et seq.* The district court granted MCSD's
motion to dismiss, first finding that it lacked jurisdiction over
Schneider's IDEA and retaliation claims because Schneider
had not exhausted his administrative remedies under the
IDEA. It further found that Schneider did not state a plausible
claim under 18 U.S.C. § 241 because, as a private citizen,
he cannot prosecute a criminal action in federal court.
Schneider now appeals. We assume the parties' familiarity
with the underlying facts, procedural history, and arguments
on appeal, to which we refer only as necessary to explain our
decision to affirm.

We review *de novo* a district court's grant of a motion to
dismiss, *see Bellin v. Zucker*, 6 F.4th 463, 472 (2d Cir. 2021),
including a district court's dismissal of a complaint for failure
to exhaust administrative remedies, *see Nichols v. Prudential
Ins. Co. of Am.*, 406 F.3d 98, 105 (2d Cir. 2005). In doing so,
we "liberally construe pleadings and briefs submitted by pro
se litigants, reading such submissions to raise the strongest
arguments they suggest." *McLeod v. Jewish Guild for the
Blind*, 864 F.3d 154, 156 (2d Cir. 2017).

As an initial matter, Schneider does not challenge the
dismissal of his conspiracy claim or his claim that expressly
alleges an IDEA violation, and we therefore do not consider
those claims. *See LoSacco v. City of Middletown*, 71 F.3d 88,
92–93 (2d Cir. 1995) (treating claims abandoned on appeal as
waived). We also decline to consider arguments and claims
that Schneider raises for the first time on appeal, including
that MCSD's alleged retaliatory actions violated the Equal
Protection Clause and the Americans with Disabilities Act.
*See Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994)
("[I]t is a well-established general rule that an appellate court
will not consider an issue raised for the first time on appeal.").

Schneider's primary argument properly before us on appeal
is that the district court erred in determining that he was
required to exhaust his First Amendment and Rehabilitation
Act retaliation claims using the IDEA's procedures before
filing suit in federal court. The IDEA "requires States to
provide disabled children with a free appropriate public

Case: 24-1439    Document: 33    Filed: 01/24/2025    Page: 47

Schneider v. Mahopac Central School District/Board of..., Not Reported in Fed....

2022 WL 1316211

education." *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 9 (1993) (internal quotation marks omitted). Schools must create an individualized education program ("IEP") for qualifying students to ensure they receive a free appropriate public education ("FAPE"). *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012).

**\*2** Parents who wish to challenge an IEP in court must first exhaust their administrative remedies pursuant to the IDEA's procedures. To begin, they must file a "due process complaint" with the school district setting forth the IEP's alleged deficiencies. *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014) (citing 20 U.S.C. § 1415(b)(7)(A)). If the alleged deficiencies are not corrected within 30 days, the school district and parents have an "impartial due process hearing" before an Impartial Hearing Officer ("IHO"). *Id.*; 20 U.S.C. § 1415(f)(1). The IHO's decision may be reviewed by a State Review Officer ("SRO"), who may modify or affirm the IHO's order; then, either party may bring a lawsuit in federal court for review of the SRO's decision. *Id.*; *see also R.E.*, 694 F.3d at 175.

In addition to applying to IDEA claims, these exhaustion requirements apply to claims brought under the Americans with Disabilities Act, Rehabilitation Act, and other federal laws protecting the rights of children with disabilities to the extent that those claims "seek[ ] relief that is also available under" the IDEA. 20 U.S.C. § 1415(*l*). "A plaintiff's failure to exhaust administrative remedies under the IDEA deprives a court of subject matter jurisdiction." *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 483 (2d Cir. 2002).

Schneider does not claim that he followed the IDEA's procedures with respect to his First Amendment and Rehabilitation Act retaliation claims. Instead, he argues that the claims do not seek relief that is available under the IDEA, and, accordingly, he was not required to exhaust them before bringing suit. In *Fry v. Napoleon Community Schools*, 137 S. Ct. 743 (2017), the Supreme Court clarified the framework for determining whether a claim that is not expressly brought under the IDEA is nonetheless subject to the IDEA's exhaustion requirements. The Court explained that "[Section] 1415(*l*)'s exhaustion rule hinges on whether a lawsuit seeks relief for the denial of a free appropriate public education. If a lawsuit charges such a denial, the plaintiff cannot escape § 1415(*l*) merely by bringing her suit under a statute other than the IDEA." *Id.* at 754. Under this standard, we must "examine whether a plaintiff's complaint

—the principal instrument by which she describes her case—seeks relief for the denial of an appropriate education," scrutinizing the complaint's "substance, not surface." *Id.* at 755.

On review of Schneider's complaint, we conclude that it seeks relief that is available under the IDEA, and therefore that his First Amendment and Rehabilitation Act retaliation claims were subject to the IDEA's exhaustion requirements. Schneider's complaint expressly asserts a claim for a violation of the IDEA. It details his and his wife's efforts over many months to persuade MCSD to understand "how to best accommodate JS's safety *and educational* needs." App'x at 83 (emphasis added); *see also id.* at 86 (explaining how Schneider "reiterat[ed] the disapproval the Plaintiff felt and the failures that MCSD continued to display in handling JS's medical and educational needs"). Schneider complains of MCSD's failure to deliver on "accommodations agreed to in the IEP," *id.* at 87, including "the removal of services JS and Plaintiff were accustomed to and were provided by JS's IEP," and which were removed "without written notice and ... without consent of a committee meeting," *id.* at 71. He seeks relief stemming from MCSD's termination of accommodations it had agreed to in J.S.'s IEP—relief that is inherently related to whether J.S. was receiving a FAPE, and that a hearing officer would be able to provide.

**\*3** This analysis is confirmed by considering the two hypothetical questions that the Supreme Court posed in *Fry*: (1) "[C]ould the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library?"; and (2) "[C]ould an *adult* at the school ... have pressed essentially the same grievance?" 137 S. Ct. at 756. When the answer to these questions is no, the Court instructed, "then the complaint probably does concern a FAPE, even if it does not explicitly say so." *Id.*

We agree with the district court that in this case, the answer to *Fry*'s hypotheticals is "no." *See Schneider v. Mahopac Cent. Sch. Dist.*, No. 20-CV-709 (CS), 2021 WL 3887913, at *5 (S.D.N.Y. Aug. 31, 2021). The allegedly retaliatory actions that Schneider focuses on began at a Committee on Special Education meeting and, as noted above, concern the removal of certain aspects of J.S.'s IEP (primarily, provision of a trained, one-on-one aide). Because Schneider's retaliation claims seek relief for changes to J.S.'s IEP—an accommodation that is available only to school children—he would be unable to bring the same claim against a

Case: 24-1439    Document: 33    Filed: 01/24/2025    Page: 48

Schneider v. Mahopac Central School District/Board of..., Not Reported in Fed....

2022 WL 1316211

different public facility, and an adult at the school could not have pressed essentially the same grievance. Thus, Schneider was required to exhaust administrative remedies under the IDEA before bringing his First Amendment and Rehabilitation Act retaliation claims in federal court, and the district court correctly dismissed his retaliation claims for lack of jurisdiction. *See, e.g.*, *S.D. by A.D. v. Haddon Heights Bd. of Educ.*, 722 F. App'x 119, 126–27 (3d Cir. 2018) (finding that retaliation claims were subject to IDEA exhaustion procedures). That J.S.'s safety was also an important interest addressed by the accommodations provided through the IEP

does not remove Schneider's claims from the proper ambit of the IDEA's exhaustion requirements.

We have considered Schneider's remaining arguments and find in them no basis for reversal. Accordingly, we **AFFIRM** the judgment of the district court.

**All Citations**

Not Reported in Fed. Rptr., 2022 WL 1316211

Footnotes

\*        The Clerk of Court is directed to amend the case caption to conform to the above.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

519 Fed.Appx. 176
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S.Ct. of Appeals 4th Cir. Rule 32.1.
United States Court of Appeals, Fourth Circuit.

Toni C. WORKS, Plaintiff–Appellant,

v.

Carolyn W. COLVIN, Acting
Commissioner, U.S. Social Security
Administration, Defendant–Appellee.

No. 12–1288
|
Argued: Feb. 21, 2013.
|
Decided: April 24, 2013.

**Synopsis**
**Background:** Former Social Security Administration (SSA)
employee filed employment discrimination suit against her
former employer for disability discrimination, failure to
accommodate, and retaliation, claiming it illegally terminated
her from probationary program for disabled individuals
attempting to reenter the workforce. The United States
District Court for the District of Maryland, Richard D.
Bennett, J., 2011 WL 1197655, granted summary judgment
for SSA and, 2012 WL 380116, denied reconsideration.
Employee appealed.

**Holdings:** The Court of Appeals held that:

[1] employee did not waive request for discovery before
ruling on summary judgment motion;

[2] district court's denial of employee's discovery request was
abuse of discretion; and

[3] employee was not barred from conducting discovery in
federal court because she had chance to do so at administrative
level.

Vacated and remanded.

West Headnotes (3)

[1]    **Summary Judgment**  👉  **Continuance**

District court's denial of Social Security
Administration (SSA) employee's request for
discovery in Rehabilitation Act case prior to
ruling on SSA's summary judgment motion
was abuse of discretion; employee set forth
in affidavit specific, discoverable evidence that
could enable her to defeat SSA's motion,
including testimony from SSA employees and
managers who did not testify at administrative
hearing and were never deposed. Rehabilitation
Act of 1973, § 2 et seq., 29 U.S.C.A. § 701
et seq.; Fed.Rules Civ.Proc. Rule 56(d), 28
U.S.C.A.

14 Cases that cite this headnote

[2]    **Summary Judgment**  👉  **Continuance**

Social Security Administration (SSA) employee
did not waive her request for discovery before
ruling on agency's motion for summary judgment
in her employment discrimination case by failing
to include request in argument section of her
summary judgment opposition brief; employee
squarely presented summary judgment affidavit
to district court, which was sufficient. Fed.Rules
Civ.Proc. Rule 56(d), 28 U.S.C.A.

20 Cases that cite this headnote

[3]    **Federal Civil Procedure**  👉  **Actions in which
remedy is available**

Social Security Administration (SSA) employee
was not barred from conducting discovery in her
employment discrimination suit in federal court
because she had chance to do so at administrative
level.

2 Cases that cite this headnote

27 A.D. Cases 1450, 47 NDLR P 29

**\*176** Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, District Judge. (1:10–cv–01284–RDB).

**Attorneys and Law Firms**

ARGUED: Richard Talbot Seymour, Law Offices of Richard T. Seymour, PLLC, Washington, D.C., for Appellant. Jason Daniel Medinger, Office of the United States Attorney, Baltimore, Maryland, for Appellee. ON BRIEF: **\*177** Gary M. Gilbert, Sarah E. Diouf, Stephanie M. Herrera, Daniel A. Katz, The Law Offices of Gary M. Gilbert & Associates, P.C., Silver Spring, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

Before TRAXLER, Chief Judge, and KEENAN and THACKER, Circuit Judges.

Vacated and remanded by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

**Opinion**

PER CURIAM:

Appellant Toni C. Works filed this employment discrimination suit under the Rehabilitation Act, 29 U.S.C. §§ 701 et seq., against the Social Security Administration (the "SSA" or "Appellee"). She claims the SSA illegally terminated her from a probationary program for disabled individuals attempting to re-enter the workforce. This case was first heard by an administrative law judge ("ALJ"), who decided in the SSA's favor, and that decision was upheld by the Equal Employment Opportunity Commission ("EEOC").

Works then filed a separate suit in the district court. There, in her response to the SSA's Motion to Dismiss, or Alternatively, for Summary Judgment, Works requested discovery pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, as she had not yet had the opportunity to conduct discovery at the district court level. The district court granted the SSA's motion—deeming it a summary judgment motion—without passing on Works's discovery request. Indeed, the court addressed the request for the first time in its subsequent denial of Works's Motion for Reconsideration.

**[1]** We hold the district court's denial of Works's discovery request was an abuse of discretion. Works set forth in an affidavit specific, discoverable evidence that could enable her to defeat the SSA's motion, including testimony from SSA employees and managers who did not testify at the administrative hearing and were never deposed.

Therefore, we vacate the district court's orders granting summary judgment to the SSA and denying Works's Motion for Reconsideration, and remand with instructions to grant Works's request for discovery.

I.

A.

Works is a disabled veteran of the United States Navy. She suffered a service-related accident in 1985, which resulted in a permanently disabling seizure disorder. She was honorably discharged from the Navy in 1989. From November 1989 to September 1991, she worked as a biomedical equipment technician. The next year, Works stopped working as a result of her seizure disorder. She applied for and received 100% disability compensation from the SSA, which found her to be totally disabled. After that, Works applied for and received 100% disability benefits from the Department of Veterans Affairs ("VA"), which likewise found that she was completely disabled. From 1992 to 2002, Works did not have gainful employment.

On August 26, 2002, Works began working at the SSA as a probationary employee, "which meant she could work for the SSA on a trial basis for one year without having to discontinue her disability benefits to demonstrate whether she could successfully perform the job and be retained on a permanent basis." **\*178** Works v. Astrue, Civ. Action No. 10–1284, 2011 WL 1197655, at \*1 (D.Md. Mar. 29, 2011) (J.A. 2156);[1] see also 20 C.F.R. § 404.1592(a). Works worked as a "Management Assistant" in the Office of Management Operations ("OMO"). As a Management Assistant, she was required to, *inter alia,* conduct workflow studies; maintain, gather, and compile informational records such as organizational and workflow charts; make routine calculations, such as staff hours and workload figures; and develop, evaluate, and advise on methods and procedures for providing administrative support systems to organizations. Her supervisors at OMO were

Marjorie Warner, Branch Manager, and William Johnson–Bey, Deputy Branch Manager. OMO project managers for whom she worked were Noma Carter and Jane Leidig.

The quality of Works's performance during her tenure with OMO is disputed. On March 19, 2003, Johnson–Bey met with Works to discuss her mid-year performance review. There is no written record; however, in a later memo given to Works, Warner recounted the results of that review. That memo, which was given to Works on June 23, 2003, stated that at the mid-year point in March, Works's performance was "basically satisfactory, although not exceptional." J.A. 1701 (the "June 2003 Memo"). The June 2003 Memo continued, "The only negative addressed at [the time of the March mid-year review] was your handling of a budget data entry project assigned to you by the Deputy Branch Manager, Bill Johnson–Bey, which you had difficulty understanding and needed an excessive amount of direction to complete." *Id.*

The June 2003 Memo also mentioned another project: developing a database to capture course registration data. The memo states, "[W]e asked that you prepare and schedule a briefing to demonstrate the database. Your co-worker, shortly thereafter, demonstrated the database, in passing, and you interjected a few items.... [F]eedback since, has indicated that your co-worker has done most of the work on this project." J.A. 1701.[2]

Also during the first half of her probationary period, Works experienced some health problems. From late December 2002 to January 2003, Works's doctors at the VA began trying new medications for her seizure disorder. In January, she suffered a seizure at home and as a result, could not work for nearly two weeks. Works had not accrued enough sick leave to cover her absence from work, so she requested advanced sick leave from Warner, who approved the request. On February 13, 2003, she suffered another seizure—this time at work—and requested another week's worth of leave, which was approved. Works missed other days in February, both related and unrelated to her disability. Her leave was approved for all of these days. *See* J.A. 1683–85 (leave slips with approval signatures of Johnson–Bey and Warner).[3]

**\*179**  During the spring and summer of 2003, Works took additional leave for issues unrelated to her seizures, but all of this leave was also approved by either Warner or Johnson–Bey. *See* J.A. 1686–97 (leave slips, all approved by Johnson–Bey or Warner). Works also suffered a seizure on July 15, after

which she missed work from July 15–17, and this leave was approved by Warner. *See id.* at 1694.

The June 2003 Memo also outlined performance deficiencies during a portion of the second half of Works's probationary period, from March to June 2003. It stated, "Since [the March mid-year] progress review, several other issues have come to light, which indicate a need for improvement and which may impact our decision to retain you beyond your probationary period." J.A. 1701. These issues were as follows:

- Works was resistant to join the typing pool for two hours a day, which would have extended the opportunity to work overtime on the weekends, because Works did not want to work overtime;

- Works wrongly notified Warner that she could be released from having her work reviewed because her mentor was pleased with her work;

- Works took too long completing a project assigned by Johnson–Bey. The June 2003 Memo stated, "Much direction is needed to get a completed assignment from you. [Y]ou don't seem to comprehend the instructions given."

*Id.* at 1701–02. The June 2003 Memo went on to discuss Works's character traits as follows:

Dependability—[I]n addition to your assignments not being completed timely, you are frequently absent, unaware of your leave balances, and you seem to have trouble comprehending the rules for requesting and using leave.... Your documentation is usually vague and doesn't usually justify total incapacitation for duty. In addition, you frequently make incorrect entries on the sign-in sheets and you continue to make these incorrect entries even after instruction is provided.... Your sign-in and out times frequently disagree and your leave slips often do not agree with the entries in the leave column on the sign-in sheets[.] You also sign out or annotate your leave on other employees' lines, or you sign out, out of order.

Application of Time—[Y]ou are often out of the area. You have been seen in the halls and at other employees' desks for long periods of time and you appear to be having personal conversations rather than work-related conversations. You have often been observed on the phone for long periods of time, as well, having personal conversations. You have also been observed sleeping during meetings, most recently at the CMA Townhall meeting.

*Id.* at 1702. The June 2003 Memo concluded with the statement, "Thus far your performance and conduct has considerably deteriorated since the last performance discussion and immediate and substantial improvement is needed." *Id.*

On July 18, 2003, after a three-day absence due to a seizure, Works went to Warner and asked if she would be retained beyond her probationary period. Warner told her, if she had to make the decision that day, Works would not be retained "because she hadn't made any effort to improve in any of the areas [ ] pointed out [in the June 2003 Memo]." J.A. 1121. After that conversation, Works approached the EEOC on July 22, 2003, about a possible **\*180** claim. Then, she asked to meet with Warner and Johnson–Bey in order to show them that she was capable of performing the job. They agreed.

Warner set up the meeting for the morning of July 25. Works attended with a banker's box full of documents in order to justify the work she had been doing; however, upon closer examination, the box was full of the same two pages copied over and over again. When questioned about this, Works "began crying and talking about personal problems she was having with her home life." J.A. 1122.

That afternoon, Works was given a notice of proposed removal, with an effective date of two weeks later, August 8, 2003, about two weeks short of the end of her one-year probationary period. The termination notice gave the following reasons for termination:

- "repeated failure to complete assignments as expected," which can "largely be attributed to your excessive amount of time that you have been seen away from your workstation, socializing with others, aimlessly walking the halls and spending an inordinate amount of time on the telephone for personal reasons"; and

- "[I]t is essential that our employees report to work regularly and perform their duties. Your actions are unacceptable because when you have been out on unscheduled leave, management cannot depend on you being available to accept and perform the assignments expected."

J.A.2003.

The following Monday, July 28, 2003, Works returned to work and asked Warner for reassignment to a different position. Warner referred Works to Joan Stewart–Stevens, Assistant Associate Commissioner for Management

Operations Support, who called a meeting with "all the managers ... and team leaders," including Warner; Johnson–Bey; Leidig; Kathy Fox, Center Director; Denise Kendall, Deputy Center Director; Yvonne Curry, Team Leader; and Phyllis Branch–McCoy.[4] J.A. 1404–05 (the "Stewart–Stevens Meeting"). Stewart–Stevens asked all those present, "[S]hould this employee be terminated[?]" and "each one of them said yes." *Id.* at 1405. It is undisputed that Noma Carter, one of Works's project managers, was not present at the meeting. Works alleges Carter was deliberately excluded; however, Warner testified at the administrative hearing that Carter simply "didn't show up," and that they obtained Carter's approval for termination the following day. *Id.* at 1137.[5]

B.

After Works's contact with the EEOC on July 22, 2003, the administrative investigation began. Works requested a hearing before an ALJ, and the administrative hearing took place during four days in **\*181** August 2006. The ALJ ruled in favor of the SSA, finding the SSA granted the only accommodation Works ever sought (taking leave), Works had consistent performance problems, and those problems, rather than discrimination or retaliation, resulted in her termination. Works appealed to the EEOC, and on February 19, 2010, the EEOC affirmed the ALJ's decision.

Works then filed the instant action in the District of Maryland on May 21, 2010. On August 26, 2010, the SSA filed a Motion to Dismiss, or Alternatively, for Summary Judgment. Because this motion was styled as a motion to dismiss, by operation of the District of Maryland's Local Rules, a scheduling order could not be entered—and discovery could not commence—until the motion was resolved. *See* D. Md. Local Rule 104(4) ("Unless otherwise ordered by the Court or agreed upon by the parties, the conference of counsel required by Fed.R.Civ.P. 26(f) need not take place and discovery shall not commence and disclosures need not be made until a scheduling order is entered.").[6] Works responded to the motion on February 8, 2011, and requested time to conduct discovery pursuant to Rule 56(f) (actually 56(d)).[7] Her attorney attached an affidavit specifically explaining the discovery needed at the district court level and the relevance thereof. *See* J.A. 1872–73 (the "Affidavit").

The district court granted the SSA's motion on March 29, 2011, without mentioning Works's discovery request. Works then filed a Motion for Reconsideration on April 12, 2011. In that motion, she noted that the district court "remained silent" on her discovery request, and she argued, "[t]he Court should have permitted [her] to conduct discovery before ruling for Defendant based on an incomplete factual record." J.A. 2173. The district court denied the Motion for Reconsideration on February 3, 2012. As to the discovery request, the district court stated only the following:

> [T]his Court does not need to expressly explain its reasoning when granting an order that is inconsistent with the requested relief. As the Fourth Circuit explained in *Malbon v. Pa. Millers Mut. Ins. Co.,* "the determination of a motion need not always be expressed but may be implied by the entry of an order inconsistent with the granting of the relief sought." 663 [636] F.2d 936, 939 n. 8 (4th Cir.1980).

*Id.* at 2274. Works then timely noted this appeal.[8]

## II.

Rule 56(d) "require[s] that 'summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.' " *Nguyen v. CNA Corp.,* 44 F.3d 234, 242 (4th Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *see also* **\*182** *Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 961 (4th Cir.1996) (Generally, "summary judgment is appropriate only after adequate time for discovery." (internal quotation marks omitted)). The rule "is intended as a safeguard against a premature grant of summary judgment ... thus, [courts] should construe the rule liberally[.]" *King v. Cooke,* 26 F.3d 720, 726 (7th Cir.1994); *see also Harrods Ltd. v. Sixty Internet Domain Names,* 302 F.3d 214, 245 n. 18 (4th Cir.2002) (discussing with approval sources in favor of applying the rule liberally). Such requests should be denied, however, "if the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Ingle v. Yelton,* 439 F.3d 191, 195 (4th Cir.2006) (internal quotation marks omitted). We should not reverse a denial of a Rule 56(d) request unless we find "a clear abuse of discretion or, unless there is a real possibility the party was prejudiced by the denial of the extension." *Id.* (internal quotation marks omitted).

## III.

### A.

[2]    In her response to the SSA's Motion to Dismiss or, Alternatively, for Summary Judgment, Works asked the district court for a chance to conduct discovery, as she had not yet had the opportunity to conduct discovery at all in the district court. She explained that she needed documents and deposition testimony on "a range of disputed issues," including:

- "Defendant's characterization of Plaintiff's work on certain projects";

- "Defendant's knowledge that Ms. Works' medical condition affected her work performance such that she required a reasonable accommodation";

- "Defendant's argument that Ms. Works was not a qualified individual with a disability because she could not perform the essential functions of the job of a Probationary Management Assistant"; and

- "The specific performance deficiencies Defendant asserts justify its termination of Ms. Works."

J.A. 1835. The Affidavit, which was attached to the response, explained that the following evidence needed to be collected:

- "instructions provided to Ms. Works";

- "correspondence or the details of conversations regarding Ms. Works' performance on those projects";

- "the final version of any projects assigned to Ms. Works, as well as drafts of Mr. Works' work on those projects";

- "medical documentation from the Nurse's Suite ... as it may give some indication of how Ms. Works' seizure disorder affected her work performance and what symptoms she experienced and exhibited in the workplace";

- deposition testimony of Dionne (Harrison) Miller, Blas Rueda–Caraballo, Renee M. Moore, John Wargo, and/or Shawnte Jordan, "all of whom were Probationary Management Assistants either during Ms. Works' tenure at the Agency or shortly after her termination. In addition to being comparators, these employees possess critical

information regarding the essential functions of the Management Assistant position";

• deposition testimony of Warner, Johnson–Bey, Yvonne Curry, and Noma Carter, "all of whom supervised Ms. Works on the various projects at issue and can provide insight into her work performance";

• deposition testimony of Denise Kendall, Janet Edrington, Kathy Fox, Ethel Maker, "and/or any other Agency Employee Relations staff who were **\*183** involved in drafting or have knowledge regarding the Termination of Career Conditional Appointment issued to Ms. Works on July 25, 2003."

*Id.* at 1872–73.[9]

The SSA contends, "because the record in this case makes clear that [Works] had every opportunity to discover all pertinent facts necessary to her opposition," and because she "failed to demonstrate how any more discovery was 'essential' to her opposition," the district court's tacit denial of her request for discovery should be affirmed. Appellee's Br. 27. In support of its position, the SSA references the numerous exhibits and pages of testimony from the ALJ hearing available to Works and notes that she had ample time at the administrative level to collect evidence relevant to her case.

**B.**

*Rule 56(d)* provides,

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

*Fed.R.Civ.P. 56(d).* This court has long held that parties wishing to obtain additional discovery must "specifically allege why the information sought would have been sufficient to create a genuine issue of material fact such that it would have defeated summary judgment." *Strag v. Bd. of Trustees, 55 F.3d 943, 954 (4th Cir.1995); see also Nguyen v. CNA Corp., 44 F.3d 234, 242 (4th Cir.1995)* (affirming district court's denial of *Rule 56(d)* request because Nguyen did not

"focus our attention on an affidavit presented to the district court that particularly specifies legitimate needs for further discovery").

In *Ingle v. Yelton,* this court held that the district court abused its discretion in denying Ingle's *Rule 56(d)* motion in the context of a motion to dismiss, or in the alternative for summary judgment. *See 439 F.3d 191, 194 (4th Cir.2006).* Ingle asked for extra time in order to seek videotape evidence of a police chase and shooting that left her son dead. This evidence was to be used to support Ingle's theory of the case with regard to qualified immunity: that the window in her son's car was closed when officers took shots at him. The defendant's theory, in contrast, was that Ingle's son was aiming his shotgun at the officers through an open car window. *See id.* at 195.

We held the district court abused its discretion in failing to grant this request for discovery because it "seemingly ignored" an earlier request for such evidence, the necessary information was "possessed only by her opponent," and "there was a sufficient basis to believe such videos existed, and [ ] this evidence represented Ingle's principal opportunity to contradict the assertion that the district court found dispositive[.]" *Id.* at 196–97.

Like *Ingle,* here, Works set forth in the Affidavit legitimate requests for discovery that could very well "contradict the assertion[s] **\*184** made by the SSA to the district court, as explained *infra.* Furthermore, because certain key players in this matter—employees of the SSA—did not testify at the administrative hearing and were not deposed at that level or at the district court level, there is a "real possibility that [Works] was prejudiced by the denial" of her discovery request. *Ingle, 439 F.3d at 195* (internal quotation marks omitted).

**C.**

Works brought three claims under the Rehabilitation Act, *29 U.S.C. §§ 701, et seq.*[10] First, she claimed that the SSA discriminated against her based upon her disability (the "Discrimination Claim"); second, she claimed that the SSA failed to accommodate her disability (the "Accommodation Claim"); and third, she claimed that the SSA retaliated against her for requesting leave and reassignment (the "Retaliation Claim"). As explained below, her specific requests for discovery bear on the disputed nature of each of these claims.

1.

The Discrimination Claim

The analysis used to determine whether an employer has discriminated under the Rehabilitation Act is the same as the analysis under the Americans with Disabilities Act ("ADA"). *See Hooven–Lewis v. Caldera, 249 F.3d 259, 268 (4th Cir.2001).* To establish a claim of discrimination under the ADA, a plaintiff must show she (1) was a qualified individual with a disability; (2) was discharged; (3) was fulfilling her employer's legitimate expectations at the time of discharge; and (4) "the circumstances of h[er] discharge raise a reasonable inference of unlawful discrimination." *Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir.2012)* (internal quotation marks omitted). The SSA claims discovery on this claim would be futile. We disagree.

The parties have agreed that Works has a disability: the seizure disorder. As to the other aspect of the first element, in determining whether a plaintiff is a qualified individual, a court should ask whether she is someone who, "with or without reasonable accommodation, can perform the essential functions of the employment position[.]" *42 U.S.C. § 12111(8).* A court must decide (1) whether she could perform "functions that bear more than a marginal relationship to the job at issue," and (2) if not, whether "any reasonable accommodation by the employer would enable [her] to perform those functions." *Tyndall v. Nat'l Educ. Ctrs., 31 F.3d 209, 213 (4th Cir.1994)* (internal quotation marks omitted) (alteration in original).

The Affidavit asks for deposition testimony of other Probationary Management Assistants who were employed either during Ms. Works's tenure at the SSA or shortly after her termination. We agree with the Affidavit that "these employees possess critical information regarding the essential functions of the Management Assistant position," J.A. 1873, which bears on whether Works was a qualified individual.

Furthermore, there is certainly some dispute as to Works's performance, the employer's expectations, and the level of instruction and training provided to Works. *See* **\*185** *King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir.2003)* (considering whether employee was performing to employer's "legitimate expectations" is key to establishing a prima facie discrimination claim). Indeed, one of Works's arguments to the district court was "[w]hen she tried her best to complete

projects successfully, she was often prevented from doing so because she was never given clear instructions or specific guidance as to what was expected of her." J.A. 1817. Noma Carter also testified, "I don't think" Works "received adequate training." *Id.* at 1458.

To further investigate this claim, Works's attorney explains that he would like to ascertain the instructions provided to Works for each of the projects the SSA claims she failed to complete; correspondence or the details of conversations regarding Works's performance on those projects; and the final version of any projects assigned to Works, as well as drafts of her work on those projects. We find these requests to be essential to Works's claim.

Likewise, as to whether the circumstances of Works's discharge raise a reasonable inference of unlawful discrimination, the record needs more development through relevant discovery, as stressed in Works's 56(d) request and the Affidavit. Notably, Johnson–Bey—one of Works's supervisors who approved her leave time, assigned projects to her, oversaw those projects, and ultimately participated in the decision to uphold her termination—was never deposed and did not testify at the administrative hearing.[11] His testimony is crucial on the issue of Works's job performance and her termination. Also relevant to this inquiry is the testimony of SSA managers Kathy Fox and Denise Kendall, who were allegedly present at the Stewart–Stevens Meeting. These individuals also did not testify at the administrative hearing and were not deposed.

On this point, the SSA argues "the only perspective that is legally relevant is that of the Plaintiff's supervisors, Warner and Johnson–Bey," and the court should not sit as a " 'super-personnel department' " that second-guesses management decisions. Appellee's Br. 22–23 (citing *King, 328 F.3d at 149;* quoting *Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir.2005)*). The SSA also cites *King* for the proposition that "the alleged opinions of [plaintiff's] coworkers as to the quality of [plaintiff's] work are close to irrelevant." *329 F.3d at 149* (internal quotation marks omitted).

These admonishments do not apply given that here, the SSA has admitted, "Warner solicited feedback from coworkers who worked with [Works] and she was informed that [Works's] work performance was not acceptable and that [Works] had trouble completing virtually every assignment ... given her." J.A. 32 (internal quotation marks omitted). Therefore,

27 A.D. Cases 1450, 47 NDLR P 29

Warner's perception was undoubtedly based on the opinions and perceptions of Works's coworkers, which would make deposing those coworkers all the more crucial. Furthermore, because the SSA has acknowledged that Johnson–Bey's perspective is "legally relevant," Works should be able to depose him. Appellee's Br. 22.

**\*186** 2.

The Accommodation Claim

In order to prevail on a reasonable accommodation claim under the Rehabilitation Act, Works would have to prove (1) she was an individual with a disability in the name of the ADA; (2) the SSA had notice of her disability; (3) with reasonable accommodation, Works could perform the essential functions of the position; and (4) the SSA refused to make such accommodation. *See Rhoads v. FDIC,* 257 F.3d 373, 387 n. 11 (4th Cir.2001). *See also* 34 C.F.R. § 104.12(a); 45 C.F.R. § 84.12(a) ("A recipient [of federal financial assistance] shall make reasonable accommodation to the known physical ... limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program[.]") (internal quotation marks and alterations omitted).

On this claim, the only accommodation Works sought was medical leave to deal with her recurring seizures. As stated above, there is evidence yet to be discovered regarding whether Works could perform the essential functions of the position, even considering her approved leave. This issue should be fleshed out with testimony from those individuals whom Stewart–Stevens said participated in the Stewart–Stevens Meeting and who were not deposed at the administrative or district court level—i.e., Warner, Johnson–Bey, Leidig, Kendall, Curry, Fox, and Branch–McCoy. Indeed, the Affidavit requests evidence from "any ... agency Employee Relations staff who were involved in drafting or have knowledge regarding the Termination of Career Conditional Appointment issued to Ms. Works on July 25, 2003." J.A. 1873. Works's project managers could also speak to their perceptions of her performance at the time she was taking large amounts of leave related to her disability. Medical documentation from the Nurse's Suite—also requested in the Affidavit—could likewise shed light on if and how Works's seizure disorder affected her work performance.

3.

The Retaliation Claim

In order to prevail on a **Rehabilitation Act retaliation** claim, Works must prove (1) she engaged in a protected activity; (2) the SSA took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the adverse action. *Hooven–Lewis,* 249 F.3d at 272–74. If the SSA proffers a legitimate, non-retaliatory reason for the decision, then Works must rebut the reason as pretextual. *See Brockman v. Snow,* 217 Fed.Appx. 201, 207, 208 n. 6 (4th Cir.2007) (Rehabilitation Act); *Yashenko v. Harrah's N.C. Casino Co.,* 446 F.3d 541, 551 (4th Cir.2006) (Title VII) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800–06, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

Again, discovery could aid Works on this claim. What is most pertinent to this analysis is the termination notice given to Works on July 25, 2003. That notice provided only two reasons for termination: (1) failure to complete assignments as expected, which was "largely ... attributed to your excessive amount of time that you have been seen away from your workstation, socializing with others, aimlessly walking the halls and spending an inordinate amount of time on the telephone for personal reasons"; and (2) being absent from work on unscheduled leave.[12] J.A.2003.

Further discovery could help Works to develop her theory of pretext. To demonstrate **\*187** pretext, a plaintiff must provide the court with admissible evidence that a defendant's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." *Mereish v. Walker,* 359 F.3d 330, 336 (4th Cir.2004) (internal quotation marks omitted); *see also EEOC v. Sears Roebuck & Co.,* 243 F.3d 846, 853 (4th Cir.2001) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext." (internal quotation marks omitted)). First, Warner explicitly stated, "[t]he sole determination to fire [Works] was based on performance," J.A. 1303, despite the different reasons set forth in the termination notice, such as socializing and talking on the phone.[13] Other potential evidence could support the pretext argument, including information about Noma Carter's exclusion from the Stewart–Stevens Meeting and the idea that the SSA terminated Works for taking leave,

while nonetheless admitting, "all of [Works's] leave requests were granted by the [SSA]." Appellee's Br. 32 n. 3.

D.

**[3]**  Finally, we reject SSA's argument that because Works had a chance to conduct discovery at the administrative level, she is somehow barred from doing so in federal court. *Amirmokri v. Abraham,* 266 Fed.Appx. 274 (4th Cir.2008), the case cited by the SSA, is inapposite. In that case, "the central participants were all deposed." *Id.* at 282 (internal quotation marks omitted). Here, as mentioned *supra,* many of the crucial decision-makers were not deposed. Moreover, the Supreme Court has recognized a federal employee's right to a trial anew following an adverse administrative decision. *See Chandler v. Roudebush,* 425 U.S. 840, 848, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976) (holding, in the Title VII context, "Congress intended to accord federal employees the same right to a trial de novo [following administrative proceedings] as is enjoyed by private-sector employees[.]");[14] *Massingill v. Nicholson,* 496 F.3d 382, 384 (5th Cir.2007) ("Once a federal-sector employee exhausts her administrative remedies, she can file two types of civil actions: a suit to enforce the final administrative disposition, in which the court examines only whether the agency has complied with the disposition, or *de novo* review of the disposition." (emphasis added) (footnote

omitted)). *See also Boandl v. Geithner,* 752 F.Supp.2d 540, 557 (E.D.Pa.2010) ("While we are entitled to review the administrative record, we are also entitled to consider new evidence presented by the parties, and are **\*188** not bound in any way by the determinations made by the [administrative review boards] below." (alteration in original)).[15]

Further, while we are cognizant that parties who are "dilatory in pursuing discovery" should not find solace in Rule 56(d), *Harrods,* 302 F.3d at 246, we have been presented with no evidence tending to show that Works was dilatory in this manner, and the district court certainly made no such finding in its implicit denial of Works's request for discovery.

IV.

For the foregoing reasons, the district court's orders granting summary judgment to the SSA and denying Works's motion for reconsideration are vacated, and this matter is remanded for the district court to grant Works's request for discovery.

*VACATED AND REMANDED.*

**All Citations**

519 Fed.Appx. 176, 27 A.D. Cases 1450, 47 NDLR P 29

## Footnotes

1   Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

2   In April 2003, Works's supervisors asked for a presentation on the progress of this project, which she was completing with co-worker George Frank. At the administrative hearing, Warner testified, "[I]t was obvious that this was George's work and not Toni's" and said that Frank told her Works "was more of a hindrance than helping." J.A. 1103. Frank, who also testified at the administrative hearing, agreed that Works was "taking credit for the majority of th[e] project from [him]." *Id.* at 1031. But he also testified that Works had "good work ethics," was "a diligent worker," "applied herself," and her work was "good quality." *Id.* at 1017, 1018, 1020.

3   One of these leave slips for February 24 and 25 was approved by Warner "pending documentation." J.A. 1685. The record shows that a medical excuse was provided for February 25, but it is unclear whether Warner retracted her contingent approval.

4   Branch–McCoy's position is not clear from the administrative record.

5   Carter testified at the administrative hearing that she was not invited to the Stewart–Stevens Meeting, but that her opinion would be that Works should not have been fired. *See* J.A. 1481. She also stated at the hearing that after Works was notified of her termination, she was "never" asked about Works's performance. *Id.* at 1470. This is contrary to Warner's testimony: "Bill Johnson–Bey and I met with [Carter] separately the next day [after Works was terminated] and asked her what her opinion was of Toni's performance ... and we asked her if she was in agreement with [the termination]." *Id.* at

Case: 24-1439    Document: 33    Filed: 01/24/2025    Page: 58

27 A.D. Cases 1450, 47 NDLR P 29

1137. Warner stated that Carter responded, "[Works] would function probably better in a job that was more structured and had more supervision" and that Works should not be retained. *Id.* at 1137–38.

6    The operation of this rule can be seen in *Young v. United States,* which states, "Because of the dispositive nature of the [motion to dismiss or for summary judgment], it is not appropriate at this time to enter a scheduling order that would permit discovery to commence." No. RDB–08–3349, 2009 WL 2170068, at *1 n. 1 (D.Md. Jul. 20, 2009).

7    Rule 56(f) was recodified as Rule 56(d) on December 1, 2010, without significant substantive change. In her response to the SSA's motion in February 2011, Works inadvertently cited to Rule 56(f). For ease of reference, we herein refer to the appropriate rule as "Rule 56(d)," regardless of which version was in effect at the particular time.

8    The district court also dismissed a number of Works's claims for failure to exhaust administrative remedies. Works does not appeal the judgment as to those claims.

9    We reject the SSA's contention that Works waived this request for discovery because it was "not included in the argument section of her summary judgment opposition brief" but rather, "tucked ... in the middle of her recitation of the legal standards." Appellee's Br. 26. Works squarely presented a Rule 56(d) affidavit to the district court, which this court has deemed sufficient. *See Harrods,* 302 F.3d at 244 ("If a party believes that more discovery is necessary for it to demonstrate a genuine issue of material fact, the proper course is to file a Rule 56 ( [d] ) affidavit[.]").

10    Section 504 of the Rehabilitation Act provides, "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a).

11    The parties submit that because Johnson–Bey had retired from the SSA at the time of the administrative hearing, he was not subject to EEOC's subpoena power. Thus, the only opportunity Works had to cross-examine Johnson–Bey was at her unemployment insurance appeal hearing, during which she was not represented by an attorney. There, the focus was on Works's unemployment benefits and, specifically, whether Works had engaged in misconduct disqualifying her from receipt of unemployment benefits. And, the cross-examination was necessarily limited by the scope of direct examination.

12    At oral argument, the SSA's counsel stated that the banker's box incident itself could be grounds for dismissal. However, management did not mention this incident in its termination notice.

13    Even if these were reasons for her termination, there is disputed evidence regarding the time Works spent socializing and on personal phone calls, something that could also be developed with further discovery. For example, Warner testified at the administrative hearing, "[Trevette] [H]ord, Yvonne Curry, Phyllis Branch, No[ma] Carter, [and] Bill Johnson–Bey ... all told me that [Works] was on the phone and having a personal conversation." J.A. 1116. However, one of these individuals has declared, "[Works] did not engage in extended conversations on the telephone. All employees are allowed to make and receive telephone calls, and Ms. Works never abused the privilege bestowed upon us." *Id.* at 1976 (Hord affidavit). Furthermore, Carter claimed Works "did not socialize at the workplace any more than other employees." *Id.* at 1978 (Carter affidavit).

14    Although *Chandler* addressed Title VII, the Rehabilitation Act and the ADA share "standards used to determine whether" a violation has occurred, 29 U.S.C. § 794(d), and the ADA, in turn, follows the "powers, remedies and procedures" set forth in Title VII, 42 U.S.C. § 12117(a). *See also Spencer v. Ashcroft,* 147 Fed.Appx. 373, 375 (4th Cir.2005).

15    This court has also held in an unpublished opinion, "[T] he existence of an administrative investigation and record" does not "automatically preclude[ ] the need for discovery." *Radi v. Sebelius,* 434 Fed.Appx. 177, 179 (4th Cir.2011).

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.